ACCEPTED
05-15-01292-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 7:38:11 PM
LISA MATZ
CLERK

05-15-01292-CV

**No.** _____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 7:38:11 PM
LISA MATZ
Clerk

**In the**
**FIFTH COURT OF APPEALS OF TEXAS**

*In re Giant Eagle, Inc.*,

*Relator.*

**On Petition for Writ of Mandamus from the**
**68th Judicial District Court of Dallas County, Texas**

**INDEX TO THE RECORD**

TO THE HONORABLE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS:

Pursuant to Texas Rule of Appellate Procedure 52.7, Relator Giant Eagle, Inc. submits this Index to the Record containing (1) a certified or sworn copy of every document that is material to Relator's claim for relieve and that was filed in any underlying proceeding; and (2) a properly authenticated transcript of any relevant testimony from any underlying proceeding, including any exhibits offered in evidence.

A0964036.1

| TAB | DESCRIPTION | DATE | RECORD PAGE NUMBER |
|---|---|---|---|
| A. | First Amended Petition | 6/25/2015 | R001 |
| B. | Defendant Giant Eagle's Motion to Dismiss for Collateral Estoppel or In the Alternative, Pursuant to the Governing Forum Selection Clause | 7/15/2015 | R030 |
| C. | Plaintiff's Response to Defendant Giant Eagle, Inc.'s Motion to Dismiss | 8/14/2015 | R179 |
| D. | Plaintiff's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss | 8/17/2015 | R226 |
| E. | Defendant Giant Eagle's Reply in Support of Its Motion to Dismiss for Collateral Estoppel or, In the Alternative, Pursuant to the Governing Forum Selection Cause | 8/19/2015 | R286 |
| F. | PowerPoint Presentation used by Plaintiff's Counsel at Argument on 8/24/2015 – Response to Giant Eagle's Motion to Dismiss | 8/24/2015 | R305 |
| G. | Plaintiff's Letter Brief to Court providing cases in which Texas courts construed the "arise out of" to exclude the particular claims at issue | 8/25/2015 | R325 |
| H. | Giant Eagle's Letter Brief in Support of Motion to Dismiss | 8/25/2015 | R369 |
| I. | Giant Eagle's Motion to Strike Plaintiff's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss | 8/25/2015 | R462 |
| J. | Order Denying Defendant Giant Eagle Inc.'s Motion to Dismiss for Collateral Estoppel or, In the Alternative, Pursuant to the Governing Forum Selection Clause | 9/22/2015 | R509 |
| K. | Giant Eagle's Motion to Stay All Proceedings, Aside from Outstanding Motions, Pending Resolution of Its Forthcoming Petition for Writ of Mandamus & Proposed Order | 10/6/2015 | R510 |
| L. | Plaintiff's Response to Defendant Giant Eagle, Inc.'s Motion to Stay All Proceedings | 10/14/2015 | R516 |

A0964036.1

| | | | |
|---|---|---|---|
| M. | Order Denying Defendant Giant Eagle, Inc.'s Motion to Stay All Proceedings, Aside from Outstanding Motions, Pending Resolution of Its Forthcoming Petition for Writ of Mandamus | 10/19/2015 | R534 |
| N. | Defendants Giant Eagle Inc., David Shapira, and Daniel Shapira's Response to Plaintiff's [Proposed] Level Three Scheduling Order | 9/18/2015 | R535 |

Dated: October 23, 2015        Respectfully Submitted:


*/s/  Orrin L. Harrison III*
Orrin L. Harrison III
  Bar No. 09130700
  oharrison@ghetrial.com
Hayley Ellison
  Bar No. 24074175
  hellison@ghetrial.com
GRUBER HURST ELROD
  JOHANSEN HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Telephone:  214-855-6828
Fax:  214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com
Jonathan Marcus
  jmarcus@marcus-shapira.com
Daniel J. Stuart
  stuart@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone:  412-338-5200
Fax: 412-391-8758

***Counsel for Giant Eagle, Inc., David Shapira, and Daniel Shapira***

A0964036.1

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Record was served upon the attorneys of record in the above cause in accordance with the Texas Rules of Appellate Procedure, on October 23, 2015.

*/s/ Hayley Ellison*
Hayley Ellison

# Tab A

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | 68TH JUDICIAL DISTRICT |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ADS ALLIANCE DATA SYSTEMS, INC. | § § § § § § § | DALLAS COUNTY |
| Defendants. | | |

## FIRST AMENDED PETITION

Plaintiff Dickson Perry, derivatively on behalf of Excentus Corporation ("Excentus"), files his First Amended Petition against Excentus Corporation, Brandon Logsdon ("Logsdon"), Jim Mills ("Mills"), Giant Eagle, Inc. ("Giant Eagle"), Daniel Shapira, David Shapira, Auto-Gas Systems, Inc. ("Auto-Gas"), Randy Nicholson, and Alliance Data Systems, Inc. ("ADS") (collectively, "Defendants"), and hereby alleges as follows:

### I. SUMMARY

Dickson Perry, founder and shareholder of Excentus Corporation, sues derivatively on behalf of Excentus certain of its officers, directors, and shareholders for breach of fiduciary duty, fraud, and civil conspiracy. His claims stem from the decision by a cadre of self-dealing directors and officers, and the shareholders that aided and abetted them, to pay themselves off at Excentus' expense.

Mr. Perry founded Excentus in 1996, and over the next eighteen years he led the company as its Chairman and CEO from nothing to becoming a 200-employee, multi-million dollar growth company and the undisputed leader in the fuel and grocery cross-marketing programs market. But on the evening of July 31, 2014, Defendants – a cadre of shareholders holding a little over half of Excentus' shares, along with the Defendant officers and directors – met in secret to oust Mr. Perry from Excentus. The following day, these officers and directors removed Mr. Perry from every position he held in Excentus without providing a reason; they fired his daughter and two of his friends from the company without cause; they cut off his cellular phone; they cut-off his health benefits; they towed his car from the company lot; and they even cancelled his national fuel rewards card, a program which Mr. Perry had himself envisioned and created.

Defendants immediately began reaping the fruits of their illicit conspiracy. With Mr. Perry out of the way, the officer Defendants paid themselves hundreds of thousands of dollars in bonus payments that Mr. Perry had previously opposed; the director Defendants usurped a corporate opportunity of Excentus that Mr. Perry had painstakingly negotiated; and the shareholder Defendants settled litigation that Excentus, with Mr. Perry at the helm, had initiated against them with a near total capitulation of Excentus' rights and interests. With stunning impunity, and while sitting as directors of the company, Nicholson, Logsdon, and the Shapiras even caused Excentus to pay the Shapiras hundreds of thousands of dollars and to award Giant Eagle rights it never had.

Mr. Perry brings this derivative action on behalf of a company that represents his life's work. He seeks to restore to it the right to conduct its business without the subversion of self-serving directors, officers, and shareholders who are intent on plundering Excentus' valuable

assets for their own respective exploitation. Accordingly, he requests an award of damages to Excentus for the harms committed by Defendants, as well as injunctive relief to stop and remove the corrupt cadre presently running, and potentially ruining, Excentus.

## II. DISCOVERY

1. Discovery shall be conducted pursuant to Texas Rule of Civil Procedure 190.4.

## III. PARTIES

2. Plaintiff Dickson Perry is an individual who is a citizen of the State of Texas. Excentus Corporation is a corporation organized and existing under the laws of the State of Texas. Its principal place of business is in Dallas County, Texas.

3. Defendant Brandon Logsdon is an individual who is a citizen of the State of Texas. He may be served with process at his principal place of business, located at 14241 Dallas Parkway, Suite 1200, Dallas, TX 75254. Defendant Logsdon was served with process and has appeared in this action.

4. Defendant Jim Mills is an individual who is a citizen of the State of Texas. He may be served with process at his principal place of business, located at 14241 Dallas Parkway, Suite 1200, Dallas, TX 75254. Defendant Mills was served with process and has appeared in this action.

5. Defendant Randy Nicholson is an individual who is a citizen of the State of Texas. He may be served with process at his principal place of business, either at 1202 Estates Drive, Suite D, Abilene, TX 79602 or at 14241 Dallas Parkway, Suite 1200, Dallas, TX 75254. Defendant Nicholson was served with process and has appeared in this action.

R003

6.	Defendant Giant Eagle, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania that conducts business in the State of Texas.  It may be served with process at its principal place of business, located at 101 Kappa Drive, Pittsburgh, PA 15238. Defendant Giant Eagle, Inc. may also be served with process by serving the Texas Secretary of State.  Defendant Giant Eagle was served with process and has appeared in this action.

7.	Defendant David Shapira is a citizen and resident of the State of Pennsylvania, a Director of Excentus Corporation, and Executive Chairman of the Board of Directors of Giant Eagle.  David Shapira can be served c/o Giant Eagle, Inc., 101 Kappa Drive, Pittsburgh, PA 15238.  Defendant David Shapira may also be served with process by serving the Texas Secretary of State.

8.	Defendant Daniel Shapira is a citizen and resident of the State of Pennsylvania, a Director of Excentus Corporation, and an owner and/or director of Giant Eagle.  Daniel Shapira can be served at Marcus & Shapira LLP, One Oxford Center, 35th Floor, 301 Grant Street, Pittsburgh, PA 15219.  Defendant Daniel Shapira may also be served with process by serving the Texas Secretary of State.

9.	Defendant Auto-Gas Systems, Inc. ("Auto-Gas") is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business in Abilene, Texas.  It may be served with process by serving its Texas registered agent Jeffrey F. Upp, 1202 Estates Drive, Suite D, Abilene, TX 79602.  Defendant Auto-Gas was served with process and has appeared in this action.

10.	Defendant ADS Alliance Data Systems, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Gahanna, Ohio, that conducts business in the State of Texas.  It may be served with process by serving its Texas

registered agent CT Corporation System, 1999 Bryan St. Suite 900, Dallas, TX 75201. Defendant ADS Alliance Data Systems, Inc. was served with process and has appeared in this action.

11.     Defendant Excentus Corporation ("Excentus") is a corporation organized and existing under the laws of the State of Texas.  It may be served with process at its principal place of business, 14241 Dallas Parkway, Suite 1200, Dallas, TX 75254.

## IV. JURISDICTION & VENUE

12.     This Court has jurisdiction over this matter.  Defendants either reside in the State of Texas or transact substantial business in the State of Texas.

13.     Defendants David and Daniel Shapira transact substantial business in the State of Texas.  Since approximately 2004 and 2006, Defendants David and Daniel Shapira, respectively, have served on the Board of Directors of Excentus, a Texas corporation.  As Board members, the Shapiras have participated, both in person and via telephone, in over a dozen Excentus Board and shareholder meetings and actions, and on information and belief continue to participate in such meetings and actions today.  Further, the Shapiras have participated in the Board and shareholder meetings in which the tortious acts described below took place, including without limitation the July 31, 2014 shareholder meeting and the Board meeting held on the following day.  They have also executed written consents and agreements pertaining to the business of Excentus and executed pursuant to Texas law.  They have regularly communicated – in person, via telephone, and via email – with Excentus representatives in Texas about matters pertaining to Excentus.  The Shapiras have also, on behalf of Giant Eagle, negotiated agreements with Texas entities and persons both in person in Texas as well as via email and telephone.  Additionally, the

Shapiras have been members of committees formed by Excentus, including without limitation its Compensation Committee and Audit Committee, and as members have also participated in the meetings of such committees.

14. Venue is proper in Dallas County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.

## V. FACTS

### A. Mr. Perry Founds and Positions Excentus as an Undisputed Market Leader.

15. Mr. Perry founded Dallas-based Excentus Corporation ("Excentus") in 1996. He served as its first and sole investor, shareholder, and employee. For its first eight years of existence, Mr. Perry funded the company almost exclusively with his own resources.

16. Mr. Perry envisioned Excentus creating integrated fuel marketing programs that would allow consumers to save money on gas and at the same time allow retailers, such as grocery and convenience stores, to increase their sales. He foresaw Excentus providing the technology, services, and programs to grocery and convenience stores necessary to implement these fuel cross-marketing programs. His vision included Excentus eventually launching a national coalition of fuel cross-marketing programs for its customers and consumers. To accomplish these goals, Excentus would have to develop the next generation of proprietary pay-at-the-pump technology and related innovations so that consumers could receive loyalty rewards in the form of fuel discounts when making certain purchases and then redeem their rewards to save money when buying gas.

17. Mr. Perry's vision has become a valuable reality for Excentus. In the eighteen years since its founding, Excentus has led the creation and growth of fuel cross-marketing

programs from a novel idea into a multi-billion dollar market. Today, nearly all major oil companies – including Shell, Exxon Mobil, and Chevron – and grocery stores – such as Safeway, Tom Thumb, Kroger, and Wal-Mart – are leveraging Excentus' technology, services, trade secrets, patents and programs. Excentus has helped these companies promote billions of dollars in sales by providing the technology and services necessary to create customer loyalty programs. These programs have also saved consumers over $2 billion dollars on fuel to date.

18. Mr. Perry made Excentus his life's work. He put every ounce of his entrepreneurial skills, experience, efforts and passion into its creation and success. Through his hard work and leadership, Excentus has acquired an extensive patent portfolio; developed valuable patent-protected technology and marketing programs; hired and nurtured over 200 employees; achieved double-digit, compounded annual revenue growth; negotiated a multitude of major commercial agreements with important market players; accumulated tens of millions dollars of cash to support its current business operations and future growth plans; and yielded tens of millions dollars in shareholder equity.

**B.** **Excentus Brings on Investors.**

19. Due to its growing success, Excentus began drawing the attention of various businesses in the fuel rewards market. Beginning in 2004, Mr. Perry and the other shareholders agreed to take on certain companies who had expressed an interest in becoming strategic investors in Excentus. In addition to their capital contributions, these particular companies entered into commercial agreements with, and promised to bring strategic business opportunities to, Excentus. These investors included Defendants Giant Eagle, ADS, and Auto-Gas.

### 1. *Giant Eagle*

20.     Pittsburgh-based Giant Eagle was the first such major investor.  Giant Eagle operates over 400 grocery stores and convenience stores, primarily in Pennsylvania and Ohio.  It is one of the forty largest privately-held and family operated companies in the U.S., and it is owned by, among others, Defendants David and Daniel Shapira.  David Shapira has served as its principal executive leader for many years, while Daniel Shapira has provided legal representation to Giant Eagle through his law firm, Marcus & Shapira.

21.      Prior to learning about Excentus, Giant Eagle had unsuccessfully sought to create its own fuel and grocery cross-marketing program to generate loyalty from, and increased sales to, its customers.  But Giant Eagle lacked the technology and know-how to integrate and implement such a program on its own.  It therefore recognized the value of Excentus, which at the time was already assisting other grocery store companies develop, integrate, and launch fuel cross-marketing programs.  As a result, in 2002 Giant Eagle and Excentus entered into a Software License and General Services Agreement. Pursuant to that agreement, Excentus provided Giant Eagle with the technology, services and know-how necessary for Giant Eagle to launch its fuel cross-marketing program "fuelperks!"  Without Excentus' technology and services, Giant Eagle could not have launched or maintained fuelperks!, which became one of its most profitable programs.

22.     Two years later, after launching their fuelperks! program and after listening to Mr. Perry describe his vision for Excentus, Defendant David Shapira asked to invest in Excentus, but that investment came with certain strings.  First, Giant Eagle wanted a controlling interest in Excentus.  Second, Giant Eagle wanted the right to consent to various major corporate decisions

of Excentus. Third, Giant Eagle wanted to reconstitute Excentus' Board so as to ensure Giant Eagle could fill it with its own representatives.

23. Mr. Perry did not agree to the first two demands. Instead, Excentus allowed Giant Eagle to have consent rights only for a limited time. Giant Eagle nonetheless invested. With respect to the third, Excentus allowed Giant Eagle to appoint a single director. And one year after Giant Eagle's initial investment, Giant Eagle again offered to purchase additional shares. Mr. Perry and the other shareholders agreed to let Giant Eagle appoint a second board members to Excentus' board of directors in exchange for that second investment. Giant Eagle appointed David and Daniel Shapira.

### 2. ADS

24. Excentus' success also attracted the interest of ADS, a leader in credit card and payment processing services for retailers. In particular, ADS coveted Excentus' relationship with Giant Eagle and other grocery store chains across the U.S. These grocery store chains were potential customers for ADS, and Excentus offered ADS a way into a market it had faced difficulty penetrating.

25. In addition to its payment card business, ADS also owned the AirMiles program, a profitable cross-marketing marketing program in Canada. ADS therefore understood the potential and value of Excentus' plans for a national fuel cross-marketing program. They were also keenly aware of the success Giant Eagle and other Excentus customers were having with fuel cross-marketing developed by Excentus.

26. Around 2007, Excentus and ADS negotiated and executed a stock purchase agreement. Giant Eagle and the Shapiras strongly supported this new relationship with ADS, as it more than doubled the value of Giant Eagle's interest in Excentus in just two years.

R009

### 3. *Auto-Gas*

27. While negotiating and closing Excentus' agreements with ADS, Mr. Perry had also begun discussions with Defendant Randy Nicholson, the founder and principal executive of Defendant Auto-Gas. Since the founding of Excentus, Auto-Gas had been a competitor of Excentus. Nicholson and Auto-Gas had applied for and received several patents that held potential value for Excentus and its future plans. Nicholson and Auto-Gas, however, had been unable to capitalize on these patents or compete against Excentus. By 2008, Auto-Gas had become primarily a holding company for these patents, neglecting even to enforce them.

28. In 2008, Mr. Perry negotiated the purchase of Auto-Gas's patent portfolio. In exchange, Auto-Gas became one of Excentus' largest shareholders, along with Mr. Perry, Giant Eagle and ADS.

29. Nicholson had additional demands, however. Faced with the prospect of having no income, he demanded a position on Excentus' Board of Directors, as well $300,000 for him and his son-in-law Jeff Upp per year for five years in exchange for a non-compete agreement. Excentus knew it was competing against others to acquire these patents, so in an effort to appease Nicholson and close the deal, Excentus agreed.

## C. Defendants Pursue a Self-Serving Agenda.

30. What Mr. Perry, along with the other Excentus directors and shareholders, initially identified as opportunities for growth via collaboration with its new "strategic" investors instead devolved into a race by these Defendants to subserve Excentus' best interests to their respective aims. What follows is a description of how each of the Defendants' personal agenda led them to ultimately conspire against and harm Excentus.

### 1. *Giant Eagle and the Shapiras*

31. The Shapiras were not on Excentus' board to loyally serve Excentus' best interests. Instead, they worked tirelessly to benefit and protect Giant Eagle. And when they could no longer subserve Excentus' interests to those of Giant Eagle, they conspired with Defendants to terminate Mr. Perry and reap their illicit rewards.

32. As mentioned above, Giant Eagle needed Excentus' technology to successfully implement and operate its fuelperks! cross-marketing program. While Excentus expected compensation for the use of its technology, for some time, it relied on Giant Eagle and the Shapiras' promises that the two would enter into a trademark licensing agreement for fuelperks! and that Giant Eagle would also agree to have its program participate in Excentus' anticipated national fuel cross-marketing coalition. Excentus anticipated that the fuelperks! brand would become only one of many participating programs in Excentus' future national coalition. But while Giant Eagle eventually did enter into a license agreement so that Excentus had the right – but not the obligation – to use fuelperks! as part of its programs, the Shapiras never allowed Giant Eagle to become a member of Excentus' national coalition. They instead wanted their own program – fuelperks! – to be the single program promoted by Excentus, even though Excentus had no obligation to do so and instead had the opportunity to develop a much broader and more promising national coalition.

33. In March of 2012, the Shapiras' true loyalties were on display. Mr. Perry announced at one of Excentus' board meetings that Excentus would finally launch its national cross-marketing program, which was to be called the Fuel Rewards Network. This was due in part to a major new agreement between Excentus and Shell Corporation for national redemption coverage at Shell fuel stations, and it represented a monumental step for Excentus towards

R011

enacting Mr. Perry's vision. Excentus would be able to engage untold partners across the country to participate in its Fuel Rewards Network, including, as only one among many, Giant Eagle's fuelperks! program. But since Excentus would not exclusively be using the fuelperks! brand (which Excentus had no obligation to do, and the brand had not agreed to participate in the national program anyway), the Shapiras were furious. To them, this announcement did not mean more profits for Excentus; instead, they saw it as more competition against, and thus less profits for, Giant Eagle. Giant Eagle was a competitor of Shell, and the Shapiras had not allowed Giant Eagle to add the fuelperks! brand to the Fuel Rewards Network. They wanted only their brand promoted by Excentus. Following the announcement, the Shapiras began shouting angry threats to sue Excentus and all of its individual board members. Importantly, they also began advocating that Mr. Perry be terminated.

34. Following this meeting, Mr. Perry continued exploring ways to resolve Giant Eagle's disputes. After consulting with Excentus' counsel, Mr. Perry offered that Giant Eagle could still join the Fuel Rewards Network (as originally discussed) or alternatively license Excentus' technology for Giant Eagle's use with their own fuelperks! program. But the Shapiras (despite serving as Excentus directors) and Giant Eagle refused. Indeed, David Shapira went so far as to state that prior to their dispute, he was willing to have Giant Eagle pay Excentus for use of Excentus' technology. But now he was not going to allow Giant Eagle to pay Excentus one [expletive] penny.

35. Seeing no other options, Mr. Perry consulted with legal counsel at Fulbright & Jaworski, LLP (now Norton Rose Fulbright), and in accordance with their advice, on December 2, 2012, Excentus filed breach of fiduciary duty, unfair competition, and patent infringement claims against Giant Eagle and the Shapiras. Norton Rose Fulbright also advised Excentus to

hold a board meeting to decide how to conduct the litigation while two self-dealing directors continued serving on the Board. Following their advice, Excentus' Board voted to create an Executive Committee (which would exclude the Shapiras) to manage Excentus' business affairs, as well as a Litigation Committee to manage the litigation free from the self-serving misconduct of the Shapiras. Defendants Nicholson, Logsdon, and Mills all either voted or expressed their support for these measures at the time.

36. In the lawsuit filed by Norton Rose Fulbright, Excentus alleged that "Giant Eagle has embarked on a course of action to disrupt and gain control of Excentus through breach of fiduciary duties owed by the Shapiras to Excentus." Excentus further alleged that "the Shapiras have placed Giant Eagle's interests ahead of Excentus' interests. . . . [W]henever there was a choice to do what was best for Excentus and what was best for Giant Eagle, the Shapiras have consistently chosen to place Giant Eagle's interests ahead of Excentus' interests."

37. Both the Shapiras and Giant Eagle zealously contested Excentus' allegations, but two federal courts disagreed. The Shapiras moved to dismiss the claims against themselves as directors, but in 2014, a federal court in Pennsylvania denied their motion to dismiss the claim that the Shapiras had breached the duties they owed to Excentus by causing Giant Eagle not to pay royalties for the use of the Excentus patents.

38. A Texas federal court also denied a Giant Eagle motion for preliminary injunctive relief that sought to stop Excentus from exercising an option to buy ADS's shares back from ADS (as described in greater detail below). Of particular relevance to this lawsuit was that federal court's ruling that Giant Eagle no longer held certain rights to consent to all of Excentus' share purchases. As part of Giant Eagle's preliminary injunction requests, Giant Eagle argued that Giant Eagle had the right to approve Excentus' exercise of its option to buy

R013

back all of ADS' shares. The federal court disagreed, however, explaining that any such consent rights had expired. Giant Eagle had lost. Unable to achieve their aims legally, they resorted to illicit, extra-judicial means.

### 2. ADS

39. ADS also developed an agenda that would ultimately incentivize it to conspire with Giant Eagle, the Shapiras, and the remaining Defendants to oust Mr. Perry.

40. The original relationship between ADS and Excentus was no longer a profitable one for Excentus. When ADS invested in Excentus, the two had entered into a Joint Marketing Agreement pursuant to which they would jointly offer a private label payment card that grocery store chains could provide to their customers. Giant Eagle had committed to being a first, test customer for the offering. However, shortly after the execution of the Joint Marketing Agreement, Giant Eagle and ADS wound up working together and excluding Excentus entirely from the project. Excentus' relationship with ADS quickly became a dormant one.

41. As a result, Mr. Perry began exploring Excentus' options with respect to ADS. Following a general agreement in principle to unwind the relationship between ADS and Excentus, he delegated negotiations to Logsdon, whom he had promoted to Chief Operating Officer.

42. But the calculus for ADS soon changed. Around that same time, Excentus executed with MasterCard an agreement to launch a co-branded MasterCard for the Fuel Rewards Network. This represented a lucrative opportunity to ADS to become the issuer of the card, and Logsdon came to Mr. Perry with a request from ADS to become the issuer. Mr. Perry agreed, but only if any agreement with ADS also included an option for Excentus to buy back all of the Excentus shares that ADS had purchased. Logsdon said ADS would agree, but that it had

one additional (and, in retrospect, highly suspect) request: ADS wanted to be indemnified if Giant Eagle opposed the option.

43. As noted above, Giant Eagle did in fact oppose the exercise of the option, but it failed to do so successfully. Thus, with Excentus having the right to exercise the option and buy back all ADS shares, ADS was faced with the prospect of being bought out of Excentus at the same time that highly lucrative opportunities were materializing – Excentus' co-branded MasterCard for the Fuel Rewards Network, among others.

### 3. *Auto-Gas*

44. Soon after Excentus acquired the patent portfolio from Auto-Gas, Mr. Perry embarked on an aggressive and wildly successful patent enforcement effort. Mr. Perry achieved tens of millions of dollars in settlements for Excentus, something that Nicholson had never been able to achieve for Auto-Gas.

45. Following such success, Nicholson and Upp began asking about the money Excentus was paying Auto-Gas. Their $300,000 per year payments were set to expire in September 2013, and Nicholson made clear to Mr. Perry that he was in desperate need for additional cash and income. He wanted his non-compete renewed, but Mr. Perry could not agree to have Excentus pay additional consideration for essentially no value in return. The best that Excentus could do was pay Nicholson some consulting fees for assisting in Mr. Perry's patent enforcement efforts. But this turned out not to be enough to meet Nicholson's cash needs.

### 4. *Logsdon and Mills*

46. As part of his effort to develop the next crop of Excentus leaders, Mr. Perry had promoted Logsdon to President and Chief Operating Officer and Mills to Executive Vice President and Chief Administrative Officer. In effect, Mr. Perry delegated to Logsdon

responsibility for the day-to-day operations and growth of both the Fuel Rewards Network and of Centego (an Excentus subsidiary that held Excentus' patents). This would allow Mr. Perry to focus on Excentus' aggressive patent enforcement plans (which at that point included its largest enforcement action to date against one of the largest grocery store chains in the country), as well as resolving corporate issues with Giant Eagle, ADS and Auto-Gas.

47. In late 2013, and following a sizeable settlement payment to Excentus for the use of its patents, Mr. Perry began to look more closely into Logsdon and Mills' performance. In early 2014, when Logsdon and Mills presented the company's 2013 operating results and their proposed 2014 operating plan and budget, Mr. Perry became increasingly concerned. Growth in both Excentus' Fuel Rewards Network and in other aspects of the business was lagging significantly behind Logsdon and Mills' previous projections and expenses were soaring, particularly personnel costs, far outpacing relative revenue and gross profit growth.

48. It also became very apparent that none of the major agreements Logsdon had negotiated for the Fuel Rewards Network were performing as had been promised by Logsdon and his team. Key customers of Excentus, such as MasterCard and Shell, had begun voicing their concerns to Mr. Perry regarding Excentus' ability to deliver on its commitments under the agreements Logsdon had negotiated with them. One even demanded Mr. Perry re-negotiate their agreement under the threat that they may exercise their right to terminate their agreement.

49. Even more troubling, it appeared to Mr. Perry that Logsdon and Mills were improperly accounting for revenues from one major partner so as to inflate Excentus' performance and cover up their shortcomings. Worse yet, their 2014 operating plan and budget did not appear to adequately address the issues with Logsdon's performance and yet it included sizeable proposed bonuses to Logsdon and his team. These proposed bonus payments were

R016

completely out of line with the actual performance of the business, including the performance of both Logsdon and certain of his subordinates.

50.    Mr. Perry made it clear that Logsdon - as President and COO - along with rest of the senior management term were going to be held specifically accountable for the necessary improvements. Mr. Perry also informed Logsdon that he would only approve partial payment of some of the bonus amounts Logsdon had proposed.  The other portions would be deferred for possible payment later in the year, pending expected improvements.  Logsdon was not happy with Mr. Perry's decisions.

51.    Mr. Perry then communicated his concerns regarding the performance of Logsdon and his senior management team to Mills, who was responsible for all HR and financial matters for the company.  During their discussions, Mills concurred with many of Mr. Perry's concerns. Mr. Perry shared with Mills that he was considering placing Logsdon, and possibly other senior management members, on a Performance Improvement Plan (or "PIP") consistent with Excentus HR policies and precedents with other non-performing employees.  But when Mr. Perry conveyed to Mills that he would postpone any issuance of bonus payments (including one to Mills), Mills became incensed and stormed out of the building.

**D.    Defendants Conspire to Oust Mr. Perry and Plunder Excentus.**

52.    Defendants' interest converged during the summary of 2014.  They found in each other willing co-conspirators to hijack Excentus and use it to achieve their respective aims, no matter the cost to the company.  It is Defendants' actions during the summer of 2014 that give rise to Mr. Perry's derivative claims.

53.    On the evening of July 31, 2014, Defendants set their scheme in motion.  The Defendant shareholders (holding just a little over fifty percent) called a secret meeting.  Present

R017

at the meeting were the Shapiras, Nicholson, Leigh Ann Epperson (Senior Vice President and General Counsel of ADS), Logsdon, and Mills. They provided no notice of this meeting to Excentus' eight other shareholders (including, of course, Mr. Perry).

54.     That night, Defendants enacted a series of changes to Excentus' Bylaws to allow them to take control of Excentus. The ultimate effect of their actions was:

   a. Changing Excentus' Bylaws to explicitly permit a majority of the shareholders to remove any officer, with or without cause, from his or her position, a power previously reserved exclusively for the Board;

   b. Citing no reason for doing so, removing Mr. Perry from his positions as Chairman of the Board, Chief Executive Officer and any other position he presently held at the Company;

   c. Ousting two other long-time directors and shareholders from the Board, Art Hinckley and Jim Callier;

   d. Electing Logsdon and Mills to the Board; and

   e. Waiving Giant Eagle's right to force Excentus to repurchase its shares in the event Mr. Perry was no longer an executive at Excentus, a right they had originally demanded prior to investing in Excentus.

55.     The very next morning, and surrounded by new lawyers (not the Norton Rose Fulbright lawyers who for years had represented Excentus), Defendants held a meeting of their "reconstituted" Excentus Board. According to the company's minutes, *first*, Defendants formally abolished both the Executive Committee and the Special Litigation Committee Mr. Perry had created upon the advice of Norton Rose Fulbright so that disinterested directors could conduct Excentus' affairs and litigation. Daniel Shapira then instructed that Giant Eagle be provided with all of the Executive Committee's records for the Shapiras' review, even though the litigation against the Shapiras was still pending. *Second*, Defendants called in a number of the senior management members whose bonuses Mr. Perry has deferred and who worked directly for Logsdon. They concocted a series of trumped-up charges against Mr. Perry so as to justify

his termination (which, based on the pervious evening's secret meeting, was evidently a foregone conclusion). ***Third***, and a mere minutes after concocting their trumped up charges against Mr. Perry, Defendants authorized Logsdon to pay many of these same senior executives – including, without limitation, Stacey Smotherman (Excentus' General Counsel), Thomas Wightman, Scott Schaper, and Mike Melson – tens of thousands of dollars. ***Fourth***, the Defendants unanimously approved indemnification for themselves, apparently well aware that their conduct would result in personal liability. ***Fifth***, the Defendants made Logsdon the new CEO and Nicholson the new Chairman of the Board. And ***sixth***, they fired Mr. Perry (again).

56. Their subsequent treatment of Mr. Perry, who had founded and successfully led Excentus for eighteen years, evidences Defendants' malicious intent. That same morning of August 1, 2014, Mr. Perry received a call from Logsdon, Mills and Smotherman. They informed him that he had been terminated by the "new majority of shareholders" for "cause." They did not explain to him what that supposed "cause" was. They had his car towed from the company parking lot, at his expense; they cut off access to his cell phone; they cut off all of his health benefits, despite knowing that Mr. Perry's two daughters suffered from a chronic, life threatening medical condition; and, in a final act of petty malice, they cancelled Mr. Perry's own Fuel Rewards Network MasterCard.

57. Defendants did not stop with Mr. Perry. That same day, Mr. Perry received a phone call from his daughter, who was at the time also an Excentus employee. She told him she had been pulled out of a meeting by security and was in the process of being escorted off the premises. Mr. Perry also learned that day that Defendants had fired two long-time Excentus employees close to Mr. Perry, and that they had removed from the Board two of his long-time

friends. These board members also happened to be two of Excentus' original investors and remained Excentus shareholders.

58. With Mr. Perry out of Excentus, Defendants began to reap the fruits of their illicit bargain. Now in control of the company, each of the Defendants set to secure for him or itself what they had previously sought from Excentus but had been denied by Mr. Perry.

59. *First*, almost immediately after ousting Mr. Perry Excentus, Giant Eagle, and the Shapira filed emergency motions stating that "[r]ecent discussions between the new Chief Executive Officer of Plaintiff Excentus Corporation and Defendants Giant Eagle, Inc., David Shapira, and Daniel Shapira . . . suggest that the parties may be able to reach a settlement agreement . . ."

60. Soon after, Excentus, Giant Eagle, and the Shapiras signed a purported settlement agreement. That "agreement," negotiated with the Shapiras sitting on both sides of the table, turned out to be a complete sham. It contains a near total capitulation by Excentus of all of the rights and interests that Excentus had successfully pursued in litigation against Giant Eagle and the Shapiras. The Shapiras and Giant Eagle awarded themselves rights that they never had and that a Texas federal court had denied them. Defendants also had Excentus make hundreds of thousands of dollars in payments directly to the Shapiras, for no apparent reason whatsoever. Defendants also modified the compensation structure of certain royalties for the fuelperks! trademark and added the Fuel Rewards Network – a mark that Giant Eagle had had no role in developing – to the marks covered by the agreement so as to require Excentus to pay for its own marks' use. Defendants also built in punitive provisions to ensure that Excentus could not pursue its rights in court against Giant Eagle. This sham settlement agreement in effect resulted in a complete grant of impunity to Giant Eagle and the Shapiras for their conduct, and

also in a windfall of ill-gotten profits for Giant Eagle and the Shapiras far into the foreseeable future.

61.     ***Second,*** Defendants rewarded Logsdon, Mills, Smotherman, and the other members of senior management with promotions, increased compensation, and hundreds of thousands of unmerited bonus payments (including payments previously deferred by Mr. Perry). Tellingly, on the same day that these executives were paid off, Nicholson sent a letter to Mr. Perry threatening that some of those same executives who had just been paid tens of thousands of dollars were ready to speak ill of Mr. Perry's performance as CEO, so as to justify his termination.

62.     ***Third,*** Defendants caused Excentus to forego the valuable option rights secured from ADS to repurchase their shares in Excentus. ADS remains an Excentus shareholder today, which was the result ADS sought and Giant Eagle unsuccessfully fought for in court. What ADS and Giant Eagle could not achieve publicly and legitimately they achieved secretly and illicitly.

63.     ***Fourth***, Defendants elected Nicholson as the new Chairman of the Board and Upp as a new board member. Nicholson finally secured the place at the head of the table he believed he deserved and, on information and belief, both Nicholson and Upp are reaping the cash they purported to need.

64.     ***Fifth,*** because the compensation structure of certain intellectual property agreements between Auto-Gas and Excentus mirrored the agreements between Excentus and Giant Eagle, on information and belief the "re-negotiated" Excentus-Giant Eagle agreements resulted in an equal increase in what Excentus would have to pay Auto-Gas. Again, Auto-Gas and Nicholson secured the cash they desperately needed from Excentus.

R021

65. In essence, over the course of a few days during the summer of 2014, Defendants hijacked and potentially destroyed the value Mr. Perry had built for Excentus. Instead of conducting themselves in accordance with their duties of utmost loyalty and due care, the director and officer Defendants breached their duties and acted in their own self-interest. The shareholder Defendants aided and abetted them. Faced with no other options, Mr. Perry asks the Court for injunctive relief that restores Excentus to its prior promise and monetary damages that compensates the non-Defendant shareholders of Excentus.

## VI. <u>CAUSES OF ACTION</u>

### Breach of Fiduciary Duty

66. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

67. Defendants Daniel Shapira, David Shapira, Logsdon, Mills and Nicholson owe Excentus duties of obedience, utmost loyalty, and due care, including a duty to use their uncorrupted business judgment for the sole benefit of the Excentus.

68. Defendants Daniel Shapira, David Shapira, Logsdon, Mills and Nicholson have breached the duties they owe to Excentus by acting to benefit themselves at the expense of Excentus. Their conduct in terminated Mr. Perry and the actions they took following that termination constitute breaches of the duties they owe to Excentus.

69. These breaches of duties were willful and in bad faith and they have caused Excentus and its shareholders damage. Excentus is entitled to injunctive relief, actual damages, and punitive damages.

### Aiding and Abetting Breach of Fiduciary Duty

70. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

71. Defendants Giant Eagle, ADS, and Auto-Gas knowingly participated in the breach of duty the director and officer Defendants carried out in the late summer of 2014, and as such they became a joint tortfeasors with the fiduciaries and are liable as such.

72. Defendants Giant Eagle's, ADS's, and Auto-Gas' aiding and abetting of the breaches of fiduciary duties was willful and in bad faith and it has caused Excentus and its shareholders damage. Excentus is entitled to injunctive relief, actual damages, and punitive damages.

## Unfair Competition

73. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

74. The conduct of Defendants Giant Eagle, ADS, and Auto-Gas as described above constitutes business conduct that is contrary to honest practice in commercial matters.

75. Defendants have gained an unfair advantage in the market by capitalizing on Excentus' customer relationships, prospective business opportunities, and trademarks, which they have misappropriated for their own illicit use when they terminated Mr. Perry and paid themselves off with rights and compensation they never previously had. Defendants conduct and acts constitute unfair competition.

76. Defendants acts were willful and in bad faith and they have caused Excentus damage. Excentus is entitled to injunctive relief, actual damages, and punitive damages.

## Civil Conspiracy

77. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

78. Defendants combined to accomplish an unlawful purpose, to wit, the above-described torts.

79. Defendants' conspiracy was willful and in bad faith and it has caused Excentus damage. Excentus is entitled to injunctive relief, actual damages, and punitive damages.

## Declaratory Judgment

80. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

81. Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Plaintiff seeks a declaration that (a) all actions taken by Defendants as shareholders or directors of Excentus on behalf of Excentus on July 31, 2014 are invalid and unenforceable; (b) all actions taken by Defendants regarding the ADS option are invalid and unenforceable; (c) all actions taken by Excentus after July 31, 2014 regarding its relationship with Giant Eagle, ADS, or Auto-Gas are invalid and unenforceable; (d) all bonus payments or other compensation paid to any Defendants by Excentus are invalid; and (e) the settlement agreement entered into by Excentus, the Shapiras and Giant Eagle is invalid and unenforceable.

## Fraud by Nondisclosure

82. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

83. Despite having a duty to do so as Board members of Excentus, Defendants David Shapira, Daniel Shapira, Logsdon, and Mills deliberately concealed from or failed to disclose material information – Defendants' scheme – to Excentus, including, without limitation, to its Chief Executive Officer and Chairman of the Board. Defendants David Shapira, Daniel Shapira, Logsdon, and Mills knew that Excentus was ignorant of the scheme and did not have an equal opportunity to discover the scheme.

84. By failing to disclose the scheme, Defendants intended to induce Excentus to refrain from acting. Excentus relied on Defendants' nondisclosure.

85. Excentus was injured as a result of acting without the knowledge of the undisclosed facts.

## VII. APPLICATION FOR APPOINTMENT OF RECEIVER AND/OR TEMPORARY INJUNCTIVE RELIEF.

86. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

87. Pending the resolution of Plaintiff's claims, Defendants will continue to manage the affairs of Excentus, including without limitation this litigation. Accordingly, there is a substantial risk of ongoing and irreparable harm to the rights and interests of Excentus so long as Defendants continue leading Excentus and, particularly, its conduct vis-à-vis this litigation. The actions of the persons presently governing Excentus are illegal, oppressive, and/or fraudulent.

88. Plaintiff therefore requests that the Court appoint a receiver to manage this litigation on behalf of Excentus. Alternatively, Plaintiff requests that the Court issue temporary and permanent injunctive relief, as follows:

    a. Order a special committee be formed and maintained, made up of members elected by majority vote of shareholders excluding the Defendants, to review and approve any matter or action by the company that involves the person or business interest of any of the Defendants.

    b. Order a special committee be formed and maintained, made up of members elected by majority vote of shareholders excluding the Defendants, to manage Excentus' response to this litigation (including any requests for indemnification by Defendants).

    c. Order that all compensation to be paid to any director or persons reporting to the President, CEO or any executive officer of the company be approved by the same special committee order.

    d. Order that all shareholders be notified of all meetings of the directors or shareholders while this litigation is pending.

    e. Order that all meetings of directors, whether duly called or not, involving two or more of the Defendants be video recorded and promptly provided to all shareholders.

f.  Order that all information of any kind provided to directors as part of a meeting or otherwise be promptly provided to all shareholders unless otherwise requested by a shareholder.

g.  Order that all meetings held by management to which at least a majority of employees are invited to be made aware of the company's business be video recorded and promptly made available to a shareholders as requested.

## VIII.  REQUEST FOR EXPENSES INCURRED

89.  Plaintiff has retained the undersigned counsel to represent him in this action, and he has incurred and will continue to incur expenses for investigating and bringing the foregoing claims on behalf of Excentus Corporation. Plaintiff requests that the Court award him all expenses incurred, including without limitation reasonable attorneys' fees and costs incurred, as per to Section 21.561(b)(1) of the Texas Business Organizations Code.

## IX.  JURY DEMAND

90.  Plaintiff demands a trial by jury.

## RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiff Dickson Perry respectfully prays that the Court:

1.  Enter a judgment for Plaintiff on behalf of Excentus on Plaintiff's claims for damages in excess of $1,000,000, including actual, consequential, incidental, and punitive damages, plus pre- and post-judgment interest;

2.  Rescind the settlement agreement executed by Excentus and Defendants Giant Eagle, David Shapira, and Daniel Shapira;

3.  Place a constructive trust on all of the bonus payments illicitly made to Logsdon, Mills, Wightman, Melson, and Schaper;

4.  Order an accounting;

5.      Enter a declaration as described above;

6.      Appoint a receiver, provisional director, and/or custodian, or, in the alternative, enter temporary and permanent injunctive relief;

7.      Award Plaintiff all expenses incurred in bringing his claims, including without limitation reasonable attorneys' fees and costs;

8.      Award Plaintiff such other and further relief, both special and general, at law or in equity, to which he may show himself to be justly entitled.

DATED:  June 25, 2015                    Respectfully submitted,

*/s/Michael P. Lynn*
Michael P. Lynn, P.C.
State Bar No. 12738500
mlynn@lynnllp.com
Jeremy A. Fielding
State Bar No. 24040895
jfielding@lynnllp.com
Andrés Correa
State Bar No. 24076330
acorrea@lynnllp.com
Andrew S. Hansbrough
State Bar No. 24094700
ahansbrough@lynnllp.com
**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:    214.981.3800
Facsimile:    214.981.3839
**ATTORNEYS FOR PLAINTIFF DICKSON PERRY**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served as shown below on counsel of record on June 25, 2015:

*Via Email*
Orrin L. Harrison III
(oharrison@ghjhlaw.com)
GRUBER HURST ELROD JOHANSEN HAIL
SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

*Via Email*
Lisa S. Gallerano
(lgallerano@akingump.com)
Patrick O'Brien
(pobrien@akingump.com)
AKIN GUMP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4624
*Attorneys for Defendant*
*Alliance Data Systems, Inc.*

*Via Email*
Bernard Marcus
(marcus@marcus-shapira.com)
Scott Livingston
(livingston@marcus-shapira.com)
Jonathan Marcus
(jmarcus@marcus-shapira.com)
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, PA 15219-6401
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

*Via Email*
Ken Carroll
(kcarroll@ccsb.com)
Byran Erman
(berman@ccsb.com)
Sara Romine
(sromine@ccsb.com)
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202-3767
*Attorneys for Defendants*
*Brandon Logsdon and Jim Mills*

*Via Email*
Robert B. Wagstaff
(rwagstaff@mcmahonlawtx.com)
MCMAHON SUROVIK SUTTLE
P.O. Box 3679
Abilene, TX 79604
*Attorney for Defendants*
*Randy Nicholson and Auto-Glass Systems, Inc.*

/s/ Andres Correa
Andres Correa

4813-2413-6485, v. 1

R029

# Tab B

**CAUSE NO. DC-15-03853**

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| vs. | § § § | DALLAS COUNTY, TEXAS |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | § § § § § § § § § § | 68TH JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE

Defendant Giant Eagle, Inc. ("Giant Eagle") files this motion requesting that this Court dismiss the First Amended Petition ("First Am. Pet.") on the basis of collateral estoppel, which precludes Plaintiff Dickson Perry ("Perry") from bringing this lawsuit against Giant Eagle in Texas.[1]

---

[1] Defendants David Shapira and Daniel Shapira (together, "the Shapiras") filed a Verified Special Appearance and Motion Objecting to Jurisdiction prior to joining Giant Eagle's Plea to Jurisdiction, Motions to Dismiss, Plea in Abatement, Special Exceptions, and Original Answer to Plaintiff's Original Petition ("Original Answer"). The Shapiras joined the Original Answer subject to their Special Appearance. *See* Original Answer at 1, n.1. The Shapiras' Special Appearance is still pending.

To avoid waiving the Shapiras' Special Appearance, the present Motion to Dismiss for Collateral Estoppel is filed on behalf of Giant Eagle only. However, as explained throughout, collateral estoppel also bars Perry's claims against the Shapiras in Texas. Accordingly, judicial efficiency would be served by hearing the present collateral estoppel motion *before* requiring the parties to undertake jurisdictional discovery related to the Shapiras' Special Appearance. If the Court grants the present motion, the Shapiras will withdraw their Special Appearance and will request dismissal of the claims against them on the basis of collateral estoppel.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE      PAGE 1
A0927450.9/234716.docx

R030

## I.  SUMMARY OF GROUNDS FOR MOTION TO DISMISS

Collateral estoppel exists precisely for cases like this, where a party unhappy with the outcome of a previous lawsuit wants a second bite at the apple.  A federal district court has already held that Texas is not the proper forum for this litigation.  *Excentus Corp. v. Giant Eagle, Inc.*, 3:11-cv-03331, 2012 WL 2525594, at *8-11 (N.D. Tex. July 2, 2012) (Boyle, J.) (attached as Ex. 1).  Perry, through this derivative action, is not entitled to another try.

In 2010, the Excentus Corporation ("Excentus"), in litigation led by then-Chairman and CEO Perry, sued Giant Eagle and the Shapiras in the U.S. District Court for the Northern District of Texas (the "First Texas Case").  The First Texas Case set forth essentially the same claims as here, including that Giant Eagle owes Excentus additional compensation for the use of certain Excentus technology and that the Shapiras breached their fiduciary duties as members of the Excentus Board of Directors (the "Board") by taking the position that Giant Eagle did not owe additional compensation because it already had licensed the right to use the disputed technology.

Giant Eagle and the Shapiras argued that two Stock Purchase Agreements ("SP Agreements") between Giant Eagle and Excentus—whereby Giant Eagle invested over $7 million in Excentus, obtained a license to use Excentus' technology, and nominated the Shapiras to the Excentus Board—provided Giant Eagle with a defense to Excentus' claims.  Specifically, the SP Agreements provided Giant Eagle with both a license to the disputed technology and a warranty of non-infringement, and, as a result, Giant Eagle could not be liable for infringing Excentus' potential technology.

Relevant here, the SP Agreements contained a mandatory forum selection clause requiring any claims arising out of them to be brought where the respondent's principal offices are located.  Giant Eagle's and the Shapiras' principal office is in Allegheny County, Pennsylvania.  Therefore, Giant Eagle and the Shapiras moved to dismiss for improper venue,

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE            PAGE 2
A0927450.9/234716.docx

R031

arguing that although Excentus' complaint did not expressly allege any breaches of the SP Agreements, the forum selection clause still applied because it provided Giant Eagle and the Shapiras with a defense to all claims asserted against them.

Judge Boyle agreed with Giant Eagle and held that because "resolution of [the] claims clearly requires the Court to construe the [SP] Agreements, given Giant Eagle's reliance on the Agreements as a defense," the forum-selection clause within those agreements applied and the case could only be brought in Pennsylvania. *Excentus*, 2012 WL 2525594, at *8-11 (Ex. 1).[2] The court dismissed the case without prejudice for improper venue. *Id.* As a result of this decision, collateral estoppel plainly bars Perry's second attempt, purportedly on behalf of Excentus, to sue Giant Eagle and the Shapiras in Texas because it already has been decided that Texas is *not* a proper forum.

All three elements of collateral estoppel are met. First, this case raises the exact same issues that were fully and fairly litigated in the First Texas Case—namely, whether the SP Agreements' forum selection clause applies to claims, like those here, that require the court to examine the parties' respective rights under those agreements. The clause does apply, and Texas is not a proper forum. *Id.* at *9 ("the Court must look to the [SP] Agreements to determine whether Giant Eagle's defenses are valid and therefore the forum selection clauses contained in them are applicable."). Second, the federal court's enforcement of the forum selection clause was essential to its judgment regarding the proper venue for the First Texas Case. Finally, this case involves the same parties, as both the First Texas Case (brought by Excentus) and the present case (brought derivatively on behalf of Excentus) purport to represent the interests of Excentus shareholders against Giant Eagle and the Shapiras.

---

[2] All of the documents attached to this motion were considered by the court in the First Texas Case.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE  PAGE 3
A0927450.9/234716.docx

R032

Giant Eagle first raised this collateral estoppel defense in its Original Answer (filed June 5, 2015). Perry then amended his Petition in a transparent attempt to avoid collateral estoppel. The amendment is futile and only highlights the fact that no amount of creative pleading can maneuver around the preclusive effect of Judge Boyle's decision in the First Texas Case. For example, the First Amended Petition dropped the word "patents" and instead uses "technology"; however, this rewording has no effect because the term "technology" encompasses the "patents" at issue, the rights to which are set forth in the SP Agreements. *Compare* Original Petition ¶ 29 *with* First Am. Pet. ¶ 32. Further, the First Amended Petition revises the unfair competition claim by deleting the allegation that Giant Eagle unfairly capitalized on Excentus' "proprietary technology" and "intellectual property," and replaces it with the allegation that Giant Eagle "paid [itself] off with rights and compensation they never previously had." Of course, the "rights" Giant Eagle allegedly awarded itself are the "rights" to certain "proprietary technology" and "intellectual property" covered by the license Giant Eagle received under the SP Agreements. *Compare* Orig. Pet. ¶ 73 *with* First Am. Pet. ¶ 75.[3]

Ultimately, the First Amended Petition's wordsmithing does not change the facts: Perry is seeking, through his derivative action on behalf of Excentus, to bring claims against Giant Eagle and the Shapiras arising out of actions they took with respect to the parties' rights under the SP Agreements. In other words, Perry seeks to reinstate—in Texas—a lawsuit that was already dismissed from the state because it is an improper forum. Perry's attempt to artfully plead his way around a very straightforward case of collateral estoppel fails and, accordingly, this case should be dismissed.

---

[3] In the First Texas Case, Excentus, in litigation initiated and directed by Perry, similarly tried to avoid the forum selection clause in the SP Agreements by avoiding mentioning the SP Agreements by name. This attempt to dodge the forum selection clause through creative pleading was rejected.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 4
A0927450.9/234716.docx

R033

## II.    FACTS SUPPORTING MOTION TO DISMISS

### A.    The Parties

1.    Perry purports to bring this action "derivatively on behalf of Excentus Corporation." First Am. Pet. at p. 1. Perry is an Excentus shareholder and previously served as its Chairman and CEO. *Id.*

2.    Giant Eagle is a Pennsylvania corporation with its principal place of business in Allegheny County, Pennsylvania. *Id.* ¶ 6.[4]

3.    The Petition asserts that venue is proper in Dallas County "because a substantial part of the events or omissions giving rise to the claims occurred in Dallas County, Texas." *Id.* ¶ 14. Defendants have specifically denied this allegation. *See* Original Answer ¶ 35.[5]

### B.    Excentus' Relationship with Giant Eagle and the Shapiras

4.    In 2002, Excentus and Giant Eagle entered into a Software License and General Services Agreement (the "Software License") (attached as Exhibit 2) under which Excentus granted Giant Eagle a non-exclusive license to use Excentus' fuel site controller technology in connection with Giant Eagle's fuelperks! program—a program that rewards customers with a discount on their fuel based on grocery store purchases made using a customer loyalty card. First Am. Pet. ¶ 21. The Software License remains in full force and effect.[6]

5.    In two separate transactions in 2004 and 2005, respectively, Giant Eagle invested over $7 million in Excentus pursuant to two nearly identical agreements, thereby becoming the first "major investor" in Excentus. First Am. Pet. ¶¶ 19-23.

---

[4] Defendant David Shapira is a citizen and resident of Pennsylvania, a Director of Excentus, and Executive Chairman of the Board of Directors of Giant Eagle. *Id.* ¶ 7. Daniel Shapira is a citizen and resident of Pennsylvania and a Director of Excentus. *Id.* ¶ 8.

[5] Giant Eagle's General Denial in its Original Answer extends to the claims asserted in the First Amended Petition. *See* Tex. R. Civ. P. 92.

[6] The Software License was with Excentus' predecessor-in-interest, CCISTech, Inc.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE    PAGE 5
A0927450.9/234716.docx

R034

6.    In the 2004 transaction, Giant Eagle invested approximately $3 million in Excentus pursuant to a Series A Stock Purchase Agreement (the "2004 SP Agreement"). *See* 2004 SP Agreement (attached as Ex. 3). In exchange, Excentus warranted that "none of the Intellectual Property currently sold or licensed by [Excentus] to any Person . . . infringes upon or otherwise violates any Intellectual Property rights of others." *Id.* at ¶ 3.09(d). Excentus fully indemnified Giant Eagle for any claim arising out of "any misrepresentation or breach of [this] warranty" by Excentus. *Id.* ¶ 7.01(a). Excentus also granted Giant Eagle the "non-exclusive right to license [Excentus'] Products and to establish retail/gas station alliances utilizing [Excentus'] Products in any market in which [Giant Eagle] operates as of or after the Closing Date." *Id.* at ¶ 5.06. "Products," in turn, is defined as the technology Excentus licensed to Giant Eagle under the Software License "and all improvements and enhancements thereto . . . ." *Id.* Together, this language makes clear that the 2004 SP Agreement gave Giant Eagle the right to use whatever Excentus technology—including patented technology—it needed for its fuelperks! program, as well as all "improvements and enhancements" to that technology.

7.    Also pursuant to the 2004 SP Agreement, Excentus granted Giant Eagle "the right to nominate one candidate . . . for election to [its] Board of Directors." *Id.* at ¶ 5.07. The 2004 SP Agreement expressly designated David Shapira as Giant Eagle's initial representative on the Excentus Board. *Id.*

8.    Of critical importance here, the 2004 SP Agreement provides: "**VENUE FOR ANY ACTION ARISING OUT OF THIS AGREEMENT SHALL RESIDE EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED**." *Id.* ¶ 8.06 (emphasis in original).

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 6
A0927450.9/234716.docx

R035

9.      In the 2005 transaction, Giant Eagle made an additional $4 million investment pursuant to a Series B Preferred Stock Purchase Agreement (the "2005 SP Agreement") which is, in all material respects, identical to the 2004 SP Agreement, including the forum selection clause. *See* 2005 SP Agreement ¶ 8.06 (attached as Ex. 4). The 2005 SP Agreement allowed Giant Eagle to nominate an additional candidate for the Excentus Board. *Id.* ¶ 8.06. Giant Eagle nominated Daniel Shapira who was then appointed to the Board. First Am. Pet. ¶ 23.

10.      In 2010, Excentus and Giant Eagle entered into an addendum to the Software License, under which Excentus granted Giant Eagle an additional non-exclusive license "to make, have made, use, reproduce, and make derivative works of, the source code" for its fuel cite controller technology. *See* Addendum No. 1 to Software License and General Services Agreement ("SL Addendum") at ¶ 1(a) (attached as Ex. 5). As a result of the Software License and SL Addendum, Giant Eagle obtained the right to use both the source and object codes to Excentus' fuel controller software.

## C.  Excentus sues Giant Eagle and the Shapiras in Federal District Court in Texas

11.      Unfortunately, the agreements setting forth the parties' respective rights did not stop Perry from setting in motion an onslaught of fruitless litigation that he now – via derivative action – seeks to relitigate in Texas, despite being precluded from doing so by the prior judgment of a Texas federal court.

12.      In 2010, Perry, while serving as Chairman and CEO of Excentus, caused Excentus to sue Giant Eagle and the Shapiras in the U.S. District Court for the Northern District of Texas (the "First Texas Case"). The Second Amended Complaint ("S.A.C.") in that case alleged Breach of Duties of Loyalty and Utmost Good Faith, Declaratory Judgment, and Patent Infringement. *See* S.A.C. (attached as Ex. 6). The First Texas Case was based on the same legally untenable position asserted here; namely, that Giant Eagle owes Excentus additional

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE                    PAGE 7
A0927450.9/234716.docx

R036

compensation for its use of certain Excentus technology, and that the Shapiras breached their fiduciary duties to Excentus by taking the position that Giant Eagle did not owe additional compensation because Giant Eagle already had rights to the disputed technology under the parties' SP Agreements. *See generally id.*

13.      Giant Eagle's defense in the First Texas Case was the same as its defense will be here. Excentus, through the SP Agreements, granted Giant Eagle a license to use the technology that formed the basis of Excentus' intellectual property claims and granted Giant Eagle a warranty of non-infringement. *Excentus*, 2012 WL 2525594, at *6-8. Because this defense required the court to determine the parties' rights under the SP Agreements, Giant Eagle and the Shapiras moved to dismiss for improper venue, arguing that the mandatory forum selection clause in those agreements required Excentus to sue them in Pennsylvania. *Id.*; *see also* Exs. 3, 4 § 8.09. The principal issues before Judge Boyle were (1) whether the mandatory forum selection clause applied even though Excentus did not directly assert a breach of those Agreements, and (2) whether the forum selection clause applied to the Shapiras even though they were not signatories to those agreements.

### D.  **The Decision in the First Texas Case**

14.      In her decision, Judge Boyle noted that although the court was not deciding whether the SP Agreements did, in fact, grant Giant Eagle a license to use certain Excentus patents—*i.e.*, the court was not deciding the merits of Giant Eagle's defense—it had to "look to the Stock Purchase Agreements to determine whether Giant Eagle's defenses are valid" and, therefore, "the forum selection clauses contained in them are applicable." *Excentus*, 2012 WL 2525594, at *9 (Ex. 1). Judge Boyle noted that although "Excentus' claims do not rely on the [SP] Agreements, . . . resolution of these claims clearly requires the Court to construe the [SP] Agreements, given Giant Eagle's reliance on the Agreements as a defense." *Id.* at *9-10.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE            PAGE 8
A0927450.9/234716.docx

R037

15. The court further held that it was required to construe the SP Agreements to resolve *all* of Excentus' claims—which included breach of the duty of loyalty and good faith, patent infringement, and unfair competition—because the claims asserted "involve[d] Giant Eagle's obligations under the [SP] Agreements, whether Giant Eagle had a license to the patents at issue, or whether such purported license is a defense to Excentus' claims." *Id.* at *10. In addition, the court held that the Shapiras, who were sued, as they are here, for breach of duties owed as Excentus Board members, could invoke the forum selection clause "given the relatedness of the Shapiras to the dispute between Excentus and Giant Eagle." *Id.* at *10, n. 10.[7]

16. Accordingly, the court dismissed the case for improper venue. *Id.*[8] Excentus re-filed its lawsuit in the U.S. District Court for the Western District of Pennsylvania. *Excentus v. Giant Eagle, Inc.*, No. 2:13-cv-00178-JFC (W.D. Pa. 2013). That case was resolved by the Settlement Agreement referenced in the First Amended Petition. *See* First Am. Pet. ¶¶ 59-60.

## III. LEGAL ARGUMENT

Collateral estoppel precludes Perry from pursuing this misguided lawsuit in Texas. Resolution of the claims asserted here will turn on the same issues as in the First Texas Case, in particular, the parties' rights to certain technology and the propriety of certain actions taken by Giant Eagle and the Shapiras with respect to those rights, as provided in the SP Agreements. As the Northern District of Texas held, reliance on these Agreements as a defense triggers the

---

[7] Judge Boyle also held that the forum selection clause was "valid and enforceable" on its face because "it is neither unfair nor unreasonable to require the party initiating litigation to sue in the county of the respondent, as agreed to by the parties, which evidences the parties' apparent desire to discourage litigation." *Id.* at *6. Further, because the forum selection clause provided that venue "shall reside exclusively in the county in which the respondent's principal offices are located," the provision was held to be mandatory rather than permissive. *Id.* at *6, n.4.

[8] Although Excentus argued in the First Texas Case that certain provisions in the SP Agreements had expired, the forum selection clause was not one of them. To the contrary, Excentus expressly invoked and relied upon the forum selection clause in companion litigation in federal court in Pennsylvania. Accordingly, any argument by Perry here that certain provisions of the SP Agreements are expired has no impact on the preclusive effect of Judge Boyle's decision in the First Texas Case—the issue of whether certain provisions of the SP Agreements had expired was raised to Judge Boyle, and she nevertheless dismissed the action based on the forum selection clause. That finding precludes this second attempt to sue in Texas.

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 9
A0927450.9/234716.docx

R038

Agreements' mandatory forum selection clause. That clause requires this case to be brought against Giant Eagle (and the Shapiras) in Allegheny County, Pennsylvania.

## A. Overview of Collateral Estoppel

Collateral estoppel is intended to "promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of matters that have already been decided . . . in a prior suit." *In re Team Rocket, L.P.*, 256 S.W.3d 257, 260 (Tex. 2008). "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Davillier v. Sw. Sec., FSB*, No. 3:12-CV-2413-D, 2012 WL 6049014, at *2 (N.D. Tex. Dec. 5, 2012) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Collateral estoppel applies to issues of venue and forum selection clauses. *Id.* at *2-3; *see also Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 829-30 (5th Cir. 2006) ("[T]his and other courts have held that . . . dismissals based on valid forum selection clauses are preclusive."). "Texas applies the doctrine of collateral estoppel in accordance with traditional federal common law." *Hanson v. Odyssey Healthcare, Inc.*, 2007 WL 5186795, at *3, n.4 (citing *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 802, n.7 (Tex. 1994)).

"[T]o invoke the doctrine of collateral estoppel, a party must establish (1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1990). The doctrine does not require an identity of claims or parties in the original and subsequent actions. Collateral estoppel, rather, "precludes the relitigation of *identical issues* actually litigated in a previous action, even though the subsequent action is based upon a different cause of action."

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 10
A0927450.9/234716.docx

R039

*Wilhite v. Adams*, 640 S.W.2d 875, 876 (Tex. 1982) (emphasis added). Moreover, "[s]trict mutuality of parties is no longer required." *Eagle Props.*, 807 S.W.2d at 721 (citing *Petta*, 44 S.W.3d at 579). Instead, "[i]t is only necessary that the party against whom collateral estoppel is being asserted was a party or in privity with a party in the first action." *Id*. Each of the three elements for collateral estoppel is satisfied here.

**B. The Applicability of the Forum Selection Clause in the SP Agreements was Fully and Fairly Litigated in the First Texas Case**

Whether the SP Agreements' forum selection clause applies when raised as a defense was fully litigated in the First Texas Case and is front-and-center once again. Just as in the First Texas Case, Giant Eagle (and the Shapiras) will be asserting the SP Agreements as a defense because the key factual allegations asserted here are, in all material respects, virtually identical to those asserted in the First Texas Case:

(1) Perry alleges that "[t]he Shapiras were not on Excentus' board to loyally serve Excentus' best interests" and that "they worked tirelessly to benefit and protect Giant Eagle." First Am. Pet. ¶ 31. The First Texas Case was premised on the same theory that "in many dealings related to Excentus, the Shapiras have placed Giant Eagle's interests ahead of Excentus' interests." S.A.C. ¶ 29 (Ex. 6).

(2) Perry alleges that Giant Eagle has not properly compensated Excentus for the use of certain technology. First Am. Pet. ¶ 32; *see also id*. ¶ 34 ("David Shapira went so far as to state that prior to their dispute, he was willing to have Giant Eagle pay Excentus for use of Excentus' technology. But now he was not going to allow Giant Eagle to pay one [expletive] penny."). The First Texas Case contains nearly identical allegations. *See* S.A.C. ¶ 29 (Ex. 6) ("Giant Eagle and the Shapiras have refused to act in good faith to negotiate a license or other agreement to provide Giant Eagle with the right to use the Excentus Patents and to compensate Excentus fairly for such use.").

(3) Perry alleges that the Shapiras were "furious" about the announcement of the Fuel Rewards Network ("FRN") when they should have been happy about it. First Am. Pet. ¶ 33. The First Texas Case alleges the same thing. *See* S.A.C. ¶ 34 (Ex. 6) ("[i]nstead of cheering the rollout of the FRN which is to the great benefit of Excentus, the Shapiras have complained of it and looked for excuses to object to it because they have placed their own interests and those of Giant Eagle ahead of Excentus.").

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE                PAGE 11
A0927450.9/234716.docx

R040

(4) Perry alleges that Giant Eagle acted to "aid and abet" the Shapiras' alleged breaches of their fiduciary duties. First Am. Pet. ¶¶ 68, 71 (alleging that Giant Eagle "knowingly participated" in helping the Shapiras breach their duties "by acting to benefit themselves at the expense of Excentus."). The First Texas Case similarly alleged that Giant Eagle acted through the Shapiras "to disrupt and gain control of Excentus through breaches of the Shapiras' duties of loyalty and utmost good faith," S.A.C. ¶ 29 (Ex. 6), and pled that "the actions of the Shapiras . . . constitute the acts of Giant Eagle." *Id.* ¶ 28; and

(5) Likewise, Perry's unfair competition claim is nothing more than a revised version of the patent infringement claims set forth in the First Texas Case. Perry alleges that Giant Eagle has "gained an unfair advantage in the market by capitalizing on Excentus' customer relationships, prospective business opportunities, and trademarks which [Giant Eagle] [has] misappropriated for [its] own illicit use when they terminated Mr. Perry and paid themselves off with **rights and compensation** they never previously had." First Am. Pet. ¶ 75 (emphasis added). The "rights" referred to here are the rights to the technology that was at the heart of the First Texas Case. Indeed, in the First Texas Case, Excentus alleged essentially the exact same claims, although in language of patent infringement. *See* S.A.C. ¶ 64 (Ex. 6) ("Giant Eagle gained an unfair advantage in the market by capitalizing on Excentus' efforts and success in its fuel discount systems by infringing its patents and gaining access to Excentus' confidential and proprietary information and technology and then using these for Giant Eagle's benefit and against Excentus in the marketplace, which are acts that constitute unfair competition under the common law.").

As these examples demonstrate, the issues raised here are the same as the issues raised in the First Texas Case and the defense will be the same. The "technology" referred to throughout the First Amended Petition—and for which Giant Eagle is alleged to owe additional compensation—is the patents that Excentus purchased from Defendant Auto-Gas in 2008. First Am. Pet. ¶ 28. This technology, however, either existed or was based on claimed technology that existed (and was disclosed) *before* Excentus represented in the SP Agreements that none of its technology infringed upon any other existing patents. Thus, the license granted by Excentus to Giant Eagle in the Software License, and reaffirmed in the SP Agreements, is fatal to any claims by Perry that (1) Giant Eagle owes additional compensation; (2) the Shapiras violated their fiduciary duties by taking the position that Giant Eagle already had a license to the disputed

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 12
A0927450.9/234716.docx

R041

technology; or (3) the Settlement Agreement between Excentus and Giant Eagle *resolving* the parties' claims to the disputed technology under the SP Agreements was a "complete sham."

As Giant Eagle alleged in the First Texas Case, this license granted Giant Eagle the right to use Excentus' fuel site controller technology and "all improvements and enhancements thereto." Ex. 3 ¶ 5.06. By definition, any later acquired patents involving the same technology—such as the patents Excentus allegedly bought from Auto-Gas, which were known at the time of the original Software License—would provide a complete bar to any claim for additional compensation based on Giant Eagle's use of this *licensed* technology.[9] This point, as her opinion makes clear, was not lost on Judge Boyle. Moreover, Excentus' warranty of non-infringement (and related indemnification) in the SP Agreements covered any patents existing at that time, which includes the patents for which Perry now claims Giant Eagle owes additional compensation. Thus, the SP Agreements provide Giant Eagle (and the Shapiras) with a defense to Perry's claims, as their alleged conduct was entirely consistent with the parties' respective rights under the SP Agreements.

On top of that, the relief Perry seeks—including rescission of the Settlement Agreement resolving the parties' disputes about their rights under the SP Agreements—demonstrates why collateral estoppel is so important here. First Am. Pet. at p.26, ¶ 2. Rescission of the Settlement Agreement that ultimately resolved the claims asserted in the First Texas Case (and later re-filed in Pennsylvania) would result in the reinstatement—***in Texas***—of the ***exact same litigation*** that already was dismissed out of Texas by Judge Boyle. This would be a blatant end-run around the principles of collateral estoppel. Perry cannot "sidestep the reach of a contractual forum-

---

[9] *DeForeste Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927); *Corebrace LLC v. Star Seismic LLC*, 2008 WL 7071435, at *5 (D. Utah July 18, 2008) ("the licensee's rights under that agreement remain intact and [p]laintiff's claims for … infringement fail to state a claim for which relief may be granted.").

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 13
A0927450.9/234716.docx

R042

selection clause by suing under causes of action sounding in tort." *Ginter*, 536 F.3d at 445; *accord Marinechange Shipping Ltd. v. Sebastian*, 143 F.3d 216, 220-21 (5th Cir. 1998). Moreover, Perry argues that the Settlement Agreement was a "complete sham" because "[t]he Shapiras and Giant Eagle awarded themselves rights that they never had" and that it "resulted in a complete grant of impunity to Giant Eagle and the Shapiras for their conduct" with respect to the parties' usage of, and rights to, certain technology. First Am. Pet. ¶ 60. Of course, the only way for a court to determine whether the Settlement Agreement resolving a dispute about the parties' rights under the SP Agreements was a "sham" would be to construe the parties' rights under the SP Agreements. As explained throughout, construing these Agreements triggers the forum-selection clause.

Accordingly, because "resolution of [the] claims clearly requires the Court to construe the [SP] Agreements, given Giant Eagle's reliance on the Agreements as a defense," the forum-selection clause within those Agreements applies and this case must be brought in Pennsylvania—not Texas. *Excentus*, 2012 WL 2525594, at *9-10 (Ex. 1); *see also Fuchs Family Trust v. Parker Drilling Co.*, No. 9986-VCN, 2015 WL 1036106 (Del. Ch. March 4, 2015) (unpublished) (applying Texas collateral estoppel law to bar subsequent derivative litigation where the subsequent action was "based on the same underlying operative facts" and noting "[t]hat the two plaintiffs may have offered somewhat different theories…does not deprive the [initial action] of preclusive effect."). The first element of collateral estoppel is satisfied because the applicability of the forum selection clause already has been litigated and decided.

## C. The Finding that the Forum Selection Clause Applied was Essential to the Judgment

The federal district court's holding that the forum selection clause applied was essential to the judgment in the First Texas Case; indeed, it was the very reason for dismissal. *Excentus*,

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 14
A0927450.9/234716.docx

R043

2012 WL 2525594, at *8 ("The Court finds that the [SP] Agreements' forum selection clauses are applicable in this case, and therefore venue is improper."); *Davillier*, 2012 WL 6049014, at *1 ("collateral estoppel bars the parties from relitigating the enforceability or applicability of the forum selection clause in the parties' . . . agreement."). The second element is satisfied.

### D. The Parties Were Cast as Adversaries in the Original Texas Action

Collateral estoppel operates "against persons who have had their day in court either as a party to the prior suit or as a privy, and, where not so, that, at the least, the presently asserted interest was actually and adequately represented in the prior trial." *Eagle Prop.*, 807 S.W.2d at 721 (Tex. 1990) (quotations omitted). The doctrine does not require that the parties in both actions be identical; "rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation." *Id.* (citations omitted). "People can be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action." *Id.* (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996)). "The judgment in an action to which the corporation is a party is binding under the rules of [collateral estoppel] in a subsequent action by its stockholders or members suing derivatively on behalf of the corporation . . . ." RESTATEMENT (SECOND) OF JUDGMENTS § 59(2) (1982).[10]

The application of these privity principles is straightforward. In the First Texas Case, Excentus was the named Plaintiff and represented the corporation's (*i.e.*, the shareholder's)

---

[10] *See also* COMMERCIAL RELATIONSHIPS, 18A Fed. Prac. & Proc. Juris. § 4460 (2d ed.) (because a derivative proceeding "is on the claim of the corporation, any judgment that precludes the claim of the corporation also precludes a derivative action to enforce that claim."); *Foreman v. Gen. Motors Corp.*, 625 F. Supp. 1048 (S.D. Ohio 1985) (holding that individual shareholders could not relitigate breach of contract claims that had already pursued by the corporation); *In re Horne*, 44 B.R. 796, 797 (Bankr. S.D. Fla. 1984) (citing *Montana v. U.S.*, 440 U.S. 147, 154) (dismissal of a prior proceeding brought by a corporation "constitutes an adjudication on the merits and this debtor, whose present claim is derivative, is collaterally estopped from relitigating those issues.").

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE        PAGE 15
A0927450.9/234716.docx

R044

interests against Giant Eagle and the Shapiras. Perry was a major shareholder and CEO of Excentus; his interests were well-represented. As misguided and meritless as the present case may be, Perry is seeking, through this purported derivative action, to represent the same interests (Excentus shareholders against Giant Eagle and the Shapiras) that Excentus represented in the First Texas Case. *See* TEX. BUS. ORGS. CODE § 21.551(1) ("Derivative proceeding" means a civil suit in the right of a domestic corporation); *In re Sonus Networks, Inc. Shareholder Derivative Litig.*, 499 F.3d 47, 63 (1st Cir. 2007) (applying collateral estoppel to bar second derivative lawsuit because "[i]t is a matter of black letter law that the plaintiff in a derivative suit represents the corporation, which is the real party in interest").[11] If this derivative suit were successful, the relief requested would flow to Excentus. *See Hanson*, 2007 WL 5186795, at *5 ("an individual shareholder bringing a derivative claim is at best a nominal plaintiff. . . . The corporation is the real party in interest; it receives the proceeds of the action and is bound by the results of the suit. . . . Therefore, [the corporation] is the true plaintiff in this suit, just as it was in the State Court Derivative Action."). The privity element is satisfied.[12]

---

[11] *See also Hanson*, 2007 WL 5186795, at *5 (holding that "because [plaintiff] and the state court plaintiffs both represent identical interests—Odyssey and all of its shareholders—the Court finds that the parties to this suit were indeed cast as adversaries" in the previous action); *LeBoyer v. Greenspan,* No. 03-cv-5603, 2006 WL 2987705, at *3 (C.D. Cal. Oct. 16, 2006) ("differing groups of shareholders who can potentially stand in the corporation's stead are in privity for the purposes of issue preclusion."). Moreover, the same reasoning that Judge Boyle applied in finding that the Shapiras could invoke the forum selection clause—namely, "the relatedness of the Shapiras to the dispute between Excentus and Giant Eagle," *Excentus*, 2012 WL 2525594, at *10, n.10—applies to bind Perry, an Excentus shareholder and former CEO, to the results of that dispute.

[12] In the alternative, even if the Court finds the elements of collateral estoppel are not met here, the Court should nevertheless dismiss this case based on the forum selection clause *for the same reasons* outlined in Judge Boyle's opinion. The forum selection clause applies because the Court is required to determine the parties' rights under the SP Agreements to resolve Perry's claims. *See Aerus L.L.C. v. Pro Team, Inc.*, No. 3:04-cv-1985-M, 2005 WL 1131093 (N.D. Tex. May 9, 2005) ("If enforcement of a provision in [an agreement with a forum selection clause] is … a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause."); *Pinnacle Interior Elements, Ltd. v. Panalpina, Inc.*, 3:09-cv-0430-G, 2012 WL 445927, at *5 (N.D. Tex. Feb. 9, 2010) ("When the plaintiff raises tort claims, the applicability of a contractual forum-selection clause to those claims depends on whether resolution of the claims relates to interpretation of the contract.").

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE                    PAGE 16
A0927450.9/234716.docx

R045

## IV. CONCLUSION

Perry is collaterally estopped from bringing this case against Giant Eagle (and the Shapiras) in Texas. Even though the Petition does not allege a breach of the SP Agreements, resolution of Perry's claims will require a court to construe the parties' respective rights and obligations under those Agreements. As previously held by the U.S. District Court for the Northern District of Texas, the mandatory forum selection clause in the SP Agreements applies, and Perry can only pursue these claims against Giant Eagle (and the Shapiras) in Allegheny County, Pennsylvania. This case should be dismissed.

Respectfully Submitted,

*/s/ Orrin L. Harrison III*

Orrin L. Harrison III
  Bar No. 09130700
  oharrison@ghetrial.com
GRUBER HURST ELROD JOHANSEN
HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Telephone:  214-855-6828
Fax: 214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com
Jonathan Marcus
  jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone:  412-338-5200
Fax: 412-391-8758

***Attorneys for Giant Eagle, Inc., David Shapira, and Daniel Shapira***

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 17
A0927450.9/234716.docx

R046

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause via electronic filing and E-Mail, in accordance with Rule 21a, Texas Rules of Civil Procedure, on July 15, 2015.

Michael P. Lynn
 mlynn@lynnllp.com
Jeremy A. Fielding
 jfielding@lynnllp.com
Andres Correa
 acorrea@lynnllp.com
Lynn Tillotson Pinker & Cox, LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
*Counsel for Plaintiffs*

Ken Carroll
 kcarroll@ccsb.com
Bryan Erman
 berman@ccsb.com
Sara Romine
 sromine@ccsb.com
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202
*Counsel for Defendants Brandon Logsdon and Jim Mills*

Lisa S. Gallerano
 lgallerano@akingump.com
Patrick O'Brien
 obrien@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201-4624
*Counsel for Defendant Alliance Data Systems, Inc.*

Robert Wagstaff
 rwagstaff@mcmahonlawtx.com
Paul L. Cannon
 pcannon@mcmahonlawtx.com
McMahon Surovik Suttle, PC
400 Pine Street, Suite 800
Abilene, Texas 79601
*Counsel for Defendants Randy Nicholson and Auto-Gas*

 */s/ Orrin L. Harrison III*
Orrin L. Harrison III

DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS FOR COLLATERAL ESTOPPEL
OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE          PAGE 18
A0927450.9/234716.docx

R047

# EXHIBIT 1

*Excentus Corp. v. Giant Eagle, Inc.*, 3:11-cv-03331,
2012 WL 2525594 (N.D. Tex. July 2, 2012) (Boyle, J.)

2012 WL 2525594
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

EXCENTUS CORPORATION, Plaintiff,

v.

GIANT EAGLE, INC., David Shapira,
and Daniel Shapira, Defendants.

Civil Action No. 3:11–CV–
3331–B.    |    July 2, 2012.

**Attorneys and Law Firms**

Brett C. Govett, Karl G. Dial, Fulbright & Jaworski, Dallas, TX, for Plaintiff.

Orrin Lea Harrison, III, Patrick G. O'Brien, Akin Gump Strauss Hauer & Feld, Dallas, TX, Bernard D. Marcus, Brian C. Hill, Scott D. Livingston, Marcus & Shapira LLP, Pittsburgh, PA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JANE J. BOYLE, District Judge.

 **\*1**  Before the Court are the Motions to Dismiss for Improper Venue, Lack of Personal Jurisdiction, and Failure to Plead a Legally Sufficient Claim filed by Defendants Giant Eagle, Inc. ("Giant Eagle") (doc. 24) and David and Daniel Shapira (the "Shapiras") (doc. 27), both filed January 31, 2012. For the reasons listed below, the Court finds that venue is improper and therefore **DISMISSES** Excentus' Second Amended Complaint ("SAC") without prejudice to refiling in a court of proper venue.

### I.

### BACKGROUND

This case concerns tort claims stemming from a soured business relationship between the parties. Starting in 2001, the parties began discussing a project whereby Excentus Corporation ("Excentus") would provide Giant Eagle with technology in support of Giant Eagle's efforts to design a loyalty rewards program for Giant Eagle grocery stores. These types of programs, increasingly common across the country, provide grocery store or other retail establishment customers with discounts at gasoline stations, gift cards, or other types of rewards. Pursuant to these discussions, the parties entered into a Software License and General Services Agreement ("Software License") in 2002 and a later Addendum in 2010. Through the Software License, Excentus provided computer software that Giant Eagle uses in its "fuelperks!" program, which is Giant Eagle's specific gas-grocery cross-marketing program using fuel discounts as consumer loyalty rewards.

The parties' relationship expanded over time as Giant Eagle invested in Excentus twice in 2004 and 2005 through its Stock Purchase Agreements, becoming one of Excentus' largest shareholders and gaining two seats on Excentus' Board of Directors. [1] Unfortunately, relations between the parties eventually deteriorated due to Excentus' claims that Giant Eagle failed to properly support Excentus' current and future business plans as required by the parties' Stock Purchase Agreements and also failed to obtain a license to Excentus' patents for use in Giant Eagle's fuelperks! program and failed to pay for such license. Excentus now asserts claims against Giant Eagle and the Shapiras, directors or officers of both Giant Eagle and Excentus, for breach of duties of loyalty and good faith, patent infringement, and unfair competition. Excentus also seeks declaratory judgement regarding whether Giant Eagle has a license to the patents at issue pursuant to the parties' Software License. Giant Eagle now seeks dismissal of Excentus' claims for improper venue, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted. Specifically, Giant Eagle argues that venue is improper due to forum selection clauses contained in contracts between the parties, Defendants have insufficient contacts with Texas that would subject them to personal jurisdiction in this Court, and Defendants are relieved from any liability pursuant to the parties' various contracts.

### II.

### LEGAL STANDARD

 **\*2**  Federal Rule of Civil Procedure 12(b)(3) ("Rule 12(b)(3)") provides for the dismissal of civil actions for improper venue. In relevant part, 28 U.S.C. § 1391(b) states that a

civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."A motion to dismiss for improper venue requires that the facts be viewed in the light most favorable to the plaintiff.*Ambraco,* 570 F.3d at 237–38 (citation omitted). Moreover, " 'the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments.' "*Id.* at 238 (citation omitted).[2]

## III.

## ANALYSIS

Giant Eagle moves the Court to dismiss the case for improper venue, alleging that venue is not proper in the Northern District of Texas because of forum selection clauses in two of the contracts between the parties. Specifically, Giant Eagle argues that its Stock Purchase Agreements with Excentus granted it a full license to use any and all Excentus intellectual property and its purported obligations that it allegedly failed to meet arose out of the Stock Purchase Agreements, and therefore the forum selection clauses in the Stock Purchase Agreements are applicable. In response, Excentus argues that the two contracts containing these forum selection clauses have nothing to do with its claims in this case and therefore the forum selection clauses are inapplicable in this case.

The parties' Stock Purchase Agreements set forth as follows:

> 8.06 GOVERNING LAW; VENUE. This agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to the conflict of laws rules or choice of laws rules thereof or of any state. Venue for any action arising out of this agreement shall reside exclusively in the county in which the respondent's principal offices are located.

Giant Eagle Mot.App. 53, 89.[3] Giant Eagle is located in Allegheny County, Pennsylvania, and Giant Eagle argues that, given its reliance on the Stock Purchase Agreements as a defense to Excentus' claims, these claims must be brought in Allegheny County. The Court will first look to whether the forum selection clauses at issue are enforceable and then to whether such clauses apply to Excentus' claims in this case.

### i. Enforceability of the Forum Selection Clause.

"[A] forum selection clause is prima facie valid and should be enforced unless the resisting party shows that enforcement would be unreasonable."*Seattle–First Nat'l Bank v. Manges,* 900 F.2d 795, 799 (5th Cir.1990) (citing *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). Federal law governs whether forum selection clauses are enforceable.*Von Graffenreid v. Craig,* 246 F.Supp.2d 553, 560 (N.D.Tex.2003) (citing *Haynsworth v. Corp.,* 121 F.3d 956, 962 (5th Cir.1997)). Under Fifth Circuit precedent, courts are to presumptively enforce forum selection clauses with few exceptions. *See Haynsworth,* 121 F.3d at 962–63. The presumption can only be overcome by a clear showing that the clause is unreasonable under the circumstances. *Id.* at 963.The party resisting the enforcement bears the "heavy burden" of showing that one of the following makes the clause unreasonable: "(1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state."*Id.* (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *M/S Bremen,* 407 U.S. at 12–13, 15, 17, 18).

**\*3** Excentus does not argue that any of the foregoing factors render the forum clauses unreasonable, focusing instead on its contention that the forum selection clauses are inapplicable to its claims. Nevertheless, the Court finds that it is neither unfair nor unreasonable to require the party initiating litigation to sue in the county of the respondent, as agreed to by the parties, which evidences the parties' apparent desire to discourage litigation. *See Abbott Labs. v. Takeda Pharm. Co.,* 476 F.3d 421, 422 (7th Cir.2007) ("The purpose of specifying two forums in this way is to discourage either side from instituting litigation, because whoever sues must litigate on the other party's turf.") The Court also notes that the contracts appear to have been negotiated at arm's length and there is no indication of fraud. The Court further finds that litigating Excentus' claims in Pennsylvania will not deprive Excentus of its day in court or any legal remedy, and enforcement of the forum selection clause does not contravene a strong public policy of any state. *See Haynsworth,* 121 F.3d at 963. Accordingly, the

Court finds that the forum selection clauses contained in the Stock Purchase Agreements are valid and enforceable. [4]

***ii. Does the Forum Selection Clause Apply in This Case?***

Having found that the forum selection clauses are valid, the Court must determine whether they apply to Excentus' claims in this case. Giant Eagle points to several provisions of the Stock Purchase Agreements to argue that the forum selection clauses apply. Specifically, Giant Eagle points to ¶ 3.09(d) of both Agreements, in which Excentus represented that "none of the Intellectual Property currently sold or licensed by [Excentus] to any Person ... infringes upon or otherwise violates any Intellectual Property rights of others."*See* Giant Eagle Mot.App. 36, 73. Giant Eagle also points to ¶ 7.01(a) of both Agreements, in which Excentus fully indemnified Giant Eagle for any claim arising out of "any misrepresentation or breach of [this] warranty" by Excentus. *Id.* at App. 49, 86–87. Giant Eagle further argues that the patents now claimed to have been infringed, U.S. Patent Nos. 6,321,984 (the "#984 Patent"); 6,332,128 (the ʹ128 Patent); and 7,383,204 (the "#204 Patent"), were issued or were based on claimed technology that existed and was disclosed before Excentus represented that none of its technology infringed any other patents. It also argues that Excentus' representation included the technology that Excentus licensed to Giant Eagle under the Software License. In its view, Excentus' warranty of non-infringement and indemnification includes the ʹ984, ʹ128, and ʹ204 Patents, which were acquired by Excentus from Auto Gas in 2008. Giant Eagle also notes ¶ 5.06 of the 2004 Stock Purchase Agreement, which granted Giant Eagle "the non-exclusive right to license [Excentus'] Products and to establish retail/gas station alliances utilizing [Excentus'] Products in any market in which [Giant Eagle] operates as of or after the Closing Date." [5] Giant Eagle Mot.App. 47–48. "Products" are defined in the Stock Purchase Agreement as "the technology which [Excentus] has licensed to [Giant Eagle] ... and all improvements and enhancements thereto, and the Company's Reward Marketing Engine software module."*Id.* at 48, 84–85.Under these terms, Giant Eagle argues, "the 2004 Stock Purchase Agreement gave Giant Eagle the right to use whatever Excentus technology—including patented technology—it needed for its fuelperks! program."Giant Eagle Mot. Br. 7. In its view, it has a license granted under the Stock Purchase Agreements, and such license is a complete defense to the patent infringement claims. Giant Eagle also argues that Excentus' breach of duty of loyalty claims and unfair competition claims are also barred by such alleged license, given the Second Amended Complaint's

allegations that Giant Eagle "gained an unfair advantage in the market by capitalizing on Excentus' efforts and success in its fuel discount systems by infringing its patents ... which are acts that constitute unfair competition under the common law ...," SAC ¶¶ 64–65, and the complaint's allegation that the Shapiras breached their fiduciary duty to Excentus by claiming that the Software License "granted Giant Eagle a license to the Excentus Patents," SAC ¶ ¶ 30, 33.

**\*4** In response, Excentus argues that its tort claims fall outside the scope of the forum selection clauses because its claims do not involve an interpretation of the Stock Purchase Agreements, and it also argues that none of the elements of its claims "arise out of" the Stock Purchase Agreements. In its view, it may "prove and prevail on all of its tort claims against Giant Eagle without reference to, or interpretation of, the Stock Purchase Agreements." [6] Pl.'s Resp. Giant Eagle Mot. 6. Excentus further argues that forum selection clauses "do not apply when the alleged nexus between the action and the contract arises only with respect to a claimed defense." [7] *Id.* at 8 (citing *Philips v. Audio Active Ltd.,* 494 F.3d 378, 391–92 (2d Cir.2007)).

The Court finds that the Stock Purchase Agreements' forum selection clauses are applicable in this case, and therefore venue is improper. The Court first notes that whether a forum selection clause applies to a plaintiff's claims is a case-specific inquiry. *See, e.g., Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 694 (8th Cir.1997). Without deciding whether the Stock Purchase Agreements do in fact grant Giant Eagle a license to Excentus' patents and are a defense to the breach of duty of loyalty and unfair competition claims, Giant Eagle's defense requires the Court to interpret the Stock Purchase Agreements. As explained by the court in *Aerus L.L.C. v. Pro Team, Inc.,* No. 3:04–cv–1985–M, 2005 WL 1131093 (N.D.Tex. May 9, 2005), "[i]f enforcement of a provision in [an agreement with a forum selection clause] is ... a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause."*Id.* at \*8 (citing *Penn, L.L.C. v. New Edge Network, Inc.,* No. 03 C 5496, 2003 WL 22284208, \*2 (N.D.Ill. Oct. 3, 2003)); *see also Pinnacle Interior Elements, Ltd. v. Panalpina, Inc.,* No. 3:09–cv–0430–G, 2010 WL 445927, \*5 (N.D.Tex. Feb.9, 2010) ("When the plaintiff raises tort claims, the applicability of a contractual forum-selection clause to those claims 'depends on whether resolution of the claims relates to interpretation of the contract.'") (citations omitted). The *Aerus* court found that the defendant's defense to a patent infringement claim

was based on a contract containing a forum selection clause, and therefore "the allegations in this claim [had] a 'direct or indirect connection, link or association with, or relation to" that contract containing the forum selection clause. *Aerus,* 2005 WL 1131093, at \*8 (citing *Smith v. Lucent Techs., Inc.,* No. Civ.A. 02–0481, 2004 WL 515769, \*11 (E.D.La. Mar.16, 2004)). Accordingly, the court found the forum selection applicable to the patent infringement claim, and it later found that the forum selection clause was also applicable to the plaintiffs' other claims, including its unfair competition claim.

Here, the Court must look to the Stock Purchase Agreements to determine whether Giant Eagle's defenses are valid, and therefore the forum selection clauses contained in them are applicable. Excentus' claims do not rely on the Stock Purchase Agreements, but resolution of these claims clearly requires the Court to construe the Stock Purchase Agreements, given Giant Eagle's reliance on the Agreements as a defense. [8] *See Pinnacle Interior Elements,* 2010 WL 445927, at \*5. Further, the Court must look to the Stock Purchase Agreements in order to resolve *all* of Excentus' claims, given that they involve Giant Eagle's obligations under the Stock Purchase Agreements, [9] whether Giant Eagle had a license to the patents at issue, or whether such purported license is a defense to Excentus' claims. Accordingly, the Court finds both that the forum selection clause of the Stock Purchase Agreements applies to all of Excentus' claims and also that venue is improper as to all of these claims. [10]

\*5 The Court reiterates that its finding that the forum selection clause is applicable does not resolve the issue of whether the Stock Purchase Agreements are in fact valid defenses to Excentus' claims. However, such determination requires the Court to examine the Stock Purchase Agreements, thereby invoking the forum selection clauses found in these Agreements. Accordingly, venue is not proper in the Northern District of Texas, and Excentus' Second Amended Complaint is hereby **DISMISSED** for improper venue.

## IV.

## CONCLUSION

For the reasons discussed above, the Court finds that venue is improper in the Northern District of Texas and **GRANTS** Giant Eagle's and the Shapiras' Motions (docs.24, 27) to the extent they seek dismissal of Excentus' Second Amended Complaint under Rule 12(b)(3). The Second Amended Complaint is hereby **DISMISSED.**This dismissal is without prejudice to refiling in a court of proper venue. [11]

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2525594

Footnotes

1   Although not directly referred to in the Second Amended Complaint, the Stock Purchase Agreements by which Giant Eagle gained seats on Excentus' Board of Directors are referred to indirectly. *See* SAC ¶¶ 13–15. Further, a court may look at evidence outside of the complaint in resolving a motion to dismiss for improper venue. *See, e.g., Ambraco, Inc. v. Bossclip B.V.,* 570 F.3d 233, 237–38 (5th Cir.2009). Accordingly, the Court looks to the Stock Purchase Agreements and other documents in addition to the documents attached to the Second Amended Complaint in resolving Defendants' Motions to Dismiss for Improper Venue.

2   Although courts have not been consistent as to which party bears the burden of proof on a Rule 12(b)(3) motion for improper venue, several of them have found that the burden of proving that venue is proper lies with the plaintiff. *See, e.g., Inst. for Creation Research Graduate Sch. v. Paredes,* No. 3–09–cv–693–B, 2009 WL 4333366, \*2 (N.D.Tex. Dec.1, 2009); *Tracfone Wireless, Inc. v. Carson,* No. 3:07–cv1761–G, 2008 WL 4107584, \*7 (N.D.Tex. Aug.28, 2008); *Psarros v. Avior Shipping, Inc.,* 192 F.Supp.2d 751, 753 (S.D.Tex.2002); *Advanced Dynamics Corp. v. Mitech Corp.,* 729 F.Supp. 519, 519 (N.D.Tex.1990). The Court also notes the opinion of 5 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure* § 3826 (3d ed. 2007) ("The federal courts are divided on which party bears the burden on a motion to dismiss for improper venue.... But what has been characterized as 'the better view,' and the position that probably represents the weight of judicial authority, is that, when an objection has been raised, the burden is on the plaintiff to establish that the district he or she has chosen is a proper venue.... This approach is consistent with the plaintiff's threshold obligation to show that the case belongs in the particular district court in which suit has been instituted.") (citations omitted).

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

3    This provision is identical in both of the Stock Purchase Agreements and is numbered § 8.06 in both.

4    The Court also finds that the forum selection clauses contained in the Stock Purchase Agreements are mandatory, rather than permissive, given that the clauses state that venue "shall reside *exclusively* in the county in which the respondent's principal offices are located."(emphasis added).*See, e.g., Von Graffenreid,* 246 F.Supp.2d at 560 ("Where the [forum selection clause] contains clear language showing that jurisdiction is appropriate only in a designated forum, the clause is mandatory.") (citations omitted).

5    The 2005 Stock Purchase Agreement contains an identical provision. Giant Eagle Mot.App. 84–85.

6    As noted by Giant Eagle, though, Excentus does rely on, *inter alia,* the Stock Purchase Agreements in arguing that this Court has both general and specific jurisdiction with respect to Excentus' claims against Giant Eagle.

7    Excentus also argues that the February 2010 Addendum to the Software License "makes it clear that Giant Eagle has no license to the Excentus patents" and the purported warranty of noninfringement does not provide a defense because "the warranty given expired 18 months after the closing date, and the software Excentus licensed does not contain all the elements for infringement of the patents Excentus acquired years later."Pl.'s Resp. Giant Eagle Mot. 9–10.

8    The Court notes the *Phillips* court's finding that a forum selection clause, contained in a contract that was relevant only as a defense, was without effect, *Phillips,* 494 F.3d at 391, but finds persuasive the warning of the court in *Penn, L.L.C. v. New Edge Network, Inc.,* No. 03 C 5496, 2003 WL 22284207 (N.D.Ill. Oct.3, 2002) which found that such a rule would allow a "clever party" to "simply avoid its contractual obligations through sophistry."*Id.* at *2. The Court further notes that the basis for the *Phillips* court's ruling, a narrow interpretation of phrases such as "arising out of," has been rejected by some courts. *See, e.g., Appliance Zone, LLC v. NexTag, Inc.,* 2009 WL 5200572, *6 (S.D.Ind.2009) (noting that both the Seventh and Ninth Circuits interpreted "arising out of" more broadly than the Second Circuit) (citations omitted).

9    As stated previously, at least some of the obligations allegedly not met by the Shapiras were allegedly assumed by Giant Eagle at the time of the Stock Purchase Agreements. *See, e.g.,* SAC ¶ 15 "As part of the investment in Excentus, Giant Eagle committed to suport Excentus' current and future business and plans.").

10   The Court also finds the Shapiras may invoke the forum selection clause of the Stock Purchase Agreements given the relatedness of the Shapiras to the dispute between Excentus and Giant Eagle. *See Excel Mktg. Solutions Inc. v. Direct Fin. Solutions LLC,* 2011 WL 1833022, at *6 (N.D.Tex. May 13, 2011) ("A nonparty can be bound to a forum selection clause if the nonparty is 'closely related to the dispute such that it becomes foreseeable that it will be bound.") (citing, *inter alia, Hugel v. Corp. of Lloyds,* 999 F.2d 206 (7th Cir.1993)). Indeed, the complaint itself explains that "the actions of the Shapiras described herein constitute the acts of Giant Eagle" and "[r]eference to Giant Eagle is reference to these acts."SAC ¶ 28. Accordingly, venue is improper as to the Shapiras as a result of the forum selection clause contained in the Stock Purchase Agreements, for the reasons discussed above.

11   Given that the Court has dismissed the Second Amended Complaint under Rule 12(b)(3), the Court does not express an opinion on Defendants' contention that dismissal is also proper for lack of personal jurisdiction over all Defendants and for failure to state a claim upon which relief can be granted.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2


Software License and General Services Agreement

R054

# CCIS*TECH*, Inc.

## SOFTWARE LICENSE
## AND
## GENERAL SERVICES AGREEMENT

Date of Agreement: ~~February~~ ~~, 200~~ ~~~

*March  4, 2002*

THIS SOFTWARE LICENSE AND GENERAL SERVICES AGREEMENT (the. "Agreement") sets forth the terms and conditions on and subject to which CCIS*TECH*, Inc. ("CCIS*TECH*"), a Texas corporation, will license the Licensee identified below the right to use certain technology product(s) proprietary to CCIS*TECH* and under which CCIS*TECH* will provide certain services to the Licensee. The License and Services Terms and Conditions and the Exhibits attached hereto are part of this Agreement and are incorporated herein by reference.

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT, UNDERSTANDS IT, AND AGREES TO BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS.

Licensor:                                    Licensee:

CCIS*TECH*, INC.                            GIANT EAGLE, INC.


By: _____              By: _____
Name: Dickson D. Perry                      Name: Robert Garrity
Title:   President & CEO                     Title:    Sr. VP Information Services

Address for Formal Notices:                 Address for Formal Notices:

Attention: President                        Attention: _____
CCIS*TECH*                                   Giant Eagle, Inc.
4320 N. Beltline Road, Suite A205           101 Kappa Drive
Irving, Texas 75038                         RIDC Park
                                            Pittsburgh, PA 15238


CCIS*TECH* Contract Control No.: _____     Giant Eagle, Inc.  Contract.doc

# CCIS*TECH*, Inc.

## SOFTWARE LICENSE AND GENERAL SERVICES AGREEMENT

1. <u>Grant of Non-Exclusive License</u>. Licensee hereby requests and CCIS*TECH* hereby grants, on a per site basis, a non-exclusive license (a "Site License" or "Site Licenses") to use the CCIS*TECH* fuel site controller technology ("CCIS*TECH* Software") on certain hardware (a "Site Controller"), including certain modules and module configurations, as described in each Site License identified in Exhibit C. This Agreement is not a sale of the original CCIS*TECH* Software or any copy thereof.

2. <u>Services</u>. CCIS*TECH* agrees to provide only those services set forth on Exhibit D, which may include consulting, system requirements definition, software programming, site profile studies, software and hardware configuration, training, equipment installation, site operations and management support, transaction and telecommunications management and support of the CCIS*TECH* Software (the "Services"). Licensee acknowledges that no services of any kind are included in this Agreement or any part thereof unless expressly stated on Exhibit D. Licensee shall not be obligated to obtain Services from CCIS*TECH*, and CCIS*TECH* shall not be obligated to provide Services other than those specifically agreed to by both parties in writing.

3. <u>Fees</u>. In consideration for the Site Licenses granted herein and the Services to be provided by CCIS*TECH*, Licensee shall pay to CCIS*TECH* all fees set forth in this Agreement and Exhibits attached hereto. CCIS*TECH* shall have the right to increase the fees in this Agreement after the first anniversary of this Agreement and after each anniversary thereafter. Such increases shall be no greater than the percentage increase in the Consumer Price Index ("CPI"), or any replacement index or measurement in the future, for the previous year as measured by the government of the United States. In the event CCIS*TECH* elects to increase fees in accordance with this paragraph 3, CCIS*TECH* shall notify Licensee at least thirty (30) days in advance of such increase and licensee will have the option of terminating the Agreement.

4. <u>Payments</u>. All payments shall be due upon receipt of an invoice from CCIS*TECH* unless otherwise agreed in writing. CCIS*TECH* shall have no obligation to provide CCIS*TECH* Software, Site Controllers or Services until such time as all required payments have been received by CCIS*TECH*. In the event there is a legitimate dispute regarding payment(s) on a Site Controller(s) or related hardware, CCIS*TECH* will not withhold performance on Services for which Licensee is current on all required payments. CCIS*TECH* shall collect from Licensee and pay all sales tax due for the license and any services provided under this Agreement, however, Licensee agrees to pay all other taxes due, including but not limited to any personal property taxes which may be due for the CCIS*TECH* Software as installed.

5. <u>Term</u>. The term of this Agreement shall be for one years, beginning on the date indicated on the signature page (the "Term"). The Agreement will automatically renew at the end of each Term for additional one year Terms unless either party provides prior written notice to the other party that they do not intend to renew the Agreement at least 180 days prior to the expiration of the then-current Term.

6. <u>Necessary Information</u>. Licensee agrees to provide CCIS*TECH* with, or access to, any necessary information reasonably required for CCIS*TECH* to install, operate, support and update the CCIS*TECH* Software (the "Necessary Information"). Throughout the Term of this Agreement, Licensee agrees to designate one (1) employee (the "Designated Employee") that can provide or cause to be provided the Necessary Information requested by CCIS*TECH*. CCIS*TECH* shall make a written request to the Designated Employee for any needed Necessary Information, and Licensee shall respond in the same form, unless otherwise agreed by the parties. <u>Necessary Information shall be designated as Confidential Information to the Licensee and subject to the terms and provisions of confidentiality and nondisclosure as set forth below in Section 21.</u>

7. <u>Support Personnel Designation and Certification</u>. Throughout the term of this Agreement, Licensee shall designate one (1) employee plus one (1) back up employee to be trained and certified by CCIS*TECH* at the expense of Licensee to support the CCIS*TECH* Software ("Certified Personnel"). Licensee agrees to utilize its best efforts to maintain a minimum of two Certified Personnel at all times during this Agreement. Such Certified Personnel shall be the only ones authorized to test, operate, support, change, copy, or backup the CCIS*TECH* Software as outlined in this Agreement other than the employees of CCIS*TECH*. Licensee acknowledges that such certification is only regarding Licensee's ability to work with CCIS*TECH* to support the CCIS*TECH* Software and does not relate to any other equipment available, installed or used at any Licensee site. Licensee acknowledges that such Certified Personnel shall be the initial point of support for the Licensee and its

**CONFIDENTIAL**
*Page 2* App. 9

R056

employees and representatives and that CCIS*TECH* shall be obligated only to provide support as described in Exhibit D, or elsewhere in this Agreement, to such Certified Personnel.

In the event someone requests support other than Licensee's Certified Personnel, then CCIS*TECH* shall direct such request to Licensee's Certified Personnel and/or Licensee's Designated Employee. In the event that Licensee's Certified Personnel are not available, CCIS*TECH* may, in its sole discretion, (i) wait to provide the requested support until Licensee's Certified Personnel are available; or (ii) request written authorization from Licensee's Designated Employee designating another employee to be certified by CCIS*TECH* at Licensee's expense prior to providing the requested support. Licensee acknowledges that supplementary certification and training will be offered at such time and locations as mutually agreed by both parties.

8. Training. CCIS*TECH* will provide, at the expense of the Licensee, training necessary to satisfy Licensee's obligation to provide Certified Personnel that is tailored for the License, which shall be mutually agreed to in a Service Order under Exhibit D. No training is included, neither in this Agreement nor in any Site License, unless expressly written.

9. Hardware. Licensee acknowledges that CCIS*TECH* does not manufacture the Site Controller hardware on which the CCIS*TECH* Software is installed or any equipment operated by the CCIS*TECH* Software, and therefore is not responsible for its performance or malfunction. CCIS*TECH* does test all hardware on which the CCIS*TECH* Software is installed in order that CCIS*TECH* may determine that such hardware is compatible with the CCIS*TECH* Software and proper support can be provided for the CCIS*TECH* Software. The manufacturers warranties included with any hardware CCIS*TECH* provides will be passed through to the licensee.

10. Freight and Insurance. Licensee agrees to pay all costs for transportation to the site. All shipments are FOB from CCIS*TECH*'s point of shipment. Licensee, at the expense of Licensee, may choose to either insure shipments through Licensor's transportation provider or through its own insurance provider as long as any administration is mutually agreed upon in advance between Licensee and Licensor.

11. Documentation. CCIS*TECH* shall provide one copy of generic system documentation ("Documentation") along with the back up disk(s) for each software module operated by Licensee. "Documentation" refers to any and all associated user manuals, documentation and any other supporting materials relating to the CCIS*TECH* Software and provided to Licensee. Documentation may or may not be updated. CCIS*TECH* reserves the right to determine, in its sole discretion, if updates are needed to the Documentation, and/or to provide updated Documentation through alternate support mechanisms, such as electronic bulletin boards, telephone support, and other means of conveying any needed information. CCIS*TECH* will provide to Licensee, one copy of documentation updates for each Site Controller as updates are produced and released generally to all Licensees at no charge to Licensee other than the fees defined in Exhibit A as part of Base CCIS*TECH* Support and Software Maintenance as identified in Exhibit D. Additional copies of Documentation may be requested by the Licensee at an additional cost and will be sent to Licensee as available. Licensee shall not photocopy or otherwise copy or reproduce the Documentation unless authorized in writing by CCIS*TECH*.

12. Equipment Installation and Site Pre-certification. Licensee shall be solely responsible for the planning, preparation, installation, and costs associated with making a site operational utilizing the CCIS*TECH* Site Controller, unless otherwise provided in Exhibit D. Licensee's obligations shall include the installation and testing of all site equipment including, but not limited to, card readers, pumps, pump control devices, electrical and communications wiring, telecommunications service, and electrical power service. A site shall be ready for installation once Licensee has properly installed and made completely functional all site equipment and services to be controlled or utilized by the Site Controller ("Pre-certification").

13. Site Certification. Once a site has been Pre-certified as described in paragraph 12 above, both parties shall mutually schedule a date and time that Licensee can be at the site and CCIS*TECH* can be available via telecommunications for the installation of the Site Controller by the Licensee and CCIS*TECH* can certify that the site is ready to be supported as described in Exhibit D ("Site Certification"). Site Certification is intended to verify to both parties that the site can be properly supported once operational but in no way insures that the site will operate without error or disruption. Once the Site Certification is completed by CCIS*TECH*, then Licensee may make the site operational at its sole discretion and CCIS*TECH* will provide support as described in Exhibit D. Site Certification shall be at the sole expense of the Licensee and CCIS*TECH* shall not be obligated to provide support as described in Exhibit D, or otherwise, until a site has been certified.

14. Telecommunications. Licensee acknowledges that proper operation and support of the CCIS*TECH* Software requires reliable telecommunications that is supported by the CCIS*TECH* Software at the Licensee's site.

Reliable telecommunications is defined as the capability to make and maintain a telecommunications connection for the necessary time required to complete in a reasonable amount of time the intended activity ninety-nine percent (99%) of the attempts in a thirty (30) day period. Licensee shall provide such reliable telecommunications as specified by CCIS*TECH* unless otherwise described in Exhibit D. In the event that reliable telecommunications are not provided by the Licensee, CCIS*TECH* shall provide written notice to Licensee. Licensee shall cause such reliable communications within thirty (30) days of such notice and if Licensee does not provide reliable communications, then after the thirty (30) days CCIS*TECH* may reasonably, refuse to provide support until such time as such necessary telecommunications are provided.

15. <u>Restrictions on CCIS*TECH* Software Installation and Transfer to Replacement Hardware.</u> The parties agree that all CCIS*TECH* Software shall be installed on a Site Controller by CCIS*TECH*, unless otherwise agreed in writing by CCIS*TECH*. Licensee acknowledges that if it desires to have any employee install CCIS*TECH* Software licensed under this Agreement, such employee shall be required to obtain all standard training and certification required by CCIS*TECH* as set forth in this Agreement and/or as modified from time to time by CCIS*TECH*. All training and certification of Licensee's employees shall be solely at Licensee's expense, and must be completed prior to the installation of any CCIS*TECH* Software by such employee(s). In no event shall CCIS*TECH* Software be installed on a Site Controller by any person who has not been certified by CCIS*TECH* unless otherwise agreed in writing by CCIS*TECH*. All CCIS*TECH* Software installed by Licensee's employees must conform to the configuration(s) described in Exhibit C, and be installed only on a Site Controller that has been certified by CCIS*TECH* or meets specifications agreed to by CCIS*TECH* and has been registered with CCIS*TECH*.

Certified Personnel may transfer the CCIS*TECH* Software from one certified Site Controller to replacement hardware in the exact configuration, and only after the replacement hardware has been certified or otherwise approved and registered by CCIS*TECH*. In the event Licensee transfers such CCIS*TECH* Software to replacement equipment, Licensee must notify CCIS*TECH* in writing within thirty (30) days that the previous copy of the CCIS*TECH* Software has been deleted and permanently purged. If CCIS*TECH* does not receive the notification required herein and Licensee continues to operate the Site Controller from which the CCIS*TECH* Software was transferred along with the replacement hardware, Licensee agrees that the replacement equipment will be licensed as an additional site under the terms and conditions set forth in Exhibits C, and D of this Agreement, as applicable, and Licensee agrees to pay the required fee(s) for an additional site as set forth in Exhibit A to this Agreement.

16. <u>CCIS*TECH* Software Backup or Archiving.</u> One (1) copy per CCIS*TECH* Software module as described under Exhibit C shall be sent to Licensee on disk(s) or other acceptable electronic media for back up purposes only. Licensee agrees to store such back up disk(s) in an auditable location and to protect, secure, and keep such disk(s) confidential, and not to disclose, use, or allow third parties to use such disk(s), including any disk(s) for updating the CCIS*TECH* Software, and any accompanying Documentation, other than as specifically provided in this Agreement. Licensee shall protect, secure, and keep such disk(s) or other acceptable electronic media and accompanying Documentation confidential with the same care as if it were its own confidential proprietary product or information, but with no less than reasonable effort.

In the event the Licensee requests replacement disk(s) then CCIS*TECH* shall provide such disk(s), in its sole discretion, only after Licensee has submitted a written request stating the reason for replacement and payment of any cost associated with such replacement including any fees as stated in Exhibit A.

17. <u>Product and Services Support.</u> CCIS*TECH* offers support that is tailored for the Licensee under Exhibit D. No support is included under this Agreement unless otherwise described in Exhibit D.

18. <u>CCIS*TECH* Software Updates.</u> From time to time CCIS*TECH* may, in its sole discretion, provide CCIS*TECH* Software updates to Licensee that change or improve the CCIS*TECH* Software but do not materially change its features or functionality (the "Updates"). Such Updates may, but are not required to, include updates to the Documentation. Licensee shall have the sole responsibility for installing the Updates provided by CCIS*TECH* on all of its sites, and shall confirm to CCIS*TECH* that such installation has been completed within sixty (60) days following the shipment date from CCIS*TECH*.

In the event CCIS*TECH* provides CCIS*TECH* Software Updates via disk(s), Licensee shall return all disk(s) with all previous versions of the CCIS*TECH* Software to CCIS*TECH* via traceable shipment or provide written verification that the disk(s) have been destroyed within ninety (90) days from the date of shipment.

In the event that CCIS*TECH* provides CCIS*TECH* Software Updates via file transfer, Licensee shall have the sole responsibility for updating both its sites and back-up disk(s) and shall notify CCIS*TECH* in writing that the

CONFIDENTIAL

Updates have been installed within ninety (90) days from the date CCIS*TECH* transfers such Updates to Licensee.

Sites that are not updated by Licensee in the timeframes set forth in this paragraph 18 shall not be covered under any support agreements, including those support services set forth in Exhibit D to this Agreement. In the event Licensee requests support for a site, which has not been updated, CCIS*TECH* may, in its sole discretion, choose to (i) refuse to support such site; or (ii) charge Licensee for installing the Updates on all sites on which the Updates have not been installed prior to providing the requested support services under the terms of Exhibit D.

19. Intellectual Property Ownership. CCIS*TECH* retains all right, title and interest to this CCIS*TECH* Software and any related Documentation, including (but not limited to) all copyrights, trademarks, trade secrets and patents, if applicable. The CCIS*TECH* Software and related Documentation is protected by United States copyright law and applicable copyright laws throughout the World.

20. Restrictions on Use of CCIS*TECH* Software. Other than as provided specifically in this Agreement, or as mutually agreed in writing by the parties, Licensee is not permitted to copy or otherwise reproduce this CCIS*TECH* Software, modify or prepare derivative copies based on the CCIS*TECH* Software, distribute copies of the CCIS*TECH* Software by sale or other transfer of ownership, rent, lease, lend, or display the CCIS*TECH* Software publicly. Licensee is expressly prohibited from transmitting the CCIS*TECH* Software electronically over the Internet or to any unrelated third party. CCSI*TECH* hereby specifically acknowledges that Licensee may use this software in connection with its independently owned and operated stores and that such use shall in no way violate this restriction.

LICENSEE IS NOT PERMITTED TO REVERSE ENGINEER, DECOMPILE OR DISASSEMBLE THE CCIS*TECH* SOFTWARE IN ANY WAY. Any copying of the CCIS*TECH* Software and related Documentation not specifically allowed in this Agreement is a breach of this Agreement, and may also be a violation of law.

21. Confidentiality / Nondisclosure. The parties agree that, during the term of this Agreement, they may receive confidential and proprietary information about the other party's business, which confidential and proprietary information specifically includes but is not limited to CCIS*TECH* Software and Documentation (the "Confidential Information"). "Confidential Information" shall include, but not be limited to, this Agreement, all Exhibits, modifications, and/or Addendums attached hereto or added at any time in the future. Confidential Information shall not include information which (i) has come within the public domain through no fault of, or action by, the parties; (ii) is in the possession of either party prior to the date of this Agreement unless disclosed under prior Confidentiality/Nondisclosure between the parties, or which is independently discovered by either party after the date of this Agreement without the aid, application or use of the Confidential Information; or (iii) is lawfully obtained after the date of this Agreement by either party from any third party which lawfully possesses the Confidential Information. The parties agree not to disclose, provide or otherwise make available the Confidential Information, or any part thereof, or any of the methods or concepts utilized therein, in any form, to third persons, before or after termination of this Agreement, except as expressly agreed in writing by the parties. The parties shall disclose the Confidential Information to its employees solely on a "need to know" basis, and shall take reasonably prudent precautions to prevent any disclosure or use of the Confidential Information by such employees.

22. Limited Warranty, Customer Remedies, and Warranty Disclaimers.
LIMITED WARRANTY/EXCLUSIVE REMEDIES. CCIS*TECH* warrants that the original Storage Media holding the CCIS*TECH* Software is free from defects in materials and workmanship under normal use and service and that the unmodified CCIS*TECH* Software will substantially perform functions described in Documentation provided by CCIS*TECH* when operated on a Site Controller that has been certified and registered by CCIS*TECH* for the site at which the CCIS*TECH* Software is being operated for a period of one hundred eighty (180) days from the date of delivery.

If for any reason Licensee discovers defects in the Storage Media or the unmodified CCIS*TECH* Software will not substantially perform functions described in Documentation provided by CCIS*TECH* within one hundred eighty (180) days from the date of the delivery of a Site Controller(s), CCIS*TECH* shall, at its option, replace the Storage Media or CCIS*TECH* Software, provide support, maintenance, and Updates as described in Exhibit D — Service Order No. 1, or accept the return of such Site Controller(s) from Licensee and refund all initial fees paid by Licensee as described in the Rates and Fees section of Exhibit A as long as the CCIS*TECH* Software, Documentation and all CCIS*TECH* property is returned and the hardware is not damaged by licensee. The

option that CCIS*TECH* chooses, as long as it corrects the defect or error, shall be the exclusive and entire liability of CCIS*TECH*.

CUSTOMER'S REMEDY. Licensee's exclusive remedies, and the entire liability of CCIS*TECH*, shall be replacement of any original Storage Media with the CCIS*TECH* Software.

WARRANTY DISCLAIMERS. THE ONLY WARRANTIES OF ANY KIND MADE BY CCIS*TECH* ARE LISTED ABOVE. TO THE MAXIMUM EXTENT PERMITTED BY LAW, CCIS*TECH* EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE.

CCIS*TECH* DOES NOT REPRESENT OR GUARANTEE THE QUALITY OR THE PERFORMANCE OF THE CCIS*TECH* SOFTWARE OTHER THAN THAT SET FORTH IN THE ABOVE LIMITED WARRANTY. CCIS*TECH* ALSO DOES NOT REPRESENT OR GUARANTEE THAT THE CCIS*TECH* SOFTWARE CAPABILITIES WILL MEET LICENSEE'S SPECIFIC NEEDS, THAT THE CCIS*TECH* SOFTWARE WILL CONTINUOUSLY OPERATE, OR BE ERROR FREE BEYOND THE AFOREMENTIONED WARRANTY PERIOD.

CCIS*TECH* DOES NOT REPRESENT THAT THE CCIS*TECH* SOFTWARE WILL OPERATE CORRECTLY IN ALL LOCAL AREA OR WIDE AREA NETWORK (LAN OR WAN) ENVIRONMENTS.

NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY CCIS*TECH*, ITS DEALERS, DISTRIBUTORS, AGENTS, OR EMPLOYEES SHALL CREATE ANY OTHER WARRANTY OR EXTEND OR EXPAND THE SCOPE OF THIS WARRANTY. YOU MAY NOT RELY ON ANY SUCH INFORMATION OR ADVICE.

THIS LIMITED WARRANTY GIVES THE LICENSEE SPECIFIC LEGAL RIGHTS. LICENSEE MAY HAVE OTHER RIGHTS, WHICH VARY FROM STATE TO STATE. IN THAT EVENT, ANY IMPLIED WARRANTIES ARE LIMITED TO NINETY (90) DAYS FROM THE DATE OF RECEIPT, UNLESS REQUIRED OTHERWISE BY A PARTICULAR STATE'S LAW.

23. Liability Limitation. To the maximum extent permitted by applicable law, and regardless of whether any remedy set forth herein fails of its essential purpose, IN NO EVENT WILL CCIS*TECH* NOR ANYONE ELSE INVOLVED IN THE DEVELOPMENT, MANUFACTURE OR DISTRIBUTION OF THIS CCIS*TECH* SOFTWARE BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING WITHOUT LIMITATION, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES FOR, LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, LOSS OF TEXT OR DATA STORED IN OR USED WITH THE CCIS*TECH* SOFTWARE INCLUDING THE COST OF RECOVERING OR REPRODUCING THE TEXT OR DATA, OR ANY OTHER PECUNIARY LOSS, ARISING FROM OR OUT OF THE USE OR INABILITY TO USE THIS CCIS*TECH* SOFTWARE.

THIS LIABILITY LIMITATION APPLIES EVEN IF LICENSEE OR ANYONE ELSE HAS ADVISED CCIS*TECH* OR ANY OF ITS AUTHORIZED REPRESENTATIVES OF THE POSSIBILITY OF SUCH DAMAGES.

24. Termination. In the event of default of either party under this Agreement, the non-defaulting party may terminate this Agreement without further notice if the defaulting party fails to cure the default within thirty (30) days following its receipt of written notice of the default from the non-defaulting party. If the parties mutually agree in writing that additional time will be allowed for the defaulting party to cure the default, the non-defaulting party may immediately terminate the Agreement if the defaulting party fails to cure the default within the agreed upon time. In the event that the default relates to payments required, CCIS*TECH* may terminate this Agreement without further notice if Licensee fails to pay all delinquent payments within ten (10) days following Licensee's receipt of written notice of CCIS*TECH*'s failure to receive such payment(s).

25. Obligations Upon Termination. Within thirty (30) days of the termination of this Agreement for any reason, Licensee shall (i) permanently delete and purge the CCIS*TECH* Software and Updates from all Site Controllers or other storage devices, and notify CCIS*TECH* in writing that the CCIS*TECH* Software and Updates have been

permanently deleted and purged; and (ii) return all Documentation, disk(s) and Confidential Information owned by CCIS*TECH* to CCIS*TECH* by hand delivery or overnight mail.

26. <u>Assignment</u>. This Agreement, nor any portion thereof, may not be assign or transferred, unless an inter-company assignment or transfer that otherwise does not change the terms or enforceability of the Agreement, without the written consent, which will not be unreasonably withheld, of the other party.

27. <u>Survival</u>. All rights and obligations provided by this Agreement in Paragraphs 19, 20, 21, 22, 24 and 26 shall survive its termination.

28. <u>Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

30. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written, and all other communications between the parties regarding the subject matter of this Agreement.

31. <u>Headings</u>. The headings used in this Agreement are for convenience of reference only and shall not be used to interpret this Agreement.

32. <u>Amendments in Writing</u>. This Agreement may only be changed by written amendment signed by both parties or their duly authorized agents.

33. <u>Severability</u>. If any provision of this Agreement is declared by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be modified to the fullest extent possible under the law to reflect the intent of the parties, and all other provisions shall remain in full force and effect.

34. <u>Force Majeure</u>.   Licensor and Licensee shall be excused from performance hereunder so long as, and to the extent that, performance by the party shall be prevented by any act of God, act of a public enemy, or by third party strike, war insurrection, third party labor disturbance, fire, natural disaster, explosion, shortage of labor or supplies caused by any of the above, governmental action of any kind, or any court order or decree, or by any other cause beyond the control of the party to prevent or rectify.

In the event any performance by a party is hindered, in full or in part, such party shall not be liable for any loss, damage, or delay occasioned thereby. Should such hindrance continue for beyond sixty (60) days, either party shall have the option to terminate this Agreement, unless the non-hindered party agrees to waive all performance by the hindered party or both parties agree to a partial performance thereof.

<u>Attachable Exhibits</u>

A – Rates, Fees and Payment Terms
B – Purchase Orders
C – Site Licenses
D – Service Orders
E – Miscellaneous

## EXHIBIT A

### Rates, Fees and Payment Terms

This Exhibit A is subject to all terms and conditions and hereby made a part of the Software License and General Services Agreement between CCISTech, Inc. and Giant Eagle, Inc. Dated February ~~—2002.~~ *March 4, 2002* ✓

| | |
|---|---|
| Project Management and System Definition Cost: | Exhibit D - Service Order No. 1<br>$20,000.00 |
| System Purchase Costs:<br>    Lab System Cost:<br>    Beta Site 1 Cost: | Exhibit B – Purchase Order No. 1<br>$17,740.00<br>$27,900.00 |
| System Purchase Option:<br>    CCISLink PC-POS Workstation | Exhibit B – Purchase Order No. 2<br>$11,400.00 |
| Fuel Site Project Management Services<br>    (Per site) | Exhibit B – Purchase Order No. 2<br>$1,000.00/site |
| Monthly Licensing and Support Fees<br>    (Per site) | Exhibit D – Service Order No. 3<br>$125.00/site/month |
| Annual Licensing and Support Fee<br>    (Lab System) | Exhibit D – Service Order No. 3<br>$250.00/yr |

**Payment Terms:**

In addition to "Section 4 – Payments" in the Agreement, Licensee does hereby agree to the following payment terms.

**Project Management and System Definition Fee:**

CCIS*TECH* will begin the proposed project once it has received an executed General Services Agreement and a Service order for the Project. Upon execution of the Service Order 50% of the Project Management Fee or $10,000 will be due and payable. When both CCISTech and Giant Eagle have agreed on the Definition for System Specifications and the Project Plan the balance of the Project Management Fee $10,000 will be due and payable.

**Lab & Beta System Fee:**

The Lab & Beta systems will be developed in accordance with the specifications defined. A Purchase Order will be issued for the systems. 50% of the Lab & Beta systems cost will be paid when the Purchase Order is issued. The remaining 50% will be paid upon acceptance of the Lab & Beta systems as provided for herein. The Licensor shall have no obligation to schedule work until such time as payments due have been collected in full.
The Agreement will be terminated if the Lab or Beta systems cannot meet the acceptance criteria as defined herein. The systems will be returned to CCISTech and Giant Eagle will receive a refund of the System Costs. The deliverables under the Project Management Fee will be considered fulfilled and paid in full.

**Ongoing CCIS*TECH* Software Licensing, Support and Maintenance Fees**

Licensee shall be invoiced the ongoing fees beginning in the month in which delivery is made by CCIS*TECH* with payment being in advance for licensing and support in the following month.

The above pricing does not include travel expenses, replacement parts or components, shipping and handling or taxes, which are the responsibility of the Licensee.

Licensee agrees that if payment is not received by CCIS*TECH* within 30 days of the invoice date, Licensee shall, to the extent permitted by applicable law, pay in addition, as an interest charge, the lesser of one and one-half per month (18% per annum) or the maximum allowable by law on the amount outstanding for each thirty (30) day period, or portions thereof, that payment is not received in full.

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:                                         Licensee:

CCIS*TECH*, INC.                                  GIANT EAGLE, INC.

By:_____               By:_____
Name:   Dickson D. Perry                          Name:   Robert Garrity
Title:   President & CEO                          Title:   SR VP Information Services

## EXHIBIT B

### Purchase Orders

Purchase Order No: 1

Effective Date _____*March 4*_____, 2002

This Purchase Order ("PO") is subject to all terms and conditions and hereby made a part of the Software License and General Services Agreement between CCISTech, Inc. and Giant Eagle. Inc. dated ~~February,~~ 2002. *March 4, 2002*

In consideration for the fees paid or to be paid in full as described in this Agreement, Licensee does hereby agree to take delivery of the following:

**SYSTEM COSTS**

**Lab System:**
CCIS*LINK* PC-POS Workstation.................................................................................................*$17,740.00
* Does not include taxes, shipping, travel and expenses.

**Beta Site 1:**
CCIS*LINK* PC-POS Workstation.................................................................................................*$27,900.00
* Does not include taxes, shipping, travel and expenses.

- **System Configuration**
  Hardware:
  - One (1) standard CPU (PIII 733 minimum) with one hundred, twenty-eight (128) MB RAM, one (1) 10+ GB hard drive, one (1) 3.5" floppy drive, and ten (10) comm. ports
  - One (1) mouse and one (1) mini-keyboard
  - One (1) B.O.S. 9000 box containing power strip, two (2) 56K baud modems, and dispenser and terminal communications protocol converters and cables.

  POS Hardware:
  - One (1) 12.1" touch screen flat panel color monitor
  - One (1) display pole (2 line by 20 character)
  - One (1) thermal receipt printer
  - One (1) cash drawer
  - One (1) scanner
  - One (1) magnetic card swipe
    (Debit encrypted Pin Pad to be provided by the proposed debit network)

  System Software:
  - One (1) Microsoft Windows™ 2000 Professional OS
  - One (1) Wayne Dispenser Module
  - One (1) Wayne CAT Module
  - One (1) MPS Network Bankcard Authorization Module (MPS)
  - One (1) IBM 4690 Interface Module (IBM)
  - One (1) Attendant Interface Modules (POS)
  - One (1) Site Reporting Module (Reports & Exports)
  - One (1) Site Server Module (Support)

*CCISTECH* Agreement, Sample Exhibit C – Page 1          **CONFIDENTIAL**
*Defendant Giant Eagle's Motion to Dismiss*          *Page* App. 17

R064

♦ One (1) ID Authorization Module (Loyalty)

Off Site System Software
♦ Two (2) Site Communicator Support Module (installed on a support PC workstation)
♦ One (2) IBM Gaslink 286 Module (installed on the IBM 4690 SA system CC, DD Controllers)

**Payment Requirements:**

**Project Management and System Development Cost**
CCISTECH will begin the proposed project once it has received an executed General Services Agreement and a Service order for the Project. Upon execution of the Service Order 50% of the Project Management Fee or $10,000 will be due and payable. When both CCISTech and Giant Eagle have agreed on the Definition for System Specifications and the Project Plan the balance of the Project Management Fee $10,000 will be due and payable.

**The Lab & Beta Systems**
The Lab & Beta systems will be developed in accordance with the specifications defined. A Purchase Order will be issued for the systems. 50% of the Lab & Beta systems cost will be paid when the Purchase Order is issued. The remaining 50% will be paid upon acceptance of the Lab & Beta systems as provided for herein.

The Agreement will be terminated if the Lab or Beta systems cannot meet the acceptance criteria as defined herein. The systems will be returned to CCISTech and Giant Eagle will receive a refund of the System Costs. The deliverables under the Project Management Fee will be considered fulfilled and paid in full.

Annual Licensing for the Lab System        $250.00/site/year

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:                                      Licensee:
CCISTech, Inc.                                 Giant Eagle, Inc.

By: _____                  By: _____
Name:   Dickson D. Perry                       Name:  Robert Garrity
Title:    President & CEO                       Title:   SR VP Information Services

## EXHIBIT B

### Purchase Orders

Purchase Order No: 2

Effective Date _____ *March 4,* _____, 2002

This Purchase Order ("PO") is subject to all terms and conditions and hereby made a part of the Software License and General Services Agreement between CCISTech, Inc. and Giant Eagle, Inc. dated *March 4* _____, 2002.

In consideration for the fees paid or to be paid in full as described in this Agreement, Licensee does hereby agree to take delivery of the following:

**Purchase Option:**
CCIS*LINK* PC-POS Workstation. ...................................................................$11,400.00 per site

- **System Configuration**
  Hardware:
  - One (1) standard CPU (PIII 733 minimum) with one hundred, twenty-eight (128) MB RAM, one (1) 10+ GB hard drive, one (1) 3.5" floppy drive, and ten (10) comm. ports
  - One (1) mouse and one (1) mini-keyboard
  - One (1) B.O.S. 9000 box containing power strip, two (2) 56K baud modems, and dispenser and terminal communications protocol converters and cables.

  POS Hardware:
  - One (1) 12.1" touch screen flat panel color monitor
  - One (1) display pole (2 line by 20 character)
  - One (1) thermal receipt printer
  - One (1) cash drawer
  - One (1) scanner
  - One (1) magnetic card swipe
    (Debit encrypted Pin Pad to be provided by the proposed debit network)

  System Software:
  - One (1) Microsoft Windows™ 2000 Professional OS
  - One (1) Wayne Dispenser Module
  - One (1) Wayne CAT Module
  - One (1) MPS Network Bankcard Authorization Module (MPS)
  - One (1) IBM 4690 Interface Module (IBM)
  - One (1) Attendant Interface Modules (POS)
  - One (1) Site Reporting Module (Reports & Exports)
  - One (1) Site Server Module (Support)
  - One (1) ID Authorization Module (Loyalty)

  Off Site System Software
  - Two (2) Site Communicator Support Module (installed on a support PC workstation)

♦   One (2) IBM Gaslink 286 Module (installed on the IBM 4690 SA system CC, DD Controllers)

When Giant Eagle formally accepts the Lab & Beta Site systems, they will have the option of purchasing 10 systems at a discounted price. The purchase order must be placed within 90 days after final acceptance of the Beta Site and the 10 units must be delivered within an 18-month time frame.

CCISTech shall deliver the above systems "as is". CCISTech and Licensee shall mutually agree on installation dates at least two (2) weeks in advance of such date for all CCISLink Site Controllers that have been delivered.

Monthly Licensing and Support per Site in production .............................................$125.00/site/month .
- Ongoing CCIS*LINK* software license
- 7 x 24 system support 2nd Level to Customers Certified Personnel
- Updates for CCIS*LINK* Software modules listed above
- Coordinate hardware support and warranty service

Fuel Site Project Management Services (2nd site and future sites)...................................$1,000.00/site
- Assist with site profiling (used to configure site controller variables)
- Remote fuel site start-up support and certification


BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.


Licensor:                                          Licensee:
CCISTech, Inc.                                     Giant Eagle, Inc.


By: _____                      By: _____
Name:   Dickson D. Perry                           Name:   Robert Garrity
Title:    President & CEO                           Title:    SR VP Information Services

## EXHIBIT C

### Site Licenses

Site License No.:  _____

Site License Effective Date:  _____

This Site License is subject to all terms and conditions of the Software License and General Service Agreement between CCIS*TECH*, Inc. and Giant Eagle, Inc. dated _____, 2001.

In consideration for all fees paid in full as described in the Agreement, CCIS*TECH* does hereby grant for as long as such fees are paid in full, one (1) Site License for the possession and operation of one (1) copy of CCIS*TECH* Software on one (1) Site Controller at one (1) location as and only as fully described below in this Exhibit A. Such Site License is subject to and only to the warranties as more fully described in the Agreement and does not include any Services unless otherwise described in the Agreement or any Exhibit(s) therefore.

Site License Location:

| | |
|---|---|
| Site Name: | _____ |
| Site ID: | _____ |
| Site Street Address: | _____ |
| Site City: | _____ |
| Site Zip Code: | _____ |
| Site Phone Number: | _____ |

> **EXAMPLE ONLY -
> ACTUAL SITE LICENSE
> DELIVERED AFTER A SITE
> BECOMES OPERATIONAL**

CCIS*TECH* Software Description:

| | |
|---|---|
| Pump Control: | _____ |
| Card Reader Control: | _____ |
| Authorization Module: | _____ |
| Site Communications: | _____ |
| Attendant Interface: | _____ |
| Other: | _____ |

**Granted:**

## EXAMPLE

Dickson D. Perry
President & CEO
Date:_____

For CCIS*TECH* Purposes Only:

CCIS*TECH* Site No:_____     Site Controller Registration No(s).: _____
Ship Date:_____                                            _____
Site Certification Date:_____                                            _____
Site Operational Date:_____                                            _____
Site License Termination Date:_____                                            _____

*Defendant Giant Eagle's Motion to Dismiss*                                            *App.* 21

R068

## EXHIBIT D

### Service Orders

Service Order No. 1

Date: February ___March 4___, 2002

This Service Order ("SO") is subject to all terms and conditions and hereby made a part of the Software License and General Service Agreement between CCIS*TECH*, Inc. and Giant Eagle, Inc. Dated: February____, 2001.

March 4, 2002

In consideration for the Project Management and System Definition Fee paid in full as described in Exhibit A of this Agreement, CCIS*TECH* does hereby agree to provide the following:

**Project Management and System Definition**

**Project Deliverables (Definition of System Specifications, Project Plan, Training & Delivery)**

1. <u>Definition - Outside Sales Functionality</u>: Define the Giant Eagle specifications and requirements for the "outside" operations of the Wayne CAT and Dispensers hardware. The functionality to be defined will include card acceptance and behavior with respect to the customer, and transaction data operations with respect to bankcard and loyalty card processing. The information will determine the configuration of the CCISTech fueling system, the network and the loyalty card processor software modules.

2. <u>Definition - Inside Sales Functionality</u>: Define Giant Eagle specifications and requirements for "inside" C-store operations. Functionality to be defined includes: clerk sales and manager operations, fixed processes like shift changes/end-of-day, and any other requirements relative to on-site reporting. In addition we will define the functionality regarding inside operations of bank and loyalty cards. This information will determine the configuration of the CCISTech POS system software modules.

3. <u>Definition - MPS Network Interface</u>: Define Giant Eagle specifications and requirements for the processing of credit and debit transactions as defined in the Outside Sales and Inside Sales functional areas above. This information will determine the configuration of the CCISTech MPS Network interface software module.

4. <u>Definition - Loyalty Card Interface</u>: Define Giant Eagle specifications and requirements for the processing of loyalty card transactions as defined in the Outside Sales and Inside Sales functional areas above. Determine phase 1 deliverables and plan future enhancements. This information will determine the configuration of the CCISTech CCID software module.

5. <u>Definition - IBM Integration</u>: Define Giant Eagle specifications and requirements for the integration to the IBM 4690 system to include T-log update, product look-up, item movement, and other features. This information will determine the configuration of the CCISTech IBM 4690 SA Interface software module and the Gaslink 286 Bridge that is loaded on the IBM 4690 controllers.

6. <u>Definition - Hardware Specifications</u>: Determine Giant Eagle specifications and requirements with respect to system hardware components and subject to CCISTech technical requirements. To be determined are the communications mediums for various integrations and interfaces required i.e. MPS Network authorization, IBM integration, store connectivity and operations, and

support from Giant Eagle and CCIStech. These specifications may vary from the Lab and Beta site acceptance phase to the system rollout as may be determined in the Project Plan.

7. <u>Definition - Project Plan and Management</u>: Develop a Project Plan to manage the deliverables as defined herein. Included will be preliminary planning for the production and rollout of once the Beta Site 1 system is accepted. In addition we will define the support roles and responsibilities between all parties.

8. <u>Definition - Training and System Delivery</u>: In conjunction with the delivery of the Lab system CCISTech will deliver technical training and certification for up to three Giant Eagle employees and/or third party contractor's at CCISTech offices, and provide on-site installation for the Lab System.

**Acceptance of the Beta Site System**

Lab Acceptance

Once the Project Deliverables have been implemented and the CCISTech system is installed in the Giant Eagle lab, the formal acceptance testing can be conducted. Issues raised for resolution during the Lab Acceptance process will be addressed based on the severity level of the issue and the complexity of the programming required. CCISTech will provide problem resolution during the Lab Acceptance process to resolve, test, and install fixes for all high severity problems (Severity 1 and Severity 2 as defined below). If the Lab system cannot meet Acceptance Criteria within 45 days of installation then the agreement may be terminated at any time prior to meeting Acceptance criteria by either party pursuant to termination rights stipulated herein. The date of Lab Acceptance shall be the date on which the CCISTech software and systems has satisfactorily passed testing criteria with no Severity 1 or 2 issues outstanding.

Beta Site Acceptance

If Giant Eagle accepts the lab system we will conduct the Beta Site Acceptance test. With the assistance of CCISTech's representatives, Giant Eagle will install the system in the Beta Site.

CCISTech will provide problem resolution during the Beta Site Acceptance process to resolve, test, and install fixes for all high severity problems (Severity 1 and Severity 2 as defined herein). Issues that are raised for resolution during this acceptance process will be addressed based on the severity level of the issue and the complexity of the programming required by the issue.

When the system operates for a period of fifteen (15) consecutive business days of normal operations without any high severity problems (Severity 1 or 2) the Beta Site system will be considered Accepted. If, for any reason, the Acceptance Date has not occurred within 30 days of the Lab Acceptance date, then either party may thereupon terminate this Agreement by written notice to other party. Both parties can mutually agree to extend the Acceptance Date.

<u>Acceptance Criteria will be defined as follows:</u>

1. Certification of Wayne CAT & Dispenser and POS operations as mutually agreed in the deliverables. (CCISTech and Giant Eagle).

2. Certification of hardware configuration and installation as mutually agreed in the deliverables. (CCISTech and Giant Eagle).

3. Certification of interface to MPS for processing and settlement based on the standard specifications as provided by MPS. (MPS, CCISTech, and Giant Eagle)

**CONFIDENTIAL**

*Defendant Giant Eagle's Motion to Dismiss*                          *Page* App. 23

R070

4. Certification of loyalty card interface is properly functioning and the data is being included in the transaction data for further processing. (CCISTech, and Giant Eagle)

5. Certification of Giant Eagle configured IBM 4690 Interface integration as mutually agreed in the deliverables. (CCISTech and Giant Eagle).

6. Completion of training & lab installation and certification of software and support processes as mutually agreed in the deliverables. (CCISTech and Giant Eagle).

<u>Definition and processes for resolution of problem issues:</u>

High severity problems are defined as a Severity 1 or 2 below and lower severity problems are listed as a Severity 3 or 4. Exceptions to the above stated problem resolution rules are possible, when mutually agreed upon by both parties.

<u>Definition - Severity 1.</u> Critical Problem. The CCISTech Software is not operating as Accepted and is critically impacting fueling operations at a site. Without attention fuel cannot be sold at the site.

<u>Definition - Severity 2.</u> Semi-critical Problem. The CCISTech Software is operating, but not as Accepted and is severely restricting fueling operations at a site. Without attention the situation could escalate to a Severity 1 condition.

<u>Definition - Severity 3.</u> Non-critical Problem. The CCISTech Software is operating, but not as Accepted and is negligibly impacting fueling operations at a site. Without attention to the situation, the Licensees business will continue to be negatively impacted.

<u>Definition - Severity 4.</u> Changes or Enhancements: The CCISTech Software is operating, as accepted. Through field experience the customer has defined changes or enhancements that they desire.

<u>Resolution - Severity 1 and 2</u> problems will be corrected as described above in the Lab and Beta Site Acceptance process.

<u>Resolution - Severity 3</u> problems will be assessed for severity and addressed through normal CCISTech support management processes. If the problem can be corrected on next Scheduled Update basis, then such non-critical problem shall be corrected by the earlier of (1) the date of the next Scheduled Update with respect to the CCISTech Software or within 180 days.

<u>Resolution - Severity 4</u> issues will be assessed as either a new project, specifically for Giant Eagle, or in conjunction with other developments CCISTech may have planned or has in process. Timeframes for the delivery of Severity 4 issues will be established as they are determined to be mutually beneficial to CCISTech and Giant Eagle.

**Project Time Frames:**

CCIS*TECH* will begin the proposed project within 30 days of the execution of an agreement and payment of the initial project management fee. The definition of System Specifications and the Project Plan will be completed within the next 45 days.

Assuming no new and unexpected software or system development is required, the system configuration, testing, and delivery to the Lab can be completed within the next 45 days.

The Lab Acceptance phase should take 30 days to complete with Beta site installation following shortly thereafter. Once Beta Acceptance is completed, each additional site system can be delivered within 15 to 30 days.

All work must be completed as outlined in the Project Plan that has been jointly developed and mutually owned by CCISTech and Giant Eagle Super Markets, Inc. CCISTech shall not be responsible or liable for delays that are caused by factors that are outside of its control.

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:
CCISTech, Inc.

By: _____
Name:  Dickson D. Perry
Title:   President & CEO

Licensee:
Giant Eagle, Inc.

By: _____
Name:  Robert Garrity
Title:   SR VP Information Services

# EXHIBIT D

## Service Orders

Service Order No.: 2

Date: February _March 4_, 2002

This Service Order ("SO") is subject to all terms and conditions and hereby made a part of the Software License and General Service Agreement between CCIS*TECH*, Inc. and Giant Eagle, Inc. Dated ~~February~~ _____, 2002. _March 4, 2002._

In consideration for the fees as described in Exhibit A of this Agreement, CCIS*TECH* does hereby agree to provide the following:

**CCIS*TECH* Installation & Support Training**

CCIS*TECH* shall assist Licensee in profiling the site to determine the exact specifications for a CCIS*TECH* Site Controller at a new fuel site installation. CCIS*TECH* shall provide Licensee with such profile, a project plan for the production and installation of a Site Controller for the site, and a site controller purchase order(s).

In the event Licensee decides to move forward with project plan by executing such purchase order(s) under Exhibit B of this Agreement, Licensor shall provide initial training services for Licensee's personnel who have been designated by Licensee to become Certified Personnel per this Agreement. This training will be held at the corporate offices of Licensor.

During this training, two (2) copies of training and product documentation manuals will be handed out and reviewed. In addition, CCIS*TECH* personnel will review the business relationship as per this Agreement between Licensee and CCIS*TECH* including, but not limited to, site certification, customer support, the relationship between Certified Personnel and CCIS*TECH*, and site certification requirements. Finally, Licensee personnel will receive technical training regarding CCIS*Link*™ hardware and software including assembly, configuration, installation, and operation as well as software and hardware troubleshooting.

CCIS*TECH* shall begin these services no later then thirty (30) days from the date payment for fees is received. Fees paid shall be nonrefundable. All travel and miscellaneous expenses shall be approved in advance by Licensee and payable to CCIS*TECH* upon receipt of invoice.

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:                                          Licensee:

CCIS*TECH*, INC.                                   GIANT EAGLE, INC.

By: _____                      By: _____
Name:   Dickson D. Perry                           Name:   Robert Garrity
Title:    President & CEO                           Title:    SR VP Information Services

# EXHIBIT D

## Service Orders

Service Order No.: 3

Date: ~~February~~ *March 4, 2002*

This Service Order ("SO") is subject to all terms and conditions and hereby made a part of the Software License and General Service Agreement between CCIS*TECH*, Inc. and Giant Eagle, Inc. Dated ~~February 2002.~~ *March 4, 2002*

In consideration for the Licensing and Support Fees paid in full as described in Exhibit A and/or Exhibit B of this Agreement, CCIS*TECH* does hereby agree to provide for as long as such fees are paid in full, the following:

**Base CCIS*TECH* Support and Software Maintenance**

Upon Site Certification and the Site Controller becoming operational at Licensee's site, CCIS*TECH* shall provide second-level telephone support for the CCIS*TECH* Software to Licensee's Certified Personnel as outlined in this Exhibit D - Service Order 3. The standard hours of operation are 8:00 a.m. to 5:00 p.m. Central Standard Time Monday through Friday, excluding holidays. For all other hours, CCIS*TECH* shall provide Licensee's Certified Personnel with a pager number or other means of communication for contacting CCIS*TECH* support personnel.

Second-level telephone support shall mean CCIS*TECH* support personnel working with Licensee's Certified Personnel to determine the cause of an operating error within the CCIS*TECH* Software that causes the unmodified CCIS*TECH* Software not to substantially perform functions described in Documentation provided by CCIS*TECH* when operated on a Site Controller that has been certified and registered by CCIS*TECH* for the site at which the Software is being operated. In order to receive such support, Licensee's Certified Personnel must have provided first-level support to Licensee's contractors, personnel, and customers and provide CCIS*TECH* with definitive Necessary Information including, but not limited to, the nature of the operating error, dates and times when the operating error occurred, and events leading up to or involving the operating error. Licensee shall also provide CCIS*TECH* with security access as well as telecommunications as described in Section 14 of the Agreement so that CCIS*TECH* may communicate with the Site Controller to determine the cause of operating errors reported by Licensee's Certified Personnel. In the event CCIS*TECH* has to spend a substantial amount of support time gathering Necessary Information about an operating error or determining operating errors other than those of the CCIS*TECH* Software, then CCIS*TECH* may bill Licensee for such time as additional Services based on the fees set forth in Exhibit A of this Agreement.

In the event an operating error as described above is identified in the CCIS*TECH* Software, CCIS*TECH*, without additional charge to Licensee, shall use commercially reasonable efforts to, at its option, correct the operating error and provide the Licensee with Updates subject to the terms of Section 18 – Software Updates of this Agreement or provide Licensee with a reasonable procedure to circumvent the operating error.

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:                                          Licensee:

CCIS*TECH*, INC.                                  GIANT EAGLE, INC.

By:_____                              By:_____
Name:   Dickson D. Perry                          Name:   Robert Garrity
Title:    President & CEO                          Title:    SR VP Information Services

## EXHIBIT D

### Service Orders
Service Order No.:  4
Date:   April 9 , 2003

This Service Order ("SO") is subject to all terms and conditions and hereby made a part of the Software License and General Service Agreement between Controlled Commerce Integrated Systems, Inc. (CCISTech) and Giant Eagle dated  March 4, 2002

## Unitec Car Wash Interface at the Fuel Station POS

**General:**

CCISTech will deliver the standard Unitec Car Wash Interface Module to the Giant Eagle Fuel Station Set-up.  There will be no development required beyond current CCISTech interface capabilities to the Unitec POS controller.  All configuration will be per functional requirement specifications.

**Service Deliverables:**

  Delivery to Giant Eagle fuel station – Painesville, OH

**Costs and Terms:**

The Unitec Car Wash interface will be considered an additional module to the base CCISTech software platform for Giant Eagle.  The cost to Giant Eagle for this product will be an additional $1,500 per each site running the CCISTech Unitec Interface.  This cost will be billed to Giant Eagle as part of the purchase order for each new site installation.  Travel and other miscellaneous expenses are not included and Giant Eagle agrees to reimburse CCISTech all actual but reasonable expenses incurred.

BY SIGNING THIS EXHIBIT, LICENSEE ACKNOWLEDGES THAT LICENSEE HAS READ THE ENTIRE AGREEMENT AND THIS EXHIBIT, UNDERSTANDS THEM, AND AGREES TO BE LEGALLY BOUND BY THEIR TERMS AND CONDITIONS.

Licensor:                                                     Licensee:

CONTROLLED COMMERCE                        GIANT EAGLE, INC.
INTEGRATED SYSTEMS, INC.
(CCISTECH)

By:_____                 By:_____
Name:    Dickson D. Perry                           Name:    Robert Garrity
Title:     President & CEO                            Title:     Senior VP - IS

## EXHIBIT E

## ADDENDUM TO SOFTWARE LICENSE AND
## GENERAL SERVICES AGREEMENT

This Addendum to the Software License and General Services Agreement dated March 4, 2002 (the "Agreement") is entered into by and between CCIS*TECH*, Inc. ("CCIS*TECH*"), having its principal place of business at 4320 N. Beltline Road, Suite A205, Irving, Texas 75038 and Giant Eagle, Inc. ("Giant Eagle") having its principal place of business at 101 Kappa Drive, Pittsburgh, Pennsylvania 15238.

## WITNESSETH

WHEREAS, CCIS*TECH* and Giant Eagle are parties to the Agreement; and

WHEREAS, the parties desire to execute this Addendum and incorporate it as part of the Agreement;

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

1. CCIS*TECH* hereby specifically acknowledges and understands that Giant Eagle has entered into joint venture with Guttman Enterprises, operators of Crossroads Convenience Stores and that such joint venture will require the installation of certain CCIS*TECH* technology.

2. CCIS*TECH* hereby agrees to grant site licenses to Giant Eagle that are designated for Crossroads Convenience Stores or other locations that may be a part of said joint venture upon the same terms and conditions as set forth in the Agreement, as if such locations were wholly-owned by Giant Eagle.

3. This Addendum shall be effective as of May 23, 2003.

4. All other terms and conditions of the Agreement shall remain in full force and effect as set forth therein.

Licensor:  
CCIS*TECH*, Inc.

By: _____  
Name: Dickson D. Perry  
Title: President & CEO

Licensee:  
Giant Eagle, Inc.

By: _____  
Name: Robert Garrity  RLR  
Title: Senior VP, Information Services

# EXHIBIT 3

2004 Series A Preferred Stock Purchase Agreement

R077

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

This Series A Preferred Stock Purchase Agreement (this "**Agreement**") is made and entered into as of August 6, 2004 by and between CCISTech, Inc., a Texas corporation (the "**Company**"), and Giant Eagle of Delaware, Inc., a Delaware corporation (the "**Investor**"). Each of the Company and the Investor may be referred to herein as a "**Party**," and collectively as the "**Parties.**"

WHEREAS, the Company desires to sell to the Investor, and the Investor desires to purchase from the Company, 83,334 shares (the "**Purchased Shares**") of the Company's Series A Preferred Stock, par value $0.01 per share (the "**Series A Preferred Stock**"), which Purchased Shares shall have the rights, preferences, privileges and restrictions set forth in the Certificate of Designation of the Company attached to this Agreement as Exhibit A (the "**Certificate of Designation**"), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## AGREEMENT TO PURCHASE AND SELL STOCK

1.01   Authorization. As of the Closing Date (as defined below), the Company will have authorized the issuance, pursuant to the terms and conditions of this Agreement, of the Purchased Shares.

1.02   Agreement to Purchase and Sell. The Company agrees to sell to the Investor at the Closing, and the Investor agrees to purchase from the Company at the Closing, the Purchased Shares at a price of $36.00 per share for an aggregate price of $3,000,024 (the "**Purchase Price**"). The shares of Common Stock (as defined below) issuable and that are issued upon conversion of the Purchased Shares will be hereinafter referred to as the "**Conversion Shares**".

## ARTICLE II
## CLOSING

2.01   The Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Fish & Richardson P.C., 1717 Main Street, Suite 5000, Dallas, Texas 75201, at (i) 10:00 a.m. Central Time, on August 16, 2004 or (ii) such other date and at such other time and place as the Parties may agree. The date on which the Closing occurs is referred to herein as the "**Closing Date.**" At the Closing, the Parties shall deliver or cause to be delivered the following:

(a)   the Company shall deliver or cause to be delivered to the Investor:

(i)   a stock certificate representing the Purchased Shares;

-1-

(ii)    a Secretary's Certificate in substantially the form attached hereto as Exhibit B;

(iii)   an Officer's Certificate in substantially the form attached hereto as Exhibit C;

(iv)    any consents set forth on Schedule 3.17, dated prior to the Closing Date, required to be obtained by the Company from third parties in order to consummate the transactions contemplated by this Agreement;

(v)     an executed Registration Rights Agreement in the form attached hereto as Exhibit D (the "**Registration Rights Agreement**");

(vi)    a Shareholders Agreement in the form attached hereto as Exhibit E (the "**Shareholders Agreement**" and together with the Registration Rights Agreement, the "**Related Agreements**") executed by the Company and each Person (as defined below) who owns in excess of 5% of the issued and outstanding Common Stock (as defined below) on a fully-diluted basis as of the Closing Date;

(vii)   a legal opinion from Fish & Richardson P.C., counsel to the Company, dated as of the Closing Date in the form attached hereto as Exhibit F; and

(viii)  an amendment to the Certificate of Incorporation of the Company in a form reasonably acceptable to counsel for the Investor.

(b)     the Investor shall deliver to the Company:

(i)     the Purchase Price, paid by (A) a bank certified or cashier's check payable to the Company's order, (ii) wire transfer of immediately available funds to the Company or (iii) any combination of the foregoing (collectively, "**Cash**");

(ii)    a Secretary's Certificate in substantially the form attached hereto as Exhibit G;

(iii)   an Officer's Certificate in substantially the form attached hereto as Exhibit H;

(iii)   an executed Registration Rights Agreement; and

(iv)    an executed Shareholders Agreement.

-2-

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

To induce the Investor to enter into this Agreement and to consummate the transactions contemplated hereby, the Company hereby represents and warrants to the Investor, as of the Closing Date, the following:

3.01    Organization and Good Standing.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas.  Schedule 3.01(a) includes (i) a true and complete copy of the Company's Articles of Incorporation and all amendments thereto, certified by the Secretary of State of Texas; (ii) a true and complete copy of the Bylaws of the Company presently in effect, certified as true and correct by the Company's Secretary; and (iii) true and complete copies of certificates of existence and good standing for the Company, certified by the Secretary of State of Texas and the Texas Comptroller of Public Accounts, respectively, as of the Closing Date.

3.02    Authority; Qualification.  The Company has all requisite corporate power and authority to own its property, to conduct its business, and to execute and deliver this Agreement and the Related Agreements and any instruments and agreements contemplated herein or therein that are required to be executed and delivered by the Company pursuant to its obligations hereunder and thereunder, and to perform its obligations hereunder and thereunder.  This Agreement and the Related Agreements have been approved by the Company's Board of Directors and have been duly authorized, executed, and delivered by the Company.   The Company is duly qualified to do business as a foreign corporation in good standing in all jurisdictions in which it is required to be qualified to do intrastate business as the Company's business is currently conducted, except for jurisdictions in which failure to so qualify could not reasonably be expected to have a Material Adverse Effect on the Company. All corporate action on the part of the Company's directors and shareholders necessary for (i) the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement and the Related Agreements; (ii) the authorization, issuance, reservation for issuance and delivery of all of the Purchased Shares being sold under this Agreement and of the Conversion Shares; and (iii) the filing of the Certificate of Designation has been taken or will be taken prior to the Closing.  This Agreement and the Related Agreements represent the valid and binding obligations of the Company, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion.  The Company has delivered to the Investor a copy of the resolutions of the Company's Board of Directors certified as true and correct by the Company's Secretary, approving this Agreement and the Related Agreements and authorizing the execution hereof by the Company's president.  For purposes of this Agreement, "**Material Adverse Effect**" means any effect(s), individually or in the aggregate, that would be materially adverse to a Party's assets in an amount of $10,000 or more.

3.03    No Violation.  The Company is not in violation or default of any provisions of its organizational documents as amended to date, and is in compliance with all applicable statutes, laws, court orders, regulations and executive orders of any Governmental Authorities having

-3-

R080

jurisdiction over its business or properties, except in the case of statutes, laws, regulations and orders the violation of which would not have a Material Adverse Effect on the Company. The Company has not received any notice of any violation of any such statute, law, regulation or order which has not been remedied prior to the date hereof. Neither the execution and delivery by the Company of this Agreement or the Related Agreements nor the consummation by the Company of the transactions contemplated hereby and thereby will (i) violate any provision of the Texas Business Corporation Act, the Articles of Incorporation of the Company, or the Bylaws of the Company; (ii) except as set forth on Schedule 3.03, violate, or be in conflict with, or constitute a default (or an event or condition that, with notice or lapse of time, or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any liabilities of the Company, or result in the creation or imposition of any security interest, lien, charge, or other encumbrance upon any of the assets of the Company under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, understanding, arrangement, agreement, or restriction of any kind or character to which the Company is a party or by which the Company may be bound or affected or to which any of the Company's assets are subject; or (iii) violate any statute or law or any judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority. For purposes of this Agreement, "**Governmental Authority**" means any nation or government, any state, regional, local, or other political subdivision thereof, and any entity or official exercising executive, legislative, judicial (including courts), regulatory, or administrative functions of or pertaining to government.

3.04   Brokers.   The Company has not employed any broker, agent, or finder in connection with any transaction contemplated by this Agreement for which the Investor may be liable or responsible to pay.

3.05   Capitalization.   The capitalization of the Company immediately prior to the Closing consists of the following:

(a)   Common Stock.   A total of 5,000,000 authorized shares of Common Stock, par value $0.01 per share (the "**Common Stock**"), of which 361,233 shares are issued and outstanding.

(b)   Preferred Stock.   A total of 1,000,000 authorized shares of preferred stock, par value $0.01 (the "**Preferred Stock**"), 83,334 of which have been designated as Series A Preferred Stock, and none of which will be issued and outstanding. Upon the Closing, the rights, preferences and privileges of the Series A Preferred Stock will be as stated in the Certificate of Designation and as provided by law.

(c)   Options, Warrants, Etc.   Except for the (i) conversion rights of the Series A Preferred Stock, and (ii) 91,000 shares of Common Stock reserved for issuance under the Company's 2002 Stock Option Plan (the "**Plan**") under which, as of the Closing Date, there are options to purchase 74,750 shares of Common Stock outstanding, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from the Company of any shares of its capital stock or any securities convertible into or ultimately exchangeable or exercisable for any

-4-

shares of the Company's capital stock. Except as set forth on Schedule 3.05(c), no shares of the Company's outstanding capital stock are subject to any rights of first refusal or other rights to purchase such stock (whether in favor of the Company or any other Person), pursuant to any agreement or commitment of the Company. For the purposes of this Agreement, "**Person**" shall have the meaning given in Section 3(a)(9) of the Securities Exchange Act of 1934, as amended, as modified and used in Sections 13(d)(3) and 14(d)(2) of such act.

(d)     Valid Issuance. The outstanding shares of the capital stock of the Company are duly authorized and validly issued, fully paid and nonassessable, and have been approved by all requisite shareholder and board action. A description of all issuances and grants by the Company prior to the Closing of any capital stock, convertible securities, rights, warrants, or options of the Company is set forth on Schedule 3.05(d). The offer and sale by the Company of all capital stock, convertible securities, rights, warrants, or options of the Company issued prior to the Closing was conducted in compliance with all applicable federal and state securities laws, and to the Knowledge (as defined below) of the Company, no holder of any such securities has a right of rescission or has made or threatened to make a claim for rescission or damages with respect thereto. For purposes of this Agreement, a Party shall be deemed to have "**Knowledge**" of a particular fact or other matter as follows: (i) if the Party is an individual, if such individual is actually aware of such fact or other matter or a person serving in the same capacity as such individual would be expected to discover or otherwise become aware, after due inquiry, of such fact or other matter in the course of performing the duties of such individual; or (ii) if the Party is a corporation or other form of business entity, if (A) any executive officers of such Party are actually aware of such fact or other matter, or (B) any person or persons serving in the same capacities as such executive officers would be expected to discover or otherwise become aware, after due inquiry, of such fact or other matter in the course of performing the official duties of such offices.

(e)     Outstanding Shareholders and Option Holders.  Schedule 3.05(e) sets forth a complete list of all shareholders and option holders of the Company as of the Closing Date.

(f)     Original Shareholders Agreement. That certain Shareholders Agreement, dated as of November 1, 2000, and entered into by and among the Company and certain of its shareholders, has been terminated in accordance with its terms on or before the Closing Date.

3.06     Valid Issuance of Purchased Shares and Conversion Shares.

(a)     The Purchased Shares, when issued in accordance with this Agreement, will have been validly issued, fully paid and non-assessable and will be free and clear of any lien, charge or other encumbrance and will not be subject to any preemptive or similar rights. The Conversion Shares have been duly and validly reserved for issuance upon conversion thereof and, when issued upon such conversion in accordance with the

-5-

Certificate of Designation, will have been validly issued, fully paid and non-assessable and will be free and clear of any lien, charge or other encumbrance and will not be subject to any preemptive or similar rights.

(b)     Based in part on the representations made by the Investor in Article IV hereof, the offer and sale of the Purchased Shares to the Investor in accordance with this Agreement and the issuance of the Conversion Shares are exempt from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and from all other provisions of applicable securities laws of states of the United States.

3.07    Governmental Consents.    No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local Governmental Authority is required on the part of the Company in order to enable the Company to execute, deliver and perform its obligations under this Agreement or the Related Agreements and the transactions contemplated hereby and thereby, except for such qualifications or filings under applicable securities laws as may be required in connection with the transactions contemplated by this Agreement. All such qualifications and filings will, in the case of qualifications, be effective on the Closing Date and will, in the case of filings, be made within the applicable time period(s) prescribed by law.

3.08    Litigation.    Except as set forth in Schedule 3.08, there are no Proceedings in progress, pending, or, to the Company's Knowledge, threatened against or affecting the Company, the Company's assets, or the transactions contemplated hereby in any court or before any arbitration panel of any kind or before or by any Governmental Authority. For purposes of this Agreement, "**Proceeding**" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, whether public or private) commenced, brought, conducted, or heard by or before, or otherwise involving any Governmental Authority or arbitrator.

3.09    Intellectual Property.

(a)     Except as set forth in Schedule 3.09(a), the Company is the owner of all, or has the perpetual and irrevocable license or right to use, sell and license all of, the Copyrights, Patents, Trade Secrets, Trademarks, Software and other proprietary rights (collectively, "**Intellectual Property**") that are used in connection with its business as presently conducted. For the purposes of this Agreement, "**Copyrights**" means any foreign or United States copyright registrations and applications for registration thereof, and any non-registered copyrights; "**Patents**" means any foreign or United States patents and patent applications, including any divisions, continuations, continuations-in-part, substitutions or reissues thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted; "**Trade Secrets**" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto; "**Trademarks**" means any foreign or United States trademarks, service marks, trade dress, trade names, brand names, designs and logos, corporate

-6-

names, product or service identifiers, whether registered or unregistered, and all registrations and applications for registration thereof; and "**Software**" means any computer software programs, source code, object code, data and documentation.

(b)     Except as set forth in Schedule 3.09(b), none of the Intellectual Property owned by the Company is subject to any outstanding judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or, to the Company's Knowledge, threatened, which challenges the validity, enforceability, use or ownership of the Company's Intellectual Property.

(c)     The Company has performed all material obligations imposed upon it under all Intellectual Property licenses, sublicenses, distributor agreements and other agreements under which it is either a licensor, licensee or distributor, except such licenses, sublicenses and other agreements relating to off-the-shelf software which is commercially available on a retail basis and used solely on the Company's computers (collectively, the "**Intellectual Property Licenses**"), and is not, nor to the Company's Knowledge is any other party thereto, in breach of or default thereunder in any respect, nor has any event occurred which with notice or lapse of time or both would constitute a default thereunder. All of the Intellectual Property Licenses are valid, enforceable and in full force and effect, and will continue to be so on identical terms immediately following the closing of the transactions contemplated by this Agreement and the Related Agreements, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion.

(d)     Except as set forth in Schedule 3.09(d), none of the Intellectual Property currently sold or licensed by the Company to any Person, or to the Company's actual knowledge used by or licensed to the Company by any Person, infringes upon or otherwise violates any Intellectual Property rights of others.

(e)     Except as set forth in Schedule 3.09(e), no litigation is pending and no claim has been made against the Company or, to the Company's Knowledge, is threatened, contesting the right of the Company to sell or license to any Person or use the Intellectual Property.

(f)     Except as set forth in Schedule 3.09(f), to the Company's Knowledge, no Person is infringing upon or otherwise violating the Intellectual Property rights of the Company.

(g)     No former employer of any employee of the Company has made a claim against the Company or, to the Company's Knowledge, against any other Person, that such employee is utilizing Intellectual Property of such former employer.

(h)     Except as set forth in Schedule 3.09(h), the Company is not a party to or bound by any license or other agreement requiring the payment by the Company of any

-7-

royalty payment, excluding such agreements relating to off-the-shelf software licensed for use solely on the Company's computers.

(i)     Except as set forth on Schedule 3.09(i), to the Company's Knowledge, no employee of the Company is in violation of any requirements of law applicable to such employee, or any term of any employment agreement, patent or invention disclosure agreement or other contract or agreement relating to the relationship of such employee with the Company or any prior employer.

(j)     To the Company's Knowledge, none of the Company's Trade Secrets, wherever located, the value of which is contingent upon maintenance of confidentiality thereof, has been disclosed to any Person other than employees, representatives and agents of the Company, except as required pursuant to the filing of a patent application by the Company.

(k)     Except as set forth on Schedule 3.09(k), each employee of the Company has executed a confidential information and invention assignment agreement, in the form delivered to the Investor. Except as set forth on Schedule 3.09(k), no employee of the Company has excluded works or inventions made prior to his or her employment with the Company from his or her assignment of inventions pursuant to such employee's confidential information and invention assignment agreement. Each consultant that has had access to the Company's Intellectual Property has entered into an agreement containing appropriate confidentiality and invention assignment provisions. To the Company's actual knowledge, no officer, employee or consultant of the Company is in violation of such confidential information and invention assignment agreement or any prior employee contract or proprietary information agreement with any other corporation or third party.

3.10    Registration Rights. The Company is not under any obligation to register any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities under the Securities Act, nor is the Company obligated to register or qualify any such securities under any state securities or blue sky laws.

3.11    Title to Property and Assets. Except as set forth on Schedule 3.11, the Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances, leases and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not have a Material Adverse Effect on the Company. With respect to the property and assets it leases, the Company is in material compliance with all such leases and, to the Company's Knowledge, the Company holds valid leasehold interests in such assets free of any liens, encumbrances, security interests or claims of any Person other than the lessors of such property and assets.

3.12    ERISA Plans. Except for the Company's 401(k) plan, the Company does not have any Employee Pension Benefit Plans as defined in Section 3 of the Employee Retirement Income Security Act of 1974, as amended.

-8-

3.13   Insurance.   Schedule 3.13 lists each insurance policy (including fire, theft, casualty, general liability, professional liability, workers compensation, business interruption, environmental, product liability and automobile insurance policies and bond and surety arrangements) to which the Company is a party.   There is no material claim pending under any such policy as to which coverage has been questioned, denied or disputed by the underwriter of such policy.   All premiums due and payable under all such policies have been paid, the Company may not liable for any retroactive premiums or similar payments, and the Company is otherwise in compliance in all material respects with the terms of such policies applicable to it.   The Company has no Knowledge of any threatened termination of, or material premium increase (other than increases that are consistent with the increases experienced by the industry in which the Company does business) with respect to, any such policy.

3.14   Environmental Matters.   The Company, to its Knowledge, is not in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to the Company's Knowledge, no material expenditures are or will be required in order to comply with any such statute, law or regulation.

3.15   Tax Elections.   The Company has not elected pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**"), to be treated as an "S" corporation or a collapsible corporation pursuant to Section 341(f) or Section 1362(a) of the Code, nor has it made any other elections pursuant to the Code (other than elections which relate solely to matters of accounting, depreciation or amortization) which would have a Material Adverse Effect on the Company, its financial condition, its business as presently conducted or presently proposed to be conducted or any of its properties or material assets.

3.16   Taxes.

(a)   Except as set forth on Schedule 3.16, the Company has (i) timely filed all returns required to be filed by it with respect to all federal, state, local, and foreign income, payroll, withholding, unemployment, excise, added value, social security, sales and use, real and personal property, use and occupancy, business and occupation, mercantile, real estate, capital stock, and franchise or other tax (including interest and penalties thereon and including estimated taxes thereof) (hereinafter referred to collectively as "**Taxes**"); (ii) paid all Taxes shown to have become due pursuant to such returns; and (iii) paid all other Taxes for which a notice of assessment or demand for payment has been received;

(b)   All returns for Taxes filed by or on behalf of the Company have been prepared in accordance with all applicable laws and requirements and accurately reflect the taxable income (or other measure of Tax) of the Company;

(c)   There are no Tax liens upon any of the assets of the Company, and the Company is not aware of any audit or other proceeding or investigation, or of any position taken on a Tax return of the Company, that could give rise to a Tax lien upon any of the Company's assets; and

-9-

(d)     The Company has not been advised in writing (i) that any of its returns have been or are being audited as of the date hereof, or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state or local taxes.

3.17     Consents.     Except as set forth on Schedule 3.17, no consent, approval, license, permit, authorization, or order of any Person is required in connection with the execution and delivery of this Agreement and the Related Agreements or the consummation of the transactions contemplated hereby or thereby by the Company.

3.18     Financial Statements; No Financial Change.     The Company has previously delivered to the Investor true, correct, and complete copies of the following financial statements: unaudited balance sheets, statements of income, statements of changes in shareholders' equity, and statements of cash flows as of and for the years ended December 31, 2003, and an unaudited balance sheet, statement of income, and statement of cash flows as of and for the five months ended May 31, 2004 (the "**Company Financial Statements**").     The Company Financial Statements have been prepared consistently during the periods indicated, are correct and complete in all respects, accurately present the financial condition and results of operations of the Company as of the dates set forth.     Since the date of the Company Financial Statements, there has not been any material adverse change in the business, operations, prospects, assets, results of operations or condition (financial or other) of the Company, and no event has occurred or circumstance exists that may result in such a change.     Except as set forth on Schedule 3.18, the Company Financial Statements were prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby.

3.19     Changes.     Except as set forth on Schedule 3.19, since May 31, 2004 (the date of most recent financial statements provided to Investor), there has not been:

(a)     any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Company Financial Statements, except changes in the ordinary course of business, that has had a Material Adverse Effect;

(b)     any damage, destruction or loss to any assets or properties of the Company, whether or not covered by insurance, that has had a Material Adverse Effect;

(c)     any waiver by the Company of a valuable right or of a material debt owed to it;

(d)     any change or amendment to an agreement by which the Company or any of its assets or properties is bound or subject that has had a Material Adverse Effect;

(e)     any loans made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(f)     any resignation or termination of any executive officer or key employee of the Company;

-10-

R087

(g)   any material change in any compensation arrangement or agreement with any employee, director or shareholder of the Company;

(h)   any sale, assignment or transfer of any Patents, Trademarks, Copyrights, Trade Secrets or other intangible assets of the Company;

(i)   any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the business, properties, prospects or financial condition of the Company;

(j)   any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(k)   any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable;

(l)   any receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)   to the Company's Knowledge, any other event or condition of any character that has had a Material Adverse Effect; or

(n)   any agreement or commitment by the Company to do any of the things described in this Section 3.19.

3.20   **Labor Relations; Employees.**   There are no strike, labor dispute or union organization activities pending or threatened between the Company and its employees. To the Company's Knowledge, none of its employees belongs to any union or collective bargaining unit. Except as set forth on <u>Schedule 3.20</u>, the Company is not a party to or bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, or other employee compensation agreement. To the Company's Knowledge, no officer or key employee intends to terminate his or her employment with the Company, nor does the Company have a present intention to terminate the employment of any officer or key employee. Subject to general principles related to wrongful termination of employees, the employment of each officer and employee of the Company is terminable at the will of the Company.

3.21   **Material Contracts.**   Except for the Related Agreements or any agreements listed on <u>Schedule 3.21</u>, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound which may involve (i) obligations of, or payments to, the Company in excess of $10,000 (other than obligations of, or payments to, the Company arising from agreements entered into in the ordinary course of business), (ii) the license of any patent, copyright, trade

-11-

secret or other proprietary right to or from the Company or (iii) the grant of rights to produce, license, market or sell the Company's products or affect the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products (each, a "**Material Contract**", collectively the "**Material Contracts**"). All Material Contracts to which the Company is a party are valid, binding and in full force and effect in all material respects, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies and to general principles of equity. Neither the Company nor, to the Company's Knowledge, any other party to any Material Contract, is in default under any of such Material Contracts.

3.22  Obligations to Related Parties. No employee, officer, director or, to the Company's Knowledge, shareholder of the Company or member of his or her immediate family is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them other than (i) for payment of salary for services rendered, (ii) reimbursement for reasonable expenses incurred on behalf of the Company and (iii) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the Company's Board of Directors and stock purchase agreements approved by the Company's Board of Directors). To the Company's Knowledge, none of such persons has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, except in connection with the ownership of stock in publicly-traded companies. To the Company's Knowledge, no employee, officer, director or shareholder of the Company, nor any member of their immediate families, is, directly or indirectly, interested in any Material Contract with the Company (other than such contracts as relate to any such person's ownership of capital stock or other securities of the Company or such person's employment agreement with the Company).

3.23  Full Disclosure. The Company has provided the Investor with all the information regarding the Company that the Investor has requested for deciding whether to purchase the Purchased Shares, as set forth on Schedule 3.23. No representation or warranty regarding the Company made in this Agreement, the Related Agreements, the Exhibits and Schedules hereto, or the documents to be delivered by the Company at the Closing pursuant to Article II, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein not misleading in light of the circumstances under which they were made. Each of the Schedules attached hereto is a true and complete list or description, as appropriate, of the items purported to be listed or described thereon. The Company represents and warrants that any financial projections provided to the Investor were prepared in good faith.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE INVESTOR

To induce the Company to enter into this Agreement and to consummate the transactions contemplated hereby, the Investor hereby represents and warrants to the Company, as of the Closing Date, the following:

-12-

4.01    Organization and Good Standing.  The Investor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

4.02    Authority.  The Investor has all requisite corporate power and authority to execute and deliver this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby.  This Agreement and the Related Agreements have been approved by the Investor's Board of Directors  and have been duly authorized, executed, and delivered by the Investor.  All corporate action on the part of the Investor's directors and shareholders necessary for the authorization, execution, delivery of, and the performance of all obligations of the Investor under this Agreement and the Related Agreements has been taken or will be taken prior to the Closing.  This Agreement and the Related Agreements represent the valid and binding obligations of the Investor, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion.  The Investor has delivered to the Company a copy of the resolutions of the Investor's Board of Directors, certified as true and correct by the Investor's secretary, approving this Agreement and the Related Agreements and authorizing the execution hereof by the Investor's president.

4.03    No Violation.  Neither the execution and delivery by the Investor of this Agreement and the Related Agreements nor the consummation by the Investor of the transactions contemplated hereby and thereby will (i) violate any provision of the Delaware General Corporation Law or charter or bylaws of the Investor; (ii) violate, or be in conflict with, or constitute a default (or an event or condition that, with notice or lapse of time, or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any agreement to which the Investor is subject, or result in the creation or imposition of any security interest, lien, charge, or other encumbrance upon any of the Investor's assets under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, understanding, arrangement, agreement, or restriction of any kind or character to which the Investor is a party or by which the Investor may be bound or affected or to which any the Investor's assets is subject; or (iii) violate any statute or law or any judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority.

4.04    Brokers.  The Investor has not employed any broker, agent, or finder in connection with any transaction contemplated by this Agreement for which the Company may be liable or responsible to pay.

4.05    Litigation.  There are no Proceedings in progress, pending, or, to the Investor's Knowledge, threatened against or affecting the Investor, the Investor's assets, or the transactions contemplated hereby in any court or before any arbitration panel of any kind or before or by any Governmental Authority, except such proceedings which would not have an effect, individually or in the aggregate, that would be materially adverse to the Investor's assets.

4.06    Consents.  No consent, approval, license, permit, authorization, or order of any Person is required in connection with the execution and delivery of this Agreement or the

-13-

R090

Related Agreements or the consummation of the transactions contemplated hereby and thereby by the Investor.

4.07 Full Disclosure. To the Investor's Knowledge, no representation or warranty regarding the Investor made in this Agreement, the Exhibits and Schedules hereto, or the documents to be delivered by the Investor at the Closing pursuant to Article II, contains any untrue statement of a material fact that affects the ability of the Investor to consummate the transactions contemplated by this Agreement and the Related Agreements or omits to state a material fact necessary to make the statements or facts contained herein not misleading.

4.08 Representations Regarding the Acquisition of the Purchased Shares and the Conversion Shares.

(a) Purchase Entirely for Own Account. This Agreement is made with the Investor in reliance upon the Investor's representation to the Company, which by the Investor's execution of this Agreement the Investor hereby confirms, that the Purchased Shares to be received by the Investor and the Conversion Shares issuable upon conversion thereof (collectively, the "Offered Securities") will be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Investor has no present intention of selling, granting any participation in or otherwise distributing the same. The Investor further represents that the Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Offered Securities.

(b) Sophistication; Accredited Investor Status. The Investor is a Person who either alone or with its purchaser representative(s) has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company. The Investor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(c) Speculative Investment. The Investor understands the speculative nature and risks of investments associated with the Company and confirms that it is able to bear the risk of the investment, and that there may not be any public market for the Offered Securities received herein.

(d) No Coercion or Solicitation. The Investor has freely entered this Agreement and has been subject to neither pressure to make a hasty or uninformed decision to enter into this Agreement nor solicitation to receive the Offered Securities.

(e) Transfer Restrictions. Except as otherwise set forth in this Agreement or the Related Agreements, the Investor is not under an obligation to register or seek an exemption under any federal and/or state securities acts for any sale or transfer of the Offered Securities by the Investor, and the Investor hereby acknowledges that the Offered Securities constitute restricted securities as that term is defined in Rule 144 under the Securities Act and that the Offered Securities may not be sold, transferred, assigned or

-14-

hypothecated unless there is an effective registration statement under the Securities Act covering the Offered Securities, the sale is made in accordance with Rule 144 under the Securities Act, or the Company receives an opinion of counsel of the Investor reasonably satisfactory to the Company, stating that such sale, transfer, assignment or hypothecation is exempt from the registration and prospectus delivery requirements of the Securities Act.

(f)     Disclosure of Information. To the Knowledge of the Investor, the Investor has received all the information it considers necessary or appropriate for deciding whether to purchase the Offered Securities. The Investor further represents that it has had the opportunity to ask questions of the Company and receive answers from the Company, to the extent that the Company possessed such information or could acquire it without unreasonable effort or expense, necessary to evaluate the merits and risks of any investment in the Company.  Further, the Investor has been given an opportunity to question the appropriate executive officers of the Company.

(g)     Legends. It is understood that the certificates evidencing the Offered Securities will bear the legend set forth below:

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTIONS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

The legend set forth above shall be removed by the Company from any certificate evidencing Offered Securities upon delivery to the Company of an opinion by counsel, reasonably satisfactory to the Company, that a registration statement under the Securities Act is at that time in effect with respect to the legended security or that such security can be freely transferred in a public sale without such a registration statement being in effect and that such transfer will not jeopardize the exemption or exemptions from registration pursuant to which the Company issued the Offered Securities.

-15-

## ARTICLE V
## ADDITIONAL AGREEMENTS

5.01   Put and Call Options.

(a)   Within 10 days of the closing of an event that constitutes a Triggering Event (as defined below) of the Company, the Company shall notify the Investor in writing of such event (a "**Company Notice**"). In the event of a Triggering Event of the Company, the Investor shall have the right to cause the Company to repurchase all, but not less than all, of the Purchased Shares and Conversion Shares, as the case may be, held by the Investor (collectively, the "**Covered Shares**") for a price per share of $36.00 plus increases to such amount equal to 10% annually from the Closing Date through the date of closing the acquisition of the Covered Shares by the Company (the "**Put Price**"). The Investor must notify the Company of its intention to exercise the put right granted pursuant to this Section 5.01(a) in writing (a "**Put Exercise Notice**") within 60 days of its receipt of the Company Notice. The Company shall deliver to the Investor Cash in the dollar amount equal to the number of Covered Shares multiplied by the Put Price (the "**Put Amount**") within 90 days of the Company's receipt of the Put Exercise Notice (the "**Put Payment Date**"). Notwithstanding anything in this Agreement to the contrary, if a Triggering Event of the Company occurs pursuant to Section 5.01(d)(iii) of this Agreement as a result of the death or permanent disability of Mr. Dickson Perry or pursuant to Section 5.01(d)(iv) of this Agreement, then the Company shall pay the Put Amount to the Investor as follows:

(i) the Company shall deliver to the Investor 50% of the Put Amount in Cash on or before the Put Payment Date; and

(ii) the balance of the Put Amount shall be delivered to the Investor on or before the Put Payment Date in the form of a promissory note (the "Note") payable to the Investor. The Note shall expire upon payment in full on the second anniversary of the Put Payment Date, and shall be for the principal amount equal to 50% of the Put Amount with interest at the annual rate of 10% payable in 8 quarterly installments of interest to the Investor, and with 50% of such principal amount due on the first anniversary of the Put Payment Date and the balance of such principal amount plus any accrued but unpaid interest due on the second anniversary of the Put Payment Date.

(b)   Within 10 days of the closing of an event that constitutes a Triggering Event of the Investor or of Giant Eagle, Inc., a Pennsylvania corporation ("**Giant Eagle, Inc.**"), the Investor shall notify the Company in writing of such event (an "**Investor Notice**"). In the event of a Triggering Event of the Investor or of Giant Eagle, Inc., the Company shall have the right to repurchase all, but not less than all, of the Covered Shares for an amount equal to the greater of (i) the dollar amount equal to the number of

-16-

Covered Shares multiplied by the Put Price or (ii) the Call Price (as defined below). The Company must notify the Investor of its intention to exercise the call right granted pursuant to this Section 5.01(b) in writing within 60 days of its receipt of the Investor Notice. Upon its receipt of such notice from the Company, the Company and the Investor shall have 90 days to determine the Call Price, and upon the expiration of such 90-day period the Company shall deliver to the Investor Cash in an amount equal to the greater of subclause (i) or (ii) of this Section 5.01(b).

(c)     For the purposes of this Agreement, the "**Call Price**" shall be determined as follows:

(i) three appraisals of the Company's value shall be conducted by three independent appraisers (selected as described below),

(ii) the appraisal which contains a final appraised value between the final appraised values provided in the two other appraisals (the "**Base Appraisal**") shall be added to the final appraised value of the one other appraisal that is closest in amount to the Base Appraisal, and that amount shall be divided by two to determine the Company's value; and

(iii) the Company's value as determined in subsection (ii) above shall be divided by (ii) the number of issued and outstanding shares of Common Stock (on an as-converted, fully-diluted basis, but excluding shares of Common Stock issuable pursuant to unvested stock options) to determine the Call Price per Covered Share.

For purposes of this Section 5.01(c), the three independent appraisers shall be selected and compensated as follows: (x) one appraiser shall be selected by and at the expense of the Company; (y) one appraiser shall be selected by and at the expense of the Investor; and (z) one appraiser shall be selected by the two foregoing appraisers whose expense shall be borne equally by the Company and the Investor. All appraisals shall be completed no later than 90 days after the Company's notification of its intention to exercise the call right as provided in subsection (b) above.

(d)     For the purposes of this Agreement, a "**Triggering Event**" shall mean (i) the consummation of a reorganization, merger or consolidation with an entity, or any other event (or series of related events), in which the persons who hold a majority of the outstanding capital stock of the Company, the Investor, or Giant Eagle, Inc., as the case may be, before such transaction do not own at least a majority of the equity securities entitled to vote to elect directors (or persons serving in a similar capacity) of the entity surviving such transaction, (ii) a disposition of all or substantially all of the assets of the Company, the Investor, or Giant Eagle, Inc., as the case may be, (iii) in the case of the Company, if Mr. Dickson Perry ceases to serve as a member of the Company's executive management, or (iv) in the case of the Company, if the Company, due to the outcome of any litigation set forth in Schedule 3.08, loses the right to use its Reward Marketing Engine software module and has no replacement for such software module within 180 days of the event of such loss.

-17-

5.02    Repurchase Restrictions. For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the consent of the Investor shall be required for the repurchase or redemption by the Company of any shares of Common Stock or Preferred Stock from any of the Company's shareholders in either a single or multiple transactions and from time to time for an aggregate amount in excess of $250,000 (except pursuant to any obligation or right of the Company to repurchase or redeem shares of Common Stock or Preferred Stock upon termination of a Company shareholder's employment or other service to the Company or pursuant to Section 5.01 (a) or (b) of this Agreement).

5.03    Information Rights. For so long as the Investor continues to hold at least 5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the Company shall deliver to Investor annual, quarterly and monthly financial statements, annual budgets and other information reasonably requested by the Investor. The annual financial statements shall be audited by an accounting firm approved by the Company's board of directors. The Investor shall have the right no more than twice per calendar year, with reasonable notice and at the Investor's sole expense, to inspect, or have its accountants inspect, the Company's books and records; provided, however, that such inspection(s) shall be conducted in a manner so as not to be unreasonably disruptive to the Company's operations.

5.04    Use of Purchase Price. The Purchase Price shall be used by the Company for items such as working capital, capital expenditures, product development, marketing and sales expenses and insurance coverages (including key person life insurance coverages) or as otherwise approved by the Company's board of directors.

5.05    Stock Option Agreements. Each stock option agreement executed after the Closing Date between the Company and any optionee (each, an "Optionee") in connection with a Common Stock option grant shall provide, unless otherwise approved by the Investor, that (i) upon the cessation of employment or service to the Company for any reason, such Optionee shall immediately lose all unvested options; (ii) if such Optionee is terminated for cause, such Optionee shall immediately lose all vested but unexercised options and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee pursuant to the exercise of options at the actual exercise price of such options; and (iii) if such Optionee's employment with or service to the Company ceases for any reason other than termination for cause (including without limitation by reason of death or disability), the Optionee (or his or her estate as the case may be) shall have 60 days to exercise any vested options, and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee (or his or her estate as the case may be) pursuant to the exercise of options at the then-current fair market value of such share of Common Stock, as reasonably determined by the Company's board of directors. The Company shall also use its best efforts to enter into amended stock option agreements containing the provisions set forth in the preceding sentence with all Persons with whom the Company has entered into stock option agreements prior to the Closing Date.

5.06    Retail/Gasoline Station Alliances. The Investor shall have the non-exclusive right to license the Company's Products and to establish retail/gas station alliances utilizing the

-18-

Company's Products in any market in which the Investor operates as of or after the Closing Date. Any exclusive license or arrangement granted to any other Person in any such market shall provide an exception for the Investor's non-exclusive rights as set forth in the preceding sentence. For the purposes of this Agreement, "**Products**" means the technology which the Company has licensed to the Investor as of the Closing Date, and all improvements and enhancements thereto, and the Company's Reward Marketing Engine software module.

5.07   Board Representation. For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the Investor shall have the right to nominate one candidate (the "**Investor Designee**") for election to the Company's Board of Directors. The initial Investor Designee shall be Mr. David Shapira. In the event of Mr. Shapira's death or disability, or if the Company requests the resignation of Mr. Shapira (in which event the Investor shall cause Mr. Shapira to promptly resign from the Company's Board of Directors), the Company shall make a written request (the "**Board Request**") to the Investor for the appointment of another designee for director by the Investor, and the Investor shall provide at least two candidates for director as follows: (i) one executive-level employee of the Investor who has significant experience in operations and merchandising/marketing in the grocery retail business and is not directly involved in the management of the working relationship between the Investor and the Company, and (ii) one independent candidate who is not involved in the Investor's business but has significant experience in managing investments such as the Investor's interest in Company. The remaining members of the Company's Board of Directors shall, within 30 days of the Investor's submission to the Company of candidates meeting such qualifications, approve one of the Investor's candidates as set forth above and appoint such candidate as a director of the Company. In the event that the Investor does not submit candidates to the Company within 90 days of the Investor's receipt of a Board Request, then the Investor shall be deemed to have fully waived its right to designate a candidate for appointment to the Company's Board of Directors, the remaining members of the Company's Board shall fill the Investor's position on the Company's Board of Directors, and the Investor shall no longer have any right to nominate a candidate for election to the Company's Board of Directors. Any Board Request shall clearly state the Investor's rights and obligations pursuant to this Section 5.07, including the deemed waiver of rights hereunder if the Investor fails to submit candidates within 90 days of the Investor's receipt of a Board Request.

## ARTICLE VI
### CONDITIONS TO THE PARTIES' OBLIGATIONS AT CLOSING

6.01   Conditions to Obligations of the Company. The obligation of the Company to hold the Closing is subject to the satisfaction of the following conditions on or before the Closing Date unless waived in writing by the Company:

(a)   Representations and Warranties.   The representations and warranties of the Investor contained in Article IV shall be true and complete as of the Closing Date.

(b)   Deliverables. The Company shall have received the deliverables from the Investor in accordance with the provisions of Section 2.01(b).

-19-

(c)     Certificate of Designation Effective. The Certificate of Designation shall have been duly adopted by the Company by all requisite board and shareholder action, and shall have been duly filed with and accepted by the Secretary of State of the State of Texas.

(d)     Securities Exemptions. The offer and sale of the Purchased Shares to the Investor pursuant to this Agreement shall be exempt from the registration and prospectus delivery requirements of the Securities Act, the registration and qualification requirements of all applicable securities laws of states of the United States and all other provisions of applicable securities laws of states of the United States.

6.02     Conditions to Obligations of the Investor. The obligation of the Investor to hold the Closing is subject to the satisfaction of the following conditions unless waived in writing by the Investor:

(a)     Representations and Warranties. The representations and warranties of the Company contained in Article III shall be true and complete as of the Closing Date.

(b)     Certificate of Designation Effective. The Certificate of Designation shall have been duly adopted by the Company by all requisite shareholder and board action, and shall have been duly filed with and accepted by the Secretary of State of the State of Texas.

(c)     Noncompetition Agreements. Each officer and other key employee of the Company shall have entered into a noncompetition agreement with the Company in a form reasonably acceptable to the Investor.

(d)     Deliverables. The Investor shall have received the deliverables from the Company in accordance with the provisions of Section 2.01(a).

## ARTICLE VII
## INDEMNIFICATION

7.01.     Indemnification by the Company. The Company shall defend, indemnify and hold harmless the Investor and its directors, officers, employees and agents (each an "Investor Indemnitee") from and against any and all claims (including without limitation any investigation, action or proceeding, whether instituted by a third party against the Company or an Investor Indemnitee or by an Investor Indemnitee for the purpose of enforcing its rights hereunder), damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a)     any misrepresentation or breach of warranty under Article III hereof (a "Company Warranty Breach"); or

-20-

(b) any default by the Company in the performance or observance of any of its covenants or agreements hereunder or under the Related Agreements or any instruments or agreements contemplated herein or therein.

7.02. Indemnification by the Investor. The Investor shall defend, indemnify and hold harmless the Company and its directors, officers, employees and agents (each a "Company Indemnitee") from and against any and all claims (including without limitation any investigation, action or proceeding, whether instituted by a third party against a Company Indemnitee or by a Company Indemnitee for the purpose of enforcing its rights hereunder), damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty under Article IV (an "Investor Warranty Breach"); or

(b) any default by the Investor in the performance or observance of any of its covenants or agreements hereunder or under the Related Agreements or any instruments or agreements contemplated herein or therein.

7.03. Representation, Settlement and Cooperation. If any investigation, action or other proceeding (each a "Proceeding") is initiated against any Investor Indemnitee or Company Indemnitee (each an "Indemnitee") and such Indemnitee intends to seek indemnification from the Company or the Investor (each an "Indemnitor"), as applicable, under this Article on account of its involvement in such Proceeding, then such Indemnitee shall give prompt written notice to the applicable Indemnitor of such Proceeding. The failure to deliver prompt written notice to the Indemnitor after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve such Indemnitor of any liability to the Indemnitee under this Article VII to the extent of the prejudice caused by such failure. Upon receipt of such notice, such Indemnitor shall diligently defend against such Proceeding on behalf of such Indemnitee at its own expense using counsel reasonably acceptable to such Indemnitee; provided, that if such Indemnitor shall fail or refuse to conduct such defense, or such Indemnitee has been advised by counsel that it may have defenses available to it which are different from or in addition to those available to such Indemnitor, or that its interests in such Proceeding are adverse to such Indemnitor's interests, then such Indemnitee may defend against such Proceeding at such Indemnitor's expense. Such Indemnitor or Indemnitee, as applicable, may participate in any Proceeding being defended against by the other at its own expense, and shall not settle any Proceeding without the prior consent of the other, which consent shall not be unreasonably withheld. Such Indemnitor and Indemnitee shall cooperate with each other in the conduct of any such Proceeding.

7.04. Notice and Satisfaction of Indemnification Claims. No indemnification claim shall be deemed to have been asserted until the applicable Indemnitor has been given notice by the Indemnitee of the amount of such claim and the facts on which such claim is based. For purposes of Section 7.04, notice of an indemnification claim shall be deemed to cover claims arising out of all related Proceedings so long as, in the case of Proceedings instituted by third parties, the Indemnitee complies with Section 7.03. Indemnification claims shall be paid within

-21-

30 days after the Indemnitor's receipt of such notice and such evidence of the amount of such claim and the Indemnitor's liability therefor as the Indemnitor may reasonably request.

### ARTICLE VIII
### MISCELLANEOUS

8.01    Reformation and Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof: (a) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable; and (b) the legality, validity, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

8.02    Further Assurances.  Each Party shall, from time to time after the Closing Date, at the request of any other Party and without further consideration, execute and deliver such other instruments of conveyance, assignments, transfer, and assumption, and take such other actions, as such other Party may reasonably request to more effectively consummate the transactions contemplated by this Agreement and the Related Agreements.

8.03    Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be sent by first class U.S. mail (certified mail – return receipt requested), or by facsimile transmission (if facsimile transmission is also sent by regular U.S. mail the same day), or delivered by hand or by overnight or similar delivery service, fees prepaid, to the Party to whom it is to be given at the address of such Party set forth below or to such other address for notice as such Party shall provide in accordance with the terms of this Section 8.03.  Except as otherwise specifically provided in this Agreement, notice so given shall, in the case of notice given by certified mail (or by such comparable method) be deemed to be given and received three business days after the time of certification thereof (or comparable act), in the case of notice so given by overnight delivery service, on the date of actual delivery, and, in the case of notice so given by facsimile transmission or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

|                     |                                                     |
|---------------------|-----------------------------------------------------|
| If to the Company:  | CCISTech, Inc.                                      |
|                     | Attn: Mr. Dickson Perry, President & CEO            |
|                     | 4320 North Beltline Road, Suite A205                |
|                     | Irving, TX 75038                                    |
|                     | Fax: (972) 258-0646                                 |
|                     | Email: dperry@ccistech.com                          |
|                     |                                                     |
| With copies to:     | CCISTech, Inc.                                      |
|                     | Attn: Mr. Jim Mills, Vice President & Secretary     |
|                     | 4320 North Beltline Road, Suite A205                |
|                     | Irving, TX 75038                                    |
|                     | Fax: (972) 258-0646                                 |

-22-

Email: jmills@ccistech.com

Fish & Richardson P.C.
5000 Bank One Center
1717 Main Street
Dallas, Texas 75201
Attn:  Steven R. Block
Fax: (214) 747-2091
Email: block@fr.com

If to the Investor:

Giant Eagle of Delaware, Inc.
c/o Giant Eagle, Inc.
Attn: John Lucot, Vice President
101 Kappa Drive
Pittsburgh, PA 15238
Fax: 412.963.3522
Email: john.lucotl@gianteagle.com

With copies to:

Giant Eagle, Inc./Legal Department
Attn: Richard A. Russell, Vice President, General Counsel
261 Kappa Drive
Pittsburgh, PA 15238
Fax: 412.963.3522
Email: rick.russell@gianteagle.com

Cohen & Grigsby, P.C.
11 Stanwix Street, 15th Floor
Pittsburgh, PA  15221
Fax:  412.209.0672
Attention:      David J. Kalson, Esq.
                     James R. Carlisle, II, Esq.

8.04    Headings.   The headings of sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

8.05    Waiver.  The failure of any Party to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right or claim granted or arising hereunder or of the future performance of any such term, covenant, or condition, and such failure shall in no way affect the validity of this Agreement or the rights and obligations of the Parties.  No waiver of any provision or condition of this Agreement shall be valid unless executed in writing and signed by the Party to be bound thereby, and then only to the extent specified in such waiver.  No waiver of any provision or condition of this Agreement shall be construed as a waiver of any other provision or condition of this Agreement, and no present waiver of any provision or condition of this Agreement shall be construed as a future waiver of such provision or condition.

-23-

8.06   **GOVERNING LAW; VENUE.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS RULES OR CHOICE OF LAWS RULES THEREOF OR OF ANY STATE. VENUE FOR ANY ACTION ARISING OUT OF THIS AGREEMENT SHALL RESIDE EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED.

8.07   Court Costs and Attorneys' Fees. If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover costs of court and reasonable attorneys' fees from the other party or parties to such action, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief that may be awarded.

8.08   Assignability and Binding Effect. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, heirs, and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assignable without the express written consent of all Parties.

8.09   Expenses, Taxes, Etc. The Company shall pay all fees, taxes, and expenses incurred by it in connection with this Agreement, and the Investor shall pay all fees, taxes, and expenses incurred by it in connection with the transactions contemplated by this Agreement.

8.10   Third Parties. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the Parties and their successors, heirs or permitted assigns, any rights or remedies under or by reason of this Agreement.

8.11   Number and Gender of Words. When the context so requires in this Agreement, words of gender shall include either or both genders and the singular number shall include the plural.

8.12   Entire Agreement. This Agreement together with the Schedules and Exhibits attached hereto, shall constitute the entire agreement between the Parties with respect to the transactions contemplated hereby and shall supersede all prior or contemporaneous negotiations, understandings and agreements with respect thereto. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

8.13   Survival of Representations and Warranties. All representations, warranties, covenants, and obligations of the Parties shall survive the Closing for a period of 18 months thereafter.

-24-

8.14   Multiple Counterparts.   This Agreement may be executed in multiple counterparts, including by facsimile signature, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

8.15   Amendment. This Agreement may not be modified, amended, or supplemented except by an agreement in writing signed by all of the Parties.

[The remainder of this page is intentionally left blank.]

-25-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

**THE COMPANY:**

**CCISTECH, INC.**

By: _____

Name: Dickson Perry

Title: President & CEO

**THE INVESTOR:**

**GIANT EAGLE OF DELAWARE, INC.**

By: _____

Name: John Lucot

Title: Vice President

-26-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

THE COMPANY:

CCISTECH, INC.

By: _____
Name: Dickson Perry
Title:   President & CEO

THE INVESTOR:

GIANT EAGLE OF DELAWARE, INC.

By: _____
Name: John Lucot
Title:   Vice President

-26-

## EXHIBIT LIST

Exhibit A—Form of Certificate of Designation
Exhibit B—Form of Company's Secretary Certificate
Exhibit C—Form of Company's Officer's Certificate
Exhibit D—Form of Registration Rights Agreement
Exhibit E—Form of Shareholders Agreement
Exhibit F—Form of Opinion Letter
Exhibit G—Form of Investor's Secretary Certificate
Exhibit H—Form of Investor's Officer's Certificate

## SCHEDULE LIST

Schedule 3.01(a)—Organizational Documents of the Company
Schedule 3.03—No Violation
Schedule 3.05(c)—Rights of First Refusal
Schedule 3.05(d)—Past Issuances
Schedule 3.05(e)—Shareholders and Optionholders of the Company
Schedule 3.08—Litigation
Schedule 3.09(a)—Intellectual Property Liens
Schedule 3.09(b)—Intellectual Property Judgments
Schedule 3.09(d)—Intellectual Property Infringement of Third Party Rights
Schedule 3.09(e)—Intellectual Property Litigation
Schedule 3.09(f)—Intellectual Property  Infringement of Company Parties' Rights
Schedule 3.09(h)—Intellectual Property Royalties
Schedule 3.09(i)—Employee Violations
Schedule 3.09(k)—Excluded Works and Inventions
Schedule 3.11—Title to Property and Assets
Schedule 3.13—Insurance
Schedule 3.16—Taxes
Schedule 3.17—Consents
Schedule 3.18—GAAP
Schedule 3.19—Changes
Schedule 3.20—Employee Agreements and Plans
Schedule 3.21—Material Contracts
Schedule 3.23—Due Diligence Materials

-27-

**Schedule 3.08**

**Litigation**

On March 4, 2004, Metrosplash Systems Group, Inc. ("Metrosplash") filed a petition in the 192nd District Court of Dallas County, Texas against the Company, Buehler Foods, Inc., and Jason R. Stancil. The causes of action asserted by Metrosplash were breach of fiduciary duty, civil conspiracy, unjust enrichment, and unfair competition. In the alternative, Metrosplash requested the court to grant injunctive relief to prevent the unfair business practice of misappropriation of intellectual property owned by Metrosplash. Metrosplash, the entity that is a successor in interest to certain of the assets of Fuel Links, Inc., relies on the February 2003 License Agreement between the Company and Fuel Links to bring its claims.

On April 22, 2004, the Company and Jason R. Stancil filed counterclaims against Metrosplash and a third-party petition against Christopher J. Daly, Comstock Data Mining, Inc., Tad Marko, Jeffrey Beardsley, Marvin Brinkley d/b/a Brinkley POS, and Shadow Media, Inc. The counterclaims included tortious interference with existing and prospective business relations, civil conspiracy, defamation, tortious interference with contract, business disparagement and unfair competition.

Following negotiations between the parties to the litigation, a temporary restraining order was put in place that prevented each party from disparaging the other parties to other persons or entities involved in the retail fuel technology services market. The Company expects that a temporary injunction hearing will occur in the future. Metrosplash has indicated that it will agree to a temporary injunction that is commensurate with the terms of the temporary restraining order. The Company continues to defend itself against Metrosplash's claims.

-8-

## Schedule 3.09(a)

### Intellectual Property

None.

-9-

**Schedule 3.09(b)**

**Intellectual Property Judgments**

See Schedule 3.08.

-10-

**Schedule 3.09(d)**

**Intellectual Property Infringement of Third Party Rights**

See Schedule 3.08.

-11-

**Schedule 3.09(e)**

**Intellectual Property Litigation**

See Schedule 3.08.

-12-

## Schedule 3.09(f)

### Intellectual Property Infringement of Company Parties' Rights

None.

-13-

## Schedule 3.09(h)

### Intellectual Property Royalties

None.

-14-

## Schedule 3.09(i)

## Employee Violations

None.

-15-

## Schedule 3.09(k)

### Excluded Works and Inventions

None.

-16-

# EXHIBIT 4

2005 Series B Preferred Stock Purchase Agreement

## SERIES B PREFERRED STOCK PURCHASE AGREEMENT

This Series B Preferred Stock Purchase Agreement (this "**Agreement**") is made and entered into as of November 15, 2005 by and between Excentus Corporation, a Texas corporation (the "**Company**"), and Giant Eagle of Delaware, Inc., a Delaware corporation (the "**Investor**"). Each of the Company and the Investor may be referred to herein as a "**Party**," and collectively as the "**Parties**."

WHEREAS, the Company desires to sell to the Investor, and the Investor desires to purchase from the Company, 95,239 shares (the "**Purchased Shares**") of the Company's Series B Preferred Stock, par value $0.01 per share (the "**Series B Preferred Stock**"), which Purchased Shares shall have the rights, preferences, privileges and restrictions set forth in the Certificate of Designation of the Company attached to this Agreement as <u>Exhibit A</u> (the "**Certificate of Designation**"), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## AGREEMENT TO PURCHASE AND SELL STOCK

1.01   <u>Authorization</u>. As of the Closing Date (as defined below), the Company will have authorized the issuance, pursuant to the terms and conditions of this Agreement, of the Purchased Shares.

1.02   <u>Agreement to Purchase and Sell</u>. The Company agrees to sell to the Investor at the Closing, and the Investor agrees to purchase from the Company at the Closing, the Purchased Shares at a price of $42.00 per share for an aggregate price of $4,000,038 (the "**Purchase Price**"). The shares of Common Stock (as defined below) issuable and that are issued upon conversion of the Purchased Shares will be hereinafter referred to as the "**Conversion Shares**".

## ARTICLE II
## CLOSING

2.01   <u>The Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Fish & Richardson P.C., 1717 Main Street, Suite 5000, Dallas, Texas 75201, at (i) 10:00 a.m. Central Time, on November 15, 2005 or (ii) such other date and at such other time and place as the Parties may agree. The date on which the Closing occurs is referred to herein as the "**Closing Date**." At the Closing, the Parties shall deliver or cause to be delivered the following:

(a)   the Company shall deliver or cause to be delivered to the Investor:

(i)   a stock certificate representing the Purchased Shares;

-1-

(ii)    a Secretary's Certificate in substantially the form attached hereto as Exhibit B;

(iii)    an Officer's Certificate in substantially the form attached hereto as Exhibit C;

(iv)    any consents set forth on Schedule 3.17, dated prior to the Closing Date, required to be obtained by the Company from third parties in order to consummate the transactions contemplated by this Agreement;

(v)    an executed Registration Rights Agreement in the form attached hereto as Exhibit D (the "**Registration Rights Agreement**");

(vi)    an Amended and Restated Shareholders Agreement in the form attached hereto as Exhibit E (the "**Shareholders Agreement**" and together with the Registration Rights Agreement, the "**Related Agreements**") executed by the Company and each Person (as defined below) who owns in excess of 5% of the issued and outstanding Common Stock (as defined below) on a fully-diluted basis as of the Closing Date;

(vii)    a legal opinion from Fish & Richardson P.C., counsel to the Company, dated as of the Closing Date in the form attached hereto as Exhibit F; and

(viii)    an amendment to the Certificate of Incorporation of the Company in a form reasonably acceptable to counsel for the Investor.

(b)    the Investor shall deliver to the Company:

(i)    the Purchase Price, paid by (A) a bank certified or cashier's check payable to the Company's order, (ii) wire transfer of immediately available funds to the Company or (iii) any combination of the foregoing (collectively, "**Cash**");

(ii)    a Secretary's Certificate in substantially the form attached hereto as Exhibit G;

(iii)    an Officer's Certificate in substantially the form attached hereto as Exhibit H;

(iv)    an executed Registration Rights Agreement; and

(v)    an executed Shareholders Agreement.

-2-

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

To induce the Investor to enter into this Agreement and to consummate the transactions contemplated hereby, the Company hereby represents and warrants to the Investor, as of the Closing Date, the following:

3.01   Organization and Good Standing. The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas. Schedule 3.01(a) includes (i) a true and complete copy of the Company's Articles of Incorporation and all amendments thereto, certified by the Secretary of State of Texas; (ii) a true and complete copy of the Bylaws of the Company presently in effect, certified as true and correct by the Company's Secretary; and (iii) true and complete copies of certificates of existence and good standing for the Company, certified by the Secretary of State of Texas and the Texas Comptroller of Public Accounts, respectively, as of the Closing Date.

3.02   Authority; Qualification. The Company has all requisite corporate power and authority to own its property, to conduct its business, and to execute and deliver this Agreement and the Related Agreements and any instruments and agreements contemplated herein or therein that are required to be executed and delivered by the Company pursuant to its obligations hereunder and thereunder, and to perform its obligations hereunder and thereunder. This Agreement and the Related Agreements have been approved by the Company's Board of Directors and have been duly authorized, executed, and delivered by the Company. The Company is duly qualified to do business as a foreign corporation in good standing in all jurisdictions in which it is required to be qualified to do intrastate business as the Company's business is currently conducted, except for jurisdictions in which failure to so qualify could not reasonably be expected to have a Material Adverse Effect on the Company. All corporate action on the part of the Company's directors and shareholders necessary for (i) the authorization, execution, delivery of, and the performance of all obligations of the Company under this Agreement and the Related Agreements; (ii) the authorization, issuance, reservation for issuance and delivery of all of the Purchased Shares being sold under this Agreement and of the Conversion Shares; and (iii) the filing of the Certificate of Designation has been taken or will be taken prior to the Closing. This Agreement and the Related Agreements represent the valid and binding obligations of the Company, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion. The Company has delivered to the Investor a copy of the resolutions of the Company's Board of Directors certified as true and correct by the Company's Secretary, approving this Agreement and the Related Agreements and authorizing the execution hereof by the Company's president. For purposes of this Agreement, "Material Adverse Effect" means any effect(s), individually or in the aggregate, that would be materially adverse to a Party's assets in an amount of $10,000 or more.

3.03   No Violation. The Company is not in violation or default of any provisions of its organizational documents as amended to date, and is in compliance with all applicable statutes, laws, court orders, regulations and executive orders of any Governmental Authorities having

-3-

jurisdiction over its business or properties, except in the case of statutes, laws, regulations and orders the violation of which would not have a Material Adverse Effect on the Company. The Company has not received any notice of any violation of any such statute, law, regulation or order which has not been remedied prior to the date hereof. Neither the execution and delivery by the Company of this Agreement or the Related Agreements nor the consummation by the Company of the transactions contemplated hereby and thereby will (i) violate any provision of the Texas Business Corporation Act, the Articles of Incorporation of the Company, or the Bylaws of the Company; (ii) except as set forth on Schedule 3.03, violate, or be in conflict with, or constitute a default (or an event or condition that, with notice or lapse of time, or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any liabilities of the Company, or result in the creation or imposition of any security interest, lien, charge, or other encumbrance upon any of the assets of the Company under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, understanding, arrangement, agreement, or restriction of any kind or character to which the Company is a party or by which the Company may be bound or affected or to which any of the Company's assets are subject; or (iii) violate any statute or law or any judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority. For purposes of this Agreement, "**Governmental Authority**" means any nation or government, any state, regional, local, or other political subdivision thereof, and any entity or official exercising executive, legislative, judicial (including courts), regulatory, or administrative functions of or pertaining to government.

3.04 <u>Brokers</u>. The Company has not employed any broker, agent, or finder in connection with any transaction contemplated by this Agreement for which the Investor may be liable or responsible to pay.

3.05 <u>Capitalization</u>. The capitalization of the Company immediately prior to the Closing consists of the following:

(a) <u>Common Stock</u>. A total of 5,000,000 authorized shares of Common Stock, par value $0.01 per share (the "**Common Stock**"), of which 361,233 shares are issued and 352,900 shares are outstanding.

(b) <u>Preferred Stock</u>. A total of 1,000,000 authorized shares of preferred stock, par value $0.01 (the "**Preferred Stock**"), 83,334 of which have been designated as Series A Preferred Stock (so called herein), of which 83,334 are issued and outstanding, and 95,239 of which have been designated as Series B Preferred Stock, and none of which will be issued and outstanding. Upon the Closing, the rights, preferences and privileges of the Series B Preferred Stock will be as stated in the Certificate of Designation and as provided by law.

(c) <u>Options, Warrants, Etc.</u> Except for the (i) conversion rights of the Series A Preferred Stock and the Series B Preferred Stock, and (ii) 91,000 shares of Common Stock reserved for issuance under the Company's 2002 Stock Option Plan (the "**Plan**") under which, as of the Closing Date, there are options to purchase 91,000 shares of Common Stock outstanding, there are no outstanding options, warrants, rights (including

-4-

conversion or preemptive rights) or agreements for the purchase or acquisition from the Company of any shares of its capital stock or any securities convertible into or ultimately exchangeable or exercisable for any shares of the Company's capital stock. Except as set forth on Schedule 3.05(c), no shares of the Company's outstanding capital stock are subject to any rights of first refusal or other rights to purchase such stock (whether in favor of the Company or any other Person), pursuant to any agreement or commitment of the Company. For the purposes of this Agreement, "**Person**" shall have the meaning given in Section 3(a)(9) of the Securities Exchange Act of 1934, as amended, as modified and used in Sections 13(d)(3) and 14(d)(2) of such act.

(d)    Valid Issuance. The outstanding shares of the capital stock of the Company are duly authorized and validly issued, fully paid and nonassessable, and have been approved by all requisite shareholder and board action. A description of all issuances and grants by the Company prior to the Closing of any capital stock, convertible securities, rights, warrants, or options of the Company is set forth on Schedule 3.05(d). The offer and sale by the Company of all capital stock, convertible securities, rights, warrants, or options of the Company issued prior to the Closing was conducted in compliance with all applicable federal and state securities laws, and to the Knowledge (as defined below) of the Company, no holder of any such securities has a right of rescission or has made or threatened to make a claim for rescission or damages with respect thereto. For purposes of this Agreement, a Party shall be deemed to have "**Knowledge**" of a particular fact or other matter as follows: (i) if the Party is an individual, if such individual is actually aware of such fact or other matter or a person serving in the same capacity as such individual would be expected to discover or otherwise become aware, after due inquiry, of such fact or other matter in the course of performing the duties of such individual; or (ii) if the Party is a corporation or other form of business entity, if (A) any executive officers of such Party are actually aware of such fact or other matter, or (B) any person or persons serving in the same capacities as such executive officers would be expected to discover or otherwise become aware, after due inquiry, of such fact or other matter in the course of performing the official duties of such offices.

(e)    Outstanding Shareholders and Option Holders. Schedule 3.05(e) sets forth a complete list of all shareholders and option holders of the Company as of the Closing Date.

3.06    Valid Issuance of Purchased Shares and Conversion Shares.

(a)    The Purchased Shares, when issued in accordance with this Agreement, will have been validly issued, fully paid and non-assessable and will be free and clear of any lien, charge or other encumbrance and will not be subject to any preemptive or similar rights. The Conversion Shares have been duly and validly reserved for issuance upon conversion thereof and, when issued upon such conversion in accordance with the Certificate of Designation, will have been validly issued, fully paid and non-assessable and will be free and clear of any lien, charge or other encumbrance and will not be subject to any preemptive or similar rights.

-5-

(b)     Based in part on the representations made by the Investor in Article IV hereof, the offer and sale of the Purchased Shares to the Investor in accordance with this Agreement and the issuance of the Conversion Shares are exempt from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and from all other provisions of applicable securities laws of states of the United States.

3.07   Governmental Consents.   No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local Governmental Authority is required on the part of the Company in order to enable the Company to execute, deliver and perform its obligations under this Agreement or the Related Agreements and the transactions contemplated hereby and thereby, except for such qualifications or filings under applicable securities laws as may be required in connection with the transactions contemplated by this Agreement.   All such qualifications and filings will, in the case of qualifications, be effective on the Closing Date and will, in the case of filings, be made within the applicable time period(s) prescribed by law.

3.08   Litigation.   Except as set forth in Schedule 3.08, there are no Proceedings in progress, pending, or, to the Company's Knowledge, threatened against or affecting the Company, the Company's assets, or the transactions contemplated hereby in any court or before any arbitration panel of any kind or before or by any Governmental Authority. For purposes of this Agreement, "**Proceeding**" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, whether public or private) commenced, brought, conducted, or heard by or before, or otherwise involving any Governmental Authority or arbitrator.

3.09   Intellectual Property.

(a)     Except as set forth in Schedule 3.09(a), the Company is the owner of all, or has the perpetual and irrevocable license or right to use, sell and license all of, the Copyrights, Patents, Trade Secrets, Trademarks, Software and other proprietary rights (collectively, "**Intellectual Property**") that are used in connection with its business as presently conducted. For the purposes of this Agreement, "**Copyrights**" means any foreign or United States copyright registrations and applications for registration thereof, and any non-registered copyrights; "**Patents**" means any foreign or United States patents and patent applications, including any divisions, continuations, continuations-in-part, substitutions or reissues thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted; "**Trade Secrets**" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto; "**Trademarks**" means any foreign or United States trademarks, service marks, trade dress, trade names, brand names, designs and logos, corporate names, product or service identifiers, whether registered or unregistered, and all registrations and applications for registration thereof; and "**Software**" means any computer software programs, source code, object code, data and documentation.

-6-

(b)     Except as set forth in Schedule 3.09(b), none of the Intellectual Property owned by the Company is subject to any outstanding judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or, to the Company's Knowledge, threatened, which challenges the validity, enforceability, use or ownership of the Company's Intellectual Property.

(c)     The Company has performed all material obligations imposed upon it under all Intellectual Property licenses, sublicenses, distributor agreements and other agreements under which it is either a licensor, licensee or distributor, except such licenses, sublicenses and other agreements relating to off-the-shelf software which is commercially available on a retail basis and used solely on the Company's computers (collectively, the "**Intellectual Property Licenses**"), and is not, nor to the Company's Knowledge is any other party thereto, in breach of or default thereunder in any respect, nor has any event occurred which with notice or lapse of time or both would constitute a default thereunder. All of the Intellectual Property Licenses are valid, enforceable and in full force and effect, and will continue to be so on identical terms immediately following the closing of the transactions contemplated by this Agreement and the Related Agreements, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion.

(d)     Except as set forth in Schedule 3.09(d), none of the Intellectual Property currently sold or licensed by the Company to any Person, or to the Company's actual knowledge used by or licensed to the Company by any Person, infringes upon or otherwise violates any Intellectual Property rights of others.

(e)     Except as set forth in Schedule 3.09(e), no litigation is pending and no claim has been made against the Company or, to the Company's Knowledge, is threatened, contesting the right of the Company to sell or license to any Person or use the Intellectual Property.

(f)     Except as set forth in Schedule 3.09(f), to the Company's Knowledge, no Person is infringing upon or otherwise violating the Intellectual Property rights of the Company.

(g)     No former employer of any employee of the Company has made a claim against the Company or, to the Company's Knowledge, against any other Person, that such employee is utilizing Intellectual Property of such former employer.

(h)     Except as set forth in Schedule 3.09(h), the Company is not a party to or bound by any license or other agreement requiring the payment by the Company of any royalty payment, excluding such agreements relating to off-the-shelf software licensed for use solely on the Company's computers.

-7-

(i)     Except as set forth on Schedule 3.09(i), to the Company's Knowledge, no employee of the Company is in violation of any requirements of law applicable to such employee, or any term of any employment agreement, patent or invention disclosure agreement or other contract or agreement relating to the relationship of such employee with the Company or any prior employer.

(j)     To the Company's Knowledge, none of the Company's Trade Secrets, wherever located, the value of which is contingent upon maintenance of confidentiality thereof, has been disclosed to any Person other than employees, representatives and agents of the Company, except as required pursuant to the filing of a patent application by the Company.

(k)     Except as set forth on Schedule 3.09(k), each employee of the Company has executed a confidential information and invention assignment agreement, in the form delivered to the Investor. Except as set forth on Schedule 3.09(k), no employee of the Company has excluded works or inventions made prior to his or her employment with the Company from his or her assignment of inventions pursuant to such employee's confidential information and invention assignment agreement. Each consultant that has had access to the Company's Intellectual Property has entered into an agreement containing appropriate confidentiality and invention assignment provisions. To the Company's actual knowledge, no officer, employee or consultant of the Company is in violation of such confidential information and invention assignment agreement or any prior employee contract or proprietary information agreement with any other corporation or third party.

3.10   Registration Rights. Except for the registration rights granted to the holders of the Series A Preferred Stock, the Company is not under any obligation to register any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities under the Securities Act, nor is the Company obligated to register or qualify any such securities under any state securities or blue sky laws.

3.11   Title to Property and Assets. Except as set forth on Schedule 3.11, the Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances, leases and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not have a Material Adverse Effect on the Company. With respect to the property and assets it leases, the Company is in material compliance with all such leases and, to the Company's Knowledge, the Company holds valid leasehold interests in such assets free of any liens, encumbrances, security interests or claims of any Person other than the lessors of such property and assets.

3.12   ERISA Plans. Except for the Company's 401(k) plan, the Company does not have any Employee Pension Benefit Plans as defined in Section 3 of the Employee Retirement Income Security Act of 1974, as amended.

-8-

3.13   Insurance.   Schedule 3.13 lists each insurance policy (including fire, theft, casualty, general liability, professional liability, workers compensation, business interruption, environmental, product liability and automobile insurance policies and bond and surety arrangements) to which the Company is a party.   There is no material claim pending under any such policy as to which coverage has been questioned, denied or disputed by the underwriter of such policy.   All premiums due and payable under all such policies have been paid, the Company may not liable for any retroactive premiums or similar payments, and the Company is otherwise in compliance in all material respects with the terms of such policies applicable to it.   The Company has no Knowledge of any threatened termination of, or material premium increase (other than increases that are consistent with the increases experienced by the industry in which the Company does business) with respect to, any such policy.

3.14   Environmental Matters.   The Company, to its Knowledge, is not in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to the Company's Knowledge, no material expenditures are or will be required in order to comply with any such statute, law or regulation.

3.15   Tax Elections.   The Company has not elected pursuant to the Internal Revenue Code of 1986, as amended (the "Code"), to be treated as an "S" corporation or a collapsible corporation pursuant to Section 341(f) or Section 1362(a) of the Code, nor has it made any other elections pursuant to the Code (other than elections which relate solely to matters of accounting, depreciation or amortization) which would have a Material Adverse Effect on the Company, its financial condition, its business as presently conducted or presently proposed to be conducted or any of its properties or material assets.

3.16   Taxes.

(a)   Except as set forth on Schedule 3.16, the Company has (i) timely filed all returns required to be filed by it with respect to all federal, state, local, and foreign income, payroll, withholding, unemployment, excise, added value, social security, sales and use, real and personal property, use and occupancy, business and occupation, mercantile, real estate, capital stock, and franchise or other tax (including interest and penalties thereon and including estimated taxes thereof) (hereinafter referred to collectively as "Taxes"); (ii) paid all Taxes shown to have become due pursuant to such returns; and (iii) paid all other Taxes for which a notice of assessment or demand for payment has been received;

(b)   All returns for Taxes filed by or on behalf of the Company have been prepared in accordance with all applicable laws and requirements and accurately reflect the taxable income (or other measure of Tax) of the Company;

(c)   There are no Tax liens upon any of the assets of the Company, and the Company is not aware of any audit or other proceeding or investigation, or of any position taken on a Tax return of the Company, that could give rise to a Tax lien upon any of the Company's assets; and

-9-

(d)     The Company has not been advised in writing (i) that any of its returns have been or are being audited as of the date hereof, or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state or local taxes.

3.17    Consents.  Except as set forth on Schedule 3.17, no consent, approval, license, permit, authorization, or order of any Person is required in connection with the execution and delivery of this Agreement and the Related Agreements or the consummation of the transactions contemplated hereby or thereby by the Company.

3.18    Financial Statements; No Financial Change.  The Company has previously delivered to the Investor true, correct, and complete copies of the following financial statements: unaudited balance sheets, statements of income, statements of changes in shareholders' equity, and statements of cash flows as of and for the years ended December 31, 2004, and an unaudited balance sheet, statement of income, and statement of cash flows as of and for the nine months ended September 30, 2005 (the "Company Financial Statements").  The Company Financial Statements have been prepared consistently during the periods indicated, are correct and complete in all respects, accurately present the financial condition and results of operations of the Company as of the dates set forth.  Since the date of the Company Financial Statements, there has not been any material adverse change in the business, operations, prospects, assets, results of operations or condition (financial or other) of the Company, and no event has occurred or circumstance exists that may result in such a change.  Except as set forth on Schedule 3.18, the Company Financial Statements were prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby.

3.19    Changes.  Except as set forth on Schedule 3.19, since September 30, 2005 (the date of most recent financial statements provided to Investor), there has not been:

(a)     any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Company Financial Statements, except changes in the ordinary course of business, that has had a Material Adverse Effect;

(b)     any damage, destruction or loss to any assets or properties of the Company, whether or not covered by insurance, that has had a Material Adverse Effect;

(c)     any waiver by the Company of a valuable right or of a material debt owed to it;

(d)     any change or amendment to an agreement by which the Company or any of its assets or properties is bound or subject that has had a Material Adverse Effect;

(e)     any loans made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(f)     any resignation or termination of any executive officer or key employee of the Company;

-10-

(g)     any material change in any compensation arrangement or agreement with any employee, director or shareholder of the Company;

(h)     any sale, assignment or transfer of any Patents, Trademarks, Copyrights, Trade Secrets or other intangible assets of the Company;

(i)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the business, properties, prospects or financial condition of the Company;

(j)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(k)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable;

(l)     any receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)     to the Company's Knowledge, any other event or condition of any character that has had a Material Adverse Effect; or

(n)     any agreement or commitment by the Company to do any of the things described in this Section 3.19.

3.20     Labor Relations; Employees.     There are no strike, labor dispute or union organization activities pending or threatened between the Company and its employees. To the Company's Knowledge, none of its employees belongs to any union or collective bargaining unit. Except as set forth on Schedule 3.20, the Company is not a party to or bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, or other employee compensation agreement. To the Company's Knowledge, no officer or key employee intends to terminate his or her employment with the Company, nor does the Company have a present intention to terminate the employment of any officer or key employee. Subject to general principles related to wrongful termination of employees, the employment of each officer and employee of the Company is terminable at the will of the Company.

3.21     Material Contracts.     Except for the Related Agreements or any agreements listed on Schedule 3.21, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound which may involve (i) obligations of, or payments to, the Company in excess of $10,000 (other than obligations of, or payments to, the Company arising from agreements entered into in the ordinary course of business), (ii) the license of any patent, copyright, trade

-11-

R126

secret or other proprietary right to or from the Company or (iii) the grant of rights to produce, license, market or sell the Company's products or affect the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products (each, a "**Material Contract**", collectively the "**Material Contracts**"). All Material Contracts to which the Company is a party are valid, binding and in full force and effect in all material respects, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies and to general principles of equity. Neither the Company nor, to the Company's Knowledge, any other party to any Material Contract, is in default under any of such Material Contracts.

3.22 <u>Obligations to Related Parties</u>. No employee, officer, director or, to the Company's Knowledge, shareholder of the Company or member of his or her immediate family is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them other than (i) for payment of salary for services rendered, (ii) reimbursement for reasonable expenses incurred on behalf of the Company and (iii) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the Company's Board of Directors and stock purchase agreements approved by the Company's Board of Directors). To the Company's Knowledge, none of such persons has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, except in connection with the ownership of stock in publicly-traded companies. To the Company's Knowledge, no employee, officer, director or shareholder of the Company, nor any member of their immediate families, is, directly or indirectly, interested in any Material Contract with the Company (other than such contracts as relate to any such person's ownership of capital stock or other securities of the Company or such person's employment agreement with the Company).

3.23 <u>Full Disclosure</u>. The Company has provided the Investor with all the information regarding the Company that the Investor has requested for deciding whether to purchase the Purchased Shares, as set forth on <u>Schedule 3.23</u>. No representation or warranty regarding the Company made in this Agreement, the Related Agreements, the Exhibits and Schedules hereto, or the documents to be delivered by the Company at the Closing pursuant to Article II, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein not misleading in light of the circumstances under which they were made. Each of the Schedules attached hereto is a true and complete list or description, as appropriate, of the items purported to be listed or described thereon. The Company represents and warrants that any financial projections provided to the Investor were prepared in good faith.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE INVESTOR**

To induce the Company to enter into this Agreement and to consummate the transactions contemplated hereby, the Investor hereby represents and warrants to the Company, as of the Closing Date, the following:

-12-

4.01  Organization and Good Standing.  The Investor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

4.02  Authority.  The Investor has all requisite corporate power and authority to execute and deliver this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby.  This Agreement and the Related Agreements have been approved by the Investor's Board of Directors and have been duly authorized, executed, and delivered by the Investor.  All corporate action on the part of the Investor's directors and shareholders necessary for the authorization, execution, delivery of, and the performance of all obligations of the Investor under this Agreement and the Related Agreements has been taken or will be taken prior to the Closing.  This Agreement and the Related Agreements represent the valid and binding obligations of the Investor, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion.  The Investor has delivered to the Company a copy of the resolutions of the Investor's Board of Directors, certified as true and correct by the Investor's secretary, approving this Agreement and the Related Agreements and authorizing the execution hereof by the Investor's president.

4.03  No Violation.  Neither the execution and delivery by the Investor of this Agreement and the Related Agreements nor the consummation by the Investor of the transactions contemplated hereby and thereby will (i) violate any provision of the Delaware General Corporation Law or charter or bylaws of the Investor; (ii) violate, or be in conflict with, or constitute a default (or an event or condition that, with notice or lapse of time, or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any agreement to which the Investor is subject, or result in the creation or imposition of any security interest, lien, charge, or other encumbrance upon any of the Investor's assets under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, understanding, arrangement, agreement, or restriction of any kind or character to which the Investor is a party or by which the Investor may be bound or affected or to which any the Investor's assets is subject; or (iii) violate any statute or law or any judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority.

4.04  Brokers.  The Investor has not employed any broker, agent, or finder in connection with any transaction contemplated by this Agreement for which the Company may be liable or responsible to pay.

4.05  Litigation.  There are no Proceedings in progress, pending, or, to the Investor's Knowledge, threatened against or affecting the Investor, the Investor's assets, or the transactions contemplated hereby in any court or before any arbitration panel of any kind or before or by any Governmental Authority, except such proceedings which would not have an effect, individually or in the aggregate, that would be materially adverse to the Investor's assets.

4.06  Consents.  No consent, approval, license, permit, authorization, or order of any Person is required in connection with the execution and delivery of this Agreement or the

-13-

Related Agreements or the consummation of the transactions contemplated hereby and thereby by the Investor.

4.07    Full Disclosure. To the Investor's Knowledge, no representation or warranty regarding the Investor made in this Agreement, the Exhibits and Schedules hereto, or the documents to be delivered by the Investor at the Closing pursuant to Article II, contains any untrue statement of a material fact that affects the ability of the Investor to consummate the transactions contemplated by this Agreement and the Related Agreements or omits to state a material fact necessary to make the statements or facts contained herein not misleading.

4.08    Representations Regarding the Acquisition of the Purchased Shares and the Conversion Shares.

(a)    Purchase Entirely for Own Account. This Agreement is made with the Investor in reliance upon the Investor's representation to the Company, which by the Investor's execution of this Agreement the Investor hereby confirms, that the Purchased Shares to be received by the Investor and the Conversion Shares issuable upon conversion thereof (collectively, the "**Offered Securities**") will be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Investor has no present intention of selling, granting any participation in or otherwise distributing the same. The Investor further represents that the Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Offered Securities.

(b)    Sophistication; Accredited Investor Status. The Investor is a Person who either alone or with its purchaser representative(s) has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company. The Investor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(c)    Speculative Investment. The Investor understands the speculative nature and risks of investments associated with the Company and confirms that it is able to bear the risk of the investment, and that there may not be any public market for the Offered Securities received herein.

(d)    No Coercion or Solicitation. The Investor has freely entered this Agreement and has been subject to neither pressure to make a hasty or uninformed decision to enter into this Agreement nor solicitation to receive the Offered Securities.

(e)    Transfer Restrictions. Except as otherwise set forth in this Agreement or the Related Agreements, the Investor is not under an obligation to register or seek an exemption under any federal and/or state securities acts for any sale or transfer of the Offered Securities by the Investor, and the Investor hereby acknowledges that the Offered Securities constitute restricted securities as that term is defined in Rule 144 under the Securities Act and that the Offered Securities may not be sold, transferred, assigned or

-14-

hypothecated unless there is an effective registration statement under the Securities Act covering the Offered Securities, the sale is made in accordance with Rule 144 under the Securities Act, or the Company receives an opinion of counsel of the Investor reasonably satisfactory to the Company, stating that such sale, transfer, assignment or hypothecation is exempt from the registration and prospectus delivery requirements of the Securities Act.

(f)     Disclosure of Information. To the Knowledge of the Investor, the Investor has received all the information it considers necessary or appropriate for deciding whether to purchase the Offered Securities. The Investor further represents that it has had the opportunity to ask questions of the Company and receive answers from the Company, to the extent that the Company possessed such information or could acquire it without unreasonable effort or expense, necessary to evaluate the merits and risks of any investment in the Company.   Further, the Investor has been given an opportunity to question the appropriate executive officers of the Company.

(g)     Legends. It is understood that the certificates evidencing the Offered Securities will bear the legend set forth below:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTIONS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

The legend set forth above shall be removed by the Company from any certificate evidencing Offered Securities upon delivery to the Company of an opinion by counsel, reasonably satisfactory to the Company, that a registration statement under the Securities Act is at that time in effect with respect to the legended security or that such security can be freely transferred in a public sale without such a registration statement being in effect and that such transfer will not jeopardize the exemption or exemptions from registration pursuant to which the Company issued the Offered Securities.

-15-

## ARTICLE V
## ADDITIONAL AGREEMENTS

5.01   Put and Call Options.

(a)   Within 10 days of the closing of an event that constitutes a Triggering Event (as defined below) of the Company, the Company shall notify the Investor in writing of such event (a "**Company Notice**"). In the event of a Triggering Event of the Company, the Investor shall have the right to cause the Company to repurchase all, but not less than all, of the Purchased Shares and Conversion Shares, as the case may be, held by the Investor (collectively, the "**Covered Shares**") for a price per share of $42.00 plus increases to such amount equal to 10% annually from the Closing Date through the date of closing the acquisition of the Covered Shares by the Company (the "**Put Price**"). The Investor must notify the Company of its intention to exercise the put right granted pursuant to this Section 5.01(a) in writing (a "**Put Exercise Notice**") within 60 days of its receipt of the Company Notice. The Company shall deliver to the Investor Cash in the dollar amount equal to the number of Covered Shares multiplied by the Put Price (the "**Put Amount**") within 90 days of the Company's receipt of the Put Exercise Notice (the "**Put Payment Date**"). Notwithstanding anything in this Agreement to the contrary, if a Triggering Event of the Company occurs pursuant to Section 5.01(d)(iii) of this Agreement as a result of the death or permanent disability of Mr. Dickson Perry or pursuant to Section 5.01(d)(iv) of this Agreement, then the Company shall pay the Put Amount to the Investor as follows:

(i) the Company shall deliver to the Investor 50% of the Put Amount in Cash on or before the Put Payment Date; and

(ii) the balance of the Put Amount shall be delivered to the Investor on or before the Put Payment Date in the form of a promissory note (the "Note") payable to the Investor. The Note shall expire upon payment in full on the second anniversary of the Put Payment Date, and shall be for the principal amount equal to 50% of the Put Amount with interest at the annual rate of 10% payable in 8 quarterly installments of interest to the Investor, and with 50% of such principal amount due on the first anniversary of the Put Payment Date and the balance of such principal amount plus any accrued but unpaid interest due on the second anniversary of the Put Payment Date.

(b)   Within 10 days of the closing of an event that constitutes a Triggering Event of the Investor or of Giant Eagle, Inc., a Pennsylvania corporation ("**Giant Eagle, Inc.**"), the Investor shall notify the Company in writing of such event (an "**Investor Notice**"). In the event of a Triggering Event of the Investor or of Giant Eagle, Inc., the Company shall have the right to repurchase all, but not less than all, of the Covered Shares for an amount equal to the greater of (i) the dollar amount equal to the number of Covered Shares multiplied by the Put Price or (ii) the Call Price (as defined below). The Company must notify the Investor of its intention to exercise the call right granted pursuant to this Section 5.01(b) in writing within 60 days of its receipt of the Investor Notice. Upon its receipt of such notice from the Company, the Company and the Investor

-16-

R131

shall have 90 days to determine the Call Price, and upon the expiration of such 90-day period the Company shall deliver to the Investor Cash in an amount equal to the greater of subclause (i) or (ii) of this Section 5.01(b).

(c)     For the purposes of this Agreement, the "Call Price" shall be determined as follows:

(i) three appraisals of the Company's value shall be conducted by three independent appraisers (selected as described below),

(ii) the appraisal which contains a final appraised value between the final appraised values provided in the two other appraisals (the "Base Appraisal") shall be added to the final appraised value of the one other appraisal that is closest in amount to the Base Appraisal, and that amount shall be divided by two to determine the Company's value; and

(iii) the Company's value as determined in subsection (ii) above shall be divided by (ii) the number of issued and outstanding shares of Common Stock (on an as-converted, fully-diluted basis, but excluding shares of Common Stock issuable pursuant to unvested stock options) to determine the Call Price per Covered Share.

For purposes of this Section 5.01(c), the three independent appraisers shall be selected and compensated as follows: (x) one appraiser shall be selected by and at the expense of the Company; (y) one appraiser shall be selected by and at the expense of the Investor; and (z) one appraiser shall be selected by the two foregoing appraisers whose expense shall be borne equally by the Company and the Investor. All appraisals shall be completed no later than 90 days after the Company's notification of its intention to exercise the call right as provided in subsection (b) above.

(d)     For the purposes of this Agreement, a "Triggering Event" shall mean (i) the consummation of a reorganization, merger or consolidation with an entity, or any other event (or series of related events), in which the persons who hold a majority of the outstanding capital stock of the Company, the Investor, or Giant Eagle, Inc., as the case may be, before such transaction do not own at least a majority of the equity securities entitled to vote to elect directors (or persons serving in a similar capacity) of the entity surviving such transaction, (ii) a disposition of all or substantially all of the assets of the Company, the Investor, or Giant Eagle, Inc., as the case may be, (iii) in the case of the Company, if Mr. Dickson Perry ceases to serve as a member of the Company's executive management, or (iv) in the case of the Company, if the Company, due to the outcome of any litigation set forth in Schedule 3.08, loses the right to use its Reward Marketing Engine software module and has no replacement for such software module within 180 days of the event of such loss.

5.02   Repurchase Restrictions. For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the consent of the Investor shall be required for the repurchase or redemption by the Company of any shares of Common Stock or Preferred Stock from any of the Company's shareholders in

-17-

either a single or multiple transactions and from time to time for an aggregate amount in excess of $250,000 (except pursuant to any obligation or right of the Company to repurchase or redeem shares of Common Stock or Preferred Stock upon termination of a Company shareholder's employment or other service to the Company).

5.03    Information Rights. For so long as the Investor continues to hold at least 5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the Company shall deliver to Investor annual, quarterly and monthly financial statements, annual budgets and other information reasonably requested by the Investor. The annual financial statements shall be audited by an accounting firm approved by the Company's board of directors. The Investor shall have the right no more than twice per calendar year, with reasonable notice and at the Investor's sole expense, to inspect, or have its accountants inspect, the Company's books and records; provided, however, that such inspection(s) shall be conducted in a manner so as not to be unreasonably disruptive to the Company's operations.

5.04    Use of Purchase Price. The Purchase Price shall be used by the Company for items such as working capital, capital expenditures, product development, marketing and sales expenses and insurance coverages (including key person life insurance coverages) or as otherwise approved by the Company's board of directors. The Purchase Price will not be used to make any payments outside of the ordinary course of the Company's business, including without limitation any payments of dividends or any payments of extraordinary bonuses.

5.05    Stock Option Agreements. Each stock option agreement executed after the Closing Date between the Company and any optionee (each, an "Optionee") in connection with a Common Stock option grant shall provide, unless otherwise approved by the Investor, that (i) upon the cessation of employment or service to the Company for any reason, such Optionee shall immediately lose all unvested options; (ii) if such Optionee is terminated for cause, such Optionee shall immediately lose all vested but unexercised options and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee pursuant to the exercise of options at the actual exercise price of such options; and (iii) if such Optionee's employment with or service to the Company ceases for any reason other than termination for cause (including without limitation by reason of death or disability), the Optionee (or his or her estate as the case may be) shall have 60 days to exercise any vested options, and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee (or his or her estate as the case may be) pursuant to the exercise of options at the then-current fair market value of such share of Common Stock, as reasonably determined by the Company's board of directors. The Company shall also use its best efforts to enter into amended stock option agreements containing the provisions set forth in the preceding sentence with all Persons with whom the Company has entered into stock option agreements prior to the Closing Date.

5.06    Retail/Gasoline Station Alliances. The Investor shall have the non-exclusive right to license the Company's Products and to establish retail/gas station alliances utilizing the Company's Products in any market in which the Investor operates as of or after the Closing Date. Any exclusive license or arrangement granted to any other Person in any such market shall provide an exception for the Investor's non-exclusive rights as set forth in the preceding sentence. For the purposes of this Agreement, "Products" means the technology which the

-18-

Company has licensed to the Investor as of the Closing Date, and all improvements and enhancements thereto, and the Company's Reward Marketing Engine software module.

5.07   Board Representation.

(a)   For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the size of the Company's Board of Directors shall be fixed at seven (7) persons as follows:

(i)   The Investor shall have the right to nominate two candidates (the "Investor Nominees") for election to the Company's Board of Directors.  One of the initial Investor Nominees shall be Mr. David Shapira.  If any Investor Nominee ceases to serve in such capacity for any reason, the resulting vacancy on the Board of Directors shall be filled by a new director appointed by Investor;

(ii)   The Company covenants that no more than two nominees will be officers of the Company (the "Officer Nominees").

(b)   The Investor hereby agrees to vote, at any annual or special meeting of the shareholders of the Company at which an election of the board of directors of the Company (the "Board") is to occur (which shall include any consent of shareholders of the Company in lieu of any such meeting), all of its shares of the Company's capital stock in favor of the then-current Officer Nominees to the Company's Board of Directors.  In addition, the Investor hereby agrees not to vote to remove any Officer Nominees from the Company's Board of Directors. Notwithstanding any provision of this Section 5.07(b) to the contrary, this Section 5.07(b) shall be effective only for so long as Mr. Dickson Perry serves as a member of the executive management of the Company.

## ARTICLE VI
## CONDITIONS TO THE PARTIES' OBLIGATIONS AT CLOSING

6.01   Conditions to Obligations of the Company. The obligation of the Company to hold the Closing is subject to the satisfaction of the following conditions on or before the Closing Date unless waived in writing by the Company:

(a)   Representations and Warranties.   The representations and warranties of the Investor contained in Article IV shall be true and complete as of the Closing Date.

(b)   Deliverables. The Company shall have received the deliverables from the Investor in accordance with the provisions of Section 2.01(b).

(c)   Certificate of Designation Effective.  The Certificate of Designation shall have been duly adopted by the Company by all requisite board and shareholder action, and shall have been duly filed with and accepted by the Secretary of State of the State of Texas.

-19-

(d)     Securities Exemptions. The offer and sale of the Purchased Shares to the Investor pursuant to this Agreement shall be exempt from the registration and prospectus delivery requirements of the Securities Act, the registration and qualification requirements of all applicable securities laws of states of the United States and all other provisions of applicable securities laws of states of the United States.

6.02     Conditions to Obligations of the Investor. The obligation of the Investor to hold the Closing is subject to the satisfaction of the following conditions unless waived in writing by the Investor:

(a)     Representations and Warranties.     The representations and warranties of the Company contained in Article III shall be true and complete as of the Closing Date.

(b)     Certificate of Designation Effective.  The Certificate of Designation shall have been duly adopted by the Company by all requisite shareholder and board action, and shall have been duly filed with and accepted by the Secretary of State of the State of Texas.

(c)     Noncompetition Agreements. Each officer and other key employee of the Company shall have entered into a noncompetition agreement with the Company in a form reasonably acceptable to the Investor.

(d)     Deliverables. The Investor shall have received the deliverables from the Company in accordance with the provisions of Section 2.01(a).

## ARTICLE VII
## INDEMNIFICATION

7.01. Indemnification by the Company. The Company shall defend, indemnify and hold harmless the Investor and its directors, officers, employees and agents (each an "Investor Indemnitee") from and against any and all claims (including without limitation any investigation, action or proceeding, whether instituted by a third party against the Company or an Investor Indemnitee or by an Investor Indemnitee for the purpose of enforcing its rights hereunder), damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a)   any misrepresentation or breach of warranty under Article III hereof (a "Company Warranty Breach"); or

(b)   any default by the Company in the performance or observance of any of its covenants or agreements hereunder or under the Related Agreements or any instruments or agreements contemplated herein or therein.

7.02. Indemnification by the Investor. The Investor shall defend, indemnify and hold harmless the Company and its directors, officers, employees and agents (each a "Company Indemnitee") from and against any and all claims (including without limitation any

-20-

investigation, action or proceeding, whether instituted by a third party against a Company Indemnitee or by a Company Indemnitee for the purpose of enforcing its rights hereunder), damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty under Article IV (an "**Investor Warranty Breach**"); or

(b) any default by the Investor in the performance or observance of any of its covenants or agreements hereunder or under the Related Agreements or any instruments or agreements contemplated herein or therein.

7.03. <u>Representation, Settlement and Cooperation</u>. If any investigation, action or other proceeding (each a "**Proceeding**") is initiated against any Investor Indemnitee or Company Indemnitee (each an "**Indemnitee**") and such Indemnitee intends to seek indemnification from the Company or the Investor (each an "**Indemnitor**"), as applicable, under this Article on account of its involvement in such Proceeding, then such Indemnitee shall give prompt written notice to the applicable Indemnitor of such Proceeding. The failure to deliver prompt written notice to the Indemnitor after the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve such Indemnitor of any liability to the Indemnitee under this Article VII to the extent of the prejudice caused by such failure. Upon receipt of such notice, such Indemnitor shall diligently defend against such Proceeding on behalf of such Indemnitee at its own expense using counsel reasonably acceptable to such Indemnitee; provided, that if such Indemnitor shall fail or refuse to conduct such defense, or such Indemnitee has been advised by counsel that it may have defenses available to it which are different from or in addition to those available to such Indemnitor, or that its interests in such Proceeding are adverse to such Indemnitor's interests, then such Indemnitee may defend against such Proceeding at such Indemnitor's expense. Such Indemnitor or Indemnitee, as applicable, may participate in any Proceeding being defended against by the other at its own expense, and shall not settle any Proceeding without the prior consent of the other, which consent shall not be unreasonably withheld. Such Indemnitor and Indemnitee shall cooperate with each other in the conduct of any such Proceeding.

7.04. <u>Notice and Satisfaction of Indemnification Claims</u>. No indemnification claim shall be deemed to have been asserted until the applicable Indemnitor has been given notice by the Indemnitee of the amount of such claim and the facts on which such claim is based. For purposes of Section 7.04, notice of an indemnification claim shall be deemed to cover claims arising out of all related Proceedings so long as, in the case of Proceedings instituted by third parties, the Indemnitee complies with Section 7.03. Indemnification claims shall be paid within 30 days after the Indemnitor's receipt of such notice and such evidence of the amount of such claim and the Indemnitor's liability therefor as the Indemnitor may reasonably request.

## ARTICLE VIII
## MISCELLANEOUS

-21-

8.01   Reformation and Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof: (a) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable; and (b) the legality, validity, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

8.02   Further Assurances.  Each Party shall, from time to time after the Closing Date, at the request of any other Party and without further consideration, execute and deliver such other instruments of conveyance, assignments, transfer, and assumption, and take such other actions, as such other Party may reasonably request to more effectively consummate the transactions contemplated by this Agreement and the Related Agreements.

8.03   Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be sent by first class U.S. mail (certified mail – return receipt requested), or by facsimile transmission (if facsimile transmission is also sent by regular U.S. mail the same day), or delivered by hand or by overnight or similar delivery service, fees prepaid, to the Party to whom it is to be given at the address of such Party set forth below or to such other address for notice as such Party shall provide in accordance with the terms of this Section 8.03.  Except as otherwise specifically provided in this Agreement, notice so given shall, in the case of notice given by certified mail (or by such comparable method) be deemed to be given and received three business days after the time of certification thereof (or comparable act), in the case of notice so given by overnight delivery service, on the date of actual delivery, and, in the case of notice so given by facsimile transmission or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

| If to the Company: | Excentus Corporation |
| | Attn: Mr. Dickson Perry, President & CEO |
| | 4320 North Beltline Road, Suite A205 |
| | Irving, TX 75038 |
| | Fax: (972) 258-0646 |
| | Email: dperry@excentus.com |
| With copies to: | Excentus Corporation |
| | Attn: Mr. Jim Mills, Vice President & Secretary |
| | 4320 North Beltline Road, Suite A205 |
| | Irving, TX 75038 |
| | Fax: (972) 258-0646 |
| | Email: jmills@excentus.com |
| | |
| | Fish & Richardson P.C. |
| | 5000 Bank One Center |
| | 1717 Main Street |
| | Dallas, Texas 75201 |
| | Attn:  Steven R. Block |

-22-

Fax: (214) 747-2091
Email: block@fr.com

If to the Investor:    Giant Eagle of Delaware, Inc.
                       c/o Giant Eagle, Inc.
                       Attn: John Lucot, Vice President
                       101 Kappa Drive
                       Pittsburgh, PA 15238
                       Fax: 412.963.3522
                       Email: john.lucotl@gianteagle.com

With copies to:        Giant Eagle, Inc./Legal Department
                       Attn: Richard A. Russell, Vice President, General Counsel
                       261 Kappa Drive
                       Pittsburgh, PA 15238
                       Fax: 412.963.3522
                       Email: rick.russell@gianteagle.com

                       Cohen & Grigsby, P.C.
                       11 Stanwix Street, 15th Floor
                       Pittsburgh, PA  15221
                       Fax:  412.209.0672
                       Attention:    David J. Kalson, Esq.
                                     James R. Carlisle, II, Esq.

8.04    Headings.   The headings of sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

8.05    Waiver.   The failure of any Party to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right or claim granted or arising hereunder or of the future performance of any such term, covenant, or condition, and such failure shall in no way affect the validity of this Agreement or the rights and obligations of the Parties. No waiver of any provision or condition of this Agreement shall be valid unless executed in writing and signed by the Party to be bound thereby, and then only to the extent specified in such waiver. No waiver of any provision or condition of this Agreement shall be construed as a waiver of any other provision or condition of this Agreement, and no present waiver of any provision or condition of this Agreement shall be construed as a future waiver of such provision or condition.

8.06    GOVERNING LAW; VENUE.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS RULES OR CHOICE OF LAWS RULES THEREOF OR OF ANY STATE. VENUE FOR ANY ACTION ARISING OUT OF THIS AGREEMENT SHALL RESIDE

-23-

R138

EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED.

8.07    Court Costs and Attorneys' Fees. If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover costs of court and reasonable attorneys' fees from the other party or parties to such action, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief that may be awarded.

8.08    Assignability and Binding Effect. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, heirs, and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assignable without the express written consent of all Parties.

8.09    Expenses, Taxes, Etc. The Company shall pay all fees, taxes, and expenses incurred by it and the Investor in connection with the transactions contemplated by this Agreement.

8.10    Third Parties. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the Parties and their successors, heirs or permitted assigns, any rights or remedies under or by reason of this Agreement.

8.11    Number and Gender of Words. When the context so requires in this Agreement, words of gender shall include either or both genders and the singular number shall include the plural.

8.12    Entire Agreement. This Agreement together with the Schedules and Exhibits attached hereto, shall constitute the entire agreement between the Parties with respect to the transactions contemplated hereby and shall supersede all prior or contemporaneous negotiations, understandings and agreements with respect thereto. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

8.13    Survival of Representations and Warranties. All representations, warranties, covenants, and obligations of the Parties shall survive the Closing for a period of 18 months thereafter.

8.14    Multiple Counterparts. This Agreement may be executed in multiple counterparts, including by facsimile signature, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

8.15    Amendment. This Agreement may not be modified, amended, or supplemented except by an agreement in writing signed by all of the Parties.

-24-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

THE COMPANY:

EXCENTUS CORPORATION

By: _____

Name: Dickson Perry

Title:   President & CEO

THE INVESTOR:

GIANT EAGLE OF DELAWARE, INC.

By: _____

Name: John Lucot

Title:   Vice President

-25-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

THE COMPANY:

EXCENTUS CORPORATION

By: _____
Name: Dickson Perry
Title:   President & CEO

THE INVESTOR:

GIANT EAGLE OF DELAWARE, INC.

By:  _____
Name: John Lueqt
Title:   Vice President

-26-

## EXHIBIT LIST

Exhibit A—Form of Certificate of Designation
Exhibit B—Form of Company's Secretary Certificate
Exhibit C—Form of Company's Officer's Certificate
Exhibit D—Form of Registration Rights Agreement
Exhibit E—Form of Shareholders Agreement
Exhibit F—Form of Opinion Letter
Exhibit G—Form of Investor's Secretary Certificate
Exhibit H—Form of Investor's Officer's Certificate

## SCHEDULE LIST

Schedule 3.01(a)—Organizational Documents of the Company
Schedule 3.03—No Violation
Schedule 3.05(c)—Rights of First Refusal
Schedule 3.05(d)—Past Issuances
Schedule 3.05(e)—Shareholders and Optionholders of the Company
Schedule 3.08—Litigation
Schedule 3.09(a)—Intellectual Property Liens
Schedule 3.09(b)—Intellectual Property Judgments
Schedule 3.09(d)—Intellectual Property Infringement of Third Party Rights
Schedule 3.09(e)—Intellectual Property Litigation
Schedule 3.09(f)—Intellectual Property  Infringement of Company Parties' Rights
Schedule 3.09(h)—Intellectual Property Royalties
Schedule 3.09(i)—Employee Violations
Schedule 3.09(k)—Excluded Works and Inventions
Schedule 3.11—Title to Property and Assets
Schedule 3.13—Insurance
Schedule 3.16—Taxes
Schedule 3.17—Consents
Schedule 3.18—GAAP
Schedule 3.19—Changes
Schedule 3.20—Employee Agreements and Plans
Schedule 3.21—Material Contracts
Schedule 3.23—Due Diligence Materials

-26-

**Schedule 3.08**

**Litigation**

On March 4, 2004, Metrosplash Systems Group, Inc. ("Metrosplash") filed a petition in the 192nd District Court of Dallas County, Texas against the Company, Buehler Foods, Inc., and Jason R. Stancil. The causes of action asserted by Metrosplash were breach of fiduciary duty, civil conspiracy, unjust enrichment, and unfair competition. In the alternative, Metrosplash requested the court to grant injunctive relief to prevent the unfair business practice of misappropriation of intellectual property owned by Metrosplash. Metrosplash, the entity that is a successor in interest to certain of the assets of Fuel Links, Inc., relies on the February 2003 License Agreement between the Company and Fuel Links to bring its claims.

On April 22, 2004, the Company and Jason R. Stancil filed counterclaims against Metrosplash and a third-party petition against Christopher J. Daly, Comstock Data Mining, Inc., Tad Marko, Jeffrey Beardsley, Marvin Brinkley d/b/a Brinkley POS, and Shadow Media, Inc. The counterclaims included tortious interference with existing and prospective business relations, civil conspiracy, defamation, tortious interference with contract, business disparagement and unfair competition.

Following negotiations between the parties to the litigation, a temporary restraining order was put in place that prevented each party from disparaging the other parties to other persons or entities involved in the retail fuel technology services market. The Company expects that a temporary injunction hearing will occur in the future. Metrosplash has indicated that it will agree to a temporary injunction that is commensurate with the terms of the temporary restraining order. The Company continues to defend itself against Metrosplash's claims.

-8-

## Schedule 3.09(a)

## Intellectual Property

None.

-9-

## Schedule 3.09(b)

### Intellectual Property Judgments

See Schedule 3.08.

-10-

## Schedule 3.09(d)

### Intellectual Property Infringement of Third Party Rights

See Schedule 3.08.

-11-

**Schedule 3.09(e)**

**Intellectual Property Litigation**

See Schedule 3.08.

-12-

## Schedule 3.09(f)

### Intellectual Property Infringement of Company Parties' Rights

None.

-13-

**Schedule 3.09(h)**

**Intellectual Property Royalties**

None.

-14-

## Schedule 3.09(i)

### Employee Violations

None.

-15-

## Schedule 3.09(k)

### Excluded Works and Inventions

None.

-16-

CG_1097000_1.DOC

## AMENDMENT TO SERIES B PREFERRED STOCK PURCHASE AGREEMENT

THIS AMENDMENT TO SERIES B PREFERRED STOCK PURCHASE AGREEMENT (the "Amendment") is made as of May __, 2006, between EXCENTUS CORPORATION, a Texas corporation ("Excentus") and GIANT EAGLE OF DELAWARE, INC., a Delaware corporation ("Buyer").

### PREAMBLE

A.  Buyer and Excentus are parties to that certain Series B Preferred Stock Purchase Agreement dated as of November 15, 2005 (the "**Preferred Stock Purchase Agreement**"), pursuant to which Buyer purchased 95,239 shares of Series B Preferred Stock of Excentus (the "**Preferred Shares**").

B.  Under the terms of Section 5.01 of the Preferred Stock Purchase Agreement, Buyer was granted the right, after the occurrence of certain events, to require Excentus to purchase the Preferred Shares, and Excentus was granted the right, after the occurrence of certain events, to require Buyer to sell the Preferred Shares to Excentus.

C.  Pursuant to that Stock Purchase Agreement dated as of even date herewith (the "**Common Stock Purchase Agreement**"), Buyer is purchasing 4,500 shares of Excentus' common stock (the "**Common Shares**") from Dickson Perry, the President and Chief Executive Officer of Excentus.

D.  A condition to the obligations of Buyer to proceed with the closing under the Common Stock Purchase Agreement is that this Amendment be executed by all parties hereto.

E.  Therefore, the parties hereto desire to amend the Preferred Stock Purchase Agreement in accordance with the terms set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, the parties hereto, intending to be legally bound, agree as follows:

### AGREEMENT

1. Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Preferred Stock Purchase Agreement.

2. Amendment to Section 5.01. Section 5.01 of the Preferred Stock Purchase Agreement is hereby amended as follows:

> The term "Covered Shares", for purposes of Section 5.01 and only Section 5.01, shall mean the Purchased Shares, the Conversion Shares and the Common Shares.

3. Miscellaneous. Except as expressly modified by this Amendment, all other provisions of the Preferred Stock Purchase Agreement shall remain in full force and effect as they are currently set forth in the Preferred Stock Purchase Agreement. All references to the Preferred Stock Purchase Agreement in any document, instrument or agreement described in, referred to, annexed to, contemplated by or incorporated by reference in the Preferred Stock Purchase Agreement or this Amendment shall be deemed to mean the Preferred Stock Purchase Agreement as amended by this Amendment. By executing this Amendment, the parties hereto agree that the Preferred Stock Purchase Agreement shall be read, interpreted and applied hereafter as including the terms set forth in this Amendment. This Amendment shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania.

CG_1097000_1.DOC

IN WITNESS WHEREOF, the parties have executed this Amendment or have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers, as the case may be, as of the day and year first written above.

GIANT EAGLE OF DELAWARE, INC.          EXCENTUS CORPORATION

By:_____     By:_____
Name: _____          Dickson Perry, President and CEO
Title:_____

# EXHIBIT 5

Addendum No. 1 to Software License and
General Services Agreement

R154

F3920 (2)

## ADDENDUM NO. 1
## TO
## SOFTWARE LICENSE AND GENERAL SERVICES AGREEMENT

This Addendum No. 1 to the Software License and General Services Agreement (the "Agreement"), dated effective as of _____ 8-4 _____, 2010 (the "Addendum No. 1 Effective Date"), is entered into by and between Excentus Corporation, a Texas corporation, successor in interest to CCIS*TECH*, Inc. ("Excentus"), and Giant Eagle Inc., a Pennsylvania corporation ("Licensee").

### 1. Grant of License.

(a)  Licensc. Subject to the terms and conditions of this Addendum and in consideration of the payment of the fees set forth on Schedule A, Licensee hereby requests and Excentus hereby agrees to grant a non-exclusive, non-sublicenseable, non-transferable, fully paid up license during the term of this Addendum to make, have made, use, reproduce, and make derivative works of, the source code of the CCIS*TECH* Software described in Schedule B (the "Software") and the accompanying Documentation provided by Excentus only for Licensee's internal use to support Licensee's sites. Licensee shall use the Software (i) in accordance with the terms and conditions of the Agreement and (ii) for the sole purpose of marketing and promoting the direct sales of goods or services, other than the Business (as such term is defined in the Trademark and Copyright License Agreement between Phoenix Intangibles Holding Company and Excentus dated June 11, 2008 (the "Trademark Agreement)); (1) at any and all retail locations owned or operated by Licensee or its Affiliates (as such term is defined in the Trademark Agreement) within the GE Markets (as such term is defined in the Trademark Agreement); or (2) to Licensee's or its Affiliate's own retail customers residing within the GE Markets; or (3) to independent retail grocery stores within the GE Markets supplied to by Licensee or its Affiliates. Except as set forth above, any use of the Software shall be subject to Excentus' prior written approval; provided, however, that in the event Phoenix Tangibles Holding Company or its parent company, Licensee, or its Affiliates should own and operate a location outside the GE Markets subsequent to the Effective Date (as such term is defined in the Trademark Agreement) of the Trademark Agreement, then Excentus agrees to allow Licensee, at Licensee's request and expense, to enable Licensee to use the Software for such location provided such will not conflict with any rights Excentus may have granted to a third party in the Territory as of the date of such request.. Except for the express license to the source code of the CCIS*TECH* Software set forth above and the express license to the object code of the CCIS*TECH* Software in the Agreement, nothing in this Addendum, the Agreement or the Trademark Agreement shall be construed as a sale or license to Licensee, whether express or implied, of any copyrights, trademarks, trade secrets, patents or any other intellectual property owned or licensed by Excentus.

(b)  Ownership. This license confers no ownership rights to Licensee and is not a sale of any rights in the Software or Documentation.  Licensee's rights in the Software and Documentation will be limited to those expressly granted in this Section 1 and the Agreement. Excentus reserves all rights and licenses in and to the Software and Documentation not expressly

1

R155

granted to Licensee under this Addendum or the Agreement and shall own and retain ownership of all rights, title and interest in and to the Software and Documentation and any copies thereof and all intellectual property rights embodied within the foregoing. No changes to the Software or Documentation made by Licensee, however extensive, shall reduce the title or ownership rights of Excentus.

(c)     Licensee Ownership. Subject to Excentus' ownership of the Software and Documentation, Licensee shall own all right, title, and interest in and to all derivative works, enhancements, modifications, improvements and additions related to the Software and Documentation that are developed by Licensee ("Licensee Modifications").

(d)     Copies. Licensee may make a reasonable number of copies of the Software for backup or archival purposes. Licensee shall not copy the Software, except as permitted by this Addendum or the Agreement. Licensee shall maintain accurate and up-to-date records of the number and location of all copies of the Software and inform Excentus in writing of such location. All copies of the Software will be subject to all terms and conditions of this Addendum. Whenever Licensee is permitted to copy or reproduce all or any part of the Software, Licensee shall reproduce and not efface any and all titles, trademark symbols, copyright symbols and legends, and other proprietary markings on the Software.

(e)     Delivery. Excentus delivered one copy of source code of the Software and Documentation to Licensee prior to the Addendum No. 1 Effective Date. Licensee acknowledges that it has received the Software and Documentation prior to the Addendum No. 1 Effective Date and Licensee accepts such Software and Documentation "AS IS."

## 2. Maintenance and Support.

As of the Addendum No. 1 Effective Date and except as otherwise provided under this Addendum, Excentus shall have no further maintenance and support obligations (including but not limited to providing Updates) for the Software described on Schedule B.

## 3. Term and Termination.

This Addendum will commence on the Addendum No. 1 Effective Date and continue in perpetuity unless otherwise terminated in accordance with Section 24 of the Agreement.

## 4. Fees.

In consideration for the license granted herein and Support to be provided by Excentus pursuant to this Addendum, Licensee shall pay to Excentus all fees set forth in Schedule A to this Addendum. Excentus hereby acknowledges that Licensee has paid in full the Support and Maintenance Fees for 2009 due under the Agreement.

## 5. Audit.

Upon reasonable notice to Licensee of at least thirty (30) business days in advance of an audit, Excentus may, either itself or through an independent third party auditor, enter onto

2

Licensee's premises during Licensee's normal business hours to inspect and audit Licensee's computer systems, network, and records to verify that Licensee's use of the Software is in compliance with the terms of this Addendum, provided, however that Excentus shall be entitled to only one (1) audit per calendar year.

## 6. Miscellaneous.

(a)     Waiver. No waiver of the provisions hereto shall be effective unless in writing and signed by the party to be charged with such waiver. No waiver shall be deemed to be a continuing waiver in respect of any subsequent breach or default either of similar or different nature unless expressly so stated in writing.

(b)     Counterparts. This Addendum may be signed in one or more counterparts, all of which shall be taken together as one agreement.

(c)     Relationship of Parties; Independent Contractor. The parties to this Addendum are not, and this Addendum does not constitute the parties as, partners or joint venturers, and neither party will so represent itself. Each party hereto is engaged in an independent business, and shall perform its obligations under this Addendum as an independent contractor. Each party shall be responsible for its own acts and those of its agents, employees, Affiliates and subcontractors, and except as expressly set forth in this Addendum, neither party undertakes by this Addendum to perform any obligation of the other party, whether regulatory or contractual, or to assume any responsibility for the other party's business or operations.

(d)     No Third Party Beneficiaries. The provisions of this Addendum are for the benefit of the parties hereto and not for any other person or entity.

(e)     Full Force and Effect. Except as expressly set forth herein, (i) this Addendum does not constitute a waiver or modification of any provision of the Agreement, and (ii) the Agreement shall remain in full force and effect and is hereby ratified and confirmed. If there is any conflict between the terms and conditions of this Amendment and the terms and conditions of the Agreement, the terms and conditions of this Amendment shall prevail.

(f)     Schedules. The schedules referred to herein and attached hereto are incorporated herein to the same extent as if set forth in full herein.

(g)     Equitable Relief. The parties agree that a material breach of the license or confidentiality provisions of this Addendum would cause irreparable injury to Excentus for which monetary damages would not be an adequate remedy, and therefore Excentus shall be entitled to equitable relief in addition to any other remedies it have hereunder or at law.

(h)     Publicity. Neither party, without obtaining the other party's prior written approval, may (i) make or issue public announcements, press releases, advertisements, or marketing materials that refer to the other party, to Licensee's use of the Software, or to the subject matter of this Addendum, or (ii) use the names(s), trademark(s) or tradename(s) (whether

3

registered or not) of the other party or any of its affiliates, which includes any entity controlling, controlled by or under common control with such party.

**IN WITNESS WHEREOF,** the parties to this Addendum have set their hands hereto as of the date first written above.

EXCENTUS CORPORATION

By: _____

Name: _Dickson Perry_

Title: _President & CEO_

Date: _2/10/10_

GIANT EAGLE INC.

By: _Russell Ross_ RLR

Name: _Russell Ross_

Title: Sr. Vice President & Chief
Information Officer

Date: _2-4-10_

J:\LEGL\Robbi\ROBBIDOC\Excentus Source Code Addendum Final 1-15-10.DOC

4

## SCHEDULE A

### FEES

Licensee has prepaid all "Monthly Licensing and Support per Site in production" fees for the 158 Licensee sites under support as of the Addendum No. 1 Effective Date for the remaining calendar year 2009 in accordance with Exhibit B of the Agreement. Following this prepayment, Licensee shall not be required to pay any further support and maintenance fees to Excentus in subsequent calendar years during the term of this Addendum for the Software described in Schedule B. Notwithstanding the foregoing, Licensee will continue to pay the applicable fees set forth in Exhibit B, Purchase Order No 3 dated January 22, 2004 for each additional Site added after the Addendum No. 1 Effective Date.

Following execution of this Addendum, there will be a transitional period whereby Excentus will provide a maximum of 20 hours per month of technical consulting support to Licensee at no additional cost. This transitional period will last for a period of 120 days following the Addendum No. 1 Effective Date. During this transitional period, any additional consulting support above the 20 hours per month shall be invoiced to Licensee according to Excentus' standard market rates*. At the end of the transitional period, any consulting support shall be billed according to Excentus' standard market rates. In addition to technical consulting, Excentus shall also conduct a one-time training session with Licensee's developers at Licensee corporate offices in Pittsburgh, PA. This training will consist of two weeks of dedicated training support. A separate agenda will be provided for the training class. Licensee will be responsible for all Excentus travel fees related to the training session.

Excentus Market Rates as of 4/1/09
Software Developer - Standard Office Hours (M-F 8am-5pm central standard time) - $200/hr
Software Developer - Emergency Hours (any time outside of standard office hours) - $350/hr

Excentus shall submit an invoice to Licensee at the beginning of each month for any technical consulting support provided during the prior month. Each invoice shall be due and payable within thirty (30) days after receipt by Licensee.

**\*Labor rates are subject to change and should be quoted by the Excentus Account Manager.**

5

## SCHEDULE B

### SOFTWARE

**Reward Fuel Controller Software Modules**
- Fuel Server (EXFS.EXE) v4.0.284
- POSBC Client Interface (EXBC.EXE) v4.0.351
- Warren Rodgers OSP Interface (EXWR.EXE) v4.0.13
- Java Fuel GUI (SVBUSP.JAR) v2.29
- Dresser/Wayne CAT Interface (CCWC.EXE) v4.0.2718
- Dresser/Wayne Dispenser Interface (CCWD.EXE) v4.0.297

**Reward Fuel Controller Software Utilities**
- Setup Editor (CCSET.EXE) v4.0.66
- Site Communicator (CCSC.EXE) v2.1.103
- Site Server (EXSS.EXE) v4.0.1813
- Site Simulator (CCSIM.EXE) v4.0.286

6

# EXHIBIT 6

Second Amended Complaint from First Texas Case

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| EXCENTUS CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>GIANT EAGLE, INC., DAVID SHAPIRA,<br>AND DANIEL SHAPIRA,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:11-CV-03331 |

**SECOND AMENDED COMPLAINT**

Plaintiff Excentus Corporation ("Excentus"), for its Second Amended Complaint against

Defendants Giant Eagle, Inc. ("Giant Eagle"), David Shapira, and Daniel Shapira (collectively,

"Defendants"), alleges as follows:

**PARTIES**

1.      Excentus is a Corporation duly organized and existing under the laws of the State

of Texas, having a principal of business at 14241 Dallas Parkway, Suite 1200, Dallas, Texas

75254.

2.      Giant Eagle is a corporation duly organized and existing under the laws of the

State of Pennsylvania, having a principal place of business at 101 Kappa Drive, RIDC Park,

Pittsburgh, Pennsylvania 15238.  Giant Eagle has appeared and may be served through counsel.

3.      David Shapira is a citizen of Pennsylvania and a Director of Excentus Corporation

as well as an Officer of Giant Eagle.  David Shapira has appeared and may be served through

counsel.

95411180.3                                      - 1 -

4.     Daniel Shapira is a citizen of Pennsylvania and a Director of Excentus Corporation as well as an Owner and/or Director of Giant Eagle.  Daniel Shapira has appeared and may be served through counsel.

**JURISDICTION**

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the matter in controversy exceeds $75,000.00.  This Court also has subject matter jurisdiction over the patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Excentus' patent infringement claims arise under the patent laws of the United States, including 35 U.S.C. § 271 et seq.  This Court also has supplemental jurisdiction over the non-patent infringement claims pursuant to 28 U.S.C. § 1367 because the non-patent infringement claims are so related to the patent infringement claims (i.e. intertwined) that they form the same case or controversy under Article III of the United States Constitution.  The claim for declaratory judgment relief is brought under 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57.

6.     The Court has personal jurisdiction over Giant Eagle because this action arises by virtue of Giant Eagle's position as a shareholder of Excentus and because Giant Eagle committed a tort in whole or in part in the State of Texas (as described in more detail below).  As a result of its status as a shareholder, Giant Eagle holds two seats on Excentus' Board of Directors.  Giant Eagle has appointed David Shapira and Daniel Shapira (collectively, "the Shapiras") as Directors of Excentus Corporation to hold those seats.  The breaches of the duties of loyalty and utmost good faith described below were committed by the Shapiras in whole or in part in the State of Texas, and Giant Eagle aided, abetted, and knowingly participated in such breaches, in whole or in part, in the State of Texas.  Those actions constitute a tort and have directly damaged Excentus, a Texas corporation with its principal place of business located in Dallas County,

Texas.  The claims also result from an agreement (described below) between Giant Eagle and Excentus, a Texas resident.  That agreement establishes that Giant Eagle does business in the State of Texas pursuant to Texas Civil Practice and Remedies Code § 17.042(1) by contracting with a Texas resident (i.e., Excentus).  The exercise of personal jurisdiction over the Defendants in the State of Texas in this case is authorized by Chapter 17 of the Texas Civil Practice and Remedies Code and does not offend traditional notions of fair play and substantial justice.  Because personal jurisdiction exists over Giant Eagle in the State of Texas, the claims for patent infringement are properly in this federal court.

## VENUE

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c) because (1) this action arises from torts committed by the Defendants that have damaged Excentus in Dallas County, Texas, (2) Giant Eagle is a stockholder in and has entered into a contractual relationship with Excentus, a resident of Texas and this District, (3) a substantial part of the events or omissions giving rise to this claim occurred in this District, (4) a substantial part of property that is the subject of this action is situated in this District, and (5) the Defendants are subject to personal jurisdiction in this District at the time this case is commenced.

## FACTS

8.      Excentus (formerly CCISTech, Inc.) was founded by Dickson Perry in 1996 in Dallas, Texas.  Between 1998 and 2001, Excentus became a leader in providing fuel site automation and integration to grocery point of sale systems.

9.      In 2001, Giant Eagle and Excentus began discussions regarding Excentus providing Giant Eagle with technology in support of Giant Eagle's efforts to design and test a gas/grocery cross-marketing program using fuel discounts as consumer loyalty rewards.

95411180.3                                    - 3 -

10.     In February 2002, Excentus and Giant Eagle entered into a Software License and General Services Agreement and an Addendum was executed in February 2010 ("Agreement"). By the Agreement, Excentus provided specific software that Giant Eagle uses in its "fuelperks!" program, which is Giant Eagle's gas/grocery cross-marketing program using fuel discounts as consumer loyalty rewards.

11.     Giant Eagle's "fuelperks!" program has been successful and significantly benefitted Giant Eagle's business through increased sales and profits.

12.     In addition to providing proprietary technology to Giant Eagle under the Agreement, Excentus shared confidential information with Giant Eagle regarding Excentus' plan to form a national cross-marketing program to leverage the Excentus programs to include many other types of retailers that would benefit all the retailers involved (as well as Excentus) by using fuel discounts as consumer loyalty rewards to increase sales.

13.     Giant Eagle was so impressed with the Excentus technology and future plans that it invested in Excentus twice (in 2004 and 2005) and became one of the largest Excentus shareholders.

14.     As part of these transactions, Giant Eagle demanded that it have seats on the Excentus Board, and the Shapiras soon joined the Excentus Board as directors.

15.     As part of the investment in Excentus, Giant Eagle committed to support Excentus' current and future business and plans.  Also, a commitment was made by Giant Eagle to license the fuelperks! brand to Excentus for potential use in its business.

16.     In 2005, Giant Eagle began to promote the sales and use of gift cards of other retailers in Giant Eagle grocery stores utilizing its "fuelperks!" program.  The gift cards were provided by Blackhawk Network (a subsidiary of Safeway) ("Blackhawk").

17.     As a result of the promotional activities, Giant Eagle's gift card sales grew exponentially.   During this time, Excentus made multiple requests for Giant Eagle to share information regarding its "fuelperks!" program, which was information that Giant Eagle had agreed to provide to Excentus upon becoming an Excentus investor and shareholder.

18.     In late 2006, David Shapira facilitated discussions between Blackhawk and Excentus that resulted in an offer from Blackhawk to acquire Excentus.   David Shapira supported and encouraged Excentus management to complete this transaction.

19.     During the due diligence phase of the transaction, Excentus educated Blackhawk on its business and competitors, including providing information to Blackhawk about Auto-Gas Systems, Inc. ("Auto-Gas") and its portfolio of patents relating to fuel discounts.

20.     In 2007, Blackhawk began negotiations with Auto-Gas to acquire its fuel discounts patent portfolio.   Upon learning of this and other information, Excentus terminated its discussions with Blackhawk, to the disappointment of David Shapira and Giant Eagle.   During this process, Giant Eagle was also educated on the Auto-Gas patent portfolio.

21.     In June 2008, after applying significant pressure on Giant Eagle to fulfill its obligations, Excentus finally entered into a license agreement with Giant Eagle for Excentus to use the "fuelperks!" brand, as the parties had agreed to when Giant Eagle gained an ownership interest in Excentus.   No claim is brought or made with respect to this license agreement. Excentus is in compliance with such agreement.

22.     Immediately following the execution of the licensing agreement for Excentus to use the "fuelperks!" brand, Excentus began offering the fuelperks! brand to other grocers.   In addition, Excentus continued its business of executing other agreements that did not include the use of the "fuelperks!" brand.

23.     Excentus also made formal requests for Giant Eagle to follow through on its commitments, which Excentus justifiably relied on as material inducements to allow Giant Eagle to gain an ownership interest in Excentus, including but not limited to:  (1) sharing important information about Giant Eagle's "fuelperks!" program with Excentus, (2) entering into an agreement by which Giant Eagle's "fuelperks!" program would become part of the Excentus Coalition, and (3) addressing numerous partnership issues, such as the participation of Giant Eagle personnel in Excentus' share group meetings that included other Excentus grocer customers, the sharing of information related to Giant Eagle's gift card sales and its relationship with Blackhawk, and the participation in and the sharing of information related to Giant Eagle's test of a payment card associated with its "fuelperks!" program introduced in conjunction with another Excentus shareholder.

24.     In September 2008, Excentus acquired Auto-Gas's fuel discounts patent portfolio ("Excentus Patents").  Randy Nicholson, the father of Pay-at-the-Pump technology, is the primary inventor of many of these inventions and has sat on Excentus' Board of Directors since the acquisition, a move that the Shapiras approved and supported.

25.     By 2008, Giant Eagle's sales of other retailers' gift cards promoted by its "fuelperks!" program had attained an estimated $500 million to $1 billion in sales.  Around this time, Giant Eagle (as Blackhawk's largest customer) renegotiated its agreement with Blackhawk. Upon information and belief, the final agreement granted Giant Eagle an ownership interest in Blackhawk, or at least granted Giant Eagle the right to acquire such an interest.

26.     At all relevant times, Excentus encouraged Giant Eagle to act in good faith to resolve numerous outstanding issues, including but not limited to:  (1) the failure of Giant Eagle to fulfill its commitments and obligations that Excentus had justifiably relied upon in allowing

Giant Eagle to gain an ownership interest in Excentus, and (2) Giant Eagle's refusal to: (a) enter into the appropriate agreements to support Excentus' plans for a nationwide coalition which allows fuel discounts to be earned from many different types of retailers and subsequently redeemed ("the Excentus Coalition"), or (b) obtain a license to the Excentus Patents for use in the Giant Eagle fuelperks! program and pay Excentus for such license.

27. Due to concerns that the Excentus Coalition would adversely impact Giant Eagle's gift card sales, Giant Eagle attempted to convince Excentus to abandon the Excentus Coalition strategy. While continuing to use the Excentus Patents without a license, Giant Eagle also threatened to form its own coalition through use of its gift card sales to compete with the Excentus Coalition.

28. As Excentus directors, the Shapiras owed Excentus strict duties of loyalty and utmost good faith. The Shapiras also are officers and/or directors of Giant Eagle, and their actions described herein were taken on behalf of Giant Eagle and were adverse to Excentus; thus, the actions of the Shapiras described herein constitute the acts of Giant Eagle. Reference to Giant Eagle is reference to these acts.

29. Beginning in 2005 and continuing to the present, Giant Eagle has embarked on a course of action to disrupt and gain control of Excentus through breaches of the Shapiras' duties of loyalty and utmost good faith. As directors of Excentus, such duties of loyalty and good faith are owed first to Excentus and not to Giant Eagle. Regardless, in many dealings related to Excentus, the Shapiras have placed Giant Eagle's interests ahead of Excentus' interests. This includes, but is not limited to, seeking third-party redemption partners for its "fuelperks!" program contrary to its commitments (and with inside knowledge of Excentus' plans) to only do so through the Excentus relationship, dealings as described below concerning the Excentus

Patents, threatening to use gift cards to compete with the Excentus Coalition, and other business dealings in favor of Giant Eagle and adverse to Excentus.  In short, whenever there was a choice to do what was best for Excentus and what was best for Giant Eagle, the Shapiras have consistently chosen to place Giant Eagle's interests ahead of Excentus' interests.  For example, even after Excentus acquired the Excentus Patents in 2008, an understanding has existed between Excentus and Giant Eagle that the parties would negotiate the appropriate agreements concerning rights to use the Excentus Patents.  The Shapiras, as members of Excentus' Board of Directors in 2008, voted in favor of the transaction that transferred the fuel discounts patent portfolio to Excentus and allowed Mr. Nicholson to gain his seat on Excentus' Board of Directors.  As discussed below, Giant Eagle clearly understood that it had no rights to the Excentus Patents, and signed a document stating as much in February 2010 (i.e., the Agreement).  Recently, however, despite repeated demands to do so, Giant Eagle and the Shapiras have refused to act in good faith to negotiate a license or other agreement to provide Giant Eagle with the right to use the Excentus Patents and to compensate Excentus fairly for such use.  Because Giant Eagle is using the Excentus Patents without a license or other authorization to do so, Giant Eagle is an infringer of the Excentus Patents.

30.    In a telephone conversation that took place in November 2011, Giant Eagle President and CEO David Shapira (and Excentus Director) told Excentus President and CEO Dickson Perry that the Agreement granted Giant Eagle a license to the Excentus Patents, despite the plain language of the Agreement to the contrary.  Such a denial was a breach of the duties of loyalty and utmost good faith owed to Excentus by David Shapira.  At the Shapiras' (and others at Giant Eagle) direction, knowledge, and consent, Giant Eagle is using the Excentus Patents daily in its business.  A position that Giant Eagle has a license to the Excentus Patents, when the

95411180.3                              - 8 -

written Agreement is directly contradictory, is neither loyal nor in utmost good faith.  Rather, the position is taken in an attempt to avoid the significant liability associated with infringement of the Excentus Patents by Giant Eagle.  This intentional misconduct is in the best interest of Giant Eagle – not Excentus.

## BREACH OF DUTIES OF LOYALTY AND UTMOST GOOD FAITH

31.     Excentus incorporates and adopts by reference paragraphs 1-31 as if fully set forth herein.

32.     As directors of Excentus, the Shapiras owe duties of loyalty and utmost good faith to Excentus.  The Shapiras have willfully and intentionally breached their duties of loyalty and utmost good faith in their dealings with Excentus, and such conduct was opposed to the best interests of Excentus.  Excentus brings this claim only for the Shapiras breaches of their duties of loyalty and utmost good faith in their dealings with Excentus; this claim does not include breaches of any other duties owed to Excentus by the Shapiras.  On information and belief, the reason the Shapiras have breached their duties of loyalty and utmost good faith is because the Shapiras have desired to control and own Excentus as well as attempted to treat it as their own.  With respect to dealings with Blackhawk, gift cards, and the use of fuel as a commodity, Giant Eagle and the Shapiras have used the Excentus information to gain an advantage in the distribution, promotion, and sale of gift cards inside of Giant Eagle stores, all without remuneration to Excentus.

33.     With respect to the treatment of the patent rights held by Excentus, Giant Eagle expressly acknowledged in February 2010 that it held no rights to any patents or other intellectual property of Excentus.  This was consistent with the understanding between Giant Eagle/the Shapiras and Excentus that the parties would resolve any patent issues with Excentus at another time.  Instead of acknowledging such understanding to resolve the issues, the

95411180.3

- 9 -

Shapiras, aided and abetted by Giant Eagle, have claimed that Giant Eagle already holds rights to the patents in direct contradiction to the terms of the February 2010 Agreement and have caused Giant Eagle to infringe the Excentus Patents as described below.

34.    Also in direct contradiction of the duties of loyalty and utmost good faith owed to Excentus, Giant Eagle/the Shapiras have objected to the Fuel Rewards Network ("FRN") recently launched by Excentus solely because it will adversely impact Giant Eagle.  The FRN is the culmination of Excentus efforts and plans for the Excentus Coalition.  It was developed by Excentus over time based on feedback from the market, including current and prospective Excentus customers (e.g., Giant Eagle), relating to its plans for the Excentus Coalition.  It took years of hard work to find a suitable partner for the FRN as well as to implement it.  Finally, the FRN is live and in the marketplace.  Instead of cheering the rollout of the FRN which is to the great benefit of Excentus, the Shapiras have complained of it and looked for excuses to object to it because they have placed their own interests and those of Giant Eagle ahead of Excentus.

35.    Giant Eagle/the Shapiras have also attempted to elicit information from Excentus Board of Director meetings which would benefit Giant Eagle.

36.    The above-referenced conduct, and other similar conduct, constitutes a willful and intentional breach of the Shapiras duties of utmost good faith and loyalty to Excentus, causing injury to Excentus in Texas and benefiting Giant Eagle/the Shapiras.  At least part of the Shapiras conduct in breach of such duties occurred in Texas.  Discovery will further reveal that the actions of Giant Eagle/the Shapiras with respect to Excentus were taken to enhance Giant Eagle, not Excentus.  Excentus was injured, and Giant Eagle/the Shapiras have gained as a result of these breaches.  Giant Eagle has knowingly participated in the Shapiras' breaches of their duties of loyalty and utmost good faith in their dealings with Excentus as described above, and

95411180.3                              - 10 -

has aided and abetted the Shapiras' breaches of such duties of loyalty and utmost good faith as described above. Excentus sues for its actual damages and for a constructive trust to be placed on the proceeds, profits, funds, and other consideration obtained as a result of the above-described breaches of duty. This tort was committed at least in part in the State of Texas.

37.     As a result of the Shapiras above-described breaches of duty of loyalty and utmost good faith and Giant Eagle's knowing participation, aiding, and abetting of such breaches, all profits earned by the Defendants as a result of the above-described breaches of duty should be disgorged.

## DECLARATORY JUDGMENT CLAIM

38.     Excentus incorporates and adopts by reference paragraphs 1-38 as if fully set forth herein.

39.     This is a complaint for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57 in which Excentus asks the Court to clarify the rights and legal relationship between Excentus and Giant Eagle to settle the case and controversy at issue before it ripens into a violation of law or breach of duty.

40.     Excentus and Giant Eagle are parties to the Agreement, which Giant Eagle now claims provides Giant Eagle with, among other things, a license to the Excentus Patents.

41.     It is Excentus' position that the Agreement does not provide Giant Eagle with a license to the Excentus Patents, and in fact, the express terms of the Agreement confirm that Giant Eagle is granted no license to the Excentus Patents under the Agreement.

42.     Whether Giant Eagle has a license to the Excentus Patents under the Agreement is a substantial controversy between Excentus and Giant Eagle of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The presence or absence of a license to the Excentus Patents in the Agreement is an issue ripe for adjudication and capable of immediate

95411180.3                                   - 11 -

judicial determination by reference to well-established contract interpretation principles and the four corners of the Agreement.

43.     Excentus requests that the Court consider all evidence and declare that the Agreement does not provide Giant Eagle with a license to the Excentus Patents.  Such a declaration would provide Excentus with the requested and specific relief from uncertainty and insecurity with respect to the legal relation between Giant Eagle and Excentus arising from the Agreement.  Therefore, Excentus is asking this Court for real and specific relief through a decree of conclusive character based on actual facts that will allow the Court to adjudicate this case and controversy.

## INFRINGEMENT OF U.S. PATENT NO. 6,321,984

44.     Excentus incorporates and adopts by reference paragraphs 1-44 as if fully set forth herein.

45.     On November 27, 2001, United States Patent No. 6,321,984 ("the '984 Patent") was duly and legally issued for an invention entitled "Adjustable price fuel dispensing system." A copy of the '984 Patent is attached as Exhibit A.

46.     The '984 Patent was assigned to Excentus, and Excentus holds all rights and interests in the '984 Patent.

47.     Giant Eagle has engaged and is engaging in unauthorized conduct and activities that violate 35 U.S.C. § 271 et seq., constituting direct infringement, contributory infringement, and/or induced infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '984 Patent, including but not limited to the Giant Eagle "fuelperks!" program directly and/or indirectly infringing at least claims 1, 5, 8, 14, and 15 of the '984 Patent.

48.     The acts of infringement by Giant Eagle have caused damages to Excentus, and Excentus is entitled to recover from Giant Eagle the damages sustained by Excentus as a result of

95411180.3

- 12 -

their wrongful acts in an amount subject to proof at trial. Giant Eagle's infringement of Excentus' exclusive rights under the '984 Patent will continue to damage Excentus' business, causing irreparable harm (including loss of market share), for which there is no adequate remedy at law, unless it is enjoined by this Court. Giant Eagle continues to wrongfully profit from activities that infringe the '984 Patent.

49. Furthermore, the infringements of the '984 Patent by Giant Eagle are willful and deliberate, entitling Excentus to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## INFRINGEMENT OF U.S. PATENT NO. 6,332,128

50. Excentus incorporates and adopts by reference paragraphs 1-50 as if fully set forth herein.

51. On December 18, 2001, United States Patent No. 6,332,128 ("the '128 Patent") was duly and legally issued for an invention entitled "System and method of providing multiple level discounts on cross-marketed products and discounting a price-per-unit-volume of gasoline." A copy of the '128 Patent is attached as Exhibit B.

52. The '128 Patent was assigned to Excentus, and Excentus holds all rights and interests in the '128 Patent.

53. Giant Eagle has engaged and is engaging in unauthorized conduct and activities that violate 35 U.S.C. § 271 et seq., constituting direct infringement, contributory infringement, and/or induced infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '128 Patent, including but not limited to the Giant Eagle "fuelperks!" program directly and/or indirectly infringing at least claims 1-4 and 20-23 of the '128 Patent.

54.     The acts of infringement by Giant Eagle have caused damages to Excentus, and Excentus is entitled to recover from Giant Eagle the damages sustained by Excentus as a result of their wrongful acts in an amount subject to proof at trial.   Giant Eagle's infringement of Excentus' exclusive rights under the '128 Patent will continue to damage Excentus' business, causing irreparable harm (including loss of market share), for which there is no adequate remedy at law, unless it is enjoined by this Court.   Giant Eagle continues to wrongfully profit from activities that infringe the '128 Patent.

55.     Furthermore, the infringements of the '128 Patent by Giant Eagle are willful and deliberate, entitling Excentus to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

### INFRINGEMENT OF U.S. PATENT NO. 7,383,204

56.     Excentus incorporates and adopts by reference paragraphs 1-56 as if fully set forth herein.

57.     On June 3, 2008, United States Patent No. 7,383,204 ("the '204 Patent") was duly and legally issued for an invention entitled "System and method to provide customer incentive to provide non-fuel products and services."  A copy of the '204 Patent is attached as Exhibit C.

58.     The '204 Patent was assigned to Excentus, and Excentus holds all rights and interests in the '204 Patent.

59.     Giant Eagle has engaged and is engaging in unauthorized conduct and activities that violate 35 U.S.C. § 271 et seq., constituting direct infringement, contributory infringement, and/or induced infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '204 Patent, including but not limited to the Giant Eagle "fuelperks!" program directly and/or indirectly infringing at least claims 1-3, 5-9, 12, and 13 of the '204 Patent.

95411180.3

- 14 -

60.     The acts of infringement by Giant Eagle have caused damages to Excentus, and Excentus is entitled to recover from Giant Eagle the damages sustained by Excentus as a result of their wrongful acts in an amount subject to proof at trial.   Giant Eagle's infringement of Excentus' exclusive rights under the '204 Patent will continue to damage Excentus' business, causing irreparable harm (including loss of market share), for which there is no adequate remedy at law, unless it is enjoined by this Court.   Giant Eagle continues to wrongfully profit from activities that infringe the '204 Patent.

61.     Furthermore, the infringements of the '204 Patent by Giant Eagle are willful and deliberate, entitling Excentus to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**UNFAIR COMPETITION**

62.     Excentus incorporates and adopts by reference paragraphs 1-62 as if fully set forth herein.

63.     Giant Eagle's actions described herein constitute business conduct that is contrary to honest practice in commercial matters.

64.     Giant Eagle gained an unfair advantage in the market by capitalizing on Excentus' efforts and success in its fuel discount systems by infringing its patents and gaining access to Excentus' confidential and proprietary information and technology and then using these for Giant Eagle's benefit and against Excentus in the marketplace, which are acts that constitute unfair competition under the common law.

65.     Giant Eagle's acts were willful and in bad faith.   Giant Eagle has continued to infringe Excentus' patents and use Excentus' confidential and proprietary information and technology against Excentus, and will continue to do so, gaining an unfair advantage in the

95411180.3                                          - 15 -

market by these acts of unfair competition.   Excentus is entitled to injunctive relief, actual damages, and punitive damages as a result of these acts of unfair competition.

## JURY DEMAND

Excentus demands a trial by jury.

## PRAYER

WHEREFORE, Excentus respectfully prays that a final judgment be entered and that the following relief be granted:

(1)     Ordering and adjudging that Excentus Corporation have and recover of and from Giant Eagle, Inc., David Shapira, and Daniel Shapira, jointly and severally, all the actual, compensatory, and exemplary damages pled for herein, costs of suit, lost profits, plus pre-judgment and post-judgment interest as allowed by law;

(2)     Disgorging all profits earned by Giant Eagle, Inc., David Shapira, and Daniel Shapira as a result of their breaches of the Shapiras' duties of loyalty and utmost good faith;

(3)     Ordering and adjudging that the '984 Patent, the '128 Patent, and the '204 Patent are valid and have been and will continue to be infringed by Giant Eagle, Inc.;

(4)     Ordering an accounting of all damages and that Excentus recover all damages sustained as a result of the acts of patent infringement and unfair competition by Giant Eagle, Inc.;

(5)     Ordering preliminary and permanent injunctions enjoining the aforesaid acts of infringement and unfair competition by Giant Eagle, Inc., its officers, agents, servants, employees, subsidiaries and attorneys, and those persons acting in concert with them, including related individuals and entities, customers, representatives, dealers, and distributors;

(6)     Ordering and adjudging enhanced damages pursuant to 35 U.S.C. § 284 against Giant Eagle, Inc.;

(7)     Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law against Giant Eagle, Inc.;

(8)      Ordering the imposition of a constructive trust as set forth above on the Giant Eagle program and all benefits flowing from it;

(9)     Declaring that Giant Eagle has no patent license of any kind pursuant to the 2002 Software License and General Services Agreement to use the Excentus Patents; and

(10)     Awarding Excentus such other and further relief as this Court deems just and proper.

| Dated:  January 18, 2011 | Respectfully submitted, |
|---|---|
| | By:   /s/ *Brett C. Govett* |
| | Brett C. Govett |
| | Texas Bar No. 08235900 |
| | Karl G. Dial |
| | Texas Bar No. 05800400 |
| | FULBRIGHT & JAWORSKI, L.L.P. |
| | 2200 Ross Avenue, Suite 2800 |
| | Dallas, Texas 75201 |
| | Telephone:  (214) 855-8000 |
| | Facsimile:  (214) 855-8200 |
| | Email:  bgovett@fulbright.com |
| | Email:  kdial@fulbright.com |
| | |
| | ATTORNEYS FOR PLAINTIFF EXCENTUS CORPORATION |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service in compliance with Local Rule 5.1(f) are being served with a notice of electronic filing of this pleading via the Court's CM/ECF system in compliance with Federal Rule of Civil Procedure 5 and Local Rule LR 5.1.

/s/ *Brett C. Govett*
Brett C. Govett

95411180.3

- 17 -

*Defendant Giant Eagle's Motion to Dismiss*                                      *Page 149*

R178

Tab C

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | § § § § § § § § § § | |
| Defendants. | § | 68TH JUDICIAL DISTRICT |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT GIANT EAGLE, INC.'S MOTION TO DISMISS

---

TO THE HONORABLE JUDGE:

Plaintiff Dickson Perry ("Perry") responds to Defendant Giant Eagle, Inc. ("Giant Eagle"), Motion to Dismiss and shows the Court as follows:

### INTRODUCTION

The Court should deny Giant Eagle's Motion to Dismiss for at least the following three reasons.

*First*, collateral estoppel does not bar Mr. Perry's claims in this lawsuit because his claims have never been actually (let alone fully) litigated. Mr. Perry's lawsuit arises out of scheme by a cadre of Excentus shareholders, directors and officers during the summer of 2014 – over two years *after* the Northern District of Texas issued the opinion that Giant Eagle contends fully adjudicated these claims. Mr. Perry's unfair competition claim against Giant Eagle arises out of its misappropriation of an Excentus trademark and its aiding and abetting flagrant breaches of

---

R179

fiduciary duties by David and Daniel Shapira. With Giant Eagle's full help and support, the Shapiras, while sitting both as directors of Excentus and at the same time being sued by Excentus, ousted Mr. Perry from Excentus, approved the payment of over $1 million in bonuses to Excentus officers who conspired to oust Mr. Perry, settled claims against them previously filed by Excentus, and paid themselves half a million dollars from Excentus' coffers. Of course, none of this had occurred when Judge Boyle issued her opinion in 2012, which adjudicated only whether Excentus' patent infringement claims (which Mr. Perry does not bring here) "arose from" a pair of shareholder agreements with a forum-selection clause.

*Second*, the SP Agreements' forum-selection clause does not apply here because Mr. Perry's claims do not "arise out of" the SP Agreements. Mr. Perry seeks to vindicate no rights in the SP Agreements. He was not a party to those agreements, and he alleges no contractual duties breached. Instead, he sues Giant Eagle and the Shapiras for their breaches of duties imposed by the Texas common law, to wit, for directors to conduct themselves with utmost loyalty to the corporation and for companies not to utilize dishonest and illicit means to compete.

*Third*, enforcing the forum selection clause would be unreasonable and unjust and would constitute a serious inconvenience not just to Mr. Perry but to all parties in this litigation as well as this Court. If this Court dismisses Giant Eagle, then this case would continue against the seven other defendants and Mr. Perry would have to sue Giant Eagle in Pittsburgh, making the same allegations. The result would be litigation in two fora involving the same factual allegations and claims, the same witnesses, and the same relevant evidence. But because of the multiple fora, all discovery would be undertaken twice (at twice the cost) and all judicial decisions would threaten inconsistent and conflicting outcomes.

For these and the reasons identified below, this Court should deny Giant Eagle's motion.

# I.    RELEVANT BACKGROUND

## A.    The Perry Lawsuit Arises Out Of Defendants' Misconduct After Mr. Perry's Termination

1.    Mr. Perry founded Excentus in 1996 and led it for eighteen years.  Under his leadership, Excentus pioneered fuel rewards programs, whereby consumers could redeem points earned on retail purchases when buying gas at the pump.  *See generally* First Am. Pet.

2.    Despite serving as Excentus' Chief Executive Officer, Chairman of the Board, and the largest non-corporate shareholder during a period of uninterrupted growth, on July 31, 2014, Giant Eagle and certain other shareholders, directors, and officers met in secret to oust Mr. Perry.  They reconstituted Excentus' Board, appointed a new CEO, and in a thirty-second call told Mr. Perry he was fired and was not to return to Excentus' premises.  With Mr. Perry out of the way, over the subsequent days and months, each defendant – including the Shapiras and Giant Eagle – secured for itself monies and benefits at Excentus' expense.

3.    At the time Mr. Perry was fired, Excentus had claims pending against Giant Eagle (an Excentus shareholder that owned grocery stores, gas stations, and a fuel rewards program called fuelperks!), and David and Daniel Shapira (Giant Eagle representatives appointed to serve on Excentus' board).  As discussed in greater detail below, those claims pertained to various broken promises made, and many agreements breached, by Giant Eagle over the course of nearly a decade.  *See* Ex. 6 to GE Motion (Second Am. Pet.).

4.    Because David Shapira and Daniel Shapira were defendants, Excentus directors, and Giant Eagle representatives, Excentus' outside counsel had prompted the creation of special executive and litigation committees while the lawsuit was pending.  *See* First Am. Pet. ¶ 35.  In this way, Excentus could make decisions about its business and the litigation without interference

from conflicted directors. But upon ousting Mr. Perry, one of the Shapiras' first acts was to dismantle these committees and request all information regarding them. They then immediately approved substantial bonuses to all of the company officers and directors who had supported terminating Mr. Perry – bonuses which Mr. Perry had previously withheld.

5. Five days after that, the new CEO, basking in his newly approved bonus and salary raise, stayed all litigation between the Shapiras, Giant Eagle and Excentus, and the four parties began negotiating a settlement. *See* Ex. 2 (Joint Motions to Stay). The Shapiras sat on both sides of that transaction. As they negotiated a settlement both as Excentus directors and as defendants sued by Excentus, it was simply impossible for them to act, as it was their obligation to, with utmost loyalty to Excentus. The final settlement agreement reflects the Shapiras' conflict. Indeed, Defendant Daniel Shapira has himself described that settlement as Excentus dismissing its lawsuit with prejudice; paying his and his brother's legal fees; paying licensing fees to Giant Eagle; and firing Excentus' CEO. The company he owes his utmost loyalty to, according to Daniel Shapira, apparently got nothing.

6. It is that settlement transaction – infected with horrific conflicts of interest and self-dealing – and Defendants' self-dealing in the days and months following it that forms the nucleus of Mr. Perry's claims in this lawsuit. Mr. Perry sues the five Excentus officers and directors behind this transaction (Logsdon, Nicholson, Mills, and the Shapiras) and the three Excentus shareholders who aided and abetted them (Auto-Gas, ADS, and Giant Eagle) (the "Perry Lawsuit").

7. Mr. Perry brings two principal claims against Giant Eagle and the Shapiras (accompanied by certain aiding and abetting and conspiracy claims): breach of fiduciary duty and unfair competition. Both claims arise from the Shapiras' and Giant Eagle's conduct in connection

R182

with firing Mr. Perry, approving unwarranted bonuses to their fellow conspirators, settling the pending litigation against themselves, and pilfering and raiding Excentus. *See* First Am. Pet. ¶ 62 ("*[the Shapiras'] conduct in terminating Mr. Perry and the actions they took following that termination* constitute breaches of the duties they owe to Excentus."); *id.* ¶ 69 (alleging misappropriation by Giant Eagle of "Excentus' customer relationships, prospective business opportunities, and trademarks . . . *when they terminated Mr. Perry* and *paid themselves off*").

B.   **Giant Eagle Competes Unfairly by Misappropriating Excentus' Fuel Rewards Network Trademark.**

8.      Beyond aiding and abetting the Shapiras (and likely as motivation to help them), Giant Eagle utilized the opportunity created by the Shapiras siting on both sides of the table to appropriate for its benefit certain valuable assets of Excentus. Giant Eagle had previously licensed to Excentus its fuelperks! mark, which Excentus planned to incorporate, as one participating fuel rewards program among many others, into Excentus' broader plans for a national fuel rewards coalition. First Am. Pet. ¶ 32-33. That national coalition, which ultimately became known as Excentus' Fuel Rewards Network, would include a wide variety of marks and programs across the nation, all housed under the umbrella of "Fuel Rewards Network" trademark. *Id.*

9.      To Giant Eagle's dismay, fuelperks! would be but one among many marks promoted under the Fuel Rewards Network. *Id.* Giant Eagle wanted only its brand promoted and it insisted that Excentus had an obligation to promote only Giant Eagle's fuelperks! mark. Incredibly, it was the Shapiras who made these demands – while sitting as directors of Excentus – on behalf of Giant Eagle. Excentus' in-house counsel disagreed and explained to Giant Eagle why Excentus had no obligation to do so but would instead push forward with its Fuel Rewards Network.

10.     Giant Eagle used the settlement transaction and the Shapiras' disloyalty to illicitly achieve the goals it had been unable to achieve legally. In the settlement, Mr. Perry alleges that Giant Eagle "modified the compensation structure of certain royalties for the fuelperks! trademark and added the Fuel Rewards Network – a mark that Giant Eagle had had no role in developing – to the marks covered by the agreement so as to require Excentus to pay for its own marks' use." First. Am. Pet. ¶ 60. In other words, *Giant Eagle would be paid each time Excentus used its own Fuel Rewards Network mark.*

11.     It is this allegation in particular that gives rise to Mr. Perry's unfair competition claim against Giant Eagle. First Am. Pet. ¶ 75 ("Defendants have gained an unfair advantage in the market by capitalizing on Excentus' customer relationships, prospective business opportunities, and *trademarks*, which they have misappropriated for their own illicit use when they terminated Mr. Perry." (emphasis added)). Significantly, this allegation (like Mr. Perry's other allegations) was not — and could not have been — litigated in the case Giant Eagle argues resolves Mr. Perry's claims here.

## C.     Unlike the Perry Lawsuit, The Excentus Lawsuit Arose Out of The Agreements Between Giant Eagle and Excentus, Which Contained a Forum Selection Clause.

12.     Of course, none of the above-referenced conduct had taken place as of July 2012, when the Northern District of Texas decided that the appropriate forum for Excentus' claims against Giant Eagle and the Shapiras ("Excentus Lawsuit") was Pittsburgh. That lawsuit, although touching on some background facts also alleged as background in the Perry Lawsuit, arose out of fundamentally different set of transactions.

13.     In the Excentus Lawsuit, Excentus sued Giant Eagle for patent infringement and unfair competition. Excentus premised its unfair competition claim on Giant Eagle "infringing its patents and gaining access to Excentus' confidential and proprietary information and technology

and then using these for Giant Eagle's benefit and against Excentus in the marketplace . . . ." First Am. Pet. ¶ 64. Excentus alleged that the Shapiras helped Giant Eagle when they "caused Giant Eagle to infringe the Excentus Patents." *Id*. ¶ 33.

14. According to Judge Boyle, the Excentus Lawsuit stemmed from "Excentus' claims that Giant Eagle failed to properly support Excentus' current and future business plans *as required by the parties' Stock Purchase Agreements* and also *failed to obtain a license to Excentus' patents* for use in Giant Eagle's fuelperks! program and failed to pay for such license." *Excentus Corp. v. Giant Eagle, Inc.*, 3:11-CV-3331-B, 2012 WL 2525594, at *1 (N.D. Tex. July 2, 2012) (emphasis added). The forum selection clause Giant Eagle advances here is found in those "Stock Purchase Agreements" identified by Judge Boyle.

15. The dispositive element driving the Court's dismissal of the Excentus Lawsuit was Excentus' patent infringement claims and their relationship with the Stock Purchase Agreements. The Court granted Giant Eagle's forum motion because Giant Eagle argued "it has a license granted under the Stock Purchase Agreements, and such license is a complete defense *to the patent infringement claims*." 2012 WL 2525594, at *3 (emphasis added). The Court therefore concluded that Giant Eagle's defense – which involved determining "whether the Stock Purchase Agreements do in fact grant Giant Eagle *a license to Excentus' patents*" – "requires the Court to interpret the Stock Purchase Agreements." *Id*. (emphasis added). Accordingly, the Stock Purchase Agreements' forum clause governed.

16. There is no patent infringement claim here. Nor is there a single claim that stems from patent infringement or even makes a reference to patent infringement. Even if, as Giant Eagle contends, the Stock Purchase Agreements granted Giant Eagle a license to use Excentus'

patents, then such grant is no defense to the Shapiras' conflicts of interest or Giant Eagle's misappropriation of Excentus' trademark rights, as alleged in the Perry Lawsuit.

17.     Simply put, Mr. Perry's claims here stem from conduct arising long after Judge Boyle's decision.  He raises issues and allegations that Excentus (let alone Mr. Perry) could not have made in the Excentus Lawsuit.  The question at issue here is not whether Giant Eagle or David and Daniel Shapira infringed Excentus' patents.  Instead, the question is whether the Shapiras, without violating their fiduciary duties, could sit on both sides of a settlement negotiation when they are fiduciaries of an adverse party. (They could not.)  It is also whether Giant Eagle could connive with the Shapiras to create that situation.  (It could not.)  Finally, it also involves whether Giant Eagle and the Shapiras could approve bonuses in excess of $1 million for the same officers they secretly conspired with to terminate Mr. Perry — bonuses that Mr. Perry had previously withheld — and subsequently pilfer and raid Excentus without breaching their fiduciary duties to Excentus.  (They could not.)

18.      Mr. Perry alleges that both the Shapiras and Giant Eagle profited from these transactions.  The Shapiras paid themselves $500,000 and secured broad releases.  Giant Eagle modified the compensation structure in a trademark agreement between Excenuts and a Giant Eagle affiliate, including by paying itself royalties for a trademark it did not own.  They have taken from Excentus its hard-earned revenue.

### D.     Mr. Perry Is Not A Mere Nominal Plaintiff.

19.     Even though Mr. Perry sues derivatively to undo the settlement agreement, he is not a mere nominal plaintiff.  For purposes of a derivative action in Texas, because Excentus has fewer than thirty-five shareholders and is not listed on any exchange, Excentus is considered a

closely held corporation. *See* TEX. BUS. ORG. CODE § 21.563(a). With respect to such a claim, the Texas Business Organizations Code provides:

> If justice requires: (1) a derivative proceeding brought by a shareholder of a closely held corporation *may be treated by a court as a direct action brought by the shareholder for the shareholder's own benefit* (2) a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation.

20.     TEX. BUS. ORG. CODE § 21.563(c). Notably, Mr. Perry holds in excess of 20% of the outstanding shares of Excentus and is the single largest non-corporate shareholder of Excentus. Essentially all other shareholders that hold anywhere close to Mr. Perry's number of shares are named as defendants in this lawsuit. As a result, to ensure any recovery does not benefit the same group of shareholders that warranted this lawsuit in the first place, Mr. Perry may need to request that this Court treat this action "as a direct action brought by the shareholder for the shareholder's own benefit," and that any recovery be "paid directly to the plaintiff." This is important, as Mr. Perry was not a party to the first lawsuit.

21.     As Judge Boyle aptly noted in her forum decision, "whether a forum selection clause applies to a plaintiff's claims is a case-specific inquiry." *Id*. at \*4. The case-specific inquiry here means this case should stay in Texas.

## II.     ARGUMENT

**A.     <u>Collateral Estoppel Does Not Bar Mr. Perry's Claims Because the Issues in the Excentus Lawsuit Differ From Those in The Perry Lawsuit.</u>**

Issue preclusion, known as collateral estoppel, "prevents relitigation of particular issues already resolved in a prior suit." *Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 628 (Tex. 1992). Collateral estoppel applies only when the party asserting it

establishes: (1) the issue of fact or law sought to be litigated in the second action was ***fully and fairly litigated in the first action***; (2) that issue of fact or law was essential to the judgment in the first action; and (3) the party against whom the doctrine is asserted ***was a party or was in privity with a party*** in the first action. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801–02 (Tex. 1994).[1]

Collateral estoppel requires that the issue decided in the first action be ***identical*** to the issue in the pending action. *See Getty Oil v. Insurance Co. of N. America*, 845 S.W.2d 794, 802 (Tex. 1992) ("Although the latter action arose from the same transaction as the former . . . it is based on a different provision of [the contract] and does not present the same legal issue. As indicated, collateral estoppel only applies where the identical issue was litigated in the prior suit."). It "bars successive litigation of an issue of fact or law ***actually litigated and resolved*** in a valid court determination essential to the prior judgment . . . ." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (emphasis added) (quotations omitted). The "collateral estoppel analysis . . . [focuses] only on what was ***actually litigated*** and essential to the judgment." *Texas Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 264 (Tex. App.—Texarkana 2002, pet. struck) (emphasis added). Actual litigation occurs "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985) (quoting Restatement (Second) of Judgments § 27 (1982)).

None of the issues Mr. Perry brings to this court for resolution were fully and fairly litigated in the Excentus Lawsuit. Indeed, they were not litigated at all. That is because the questions presented by the Perry Lawsuit – whether the Shapiras engaged in self-dealing in the

---

[1] The elements of collateral estoppel are the same under federal and Texas law. *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002).

settlement transaction, whether Giant Eagle competed unfairly when it misappropriated an Excentus trademark, and whether the bonus and other pay-offs to the various officers and directors of Excentus violated fiduciary duties – *could not have been litigated* in the Excentus Lawsuit. *Those events had not yet taken place.* Accordingly, collateral estoppel cannot bar Mr. Perry's claims.

Although Mr. Perry's First Amended Petition does reference and describe some of the issues that gave rise to the Excentus Lawsuit, that does not transform Mr. Perry's fundamentally different claims into the ones at issue in the Excentus Lawsuit. It is certainly true that the relationship between Excentus, Giant Eagle, and the Shapiras provides some of the factual backdrop for Mr. Perry's claims, and may even have some relevance in this litigation. Mr. Perry merely recounts some of the issues that existed between Excentus and Giant Eagle, and he explains the Excentus Lawsuit. If the allegations against the Shapiras and Giant Eagle sound familiar, then that is most likely because the Shapiras and Giant Eagle repeatedly engage in self-dealing conduct when investing in other companies. This is not the first time the Shapiras and Giant Eagle have been accused of impropriety with respect to companies they have ownership in. *See, e.g.*, Exhibit 3, Pittsburgh Post-Gazette Article, August 8, 2014 ("[T]he former CEO of the Findlay company and his investment group accus[e] Giant Eagle of trying to gain control at a discount while he was trying to save the company . . . Our clients believe Giant Eagle and its principals are attempting to hijack one of Pittsburgh's most promising companies—in an effort to garner its tremendous value for themselves."); Exhibit 4, Pittsburgh Business Times, August 13, 2014 ("In exchange for a loan, Giant Eagle laid out a plan that essentially would have given it a pathway to take all of the assets of the company.").

Crucially, it was Excentus' patent infringement claims in the Excentus Lawsuit that drove

Judge Boyle's dismissal, and there is no patent infringement action here. Indeed, the mere fact that this case is in this Court belies the notion that this is a patent infringement action, as the federal courts have exclusive jurisdiction when it comes to patent enforcement actions. Try as it might, Giant Eagle cannot transform Mr. Perry's pleading into a patent infringement claim; there is no such claim in Mr. Perry's lawsuit. As a result, the SP Agreements cannot bar Mr. Perry's claims. Other than providing some background facts about the Excentus-Giant Eagle relationship, the SP Agreements do not play a dispositive role in this case.

It is also worth noting that collateral estoppel also fails to dispose of Mr. Perry's claims here because Mr. Perry was not a party to the Excentus Lawsuit. While Mr. Perry brings claims derivatively on behalf Excentus, because Excentus is a closely held corporation, he can and will seek recovery personally in this case. This is another reason why this case is not an instance of the same party bringing the same claims against the same defendants.

Because the issues presented by Mr. Perry's claims here were not fully and fairly litigated in the Excentus Lawsuit, and because the issues in the two cases are not identical, collateral estoppel does not bar Mr. Perry's claims.

**B.** **The Stock Purchase Agreement's Forum-Selection Clause Does Not Apply to Mr. Perry's Claims.**

*1)* *Mr. Perry's Claims Do Not "Arise Out Of" the Stock Purchase Agreement.*

"When a party seeks to enforce a forum-selection clause, a trial court must first determine whether the asserted claims fall within the scope of that clause." *See In re TCW Global Project Fund II, Ltd.,* 274 S.W.3d 166, 169 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). Forum-selection clauses are creatures of contract, and principles of contract interpretation must be applied. *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 700 (Tex. App.—Dallas 2010, no pet.). Under

R190

such principles, terms are given their plain, ordinary, and generally accepted meaning. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

In determining whether claims fall within the scope of a forum-selection clause, courts utilize a "common-sense" examination of the claims and the clause to determine if the claim fall within the scope of the clause. *Siegmund*, 309 S.W.3d at 700. Courts "consider whether a claimant seeks a direct benefit from a contract and whether the contract or some other general legal obligation establishes the duty at issue." *In re Prime Ins. Co.*, 13-14-00490-CV, 2014 WL 5314514, at *4 (Tex. App.—Corpus Christi Oct. 16, 2014, no pet.) (citing *In re Fisher*, 433 S.W.3d 523, 529–30 (Tex. 2014) (orig. proceeding)). Mr. Perry's claims do not "arise out of" the SP Agreements for at least the following reasons.

*First*, arise means "to originate or stem from or to result from." BLACK'S LAW DICTIONARY 129 (10th ed. 2014). As already described in detail, Mr. Perry's claims do not originate or stem from the SP Agreements. The simple and ordinary meaning of this provision disposes of Giant Eagle's argument.

*Second*, Mr. Perry does not seek "a direct benefit from" the SP Agreements. Indeed, he does not seek to benefit at all from them.

*Third*, the SP Agreements do not establish duties and obligations breached by Giant Eagle and they are not the source of the right that Mr. Perry seeks to vindicate; the source is Texas law. *See generally U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied) (citations omitted) ("The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."). Texas law also clearly delineates the duties directors owe to the companies and shareholders they serve.

*Fourth*, even if Mr. Perry's claims could be somehow twisted to "relate to" the SP Agreements, that is not enough to bring his claims within the scope of the forum clause. To the contrary, the lack of any "related to" language implies that the signing parties intended to restrict the clause to claims that directly arose out of the agreement. *See Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc.*, No. 12 CIV. 1033 PAE, 2012 WL 5363782, at *7 (S.D.N.Y. Oct. 26, 2012) ("Those words 'arise out of' do not encompass all claims that have some possible relationship with the contract, including claims that may only relate to, be associated with, or arise in connection with the contract.").

Simply put, Mr. Perry's claims against Giant Eagle and the Shapiras do not arise out of the SP Agreements. As a result, the SP Agreement's forum selection clauses do not apply to Mr. Perry's claim.

> 2)      *Mr. Perry Was Not A Signatory of the Stock Purchase Agreement and Cannot Be Bound By It.*

When a party seeks to enforce a forum-selection clause against a nonsignatory to a contract containing a forum-selection clause, that party bears the burden to prove the theory upon which it relies to bind the nonsignatory to the forum-selection clause. *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 895 (Tex. App.—Dallas 2007, pet. denied). Giant Eagle and the Shapiras wholly fail to put forth any theory as to why Mr. Perry would be bound here given that this is a derivative suit about a close corporation, which means any recovery would flow to him personally and not to the corporation. Giant Eagle submits no evidence or argument in this regard, and it therefore fails to carry its burden.

C.      <ins>**Even if the Stock Purchase Agreement's Forum-Selection Clause Applies to These Claims, It Would Be Manifestly Unjust to Enforce It.**</ins>

Even if this Court found that Mr. Perry's claims "arise out of" the SP Agreements, the

Court should nonetheless not enforce the clause due to the extraordinary circumstances presented here. A forum-selection clause will not be enforced if "***enforcement would be unreasonable or unjust*** . . . [or] the selected forum would be ***seriously inconvenient for trial***." *In re Intern. Profit Associates, Inc.*, 286 S.W.3d 921, 923 (Tex. 2009) (emphasis added).[2] This is a highly case-specific and flexible inquiry without a bright-line test. Courts will consider multiple factors to determine if enforcement, under the particular circumstances of the extant case, is unreasonable or unjust or presents serious inconvenience.

Whether a forum-selection clauses' enforcement was foreseeable in the particular circumstances at issue is a key component of this analysis. The Texas Supreme Court has explained that parties are protected from enforcement in "controvers[ies] that the parties could never have had in mind" when signing a forum selection clause. *See In re ADM Investor Services, Inc.*, 304 S.W.3d 371, 376 (Tex. 2010) (describing the Supreme Court's decision in *M/S Bremen*). So important is foreseeability that even a party who signs and is actually bound to a forum selection clause (which Mr. Perry is not) can demonstrate "special and unusual circumstances developed ***after*** the contract was executed" that cause litigation to be so "gravely difficult and inconvenient that [they] would for all practical purposes be deprived of their day in court." *In re Zotec Partners, LLC*, 353 S.W.3d 533, 536-37 (Tex. App.—San Antonio 2011, no pet.) (emphasis added).

The circumstances presented here were assuredly not foreseeable ***a decade ago*** when Excentus (not Mr. Perry) and Giant Eagle entered into the SP Agreements. Mr. Perry could never have foreseen (and did not, in fact, foresee) that an agreement he is not a party to would be asserted against him over a decade later when he was no longer even employed at Excentus in a

---

[2] The Supreme Court of Texas has adopted the federal analysis to determine the enforceability of forum-selection clauses and whether a clause is unreasonable. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 793 (Tex.2005).

lawsuit he brought that asserts no claims "arising out of" the SP Agreements. *See* <u>Exhibit 1</u> (Perry Affidavit). When negotiating the SP Agreements, at no point was there any discussion regarding any binding impact that agreement could or would have on Mr. Perry himself in his personal capacity. *Id.* Nowhere on the SP Agreements themselves is there any circumstance referenced that even remotely could extend to the facts at issue here. For an SP Agreement that he is not a party to and does not seek to enforce to haul his claims to a court thousands of miles away is not only unforeseeable but manifestly unreasonable.

Additionally, if the selected forum presents serious inconvenience to the party sought to be bound is also a component of enforceability. Forum-selection clauses can be avoided "if the chosen forum is so inconvenient that enforcing the clause would produce an unjust result." *In re Emex Holdings L.L.C.*, 13-11-00145-CV, 2013 WL 1683614, at *9 (Tex. App.—Corpus Christi Apr. 18, 2013, no pet.) (citing *In re ADM Investor Services, Inc.*, 304 S.W.3d 371, 375 (Tex. 2010)). Courts must weigh "in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness, that, in addition to private concerns, come under the heading of the interests of justice.'" *Byrd v. Admiral Moving & Storage, Inc.*, 355 F. Supp. 2d 234, 237-38 (D.D.C. 2005) (refusing to enforce forum-selection clause because plaintiff would have incurred unreasonable expenses by transferring forums) (quoting *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

Thus, a second and equally compelling reason to keep this action in this Court are the consequences flowing from enforcing the forum selection clause. If this Court dismisses Giant Eagle, then Mr. Perry, to enforce his rights, would have to sue Giant Eagle in Pittsburgh. But this action would continue, as there are seven other defendants. And the claims would not change, as Mr. Perry also sues those other defendants over their conduct in the days and months following

his termination as CEO.  As the District of Columbia explained in similar circumstances, where a plaintiff's claims against other defendants would remain in the first forum after transferring the claims against one defendant due to a forum selection clause, "[i]t would 'flout the theory of judicial economy' to transfer the action . . ." *Byrd*, 355 F. Supp. 2d at 238.

Consequently, the very result that Courts go to great lengths to avoid – related litigation in multiple forums with the potential for inconsistent results – will happen here.  This result would be wholly contrary to one of the very aims of forum selection clauses.  *See Carney v. Beracha*, 996 F. Supp. 2d 56, 71 (D. Conn. 2014) (holding that enforcing forum-selection clause would be unreasonable because it would require litigation in multiple fora and require multiple courts to adjudicate claims covering only portions of each transaction); *First Interstate Credit Alliance, Inc. v. Alliance Leasing, Inc.*, No. 89-CV-4038, 1990 WL 67445, at *5 (S.D.N.Y. May 15, 1990) (declining to enforce forum selection clause where it appeared likely that the same issues would be litigated in multiple fora).  *See also Rationis Enterprises, Inc. of Panama, Lim. Procs. M/V MSC Carla*, No. 97-CV-9052, 1999 WL 6364, at *3 (S.D.N.Y. Jan.7, 1999) (distinguishing cases enforcing forum selection clause due to "size and complexity" of case at issue).  In short, at least two courts would have to hear the very same claims involving the very same parties and the same facts at the same time.  Such a result constitutes the sort of seriously inconvenient outcome that warrants rejecting a forum selection clause.

Finally, the Court should not ignore the substantial personal inconvenience to be suffered by Mr. Perry.  *See* <u>Exhibit 1</u> (Perry Affidavit).  Excentus, its directors, and certain shareholders seek to impose financial and logistical burdens on Mr. Perry at every turn, while Mr. Perry seeks to act in the best interests of Excentus — the company he founded and led for over 18 years.  Excentus — without any notice or chance to cure — wrongfully terminated the only source of

employment income Mr. Perry had for nearly two decades, as well as Mr. Perry's health care (despite knowledge that Mr. Perry's family suffers from chronic healthcare conditions). Mr. Perry has had to bring a breach of contract claim against Excentus in arbitration because Excentus refused to pay him the compensation contractually owed to him upon his termination. *Id*. Excentus also refused, despite past practice and the clear language of the Excentus Bylaws and Articles of Incorporation, to pay for Mr. Perry's attorneys' fees in connection with a lawsuit where Mr. Perry was sued in his capacity as an officer of Excentus. In a detailed ruling, the 162nd District Court had to issue a temporary injunction ordering Excentus to pay Mr. Perry's fees. *See* Exhibit 5. On the other hand, every single Defendant in this suit is most likely having their attorneys' fees paid by Excentus. If Giant Eagle is dismissed, Mr. Perry would have to personally bear the substantial financial and logistical burden of litigating in three different fora, including by having to retain additional counsel in Pittsburgh. This substantial personal inconvenience and injustice is yet another reason for the Court to deny enforcement of the forum-selection clause in the unlikely instance that this Court finds it applicable here.

## III. CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Giant Eagle's Motion to Dismiss. Plaintiff further requests any additional relief to which he may show himself entitled.

Date: August 14, 2015                    Respectfully submitted,

/s/Michael P. Lynn
Michael P. Lynn, P.C. (mlynn@lynnllp.com)
State Bar No. 12738500
Andrés Correa (acorrea@lynnllp.com)
State Bar No. 24076330
Andrew S. Hansbrough (ahansbrough@lynnllp.com)
State Bar No. 24094700
**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 Telephone
214-981-3839 Facsimile

**ATTORNEYS FOR PLAINTIFF
DICKSON PERRY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served as shown below on counsel of record on August 14, 2015:

*Via Email*
Orrin L. Harrison III
(oharrison@ghjhlaw.com)
GRUBER HURST ELROD JOHANSEN HAIL
SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

*Via Email*
Bernard Marcus (marcus@marcus-shapira.com)
Scott Livingston (livingston@marcus-shapira.com)
Jonathan Marcus (jmarcus@marcus-shapira.com)
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, PA  15219-6401
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

*Via Email*
Lisa S. Gallerano
(lgallerano@akingump.com)
Patrick O'Brien (pobrien@akingump.com)
AKIN GUMP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201-4624
*Attorneys for Defendant*
*Alliance Data Systems, Inc.*

*Via Email*
Ken Carroll (kcarroll@ccsb.com)
Byran Erman (berman@ccsb.com)
Sara Romine (sromine@ccsb.com)
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX  75202-3767
*Attorneys for Defendants*
*Brandon Logsdon and Jim Mills*

*Via Email*
Robert B. Wagstaff (rwagstaff@mcmahonlawtx.com)
MCMAHON SUROVIK SUTTLE
P.O. Box 3679
Abilene, TX  79604
*Attorney for Defendants*
*Randy Nicholson and Auto-Glass Systems, Inc.*

*/s/ Andres Correa*
Andres Correa

4832-4528-4646, v. 2

# EXHIBIT 1

R199

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., AND EXCENTUS CORPORATION, | § § § § § § § § § | |
| Defendants. | § | 68TH JUDICIAL DISTRICT |

## AFFIDAVIT OF DICKSON PERRY

BEFORE ME, the undersigned authority, on this day personally appeared Dickson Perry, who is known to me and who, after having been by me duly sworn according to law upon his oath, deposed and said:

1. My name is Dickson Perry. I am over 21 years of age, of sound mind, have never been convicted of any felony, and fully competent to make this affidavit. I have personal knowledge of all of the facts stated herein, and they are true and correct.

2. I founded Excentus Corporation ("Excentus") and served as its Chairman of the Board and Chief Executive Officer from 1996 until 2014. Excentus was my only source of employment income for myself and for my family during that time.

3. On August 1, 2014, I received a phone call from certain Excentus officers in which they told me that I was terminated from all of my positions at Excentus. I had received no

Exhibit 1

R200

notice in advance of any concerns about my performance as CEO or about my work for Excentus from Excentus' management. Excentus' management never warned me that there was a risk that I would be terminated from Excentus. As a result, the call on August 1, 2014 was completely unexpected.

4.    I had an employment contract with Excentus that required that certain compensation be paid to me upon my termination without cause. Excentus contended that I was terminated for cause, however, and refused to pay me any compensation upon my termination. Excentus cut off all of my benefits, including my health benefits, despite Excentus being aware that two of my children suffer from serious, chronic illnesses. My employment agreement contained an arbitration clause, and I therefore had to bring a breach of contract claim against Excentus in arbitration in Dallas, Texas. That claim is pending and is presently still in the discovery phase.

5.    Following my termination, it became necessary for me to sell our home in Dallas. I have been unable to obtain alternate employment since my termination from Excentus. At present, I am engaged in starting a new business in Canton, Mississippi, which is my home state. I am therefore residing in Canton. That new business has not yet generated any income for me and it is not expected to generate any income for me for the foreseeable future.

6.    On December 2, 2011, Excentus filed claims against Giant Eagle, Inc. ("Giant Eagle") and David and Daniel Shapira (the "Shapiras") in the U.S. District Court for the Northern District of Texas. Every Excentus board member (other than the Shapiras), as well as members of Excentus' management, participated in discussions about whether litigation was necessary to resolve the issues between Excentus, Giant Eagle, and the Shapiras. Every

R201

Excentus board member (other than the Shapiras) and senior members of Excentus' management participated in the decision to file claims against Giant Eagle and the Shapiras. Those claims were filed in consultation with both in-house counsel for Excentus and external counsel at Fulbright Jaworski (now Norton Rose Fulbright). Further, Excentus created a Litigation Committee to consult with counsel, review certain questions presented, and make certain decision about the litigation against Giant Eagle and the Shapiras. I was not a member of the Litigation Committee.

7. While the litigation was ongoing, Excentus' in-house counsel was involved and aware at all times of the progression of the litigation. Further, Excentus' board members (other than the Shapiras), as well as senior management, were kept apprised and updated of the progression of the litigation.

8. I brought no claims against Giant Eagle and the Shapiras in my personal capacity. I have never, until the above-captioned matter, sued Giant Eagle and the Shapiras.

9. My claims in the above-captioned matter arise out of the defendants' conduct in the days and months following my termination, including without limitation the settlement agreement between Excentus, Giant Eagle, and the Shapiras.

10. I signed the 2004 Series A Preferred Stock Purchase Agreement and the 2005 Series B Preferred Stock Purchase Agreement (together, the "SPAs") in my capacity as CEO of Excentus. Those agreements were reviewed by counsel for Excentus. I did not have counsel representing me review those agreements. I did not understand, either at that time or now, any aspect of those agreements to create any obligations on me personally as to where I would have to file any claims should there be a dispute related to those agreements or a dispute unrelated to

R202

those agreements. Further, at the time that these agreements were negotiated, I did not foresee any dispute between me in my personal capacity (or Excentus, for that matter) and Giant Eagle or the Shapiras.

11.     I never expected or foresaw that a forum selection clause in the SPAs could bind me personally to litigate any personal claims in a particular forum. I never foresaw having to bring any claims against Giant Eagle and the Shapiras in my personal capacity, and even if suing them was ever necessary, I would expect that, given their substantial business activities in Texas, I would be able to do so in Texas.

12.     If Giant Eagle and the Shapiras are dismissed from this lawsuit, I would have to bring the same claims against them in Pittsburgh. Having to do so would result in a substantial, and completely unforeseeable, burden to myself. I have no personal connection to Pittsburgh. I have never lived there and have no business there. I would have to find additional counsel to represent me in Pittsburgh. Because I would continue prosecuting my claims against the remaining defendants in the above-captioned matter, any new counsel in Pittsburgh would have to begin repeating the work that my counsel in Texas has done so far. This would create duplicative and unnecessary costs -- which are a significant and unforeseeable burden, given that I was terminated from the only job I held for 18 years – as well as the potential for lack of coordination and inconsistent positions and results in the Pittsburgh and Dallas litigation.

13.     Having to litigate in arbitration, in Dallas District Court, and in Pittsburgh creates an immense burden upon my time and resources. Litigating both in arbitration and in Dallas District Court already creates a significant burden given my residence in Canton. If they are dismissed from this lawsuit, to enforce my rights I would have to file claims against Giant Eagle

and the Shapiras in Pittsburgh. However, in light of the ongoing costs of arbitration and the above-captioned matter, as well as the substantial additional costs that would result from having to retain new counsel in Pittsburgh and all attendant travel and litigation costs, I may not be able to file such litigation to enforce my rights because the expense and burden would be prohibitive.

14. In this scenario, I do not know how I could enforce my personal rights as a shareholder of Excentus, or those of Excentus, against Giant Eagle and the Shapiras.

**FURTHER AFFIANT SAYETH NOT.**

_____
DICKSON PERRY

SUBSCRIBED AND SWORN TO BEFORE ME on this the _13_ day of August, 2015, to certify which witness my hand and official seal.

NOTARY PUBLIC
STATE OF TEXAS
KARRIE L STOVALL
My Commission Expires
April 6, 2016

SEAL:

_____
Notary Public in and for the State of Texas

4819-9977-0918, v. 1

**AFFIDAVIT OF DICKSON PERRY**
2708-403/4819-9977-0918

Page 6

R205

# EXHIBIT 2

R206

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| GIANT EAGLE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:14-cv-01195 |
| | ) | |
| vs. | ) | |
| | ) | |
| EXCENTUS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**AGREED MOTION TO STAY PROCEEDING**

Recent discussions between Plaintiff Giant Eagle, Inc. and the new Chief Executive Officer of Defendant Excentus Corporation (collectively, "the parties") suggest that the parties may be able to reach a settlement agreement without incurring additional litigation expenses or taking up any more of the Court's time. Therefore, the parties jointly request that the Court use its inherent power to stay these proceedings for ninety (90) days.

Dated:  August 6, 2014

Respectfully submitted,

| | |
|---|---|
| */s/ Bernard D. Marcus* | */s/ Brett C. Govett* |
| Orrin L. Harrison, III | Brett C. Govett |
| Texas Bar No. 09130700 | Texas Bar No. 08235900 |
| oharrison@ghjhlaw.com | brett.govett@nortonrosefulbright.com |
| Mark L. Johansen | Michael B. Regitz |
| Texas Bar No. 10670240 | Texas Bar No. 24051238 |
| mjohansen@ghjhlaw.com | mike.regitz@nortonrosefulbright.com |
| Anthony J. Magee | Jason Jordan |
| Texas Bar No. 00786081 | Texas Bar No. 24078760 |
| amagee@ghjhlaw.com | jason.jordan@nortonrosefulbright.com |
| Jonathan R. Childers | Patrick Courtney |
| Texas Bar No. 24050411 | Texas Bar No. 24087351 |
| jchilders@ghjhlaw.com | patrick.courtney@nortonrosefulbright.com |

_____

R208

GRUBER HURST JOHANSEN HAIL SHANK LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Telephone:  (214) 855-6800
Facsimile:  (214) 855-6808

Bernard D. Marcus (*pro hac vice*)
marcus@marcus-shapira.com
Robert M. Barnes (*pro hac vice*)
rbarnes@marcus-shapira.com
Scott D. Livingston (*pro hac vice*)
livingston@marcus-shapira.com
Jonathan D. Marcus (*pro hac vice*)
jmarcus@marcus-shapira.com

MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA  15219
Telephone:  (412) 471-3490
Facsimile:  (412) 391-8758

*Counsel for Plaintiff*

FULBRIGHT & JAWORSKI, LLP
2200 Ross Avenue, Suite 2800
Dallas, TX  75201
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

*Counsel for Defendant*

## CERTIFICATE OF CONFERENCE

Pursuant to LOCAL CIVIL RULE 7.1(b), on August 5, 2014, a member of counsel for Plaintiff and a member of counsel for Defendant conferred regarding this Motion.  Counsel for Defendant AGREES to the request set forth herein.

Certified to on August 6, 2014, 2014, by

*/s/ Bernard D. Marcus*
Bernard D. Marcus

## CERTIFICATE OF SERVICE

On August 6, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  The electronic case files system sent a "Notice of Electronic Filing" to the attorneys entitled to notice who are registered users of ECF.

*/s/ Bernard D. Marcus*
Bernard D. Marcus

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EXCENTUS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.  2:13-CV-00178-JFC |
| | ) | |
| vs. | ) | |
| | ) | |
| GIANT EAGLE, INC., DAVID SHAPIRA | ) | |
| and DANIEL SHAPIRA, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT MOTION TO STAY

Recent discussions between the new Chief Executive Officer of Plaintiff Excentus Corporation and Defendants Giant Eagle, Inc., David Shapira, and Daniel Shapira (collectively, "the parties") suggest that the parties may be able to reach a settlement agreement without incurring additional litigation expenses or taking up any more of the Court's time.  Therefore, the parties jointly request that the Court use its inherent power to stay these proceedings for ninety (90) days.

Dated:  August 6, 2014                                      Respectfully submitted,

*/s/ Brett C. Govett*
Jeremy A. Mercer (PA ID No. 86480)
FULBRIGHT & JAWORSKI LLP
Southpointe Energy Complex
370 Southpointe Blvd., Suite 300
Canonsburg, PA  15317
Telephone: (724) 416-0400
Facsimile: (724) 416-0404
jeremy.mercer@nortonrosefulbright.com

*/s/ Jonathan D. Marcus*
Bernard D. Marcus (PA ID No. 01293)
Scott D. Livingston (PA ID No. 60649)
Jonathan D. Marcus (PA ID No. 312829)
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA  15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758
marcus@marcus-shapira.com
livingston@marcus-shapira.com
jmarcus@marcus-shapira.com

R210

Brett C. Govett
Michael B. Regitz
FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 855-8000
Facsimile:   (214) 855-8200
brett.govett@nortonrosefulbright.com
mike.regitz@nortonrosefulbright.com


Counsel for Plaintiff
Excentus Corporation

David V. Radack (PA ID No. 39633)
Mark A. Willard (PA ID No. 18103)
Eckert, Seamans, Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
(412) 566-6000
(412) 566-6099 (Facsimile)
dradack@eckertseamans.com
mwillard@eckertseamans.com


Counsel for Defendants
Giant Eagle, Inc., Daniel Shapira and David Shapira

R211

**CERTIFICATE OF SERVICE**

On August 6, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Pennsylvania, using the electronic case files system of the court. The electronic case files system sent a "Notice of Electronic Filing" to the attorneys entitled to notice who is a registered user of ECF.

/s/ Jonathan D. Marcus
Jonathan D. Marcus

3

R212

# EXHIBIT 3

R213



# Battle over control of robotics company Seegrid heads to court

August 8, 2014 12:00 AM

By Teresa F. Lindeman / Pittsburgh Post-Gazette

A boardroom battle over control of a robotics vehicle business with Carnegie Mellon University ties has ended up in court, with the former CEO of the Findlay company and his investment group accusing Giant Eagle of trying to gain control at a discount while he was trying to save the company.

In a lawsuit filed this week in Allegheny County Court of Common Pleas, Anthony Horbal, who became CEO of Seegrid Corp. in 2012, said the O'Hara grocer blocked his efforts to bring in outside capital even as the company faced a cash shortage that threatens its future.

"Our clients believe Giant Eagle and its principals are attempting to hijack one of Pittsburgh's most promising companies — in an effort to garner its tremendous value for themselves," said William A. Brewer III, partner at Bickel & Brewer in Dallas and lead counsel for plaintiffs, in an email. "Our clients believe that Giant Eagle took direct aim at them, and took steps to force them out of the company they helped build."

Since at least April, the lawsuit said, the Seegrid board and Giant Eagle have known that "by mid-July, if not sooner, Seegrid would face a cash shortage that would threaten its ability to continue to conduct business."

A Giant Eagle spokesman said the company is confident the case will be dismissed.

"As the majority shareholder in Seegrid Corp., Giant Eagle continues to believe that Seegrid can be a successful company. Contrary to the allegations in the complaint, Giant Eagle has always acted appropriately as a Seegrid shareholder. The complaint was filed on behalf of a disgruntled former CEO, and it contains numerous material misstatements and is wholly without merit," said Rob Borella, senior director of corporate communications, in an email.

Exhibit 3

The lawsuit seeks injunctive relief to keep Giant Eagle from "interfering with the management agreement," in addition to an unspecified amount of damages.

The lengthy court filing describes a startup founded in 2003 by CMU robotic scientists Hans Moravec and Scott Friedman. The company makes robotic vehicles that can handle tasks in industrial settings, according to Seegrid's website.

Seegrid was initially funded with by a small group of investors and a contract from Samsung, according to the lawsuit. Giant Eagle tested Seegrid's prototype robots in its warehouse, according to the suit, and was asked by Mr. Friedman to invest.

Mr. Horbal came in December, investing $3 million in return for 20 percent ownership, according to the lawsuit. A past Seegrid press release indicate he sold his own business, Three Rivers Health Plan, to United Health Plans in 2008. At Seegrid, he started as president and a director.

Horbal's group's ownership interest at this point is between 15 percent and 16 percent, the lawsuit said. Giant Eagle, the lawsuit said, would own more than 60 percent of Seegrid, if it converted its notes into stock.

Mr. Horbal felt Seegrid needed a cash infusion of $10 million to $20 million, but claimed Giant Eagle and its representatives have been threatening to liquidate Seegrid unless the board agrees to turn the operation into a subsidiary of Giant Eagle.

R215

# EXHIBIT 4

R216

**From the Pittsburgh Business Times**
:http://www.bizjournals.com/pittsburgh/news/2014/08/13/second-suit-filed-in-legal-battle-between-ousted.html

# Second suit filed in legal battle between ousted Seegrid CEO, Giant Eagle

Aug 13, 2014, 12:40pm EDT Updated: Aug 14, 2014, 10:18am EDT



Justine Coyne
Reporter- *Pittsburgh Business Times*
Email  |  Twitter  |  LinkedIn  |  Google+

Former Seegrid Corp. CEO Anthony Horbal has filed another suit against Giant Eagle Inc., this time claiming the grocery giant was in breach of its fiduciary duties as an investor in the robotics firm.

In the shareholder derivative suit, filed Friday, Horbal alleges Giant Eagle interfered with management in an effort to block outside investment as a way to seize control of the company. What differentiates this case from the previous filing is that a shareholder derivative suit is brought on behalf of a corporation against a third party, oftentimes with the third party being an insider of that corporation.

Horbal and his investment group, HERC Management Services LLC, claim in the suit, filed in the Chancery Court of Delaware, that Giant Eagle stymied efforts to bring new funding into Seegrid and embarked on a scheme to appropriate the value of the company for itself. Giant Eagle owns more than 60 percent of Seegrid's outstanding shares.

The parties listed in the suit include Giant Eagle Inc. and Giant Eagle of Delaware Inc., as well as Seegrid board members Daniel Shapira, general council with Giant Eagle Inc. and brother of Giant Eagle Executive Chairman David Shapira; Hans Morvac, chief scientist and founder of Seegrid; and Phillip Oliveri, vice president of finance and treasurer for Giant Eagle.

Horbal, who maintains 20 percent of Seegrid's equity, resigned from the company's board of directors before the suit was filed, according to his attorney William Brewer, partner at Bickel & Brewer. The board voted to oust Horbal as CEO on July 14; however, he contends it did not have the authority to do so under the company's stockholder agreement.

"In exchange for a loan, Giant Eagle laid out a plan that essentially would have given it a pathway to take all of the assets of the company," Brewer said.

Exhibit 4

R217

Seegrid has largely relied on month-to-month financing since January 2013, borrowing hundred of thousands — sometimes millions — of dollars most months to remain solvent, according to a Aug. 5 filling in the Allegheny County Court of Common Pleas. As CEO, Horbal brought a proposal to the company's directors to take in outside investment capital in order to bring Seegrid's intellectual property to profitability, but was blocked by members of the board that were appointed by Giant Eagle.

What Giant Eagle proposed instead is it would invest $10 million into Seegrid that would transfer all of the company's intellectual property and assets to another company it controlled, according to Brewer. In addition, Giant Eagle stipulated that in order for it to make the loan, the other shareholders would have to release all claims against the company for any past conduct in interfering with management. Giant Eagle refused to install an independent board member to vote on the proposal, Brewer said.

"What resulted instead was refusal from Giant Eagle to do anything but frankly offer minimum funding to reduce the independence of Seegrid and ensure complete dependence on them," Brewer said. "Other investors, not just Mr. Horbal, but those investors and those that provided the seed capital to fund the company, lost any real upside in this company that they had created."

Horbal maintains that with Seegrid's intellectual property and partnerships with major manufacturers, it has the potential to become a billion-dollar company.

"At this point no one will share in the benefit of any of these opportunities except Giant Eagle if it is able to move its plan forward," Brewer said.

Following a civil suit filed by Horbal Aug. 5, Giant Eagle released the following statement through Rob Borella, its senior director of corporate communications: "As the majority shareholder in Seegrid Corporation, Giant Eagle continues to believe that Seegrid can be a successful company. Contrary to the allegations in the Complaint, Giant Eagle has always acted appropriately as a Seegrid shareholder. The Complaint was filed on behalf of a disgruntled former CEO, and it contains numerous material misstatements and is wholly without merit. Giant Eagle is confident this case will be dismissed."

A spokesman for Giant Eagle said the company has no additional comment.

Justine Coyne covers manufacturing and higher education.

R218

# EXHIBIT 5

R219

420 E 000770

CAUSE NO. DC-14-14169

| | | |
|---|---|---|
| EXCENTUS CORPORATION AND. CENTEGO II, LLC, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| DICKSON PERRY, | § § § | |
| Defendant. | § | 162nd JUDICIAL DISTRICT |

---

## ORDER DEFENDANT'S APPLICATION FOR TEMPORARY INJUNCTION

---

Before the Court is Defendant/Counter-Plaintiff Dickson Perry ("Perry" or "Defendant Perry")'s Application for Temporary Injunction Against Plaintiff Excentus Corporation ("Excentus") and Centego II, LLC ("Centego II"). Having considered the application, the arguments of the parties, and all evidence properly before it, the Court rules as follows:

Defendant Dickson seeks an order from this Court requiring Plaintiffs to begin advancing to Mr. Perry his reasonable expenses actually incurred in connection with claims brought by MetroSplash Systems Group, Inc. ("MetroSplash") in Cause Number DC-14-07297, pending in the 298th District Court, Dallas County ("MetroSplash Claims"), as well as all expenses and costs incurred in connection with the above-captioned action.

1

Exhibit 5

R220

## Probable Right to the Relief.

Defendant Perry seeks enforcement of his contractual rights to advancement of expenses under Excentus' Bylaws and Articles of Incorporation, rights which he alleges Excentus has wrongfully denied. [1] Defendant Perry has a probable right to relief.

As former CEO and Chairman of the Board of Excentus, Defendant Perry falls within the categories of indemnified persons, and on October 17, 2014, his indemnification rights were triggered. Three months prior, Centego II, LLC ("Centego II"), an affiliate of Excentus, had initiated a lawsuit in the 298th District Court, Dallas County, against MetroSplash Systems Group, Inc. ("MetroSplash") and Steve Babick, its president. On October 17, 2014, MetroSplash responded with counterclaims not just against Centego II but also against Excentus (one of Centego II's shareholders), Brandon Logsdon (an officer and director of both Centego II and Excentus), Jim Mills (an officer of both Centego II and Excentus), and Mr. Perry.

In support of its claims, MetroSplash alleges that "[a]t all relevant times, Perry was the Chairman and CEO of Excentus and an officer and director of Centego[II]," and it goes on to complain about various actions taken by Mr. Perry in his capacity as a director and officer of Excentus and/or Centego II.

Defendant Perry retained the law firm of Lynn, Tillotson, Pinker & Cox, LLP ("LTPC"). On November 5, 2014 and again on December 3, 2014, LTPC, on behalf of Mr. Perry, demanded from Excentus that Excentus advance to Mr. Perry his expenses actually incurred in defense of the MetroSplash Claims. In response, Excentus forwarded to Mr. Perry a December 5 letter from its insurance company, Chubb & Son ("Chubb"). In that letter, Chubb acknowledged receipt of the pleadings associated with the MetroSplash Claims and stated that it would "provide a defense for this matter," subject to the terms and conditions of its policy and its reservation of rights, as

2

stated in the letter. Four of the conditions of Chubb's representation are of particular relevance. *First*, Mr. Perry must accept as his counsel Edward Perrin of the Hallet & Perrin law firm. *Second*, Chubb prohibits Mr. Perry from settling any claim with MetroSplash without prior consent. *Third*, Mr. Perry must provide "all information, assistance and cooperation" that the insurance company "reasonably requests." And *fourth*, Mr. Perry must "agree [] to do nothing that may prejudice the [the insurance company's] position or its potential or actual rights of recovery."

The Court concludes that nothing in the Bylaws and Articles of Incorporation permits Excentus to condition advancement on acceptance of the terms of its insurance provider. The Bylaws and Articles of Incorporation state Excentus must advance reasonable expenses actually incurred.

## Irreparable Harm.

Mr. Perry argues that there are two principal reasons why absent a temporary injunction, Mr. Perry will suffer immediate and irreparable harm, and the Court agrees. First, advancement of expenses is by its very nature an interim remedy, and therefore belated payment of such expenses cannot compensate for their loss. Second, insurance counsel does not remedy this harm. The claims and hostility between Excentus' current leadership and Mr. Perry, as well as other related lawsuits involving Excentus and Mr. Perry, renders any representation by insurance counsel, and not Mr. Perry's chosen counsel, incomplete and ineffectual. Moreover, insurance representation conditioned on Mr. Perry's cooperation is untenable and prejudicial to Mr. Perry's rights.

3

R222

According to the terms of the Bylaws and the Articles of Incorporation, Mr. Perry is entitled to advancement as per their terms, a conclusion that Excentus does not dispute. Those terms cannot be reasonably read to allow Excentus to limit Mr. Perry's advancement rights as Excentus would here. If Excentus denies Mr. Perry the advancement, then no damage award can compensate for that loss because Mr. Perry's advancement will be effectively moot at a later stage.

Argument that Insurance counsel can remedy the harm to Mr. Perry is questionable in light of his adversarial relationship with Excentus' present leadership and the unique situation where there are various related lawsuits and potential for complete information.

On November 19, 2014, Mr. Perry filed an arbitration demand against Excentus, alleging that a cadre of Excentus shareholders had secretly conspired to wrongfully force Mr. Perry out of Excentus and had caused Excentus to breach its contractual obligations with Mr. Perry ("Arbitration Claims"). Excentus counterclaimed, suing not only for breach of contract but also for alleged breaches of Mr. Perry's fiduciary duties ("Arbitration Counterclaims"). Excentus alleges, for example, that Mr. Perry "developed a plan, independent of Excentus' Board and senior management, to gain more control of the Company . . . Perry engaged Excentus' outside counsel (paid for by Excentus) to provide legal work designed solely to benefit Perry as part of his attempt to gain more control of the Company." Excentus Counterclaim, ¶ 11.

Mr. Perry also retained LTPC to represent him in arbitration, and LTPC has in fact begun litigating Mr. Perry's claims and defenses. The disputes are likely to overlap with argument given that certain of Excentus' factual allegations – which Mr. Perry contests – may infect Mr. Perry's defense against the MetroSplash Claims. For example, Excentus alleges that Mr. Perry has "damaged relationships with participants, vendors, and shareholders," and that he was

4

"unresponsive" and "disrupted the business." There exists, as a result, an imminent threat that at the very least, factual determinations and legal positions in the Metrosplash Claims may bear on the Arbitration Claims, and at worst, that Excentus may eventually reach a position adversarial to Mr. Perry in the MetroSplash Claims.

### The Equities Favor the Grant of an Temporary Injunction.

The court must balance the equities before issuing an injunction, considering injury to (1) the defendant and the public were the injunction granted and (2) the complainant were the injunction denied.

The damages to Excentus from the granting of the temporary injunction, if wrongfully granted, can be estimated and compensated. If this Court orders Excentus to advance Mr. Perry's reasonable expenses actually incurred, the sole harm to Excentus would be the expenses advanced – an obligation Excentus does not dispute. If, Mr. Perry is eventually proven to not be entitled to such advancement, then he would have to pay that money back and Excentus would be made whole.

If however, Mr. Perry chooses to personally bear the expense of his legal representation, he forever loses the right to advancement, a right that Excentus does not even dispute. Further, Mr. Perry testified to the financial burden that such expenses would place on him, who, after being terminated by Excentus, remains unemployed. Accordingly, the equities strongly favor issuance of an injunction as requested by Mr. Perry.

5

## CONCLUSION

The Court hereby GRANTS the Application, and ORDERS as follows:

1.      The Defendant shall submit his legal fees and expense bills related to his defense in *Centego II, LLC v. MetroSplash Systems Group, Inc.*, Cause No. DC-14-7297 (Dallas County, Texas, 298th District Court) and in the above-referenced case to Excentus Corporation.

2.      Excentus shall pay all fees and expenses incurred by the Defendant within fifteen (15) days of receiving a bill.  To the extent Excentus believes in good faith that any attorneys' fees and expenses incurred by the Defendant are inappropriate, excessive, or unreasonable, Excentus shall specify in writing the portion(s) of the bill it finds objectionable within thirty (30) days of receiving a bill.  Excentus must nonetheless advance any objected-to amounts within the time frame ordered above.

3.      The Court will retain jurisdiction to rule on any of Excentus' objections and on the reasonableness of the expenses incurred by Defendant after a trial on the merits or other pre-trial determination, such as summary judgment.

4.      Any Party may motion the court to review the adequacy of the bond in this matter.

This Order shall not be effective unless and until Defendant executes and files with the clerk a bond, in conformity with the law, in the amount of Five Thousand Dollars ($5,000.00).

IT IS SO ORDERED.

SIGNED this 20th day of December, 2014.

_____
PRESIDING JUDGE

6

R225

Tab D

| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff, | § § § | |
| v. | § § § | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | § § § § § § § § § | |
| Defendants. | § § | 68TH JUDICIAL DISTRICT |

**PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF IN OPPOSITION
TO GIANT EAGLE'S MOTION TO DISMISS**

TO THE HONORABLE JUDGE:

Plaintiff Dickson Perry ("Perry") files this Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss for two reasons. First, Mr. Perry received new discovery responses from Defendants which bear on the questions presented in Giant Eagle's motion to dismiss. Second, in its Reply, Giant Eagle mischaracterizes and ignores how Texas courts interpret forum-selection clauses, and therefore Mr. Perry seeks to clarify Texas law on this point.

## I.  ARGUMENT

**A.  Giant Eagle Mischaracterizes and Ignores Texas Law on Forum Selection Clauses.**

Texas courts construe the forum-selection clause asserted by Giant Eagle far more narrowly than Giant Eagle posits, and in its Reply Giant Eagle wholly ignores this well-established Texas precedent. Whether Giant Eagle believes that the SP Agreements will be

---

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION
TO GIANT EAGLE'S MOTION TO DISMISS**                                             **Page 1**
02708.403/4842-0322-0007

R226

relevant in defending against Mr. Perry's claims is irrelevant. *First*, nothing in the SP Agreements will absolve two directors sitting on a corporate board while they also negotiate against the corporation and pay themselves off, or Giant Eagle aiding and abetting those same directors, or the Shapiras and Giant Eagle ousting Mr. Perry and looting the corporate coffers to pay their co-conspirators off. *Second*, as explained below, Texas courts construe "arise out of" language narrowly, and under such construction Giant Eagle pointing to the SP Agreements as a purported defense against Mr. Perry's claims do not bring Mr. Perry's claims within the SP Agreements' forum selection clause.

When a party seeks to enforce a forum-selection clause, the court must first interpret that clause in accordance with Texas law to determine whether the claims fall within the clause's scope. *Deep Water Slender Wells, Ltd. v. Shell Intern. Exploration & Prod., Inc.*, 234 S.W.3d 679, 688 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Clauses that contain "relate to" or "are connected with" are construed broadly, while clauses containing "arising out of" – the language the SP Agreements use here – are construed narrowly. *See FD Frontier Drilling (Cyprus), Ltd. v. Didmon*, 438 S.W.3d 688, 695 (Tex. App.—Houston [1st Dist.] 2014), reh'g overruled (July 29, 2014), review denied (Nov. 7, 2014) (distinguishing between narrow clauses using "arise out of" and broader clauses using "arising out of or relating to," which "embrace all disputes between the parties having a significant relationship to the contract"); *Glassell Producing Co., Inc. v. Jared Res., Ltd.*, 422 S.W.3d 68, 77 (Tex. App.—Texarkana 2014, no pet.) (explaining that "arising out of" is narrow and "most arbitration clauses contain language that is more broad, such as 'related to' or 'connected with'"); *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 701 (Tex. App.—Dallas 2010, no pet.) (noting use of "hereunder," which the court equates to "arising under," is narrower than clauses containing "relating to"); *In re Wilmer Cutler Pickering Hale &*

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS**       **Page 2**
02708.403/4842-0322-0007

R227

*Dorr LLP*, 05-08-01395-CV, 2008 WL 5413097, at *4 (Tex. App.—Dallas Dec. 31, 2008, no pet.) ("[t]he phrase 'relates to,' in particular, is recognized as a very broad term"); *Associated Air Freight, Inc. v. Meek*, 01-00-00843-CV, 2001 WL 225516, at *4 (Tex. App.—Houston [1st Dist.] Mar. 8, 2001, no pet.) (a contract that omits broad terms, such as "relating to," indicates that the parties intended for a narrow scope); *In re Conseco Fin. Servicing Corp.*, 19 S.W.3d 562, 570 (Tex. App.—Waco 2000, no pet.) ("arising from or relating to" is different than more limited and narrow clauses).

In contrast to the broader provisions the parties could have used in the SP Agreements, "arise out of" means only "to originate or stem from or to result from." BLACK'S LAW DICTIONARY 129 (10th ed. 2014). Mr. Perry's claims do not originate, stem, or result from the SP Agreements. They seek to enforce no rights in those agreements, and they make no reference to any obligations of any party in those agreements. Mr. Perry can, and will, maintain his claims independently of whatever the SP Agreements say. Where the language "arise out of" is used, Texas courts bring within its scope only cases in which "but for" the agreement at issue, there would be no claim. *See In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 886 (Tex. 2010) ("HealthTronics's claims arise out of the Agreement rather than other general obligations imposed by law. That is, but for the Agreement, HealthTronics would have no basis to complain . . ."). Here, Mr. Perry's claims arise out of the general obligations imposed by Texas law – *not* any obligations imposed by the SP Agreements.

Judge Boyle decided to interpret SP Agreements' forum selection clause more broadly, but that holding made sense given Excentus' particular claims in that case. As that Court explained, "the Court must look to the Stock Purchase Agreements in order to resolve *all* of Excentus' claims." *Excentus Corp v. Giant Eagle, Inc.*, 3:11-cv-0331, 2012 WL 2525594, at *4

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS** **Page 3**
02708.403/4842-0322-0007

R228

(N.D. Tex. July 2, 2012) (emphasis in original). That is simply not the case here. Further, Judge Boyle was not bound by Texas Courts' narrow interpretation of "arising out of" language.[1] Instead, she looked to a single decision out of the Northern District of Illinois as support, in which the Court stated that if the subject contract is "*clearly* a defense to a claim" – which there it was, since the court was reviewing a fraudulent inducement claim in which the contract at issue contained the representations at issue – then it may come within the scope of the forum-selection clause. *See Penn, L.L.C. v. New Edge Network, Inc.*, 03 C 5496, 2003 WL 22284207, at \*2 (N.D. Ill. Oct. 3, 2003) (emphasis added).

This Court, on the other hand, must look to Texas precedent to interpret "arise out of" as every Texas court has – narrowly. The SP Agreements are themselves the best evidence of how narrow "arise out of" is. As is well established, if "parties use different language in different parts of a contract, [courts] may ordinarily assume that they intended different things." *In re Wilmer Cutler Pickering Hale & Dorr LLP*, 05-08-01395-CV, 2008 WL 5413097, at \*4 (Tex. App.— Dallas Dec. 31, 2008, no pet.) (the court differentiated between the use of "arises out of or relates to" and "instituted under" in the same contract, resulting in a broad scope for the former and a narrow scope for the latter). In sections 7.01 and 7.02 of the SP Agreement, the parties chose the wording "arise out of or in connection with" when identifying what claims Excentus would have to identify. On the other hand, Section 8.06, which contains the forum-selection clause, brings

---

[1] *But see Pennzoil Exploration & Prod. Co. v. Ramco Energy, Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (noting that "courts distinguish 'narrow arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract"). While *Pennzoil* involves arbitration clauses, it is common for courts to refer to arbitration case law in forum-selection clause issues, and "the Supreme Court of the United States has stated that an arbitration agreement is a specialized kind of forum-selection clause." *See Rodriguez de Quijas v. Shearson/American Exp., Inc.,* 490 U.S. 477, 482–83 (1989). *See also In re AIU Ins. Co.*, 148 S.W.3d 109, 115 (Tex. 2004) (describing arbitration agreements "as another type of forum-selection clause" and stating that there is no meaningful distinction between a non-arbitration forum-selection clause and an arbitration clause); *Deep Water Slender Wells, Ltd. v. Shell Intern. Exploration & Prod., Inc.*, 234 S.W.3d 679, 693-94 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (the court refers to cases involving arbitration clauses in order to reach its conclusion).

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS**                                          **Page 4**
02708.403/4842-0322-0007

R229

within its scope only "any action arising out of this agreement." The change of wording between the two clauses shows that the parties intended to apply two different standards to the scope of each provision. Sections 7.01 and 7.02 both add "or in connection with" and thus have a much broader scope. The forum-selection clause purposefully eliminates this language and specifically only states "arising out of." *See Pinnacle Interior Elements, Ltd. v. Panalpina, Inc.*, No. CIV A 309-CV-0430-G, 2010 WL 445927, at *4 (N.D. Tex. Feb. 9, 2010) ("When the phrase 'in connection with' appears in a contract, it functions to expand the scope of the clause that it modifies to include anything that has a significant relationship to the subject matter of that clause").

In short, other than Judge Boyle's opinion (which relies on a Northern District of Illinois case), Giant Eagle identifies no binding Texas authority requiring this Court to enforce a forum-selection clause merely because Giant Eagle believes it may have some defense in the subject contract to one of the many issues presented in this case.

**B.** **Defendants Make Clear They Will Not Litigate This Case in Pittsburgh.**

After filing Mr. Perry's Response, Defendants served Mr. Perry with their responses to various requests for admission propounded by Mr. Perry, attached hereto as Exhibits 1-3. Mr. Perry sought to have Defendants either admit or deny whether they would consent to jurisdiction and venue in Pittsburgh, should this Court dismiss this action. Defendants' refused to even answer the question, instead levying numerous objections to every single request for admission. This evidences what Mr. Perry argues is the unjust and unreasonable result of enforcing the SP Agreements' forum-selection clause here: concurrent litigation addressing the same issues and parties will result in multiple forums. If this Court dismisses Mr. Perry's claims in this Court, Mr. Perry will have to litigate in Pittsburgh, but the remaining Defendants will not consent to

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS** **Page 5**
02708.403/4842-0322-0007

R230

litigating in Pittsburgh. The result will be highly wasteful, duplicative litigation with the potential for inconsistent results. This is the very outcome that courts seek to avoid.

## II. CONCLUSION.

Giant Eagle's asserted interpretation of the SP Agreements' forum-selection clauses stretches that language far beyond what Texas courts have held. Although Giant Eagle tries to avoid this Court's adjudication of Mr. Perry's claims on the merits by asserting both collateral estoppel and a forum-selection clause, Mr. Perry's claims arise from a fundamentally different set of facts than those in the prior, Excentus lawsuit. Further, under Texas law, the SP Agreements' narrow forum-selection clause does not encompass Mr. Perry's claims. The Court should deny Giant Eagle's motion to dismiss.

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS** **Page 6**
02708.403/4842-0322-0007

R231

Date: August 24, 2015

Respectfully submitted,

/s/Michael P. Lynn
Michael P. Lynn, P.C. (mlynn@lynnllp.com)
State Bar No. 12738500
Andrés Correa (acorrea@lynnllp.com)
State Bar No. 24076330
Andrew S. Hansbrough (ahansbrough@lynnllp.com)
State Bar No. 24094700
**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 Telephone
214-981-3839 Facsimile

**ATTORNEYS FOR PLAINTIFF
DICKSON PERRY**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served as shown below on counsel of record on August 24, 2015:

<u>*Via Email*</u>
Orrin L. Harrison III
(oharrison@ghjhlaw.com)
GRUBER HURST ELROD JOHANSEN HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and Daniel Shapira*

<u>*Via Email*</u>
Bernard Marcus (marcus@marcus-shapira.com)
Scott Livingston (livingston@marcus-shapira.com)
Jonathan Marcus (jmarcus@marcus-shapira.com)
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, PA 15219-6401
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and Daniel Shapira*

<u>*Via Email*</u>
Lisa S. Gallerano
(lgallerano@akingump.com)
Patrick O'Brien (pobrien@akingump.com)
AKIN GUMP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4624
*Attorneys for Defendant*
*Alliance Data Systems, Inc.*

<u>*Via Email*</u>
Ken Carroll (kcarroll@ccsb.com)
Byran Erman (berman@ccsb.com)
Sara Romine (sromine@ccsb.com)
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202-3767
*Attorneys for Defendants*
*Brandon Logsdon and Jim Mills*

<u>*Via Email*</u>
Robert B. Wagstaff (rwagstaff@mcmahonlawtx.com)
MCMAHON SUROVIK SUTTLE
P.O. Box 3679
Abilene, TX 79604
*Attorney for Defendants*
*Randy Nicholson and Auto-Glass Systems, Inc.*

*/s/ Andres Correa*
Andres Correa

4842-0322-0007, v. 1

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO GIANT EAGLE'S MOTION TO DISMISS**     **Page 8**
02708.403/4842-0322-0007

R233

# EXHIBIT 1

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| vs. | § § | |
| | § | DALLAS COUNTY, TEXAS |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | § § § § § § § § | |
| *Defendants,* | § | 68TH JUDICIAL DISTRICT |

### RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES

TO:    Plaintiff Dickson Perry, derivatively on behalf of Excentus Corporation, by and through his attorney of record, Andres Correa, Lynn Tillotson Pinker & Cox, LLP, 2100 Ross Avenue, Suite 2700, Dallas, Texas 75201.

Pursuant to Texas Rule of Civil Procedure 198, Defendants Brandon Logsdon and Jim Mills respond as follows to Plaintiff's First Requests for Admission Directed to Threshold Issues:

### OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.    Logsdon and Mills object to Instructions 1, 3, 4, 6, and 7 as inapplicable to the Requests for Admission actually served by Plaintiff. Those Instructions reference "these Interrogatories and . . . these Requests for Production," rather than "Requests for Admission." Instruction No. 1 purports to require delivery of "an original sworn and executed response." But the Texas Rules of Civil Procedure do not require a "sworn" response to Requests for Admission. Instruction No. 7 directs the delivery of "[a]ll responsive Electronically Stored

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss**    **Page 2**

R235

Information . . . so as to include all metadata." But no Electronically Stored Information is sought by the Requests.

2. Logsdon and Mills object to the Definitions set forth in Plaintiff's Requests for Admission that do not pertain to the Requests actually served. For example, Definitions 13, 15, 16, and 17 refer to entities or proceedings not addressed in the Requests, themselves. Definitions 18-27 refer to terms not found in any of the Requests. Logsdon and Mills object to those definitions to the extent they may be intended to expand the Requests actually served.

3. Logsdon and Mills object to Definition 2, regarding the terms "You" and "Your." Because the Requests were served jointly upon five Defendants, the definition is vague and ambiguous. It is unclear whether it is intended to apply to all of those five Defendants collectively, or to each served Defendant individually.

### RESPONSES TO INDIVIDUAL REQUESTS FOR ADMISSION

**Request for Admission No. 1**: Admit that you would consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**    **PAGE 2**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss**    **Page 3**

R236

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 2 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 2**: Admit that you would not consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 1 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 3**: Admit that you would oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig.

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**                    **PAGE 3**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**                    **Page 4**
**in Opposition to Giant Eagle's Motion to Dismiss**

R237

proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 4 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 4**: Admit that you would not oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES** **PAGE 4**

Exhibits to Plaintiff Dickson Perry's Supplemental Brief **Page 5** in Opposition to Giant Eagle's Motion to Dismiss

R238

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 3 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 5**: Admit that the courts of Pennsylvania would have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 6 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 6**: Admit that the courts of Pennsylvania would not have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES** **PAGE 5**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief** **Page 6**
**in Opposition to Giant Eagle's Motion to Dismiss**

R239

litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 5 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 7**: Admit that you would oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 8 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**     **PAGE 6**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss**     **Page 7**

R240

**Request for Admission No. 8**: Admit that you would not oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 7 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 9**: Admit that you would consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES** **PAGE 7**

Exhibits to Plaintiff Dickson Perry's Supplemental Brief **Page 8**
in Opposition to Giant Eagle's Motion to Dismiss

R241

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 10 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 10**: Admit that you would not consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to

RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES          PAGE 8

Exhibits to Plaintiff Dickson Perry's Supplemental Brief                    Page 9
 in Opposition to Giant Eagle's Motion to Dismiss

R242

litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 9 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 11**: Admit that venue would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 12 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**                    **PAGE 9**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief                    Page 10 in Opposition to Giant Eagle's Motion to Dismiss**

R243

**Request for Admission No. 12**: Admit that venue would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Response on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 11 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 13**: Admit that you would oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES          PAGE 10**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief                    Page 11
in Opposition to Giant Eagle's Motion to Dismiss**

R244

irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 14 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 14**: Admit that you would not oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 13 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**      **PAGE 11**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**      **Page 12**
**in Opposition to Giant Eagle's Motion to Dismiss**

R245

**Request for Admission No. 15**: Admit that you would consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 16 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 16**: Admit that you would not consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

RESPONSE: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**                    **PAGE 12**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief                    Page 13 in Opposition to Giant Eagle's Motion to Dismiss**

R246

irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 15 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 17**: Admit that that the forum would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 18 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 18**: Admit that the forum would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**          **PAGE 13**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**          **Page 14**
**in Opposition to Giant Eagle's Motion to Dismiss**

R247

another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 17 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admission No. 19**: Admit that it would be inconvenient for you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE**: Logsdon and Mills object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**          **PAGE 14**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**          **Page 15**
**in Opposition to Giant Eagle's Motion to Dismiss**

R248

Respectfully submitted,

/s/ Ken Carroll
Ken Carroll
  Bar No. 03888500
  kcarroll@ccsb.com
Bryan Erman
  Bar No. 24040870
  berman@ccsb.com
Sara Romine
  Bar No. 24067488
  sromine@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202-3767
Telephone: 214-855-3000
Fax: 214-855-1333

***Attorneys for Defendants***
***Brandon Logsdon and Jim Mills***

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause, in accordance with Rule 21a, Texas Rules of Civil Procedure, on August 17, 2015.

/s/ Ken Carroll

**RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES**     **PAGE 15**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**     **Page 16**
**in Opposition to Giant Eagle's Motion to Dismiss**

R249

# EXHIBIT 2

| | | |
|---|---|---|
| **DICKSON PERRY, derivatively on behalf** | § | **IN THE DISTRICT COURT** |
| **of EXCENTUS CORPORATION,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **OF DALLAS COUNTY, TEXAS** |
| | § | |
| **EXCENTUS CORPORATION,** | § | |
| **BRANDON LOGSDON, JIM MILLS,** | § | |
| **GIANT EAGLE, INC., DAVID** | § | |
| **SHAPIRA,** | § | |
| **DANIEL SHAPIRA, AUTO-GAS** | § | |
| **SYSTEMS, INC., RANDY** | § | |
| **NICHOLSON,** | § | |
| **AND ADS ALLIANCE DATA** | § | |
| **SYSTEMS, INC.,** | § | |
| | § | |
| **Defendants.** | § | **68TH JUDICIAL DISTRICT** |

---

### DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S
### OBJECTIONS AND RESPONSES TO PLAINTIFF'S
### FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES

---

TO:   Plaintiff Dickson Perry, derivatively on behalf of Excentus Corporation, by and through his attorney of record, Andres Correa, Lynn Tillotson Pinker & Cox, LLP, 2100 Ross Avenue, Suite 2700, Dallas, Texas 75201.

Pursuant to the Texas Rules of Civil Procedure, Defendant ADS Alliance Data Systems,

Inc. ("ADS") hereby serves these Objections and Responses to Plaintiff's First Requests for

Admission Directed at Threshold Issues ("Requests").

---

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 1**

## PRELIMINARY OBJECTIONS

1.      ADS objects to Instructions 1, 3, 4, 6, and 7 as inapplicable to the Requests for Admission actually served by Plaintiff.  Those Instructions reference "these Interrogatories and ... these Requests for Production," rather than "Requests for Admission."  Instruction No. 1 purports to require delivery of "an original sworn and executed response."  But the Texas Rules of Civil Procedure do not require a "sworn" response to Requests for Admission.  Instruction No. 7 directs the delivery of "[a]ll responsive Electronically Stored Information ... so as to include all metadata."  But no Electronically Stored Information is responsive to or sought by the Requests.

2.      ADS objects to the Definitions set forth in Plaintiff's Requests for Admission that do not pertain to the Requests actually served.  For example, Definitions 13, 15, 16, and 17 refer to entities or proceedings not addressed in the Requests, themselves.  Definitions 18-27 refer to terms not found in any of the Requests.  ADS objects to those definitions to the extent they may be intended to expand the Requests actually served.

3.      ADS objects to Definition 2, regarding the terms "You" and "Your."  Because the Requests were served jointly upon five Defendants, the definition is vague and ambiguous.  It is unclear whether it is intended to apply to all of those five Defendants collectively, or to each served Defendant individually.

## OBJECTIONS AND RESPONSES TO INDIVIDUAL REQUEST FOR ADMISSIONS

**Request for Admissions No. 1:**      Admit that you would consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 2**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss**                    **Page 19**

R252

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 2 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 2:** Admit that you would not consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums.

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 3**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**            **Page 20**
**in Opposition to Giant Eagle's Motion to Dismiss**

R253

*See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 1 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 3:** Admit that you would oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 4 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 4**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss** **Page 21**

R254

**Request for Admissions No. 4:** Admit that you would not oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 3 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 5:** Admit that the courts of Pennsylvania would have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in

DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 5

Exhibits to Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss          **Page 22**

R255

Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 6 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(d) The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper, and ADS cannot admit or deny a legal conclusion as to whether a Pittsburgh, Pennsylvania court would have jurisdiction over it under the current circumstances.

**Request for Admissions No. 6:** Admit that the courts of Pennsylvania would not have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 5 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(d) The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper, and ADS cannot admit or deny a legal conclusion as to whether a Pittsburgh, Pennsylvania court would have jurisdiction over it under the current circumstances.

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 6**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**      **Page 23**
**in Opposition to Giant Eagle's Motion to Dismiss**

R256

**Request for Admissions No. 7:**     Admit that you would oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 8 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 8:**     Admit that you would not oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig.

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 7**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**                     **Page 24**
**in Opposition to Giant Eagle's Motion to Dismiss**

R257

proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 7 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 9:**     Admit that you would consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 8**

enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 10 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.)

**Request for Admissions No. 10:** Admit that you would not consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 9**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**      **Page 26**
**in Opposition to Giant Eagle's Motion to Dismiss**

R259

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 9 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 11:**     Admit that venue would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 12 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(e)  The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper, and ADS cannot admit or

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 10**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**                              **Page 27**
**in Opposition to Giant Eagle's Motion to Dismiss**

R260

deny a legal conclusion as to whether venue would be proper in Pittsburgh, Pennsylvania under the current circumstances.

**Request for Admissions No. 12:**     Admit that venue would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 11 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(e)  The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper, and ADS cannot admit or deny a legal conclusion as to whether venue would be proper in Pittsburgh, Pennsylvania under the current circumstances.

**Request for Admissions No. 13:**     Admit that you would oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 11**

Exhibits to Plaintiff Dickson Perry's Supplemental Brief                    **Page 28**
in Opposition to Giant Eagle's Motion to Dismiss

R261

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 14 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 14:**     Admit that you would not oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 12**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**      **Page 29**
**in Opposition to Giant Eagle's Motion to Dismiss**

R262

would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 13 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 15:**     Admit that you would consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 16 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 13**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief                                    Page 30
  in Opposition to Giant Eagle's Motion to Dismiss**

R263

**Request for Admissions No. 16:**    Admit that you would not consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, TEX. R. CIV. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 15 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Request for Admissions No. 17:**    Admit that that the forum would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 14**

Exhibits to Plaintiff Dickson Perry's Supplemental Brief
in Opposition to Giant Eagle's Motion to Dismiss                               **Page 31**

R264

Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 18 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(d) The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper and ADS cannot admit or deny a legal conclusion as to whether the forum would be proper in Pittsburgh, Pennsylvania under the current circumstances.

**Request for Admissions No. 18:** Admit that the forum would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** ADS incorporates its Preliminary Objections as if set forth herein. ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 17 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

(d) The Request seeks the admission of a legal conclusion that is dependent on the circumstances of the case, which is not only premature but improper, and ADS cannot admit or deny a legal conclusion as to whether the forum would be proper in Pittsburgh, Pennsylvania under the current circumstances.

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 15**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief** **Page 32**
**in Opposition to Giant Eagle's Motion to Dismiss**

R265

**Request for Admissions No. 19:**     Admit that it would be inconvenient for you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**  ADS incorporates its Preliminary Objections as if set forth herein.  ADS further objects to this Request as follows:

(a) The Request seeks information that is irrelevant, immaterial, and unlikely to lead to the discovery of admissible evidence. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 16**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**          **Page 33**
**in Opposition to Giant Eagle's Motion to Dismiss**

R266

Date: August 17, 2015                    Respectfully submitted,

/s/ Patrick G. O'Brien

Lisa S. Gallerano
State Bar No. 07589500
lgallerano@akingump.com
Patrick G. O'Brien
State Bar No. 24046541
pobrien@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Ave., Suite 4100
Dallas, Texas 75201
214-969-2800 Telephone
214-969-4343 Facsimile

**ATTORNEYS FOR DEFENDANT**
**ADS ALLIANCE DATA SYSTEMS, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause, in accordance with Rule 21a, Texas Rules of Civil Procedure, on August 17, 2015.

/s/Patrick G. O'Brien

**DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 17**

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**                    **Page 34**
**in Opposition to Giant Eagle's Motion to Dismiss**

R267

# EXHIBIT 3

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**      **Page 35**
**in Opposition to Giant Eagle's Motion to Dismiss**

R268

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE 68TH DISTRICT COURT |
| *Plaintiff,* | § § § | |
| VS. | § § | OF |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC. | § § § § § § § § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## DEFENDANTS AUTO-GAS SYSTEMS, INC'S AND RANDY NICHOLSON'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS DIRECTED AT THRESHOLD ISSUES

TO:   Plaintiff Dickson Perry, derivatively on behalf of Excentus Corporation, by and through his attorneys of record, Michael P. Lynn, P.C., Jeremy A. Fielding, and Andrés Correa, Lynn Tillotson Pinker & Cox, LLP, 2100 Ross Ave., Ste. 2700, Dallas, TX 5201.

NOW COME Auto-Gas Systems, Inc. and Randy Nicholson, two of the Defendants in the above numbered and entitled cause, and respond and object to Plaintiff's First Request for Admissions Directed at Threshold Issues to the Defendants. The responses and objections are as follows:

### OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     Auto-Gas Systems and Nicholson object to Instructions 1, 3, 4, 6, and 7 as inapplicable to the Requests for Admission actually served by Plaintiff. Those Instructions reference "these Interrogatories and . . . these Requests for Production," rather than "Requests for Admission." Instruction No. 1 purports to require delivery of "an original sworn and executed response." But the Texas Rules of Civil Procedure do not require a "sworn" response to Requests for Admission. Instruction No. 7 directs the delivery of "[a]ll responsive Electronically Stored Information . . . so as to include all metadata." But no Electronically Stored Information is sought by the Requests.

2.     Auto-Gas Systems and Nicholson object to the Definitions set forth in Plaintiff's Requests for Admission that do not pertain to the Requests actually served. For example, Definitions 13, 15, 16, and 17 refer to entities or proceedings not addressed in

---

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 1 of 17

the Requests, themselves. Definitions 18-27 refer to terms not found in any of the Requests. Auto-Gas Systems and Nicholson object to those definitions to the extent they may be intended to expand the Requests actually served.

3. Auto-Gas Systems and Nicholson object to Definition 2, regarding the terms "You" and "Your." Because the Requests were served jointly upon five Defendants, the definition is vague and ambiguous. It is unclear whether it is intended to apply to all of those five Defendants collectively, or to each served Defendant individually.

<u>REQUESTS FOR ADMISSONS</u>

<u>REQUEST NO. 1:</u>    Admit that you would consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

<u>RESPONSE:</u>    Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 2 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**                        **Page 37**
**in Opposition to Giant Eagle's Motion to Dismiss**

R270

**REQUEST NO. 2:** Admit that you would not consent to the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 1 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 3:** Admit that you would oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 3 of 17

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 4 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 4:** Admit that you would not oppose the assertion of jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 4 of 17

claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 3 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 5:**   Admit that the courts of Pennsylvania would have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**   Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 6 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 6:**   Admit that the courts of Pennsylvania would not have jurisdiction over you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 5 of 17

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**   **Page 40**
**in Opposition to Giant Eagle's Motion to Dismiss**

R273

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 5 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 7:** Admit that you would oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 6 of 17

would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 8 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 8:**   Admit that you would not oppose venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**   Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 7 of 17

2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 7 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 9:**    Admit that you would consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**    Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 8 of 17

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(e) The Request is the mirror image of Request 10 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 10:** Admit that you would not consent to venue if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 9 of 17

(e) The Request is the mirror image of Request 9 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).


**REQUEST NO. 11:** Admit that venue would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 12 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).


**REQUEST NO. 12:** Admit that venue would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 10 of 17

**RESPONSE:**     Auto-Gas Systems and Nicholson object to this Response on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request improperly applies the term "venue" to a court in Pennsylvania. *See In re Brown*, 441 S.W.3d 405, 408 (Tex. App.—Dallas 2013, orig. proceeding) ("[F]orum and venue have distinct legal meanings. A forum-selection agreement is one that chooses another state or sovereign as the location for trial, whereas a venue-selection agreement chooses a particular county or court within that state or sovereign.").

(d) The Request is the mirror image of Request 11 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 13:** Admit that you would oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:**     Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief**        **Page 46**
**in Opposition to Giant Eagle's Motion to Dismiss**

R279

Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 14 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 14:** Admit that you would not oppose the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 12 of 17

2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 13 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 15:** Admit that you would consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 16 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 13 of 17

**REQUEST NO. 16:** Admit that you would not consent to the forum if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks disclosure of Defendants' litigation strategy, which is protected from disclosure by the work product doctrine, Tex. R. Civ. P. 192.5. *See In re Culp*, No. 09-10-00308-CV, 2010 Tex. App. LEXIS 6702, *6-7 (Tex. App.—Beaumont July 16, 2010, orig. proceeding); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 150 (Tex. App.—Ft. Worth 2002, orig. proceeding).

(b) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(c) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(d) The Request is the mirror image of Request 15 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 17:** Admit that the forum would be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 14 of 17

Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 18 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

**REQUEST NO. 18:** Admit that the forum would not be proper if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

(c) The Request is the mirror image of Request 17 and is therefore improper. *See CEBI Metal Sanayi Ve Ticaret A.S. v. Garcia*, 108 S.W.3d 464, 466 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 15 of 17

**REQUEST NO. 19:** Admit that it would be inconvenient for you if this Lawsuit were brought in a court in Pittsburgh, Pennsylvania.

**RESPONSE:** Auto-Gas Systems and Nicholson object to this Request on the following grounds:

(a) The Request seeks information that is irrelevant and immaterial. The information sought has no bearing whatsoever on the merits of this Lawsuit. Defendant Giant Eagle, Inc. seeks to enforce a contractual forum-selection clause, as previously enforced by the decision of another court. *See generally* Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause. But it is irrelevant and immaterial to the enforcement of that forum-selection clause, and the application of the prior judgment enforcing that clause, (i) whether any party not a signatory to that forum-selection clause is within or would consent to the jurisdiction of a court in Pittsburgh, Pennsylvania, (ii) whether a court in Pittsburgh would be a proper or convenient venue or forum with respect to such party, or (iii) whether enforcement of that clause might require Plaintiff to litigate his claims in two forums. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009); *In re FC Stone, LLC*, 348 S.W.3d 548, 552 (Tex. App.—Dallas 2011, orig. proceeding).

(b) The Request is premature. It addresses a circumstance that *might* arise in the future, rather than facts or circumstances already in existence.

Respectfully submitted,

MCMAHON SUROVIK SUTTLE
P.O. Box 3679
Abilene, Texas 79604
(325) 676-9183 Telephone
(325) 676-8836 FAX

BY: _Robert B. Wagstaff /VCv_
Robert B. Wagstaff
State Bar No. 20665000
rwagstaff@mcmahonlawtx.com

ATTORNEYS FOR DEFENDANTS
RANDY NICHOLSON and AUTO-GAS
SYSTEMS, INC.

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 16 of 17

**Exhibits to Plaintiff Dickson Perry's Supplemental Brief
in Opposition to Giant Eagle's Motion to Dismiss**

**Page 51**

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the above and foregoing instrument was forwarded to all attorneys of record on this 14th day of August, 2015, in accordance with the Texas Rules of Civil Procedure.

_Robert B. Wagstaff / VCa_
ROBERT B. WAGSTAFF

DEFENDANTS AUTO-GAS SYSTEMS, INC.'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

Page 17 of 17

# Tab E

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § § | |
| vs. | § § | |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | § § § § § § § § § | DALLAS COUNTY, TEXAS |
| *Defendants,* | § | 68TH JUDICIAL DISTRICT |

**DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE**

Defendant Giant Eagle, Inc. ("Giant Eagle") files this Reply to Plaintiff Dickson Perry's ("Perry") Response to Defendant Giant Eagle's Motion to Dismiss for Collateral Estoppel or, in the alternative, Pursuant to the Forum Selection Clause ("Motion").

This lawsuit is a continuation of Perry's long-running hostility toward Giant Eagle's representatives on the Excentus Board of Directors, positions Giant Eagle obtained in exchange for a significant investment in Excentus through the Stock Purchase Agreements ("SP Agreements"). Try as he might, Perry cannot plead around these SP Agreements and the forum selection clauses therein which, in the end, provide a complete defense to the claims against Giant Eagle. As Judge Boyle's initial ruling reflects, the SP Agreements are at the heart of and define the relationship between Excentus and Giant Eagle. *See Excentus Corp. v. Giant Eagle, Inc.*, 3:11-cv-03331, 2012 WL 2525594 (N.D. Tex. July 2, 2012) (the "First Texas Case"). Indeed, after Excentus re-filed its lawsuit in Pennsylvania, another federal judge came to the

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE
A0946626.9/248593.docx

Page 1

same conclusion, enforcing the forum selection clause even though this decision required the parties to litigate in two separate forums. *See Excentus Corp. v. Giant Eagle, Inc.*, No. CIV.A. 13-178, 2014 WL 923520, at \*10 (W.D. Pa. Mar. 10, 2014) ("*Excentus II*") (attached as Exhibit 1). Giant Eagle files this Reply to address four arguments raised in Perry's Response.

## 1. The Issue of Whether the Forum Selection Clause Applies was Already Litigated and Decided in the First Texas Case

The court in the First Texas Case held that the forum selection clause in the SP Agreements between Giant Eagle and Excentus applies when, as in this case, those Agreements are raised as a defense. Judge Boyle's holding was crystal clear: even if the claims asserted do not rely on the SP Agreements, the forum selection clause applies so long as the responding party is relying on them as a defense. *Excentus*, 2012 WL 2525594, at \*4 ("[T]he Court must look to the Stock Purchase Agreements to determine whether Giant Eagle's defenses are valid, and therefore the forum selection clauses contained in them are applicable. Excentus' claims do not rely on the Stock Purchase Agreements, but resolution of these claims clearly requires the Court to construe the Stock Purchase Agreements, given Giant Eagle's reliance on the Agreements as a defense.").

Here, Giant Eagle relies on collateral estoppel because the issue decided by Judge Boyle in the First Texas Case – the applicability of the forum selection clause when the SP Agreements are raised as a defense – is precisely the issue now before this Court. The SP Agreements provide Giant Eagle with a complete defense to Perry's claims, and a court will have to construe the Agreements to determine the validity of that defense. As Judge Boyle already determined in the First Texas Case, this triggers the application of the forum selection clause.

Whether the conduct described in the Petition occurred before or after Judge Boyle's opinion is wholly irrelevant to this issue. Collateral estoppel, also known as issue preclusion,

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE
A0946626.9/248593.docx

Page 2

R287

prevents the re-litigation of *issues* that have already been decided. Perry's Response brief focuses on the timing of the alleged conduct, thereby confusing collateral estoppel with "claim preclusion" or *res judicata*, which precludes a party from asserting claims that were or could have been brought in prior litigation. Giant Eagle's Motion, however, does not seek to bar any claims on *res judicata* grounds. Rather, Giant Eagle argues that Perry is *collaterally estopped* from bringing these claims against Giant Eagle *in Texas* because Judge Boyle already decided that Texas is not a proper forum due to the governing forum selection clause in the SP Agreements. Pursuant to Judge Boyle's holding, the mandatory forum selection clause applies and this suit against Giant Eagle and the Shapiras must be brought in Pittsburgh, Pennsylvania. This issue cannot be re-litigated.

In addition to distorting the straightforward issue presently before the Court, Perry's Response asserts many of the exact same arguments that Judge Boyle rejected in the First Texas Case. For example, Perry's Response purports to define the meaning of "arise out of" and argues that the forum selection clause does not apply because his claims do not "arise out of" the SP Agreements. (*See* Response at 12-14). In the First Texas Case, Excentus made precisely the same argument, *see Excentus*, 2012 WL 2525594 at *8 ("Excentus argues that its tort claims fall outside the scope of the forum selection clauses because … none of the elements of its claims 'arise out of' the Stock Purchase Agreements."), and it cannot be re-litigated here. Judge Boyle held that the forum selection clause applies when the SP Agreements are raised as a defense to the claims asserted, regardless of whether or not, as Perry argues, the SP Agreements are the "source of the right that Perry seeks to vindicate." (Response at 13).

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE    Page 3
A0946626.9/248593.docx

R288

## 2. Perry's Petition Directly Implicates and Requires an Analysis of the Parties' Rights Under the SP Agreements

Perry alleges that "the nucleus" of this lawsuit involves a settlement agreement that resolved the parties' underlying litigation, and reaffirmed Giant Eagle's and Excentus' respective rights under the SP Agreements. (*See* Response at p. 4, ¶ 6). Perry's Petition seeks to rescind the Settlement Agreement on the grounds that it was a "sham." First Am. Pet. at ¶ 60.

Of course, to determine whether the Settlement Agreement is a "sham," a Court would have to engage in a fairness analysis by considering the merits of the underlying litigation that was resolved by that agreement. After all, if Giant Eagle and the Shapiras are correct about the parties' respective rights under those Agreements (and they are), then the Settlement Agreement is not a "sham." There is simply no way to analyze whether the Settlement Agreement is a "sham" without analyzing the parties' rights under the SP Agreements. Thus, we are right back where we started – construing the SP Agreements to determine the parties' respective rights thereunder, which brings the present case squarely within Judge Boyle's opinion. To allow re-litigation of the parties' rights under the SP Agreements in a Texas court when a federal court has already held that Texas is the wrong forum for such litigation would be a blatant end run around of the SP Agreements and a direct violation of the principles of collateral estoppel.[1]

---

[1] For some reason, Perry attempts to portray Giant Eagle as seeking to "transform Mr. Perry's pleading into a patent infringement claim." (*See* Response at 12). This is not at all what Giant Eagle is arguing. Whether these are "patent infringement" claims or something else is not relevant; all that is relevant is that the SP Agreements provide Giant Eagle with a *defense* to the claims asserted. Along these lines, paragraphs 15-17 of the Response attempt to portray Judge Boyle's opinion as being entirely reliant on the fact that there were patent infringement claims at issue. Nothing about Judge Boyle's opinion, however, was dependent on Excentus bringing "patent infringement" claims; rather, the determinative factor was that the court had to construe the SP Agreements to assess Giant Eagle's *defenses*. Indeed the very sentence that Perry deceptively excerpts makes clear that the opinion is not limited to, or reliant upon, there being a claim for patent infringement. *Excentus*, 2012 WL 2525594, at *4 ("Without deciding whether the Stock Purchase Agreements do in fact grant Giant Eagle a license to Excentus' patents and are a defense to the breach of duty of loyalty and unfair completion claims, Giant Eagle's defense requires the Court to interpret the Stock Purchase Agreements.") (emphasis added).

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE Page 4
A0946626.9/248593.docx

R289

### 3. Collateral Estoppel Applies Regardless of Whether Perry was a Named Party in the First Texas Case

This case is a derivative action brought by Perry, an Excentus shareholder, on behalf of Excentus. *See, e.g.*, First Am. Pet. at 1 ("Plaintiff Dickson Perry, ***derivatively on behalf of Excentus***, files his First Amended Petition …"). Perry is suing to enforce Excentus' rights. He is alleging that Giant Eagle and the Shapiras breached their fiduciary duties to Excentus and engaged in unfair competition with Excentus. He is claiming that these actions harmed Excentus. He is seeking recovery for Excentus. *See* First Am. Pet. at ¶¶ 69, 72, 76, 79 ("Excentus is entitled to injunctive relief, actual damages, and punitive damages"); *id.* at p. 26, #1 (requesting "a judgment for Plaintiff on behalf of Excentus…"). He is not asserting any claims in his personal capacity. Thus, both the First Texas Case (brought by Excentus) and the present case (brought derivatively on behalf of Excentus) purport to represent the interests of Excentus shareholders against Giant Eagle and the Shapiras. The privity element of collateral estoppel is satisfied. (*See* Motion at 15-16).

To muddle this straightforward analysis, Perry makes vague references to potentially seeking personal recovery and ruminates that he "may need to request" that the court treat this as a direct action under TEX. BUS. ORG. CODE § 21.563(c). To Perry, the mere possibility that he *may* make such a request means that "this case should stay in Texas." (*See* Response at 8-9). Perry's argument – aside from having no relationship to the lawsuit he actually filed – is wrong and has no bearing on the collateral estoppel analysis.

The possibility that Perry *may*, at some unspecified future time, request that any potential future damages be paid to him directly rather than to other shareholders does not make this case anything other than a derivative action. Such a request (even if granted) would not affect anything about this case other than who ultimately receives any recovery. *Swank v.*

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL
ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE    Page 5
A0946626.9/248593.docx

R290

*Cunningham*, 258 S.W.3d 647, 665 (Tex. App. 2008) ("A trial court's decision to treat an action as a direct action under Section 21.563(c) so as to allow recovery to be paid directly to a shareholder plaintiff, as opposed to the corporation, does not mean that the action is no longer a derivative proceeding."). Regardless of who ultimately recovers damages, the claims Perry asserts are still Excentus' claims and the alleged wrong was done to Excentus. A forum selection clause in a contract with a third party does not disappear just because a lawsuit is initiated derivatively by a disgruntled shareholder.[2] Perry's contemplation about his future litigation strategy cannot change the fact that Excentus is bound by the SP Agreements, and those Agreements apply to this case.

**4. The Interests of Justice Strongly Favor Enforcement of the Forum Selection Clause**

Perry argues that enforcement of the forum selection clause would be "manifestly unjust" to him because he could not have foreseen that the SP Agreements would require him "to litigate any personal claims" in Pittsburgh, and re-filing in Pittsburgh would be a "an immense burden upon [his] time and resources." (Perry Aff. at ¶ 11). Perry's last minute attempt to introduce new facts should have no impact on the purely legal issue before the court; namely, the preclusive effect of Judge Boyle's opinion.

Perry's assertion that he could not have foreseen having to sue Giant Eagle personally in Pittsburgh is not relevant to this lawsuit. Perry is <u>not</u> seeking to litigate personal claims against Giant Eagle and he is not suing in his personal capacity. He is bringing derivative claims on

---

[2] Perry also asserts that he is not bound by Judge Boyle's decision because he is not a signatory to the SP Agreements. (*See* Response at 14). Judge Boyle's opinion actually addresses this issue as well. Judge Boyle held that the Shapiras – who were not signatories to the SP Agreements – could invoke the forum selection clause "given the relatedness of the Shapiras to the dispute between Excentus and Giant Eagle." *Excentus*, at *4 n.10. *See also Excel Mktg. Solutions, Inc. v. Direct Fin. Solutions LLC*, 2011 WL 1833022, at *6 (N.D. Tex. May 13, 2011) ("A non-party can be bound to a forum selection clause if the nonparty is closely related to the dispute such that it becomes foreseeable that it will be bound."). That same logic applies to Perry – not only did he sign the SP Agreements on behalf of Excentus, but the Petition chronicles how closely related and inextricably linked he was to Excentus as its founder, CEO, and Chairman of its Board of Directors. As such, he is bound by the Agreements.

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE Page 6
A0946626.9/248593.docx

R291

behalf of Excentus to enforce Excentus' rights and to remedy alleged wrongs that the Defendants allegedly inflicted upon Excentus. It was undoubtedly foreseeable to Excentus – and certainly to Perry, who signed the SP Agreements on behalf of Excentus – that if Excentus chose to sue Giant Eagle to enforce Excentus' rights, it would have do to so in Pittsburgh. As Judge Boyle found, this was the essence of the parties' bargain with respect to the forum selection clause, and it should be honored. *Excentus*, 2012 WL 2525594 at *3; *see also Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 583 (2013) ("When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place. In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain."); *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 675 (Tex. 2009) ("Forum-selection clauses are generally enforceable, and a party attempting to show that such a clause should not be enforced bears a heavy burden.").

Perry argues now that it would be "wholly contrary to one of the very aims of forum selection clauses" if he had to sue Giant Eagle in Pennsylvania while also pursuing an arbitration in Texas and civil litigation against the remaining defendants in this case. (Response at 17). Even putting aside the fact that Perry initiated all of this litigation and cannot now complain that it is too much to bear, any inconvenience that results from enforcement of the forum selection clause is by design, as Excentus and Giant Eagle bargained for this mutually inconvenient forum selection clause precisely to discourage lawsuits like this one. The purpose of the forum selection clause was readily apparent to Judge Boyle when she applied it to Excentus in the First

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE    Page 7
A0946626.9/248593.docx

R292

Texas Case. *See Excentus*, 2012 WL 2525594 at \*3 ("[T]he Court finds that it is neither unfair nor unreasonable to require the party initiating litigation to sue in the county of the respondent, as agreed to by the parties, ***which evidences' the parties' apparent desire to discourage litigation***.") (emphasis added); *see also Abbott Labs v. Takeda Pharm. Co.*, 476 F.3d 421, 422 (7th Cir. 2007) ("The purpose of specifying two forums in this way is to discourage either side from instituting litigation, because whoever sues must litigate on the other party's turf.").

In addition, Excentus itself enforced the forum selection clause against Giant Eagle *precisely to achieve the multi-forum litigation* Perry now claims would be "wholly contrary" to the purpose of the clause. After the First Texas Case was dismissed, Excentus re-filed against Giant Eagle in the Western District of Pennsylvania. Giant Eagle asserted counterclaims against Excentus, and Excentus moved to dismiss Giant Eagle's counterclaims on the grounds that the forum selection clause required that Giant Eagle's counterclaims be brought in Texas. The court *agreed* with Excentus' position and, accordingly, severed Giant Eagle's claims and transferred them to Texas. *Excentus II*, 2014 WL 923520, at \*10 ("it is appropriate for a court to sever claims subject to a valid forum selection clause"). The court held that the forum selection clause permits litigation involving overlapping issues to take place in multiple venues despite potential concerns about judicial economy and efficiency. *Excentus II*, 2014 WL 923520, at \*10 (holding that severance is appropriate "even where a party opposing the severance argues … that severance would be a waste of judicial resources, and severance would severely prejudice them.") (quotations and alterations omitted). The end result was that related litigation proceeded in two separate forums – Excentus pursued its claims against Giant Eagle in Pennsylvania, and Giant Eagle pursued its claims against Excentus in Texas.

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE     Page 8
A0946626.9/248593.docx

R293

Ultimately, two separate federal courts have strictly enforced the forum selection and have found that any inconvenience arising from its enforcement is irrelevant because that is exactly what Giant Eagle and Excentus intended. *Excentus*, 2012 WL 2525594, at *3; *Excentus II*, 2014 WL 923520, at *10. *See also Atl. Marine*, 134 S. Ct. at 82 ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation"). Giant Eagle and Excentus each bargained for the mutually inconvenient forum selection clause and each has enforced it. A shareholder cannot bring a derivative action on behalf of a corporation and then pick and choose which corporate agreements should apply based on which ones better accommodate the shareholder's other lawsuits.

## CONCLUSION

For the reasons stated above, Giant Eagle respectfully requests that this Court GRANT its Motion to Dismiss.

Respectfully Submitted,

*/s/ Orrin L. Harrison III*

Orrin L. Harrison III
  Bar No. 09130700
  oharrison@ghetrial.com
GRUBER HURST ELROD JOHANSEN
HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6828
Fax: 214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE    Page 9
A0946626.9/248593.docx

R294

Jonathan Marcus
  jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone:  412-338-5200
Fax: 412-391-8758

***Attorneys for Giant Eagle, Inc., David Shapira, and Daniel Shapira***

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause via electronic filing and certified mail return receipt requested, in accordance with Rule 21a, Texas Rules of Civil Procedure, on August 19, 2015.


    */s/ Orrin L. Harrison III*
Orrin L. Harrison III

DEFENDANT GIANT EAGLE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR COLLATERAL ESTOPPEL OR, IN THE ALTERNATIVE, PURSUANT TO THE GOVERNING FORUM SELECTION CLAUSE     Page 10
A0946626.9/248593.docx

R295

# Exhibit 1

2014 WL 923520
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

EXCENTUS CORPORATION, Plaintiff,

v.

GIANT EAGLE, INC., David Shapira,
Daniel Shapira, Defendants.

Civil Action No. 13–178.
| Signed March 10, 2014.

**Attorneys and Law Firms**

Jeremy A. Mercer, Fulbright & Jaworski LLP, Canonsburg, PA, Brett C. Govett, Gita Srivastava, Karl G. Dial, Michael B. Regitz, Fulbright & Jaworski L.L.P. Dallas, TX, for Plaintiff.

Mark A. Willard, Eckert, Seamans, Cherin & Mellott, Bernard D. Marcus, Jonathan D. Marcus, Scott D. Livingston, Marcus & Shapira, Pittsburgh, PA, for Defendants.

## *OPINION*

JOY FLOWERS CONTI, Chief Judge.

### I. Introduction

**\*1** On November 26, 2013, the court denied the Motion for Leave to File Answer to Plaintiff's Amended Complaint and Amended Counterclaims (the "motion for leave to amend") (EC F No. 106) filed by defendant and counterclaim plaintiff Giant Eagle, Inc. ("Giant Eagle"). (ECF Nos. 125, 126.)In the motion for leave to amend, Giant Eagle sought leave of court to add a declaratory judgment action to its counterclaims seeking a declaration that, pursuant to stock purchase agreements entered into between Giant Eagle and plaintiff Excentus Corporation ("Excentus"), Excentus is required to obtain Giant Eagle's consent prior to exercising its option under a stock repurchase agreement between Excentus and Alliance Data Systems, Inc. ("ADS"). At a hearing on November 25, 2013, the court determined that permitting Giant Eagle leave to amend would be futile because this court was not the proper forum for Giant Eagle's declaratory judgment action pursuant to the forum selection clause contained in the stock purchase agreements. On November 26, 2013, the court issued an opinion and order denying Giant Eagle's motion for leave to amend. (ECF Nos. 125, 126.)

On December 2, 2013, Giant Eagle filed a motion for reconsideration of the court's decision denying its motion for leave to amend and a brief in support of the motion. (ECF Nos. 129, 130.)On December 3, 2013, Excentus filed a response in opposition to Giant Eagle's motion for reconsideration, and a brief in support of the response. (ECF Nos. 131, 132.)On December 12, 2013, the court issued a memorandum opinion and order granting Giant Eagle's motion for reconsideration. The court reasoned that its decision denying Giant Eagle's motion for leave to amend required reconsideration to "correct a clear error of law" in light of the Supreme Court's decision in *Atlantic Marine Construction Company, Inc. v. United States District Court for the Western District of Texas,* —— U.S. ——, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013); *Waye v. First Citizen's Nat'l Bank,* 846 F.Supp. 310, 313–14 (M.D.Pa.1994), aff'd, 31 F.3d 1175 (3d Cir.1994) (motion to reconsider "must rely on at least one of three grounds: 1) an intervening change in controlling law, 2) the availability of new evidence not previously available, or 3) the need to correct a clear error of law or prevent manifest injustice."). In denying Giant Eagle's motion for leave to amend, the court held granting Giant Eagle leave to amend would be futile under Federal Rule of Civil Procedure 12(b)(3) because this court is not the proper forum for Giant Eagle's proposed counterclaim. In the memorandum opinion granting Giant Eagle reconsideration of that decision, the court recognized that under *Atlantic Marine,* a forum selection clause does not render an otherwise proper venue improper. The Court in *Atlantic Marine* held:

> Section 1404(a) and Rule 12(b)(3) allow dismissal only when venue is "wrong or improper." Whether venue is "wrong" or "improper" depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause.
>
> ...

**\*2** Whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b). As a result, a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3). *Atlantic Marine,* 134 S.Ct. at 577. The court in this case reasoned that because there was no dispute that this court is a proper venue for Giant Eagle's proposed counterclaim

under 28 U.S.C. § 1391, the court erred under *Atlantic Marine* when it denied Giant Eagle's motion for leave to amend based upon this court being the "wrong" or "improper" forum for the counterclaim. The court granted Giant Eagle's motion for reconsideration on that basis.

The court noted, however, that Excentus was not without redress to enforce an otherwise valid forum selection clause entered into by the parties. As the Supreme Court held, "a forum-selection clause may be enforced by a motion to transfer under § 1404(a)."*Atlantic Marine,* 134 S.Ct. at 575. Section 1404(a) provides:

> (a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a). The Supreme Court instructed that "[w]hen a defendant files [a motion to transfer venue to enforce a forum selection clause] ... a district court should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer."*Atlantic Marine,* 134 S.Ct. at 575.

On January 2, 2014, Excentus filed a motion to sever and transfer Giant Eagle's counterclaims and brief in support of the motion. (ECF Nos. 147, 148.)Excentus' motion to sever and transfer is not limited to the proposed counterclaim in issue in the motion for leave to amend; Excentus requests the following counterclaims be severed and transferred to the United States District Court of the Northern District of Texas, Dallas Division:

- •Counterclaim VI–Breach of Section 8.07 of the stock purchase agreements

- Counterclaim VII–Recovery of Attorney's Fees Under Texas Code

- Counterclaim VIII–Breach of Section 7.01 of the stock purchase agreements

- Counterclaim IX–Breach of Section 5.07 of the stock purchase agreements

- Counterclaim X–Breach of Section 3.09 of the stock purchase agreements; and

- Counterclaim XII–Declaratory Judgment Regarding Excentus' Breach of Section 5.02 of the stock purchase agreements

(ECF No. 145.) The foregoing counterclaims are counterclaims asserted by Giant Eagle that arise from the stock purchase agreements entered into by the parties. (*Id.*) On January 21, 2014, Giant Eagle filed a response in opposition to Excentus' motion to sever and transfer and a brief in support of the response. (ECF Nos. 161.)On February 21, 2014, Excentus with leave of court filed an unopposed motion for leave to file a reply brief to its motion to sever and transfer and attached the proposed reply brief to the motion. (ECF No. 164.) On February 18, 2014, Giant Eagle with leave of court filed a surreply brief to Excentus' motion to sever and transfer. (ECF No. 172.)

 **\*3** In its motion to sever and transfer, Excentus argues the six counterclaims listed above should be transferred to the United States District Court of the Northern District of Texas, Dallas Division U.S.C. § 1404(a). In the alternative, Excentus argues the court should dismiss those counterclaims for failing to state a claim upon which relief cam be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). According to Excentus, the Court in *Atlantic Marine* did not address or preclude the possibility that a forum selection clause may be enforced by a party filing a motion to dismiss under Rule 12(b)(6).

In its responsive submissions, Giant Eagle argues: Texas law controls the dispute between the parties and requires the counterclaims in this case to be tried in the Western District of Pennsylvania; 28 U.S.C. § 1404(a) does not apply to counterclaims; Federal Rule of Civil Procedure 21 with respect to severance weighs heavily against severance in this case; and the counterclaims in issue cannot be dismissed for failure to state a claim upon which relief can be granted. (ECF No. 161.)

The parties' arguments will be addressed below.

## II. Discussion

### A. The Forum Selection Clause
The forum selection clause in the stock purchase agreements provides:

> VENUE FOR ANY ACTION ARISING OUT OF THIS AGREEMENT SHALL RESIDE EXCLUSIVELY IN

**THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED.**

(ECF No. 28 at 51.) This court previously held that permissive and compulsory counterclaims may be subject to forum selection clauses, and under *Jonathan H. v. The Souderton Area School District,* 562 F.3d 527, 529–30 (3d Cir.2009), a decision cited by Giant Eagle, the phrase "any action arising" was broad enough under the common meaning of the word "action" to encompass the filing of a counterclaim. (ECF No. 125 at 5–7.) Giant Eagle does not reargue the first point, i.e., that permissive and compulsory counterclaims may be subject to forum selection clauses; instead, Giant Eagle reargues that "any action arising" means the filing of an entire lawsuit, and not the filing of counterclaims.

At the hearing on November 25, 2013, Giant Eagle argued that under *Jonathan H,* a decision by the Third Circuit Court of Appeals, "a Defendant or a respondent does not bring an action by asserting a counterclaim;" instead, an "action" means the entirety of a lawsuit. (H.T. 11/25/13 (ECF No. 127) at 13–14.) The court noted, however, that the issue in *Jonathan H* was the meaning of the phrase "bring an action" under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA"), rather than the common meaning of "an action." (*Id.* at 17, 21 .)The court in *Jonathan H* explained:

> The phrase "bring an action" is defined as "to sue; institute legal proceedings." Black's Law Dictionary (8th ed.2004). Therefore, an action is "brought" when a plaintiff files a complaint, which is the first step that invokes the judicial process. *See*Fed.R.Civ.P. 3 ("A civil action is commenced by filing a complaint with the court."); *id.*Advisory Committee Note ("The first step in an action is the filing of the complaint."). Unlike the proactive nature of a complaint, a counterclaim is reactive because it is filed only after the plaintiff has initiated the case by bringing a civil action. Indeed, a counterclaim is a "claim for relief asserted against an opposing party after an original claim has been made."Black's Law Dictionary 353 (8th ed.2004); *see also* 3 James Wm. Moore, et al., Moore's Federal Practice § 13.90(2)(a), at 13–79 (3d ed. 1997) ("Only defending parties may assert counterclaims."). Counterclaims are therefore "generally asserted in the answer" to a previously filed complaint. Moore, supra, § 13.92, at 13–88.

**\*4** *Jonathan H,* 562 F.3d at 529. With respect to the common meaning of the word "action," the court of appeals prior to analyzing the statutory language of the IDEA noted:

> The word "action," without more, is arguably broad enough to encompass any type of judicial proceeding, including counterclaims. *See United States v. P.F. Collier & Son Corp.,* 208 F.2d 936, 938 (7th Cir.1953) ("If the question were one of first impression, we would have no difficulty in reaching the conclusion that the words 'any action, suit or proceeding' are sufficiently broad in their ordinary and commonly accepted meaning to encompass every form and kind of litigation."); *see also* Black's Law Dictionary 28–29 (7th ed.1999) (defining an "action" as, inter alia, "[a] civil or criminal judicial proceeding"). Cf. U.C.C. § 1–201(1) (" 'Action' in the sense of a judicial proceeding, includes recoupment, counterclaim, set-off, suit in equity, and any other proceeding in which rights are determined.").

*Id.*The court based upon the foregoing, determined that based upon the common meaning of the word "action," the phrase "any action arising" is broad enough to include the filing of a counterclaim.

Giant Eagle in its response to Excentus' motion to sever and transfer argues that under Texas law, which is applicable in this case, "any action arising" means the initiation of the lawsuit. Giant Eagle sets forth three reasons to support this argument. First, Giant Eagle argues that the district court for the Northern District of Texas "already interpreted the forum selection clause ... as a provision intended solely to discourage the *initiation* of a lawsuit."(ECF No. 161 at 4 (citing *Excentus Corp. v. Giant Eagle, Inc.,* Civ. Action No. 11–3331, 2012 WL 2525594 (N.D.Tex. July 2, 2012).) Giant Eagle cites the following passage from the court's decision in support of its argument:

> [T]he Court finds that it is neither unfair nor unreasonable to require the party initiating litigation to sue in the county of the respondent, as agreed to by the parties, which evidences the parties' apparent desire to discourage litigation. *See Abbott Labs. v. Takeda Pharm. Co.,* 476 F.3d 421, 422 (7th Cir.2007) ("The purpose of specifying two forums in this way is to discourage either side from instituting litigation, because whoever sues must litigate on the other party's turf.")

*Id.* at \* 3. The issue before this court, i.e., the meaning of the phrase "any action arising" was not before the court in the Northern District of Texas; indeed, Excentus in that case did

not argue the forum selection clause was unenforceable. *Id.* ("Excentus does not argue that any of the foregoing factors render the forum clauses unreasonable, focusing instead on its contention that the forum selection clauses are inapplicable to its claims."). Excentus argued the forum selection clause was inapplicable to its claims. *Id.* Under those circumstances, the foregoing passage addressed an issue different from the issue before the court in this case.

 **\*5**  Giant Eagle argues this court-"as a matter of judicial comity"—should follow the court's decision in the Texas case. Giant Eagle cites *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162 (3d Cir.1982), in support of its judicial comity argument. In that decision, the court noted: " '[J]udges of co-ordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other.'"*Hayman,* 669 F.2d at 168–69 (quoting *TCF Film Corp. v. Gourley,* 240 F.2d 711, 713 (3d Cir.1957)). The court held that this rule "should similarly apply to the propriety of transfer orders between two courts" because "[a] disappointed litigant should not be given a second opportunity to litigate a matter that has been fully considered by a court of coordinate jurisdiction, absent unusual circumstances."*Hayman,* 669 F.2d at 169. As noted, the matter before this court was not litigated before the district court in Texas. This court is not, therefore, bound by dictum from the district court in Texas, which, in any event, does not squarely address whether "any action arising" includes a counterclaim filed by a defendant. In any event, Giant Eagle will not be precluded from raising any valid defense in this case based upon the provisions of the stock purchase agreements. This court will coordinate with the district court in the Northern District of Texas to facilitate a fair and prompt resolution of the disputes in both cases.

Giant Eagle's second reason the court should hold "any action arising" means the initiation of a lawsuit and not a counterclaim is that "Section 11.07 of the Shareholders Agreements provides, in pertinent part, '[v]enue for ***any action brought*** hereunder shall be proper exclusively in the county in which the respondent's principal offices are located."(ECF No. 161 at 6 (quoting ECF No. 162 at 15–16)) (emphasis in (ECF No. 161).) Exhibit E to the stock purchase agreements is a "Form of Shareholders Agreement." (ECF No. 28 at 55.) Section 2.01 of the stock purchase agreements provides that at

> [t]he closing of the transactions contemplated by this Agreement ... the Parties shall deliver or cause

to be delivered ... a Shareholders Agreement in the form attached hereto as Exhibit E (the **"Shareholders Agreement"** and together with the Registration Rights Agreement, the **"Related Agreements")** executed by the Company and each Person (as defined below) who owns in excess of 5% of the issued and outstanding Common Stock (as defined below) on a fully-diluted basis as of the Closing Date[.]

(*Id.* at 28–29) (emphasis in original.) Section 8.12 of the stock purchase agreements provides:

> *Entire Agreement.*This Agreement together with the Schedules and Exhibits attached hereto, shall constitute the entire agreement between the Parties with respect to the transactions contemplated hereby and shall superseded all prior or contemporaneous negotiations, understandings and agreements with respect thereto. There are no representations, agreements, arrangement, or understandings, oral or written, between or among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

 **\*6**  (*Id.* at 51.)Section 11.07 of the shareholders agreement, in pertinent part, provides:

> **VENUE FOR ANY ACTION BROUGHT HEREUNDER SHALL BE PROPER EXCLUSIVELY1 IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED.**

(ECF No. 162 at 15.) Giant Eagle argues that under *Personal Security & Safety Systems Inc. v. Motorola Inc.,* 297 F.3d 388, 395 (5th Cir.2002), this court must consider the meaning of the word "action" in Section 11.07 of the shareholders agreement when deciding the meaning of "any action arising" in the forum selection clause of the stock purchase agreements. (ECF No. 161 at 6.)

In *Personal Security,* the parties executed three agreements in connection with the defendant making an investment in the plaintiff company: "a Stock Purchase Agreement, a Product Development and License Agreement, and a Shareholders Agreement."*Personal Sec.,* 297 F.3d at 390. The court noted that "[e]ach of these agreements played a particular role in the overall transaction."*Id.* The Producet Development and

License Agreement (the "licensing agreement") contained an arbitration clause; the stock purchase agreement did not. *Id.* The plaintiff sued the defendant for breach of the stock purchase agreement. In response, the defendant filed a motion to compel arbitration. *Id.* The plaintiff argued the arbitration provisions of the licensing agreement were not applicable to its claims because its claims arose solely under the stock purchase agreement. *Id.* The court agreed with the defendant and held: "the licensing agreement's arbitration provision governs claims arising out of the stock purchase agreement because the agreements were executed together as part of the same overall transaction and therefore are properly construed together."*Personal Sec.,* 297 F.3d at 390.

The plaintiff in *Personal Security* argued that the court's interpretation of the arbitration provision of the licensing agreement was contrary to the the forum selection clause in the stock purchase agreement. The forum selection clause provided:

> Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. ANY SUIT OR PROCEEDING BROUGHT HEREUNDER SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE COURTS LOCATED IN TEXAS.

*Personal Sec.,* 297 F.3d at 395. Plaintiff argued based upon this provision that the parties "expressly excluded the use of arbitration to resolve ... any dispute arising out of the Stock Purchase Agreement[, which] must be litigated in Texas courts."*Id.* The court rejected plaintiff's argument, reasoning:

Standing alone, one could plausibly read the forum selection clause to mean that Texas courts have the exclusive power to resolve all disputes arising under the Stock Purchase Agreement. But the forum selection clause does not stand alone. To the contrary, we must interpret the forum selection clause in the context of the entire contractual arrangement and we must give effect to all of the terms of that arrangement. *See Richland Plantation Co. v. Justiss–Mears Oil Co., Inc.,* 671 F.2d 154, 156 (5th Cir.1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to

all of them, if possible."). Given our conclusion that the arbitration provision in the Product Development Agreement applies to all claims related to the overall transaction, we must therefore interpret the forum selection provision in the Stock Purchase Agreement in a manner that is consistent with the arbitration provision.

**\*7** Reading the two provisions together, it becomes clear that the forum selection clause does not require the parties to litigate all claims in Texas courts, nor does it expressly forbid arbitration of claims arising under the Stock Purchase Agreement. Instead, we interpret the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration-for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award. Rather than covering all "disputes" or all "claims" like the arbitration provision in the Product Development Agreement, the forum selection clause confers "exclusive jurisdiction" on Texas courts only with respect to "any suit or proceeding." This limitation suggests that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court.

*Id.* at 395–96.

Giant Eagle argues that under *Personal Security,* this court should consider the meaning of "action" in the forum selection clause in the shareholders agreement when deciding the meaning of "any action arising" in the forum selection clause in the stock purchase agreement. In other words, Giant Eagle argues that because "any action brought" means the initiation of a lawsuit, and the forum selection clause in the shareholders agreement uses the phrase "any action brought," the phrase "any action arising" used in the forum selection clause in the stock purchase agreements also means the initiation of a lawsuit. *Personal Security,* however, is distinguishable from this case. The court in *Personal Security* held:

[I]n the absence of a contrary expression of intent in the Stock Purchase Agreement, the arbitration provision in the Product Development Agreement covers all disputes related to the subject matter of the entire transaction between PSSI and Motorola. Because we cannot say "with positive assurance that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue," we find that it applies to PSSI's claims under the Stock Purchase Agreement.

*Defendant Giant Eagle's Reply in Support of Its Motion to Dismiss* *Page 16*

R301

*Personal Sec.,* 297 F.3d at 394–95.

Here, an arbitration agreement is not in issue; the court, therefore, does not need to consider the " 'liberal policy favoring arbitration' " and a " 'strong federal policy in favor of enforcing arbitration agreements.' " *Id.* at 392 (quoting *Texaco Exploration and Prod. Co. v. AmClyde Engineered Prods. Co., Inc.,* 243 F.3d 906, 909 (5th Cir.2001)). Secondly, because the parties chose to use different phrases in the forum selection clauses in their agreements, i.e., "any action arising" and "any action brought," they have shown a "contrary expression of intent" that those phrases do not mean the same thing. As Giant Eagle argues, "any action brought" means the initiation of a lawsuit, and, as the court previously held, "any action arising" includes the filing of a counterclaim. The shareholders agreement in this case shows that the parties knew how to limit the application of a forum selection clause to the initiation of a lawsuit by using the phrase "any action brought." The parties chose not to use that language with respect to the stock purchase agreements. This situation is unlike in *Personal Security* where the allegedly "contrary" provision was not an anti-arbitration provision; it was a forum selection clause. Here, there are two forum selection clauses that do not provide for the same outcome. Plaintiff's argument urges the court to ignore the actual terms used by the parties. This argument runs contrary to principles of contract interpretation to "give meaning to each of the agreement's terms." *Dallas Gas Partners, L.P. v. Prospect Energy Corp.,* 733 F.3d 148, 157 (5th Cir.2013) (citing *Two Guys from Harrison–N .Y., Inc. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (N.Y.1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.)). Based upon the foregoing, *Personal Security* is distinguishable from this case, and not a ground to deny Excentus' motion to sever and transfer.

**\*8** Giant Eagle's third argument is that under Texas law, the word "action" means the entirety of a civil proceeding, and, under those circumstances, "any action arising" means the same as "any action brought." (ECF No. 161 at 7.) The decisions cited by Giant Eagle in support of this argument, however, interpreted the word "action" in statutes. *See TLI, Inc. v. United States,* 100 F.3d 424, 427 (5th Cir.1996) (interpreting 11 U.S.C. § 108); *Nolan v. Boeing Co.,* 919 F.2d 11058, 1066 (5th Cir.1990) (interpreting 28 U.S.C. § 1441); *Thomas v. Oldham,* 895 S.W.2d 352, 356 (Tex.1995) (interpreting Tex. Civ. Prac. & Remedies Code Ann. § 101.106). As the court noted in *Wells Fargo Bank,*

*N.A. v. David Orlando Collins,* Civ. Action 09–2483, 2010 WL 3303663, at \*2 (S.D.Tex. Aug.19, 2010), "[s]tatutory interpretation is a much different undertaking than contract interpretation, especially when the contract conveys rights and privileges negotiated between the parties."The court explained:

> The basic rules of contract interpretation require the court "to ascertain the true intentions of the parties as expressed in the instrument."*Ace Cash Express, Inc. v. Silverman,* No. 03–03–00205–CV, 2004 WL 101684, at \*3 (Tex.App.-Austin Jan.23, 2004) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)). The primary goal in interpreting a contract is to give effect to the meaning of the contract as drafted, not as the parties intended it to be drafted. *Id.* at \*3 (citing *First State Bank v. Keilman,* 851 S.W.2d 914, 922 (Tex.App.-Austin 1993, writ denied)). "Where the language of a [contract] is unambiguous, and its meaning is clear, the [contract] must be given effect according to its terms."*Bd. of Ins. Comm'rs,* 180 S.W.2d at 909. Normally, the language of the contract will be given its "plain grammatical meaning," unless doing so would result in a departure from the obvious intentions of the parties, ambiguity in its meaning, or an absurdity. *Ace Cash Express,* 2004 WL 101684, at \*3–4 (citing *Lyons v. Montgomery,* 701 S.W.2d 641, 643 (Tex.1985)).

*Wells Fargo,* 2010 WL 3303663, at \* 2. These rules contemplate the court ascertaining the "common meaning" of the words used in a contract by the parties. *Id.* T he parties did not point to any decisions from the Texas courts or federal courts within the Fifth Circuit addressing the common meaning of the word "action." Under those circumstances, the court finds the analysis of the common meaning of the word "action" by Third Circuit Court of Appeals in *Jonathan H* persuasive. Although the ultimate issue decided in that case was a matter of statutory interpretation, the court addressed the common meaning of the word "action" prior to its statutory analysis. The Third Circuit Court of Appeals recognized that the word "action" is broad enough to encompass a counterclaim.

The Fifth Circuit Court of Appeals has recognized that "[o]ne of the fundamental tenets of contract interpretation is that contracts should be read as a whole, viewing particular language in the context in which it appears."*Woolley v. Clifford Chance Rogers & Wells, L.L.P.,* 51 F. App'x 930,

**\*9** \* 1 (5th Cir.2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981)). In accord with that

*Defendant Giant Eagle's Reply in Support of Its Motion to Dismiss*      *Page 17*

R302

principle, the meaning of "action" in this case may be ascertained by considering the context in which that word is used in the agreements in issue. In the forum selection clause in the shareholders agreement, the pertinent phrase is "any action brought;" in the forum selection clause in the stock purchase agreements, the pertinent phrase is "any action arising." The dictionary definitions of the words "brought" and "arising" provide context that supports the court's distinction between the two forum selection clauses in this case. The forum selection clause in the shareholders agreement provides:

> VENUE FOR *ANY ACTION BROUGHT* HEREUNDER SHALL BE PROPER EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S11 PRINCIPAL OFFICES ARE LOCATED.

(ECF No. 162 at 15) (emphasis added.) The forum selection clause in the stock purchase agreements provides:

> VENUE FOR *ANY ACTION ARISING* OUT OF THIS AGREEMENT SHALL RESIDE EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED.

(ECF No. 28 at 51) (emphasis added.) The word "brought" is the past tense of "bring." MerriamWebster's Online Dictionary, http://www.merriam-webster.com/dictionary/brought (last visited on March 7, 2014). The pertinent definition of "bring" is "to cause to exist or occur: as ... INSTITUTE <*bring* legal action>." Merriam–Webster's Online Dictionary, http://www.merriamwebster.com/dictionary/bring (last visited on March 7, 2014). This definition comports with the Third Circuit Court of Appeals' statutory interpretation of "any action brought" in *Jonathan H,* which was adopted by federal courts in Texas. *Jonathan H,* 562 F.3d at 529;*see e.g., Ruben A. v. El Paso Indep. Sch. Dist.,* 414 F. App'x 704, 706– 07 (5th Cir.2011); *UNC Lear Servs., Inc. v. Kingdrom of Saudi Arabia,* 720 F.Supp.2d 800, 804 (W.D.Tex.2010). In *Jonathan H,* the court determined that "an action is "brought" when a plaintiff files a complaint, which is the first step that invokes the judicial process."*Jonathan H,* 562 F.3d at 529. The common meaning of the word "brought" supports this interpretation; indeed, the parties do not dispute the meaning of "any action brought" in this case.

The pertinent definitions of the word "arising" are: (1) "to originate from a source;" and (2) "to come into being or to attention."Merriam–Webster's Online Dictionary, http://www.merriamwebster.com/dictionary/arising (last visited on March 7, 2014). Having concluded that the common meaning of the word "action" is broad enough to include counterclaims, the court holds that "any action arising" can mean *any counterclaim originating from the stock purchase agreements.*Giant Eagle's asserted legal rights in counterclaims VI, VII, VIII, IX, X, and XII originate from the stock purchase agreement. The distinction between "any action arising" and "any action brought" is supported by the dictionary definitions of "action" and "brought."

**\*10** Under those circumstances, and in light of the foregoing discussion, the court is not persuaded by Giant Eagle's arguments with respect to the application of the forum selection clause in this case. The counterclaims asserted by Giant Eagle arising from the stock purchase agreements, i.e., counterclaims VI, VII, VIII, IX, X, and XII, are subject to the forum selection clause in the stock purchase agreements.

**B. Severance under Federal Rule of Civil Procedure 21**
The court agrees with Giant Eagle that 28 U.S.C. § 1404(a) contemplates the transfer of an entire civil proceeding and not individual claims. *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518–19 (10th Cir.1991) ("Section 1404(a) only authorizes the transfer of an entire action, not individual claims."); *Wyndham Assocs. V. Bintliff,* 398 F.2d 614, 618 (2d Cir.1968). The court may, however, sever transferable claims under Federal Rule of Civil Procedure 21, which would result in two separation actions, and then transfer the severed action to the appropriate court.*Wyndham, 398 F.2d at 618* ("Where certain claims are properly severed, the result is that there are then two or more separate 'actions,' and the district court may, pursuant to § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others.")

In *In re Nintendo Co., Ltd.,* Misc. No. 151, 2013 WL 5345899 (Fed.Cir. Sept.25, 2013), the court noted:

> Rule 21 provides that, "the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."The decision to deny a motion to sever is committed to the discretion of the district court. *In re EMC Corp. .,* 677 F.3d 1351, 1355 (Fed.Cir.2012). This discretion is not unbridled, however; it "must be exercised within the boundaries set by relevant statutes and precedent," and a "district court abuses its discretion if it relies on an erroneous conclusion of law."*Id.* This court

*Defendant Giant Eagle's Reply in Support of Its Motion to Dismiss*  *Page 18*

R303

generally applies Federal Circuit law, rather than regional circuit law, to the issue of severance. *Id.* at 1354.We may, however, look to the decisions of our sister circuits for guidance. *See id.*

*In re Nintendo Co., Ltd.,* Misc. No. 151, 2013 WL 5345899, at *6 (Fed.Cir. Sept.25, 2013).*"*A district court has broad discretion to order the severance of particular claims and afford them separate treatment when doing so advances the administration of justice and no party suffers prejudice by virtue of the severance."*El Aguila Food Prods., Inc. v. Gruma Corp.,* 167 F.Supp.2d 955, 959–60 (S.D.Tex.2001).

In accordance with the foregoing statement of the law, it is appropriate for a court to sever claims subject to a valid forum selection clause. *1–Stop Fin. Serv. Ctrs. of Am., LLC v. Astonish Results, LLC,* Civ. Action No. 13–961, 2014 WL 279669, at *10 (W.D.Te Jan. 23, 2014) ("The Court, through the above analysis, has determined the two forum selection clauses are both valid and should be enforced. Therefore, severance is appropriate."). This conclusion is true even where a party opposing the severance argues-like Giant Eagle does in this case-that "severance would be a waste of judicial resources, and severance would severely prejudice [them]."*Id.*The court will not "override" the parties' agreement with respect to where certain claims should be tried.*Id.* ("Notwithstanding the fact these claims are interrelated and separating them forces two different courts to handle similar cases, this Court cannot override the parties' contractual agreements."). As the court noted in 1–Stop, "any inconvenience or prejudice imposed on [the party opposing severance], or any other private interest factor, is not be considered in the § 1404(a) analysis given *Atlantic Marine* [;]" indeed, as the court noted, a party opposing severance "could have avoided this entire dilemma if it had read and understood the contracts it signed."*Id.*

 ***11** Based upon the foregoing, severance of counterclaims arising under the stock purchase agreements, i.e., counterclaims VI, VII, VIII, IX, X, and XII, will be severed from Excentus' claims and Giant Eagle's other counterclaims that do not arise under the stock purchase agreements.

**III. Conclusion**

For the reasons stated herein, the motion to sever and transfer (ECF No. 147) filed by Excentus will be GRANTED. Pursuant to the forum selection clause in the stock purchase agreements, the standalone civil proceeding created by the court severing counterclaims VI, VII, VIII, IX, X, and XII from the other claims asserted in this case will be transferred to the United States District Court of the Northern District of Texas, Dallas Division.

Within fourteen days of the entry of this opinion and accompanying order, Giant Eagle must file counterclaims VI, VII, VIII, IX, X, and XII as claims in a separate case in this district. The Clerk of Court will be directed not to charge a filing fee for that case. After the case is filed, this court will enter an order to transfer those counterclaims to the District Court of the Northern District of Texas, Dallas Division. This court will coordinate with the transferee court to minimize duplicative discovery, if any, and to facilitate a prompt resolution of all claims and counterclaims between Excentus and Giant Eagle in an efficient manner.

The motion to stay (ECF No. 160) with respect to Excentus' motion to sever and transfer will be DENIED as moot.

An appropriate order will be entered.

**All Citations**

Slip Copy, 2014 WL 923520

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.


Tab F



*Dickson Perry v. Giant Eagle et al.*
Cause No. DC-15-03853

PLAINTIFF'S RESPONSE TO GIANT EAGLE MOTION TO DISMISS

R305



**1** Collateral Estoppel Does Not Bar Mr. Perry's Claims

**2** Mr. Perry's Claims Do Not "Arise Out Of" the SP Agreements

R306



**1**

# Collateral Estoppel Does Not Bar Mr. Perry's Claims

"Collateral estoppel requires that the issue decided in the first action be **identical to the issue in the pending action.**"

*Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 802 (Tex. 1992)



R308

# Per Judge Boyle:

The Excentus Lawsuit stemmed from "Excentus' claims that Giant Eagle failed to properly support Excentus' current and future business plans *as required by the parties'* Stock Purchase Agreements and also *failed to obtain a license to* Excentus' *patents* for use in Giant Eagle's fuelperks! program and failed to pay for such license."

Excentus Corp. v. Giant Eagle, Inc., 3:11-CV-333I-B, 2012 WL 2525594, at *1 (N.D. Tex. July 2, 2012)

R309

# What Judge Boyle "Fully & Fairly Litigated"



- "The Court first notes that whether a forum selection clause applies to a plaintiff's claims is a case-specific inquiry."

- "the Court must look to the Stock Purchase Agreements in order to resolve *all* of Excentus' claims', given that they involve Giant Eagle's obligations under the Stock Purchase Agreements, whether Giant Eagle had a license to the patents at issue, or whether such purported license is a defense to Excentus' claims."

R310



R311



R312



R313

CONFIDENTIAL

# Complete Capitulation of Excentus' Interests

- $500,000 paid to Shapiras
- $347,500 paid to Giant Eagle affiliate
- Excentus to pay royalties for using its FRN mark

---

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into effective as of December 16, 2014 ("Effective Date") by and between Excentus Corporation ("Excentus"), a Texas corporation, formerly known as CCISTech, Inc. ("CCIS"), with its principal office at 14241 Dallas Parkway, Suite 1200, Dallas, Texas 75254 and Giant Eagle, Inc. ("Giant Eagle"), Giant Eagle's wholly-owned subsidiary Phoenix Intangible Holdings Company ("Phoenix"), Giant Eagle's wholly-owned subsidiary Giant Eagle of Delaware, Inc. ("GE Delaware"), David Shapira, and Daniel Shapira (collectively, "Defendants").

WHEREAS, on March 4, 2002, Excentus and Giant Eagle entered into a Software License and General Services Agreement (the "Software License");

WHEREAS, on August 6, 2004, Excentus entered into a Series A Preferred Stock Purchase Agreement, as amended by the First Amendment to the Series A Preferred Stock Purchase Agreement dated as of November 15, 2005, (the "2004 SP Agreement") with GE Delaware;

WHEREAS, on November 15, 2005, Excentus entered into a Series B Preferred Stock Purchase Agreement (the "2005 SP Agreement") with GE Delaware;

WHEREAS, on June 11, 2008, Excentus entered into the Trademark and Copyright License Agreement as amended on September 2, 2008, (the "Trademark Agreement") with Phoenix;

WHEREAS, on February 4, 2010, Excentus entered into Addendum No. 1 to Software License and General Services Agreement (the "SL Addendum") with Giant Eagle;

WHEREAS, the Software License, the 2004 and 2005 SP Agreements (together, the "SP Agreements"), the Trademark Agreement, and the SL Addendum shall be collectively referred to herein as the "GE/Excentus Agreements";

WHEREAS, on December 2, 2011, Excentus filed a lawsuit against the Defendants in the U.S. District Court for the Northern District of Texas in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 3:11-CV-3331 in which Excentus asserted claims against the Defendants for breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("First Texas Case"), and which case was dismissed for improper venue without prejudice to refiling in a court of proper venue;

WHEREAS, on February 1, 2013, Excentus refiled its claims against the Defendants in the U.S. District Court for the Western District of Pennsylvania in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 2:13-CV-178 asserting claims of breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("Pennsylvania Case");

WHEREAS, Giant Eagle asserted counterclaims against Excentus for breach of contract, breach of an implied duty, breach of the implied covenant of good faith and fair dealing, for an award of attorneys' fees, and declaratory judgment of patent license in the Pennsylvania Case, some of which

WHEREAS, David Shapira and Daniel Shapira (collectively, "the Shapiras") asserted counterclaims against Excentus for advancement, indemnification, breach of contract, and for an award of attorneys' fees in the Pennsylvania Case; and

A09715063

A09745562

EXC-0d0003

Ex. 5

R314

# PERRY CLAIMS

**DEFENDANTS' SELF-DEALING**

SHAPIRAS' SELF-DEALING WHEN SETTLING

GIANT EAGLE'S UNFAIR COMPETITION VIA SETTLEMENT

BONUS PAY-OFFS

USURPATION OF CORPORATE OPPORTUNITY

R315



**2**

Mr. Perry's Claims Do Not "Arise Out Of" the SP Agreements

R316



"VENUE FOR ANY ACTION **ARISING OUT OF THIS AGREEMENT** SHALL RESIDE EXCLUSIVELY IN THE COUNTY IN WHICH THE RESPONDENT'S PRINCIPAL OFFICES ARE LOCATED."

# Arising out



# Related to, in connection with

*See FD Frontier Drilling (Cyprus), Ltd. v. Didmon,* 438 S.W.3d 688, 695 (Tex. App.—Houston [1st Dist.] 2014), reh'g overruled (July 29, 2014), review denied (Nov. 7, 2014) (distinguishing between narrow clauses using "arise out of" and broader clauses using 'arising out of or relating to'"); *Glassell Producing Co., Inc. v. Jared Res., Ltd.,* 422 S.W.3d 68, 77 (Tex. App.—Texarkana 2014, no pet) (explaining that "arising out of" is narrow and "most arbitration clauses contain language that is more broad, such as 'related to' or 'connected with'"); *RSR Corp. v. Siegmund,* 309 S.W.3d 686, 701 (Tex. App.—Dallas 2010, no pet.) (noting use of "hereunder," which the court equates to "arising under," is narrower than clauses containing "relating to"); *In re Wilmer Cutler Pickering Hale & Dorr LLP,* 05-08-01395-CV, 2008 WL 5413097, at *4 (Tex. App.—Dallas Dec. 31, 2008, no pet.) ("[t]he phrase "relates to," in particular, is recognized as a very broad term"); *Associated Air Freight, Inc. v. Meek,* 01-00-00843-CV, 2001 WL 225516, at *4 (Tex. App.—Houston [1st Dist.] Mar. 8, 2001, no pet.) (a contract that omits broad terms, such as "relating to," indicates that the parties intended for a narrow scope); *In re Conseco Fin. Servicing Corp.,* 19 S.W.3d 562, 570 (Tex. App.—Waco 2000, no pet.) ("arising from or relating to" is different than more limited and narrow clauses).

Ex. 5

A forum-selection clause will not be enforced if "*enforcement would be unreasonable or unjust . . .* [or] the selected forum would be *seriously inconvenient for trial.*"

*In re Intern. Profit Associates, Inc.*, 286 S.W.3d 921, 923 (Tex. 2009)

R319



R320



LOGSDON

NICHOLSON

GIANT EAGLE

AUTO-GAS

SHAPIRAS

ADS

MILLS

EXCENTUS

R321

# THE OTHER DEFENDANTS WILL NOT GO TO PITTSBURGH

CAUSE NO. DC-15-0385

DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION,

Plaintiff,

vs.

EXCENTUS CORPORATION,
BRANDON LOGSDON, JIM MILLS,
GIANT EAGLE, INC., DAVID
SHAPIRA, DANIEL SHAPIRA, AUTO-
GAS SYSTEMS, INC., RANDY
NICHOLSON, and
ALLIANCE DATA SYSTEMS, INC.,

Defendants,

§§§§§§§§§§§§§§§§§§§

RESPONSES OF BRANDON LOGSDON
TO PLAINTIFF'S FIRST REQ
FOR ADMISSION DIRECTED AT THRE

TO: Plaintiff Dickson Perry, derivatively on behalf of Exc
his attorney of record, Andres Correa, Lynn Tillotson
Avenue, Suite 2700, Dallas, Texas 75201.

Pursuant to Texas Rule of Civil Procedure 198, Defe

Mills respond as follows to Plaintiff's First Requests for

Issues:

OBJECTIONS TO INSTRUCTIONS AND

1. Logsdon and Mills object to Instructions 1, 3,

Requests for Admission actually served by Plaintiff. The
Interrogatories and . . . these Requests for Production," rathe
Instruction No. 1 purports to require delivery of "an original s
the Texas Rules of Civil Procedure do not require a "s
Admission. Instruction No. 7 directs the delivery of "[a]ll

RESPONSES OF BRANDON LOGSDON AND JIM MILLS TO PLA
FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOL

---

CAUSE NO. DC-15-0385

DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION,

Plaintiff,

VS.

BRANDON LOGSDON, JIM MILLS,
GIANT EAGLE, INC., DAVID SHAPIRA,
DANIEL SHAPIRA, AUTO-GAS
SYSTEMS, INC., RANDY NICHOLSON,
and ALLIANCE DATA SYSTEMS, INC.

Defendants,

§§§§§§§§§§§§§§§§

IN THE 68T

OF

DALLAS CO

DEFENDANTS AUTO-GAS SYSTEMS, INC'S AND RAN
RESPONSES AND OBJECTIONS TO PLAINTIFF'S F
FOR ADMISSIONS DIRECTED AT THRESHO

TO: Plaintiff Dickson Perry, derivatively on behalf of Excen
through his attorneys of record, Michael P. Lynn, P.C.,
Andres Correa, Lynn Tillotson Pinker & Cox, LLP, 210
Dallas, TX 5201.

NOW COME Auto-Gas Systems, Inc. and Randy N
Defendants in the above numbered and entitled cause, and
Plaintiff's First Request for Admissions Directed at Threshold Is
The responses and objections are as follows:

OBJECTIONS TO INSTRUCTIONS AND DEF

1. Auto-Gas Systems and Nicholson object to Instruc
inapplicable to the Requests for Admission actually serve
Instructions reference "these Interrogatories and . . . these Re
rather than "Requests for Admission." Instruction No. 1 purport
"an original sworn and executed response." But the Texas Rule
not require a "sworn" response to Requests for Admission. Instr
delivery of "[a]ll responsive Electronically Stored Information
metadata." But no Electronically Stored Information is sought by

2. Auto-Gas Systems and Nicholson object to the
Plaintiff's Requests for Admission that do not pertain to the Requ
example, Definitions 13, 15, 16, and 17 refer to entities or proce

DEFENDANTS AUTO-GAS SYSTEMS, INC'S AND RANDY NICHOLSON'S
RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS DIRECTED AT THRESHOLD ISSUES

---

CAUSE NO. DC-15-0385

DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION,

Plaintiff,

v.

EXCENTUS CORPORATION,
BRANDON LOGSDON, JIM MILLS,
GIANT EAGLE, INC., DAVID
SHAPIRA,
DANIEL SHAPIRA, AUTO-GAS
SYSTEMS, INC., RANDY
NICHOLSON,
AND ADS ALLIANCE DATA
SYSTEMS, INC.,

Defendant,

§§§§§§§§§§§§§§§§§

IN THE DISTRICT COURT

OF DALLAS COUNTY, TEXAS

68TH JUDICIAL DISTRICT

DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S
OBJECTIONS AND RESPONSES TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES

TO: Plaintiff Dickson Perry, derivatively on behalf of Excentus Corporation, by and through
his attorney of record, Andres Correa, Lynn Tillotson Pinker & Cox, LLP, 2100 Ross
Avenue, Suite 2700, Dallas, Texas 75201.

Pursuant to the Texas Rules of Civil Procedure, Defendant ADS Alliance Data Systems,
Inc. ("ADS") hereby serves these Objections and Responses to Plaintiff's First Requests for

Admission Directed at Threshold Issues ("Requests").

DEFENDANT ADS ALLIANCE DATA SYSTEMS, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST REQUESTS FOR ADMISSION DIRECTED AT THRESHOLD ISSUES - Page 1

R322



R323



THE END

R324

Tab G

**LynnTillotsonPinkerCox**

Andrés Correa
ATTORNEY AT LAW

P 214 292 3630
F 214 981 3839
acorrea@lynnllp.com

Lynn Tillotson Pinker & Cox, LLP
ATTORNEYS AND COUNSELORS
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
www.lynnllp.com

August 25, 2015

***Via ECF and Hand Delivery***
Honorable Martin Hoffman
George L. Allen, Sr. Courts Building
68th District Court
600 Commerce St., 5th Floor
Dallas, Texas 75202

> Re:   Cause No. DC-15-03853, In the 68th District Court, Dallas County, *Dickson Perry v. Brandon Logsdon, et al.*

Dear Judge Hoffman:

Yesterday morning, we filed a 3-page supplemental brief clarifying how narrowly Texas courts construe the terms "arising out of" (and addressing some new evidence). Such narrow language stands in sharp contrast with broader terms, such as "related to" and, in particular, "in connection with," which the SP Agreements utilize when defining indemnification obligations, *see* §§ 7.01 and 7.02, but not when defining venue. We refer the Court to the authority cited in our brief.

The Court also requested cases in which Texas courts construed the "arise out of" or similar language to exclude the particular claims at issue. I have attached highlighted copies of the following cases: *Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 812 (Tex. App.—Texarkana 1995, writ denied) (in forum selection case, construing "arising hereto" to exclude tort claims where "[t]he rights, obligations, and cause of action do not arise from the contracts but from the Deceptive Trade Practices Act, the Texas Securities Act, and the common law"); *Major Help Ctr., Inc. v. Ivy, Crews & Elliott, P.C.*, 03-99-00285-CV, 2000 WL 298282, at *2 (Tex. App.—Austin Mar. 23, 2000, no pet.) (in forum-selection case, construing "[a]ny action brought by either party under this agreement" to exclude tort claims that "do not rely on the terms of the Agreement as the[ir] basis" and plaintiffs "do not attempt to enforce duties or obligations arising under the Agreement"); *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (in arbitration case, construing "any and all claims arising out of this Agreement" narrowly due to absence of "relating to" language); *Associated Air Freight, Inc. v. Meek*, 01-00-00843-CV, 2001 WL 225516, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2001, no pet.) (in arbitration case, construing "a dispute hereunder" to exclude claims where "allegations in this lawsuit touch only tangentially on the" agreements at issue); *In re Wilmer Cutler Pickering Hale & Dorr LLP*, 05-08-01395-CV, 2008 WL 5413097, at *4 (Tex. App.—Dallas Dec. 31, 2008, no pet.) (in arbitration case, construing

R325

"any action instituted under this Agreement" to apply "only if the claimant is relying on the terms and authority of the agreement as the basis for the rights sued upon"); *In re Advance Payroll Funding, Ltd.*, 254 S.W.3d 710, 713 (Tex. App.—Dallas 2008, no pet.) (in arbitration case, construing "arising out of or relating to" to exclude claims that "arose from general obligations imposed by law" and not from the agreement). Although some of these cases address arbitration provisions, the Texas Supreme Court looks to such cases when interpreting the scope of forum-selection clauses. *See In re Int'l Profit Associates, Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (listing additional authority).

The foregoing authority makes clear that "tangential" connections between the SP Agreements and the claims in the case, *see Meek*, 2001 WL 225516, at *2, or agreements that "merely created the conditions that led to" the parties dealing with each other, *see In re Advance Payroll Funding, Ltd.*, 254 S.W.3d at 714, do not suffice to bring the subject dispute within the forum-selection provision. If the SP Agreements' forum-selection clause included all disputes "related to" the SP Agreements, or all disputes "in connection with" with the SP Agreements, perhaps Giant Eagle's belief that the SP Agreements may come into play as a possible partial defense when discussing the litigation underlying the settlement transaction Mr. Perry attacks would be (tenuously) relevant. But the SP Agreements' forum-selection clause brings within its scope only disputes "arising out of" the SP Agreements, which Texas courts have interpreted to mean disputes that look to the subject agreement as the source of the obligations allegedly breached. Here, Mr. Perry's claims arise out of Defendants' breaches of obligations imposed by Texas common and statutory law, not by the SP Agreements, and his claims make no reference to any of the rights or obligations in the SP Agreements.

Lastly, during yesterday's hearing, I argued that the settlement agreement to which Giant Eagle is a party, and the execution of which Mr. Perry attacks here, belied Giant Eagle's contention that the parties expected disputes between Giant Eagle and Excentus to be litigated only in Pittsburgh. To be clear, Mr. Perry does not seek arbitration. But I highlighted that provision because (a) the settlement agreement identifies Dallas, Texas as the forum for disputes related to it, thereby directly contradicting Giant Eagle's contention that it negotiated and expects Pittsburgh to be the forum in all disputes involving the parties; and (b) the settlement agreement's broad forum-selection provision Giant Eagle agreed to stands in sharp contrast to the narrow provision Giant Eagle negotiated in the SP Agreements.

Respectfully,

Andrés Correa

AC/ks
02708-403/4830-6859-6263

R326

Honorable Martin Hoffman
August 25, 2015
Page 3


cc:     *Via Email*
        Orrin L. Harrison III (oharrison@ghjhlaw.com)
        Bernard Marcus (marcus@marcus-shapira.com)
        Scott Livingston (livingston@marcus-shapira.com)
        Jonathan Marcus (jmarcus@marcus-shapira.com)
        Ken Carroll (kcarroll@ccsb.com)
        Byran Erman (berman@ccsb.com)
        Sara Romine (sromine@ccsb.com)
        Robert B. Wagstaff (rwagstaff@mcmahonlawtx.com)
        Lisa S. Gallerano (lgallerano@akingump.com)
        Patrick O'Brien (pobrien@akingump.com)

R327

2001 WL 225516
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE 47.7, UNPUBLISHED OPINIONS
HAVE NO PRECEDENTIAL VALUE BUT MAY BE CITED WITH THE NOTATION "(not designated for
publication)."

Court of Appeals of Texas, Houston (1st Dist.).

ASSOCIATED AIR FREIGHT, INC., Appellant,
v.
David MEEK, Nancy Meek, and Professional Logistics Management Company, Inc., Appellees.
In re Associated Air Freight, Inc., Relator.

Nos. 01-00-00994-CV, 01-00-00843-CV. | March 8, 2001.

On Appeal from the 113th District Court, Harris County, Texas, Trial Court Cause No. 00-26273.

Panel consists of MIRABAL, TAFT and DUGGAN,[4] JJ.

**OPINION ON REHEARING**

TAFT.

**\*1** Relator, Associated Air Freight, Inc., has filed a motion for rehearing in Cause No. 01-00-843-CV. We deny rehearing, but withdraw our opinion of January 25, 2001, and issue this opinion in its stead.

Cause No. 01-00-00994-CV is an attempted, interlocutory, accelerated appeal from an order denying motions by Associated Air Freight, Inc. (Associated), appellant, which sought to enforce an arbitration clause, or, alternatively, to dismiss the cause below under a forum-selection clause. Cause No. 01-00-00843-CV is an original proceeding in which Associated seeks mandamus relief from this Court on similar grounds, and has moved to stay further proceedings in the trial court. We have consolidated the causes to render a decision disposing of both simultaneously. *See In re Valero Energy Corp.,* 968 S.W.2d 916, 916-17 (Tex.1998). We dismiss the interlocutory appeal, and deny mandamus relief, including Associated's motion for emergency relief.

These causes arise from a lawsuit filed by David Meek, Nancy Meek, and Professional Logistics Management Company, Inc. (PLMC), who are appellees in Cause No. 01-00-994-CV, and real parties-in-interest in Cause No. 01-00-834-CV. The Meeks' and PLMC's pleadings state that Associated is a foreign corporation doing business in Texas. The Meeks are Texas residents, and PLMC is a Texas corporation. The Meeks and PLMC allege that Associated wrongfully terminated its sales-agency agreement with PLMC, and executed a new sales-agency agreement with a different Texas corporation, Universal Logistics, Inc. (ULI). The Meeks and PLMC claim Associated conspired with their former partners, Myra Hill, Ivy Dane Mims, and David B. Rogers, who formed ULI in breach of duties owed the Meeks and PLMC, and that ULI is the alter ego of Hill, Mims, and Rogers. Shortly after suit was filed, Associated sought to enforce an arbitration provision and a forum-selection clause in its sales-agency agreement with PLMC.

001

R328

## Appeal-Cause No. 01-00-00994-CV

### A. No Jurisdiction for Appeal of Denial of Arbitration under the FAA

Associated challenges the trial court's failure to enforce an arbitration clause under Chapter 171 of the Civil Practice and Remedies Code, which contains the General Arbitration Act (the Texas Act). In requesting relief from the trial court, however, Associated relied on the Federal Arbitration Act, 9 U.S.C. § 1 (1994) (the FAA).[1] While the FAA permits appeals from interlocutory orders denying arbitration, federal procedure does not apply in Texas courts, even when we apply the FAA. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992); *Belmont Constructors, Inc. v. Lyondell Petrochem. Co.,* 896 S.W.2d 352, 355 (Tex.App.-Houston [1st Dist.] 1995, orig. proceeding). Texas procedure limits this Court's appellate jurisdiction to review of final orders and judgments, and interlocutory orders expressly authorized by statute. *Anglin,* 842 S.W.2d at 272. An order denying arbitration under the FAA is neither a final disposition, nor expressly authorized by section 171.098(a)(1)-(5) of the Civil Practice and Remedies Code, nor any other statutory exception. *See Anglin,* 842 S.W.2d at 272; *Stewart Title Guar. Co. v. Mack,* 945 S.W.2d 330, 332 (Tex.App.-Houston [1st Dist.] 1997, writ dism'd w.o.j. [leave denied] ). Accordingly, we have no jurisdiction to address Associated's complaint by appeal.

### B. No Jurisdiction over Appeal of Interlocutory Refusal to Enforce Forum-Selection Clause

**\*2** Associated also challenges the trial court's refusal to dismiss this cause based on a contractual forum-selection clause. Here, again, the trial court's order is not a final disposition of the case, but interlocutory, and none of the statutorily authorized exceptions for interlocutory appeals applies. Accordingly, we lack jurisdiction to address Associated's complaint by appeal. *See*TEX.CIV.PRAC. & REM.CODE ANN. §§ 51.014, 171.098 (Vernon Supp.2001); *Stewart Title,* 945 S.W.2d at 332.

We dismiss the appeal in Cause No. 01-00-00994-CV.

## Mandamus-Cause No. 01-00-00843-CV

### A. Associated's Right to Arbitrate under the FAA

Mandamus may issue when a trial court violates a duty imposed by law, or clearly abuses its discretion, and the complaining party has no adequate remedy by appeal. *Walker v. Packer,* 827 S.W.2d 833, 839-40 (Tex.1992). A party erroneously denied its right to arbitration under the FAA has no adequate appellate remedy and is entitled to mandamus relief. *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 88 (Tex.1996); *Hou-Scape, Inc. v. Lloyd,* 945 S.W.2d 202, 205 (Tex.App.-Houston [1st Dist.] 1997, orig. proceeding). We may not, however, disturb the trial court's factual determinations on mandamus review.*Mendoza v. Eighth Court of Appeals,* 917 S.W .2d 787, 789 (Tex.1996); *see Walker,* 827 S.W.2d at 840 (requiring deferential review of trial court's factual determinations unless the trial court "could reasonably have reached only one decision"). Likewise, we may not "plumb" the trial court's subjective reasoning; we must focus instead on the record before the trial court, and whether, based on that record, the trial court's decision was arbitrary and amounted " 'to a clear and prejudicial error of law.' " *In re Bristol-Myers Squibb Co.,* 975 S.W.2d 601, 605 (Tex.1998) (quoting from *Walker,* 827 S.W.2d at 839, which quoted from *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985)). As with any request that mandamus issue, the petitioner must establish a clear right to relief. *ISK Biotech Corp. v. Lindsay,* 933 S.W.2d 565, 568 (Tex.App.-Houston [1st Dist .] 1996, orig. proceeding).

002

R329

## 1. Factual Background

Associated is a New York company engaged in the air-freight business. In 1999, Associated and PLMC executed an agreement (the first agency agreement) by which PLMC became Associated's sales agent within the 100-mile radius from Associated's Houston facility. David L. Meek signed the agreement on behalf of PLMC on July 21, 1999. In addition to other terms, the agreement contained the following provision concerning arbitration:

> 1. This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made to be performed entirely within such State. In the event of a dispute hereunder the parties hereto agree to submit same to arbitration before the American Arbitration Association, as follows: in the event of a claim by [PLMC] against Associated, it shall be made in the White Plains office of the AAA. In the event of a claim by Associated against [PLMC] it shall be made in the office of the AAA nearest to the Agent.

**\*3** On February 9, 2000, Associated signed a virtually identical agency sales agreement, which contained the same arbitration clause (the second agency agreement), with ULI. Hill, Mims, and Rogers had signed the agreement two days before, on behalf of ULI.

The Meeks claim they were partners with Hill, Mims, and Rogers in PLMC, and advanced over $100,000 to the partnership, which the partnership agreed to repay and which allowed PLMC to become profitable in servicing Associated's requirements under the first agency agreement. The Meeks contend they were induced to assign additional stock to Hill, Mims, and Rogers after they set up PLMC, which allowed Hill, Mims, and Rogers to become majority shareholders. The Meeks claim that, once Hill, Mims, and Rogers became majority shareholders, they conspired with Associated: to defraud the Meeks of their ownership interest in PLMC, in breach of fiduciary duties owed the Meeks and PLMC; to usurp PLMC's corporate opportunities; to self-deal; to effect the resignation of Hill, Mims, and Rogers from PLMC on February 5, 2000; to terminate the first agency agreement with PLMC;[2] and to allow ULI, an alter ego entity created by Hill, Mims, and Rogers, to assume PLMC's operations on February 6, 2000, to the exclusion of the Meeks. As addressed above, the Meeks and PLMC seek legal and equitable remedies premised on partnership and corporate duties owed them, and damages, for return of over $100,000 advanced to PLMC and not paid, as well as punitive damages.[3] Less than a month after suit was filed, Associated sought to enforce the arbitration clause in the first agency agreement, and later invoked the arbitration clause in the second agency agreement as well.

## 2. Interstate Commerce

The party seeking to compel arbitration under the FAA carries a two-pronged burden: (1) to establish its right to arbitrate under the act; and (2) to establish that the opponent's claims are within the scope of the arbitration clause. *See Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996); *Anglin,* 842 S.W.2d at 269-70; *Stewart Title,* 945 S.W.2d at 333. Assuming, arguendo, that the FAA applied to the dispute, Associated did not meet its burden to establish that the Meeks' claims were within the scope of the arbitration clause.

## 3. Scope of Arbitration Clause

When a party invokes a right to arbitration under the FAA, federal law determines whether the dispute is subject to arbitration. *See Prudential Securities, Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995). Federal policy strongly favors arbitration and resolves all doubts concerning arbitrability in favor of arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941 (1983); *Prudential Securities, Inc. v. Marshall,* 909 S.W.2d at 898; *Hou-Scape,* 945 S.W.2d at 205. Arbitration clauses are enforced under the FAA, therefore, unless it can be said with positive assurance that the clause is not susceptible of an interpretation that covers the dispute at issue. *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353 (1960); *Pennzoil Exploration & Prod. Co. v. Ramco Energy, Ltd.,* 139 F.3d 1061, 1067 (5th Cir.1998); *Prudential Sec.,* 909 S.W.2d at 899; *Hou-Scape,* 945 S.W.2d at 205. But this strong policy favoring arbitration does not permit stretching an arbitration provision beyond its intended scope.

003

R330

*See Teamsters v. Stanley Structures, Inc.,* 735 F.2d 903, 905 (5th Cir.1984); *Beckham v. William Bayley Co.,* 655 F.Supp. 288, 291-92 (N.D.Tex.1987); *Belmont Constructors,* 896 S.W.2d at 356.

**\*4** In determining whether an arbitration clause encompasses a claim, courts focus on the facts alleged, not the causes of action asserted. *Prudential Sec.,* 909 S.W.2d at 900; *Hou-Scape,* 945 S.W.2d at 205. Whether a claim is within the scope of an agreement to arbitrate is a matter of contract interpretation and thus a question of law for the court. *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418-19 (1986); *see Beckham,* 655 F.Supp. at 290; We consider whether the facts alleged are "factually intertwined" with the contract containing the arbitration clause. *Anglin,* 842 S.W.2d at 271; *Hou-Scape,* 945 S.W.2d at 205;*see also Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir.1987) (whether facts alleged "touch" matters covered by the underlying agreement); *American Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 93 (4th Cir.1996) ("significant relationship" to the contract); *Griffin v. Semperit of Am., Inc.,* 414 F.Supp. 1384, 1389 (S.D.Tex.1976) ("inextricably enmeshed" with the contract). That a tort claim would not have arisen "but for" the parties' contract does not necessarily determine whether that claim is arbitrable. *Tracer Research Corp. v. National Environ. Serv. Co.,* 42 F.3d 1292, 1295 (9th Cir.1994).

The arbitration clause Associated relies on here, excerpted in full above, is contained in agreements by which Associated appointed first PLMC, and then ULI, as Associated's sales agents. The arbitration provision states only that: "In the event of *a dispute hereunder,* the parties hereto agree to submit same to arbitration ...." (emphasis added) The plain language of the clause contemplates a dispute under the sales-agency agreement.

As Judge Fitzwater, of the United States District court for the Northern District of Texas at Dallas, explained in *Beckham,* arbitration clauses generally require the parties to arbitrate " 'any controversy or claim arising out of or relating to [the] contract or the breach thereof,' " or, alternatively, " 'any controversy concerning the interpretation, performance, or application of [the] contract.' " *Beckham,* 655 F.Supp. at 291 (brackets in original). An arbitration provision that omits these broad terms indicates the parties to the contract did not agree to arbitrate all disputes arising out of their business relationship. *Id.; see Belmont Constructors, Inc.,* 896 S.W.2d at 358.

The Meeks' and PLMC's allegations in this lawsuit touch only tangentially on the agency sales agreements. The allegations focus instead on the professional relationship between the Meeks and their former partners and shareholders, and sound strongly in tort and legal and equitable duties beyond those encompassed by the sales-agency agreements. Given these allegations, and the narrow arbitration clause, which restricts arbitration to disputes under the sales-agency agreement, we conclude the arbitration clause in the agreement is not susceptible to an interpretation that covers the Meeks' and PLMC's claims. *E.g., Prudential Sec.,* 909 S.W.2d at 899. Because Associated, therefore, did not establish that the Meeks' and PLMC's claims are within the scope of the arbitration provision, Associated has not established that the trial court clearly abused its discretion by not requiring the Meeks and PLMC to arbitrate their claims under the FAA. Accordingly, Associated has not established its right to mandamus relief on that basis.

**B. Forum-Selection Clause**

**\*5** Associated also requests mandamus relief to require the trial court to enforce a forum-selection clause in the sales-agency agreements. Associated requests this relief based on two cases in which the supreme court has granted interlocutory relief by mandamus because "special circumstances" warranted revising a trial court's scheduling order. *See In re Colonial Pipeline Co.,* 968 S.W.2d 938, 943 (Tex.1998); *General Motors Corp. v. Gayle,* 951 S.W.2d 469, 477 (Tex.1997). These special circumstances are not present here. Moreover, as Associated concedes, "it is presently unclear" whether mandamus will issue to enforce a forum-selection clause. Because mandamus requires a clear right to relief, *ISK Biotech Corp.,* 933 S.W.2d at 568, Associated has not established its right to the extraordinary writ on this ground.

**Conclusion**

004

R331

We dismiss the interlocutory appeal in Cause No. 01-00-00994-CV for want of jurisdiction, and deny mandamus relief in Cause No. 01-00-00843-CV, including the motion for emergency relief.


**All Citations**

Not Reported in S.W.3d, 2001 WL 225516

Footnotes

4       The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1       In its motion for stay pending arbitration, Associated specifically stated: "Comes now [Associated] and moves that this matter be stayed pending arbitration pursuant to the Federal Arbitration Act...."

2       In their pleadings, the Meeks and PLMC acknowledge that Associated had a right to terminate the first agency agreement; their complaint is that Associated was a party to a conspiracy with the Meeks' former partners.

3       Before the trial judge ruled on the motion to stay pending arbitration, the Meeks and PLMC dismissed all claims against Associated except the claim that Associated conspired with Hill, Mims, and Rogers, in breach of the legal, equitable, and fiduciary duties Hill, Mims, and Rogers owed the Meeks and PLMC.

---

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

R332

**896 S.W.2d 807**
**Court of Appeals of Texas,**
**Texarkana.**

Lavern T. BUSSE and Jeff Busse, Appellants,
v.
PACIFIC CATTLE FEEDING FUND # 1, LTD.,
Appellee.

No. 06–94–00052–CV. | Submitted Dec. 8, 1994. |
Decided March 14, 1995. | Rehearing Denied March
14, 1995.

Limited partnership sued sellers of cattle for violations of
Texas Securities Act and the Deceptive Trade Practices
Act (DTPA), fraud, and breach of contract, after cattle
marketing program failed. The 14th Judicial District
Court, Dallas County, John McClellan Marshall, J.,
entered judgment for partnership, and sellers appealed.
The Court of Appeals, Cornelius, C.J., held that: (1)
contractual forum selection clause did not control; (2)
DTPA claim was applicable to out-of-state facts; (3)
feeding contracts were "securities" under Texas Securities
Act; (4) out-of-court fraudulent statements admitted at
trial were not hearsay; (5) sufficient evidence supported
fraud and DTPA award; (6) partnership was not limited to
breach of contract damages; and (7) damages were
properly limited to three times actual damages.

Affirmed.

West Headnotes (39)

**[1]**     **Contracts**
            🔑 Agreement as to Place of Bringing Suit;
            Forum Selection Clauses

            Forum selection clauses are valid in Texas;
            parties are allowed to choose forum in which to
            litigate their disputes.

            13 Cases that cite this headnote

**[2]**     **Contracts**

🔑 Legal Remedies and Proceedings

Forum selection clause does not apply to tort
action alleging that plaintiff was induced by
misrepresentations to enter into the contract,
where construction of the rights and liabilities of
the parties under the contract is not involved;
where wrongs arise from misrepresentations
inducing a party to execute the contract, and not
from breach of the contract itself, remedies and
limitations specified by the contract do not
apply.

14 Cases that cite this headnote

**[3]**     **Contracts**
            🔑 Legal Remedies and Proceedings

            Forum selection clause did not control claim by
            partnership against majority shareholder of
            cattle marketing enterprise, where case did not
            involve interpretation, enforcement, or
            construction of terms of contract, but rather
            alleged deceptive practices, misrepresentations,
            and fraud in the inducement to sign the contract
            predating the contract; thus the rights,
            allegations, and cause of action did not arise
            from the contract, but from the Deceptive Trade
            Practices Act (DTPA), the Texas Securities Act,
            and the common law, and where the defendants
            were not parties to the contract. V.T.C.A., Bus.
            & C. § 17.44; Vernon's Ann.Texas Civ.St. art.
            581–1 et seq.

            18 Cases that cite this headnote

**[4]**     **Appeal and Error**
            🔑 Cases Triable in Appellate Court

            Choice of law question is subject to de novo
            review on appeal.

            2 Cases that cite this headnote

006

R333

[5] **Action**
🔑What Law Governs

When determining choice of law questions, court will generally follow statutory directives of its own state, subject to constitutional limitations.

3 Cases that cite this headnote

[6] **Antitrust and Trade Regulation**
🔑Purpose and Construction in General

Texas Deceptive Trade Practices Act (DTPA) will be liberally construed in order to protect consumers from false, misleading, and deceptive business practices, and to provide efficient and economical procedures to secure such protection. V.T.C.A., Bus. & C. § 17.44.

3 Cases that cite this headnote

[7] **Action**
🔑What Law Governs

If state legislature intends for statute to be applied to out-of-state facts, courts will so apply it unless constitutional limitations forbid it, application to out-of-state facts is permissible even when local law of another state would be applicable under usual choice of law principles.

1 Cases that cite this headnote

[8] **Action**
🔑What Law Governs

If construction of Texas statute justifies application of Texas law rather than another state's law, and that does not offend the Constitution, it is not necessary to engage in the "significant relationships" choice of law

analysis. Restatement (Second) of Conflicts § 6(2).

2 Cases that cite this headnote

[9] **Antitrust and Trade Regulation**
🔑What Law Governs; Territorial Limitations

Texas Deceptive Trade Practices Act (DTPA) was applicable to facts of case, even though meeting and other facts transpired in Iowa, and DTPA did not explicitly provide that it was to apply to out-of-state facts affecting Texas consumers, where definition of "trade" and "commerce" in DTPA justified application of Texas rather than Iowa law, Texas plaintiff was solicited, in part, in Texas, and was suing Texas resident and Iowa resident, and thus application of Texas law was justified by sufficient significant relationships, and application of Texas law did not render it unconstitutionally broad, unreasonable or arbitrary. V.T.C.A., Bus. & C. §§ 17.44, 17.45(6); Restatement (Second) of Conflict § 6(2).

7 Cases that cite this headnote

[10] **Judgment**
🔑Absence of Issue of Fact
**Judgment**
🔑Presumptions and Burden of Proof

Movant is entitled to summary judgment when it shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; in deciding whether material fact issue precludes summary judgment, court will take as true any evidence favoring the nonmovant and will resolve any doubts and every reasonable inference in the nonmovant's favor. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

007

R334

**[11]**  **Securities Regulation**
⚷Persons Liable

Person or corporation who offers or sells unregistered security is liable to the buyer, who may sue for damages, under Texas Securities Act. Vernon's Ann.Texas Civ.St. art. 581–33, subd. A(1).

Cases that cite this headnote

**[12]**  **Securities Regulation**
⚷Persons Liable

Person who directly or indirectly controls seller or issuer of a security is liable jointly and severally under Texas Securities Act statute providing that offerer or seller of unregistered security may be liable to the buyer, together with the seller or issuer and to the same extent as the seller or issuer. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F(1).

1 Cases that cite this headnote

**[13]**  **Securities Regulation**
⚷Investment Contracts

An investment contract involves: a common enterprise in which a person expects profits solely from the efforts of the promoter or a third party; such contract is a "security" for purposes of the Texas Securities Act. Vernon's Ann.Texas Civ.St. art. 581–4, subd. A.

Cases that cite this headnote

**[14]**  **Securities Regulation**
⚷Recovery for Fraud

Texas Securities Act does not require proof of scienter. Vernon's Ann.Texas Civ.St. art. 581–1 et seq.

2 Cases that cite this headnote

**[15]**  **Securities Regulation**
⚷Investment Contracts

Finishing-and-feeding contracts met statutory and case-law requirements for an investment contract, and thus were "securities" for purposes of Texas Securities Act, where investor bought cattle and simultaneously entered into contracts with feeding company, which provided that investor would pay for feeding the cattle, and once cattle were ready for slaughter, feeding company would repurchase them at cost plus 12% of interest, reimburse investor for its incurred feed cost, and pay investor $25 per head profit. Vernon's Ann.Texas Civ.St. art. 581–1 et seq.

Cases that cite this headnote

**[16]**  **Securities Regulation**
⚷Fraudulent or Other Prohibited Practices

Sale of finishing-and-feeding contracts, "securities" for purposes of Texas Securities Act, violated the Act, where company that located and managed livestock enrolled in feeding company's program sent investor brochures constituting an advertisement in public solicitation, acting on behalf of feeding company and arranging sales for cattle feeding operations, even though entity locating and managing livestock may not have been agent of feeding company, and feeding company may not have known of brochures, as statute requires no scienter. Vernon's Ann.Texas Civ.St. art. 581–5, subd. I.

Cases that cite this headnote

**[17]**  **Securities Regulation**
⚷Persons Liable

008

R335

Term "control person" in Texas Securities Act is used in same broad sense as in federal statute, and major shareholders and directors are control persons. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F.

5 Cases that cite this headnote

**[18]** **Trial**
🔑Time for Taking

Complaint about improper comment by counsel is waived unless objection is timely made; objection is not timely made unless it is made at the earliest practical moment.

Cases that cite this headnote

**[19]** **Trial**
🔑Time for Taking

Failure to press for an instruction at the time of an allegedly erroneous jury argument operates as a waiver of any complaint which may be made as to the argument.

3 Cases that cite this headnote

**[20]** **Appeal and Error**
🔑Rulings by Lower Court

Where record fails to show that motion for mistrial directed to the argument of counsel was not overruled by the trial court, no error is preserved for review.

Cases that cite this headnote

**[21]** **Trial**
🔑Time for Taking

Defendant waived complaint to comment by plaintiff's counsel that court had already determined in deciding earlier motion that defendant was a control person for a company selling securities in violation of Texas Securities Act, where not until the next day did the defendants move for mistrial on grounds that statement improperly informed jury of court's prior ruling and implied that defendant was a wrongdoer, and failed to request curative instruction. Vernon's Ann.Texas Civ.St. art. 581–33, subd. F.

2 Cases that cite this headnote

**[22]** **Trial**
🔑In General; Duty of Court
**Trial**
🔑Instruction or Admonition to Jury

Improper argument is rarely cause for a mistrial and usually can be cured by an instruction.

2 Cases that cite this headnote

**[23]** **Appeal and Error**
🔑Rulings on Motions

Complaint regarding comment by opposing counsel was not preserved for review, where defendants failed to get ruling on mistrial motion.

Cases that cite this headnote

**[24]** **Evidence**
🔑Nature and Admissibility

Hearsay is out-of-court statement offered in evidence to prove truth of matter asserted, and evidence of out-of-court statement is hearsay only if it is introduced to prove truth of matter

009

R336

asserted. Rules of Civ.Evid., Rule 801(d).

3 Cases that cite this headnote

[25] **Evidence**
🔑Making of Statement Fact in Issue

Out-of-court statements made by employee of feeding company, cattle seller, and bank were not hearsay, as they were not offered for proof of matter asserted, where investor in cattle feeding and marketing plan offered statements only as operative facts, to show that they were made, as elements of fraud that investor was trying to prove.

2 Cases that cite this headnote

[26] **Appeal and Error**
🔑Interrogatories and Special Verdicts
**Appeal and Error**
🔑Total Failure of Proof

In reviewing a no evidence point, reviewing court considers only evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregards all evidence and inferences to the contrary; but if there was more than a scintilla of evidence to support the finding, the no evidence challenge fails.

Cases that cite this headnote

[27] **Appeal and Error**
🔑Extent of Review
**Appeal and Error**
🔑Clear or Palpable Weight or Preponderance

In reviewing factual insufficiency point, appellate court first must examine all of the evidence, and having considered and weighed all that evidence, it will set aside the verdict only if the evidence is so weak or the finding so

against the great weight and preponderance of the evidence that it is clearly wrong and unjust.

Cases that cite this headnote

[28] **Fraud**
🔑Elements of Actual Fraud

Under Iowa law, as interpreted by Texas appellate court, elements of fraud are a material misrepresentation, made knowingly, with intent to induce plaintiff to act or refrain from acting, on which plaintiff justifiably relies, with damages.

1 Cases that cite this headnote

[29] **Fraud**
🔑Weight and Sufficiency

Evidence was factually sufficient to support jury findings that cattle seller had committed fraud and engaged in deceptive acts under Iowa law, where cattle seller made misrepresentations that product demand was outstripping supply, that he would use money received from investor to purchase more bulls and increase inventory of cattle feeder and marketer, that he had contracts with certain buyers, and that he was personally committed to funding project to success, where there was evidence that cattle seller failed to disclose facts that because feeding program was unproven, bulls had serious health problems and high death loss, most inventory was not saleable; demand for products was not great; cattle seller was company's majority shareholder, and also was sole secured creditor with ability to foreclose on assets, feeding company did not have funds or prospect of funds to pay significant percentage of its existing obligations to investors; and cattle seller had threatened to cut off funds to feeding company and was seeking buyer for company.

Cases that cite this headnote

010

R337

[30]    **Antitrust and Trade Regulation**
🗝Reliance; Causation; Injury, Loss, or Damage
**Antitrust and Trade Regulation**
🗝Omissions and Other Failures to Act in General; Disclosure

For deceptive acts under Deceptive Trade Practices Act (DTPA), consumer may maintain action where a false, misleading, or deceptive act or practice constitutes a producing cause of actual damages; failure to disclose information about goods or services can be a deceptive act if the failure to disclose was intended to induce consumer to enter into transaction. V.T.C.A., Bus. & C. §§ 17.46(b)(23), 17.50(a)(1).

5 Cases that cite this headnote

[31]    **Antitrust and Trade Regulation**
🗝Weight and Sufficiency

Evidence was legally and factually sufficient to support jury's findings that cattle seller was liable to investor under Deceptive Trade Practices Act (DTPA), as cattle seller made misrepresentations that were a producing cause of investor's damages, where, when investor investigated to find out why bulls were not being slaughtered and why investor was not being paid in compliance with contracts, cattle seller told him they had a bid order coming and that investor should continue to hold onto bulls and continue feeding them, and told investor that he still believed in program and was buying more cattle and putting them on feed, and after investor sent demand letter, seller responded with letter asking for an additional ten days and made representations that bid order was supposed to come in, but then told feeding company's board that because litigation was imminent, seller was calling his note and foreclosing on assets. V.T.C.A., Bus. & C. § 17.50(a)(1).

Cases that cite this headnote

[32]    **Action**
🗝Nature of Action
**Damages**
🗝Natural and Probable Consequences of Torts

Plaintiff presented evidence of damages that were primarily tort related, rather than for breach of contract damages, and thus they could be recovered in their tort action for fraudulent inducement to enter transaction, even though types of damages alleged could also result from breach of contract, where plaintiff, who invested in cattle for enrollment in feeding and finishing contracts, not only sought damages for the difference between value as represented and received, but also for out-of-pocket expenses, loss of credit, reputation, loss of time value, and loss to business reputation.

1 Cases that cite this headnote

[33]    **Trial**
🗝Written Requests or Prayers
**Trial**
🗝Sufficiency and Scope of Exceptions to Failure or Refusal to Instruct

Party requesting jury instruction must do three things to preserve error: tender in writing and request proper instruction before submission; make a specific objection to its omission; and obtain ruling from the court.

2 Cases that cite this headnote

[34]    **Appeal and Error**
🗝Objection to Refusal of Requested Charge

Party waived alleged error in trial court's failure to submit requested instruction on mitigation of damages, even through party submitted proper jury instruction that court rejected, where party failed to object at charge conference.

1 Cases that cite this headnote

011

R338

[35]    **Trial**
🗝Mode of Making Objection

Defendants waived any complaint regarding jury instruction on definition of "exemplary damages," even though defendants' attorney specifically objected to reference to "stupid" and "mean" defendant in the definition, where defendants did not renew objection after court modified the instruction.

Cases that cite this headnote

[36]    **Appeal and Error**
🗝Instructions in General
**Appeal and Error**
🗝Damages and Amount of Recovery

Jury instruction defining exemplary damages was not reversible error, even though portion of instruction that stated that exemplary damages could only be imposed against "really stupid" or "really mean" defendant departed from correct standard and was improper, where standard used by court placed more onerous burden of proof on plaintiff than proper standard, and court did not say that defendants were "stupid and mean," but only that such characteristics, if found, would justify imposition of exemplary damages.

Cases that cite this headnote

[37]    **Antitrust and Trade Regulation**
🗝Enhanced Damages; Double or Treble Damages

Consumer who prevails under Deceptive Trade Practices Act (DTPA), for knowing violation may recover three times first $1,000 of actual damages plus three times actual damages in excess of $1,000; equal to trebling of actual damages. V.T.C.A., Bus. & C. § 17.50(b)(1).

Cases that cite this headnote

[38]    **Antitrust and Trade Regulation**
🗝Enhanced Damages; Double or Treble Damages

Legislature intended treble damages to be a cap on total damages recoverable in Deceptive Trade Practices Act (DTPA) action, regardless of number of defendants. V.T.C.A., Bus. & C. § 17.50(b)(1).

1 Cases that cite this headnote

[39]    **Antitrust and Trade Regulation**
🗝Enhanced Damages; Double or Treble Damages

Damages were correctly reduced to $1,215,000, three times the jury's finding of actual damages of $405,000, the limit provided by Deceptive Trade Practices Act (DTPA), even though jury found additional damages under DTPA of $729,000 against one defendant and $496,000 against another defendant. V.T.C.A., Bus. & C. § 17.50(b)(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*811** James H. Baumgartner, Jr., David Reese, Vial, Hamilton, Koch & Knox, Dallas, for appellants.

Orrin L. Harrison, III, Vinson & Elkins, LLP, Eric R. Cromartie, Hughes & Luce, LLP, Thomas W. Mills, Jr., Mills Presby & Anderson, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

012

R339

**OPINION**

CORNELIUS, Chief Justice.

Lavern T. Busse and his son, Jeff Busse, appeal from an adverse judgment rendered in Pacific Cattle Feeding Fund's suit against them for damages resulting from Pacific's investment in a failed cattle marketing arrangement. Pacific sued the Busses, alleging Texas Securities Act and Deceptive Trade Practices Act violations, common law fraud, and breach of contract. The court rendered summary judgment for Pacific on the Securities Act claims. The jury found in Pacific's favor on the DTPA and fraud claims. The court directed verdicts for the Busses on Pacific's breach of contract claims.

Stan Bert formed the Pacific Cattle Corporation, of which he was president and sole shareholder, in September 1985. He formed the Pacific Cattle Feeding Fund # 1, here called "Pacific," as a Texas limited partnership with Pacific Cattle Corporation as general partner in 1986–87. Pacific began investing in cattle in October 1988.

Lean and Free, an Iowa corporation, was formed in September 1987 by twenty-five investors to take advantage of a process developed in England by which Holstein bulls fed a special diet purportedly produced beef low in saturated fat, calories, and cholesterol. Lean and Free encountered financial difficulties early, and by April or May of 1988, it approached Lavern Busse about providing capital. In December of 1988, Lavern Busse made Lean and Free a loan of $150,000, and in January 1989, he increased the loan to $243,000. In April 1989, Lean and Free approached Lavern Busse about additional monies. In response, Lavern increased the amount of his loan and converted the loan into common and preferred stock, making him the major stockholder.

Pacific alleged that Bert learned about Lean and Free in 1989 from Dean Freed of Ag Dimensions International (ADI), which was locating and managing livestock enrolled in the Lean and Free Program. ADI told Bert about Lavern Busse, and Bert and Lavern Busse met on October 23, 1989, at Lavern's office in Cedar Rapids, Iowa. Present **\*812** at the meeting were ADI principals and Mike Knipp, a Lean and Free manager. Lavern Busse already had bulls enrolled in the Lean and Free program under what were called finishing contracts. Bert testified that Lavern Busse assured him that there was more demand for Lean and Free beef than they could satisfy, that he needed to get more investors like Pacific so he could invest more of his money to increase inventory, that Lean and Free was building inventory so it could meet demand, that it had a contract with Amway to supply it

with beef, and that he was carrying Lean and Free beef on his own menus at Bonanza steakhouses. At the close of the meeting, Lavern Busse told Bert that he should deal with ADI and that ADI would put together a group of Busse's bulls that Pacific could buy and place with Lean and Free for feeding.

After the meeting, Bert received through the mail at his Texas offices some Lean and Free advertising brochures that contained analyses of the rate of return investors would receive by investing in Lean and Free.

Bert testified that before he invested he learned that an ADI officer had been convicted of fraud involving cattle contracts. Steve Knutson, a banker at Norwest Bank in Iowa, called Bert to tell him that ADI's chief executive officer, Dennis Peterson, had served some time in prison. Bert then called Jeff Busse. Jeff Busse told Bert that they knew about Peterson's history but that controls were in place at ADI to protect investors. Bert and Jeff Busse had a second phone conversation in which they discussed the difficulties Pacific was having arranging financing at Norwest Bank for the bull purchase. Bert testified that Jeff Busse told him that if the financing did not come through, Lavern Busse would sell the bulls to other buyers. Bert testified that Jeff told him he would speak to Knutson at the bank to speed the matter along.

Pacific bought 1,362 cattle from Lavern Busse on January 25, 1990. Pacific simultaneously entered into feeding and finishing contracts with Lean and Free. The contracts provided that Pacific would pay for feeding the cattle, and once the cattle were ready for slaughter, Lean and Free would repurchase them at cost plus 12% interest, reimburse Pacific for its incurred feed costs, and pay Pacific $25 per head profit.

Lean and Free failed to find enough markets to support its operations. By April 1990, it had failed to repurchase Pacific's cattle, failed to reimburse Pacific for its feed costs, and failed to pay the $25 per head profit. On June 7, 1990, Lean and Free's directors allowed Lavern Busse, as its only secured creditor, to foreclose on the company's processed inventory and trade name. From June 1990 to January 1991, Pacific continued to feed its cattle and gradually sold them off.

Pacific filed suit against Lavern and Jeff Busse in August 1991. It alleged that the Busses knew Lean and Free was failing and that they sold the bulls to Pacific as part of a scheme to liquidate the inventory before the business went under.

The trial court granted partial summary judgment in favor

of Pacific on its claims against Lavern Busse under the Texas Securities Act and granted the Busses a directed verdict on Pacific's breach of contract and alter ego claims. The other issues were submitted to a jury, which found in favor of Pacific, assessing actual damages, additional damages under the DTPA, and punitive damages under the common law fraud claims. The court entered judgment for Pacific on its DTPA claim, but reduced the additional damages by $405,000.

The Busses contend in their first point of error that the trial court erred in denying their motion to dismiss based on forum selection clauses in the feeding and finishing contracts.

[1] [2] Forum selection clauses are valid in Texas. *Greenwood v. Tillamook Country Smoker,* 857 S.W.2d 654, 657 (Tex.App.—Houston [1st Dist.] 1993, no writ). Parties are allowed to choose the forum in which to litigate their disputes. In this case, the feeding and finishing contracts between Pacific and Lean and Free contained the following clauses:

> This agreement and the rights and obligations of the parties arising hereto shall be construed in accordance with the laws **813** of the State of Iowa, with venue in [certain Iowa counties].

A forum selection clause, however, does not apply to a tort action alleging that the plaintiff was induced by misrepresentations to enter into the contract, where construction of the rights and liabilities of the parties under the contract is not involved. *See Caton v. Leach Corp.,* 896 F.2d 939, 942–43 (5th Cir.1990); *Pozero v. Alfa Travel, Inc.,* 856 S.W.2d 243, 245 (Tex.App.—San Antonio 1993, no writ). Where the wrongs arise from misrepresentations inducing a party to execute the contract and not from breach of the contract, remedies and limitations specified by the contract do not apply. *See Caton v. Leach Corp., supra; Decision Control Systems, Inc. v. Personnel Cost Control, Inc.,* 787 S.W.2d 98, 100–01 (Tex.App.—Dallas 1990, no writ).

[3] This case does not involve an interpretation or construction of the contracts but rather the misrepresentations and fraud in the inducement to sign the contracts. The rights, obligations, and cause of action do not arise from the contracts but from the Deceptive Trade Practices Act, the Texas Securities Act, and the common law.

In *Pozero v. Alfa Travel, Inc.,* a couple purchased a cruise

ticket and a ticket cancellation insurance policy. They sued the travel agent and the cruise line, as principal, when the cruise was canceled and the insurance refused to reimburse them. The ticket contract had a forum-selection clause setting California as forum for any lawsuit "arising out of or in any manner relating" to the contract. The court held that the DTPA action involved misrepresentations and nondisclosures leading to the ticket's purchase, not a construction of the ticket contract.

Likewise, in this case the causes of action are based on alleged fraud and deceptive practices that induced Pacific to enter into the contracts, not to interpret or enforce rights under the contracts. Moreover, the Busses were not even parties to the contracts. Although Pacific alleged that Lean and Free was Lavern Busse's alter ego, they failed to prove that allegation.

The Busses rely on *Barnette v. United Research Co.,* 823 S.W.2d 368 (Tex.App.—Dallas 1991, writ denied). That case, however, is distinguishable because there the issues arose from an employment contract and from the parties' employer-employee relationship that implicated the contract terms. Here, the fraud and misrepresentation allegations deal not with the terms of the contract, but predate the contract and deal with inducement to sign the contract. Similarly, the case of *Brock v. Entre Computer Centers, Inc.,* 740 F.Supp. 428 (E.D.Tex.1990), involved a provision that applied to "any action" and was not limited to actions arising under the contract itself. Moreover, the court in *Brock* was construing a federal venue statute not involved here.

For the reasons stated, we conclude that the contractual forum selection clauses do not control this suit.

The Busses also contend that the court erred in denying their motion for judgment notwithstanding the verdict as to Pacific's DTPA claim because Iowa law, not Texas law, applies to the transaction.

[4] [5] [6] A choice of law question is subject to de novo review on appeal. *See, e.g., Huddy v. Fruehauf Corp.,* 953 F.2d 955, 956 (5th Cir.1992). When determining choice of law questions, a court will generally follow the statutory directives of its own state, subject to constitutional limitations. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(1) (1971). The Texas Deceptive Trade Practices Act will be liberally construed in order to protect consumers from false, misleading, and deceptive business practices and to provide efficient and economical procedures to secure such protection. TEX.BUS. & COM.CODE ANN. § 17.44 (Vernon 1987).

014

R341

The Busses do not argue that the DTPA's reach is unconstitutionally broad. Here we have a Dallas-based partnership suing a Texas resident, Lavern Busse. Jeff Busse, an Iowa resident, has waived any jurisdictional complaint and has subjected himself to the jurisdiction of the Texas court. He does not raise the issue on appeal.

[7] If the State Legislature intends for a statute to be applied to out-of-state facts, the courts will so apply it unless constitutional **\*814** limitations forbid it. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(1) cmt. b (1971). Application to out-of-state facts is permissible even when the local law of another state would be applicable under usual choice of law principles. *Id.*

[8] [9] Although the Texas DTPA does not explicitly provide or state an intention that it is to apply to out-of-state facts affecting Texas consumers, it is to be applied liberally to protect those citizens from false, misleading, and unconscionable acts, and it does not provide that its application will be limited to acts or practices occurring in Texas. Moreover, the DTPA's definition of "trade" and "commerce" includes the sale of any good or service "wherever situated" if the trade or commerce directly or indirectly affects the people of Texas. TEX.BUS. & COM.CODE ANN. § 17.45(6) (Vernon 1987); *Reed v. Israel Nat'l Oil Co.,* 681 S.W.2d 228 (Tex.App.—Houston [1st Dist.] 1984, no writ). As noted, here we have a Texas plaintiff who was solicited, in part, in Texas, suing a Texas resident and an Iowa resident. Even under a traditional choice of law analysis, Texas would have sufficient contacts to Pacific's claims so the application of Texas law would not be unreasonable or arbitrary. If construction of the Texas statute justifies the application of Texas rather than Iowa law, and that does not offend the constitution, it is not necessary to engage in the choice of law analysis based on the significant relationships set out in RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971). *See, e.g., Siskind v. Villa Foundation for Education, Inc.,* 642 S.W.2d 434 (Tex.1982). If such an analysis is proper, we find that the record reveals sufficient significant relationships to justify the application of Texas law to the controversy here. Consequently, since it does not offend constitutional principles to apply Texas law in this case, we conclude that the trial court correctly refused to apply Iowa law.

The Busses also contend that the trial court erred in granting Pacific's motion for partial summary judgment on its Securities Act claims against Lavern Busse.

[10] A movant is entitled to a summary judgment when it shows there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c). In deciding whether a material fact issue precludes summary judgment, the court will take as true any evidence favoring the nonmovant and will resolve any doubts and every reasonable inference in the nonmovant's favor. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985).

[11] [12] [13] A person or corporation who offers or sells an unregistered security is liable to the buyer, who may sue for damages. TEX.REV.CIV.STAT.ANN. art. 581–33A(1) (Vernon Supp.1995). A person who directly or indirectly controls a seller or issuer of a security is liable jointly and severally under Section 33A with the seller or issuer and to the same extent as the seller or issuer. TEX.REV.CIV.STAT.ANN. art. 581–33F(1) (Vernon Supp.1995). An investment contract is a "security." TEX.REV.CIV.STAT.ANN. art. 581–4A (Vernon Supp.1995). An investment contract involves (1) a common enterprise in which a person (2) expects profits (3) solely from the efforts of the promoter or a third party. *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *Russell v. French & Associates, Inc.,* 709 S.W.2d 312, 314 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). A security is exempt from registration if the sale is made without public solicitation or advertisement *and* the issuer sold its securities during the preceding twelve months to not more than fifteen persons who bought for their own account. TEX.REV.CIV.STAT.ANN. art. 581–5I (Vernon Supp.1995).

Pacific's summary judgment motion raised two grounds: (1) Lavern Busse sold unregistered securities to Pacific in violation of the Texas Securities Act, and (2) Lavern Busse and a corporation he controlled, Lean and Free, offered and sold securities to Pacific by means of untrue statements of material fact or misleading omissions of material fact or both, in violation of the Securities Act.

In the order granting partial summary judgment, the court found that (1) Lavern Busse was a control person for Lean and Free, (2) Pacific bought a security from Lean and Free that the Securities Act required to **\*815** be registered but was not registered, (3) the security was not exempt from the Act's registration requirements, (4) the sale was made through the use of materially misleading statements and omissions on which Pacific relied in purchasing the security, and (5) Lavern Busse was liable to Pacific for its damages as a result of Busse's violations of the Act.

Lavern Busse in his summary judgment response did not dispute that the securities were sold through the use of

015

R342

materially misleading statements and omissions, so he has waived that issue.

[14] The Texas Securities Act does not require proof of scienter. *American General Ins. Co. v. Equitable General Corp.,* 493 F.Supp. 721 (E.D.Va.1980). If there was adequate summary judgment proof that Lean and Free sold an unregistered security that was not exempt from registration and that Lavern Busse was a control person, the summary judgment was proper.

[15] That Lean and Free sold the finishing-and-feeding contracts is not disputed. On appeal the Busses argue that a fact question remains as to whether the contracts are a security. The Busses in their memorandum in opposition to Pacific's summary judgment motion argue that the contracts are "forwarding" contracts. They do not argue that the elements of the forwarding contracts are different from an investment contract. We conclude that the contracts meet the statutory and case-law requirements for an investment contract.

[16] As to whether the securities were exempt, the summary judgment evidence shows that ADI sent to Pacific two brochures: "A Profile of AG Dimensions International, Inc." and "The Lean and Free Beef Challenge to White Meat." These constituted an advertisement and public solicitation. ADI was acting for Lean and Free in arranging sales for the cattle feeding operations. Whether ADI was Lavern Busse's agent or whether Lavern Busse knew of the brochures is irrelevant. The statute requires no scienter.

[17] As to whether Lavern Busse was a "control person," that term in the Texas statute is used in the same broad sense as in the federal statute. TEX.REV.CIV.STAT.ANN. art. 581–33F cmt. (Vernon Supp.1995). Major shareholders, TEX.REV.CIV.STAT.ANN. art. 581–33F cmt., and directors, *Salit v. Stanley Works,* 802 F.Supp. 728, 734–35 (D.Conn.1992), are control persons. As Lavern Busse was both the majority shareholder and a director, he was a control person within the meaning of the statutes.

As all the statutory elements required to show a violation of the Texas Securities Act were established by summary judgment evidence, summary judgment for Pacific on that issue was proper.

In their fourth point of error, the Busses complain because the court allowed Pacific's attorney to advise the jury of the court's ruling on Pacific's motion for partial summary judgment. They argue that this was an impermissible comment on the weight of the evidence.

[18] [19] [20] Complaint about improper comment by counsel is waived unless objection is timely made. An objection is not timely made unless it is made at the earliest practical moment. *City of Corsicana v. Herod,* 768 S.W.2d 805, 815–16 (Tex.App.—Waco 1989, no writ). Failure to press for an instruction at the time of an allegedly erroneous jury argument operates as a waiver of any complaint which may be made as to the argument. *Fowler v. Garcia,* 687 S.W.2d 517, 520 (Tex.App.—San Antonio 1985, no writ). Where the record fails to show that a motion for mistrial directed to the argument of counsel was not overruled by the trial court, no error is preserved for review. *Biard Oil Co. v. St. Louis Southwestern Ry. Co.,* 522 S.W.2d 588, 590 (Tex.Civ.App.—Tyler 1975, no writ).

During discussions before the court and the jury in connection with a hearsay objection, Pacific's counsel said that the court had already determined that Lavern Busse was a control person for Lean and Free. The court had already decided that question with its ruling on Pacific's motion for partial summary judgment, but the jurors had not been told. The next day, the Busses' moved for a **\*816** mistrial on grounds that the statement improperly informed the jury of the court's prior ruling and that the statement implied that Lavern Busse was a wrongdoer. The court reserved its ruling on the motion.

[21] [22] [23] If counsel's comment was error, the Busses waived their complaint because they failed to timely object. Although there is no bright-line rule to determine the timeliness of an objection, we conclude that an objection made the day following the objectionable event is not timely. Moreover, the Busses failed to request a curative instruction. Improper argument is rarely cause for a mistrial and usually can be cured by an instruction. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839–40 (Tex.1979). The Busses also failed to get a ruling on their mistrial motion, so their complaint was not preserved for review.

The Busses also allege error because the court admitted testimony and documentary evidence about statements made by employees of Lean and Free, Ag Dimensions International, and Norwest Bank. They urge that the statements were hearsay and were highly prejudicial. The Busses point to four pieces of evidence admitted over their objections. They are two pieces of Bert's testimony about what Dean Freed of ADI had told him about Lavern Busse; Bert's testimony about what Steve Knutson of Norwest Bank told him about Lavern Busse; and a brochure titled "Lean and Free Beef Challenge to White Meat."

016

R343

[24] Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. TEX.R.CIV.EVID. 801(d). Evidence of an out-of-court statement is hearsay only if it is introduced to prove the truth of the matter asserted. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982).

[25] The statements in question were not offered for the proof of the matter asserted. In fact, Pacific argued that they were false rather than true. They were offered only to show that they were made, as elements of the fraud Pacific was trying to prove, i.e., as operative facts. *See Williams v. Jennings,* 755 S.W.2d 874, 885 (Tex.App.—Houston [14th Dist.] 1988, writ denied); *Yellow Freight System, Inc. v. North American Cabinet Corp.,* 670 S.W.2d 387, 390 (Tex.App.—Texarkana 1984, no writ). It was not error to admit the statements.

In their sixth point of error, the Busses contend that the trial court erred in overruling their motions for judgment notwithstanding the verdict and for new trial because there was no or insufficient evidence to support the jury's findings that they had committed fraud and engaged in deceptive acts.

[26] In reviewing a no evidence point, the reviewing court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987).

[27] [28] In reviewing a factual insufficiency point, the appellate court first must examine all of the evidence, *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986), and having considered and weighed all the evidence, it will set aside the verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The court apparently held that Iowa law controlled the common law fraud action. Neither side appeals that decision. Under Iowa law the elements of fraud are: a material misrepresentation; made knowingly; with intent to induce the plaintiff to act or refrain from acting; on which the plaintiff justifiably relies; with damages. *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981).

Bert testified that Lavern Busse made several misrepresentations: that the product demand was outstripping supply; that he was going to use the money

he received from Pacific to purchase more bulls and increase the Lean and Free inventory; that he had contracts with certain buyers; and that he was personally committed to funding the project to success.

**\*817** Jeff Busse directly reassured both Bert and the bank that the Busses had control over the activities of ADI and drew up the documents. He signed the contracts between Lean and Free and Pacific and prepared and signed the assignment documents covering Pacific's purchase of the bulls.

There was also evidence that the Busses failed to disclose these facts: (1) because the Lean and Free program was unproven, bulls had serious health problems, had damage to their digestive tracts, had high death loss, and had high disease rates; (2) the inventory being accumulated and carried at cost on the Lean and Free books had substantial problems and most of it was not salable; (3) demand for the product was not great because of its high cost, appearance, and taste; (4) Lean and Free had a going concern qualification on its most recent audited financial statements; (5) Lean and Free had low sales for years and the Busses had no reason to believe sales would improve; (6) Lavern Busse was not only Lean and Free's majority shareholder, but also its sole secured creditor with the ability to foreclose on its assets; (7) Lean and Free had neither the funds nor the prospect of funds based on past performance, present contracts, and future promises to pay for even a significant percentage of its existing obligations to investors; (8) Lavern Busse was reducing his unsecured exposure to Lean and Free by selling bulls to investors; and (9) Lavern Busse had no long-term commitment to Lean and Free, had threatened to cut off funds before the sale to Pacific, and was seeking a buyer for the company.

[29] There is more than a scintilla of evidence to support the jury findings. We also find, after reviewing all the evidence, that it is factually sufficient to support the jury findings.

[30] As to deceptive acts under the DTPA, a consumer may maintain an action where a false, misleading, or deceptive act or practice constitutes a producing cause of actual damages. TEX.BUS. & COM.CODE ANN. § 17.50(a)(1) (Vernon 1987). A failure to disclose information about goods or services can be a deceptive act if the failure to disclose was intended to induce the consumer to enter into the transaction. TEX.BUS. & COM.CODE ANN. § 17.46(b)(23) (Vernon Supp.1995); *see Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 541 (Tex.1981).

[31] The evidence shows that the Busses made

017

R344

misrepresentations that were a producing cause of Pacific's damages. Bert testified that when he investigated to find out why the bulls were not being slaughtered and why Pacific was not being paid in compliance with the contracts, the Busses told him they had a big order coming and that Pacific should continue to hold onto the bulls and continue feeding them. Bert also testified that Jeff Busse told him that Lavern Busse still believed in the program and was buying more cattle and putting them on feed. After Bert returned to Texas and sent a demand letter to the Busses, Jeff Busse responded with a letter asking for an additional ten days, until June 8, 1990, and made representations that a big order was supposed to come in. On June 7, 1990, Jeff Busse told the Lean and Free board that, because litigation was imminent, Lavern Busse was calling his note and foreclosing on the assets.

[32] The Busses also say there is no evidence of damages to Pacific other than breach of contract damages, which cannot be recovered in a tort action for fraud. We find, though, that most of the damages Pacific sought and supported by evidence were tort-related. In addition to seeking the difference between the value as represented and received, it sought out-of-pocket expenses, loss of credit reputation, loss of time value, and loss to business reputation. While this kind of damage could result from a breach of contract, it can also result from fraudulent inducement to enter into a transaction. Pacific did not sue to enforce the contract.

We find the evidence to be both legally and factually sufficient to support the jury findings.

The next complaint is that the trial court erred in failing to submit a requested instruction on mitigation of damages and requested issues and instructions regarding whether Pacific disposed of the bulls in a **\*818** commercially reasonable manner and in good faith.

[33] [34] A party requesting a jury instruction must do three things to preserve error: (1) tender in writing and request the proper instruction before submission, (2) make a specific objection to its omission, and (3) obtain a ruling from the court. *Wright Way Construction Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 418–19 (Tex.App.—Corpus Christi 1990, writ denied). The Busses, although they tendered a proper jury instruction that the court rejected, failed to object at the charge conference, and so waived their complaint. If they preserved their complaint, they still failed to show that the failure to give the instruction probably caused the rendition of an improper verdict.

Complaint is also made that the court erred in submitting

the definition of "exemplary damages" because the definition is an erroneous statement of the law and constituted an impermissible comment on the weight of the evidence.

The court gave the following definition:

> "EXEMPLARY DAMAGES" are those damages which by law may be assessed against a really stupid defendant, or a really mean defendant, or a really stupid defendant who could have caused a great deal of harm by its actions but who actually caused minimal harm, where actual damages have been found, in order to make an example of such person or persons and to deter such conduct on their part in the future.

[35] The Busses' attorney specifically objected to the reference to a stupid and mean defendant in the definition. The court then modified the instruction as to another portion. The Busses did not renew their objection after the court modified the instruction, so they waived any complaint. *Wright Way Construction Co. v. Harlingen Mall Co., supra.*

[36] Although informing the jury that exemplary damages could only be imposed against a really stupid or really mean defendant departed from the correct standard and was improper, we do not find it to be reversible, even if error had been properly preserved. Indeed, the standard used by the court placed a more onerous burden of proof on Pacific than the proper standard. We cannot see that the instruction was harmful. The court did not say that the Busses were "stupid and mean," but only that such characteristics, *if found,* would justify the imposition of exemplary damages.

Pacific contends in its cross-point that the court erred in reducing its damages. It argues that it is entitled to $1,620,000 in damages under the DTPA rather than the $1,215,000 awarded by the trial court. The court awarded damages of $1,215,000, three times the jury's finding of actual damages, $405,000. The jury found additional damages under the DTPA of $729,000 against Lavern Busse and $486,000 against Jeff Busse, which together also total three times actual damages.

[37] A consumer who prevails under the DTPA under a knowing violation may recover three times the first $1,000 of actual damages plus three times the actual

018

R345

damages in excess of $1,000. This is equal to a trebling of actual damages. TEX.BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.1995); *Jim Walter Homes, Inc. v. Valencia,* 690 S.W.2d 239, 241 (Tex.1985).

Pacific argues it is entitled to $1,630,000 ($729,000 + $405,000 + $486,000), because damages allocated to Lavern Busse ($720,000 + $405,000 = $1,134,000) are under the $1,215,000 legislative cap and the damages allocated to Jeff Busse ($405,000 + $496,000 = $891,000) also are under the legislative cap.

[38] [39] It appears that the Legislature intended the treble damages to be a cap on the total damages recoverable in a DTPA action regardless of the number of defendants. *See Jim Walter Homes, Inc. v. Valencia,* 690 S.W.2d at 241;

*Providence Hospital v. Truly,* 611 S.W.2d 127, 135 (Tex.Civ.App.—Waco 1980, writ dism'd). We agree with the authorities that suggest that this was the legislative intent and hold that the trial court correctly reduced the damages to the limit provided by the DTPA.

**\*819** For the reasons stated, the judgment is in all things affirmed.

**All Citations**

896 S.W.2d 807

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

019

R346

254 S.W.3d 710
Court of Appeals of Texas,
Dallas.

In re ADVANCE PAYROLL FUNDING, LTD., Relator.
Advance Payroll Funding, Ltd., Appellant
v.
Landry Marks Partners, LP, Appellee.

No. 05–07–00992–CV. | May 21, 2008.

**Synopsis**
**Background:** Buyer of accounts receivable brought action against seller, asserting claims for fraudulent misrepresentation, negligent misrepresentation, fraudulent transfer, unjust enrichment, and aiding and abetting fraud, alleging that seller sold the accounts knowing that they were not real obligations. Seller filed motion to stay proceedings and compel arbitration under arbitration clause of seller's factoring agreement with original holder of the accounts. The 95th Judicial District Court, Dallas County, Karen Gren Johnson, J., denied the motion, and seller filed interlocutory appeal and petition for writ of mandamus.

**Holdings:** The Court of Appeals, Morris, J., held that:

[1] buyer was not required to arbitrate its claims under theory of direct-benefits estoppel;

[2] letter agreement between buyer and seller did not incorporate factoring agreement by reference; and

[3] buyer did not assume, and was not assigned, original holder's obligations to seller under factoring agreement.

Petition denied; appeal dismissed.

**Attorneys and Law Firms**

**\*711** Charles Thomas Kruse, Baker & Hostetler LLP, Houston, for appellant.

Roger B. Cowie, Locke Liddell & Sapp, LLP, Charles Glen Morris, Crews, Shepherd & McCarty, LLP, Dallas, for appellee.

**\*712** Before Justices MORRIS, FITZGERALD, and LANG.

**OPINION**

Opinion by Justice MORRIS.

In this consolidated interlocutory appeal and petition for writ of mandamus, Advance Payroll Funding, Ltd. contends the trial court erred when it denied its motion to compel arbitration of claims filed by Landry Marks Partners, LP. Advance Payroll Funding asserts that Landry Marks, a nonparty to the agreement containing the arbitration clause, should be compelled to

arbitrate its claims under the theory of equitable estoppel. For the reasons that follow, we deny the petition for writ of mandamus and dismiss the interlocutory appeal.

## I.

Advance Payroll Funding (APF) and Landry Marks are both engaged in the factoring business.[1] In 2005, APF executed a factoring agreement with Administrative Staffing Resources, L.L.C. (ASR). That agreement contained an arbitration clause giving APF the right to have "any dispute or disagreement between the parties arising out of or relating to this Agreement, or the transactions or relationships contemplated hereby, resolved by arbitration...." In 2006, Landry Marks executed a factoring agreement with ASR for the accounts receivable then owned by APF. As a condition to that agreement, ASR was required to terminate its agreement with APF. On December 11, 2006, ASR and APF signed a termination agreement that required ASR to pay APF $2,676,192.37 and APF to assign back to ASR all of ASR's accounts. On that date, Landry Marks wire-transferred to APF the specified payoff amount on behalf of ASR. Landry Marks and APF also signed a letter agreement providing that, upon Landry Marks's payment of ASR's obligations to APF, APF would provide a letter notifying account debtors of the transfer of the accounts, terminate its UCC filings against ASR's assets, and return any funds received on ASR's accounts after December 11, 2006. Shortly after acquiring the ASR accounts, Landry Marks learned that many of the accounts were not real obligations and ASR's president admitted he had provided false information to Landry Marks about the accounts.

Landry Marks sued APF to recover the payoff amount, asserting claims for fraudulent misrepresentation, negligent misrepresentation, fraudulent transfer, unjust enrichment, and aiding and abetting fraud.[2] APF filed a motion to stay proceedings and compel arbitration of Landry Marks's claims under the Texas Arbitration Act (TAA) and the Federal Arbitration Act (FAA) based on the arbitration clause in APF's factoring agreement with ASR. The trial court denied the motion. APF filed this interlocutory appeal and petition for writ of mandamus challenging the trial court's denial.

## II.

[1] [2] [3] [4] As a preliminary matter, we note that APF urges that the FAA rather than the TAA governs the arbitration clause at issue.[3] Landry Marks does not contest **\*713** the applicability of the FAA. The APF–ASR contract involves an Ohio company's purchase of a Texas company's accounts receivable and, thus, evidences transactions involving interstate commerce. The FAA applies to contracts involving interstate commerce. *See Jack B. Anglin, Co., Inc. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992) (orig. proceeding). Moreover, the contract provides that Ohio law governs the parties' agreement. Where parties agree that another state's substantive law applies to their contract, the TAA is inapplicable. *See In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 551 (Tex.2002) (orig. proceeding). We therefore dismiss APF's interlocutory appeal because the TAA does not apply to this case.[4] Under the FAA, mandamus relief is appropriate if the trial court abused its discretion in failing to stay the litigation and compel arbitration. *In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 188 (Tex.2007) (orig. proceeding).

[5] [6] [7] [8] APF asserts Landry Marks is equitably estopped from avoiding arbitration because (1) the liability and damages for its claims against APF arise from or depend on the APF–ASR factoring agreement and (2) Landry Marks deliberately sought and obtained benefits from that factoring agreement when it paid off ASR's obligations and requested APF to take the actions listed in the letter agreement.[5] Generally, arbitration of a claim cannot be compelled unless it falls within the scope of a valid arbitration agreement. *See In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex.1999) (orig. proceeding), *abrogated in part on other grounds by In re Halliburton Co.,* 80 S.W.3d 566, 571–72 (Tex.2002). There are several recognized instances, however, where a nonparty to the agreement may nevertheless be bound to arbitrate its claims. *See Merrill Lynch,* 235 S.W.3d at 191; *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 131 (Tex.2005). For example, a nonparty

021

R348

may be required to arbitrate if (1) liability for its claim arises from the contract containing the arbitration provision or (2) it deliberately seeks and obtains substantial benefits from the contract itself. *Weekley Homes,* 180 S.W.3d at 132–33. This theory, known as direct-benefits estoppel, will not create liability for noncontracting parties that does not otherwise exist. *Id.* at 134. Nor does it apply when the benefits alleged are insubstantial or indirect. *Id.*

In this case, Landry Marks's claims do not arise from the APF–ASR factoring agreement but are based instead on APF's alleged misrepresentations or omissions with respect to the existence and amount of the accounts receivable Landry Marks purchased from ASR. Simply because Landry Marks forwarded the purchase price directly to APF as the current owner of the accounts does not mean Landry Marks's claims arose from or are dependent upon the factoring agreement from which APF derived its ownership interest. Contrary to APF's position, any duty owed to Landry Marks with respect to misrepresentations or disclosures on the accounts arose from general obligations imposed by law as a result of their dealings and were not derived from the APF–ASR factoring **\*714** agreement. Likewise, the payoff amount and actions requested of APF did not arise from the factoring agreement but from the termination agreement between ASR and APF.

In essence, the APF–ASR factoring agreement merely created the conditions that led Landry Marks to deal with APF. There is nothing in the record to suggest Landry Marks received any substantial benefit from the factoring agreement itself or that its claims depend on the factoring agreement. As such, direct-benefits estoppel does not apply to Landry Marks's claims against APF and the trial court did not abuse its discretion in denying APF's motion to compel arbitration on this ground.

## III.

[9] [10] [11] APF also argues that the trial court erred in denying its motion to compel arbitration because (1) the APF–ASR factoring agreement was incorporated by reference into the letter agreement between Landry Marks and APF and (2) Landry Marks accepted assignment of the ASR accounts and, thus, assumed ASR's obligations under the APF–ASR factoring agreement. Neither of these arguments were presented to the trial court. It is well established that arguments not presented to the trial court will not be considered in a petition for writ of mandamus. *See American Optical,* 988 S.W.2d at 714. Even if the arguments were properly before us, however, we conclude they are without merit.

APF maintains the phrase "your receipt of $2,676,192.37 ... in full payment of ASR's obligations to you" in the parties' letter agreement necessarily refers to ASR's obligations under the factoring agreement. We disagree that this language incorporates by reference the APF–ASR factoring agreement into the letter agreement. In fact, the payment obligation mentioned arose directly from the agreement to terminate the APF–ASR factoring agreement.

We likewise reject APF's contention that Landry Marks assumed or was assigned ASR's obligations under the APF–ASR factoring agreement. As noted above, that factoring agreement was terminated in a separate agreement executed by APF and ASR. Any references to Landry Marks's "assignment" of the accounts arose from the ASR–Landry Marks factoring agreement.

We conclude the trial court did not abuse its discretion in denying APF's motion to compel arbitration. We deny APF's petition for writ of mandamus and dismiss its interlocutory appeal.

**All Citations**

254 S.W.3d 710

Footnotes

[1]       Factoring involves the purchase of accounts receivable from companies at a discounted rate.

[2]       Landry Marks also sued ASR and other defendants. The claims against these additional defendants are not relevant to the disposition of this appeal.

[3]       APF has filed its interlocutory appeal "in the unlikely event that this Court does not agree that the FAA applies to this dispute."

[4]       An interlocutory appeal is the proper vehicle for challenging the denial of a motion to compel arbitration under the TAA. *See Tipps,* 842 S.W.2d at 272.

[5]       APF also argues that Landry Marks should be bound to the arbitration clause because it "stepped into the shoes" of ASR by tortiously interfering with the factoring agreement's exclusivity clause. Because APF did not present this argument to the trial court, we will not consider it here. *See In re American Optical Corp.,* 988 S.W.2d 711, 714 (Tex.1998) (orig. proceeding).

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

023

R350

2008 WL 5413097
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Dallas.

In re WILMER CUTLER PICKERING HALE AND DORR LLP, Relator.

No. 05–08–01395–CV. | Dec. 31, 2008.

Original Proceeding from the 401st Judicial District Court, Collin County, Texas, Trial Court Cause No. 401–00568–2008, Mark Rusch, J.

**Attorneys and Law Firms**

R. Paul Yetter, Gregory S. Coleman, Yetter, Warden & Coleman, LLP, Houston, TX, David E. Keltner, Kelly Hart & Hallman, LLP, Fort Worth, TX, for Relator.

Lynda Lee Weaver, Martin E. Rose, Rose Walker, LLP, Dallas, TX, Joe Kendall, Provost Umphrey Law Firm, L.L.P., Steven Dominic Sanfelipo, Dallas, TX, for Real Parties in Interest.

Before Justices WHITTINGTON, FITZGERALD, and LANG–MIERS.

**MEMORANDUM OPINION**

Opinion by Justice FITZGERALD.

**\*1** Real party in interest, McAfee, Inc., sued relator, the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, on several theories of liability including fraud. Relator moved to dismiss on several grounds, including a contractual forum-selection clause and lack of ripeness. The trial court signed an order dismissing every claim except for fraud. Relator seeks mandamus relief, asking us to direct the trial court to dismiss the fraud claim as well. We deny relator's petition for writ of mandamus.

**I. BACKGROUND**

In 2002, McAfee's former chief financial officer, Prabhat Goyal, became the subject of a federal investigation for securities fraud. Goyal retained relator in connection with that matter. The investigation led to the filing of a twenty-count federal indictment against Goyal in 2004 in the Northern District of California. Goyal continued to retain relator to defend him in that matter. He was eventually convicted of at least some counts in that case.

Goyal had an indemnity agreement with McAfee, pursuant to which McAfee was obliged to indemnify and defend Goyal against actions brought against him by reason of his status as an agent of McAfee. In that agreement, McAfee promised to advance Goyal's defense costs, and Goyal promised to repay those costs if it were ultimately determined that Goyal was not

entitled to be indemnified. Accordingly, McAfee paid Goyal's legal bills incurred in connection with the securities-fraud investigation and prosecution for several years. Goyal's legal fees and expenses from the start of the federal investigation through Goyal's conviction were approximately $12 million.

In April 2008, McAfee sued relator in Texas state court, alleging that relator billed McAfee for roughly $6.8 million of "unjustifiable legal fees and expenses." McAfee asserted equitable subrogation, negligence, breach of fiduciary duty, and fraud as its legal theories of recovery, and it also sought declaratory relief. Relator removed the case to federal court. While in federal court, McAfee amended its pleadings to add the theories of assumpsit, theft, and gross negligence. The federal judge later remanded the case on the ground that it was not ripe under federal law. The judge declined to speculate whether McAfee's claims were ripe under Texas state law.

After remand, relator filed a motion to dismiss in state court. Relator raised three grounds for dismissal: (1) lack of ripeness, (2) a forum-selection clause in the indemnity agreement between Goyal and McAfee, and (3) the absence of Goyal, an indispensable party, from the lawsuit. After a hearing, the judge signed an order denying the motion to dismiss as to McAfee's fraud claim but granting it as to all other claims asserted by McAfee. Relator seeks a writ of mandamus compelling the trial judge to dismiss McAfee's fraud claim as well. In its petition for writ of mandamus, relator argues only the forum-selection clause and the lack of ripeness as grounds for relief. Our inquiry is whether relator has demonstrated that the trial court clearly abused its discretion and that relator has no adequate remedy by appeal. *In re McAllen Med. Ctr., Inc.,* No. 05–0892, 2008 WL 4051053, at *1 (Tex. Aug.29, 2008).

## II. FORUM–SELECTION CLAUSE

**\*2** In the first of its two issues, relator argues that the trial court should have dismissed McAfee's fraud claim because of the forum-selection clause found in the indemnity agreement between McAfee and Goyal. We reject relator's argument for the following reasons.

### A. Standing to enforce the forum-selection clause

We first consider whether relator, which was not a party to the indemnity agreement between McAfee and Goyal, is entitled to enforce the forum-selection clause found therein. Ordinarily, a non-party cannot enforce a contract unless it enjoys third-party beneficiary status. *See, e.g., S. Tex. Water Auth. v. Lomas,* 223 S.W.3d 304, 306 (Tex.2007) ("A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit."). Relator does not directly contend that it is a third-party beneficiary of the indemnity agreement (although, as discussed below, it does rely on an alleged admission by McAfee that relator was a third-party beneficiary in connection with a different theory). Rather, relator relies on this Court's holding that a "transaction participant" can enforce a forum-selection clause even if the participant was not actually a party to the contract. *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 75 (Tex.App.-Dallas 1996, no writ). In its reply brief, relator also asserts the theory of equitable estoppel. Under this theory, a non-signatory defendant can invoke a forum-selection clause if the signatory plaintiff "has sued signatory and non-signatory defendants based on substantially interdependent and concerted misconduct by all defendants." *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.,* 177 S.W.3d 605, 622 (Tex.App.-Houston [1st Dist.] 2005, no pet.)(analogizing to the law governing arbitration agreements); *accord Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 694 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

### 1. Transaction participant

Relator does not fit the definition of "transaction participant" that we adopted in *Accelerated Christian Education.* In that case, we defined transaction participant as "an employee of one of the contracting parties who is individually named by

025

R352

another contracting party in a suit arising out of the contract containing the forum selection clause."925 S.W.2d at 75.From the context, it is plain that the employee relationship must have existed at the time of the transaction containing the forum-selection clause. *See id.*("To hold otherwise would allow a nonsignatory employee, who was a transaction participant, to defeat his company's agreed-to forum by refusing to be bound by the employer's contract."). And in a subsequent unpublished but persuasive opinion, we closely analyzed the question of whether the nonsignatory was an employee of the signatory at the time of the transaction. *Robbins & Myers, Inc. v. J.M. Huber Corp.,* No. 05–01–00139–CV, 2002 WL 418206, at *3 & n. 5 (Tex.App.-Dallas March 19, 2002, no pet.)(not designated for publication). Relator points to no evidence that it was an employee of Goyal at the time the indemnity agreement was executed, or that it had any involvement in the indemnity agreement transaction at all. Indeed, relator acknowledges in its reply brief that it is not Goyal's employee.

**\*3** Relator presents two arguments in support of its position that it is a transaction participant. First, relator argues that McAfee admitted that relator is, after all, a third-party beneficiary of the indemnity agreement. We have reviewed the pleading cited by relator in support of this argument, and we do not agree that McAfee admitted relator's third-party beneficiary status. At one time McAfee pleaded for declaratory relief that it "has fulfilled and discharged **any** and all liabilities to [relator] as a third party beneficiary to the agreement by paying past fees, and to declare that [McAfee] is not obligated to pay any outstanding fees or expenses or fees for future work to [relator]." (Emphasis added). As we read this pleading, McAfee did not concede relator's third-party beneficiary status, but only sought a declaration that McAfee had discharged its liabilities to relator as a third-party beneficiary if any such liabilities existed.

Second, relator argues that it is a "transaction participant" because McAfee made all of the payments at issue because of the indemnity agreement. This argument fails because it does not address the requirement that a "transaction participant" must have been an employee of a signatory at the time of the transaction containing the forum-selection clause. According to relator's own recitation of the facts, some six years passed between the execution of the indemnity agreement and Goyal's need to retain relator as counsel. Thus, relator fails to show that it was an employee of McAfee or Goyal when the indemnity agreement was executed or that relator participated in that transaction in any way. Its participation in the invoice-and-payment transactions with McAfee years later is irrelevant.

## 2. Equitable estoppel

This leaves relator's equitable-estoppel theory of standing to enforce the forum-selection clause. Under this theory, relator had to demonstrate that McAfee "has sued signatory and non-signatory defendants based on substantially interdependent and concerted misconduct by all defendants."*See Phoenix Network,* 177 S.W.3d at 622.Relator is the only defendant, so plainly McAfee has not sued both signatory and nonsignatory defendants. Moreover, McAfee does not allege interdependent and concerted misconduct by relator and signatory Goyal. The only misconduct at issue is the alleged fraud by relator. Relator argues that equitable estoppel is supported by McAfee's allegations that it required Goyal to review and approve relator's invoices before forwarding them to McAfee for payment. But McAfee alleges no wrongdoing by Goyal in connection with relator's invoices, much less that Goyal was a participant in relator's alleged fraud. Accordingly, relator has not shown that the facts of this case compel application of the equitable-estoppel theory of standing.

## 3. Conclusion

Relator has not shown that it has standing to enforce the forum-selection clause.

## B. Interpretation of the forum-selection clause

**\*4** Even if relator had standing to enforce the forum-selection clause, we would still overrule its first issue because the forum-selection clause does not cover McAfee's fraud claim. Paragraph 19 of the indemnity agreement provides as follows:

*Consent to Jurisdiction.*[McAfee] and [Goyal] each hereby irrevocably consent to the jurisdiction of the courts of the State

026

R353

of Delaware for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement and agree that any action instituted under this Agreement shall be brought only in the state courts of the State of Delaware.

This provision has two parts: a consent to Delaware jurisdiction for any action that "arises out of or relates to" the indemnity agreement, and a mandatory forum-selection provision for any action "instituted under" the indemnity agreement. Courts have recognized that clauses in which parties merely "consent" or "submit" to the jurisdiction of a particular forum are permissive rather than mandatory, and a mere consent-to-jurisdiction clause will not justify dismissing a suit that is filed in a different forum. *E.g., Dunne v. Libbra,* 330 F.3d 1062, 1063 (8th Cir.2003); *Keaty v. Freeport Indonesia, Inc.,* 503 F.2d 955, 956–57 (5th Cir.1974); *see also Sw. Intelecom, Inc. v. Hotel Networks Corp.,* 997 S.W.2d 322, 323–26 (Tex.App.-Austin 1999, pet. denied) (clause whereby parties "stipulate to jurisdiction [in] Minnesota, as if this Agreement were executed in Minnesota" was not a mandatory forum-selection clause); *Weisser v. PNC Bank, N.A.,* 967 So.2d 327, 330 (Fla.Dist.Ct.App.2007) (distinguishing mandatory forum-selection clauses from permissive clauses that "constitute nothing more than a consent to jurisdiction and venue in the named forum and do not exclude jurisdiction or venue in any other forum").

In construing the clause, we strive to ascertain the intent of the parties by giving the language its ordinary meaning. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex.2005). When parties use different language in different parts of a contract, we may ordinarily assume that they intended different things. *Cf. City of Dallas v. Heard,* 252 S.W.3d 98, 111 (Tex.App.-Dallas 2008, pet. denied) ("We assume the legislature used different language in each subsection for a reason."). In this case, the consent-to-jurisdiction clause has a scope that is different from the mandatory forum-selection clause. The consent-to-jurisdiction clause is very broad, encompassing all actions that arise out of or relate to the agreement. The phrase "relates to," in particular, is recognized as a very broad term. *See, e.g., Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby,* 183 S.W.3d 891 (Tex.App.-Austin 2006, no pet.)(arbitration clause); *Whitten v. Vehicle Removal Corp.,* 56 S.W.3d 293, 308 (Tex.App.-Dallas 2001, pet. denied) (statutory preemption provision).

The mandatory forum-selection clause, by contrast, applies only to actions "instituted under" the indemnity agreement. The use of different words indicates that the scope of the forum-selection clause is different from the scope of the consent-to-jurisdiction clause. The phrase "instituted under" connotes a scope narrower than the expansive phrase "arises out of or relates to."The plain meaning of "instituted" in this context is "initiated" or "set up," and the plain meaning of "under" is "in accordance with" or "subject to the bidding or authority of."WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1171, 2487 (1981). We agree with McAfee that an action is "instituted under" the indemnity agreement only if the claimant is relying on the terms and authority of the agreement as the basis for the rights sued upon. In other words, the forum-selection clause of section 19 applies only if the claimant is suing on rights that are created by the indemnity agreement itself. McAfee's fraud claim against relator does not depend on the authority or terms of the agreement. Rather, McAfee alleges that relator defrauded McAfee with repeated misrepresentations "contained in [relator's] billings, related correspondence and communication together with [its] reputation as a top law firm."Relator's legal duty not to defraud McAfee in the manner alleged, if any, is created by the common law, not the indemnity agreement.

*5 Relator urges that the "instituted under" requirement is satisfied because McAfee paid Goyal's legal expenses "under" the indemnification agreement. The forum-selection clause, however, applies only if McAfee's action is "instituted under" the indemnity agreement. Although the indemnity agreement may explain why McAfee was paying relator's invoices at all, the fact remains that McAfee is not suing relator based on any rights created by or spelled out in the indemnity agreement itself. McAfee's fraud claim is "instituted under" the common law, not the indemnity agreement. We decline to expand the meaning of the language contained in the agreement. *See Lewis v. Foxworth,* 170 S.W.3d 900, 903 (Tex.App.-Dallas 2005, no pet.)("We may neither rewrite the contract nor add to its language.").

**C. Conclusion**
We overrule relator's first issue.

027

R354

### III. RIPENESS

In its second issue, relator argues that McAfee's fraud claim is not yet ripe, which deprives the trial court of subject-matter jurisdiction over that claim. Relator's theory is that the indemnity agreement gives McAfee the right to recoup all of its payments from Goyal if it is ultimately determined that Goyal is not entitled to indemnification under the agreement. This determination, relator contends, cannot be made until Goyal's criminal case, including appeal, has run its course. Thus, relator concludes, McAfee's injury remains totally speculative until Goyal's criminal case is concluded and his right to indemnification determined. *See Perry v. Del Rio,* 66 S.W.3d 239, 249 (Tex.2001) ("The central concern [in a ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.").

We reject relator's argument. It may be true that McAfee's right of recoupment against Goyal, based on the terms of the indemnity agreement, is not yet ripe. But McAfee's right not to be defrauded by relator is separate and independent of any contractual rights it may enjoy against Goyal. That is, McAfee's right to recover against relator for fraud does not depend on a preliminary determination that Goyal has no right to indemnification. Whether Goyal prevails or not, neither he nor relator enjoys the right to defraud McAfee under any scenario.

In sum, McAfee's rights against relator are concrete and do not depend on contingent or hypothetical facts, or on events that may not come to pass. Accordingly, McAfee's fraud claim against relator is ripe.

We overrule relator's second issue.

### IV. CONCLUSION

Relator has not shown that the trial court clearly abused its discretion by denying relator's motion to dismiss as to McAfee's fraud claim.[1] We deny the petition for writ of mandamus.

**All Citations**

Not Reported in S.W.3d, 2008 WL 5413097

Footnotes

[1] The author of this opinion would also deny relief on the ground that the certification at the end of relator's petition for writ of mandamus does not substantially comply with the requirements of Texas Rule of Appellate Procedure 52.3(j), as amended effective September 1, 2008. *See In re Butler,* No. 05–08–01443–CV, 2008 WL 4952842 (Tex.App.-Dallas Nov.21, 2008, orig. proceeding). The rule requires the person filing a petition for writ of mandamus to certify that he or she has read the petition and concluded that "every factual statement in the petition is supported by competent evidence included in the appendix or record." The certificate at the end of relator's petition contains only an averment that "the Petition truly and correctly recites the factual allegations set forth in the pleadings and the evidence in the record." But in light of the foregoing analysis, it is unnecessary to address this issue.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

028

R355

2000 WL 298282
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL VALUE
BUT MAY BE CITED WITH THE NOTATION "(not
designated for publication)."

Court of Appeals of Texas, Austin.

MAJOR HELP CENTER, INC. and Robert Berz,
Appellants,
v.
IVY, CREWS & ELLIOTT, P.C.; Guy C. Fisher,
Esq.; Earl K. Straight, Esq.; Richard T. Jones,
Esq.; James P. Borne, Esq.; and McGraw, Brinkley
& Irwin, Appellees.

No. 03-99-00285-CV. | March 23, 2000.

From the County Court at Law No. 1 of Travis County,
No. 241,712; Orlinda Naranjo, Judge Presiding.

Before Chief Justice ABOUSSIE, Justices KIDD and
SMITH.

**Opinion**

SMITH.

**\*1** Major Help Center, Inc. is a California corporation that
sold television advertising to six lawyers or small law
firms in Austin. When the dissatisfied Lawyers[1] sued
Major Help and its Texas representative Robert Berz for
violations of the Deceptive Trade Practices Act (DTPA),
the defendants moved to dismiss the cause, citing a forum
selection clause in their contract with the Lawyers which
designated Los Angeles, California as the agreed forum.
The trial court denied the motion to dismiss, and a jury
found Major Help and Berz each liable for deceptive trade
practices and attorneys' fees. On appeal, Major Help
contends that the trial court erred in refusing to apply the
forum selection clause to this dispute and that the
evidence was legally or factually insufficient to support
the DTPA violations, the alleged double recovery from
each defendant, and the award of attorneys' fees. We will
affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April and May of 1998, Major Help contacted each of
the Lawyers for the purpose of selling them television
advertising. According to Major Help's initial
representations, the advertising would be a cooperative
venture among twelve local attorneys or law firms.[2] Each
attorney or firm would contribute a sum certain; in return,
Major Help would prepare a television advertisement
featuring each Lawyer's name and would purchase air
time to run the ads.

After the initial telephone contact, Berz visited the
Lawyers in person and presented a video depicting the
television advertisement that would be broadcast. Major
Help proposed to add the names of each participating
lawyer to the advertisement once they had reached an
agreement. According to Berz's representations, the
content of the television advertisement had been approved
by the State Bar of Texas. Berz also represented to each
of the Lawyers that the advertisements would air
according to a particular schedule and that Major Help
would spend a certain amount of money to purchase the
air time.

The advertisement included a phone number that would
be answered by Major Help. Berz represented that Major
Help would forward all incoming calls to the participating
lawyers on a rotating basis. Major Help was not to screen
the calls; rather, it represented that it would automatically
forward them with a recording identifying the referral as a
"Major Help Center call."

Each of the named Lawyers agreed to participate in the
cooperative advertising arrangement. Each deposited a
sum of money with Major Help and agreed to deposit
additional installments throughout the course of the
agreement. Subsequently, each of the Lawyers discovered
that Major Help had misrepresented their proposed
arrangements in several respects: the television
advertisement had not been approved by the State Bar of
Texas; the advertisements were not identical to the one
they had previewed; the ads did not air according to the
promised schedule; and Major Help screened some calls
rather than automatically forwarding them as it had
represented.

**\*2** After Major Help failed to respond to the Lawyers'
demand for a refund of the funds they had paid, the
Lawyers filed suit alleging breach of contract and
violations of the Deceptive Trade Practices Act. In
response, Major Help filed a special appearance and a

029

R356

motion to dismiss based on the forum selection clause in its agreement with the Lawyers (the Agreement).[3] The Lawyers then dismissed their breach-of-contract claim and proceeded solely on their DTPA claim. The trial court denied the special appearance and the motion to dismiss, and the parties tried the case to a jury.

At the close of evidence, Major Help moved for an instructed verdict, arguing that the only basis for the Lawyers' DTPA claim was breach of contract, which alone does not constitute a DTPA violation. The court denied the motion for an instructed verdict and submitted the issues to the jury. The jury found Major Help and its representative liable for DTPA violations and assessed $38,250 in actual damages and $18,000 in attorneys' fees against each of the two defendants.

## DISCUSSION

On appeal, Major Help[4] first argues that the trial court erred in denying the motion to dismiss because the forum selection clause was valid and should have been applied in this case. Second, Major Help asserts that the Lawyers presented no evidence or insufficient evidence of DTPA violations and that the written contract negated any reliance by the Lawyers on the alleged deceptive misrepresentations. Third, Major Help alleges that the jury's award of damages against each of the two defendants resulted in a double recovery for the same act and that the trial court should have found Berz and Major Help jointly and severally liable. Finally, Major Help contends that the Lawyers failed to establish that the attorneys' fees they sought were reasonable and necessary.

### I. Forum Selection Clause

Forum selection clauses are valid in Texas. *See Busse v. Pacific Cattle Feeding Fund No. 1, Ltd.,* 896 S.W.2d 807, 812 (Tex.App.-Texarkana 1995, writ denied). "When a party contractually consents to the jurisdiction of a particular state, that state has jurisdiction over that party as long as the agreed-to state will enforce the type of forum selection clause signed by the parties." *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 72 (Tex.App.-Dallas 1996, no writ). However, forum selection clauses will not apply if construction of the rights and liabilities of the parties under the contract is not involved. *See Busse,* 896 S.W.2d at 813. Thus, in determining whether the forum selection clause applies in this case, we must review the nature of the Lawyers'

claims to determine whether they could stand alone or are so interwoven with the Agreement that they could not be maintained without reference to the Agreement. *See Valero Energy Corp. v. Wagner & Brown, II,* 777 S.W.2d 564, 566 (Tex.App.-El Paso 1989, writ denied).

Major Help contends that the Lawyers' DTPA claim specifically implicates the written contract terms. For support, Major Help relies primarily on *Texas Source Group, Inc. v. CCH, Inc.,* 967 F.Supp. 234 (S.D.Tex.1997), and *Accelerated Christian,* 925 S.W.2d at 68-69. In *Accelerated Christian,* the appellate court affirmed the trial court's dismissal of contractual, tort, and DTPA claims, reasoning that "pleading alternate noncontractual theories of recovery will not alone avoid a forum selection clause if those alternate claims arise out of the contractual relations and implicate the contract's terms." *Accelerated Christian,* 925 S.W.2d at 72. Similarly, the federal district court in *Texas Source Group* enforced a forum selection clause and dismissed the plaintiffs' contractual and noncontractual claims, holding that the claims arose out of the parties' contractual relationship and implicated the agreement. *See Texas Source Group,* 925 F.Supp. at 238.

**\*3** The Lawyers counter that their DTPA suit did not arise under the Agreement and therefore the forum selection clause does not apply. Citing *Busse,* the Lawyers argue that where the wrongs arise from misrepresentations inducing a party to execute the contract and not from breach of the contract, the remedies and limitations specified by the contract do not apply. *See Busse,* 896 S.W.2d at 813.

*Texas Source Group, Accelerated Christian,* and *Busse* all turned on the issue of whether the claims pleaded implicated the terms of the contract, thereby triggering the forum selection clause. *Accelerated Christian* and *Texas Source Group* included contractual and noncontractual claims that necessarily implicated the terms of the contract. *See Accelerated Christian,* 925 S.W.2d at 72; *Texas Source Group,* 967 F.Supp. at 237-38. Indeed, in both cases the noncontractual claims were premised on the defendant's failure to comply with a contractual duty-a claim that could not have been maintained without reference to the terms of the contract. *See Accelerated Christian,* 925 S.W.2d at 69; *Texas Source Group,* 967 F.Supp. at 237-38. *Busse,* on the other hand, involved misrepresentations and fraud in the inducement to sign a contract and thus did not implicate the terms of the contract. *See Busse,* 896 S.W.2d at 813.

In this case, the Lawyers assert a single noncontractual cause of action based on alleged misrepresentations made

by Major Help prior to the date the parties signed the Agreement. The Lawyers do not rely on the terms of the Agreement as the basis for their claims. They do not attempt to enforce duties or obligations arising under the Agreement. These facts are analogous to those in the *Busse* decision, which we find persuasive. Consequently, we hold that the Lawyers' DTPA claim is independent of the Agreement, and the forum selection clause does not apply. To the extent *Accelerated Christian* or *Texas Source Group* can be read to compel a different conclusion, we decline to follow them. We overrule Major Help's first issue.[5]

## II. DTPA Violations

In its second issue, Major Help asserts that the Lawyers presented no evidence or insufficient evidence of DTPA violations. Major Help also contends that the Lawyers failed to prove reliance on Major Help's representations because the written agreement between the parties negates any reliance on statements made prior to the signing of the Agreement.

When a case is tried to a jury, factual-insufficiency complaints must be preserved through a motion for new trial. *See* Tex.R.Civ.P. 324(b); *Cecil v. Smith,* 804 S.W.2d 509, 510 (Tex.1991). Major Help did not file a motion for new trial and thus has failed to preserve its factual-insufficiency issues.

No-evidence points must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or, (5) a motion for new trial. *See Steves Sash & Door Co. v. Ceco Corp.,* 751 S.W.2d 473, 477 (Tex.1988). Major Help filed a motion for instructed verdict asserting that a breach of contract is not a deceptive trade practice violation, citing *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.,* 987 S.W.2d 50 (Tex.1998). The Lawyers claim that the stated basis for the instructed verdict was not sufficiently specific to preserve Major Help's no-evidence issues. Although Major Help's motion for instructed verdict did not specifically address the no-evidence issues that Major Help now advances on appeal, it did generally draw the trial court's attention to a lack of evidence to support the DTPA violations. In the interest of justice, we will address Major Help's no-evidence claims regarding the DTPA violations.

**\*4** In deciding a no-evidence point, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). We will uphold the finding if more than a scintilla of evidence supports it. *See Crye,* 907 S.W.2d at 499; *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970); *In re King's Estate,* 244 S.W.2d 660, 661 (Tex.1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See Crye,* 907 S.W.2d at 499; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *see also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 522 (1991); Michol O'Connor, *Appealing Jury Findings,* 12 Hous. L.Rev. 65 (1974).

We first consider Major Help's argument that the written agreement between the parties negated any evidence of reliance. Specifically, Major Help emphasizes the clause in the Agreement that places on the Lawyers the sole responsibility for complying with all applicable marketing and advertising laws, rules, and regulations pertaining to the Lawyers' profession. This clause, according to Major Help, should have alerted the Lawyers of their duty to obtain approval from the State Bar of Texas for the advertisements and negated any reliance they may have placed on Major Help's representations that the ads had already been approved. We disagree.

The Lawyers' burden was to prove that Major Help engaged in false, misleading, or deceptive acts that were the *producing cause* of the Lawyers' injuries. *See Church & Dwight Co. v. Huey,* 961 S.W.2d 560, 567 (Tex.App.-San Antonio 1997, pet. denied). The Lawyers were not required to prove reliance before they could recover under the DTPA. *See Weitzel v. Barnes,* 691 S.W.2d 598, 600 (Tex.1985). Furthermore, although the Lawyers were responsible under the Agreement for complying with their professional rules regarding advertising, this fact does not negate Major Help's representations that the proposed broadcast had been examined and approved by the State Bar. The Lawyers' complaint is that their individual responsibilities would have been easier if the proposed broadcast had been preapproved by the State Bar of Texas as represented. The record reflects sufficient evidence to conclude that preapproval of the advertisements induced the Lawyers to enter the Agreement.

Major Help also argues that the Lawyers should not have relied on the proposed broadcast or advertising schedule because they were simply proposals and depended on the

031

R358

participation of twelve lawyers; only six lawyers eventually signed the Agreement. As stated above, the Lawyers were not required to prove reliance in order to recover under the DTPA. Moreover, sufficient evidence exists to support a finding that Major Help represented to the Lawyers that the completed television advertisement would be identical to the proposed advertisement and that Major Help would obtain the requisite number of participants. Even if the Lawyers later learned that only six attorneys would participate in the cooperative advertising venture, it was Major Help's initial representations made prior to the Agreement that induced the Lawyers to enter into the Agreement and forms the basis for their DTPA claim.

**\*5** Major Help further contends that the Lawyers presented no evidence that the television advertisements violated the State Bar of Texas rules, that Major Help failed to expend a certain amount of funds for the purchase of air time, that Major Help modified the advertising schedule, and that Major Help improperly screened phone calls. We disagree.

First, it was not necessary for the Lawyers to prove that the advertisement violated State Bar rules or that Major Help's method of answering phone calls was improper in order to prevail on their DTPA claim. Rather, the Lawyers' claim is that Major Help engaged in false, misleading, or deceptive acts that induced the Lawyers to enter the Agreement. We hold that more than a scintilla of evidence exists to support the Lawyers' claims, including misrepresentations regarding the manner in which Major Help would answer phone calls, alleged State Bar approval of the advertisements, the amount of funds Major Help would expend on the purchase of air time, and the advertising schedule it would run. Because we find legally sufficient evidence that Major Help violated the DTPA by several misrepresentations, we overrule appellant's second issue.

### III. Double Recovery and Unreasonable Attorneys' Fees

In its third issue, Major Help argues that the evidence does not support recovery from both Major Help and its representative Berz and that assessing damages against both amounts to a double recovery for the same injury. Major Help requests that this Court reform the judgment to clarify that Major Help and Berz are jointly and severally liable.

We read Major Help's third issue as a challenge to the measure of damages submitted by the trial court and as a complaint of excessiveness of the damages. However, a review of the record reveals that Major Help failed to preserve this error for appeal. Major Help failed to object to the jury charge on the alleged improper measure of damages, and although Major Help submitted a motion for instructed verdict, that motion did not address the double recovery of damages. *See* Tex.R.Civ.P. 274, 268; *see also United Postage Corp. v. Kammeyer,* 581 S.W.2d 716, 722 (Tex.Civ.App.-Dallas 1979, no writ). Major Help also failed to file a motion for new trial to preserve its excessive-damages complaint. *See* Tex.R.Civ.P. 324(b)(4). In no way was the trial court given an opportunity to address or correct the alleged error.

In its fourth issue, Major Help argues that the Lawyers presented no competent evidence to establish that their attorneys' fees were reasonable and necessary. Again, Major Help has failed to preserve this error for appeal. Major Help's motion for instructed verdict did not address this alleged lack of evidence. *See* Tex.R.Civ.P. 268; *Steves Sash & Door,* 751 S.W.2d at 477. Nor did Major Help make any other attempt to preserve this issue by bringing it to the trial court's attention. Therefore, we hold that issues three and four were not preserved for appeal.

### CONCLUSION

**\*6** Because we determine that the forum selection clause did not apply to the Lawyers' DTPA claim, we hold the trial court did not err in denying Major Help's motion to dismiss. We further hold that the evidence is legally sufficient to support a violation of the DTPA and that Major Help failed to preserve its complaints about double recovery and attorneys' fees for appeal. We therefore affirm the trial court's judgment.

### All Citations

Not Reported in S.W.3d, 2000 WL 298282

### Footnotes

[1] Appellees include Ivy, Crews & Elliot, P.C.; Guy C. Fisher, Esq .; Earl K. Straight, Esq.; Richard T. Jones, Esq.; James P. Borne, Esq.; and McGraw, Brinkley & Irwin. For convenience, we will refer to appellees as the Lawyers.

032

R359

2        Ultimately only six lawyers or law firms participated in the advertising arrangement.

3        The forum selection clause provided: "Any action brought by either party under this agreement shall be instituted only in a court in the County of Los Angeles in the State of California having the appropriate monetary limits of jurisdiction."

4        We will refer to the appellants collectively as Major Help because their claims on appeal are identical, except as addressed in note 5.

5        Since we hold that the trial court was correct in deciding not to apply the forum selection clause, we reject the argument that at least the action against Berz should be dismissed because as a mere participant in the transaction, he derives some added benefit from the forum selection clause.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

033

R360

367 S.W.3d 707
Court of Appeals of Texas,
Houston (14th Dist.).

Fernando OSORNIA, Appellant,
v.
AMERIMEX MOTORS & CONTROLS, INC., Appellee.

No. 14–11–00086–CV. | March 29, 2012.

**Synopsis**
**Background:** Mud pump motors vendor filed suit against its principal and officer and against principal and officer of offshore rig's project manager, asserting claims for fraud, violations of Texas Theft Liability Act, and tortious interference with contract. The 152nd District Court, Harris County, Robert K. Schaffer, J., denied motion by vendor's principal/officer to compel arbitration pursuant to settlement agreement entered into in prior lawsuit that required all claims arising out of settlement to be submitted to arbitration. Vendor's principal/officer appealed.

**Holdings:** The Court of Appeals, Kem Thompson Frost, J., held that:

[1] vendor's claims that were assigned to it by offshore rig against principal/officer did not fall within scope of arbitration clause of settlement agreement, and

[2] issue of validity of rig's assignment went to the merits of claims and therefore was not relevant to determining propriety of the denial of application to compel arbitration.

Affirmed.

**Attorneys and Law Firms**

**\*708** Lee Keller King, Houston, for appellant.

Steve E. Couch, Charles W. Kelly, Houston, for appellee.

Panel consists of Justices FROST, SEYMORE, and JAMISON.

**OPINION**

KEM THOMPSON FROST, Justice.

This is an interlocutory appeal from the trial court's order denying a defendant's application to compel arbitration under Texas Civil Practice and Remedies Code section 171.021. Because the claims asserted against the defendant by the plaintiff

do not fall within the scope of the arbitration agreement, the trial court did not err in refusing to compel arbitration, and we affirm the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, appellee/plaintiff AmeriMex Motor & Controls, Inc. and others filed suit against appellant/defendant Fernando **\*709** Osornia and others in Cause No. 2008–56215 in the 152nd District Court of Harris County (hereinafter the "First Lawsuit"). In late October and early November of 2009, the parties to that lawsuit and other "Potential Parties" entered into a "Mutual Release and Settlement Agreement" (hereinafter "Settlement Agreement"). The parties to that agreement agreed that "any and all claims arising out of this Agreement ... shall be arbitrated." Viking Offshore (USA), Inc. was not a party in the First Lawsuit, nor was Viking a party to the Settlement Agreement, which contains no reference to Viking.

AmeriMex alleges that in June 2010, Viking assigned to AmeriMex any and all claims that Viking had against Osornia and Daniel Becker (the "Assigned Claims"). In August 2010, AmeriMex filed suit in the trial court below against Osornia and Becker (hereinafter the "Second Lawsuit"), alleging, in pertinent part, as follows:

• In October 2006, Becker was a principal and officer of Odin Rig Services, Inc. Odin was working under a contract with Viking to do the project management on an upgrade of the "VIKING PRODUCER," a semi-submersible rig.

• During that same time period, Osornia was an officer and principal of AmeriMex. Becker was aware of Osornia's position with AmeriMex.

• Odin's only business was fulfilling the rig upgrade of the VIKING PRODUCER. Under the contract between Viking and Odin, Odin was responsible for managing this project.

• Viking gave Odin substantial discretion to determine what was necessary to complete the project.

• In October 2006, Becker was in charge of this project for Odin. Becker's major responsibilities were the acquisition of the capital drilling equipment for the vessel.

• It was Becker's responsibility to select the vendor from whom to buy the capital equipment to be installed on the VIKING PRODUCER. Viking's budget for the project was based upon Becker's recommendations.

• Becker needed to buy six mud pump motors and three "draw work motors" for installation on the VIKING PRODUCER.

• AmeriMex is in the business of manufacturing and selling motors that can be used for mud pumps and draw works on drilling rigs. Osornia and Becker conspired to cause AmeriMex to assume contractual risks for the nine motors by a series of maneuvers.

• First, contrary to proper commercial practices, Becker, rather than the vendor AmeriMex, prepared the quotation for the nine motors.

• Second, when Becker issued the quotation, Osornia and Becker caused the quotation to come from a Mexican company known as Motor Power Services S.A. de C.V. (hereinafter "Motor Power"). Motor Power was used as a vehicle for illegal activity that substantially damaged AmeriMex in other transactions.

• When Becker caused Odin to issue the purchase order for the motors, he identified the vendor as Motor Power. There was no commercial relationship between Motor Power and AmeriMex, other than Osornia's use of Motor Power as a vehicle to commit crimes and cheat AmeriMex out of funds properly due it.

035

R362

• Becker was acting in the course and scope of his employment for Odin, which was in the course and scope of its employment for Viking. Becker **\*710** knowingly participated in the fraudulent construction of the transaction.

• Becker has testified that he considered the vendor to be AmeriMex at all material times.

• AmeriMex procured or manufactured the motors for sale to Viking. When it was time to pay for the motors, Becker, on behalf of Odin, participated in a conspiracy with Osornia to deprive AmeriMex of receipt of its funds for the nine motors and to divert the funds to Motor Power.

• Becker authored an email dated December 23, 2006, in which he advised Osornia to lie to Odin about why payments were going to Motor Power. The lie that Becker concocted was for Osornia to claim that Motor Power was a subsidiary of AmeriMex. Motor Power has never been a subsidiary of AmeriMex, and Becker knew this statement was false when he made it.

• Becker continued on behalf of Odin, which, in turn, was acting on behalf of Viking, to take affirmative actions to cheat AmeriMex out of its money by rushing the checks through the normal pay process and making them payable to Motor Power.

• Motor Power's Alejandro Moeller actively conspired with Becker and Osornia to deprive AmeriMex of its funds.

• On January 8,[1] Becker caused Viking to pay Motor Power $130,500 for the draw works motors and $261,000 for the mud pump motors.

• Because of the conduct of Becker and Osornia, Viking did not receive the six mud pump motors for which it paid Motor Power.

> • Becker has testified that he caused Viking to pay the wrong party.

> • Osornia has testified that Motor Power paid him a "kickback" of $1,000 for each motor for which Motor Power received payment.

> • For good and sufficient consideration, Viking assigned its claims against Becker and Osornia to AmeriMex.

Based upon these allegations and as assignee of Viking, AmeriMex has asserted claims against Osornia for fraud, violations of the Texas Theft Liability Act, and tortious interference with contractual relations. As assignee, AmeriMex also asserted claims against Becker for fraud and tortious interference with contractual relations. On its own behalf, AmeriMex asserted tort claims against Becker.

Osornia filed an application to compel arbitration, arguing that AmeriMex's claims against Osornia fall within the scope of the Settlement Agreement's arbitration clause. The trial court initially granted Osornia's application but later reconsidered that ruling and issued an order denying the application. The trial court denied Becker's motion to compel arbitration. Osornia filed this interlocutory appeal from the denial of his application to compel arbitration. Becker did not file an interlocutory appeal.

## II. ISSUES PRESENTED

Osornia presents two appellate issues. In his first issue, Osornia asserts that the trial court erred in denying his application to compel arbitration. In his second issue, Osornia asserts that the alleged assignment of claims by Viking to AmeriMex is void and unenforceable as against public policy.

## III. STANDARD OF REVIEW

It is undisputed that Osornia and AmeriMex entered into the Settlement Agreement, and no party has challenged the validity of that agreement or its arbitration **\*711** clause. Whether this clause imposes a duty upon AmeriMex to arbitrate its claims against Osornia in the Second Lawsuit is a matter of contract interpretation and a question of law for the trial court. *See IKON Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688, 694 (Tex.App.-Houston [14th Dist.] 1999, no pet.). We review the trial court's legal determination in this regard under a de novo standard of review. *See id.*

## IV. ANALYSIS

**A. Did the trial court err in denying the application to compel arbitration?**

[1] We first examine whether the trial court erred in denying Osornia's application to compel arbitration. The Settlement Agreement is silent as to whether its arbitration clause is governed by the Federal Arbitration Act ("Federal Act") or the Texas General Arbitration Act ("Texas Act"). Osornia asserts that the Texas Act applies, and AmeriMex does not contest this assertion. Neither party asserts that the Federal Act applies or that it preempts any aspect of the Texas Act relevant to this case. In this situation, we need not address whether the Federal Act applies, and we treat this case as one under the Texas Act. *See Bates v. MTH Homes–Texas, L.P.,* 177 S.W.3d 419, 421 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Even so, because the substantive principles applicable to the analysis in this appeal are the same under both the Federal Act and the Texas Act, we cite in this opinion cases under the Federal Act and Texas Act without stating under which statute the cases were decided. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 56, n. 10 (Tex.2008).

[2] A party seeking to compel arbitration must establish that (1) a valid arbitration agreement exists[2] and (2) the claims at issue are within the scope of the agreement. *See In re D. Wilson Const. Co.,* 196 S.W.3d 774, 780–81 (Tex.2006) (orig. proceeding); *In re Igloo Prods. Corp.,* 238 S.W.3d 574, 577 (Tex.App.-Houston [14th Dist.] 2007, orig. proceeding [mand. denied] ). If these two showings are made, the burden shifts to the party opposing arbitration to present a valid defense to the agreement, and absent evidence supporting such a defense, the trial court must compel arbitration. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227–28 (Tex.2003); *In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 549 (Tex.2002) (orig. proceeding); *In re Igloo Prods. Corp.,* 238 S.W.3d at 577.

It is undisputed that Osornia and AmeriMex signed and entered into the Settlement Agreement, and no party has challenged the validity of that agreement or its arbitration clause. Nonetheless, AmeriMex argues that Osornia failed to establish the existence of an arbitration agreement. AmeriMex notes that (1) AmeriMex only asserts claims against Osornia as assignee of Viking, (2) AmeriMex could have asserted the Assigned Claims in Viking's name; and (3) there is no evidence of any arbitration agreement between Osornia and Viking. Still, AmeriMex chose to bring suit in its own name, and AmeriMex is asserting claims against Osornia, albeit as assignee of Viking. In this context, we conclude that Osornia carried his burden of establishing the existence of a valid arbitration agreement between the relevant parties—AmeriMex and Osornia.

Given the existence of a valid agreement to arbitrate, the next issue is whether AmeriMex's **\*712** claims against Osornia are within the scope of the Settlement Agreement's arbitration clause. That clause reads in its entirety as follows:

> The Parties to this Agreement agree that any and all claims arising out of this Agreement, including any misrepresentations or warranties (including disputes and interpretations), shall be arbitrated before Judge Caroline Baker. If she is unwilling or unable to serve as arbitrator, the Parties shall agree to an arbitrator who has served as a former State District Judge [sic] or, if no agreement can be reached, an arbitrator shall be appointed by a Court of competent jurisdiction.[3]

[3] [4] [5] [6] [7] Any doubts as to whether AmeriMex's claims against Osornia fall within the scope of the arbitration clause must be resolved in favor of arbitration. *See Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995). A court should not deny arbitration unless the court can say with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the claims at issue. *Id.* In determining whether a claim falls within the scope of an arbitration agreement, we focus on AmeriMex's factual allegations, rather than the legal claims asserted by AmeriMex. *Id.* at 900. The presumption of arbitrability is particularly applicable when the clause is broad; that is, it provides for arbitration of "any dispute arising between the parties," or "any controversy or claim arising out of or relating to the contract thereof," or "any controversy concerning the interpretation, performance or application of the contract." *See Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, 230 (Tex.App.-Houston [14th Dist.] 1993, writ denied). We presume for the purposes of our analysis that the Settlement Agreement's arbitration clause is broad. In such instances, absent any express provision excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail, and AmeriMex has the burden of showing that its claims against Osornia fall outside the scope of the arbitration clause. *See Marshall,* 909 S.W.2d at 900; *Babcock & Wilcox Co.,* 863 S.W.2d at 230. Nonetheless, the strong policy in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or to allow modification of the unambiguous meaning of the arbitration clause. *See IKON Office Solutions, Inc.,* 2 S.W.3d at 697.

Under the unambiguous language of the arbitration clause, AmeriMex and Osornia have agreed to arbitrate all claims arising out of the Settlement Agreement. The parties did not agree to arbitrate all claims "relating to" or "connected with" the Settlement Agreement. Nor did the parties agree to arbitrate all claims "arising out of" or "relating to" the First Lawsuit or the occurrence giving rise to this lawsuit. Notably, Viking was not a party to the First Lawsuit or to the Settlement Agreement, and no reference is made to Viking in the Settlement Agreement. Focusing on the factual allegations in AmeriMex's live pleading, we note the following:

• AmeriMex does not refer to the First Lawsuit or to the Settlement Agreement.

• AmeriMex does not allege that Osornia breached the Settlement Agreement or any other contract.

• AmeriMex does not allege that there is any dispute over the interpretation of the Settlement Agreement.

**\*713** • AmeriMex alleges tortious conduct by Becker and Osornia that allegedly occurred before the Settlement Agreement was signed in 2009.

• AmeriMex does not allege any tortious conduct that is alleged to have occurred after the Settlement Agreement was signed.

AmeriMex alleges that, after the Settlement Agreement was signed, Viking assigned its claims against Osornia to AmeriMex. As alleged assignee of Viking, AmeriMex asserts three tort claims against Osornia. Assigned tort claims based upon conduct that allegedly occurred before the Settlement Agreement was signed are simply not claims "arising out of" the Settlement Agreement. *See Washburn v. Societe Commerciale de Reassurance,* 831 F.2d 149, 150–52 (7th Cir.1987) (holding that claims based upon allegedly tortious conduct in which defendants allegedly used various agreements and other devices to defraud various individuals did not fall within agreement to arbitrate disputes with respect to the interpretation of one of the agreements or a party's performance under that agreement); *Texaco, Inc. v. American Trading Transp. Co.,* 644 F.2d 1152, 1154 (5th Cir.1981) (holding that tort claims based upon the defendants' alleged conduct that allegedly caused damages to plaintiff's dock did not fall within agreement by plaintiff to arbitrate all disputes "arising out of" a time charter by the plaintiff of one of the vessels); *Coffman v. Provost * Umphrey Law Firm, L.L.P.,* 161 F.Supp.2d 720, 724–30 (E.D.Tex.2001) (denying motion to compel arbitration and holding that claims based upon breaches of prior partnership agreements, that allegedly occurred before any arbitration clause was in effect, did not fall within clause in which plaintiff agreed to arbitrate all claims "arising under" subsequent partnership agreements). We harbor no doubts as to whether AmeriMex's claims against Osornia fall within the scope of the arbitration clause, and this court can say with positive assurance that the arbitration clause is not susceptible of an interpretation that would cover AmeriMex's claims against Osornia. *See Washburn,* 831 F.2d at 150–52; *Texaco, Inc.,* 644 F.2d at 1154; *Coffman,* 161 F.Supp.2d at 724–30. We conclude that AmeriMex satisfied its burden of showing that its claims against Osornia fall outside the scope of the arbitration clause.

038

R365

Osornia relies upon a line of cases containing language to the effect that " 'if the facts alleged 'touch matters,' have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that is subject to the arbitration agreement, the claim will be arbitrable.' " *AutoNation USA Corp. v. Leroy,* 105 S.W.3d 190, 195 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (quoting *Pennzoil Co. v. Arnold,* 30 S.W.3d 494, 498 (Tex.App.-San Antonio 2000, no pet.)). Significantly, the cases in which this formulation[4] has been utilized have involved very broad arbitration clauses in which the parties agree to arbitrate all claims arising out of or relating to a contract or in which the parties agree to arbitrate all disputes that may arise among them. *See In re Prudential Securities, Inc.,* 159 S.W.3d 279, 281, 283–84 (Tex.App.-Houston [14th Dist.] 2005, orig. proceeding); *In re BP America Production Co.,* 97 S.W.3d 366, 370–71 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding); *AutoNation USA* **\*714** *Corp.,* 105 S.W.3d at 195–96; *Arnold,* 30 S.W.3d at 498–99; *Hou–Scape, Inc. v. Lloyd,* 945 S.W.2d 202, 205–06 (Tex.App.-Houston [1st Dist.] 1997, orig. proceeding); *Fridl v. Cook,* 908 S.W.2d 507, 510–13 (Tex.App.-El Paso 1995, writ dism'd w.o.j.). Though we have presumed that the arbitration clause in the Settlement Agreement is broad, it is not as broad as the clauses involved in the cases resting upon this formulation. Therefore, this line of cases is not on point. If we followed this formulation in the case under review, we would impermissibly expand the scope of the arbitration clause beyond the plain meaning of "any and all claims arising out of this Agreement." *See IKON Office Solutions, Inc.,* 2 S.W.3d at 697.

Osornia also argues that this court cannot conclude that AmeriMex's claims are outside the scope of the arbitration clause unless this court concludes with positive assurance that the claims are not "factually intertwined" with arbitrable claims. In support of this argument, Osornia cites the following sentence from *Prudential Securities, Inc. v. Marshall:* "On this record, we cannot conclude with positive assurance that the statements at issue here are not at least 'factually intertwined' with the arbitrable claims." 909 S.W.2d 896, 900 (Tex.1995) (per curiam). In *Marshall,* the Supreme Court of Texas held that various defamation claims asserted by two former stockbrokers against their former employer fell within the scope of arbitration agreements in which the stockbrokers agreed to arbitrate all controversies with the former employer arising out of the employment or termination of employment of the respective stockbrokers. *See id.* at 897–900. The claims based upon the alleged defamatory statements fell within the scope of the arbitration agreements without the need to rely upon a conclusion that the claims were factually intertwined with arbitrable claims. *See id.*

The better reading of the *Marshall* opinion is that it does not stand for the broad proposition that, when no other claims between the parties are being sent to arbitration, a claim that does not fall within the language of an arbitration clause still must be arbitrated unless the court can say with positive assurance that the claim is not "factually intertwined" with the arbitrable claims. *See id.* Significantly, in various cases the Supreme Court of Texas has relied upon the legal standard in *Marshall,* yet in none of them has the high court described the "factually intertwined" standard advanced by Osornia. *See, e.g., In re Rubiola,* 334 S.W.3d 220, 223–24 (Tex.2011) (stating the legal standard from *Marshall* without mentioning the "factually intertwined" language upon which Osornia relies). In addition, this court has held that claims did not fall within the scope of an arbitration agreement without addressing whether the claims were "factually intertwined" with arbitrable claims. *See In re Igloo Prods. Corp.,* 238 S.W.3d at 581; *IKON Office Solutions, Inc.,* 2 S.W.3d at 693–97. In the context of this case, to conclude that AmeriMex's claims are outside the scope of the arbitration clause, it is unnecessary for this court to determine whether it can conclude with positive assurance that these claims are not "factually intertwined" with arbitrable claims.[5] *See In re Rubiola,* 334 S.W.3d at 223–24.

**\*715** Under the applicable standard of review, we conclude that the trial court did not err in denying Osornia's application to compel arbitration.[6] Accordingly, we overrule Osornia's first issue.

### B. Is the issue of whether the assignment is void relevant to this appeal?

[8] In his second issue, Osornia argues that the alleged assignment of claims by Viking to AmeriMex is void because it is contrary to public policy. Therefore, Osornia asserts, this court should sustain his second issue, reverse the trial court's order, and render a take-nothing judgment against AmeriMex on its claims against Osornia. As part of the allegations in its live pleading, AmeriMex asserts that Viking assigned its claims against Becker and Osornia to AmeriMex. To succeed on the merits, AmeriMex will have to prove this assignment, and in responding on the merits Osornia is free to assert any argument

039

R366

he wishes, including that the assignment is void. But, the merits of AmeriMex's claims are not relevant to determining whether the trial court erred in denying Osornia's application to compel arbitration. *See AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986); *Universal Computer Systems, Inc. v. Dealer Solutions, L.L.C,* 183 S.W.3d 741, 749 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Accordingly, we overrule Osornia's second issue.

## V. CONCLUSION

As Viking's assignee, AmeriMex asserts tort claims against Osornia. These claims are based upon conduct that allegedly occurred before the Settlement Agreement was signed. We harbor no doubts as to whether AmeriMex's claims against Osornia fall within the scope of the arbitration clause, and this court can say with positive assurance that the arbitration clause is not susceptible of an interpretation that would cover AmeriMex's claims against Osornia. These claims are not claims "arising out of" the Settlement Agreement. AmeriMex satisfied its burden of showing that its claims against Osornia fall outside the scope of the arbitration clause. Whether the alleged assignment is void is not an issue relevant to determining whether AmeriMex must arbitrate these claims. Accordingly, because these claims are not within the scope of the arbitration clause, AmeriMex cannot be compelled to arbitrate them.

The trial court's order is affirmed.

**All Citations**

367 S.W.3d 707

Footnotes

[1]   AmeriMex does not specify a year in this allegation.

[2]   If all relevant parties did not sign the contract in which the arbitration agreement is found, this first prong may include issues as to whether a non-signatory is bound by or may enforce the arbitration agreement. *See In re Rubiola,* 334 S.W.3d 220, 223–24 (Tex.2011). Such issues are not present in this appeal.

[3]   This clause does not contain any provision in which the parties agree that the arbitrator, rather than the courts, shall determine disputes regarding the scope of the arbitration clause. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 61 (Tex.2008).

[4]   Under this formulation, courts also note that "if the facts alleged in support of the claim stand alone, are completely independent of the contract, and the claim could be maintained without reference to the contract, the claim is not subject to arbitration." *See AutoNation USA Corp.,* 105 S.W.3d at 195 (quoting *Arnold,* 30 S.W.3d at 498).

[5]   In *Jack B. Anglin Co. v. Tipps,* the Supreme Court of Texas concluded that because the breach-of-contract claim between the parties was going to be arbitrated and because certain tort claims were factually intertwined with the breach-of-contract claim, the tort claims should be arbitrated to avoid multiple determinations of the same matter. *See* 842 S.W.2d 266, 271 (Tex.1992). This case is not on point because this doctrine only applies when at least one claim between the parties is already going to arbitration. *See In re Weekley Homes, L.P.,* 180 S.W.3d 127, 132 & n. 25 (Tex.2005); *In re Prudential Securities, Inc.,* 159 S.W.3d at 281–84.

[6]   Osornia also argues that AmeriMex had notice of Viking's claims against Osornia and Becker before AmeriMex signed the Settlement Agreement. Any such notice is not relevant to whether the claims that AmeriMex asserts against Osornia in the Second Lawsuit are within the scope of the arbitration clause.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

041

R368

# Tab H

MARCUS & SHAPIRA LLP

ONE OXFORD CENTRE, 35TH FLOOR

301 GRANT STREET

PITTSBURGH, PENNSYLVANIA 15219-6401

(412) 471-3490

_____

Fax: (412) 391-8758

SCOTT D. LIVINGSTON
Email: Livingston@marcus-shapira.com
Direct Dial: (412) 338-4690

August 25, 2015

**_Via ECF and Hand Delivery_**

Honorable Martin Hoffman
George L. Allen, Sr. Courts Building
68th District Court
600 Commerce St., 5th Floor
Dallas, Texas 75202

> Re: Cause No. DC-15-03853; *Dickson Perry, derivatively on behalf of Excentus Corporation v. Brandon Logsdon, et al.*; in the 68th Judicial District Court of Dallas County, Texas

Dear Judge Hoffman:

Plaintiff Dickson Perry ("Plaintiff" or "Perry") does not dispute—nor can he dispute—that the 2004 and 2005 Excentus/Giant Eagle stock purchase agreements (the "SP Agreements") provide a potential defense to his claims against Giant Eagle. As Perry acknowledges, the Excentus/Giant Eagle settlement agreement (the "Settlement Agreement")(attached as Exhibit A) forms the "nucleus" of his claims against Giant Eagle because they all depend on proof that the Settlement Agreement was a "complete capitulation of Excentus' interests." Perry PowerPoint Slide No. 5 (attached as Exhibit B). But whether the Settlement Agreement was a good deal or a bad deal for Excentus depends, in turn, on the strength of Giant Eagle's defenses in the original litigation. Giant Eagle's principal defense in that litigation was, of course, based on the license and other key provisions in the SP Agreements. This leaves only one question for this Court to decide—whether a defense based on the SP Agreements is enough to trigger the forum selection clause in those agreements.

Judge Boyle held that a defense was enough. In analyzing the plain language of the forum selection clause, Judge Boyle rejected Excentus' argument that a mere defense based on the SP Agreements could not "arise out of" those agreements. *Excentus Corp. v. Giant Eagle, Inc.*, 2012 WL 2525594, at *4 (N.D. Tex. 2012) (Tab 17, Giant Eagle case law hearing binder). Judge Boyle also made clear that the forum selection clause applies where, as here, a "defense requires the Court to interpret the Stock Purchase Agreements." *Id.* This Court should not re-interpret the forum selection clause in the SP Agreements. In accordance with stare decisis, this Court should follow Judge Boyle's interpretation of the forum selection clause in the SP Agreements—i.e., that clause is triggered whenever those agreements provide a possible defense. Under Texas law, "once a definitive construction has been given to a specific writing [whether by a state or federal court]… such a definite determination is binding and conclusive in subsequent suits [under] [t]he doctrine of stare decisis." *Robbin v. HNG Oil Inc.*, 878 S.W.2d

A0948758.1

351, 361 (Tex. App. 1994)(applying stare decisis to federal court decision interpreting a property deed)[1]

Perry's reliance on Texas state court decisions allegedly interpreting the phrase "arising out of" narrowly is misplaced. Not one of those decisions actually interprets the phrase "any action arising out of" found in the forum selection clause at issue, language which judges in both Texas and Pennsylvania found must be broadly construed. Equally significant, not one of those decisions addresses the issue presented here (and decided by Judge Boyle)—whether the assertion of a defense based on an agreement that contains a forum selection clause satisfies the arising under requirement. Judge Boyle did not go out on a limb when she interpreted the "arising out of" language in the forum selection to include a defense under the SP Agreements. In *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 601-02 (7th Cir. 1994), the Seventh Circuit held that "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement" for the purposes of enforcing a forum selection clause. Other courts have interpreted "arising out of" in precisely the same way when enforcing a forum selection clause. *Interactive Music Tech., LLC v. Roland Corp. U.S.*, No. CIV.A. 6:07-CV-282, 2008 WL 245142, at *6-7 (E.D. Tex. Jan. 29, 2008); *Skold v. Galderma Lab., L.P.*, 2015 WL 1740032 at *15-17 (E.D. Pa. 2015). That is not all. None of the cases cites by Perry involve a plaintiff whose claims attack a settlement agreement that **by its terms directly revives and implicates the agreements containing the forum selection clause at issue**. (Exhibit A at Article 5). Perry cannot avoid the "nucleus" of the parties' relationship. "No matter how [Perry] characterizes or artfully pleads [his] claims, the claims and alleged damages arise from the contractual relationship between the parties, not from general obligations imposed by law." *In re Int'l Profit Associates, Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (Tab 29).

The dispute resolution clause in the Settlement Agreement is a complete red herring. That clause requires all disputes "arising out of" the Settlement Agreement to be arbitrated. But as Perry acknowledges, he has no desire to arbitrate and thus has waived any right he may have had to do so. *Leibowitz v. Sequoia Real Estate Holdings L.P.*, 2015 WL 3451675, at 17 (Tex. App.—Dallas 2015)("Because neither side demanded arbitration, the parties waived their right to have the dispute determined by an arbitration panel."). Thus, the parties well understood that this dispute would lead once again to the SP Agreements. This Court should apply the mutually inconvenient forum selection clause in the SP Agreements, just as the parties intended.

Respectfully Submitted,

Scott D. Livingston

cc:     All counsel of record (via ECF & email)

---

[1] *Robbin* and other newly cited cases are attached as Exhibit C.

A0948758.1

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into effective as of December 16, 2014 ("Effective Date") by and between Excentus Corporation ("Excentus"), a Texas corporation, formerly known as CCISTech, Inc. ("CCIS"), with its principal office at 14241 Dallas Parkway, Suite 1200, Dallas, Texas 75254 and Giant Eagle, Inc. ("Giant Eagle"), Giant Eagle's wholly-owned subsidiary Phoenix Intangible Holdings Company ("Phoenix"), Giant Eagle's wholly-owned subsidiary Giant Eagle of Delaware, Inc. ("GE Delaware"), David Shapira, and Daniel Shapira (collectively, "Defendants").

WHEREAS, on March 4, 2002, Excentus and Giant Eagle entered into a Software License and General Services Agreement (the "Software License");

WHEREAS, on August 6, 2004, Excentus entered into a Series A Preferred Stock Purchase Agreement, as amended by the First Amendment to the Series A Preferred Stock Purchase Agreement dated as of November 15, 2005, (the "2004 SP Agreement") with GE Delaware;

WHEREAS, on November 15, 2005, Excentus entered into a Series B Preferred Stock Purchase Agreement (the "2005 SP Agreement") with GE Delaware;

WHEREAS, on June 11, 2008, Excentus entered into the Trademark and Copyright License Agreement as amended on September 2, 2008, (the "Trademark Agreement") with Phoenix;

WHEREAS, on February 4, 2010, Excentus entered into Addendum No. 1 to Software License and General Services Agreement (the "SL Addendum") with Giant Eagle;

WHEREAS, the Software License, the 2004 and 2005 SP Agreements (together, the "SP Agreements"), the Trademark Agreement, and the SL Addendum shall be collectively referred to herein as the "GE/Excentus Agreements";

WHEREAS, on December 2, 2011, Excentus filed a lawsuit against the Defendants in the U.S. District Court for the Northern District of Texas in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 3:11-CV-3331 in which Excentus asserted claims against the Defendants for breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("First Texas Case"), and which case was dismissed for improper venue without prejudice to refiling in a court of proper venue;

WHEREAS, on February 1, 2013, Excentus refiled its claims against the Defendants in the U.S. District Court for the Western District of Pennsylvania in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 2:13-CV-178 asserting claims of breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("Pennsylvania Case");

WHEREAS, David Shapira and Daniel Shapira (collectively, "the Shapiras") asserted counterclaims against Excentus for advancement, indemnification, breach of contract, and for an award of attorneys' fees in the Pennsylvania Case; and

WHEREAS, Giant Eagle asserted counterclaims against Excentus for breach of contract, breach of an implied duty, breach of the implied covenant of good faith and fair dealing, for an award of attorneys' fees, and declaratory judgment of patent license in the Pennsylvania Case, some of which

A0875506.3                                   A0874556.2                                   - 1 -

REDACTED

were transferred to the U.S. District Court for the Northern District of Texas in *Giant Eagle, Inc. v. Excentus Corp.*, Case No. 3:14-CV-1195-B ("Second Texas Case");

**WHEREAS,** on August 5, 2014, Giant Eagle filed a notice of appeal to the Fifth Circuit seeking review of the district court's denial of Giant Eagle's request for a preliminary injunction in the Second Texas Case (captioned *Giant Eagle, Inc. v. Excentus Corp.*, Case No. 14-10865) (the "Appeal"), which was dismissed without prejudice on August 11, 2014;

**WHEREAS,** the First Texas Case, the Second Texas Case, the Pennsylvania Case, and the Appeal shall be referred to herein as the "Litigation";

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual undertakings and covenants herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree to resolve all of the disputes among the parties as follows:

## ARTICLE 1
## ROYALTIES

1.1    <u>Excentus Payment of Past Royalties to Phoenix</u>. In consideration of the relief granted hereunder and in complete satisfaction for any Phoenix claim to past royalties under the Trademark Agreement through June 30, 2014, within ten (10) business days of the Effective Date, Excentus shall pay to Phoenix the sum of
                        Payment shall be made by wire transfer to Phoenix pursuant to wiring instructions supplied by counsel for Phoenix.

1.2    <u>Excentus Ongoing Royalty Obligations</u>. Section 3.1 of the June 11, 2008 Trademark Agreement shall be deleted in its entirety and replaced with the following:

3.1 **Royalties.** In further consideration of the rights granted hereunder, Licensee agrees to pay Licensor, commencing in the first full calendar quarter of 2009 and continuing quarterly thereafter, a royalty ("Royalty") at the rates defined below ("Royalty Rates") of the net transactional revenue that is positive to Licensee on a gross margin basis ("Revenue") collected by Licensee in the previous quarter for Qualified Transactions, as hereafter defined, that occur in the U.S. and Canada so long as the Licensed Marks have been, and continue to be, properly registered to Licensor in the U.S. and Canada. For example, if Licensee collects revenue, but has direct offsetting expenses such as the cost of a reward, then revenue that is applicable to the royalty would be net transactional revenue minus cost of the rewards. However, general operating expenses of Licensee such as salaries, rent, etc. will not reduce the amount of revenue used in the royalty calculation.

**Net Transactional Revenue Example:**
10 gallon redemption

| | |
|---|---|
| Transaction Fee Collected from Wholesaler ($0.04 per gallon): | $0.40 |
| Rebate Paid to Third Party ($0.005 per gallon): | $0.05 |
| Revenue Included in Royalty Calculation: | $0.35 |

**Positive to Licensee on Gross Margin Basis Example:**

| | |
|---|---|
| Revenue Collected: | $5.00 |

REDACTED

Reward Expense Included in Revenue Collected:       $4.00
Revenue Included in Royalty Calculation:       $1.00

If Licensor obtains and maintains the registered rights to the Licensed Marks as agreed in this Agreement outside of the U.S. and Canada, Licensee will pay Licensor fifty percent (50%) of the Royalty Rate of the Revenue collected by Licensee in the previous quarter for Qualified Transactions subject to the same terms in this Agreement for Royalties to be paid for Qualified Transactions in the U.S. and Canada. A "Qualified Transaction" means a transaction in which (i) a consumer is issued one or more rewards or (ii) a consumer redeems one or more rewards (either one as a result of Licensee's use of the Licensed Marks or the Licensee Marks (as defined below)) for the purchase of gasoline at a discount which occurs at a convenience store or fuel site, with the exception of a convenience store or fuel site owned or operated by Giant Eagle, Inc., a Pennsylvania corporation and parent of Licensor, or one of its subsidiaries or any fees paid to Licensee by Licensor. Such Giant Eagle convenience stores or fuel sites presently operate under the brand name "GetGo" and Licensor shall notify Licensee of any name change of such stores for purposes of Royalty calculations. Notwithstanding the above, immediately upon a Change of Control as hereafter defined) of Licensee, then such Royalty Rate shall decrease by fifty percent (50%) for Qualified Transactions in the U.S. and Canada and outside of the U.S. and Canada for the duration of this Agreement. For purposes of this Section 3.1, a "Change of Control" means (i) the consummation of a reorganization, merger or consolidation with an entity, or any other event (or series of related events, in which the persons who hold a majority of the outstanding capital stock of Licensee or its successors before such transaction (or series of related transactions) do not own at least a majority of the equity securities entitled to vote to elect directors or persons serving in a similar capacity) of the entity surviving such transaction; or (ii) a disposition of all or substantially all of the assets of Licensee or its successors. For purposes of this Section 3.1, (i) Royalty Rates means (i) 3% from July 1, 2014 through December 31, 2014, (ii) 2% for calendar year 2015 and 2016, and (iii) 1% for calendar year 2017 and beyond. "Licensee Marks" means "Fuel Rewards", "Fuel Rewards Network" or any successor Mark used to identify the Fuel Rewards Coalition Program. "Fuel Rewards Coalition Program" means the marketing program operated by Licensee with multiple issuing participants involving, the issuing and redeeming of cents off per gallon fuel discounts as rewards to members who do business with the issuing participants and the redeeming of such fuel discounts by a single redemption partner under a common program name and specifications. Aggregate Royalties paid by Licensee to Licensor under this Agreement are capped at

**ARTICLE 2**
**SETTLEMENT PAYMENT**

2.1     <u>Excentus Payment to the Shapiras</u>. In consideration of the relief granted hereunder, within ten (10) business days of the Effective Date, Excentus shall pay to the Shapiras the sum of Payment shall be made by wire transfer to the Shapiras pursuant to wiring instructions supplied by counsel for the Shapiras.

**ARTICLE 3**
**RELEASES AND COVENANTS NOT TO SUE**

3.1     <u>Claims Against the Defendants Released by Excentus</u>. Excentus, on behalf of Excentus Corporation and its predecessors, successors, and all persons and entities claiming by, through, or under them, hereby fully, finally, and forever releases, acquits, discharges, and covenants not to sue the Defendants and their predecessors, successors, and all persons and entities claiming by,

through, or under them, for any claim asserted in the Litigation, including all claims that could have been asserted in the Litigation based on acts performed by, through, or on behalf of the Defendants, regardless of the legal basis, including but not limited to any claims, cross-claims, liabilities, demands, obligations, damages, actions, and causes of action of any kind or nature, known or unknown, suspected or unsuspected, whether based on or sounding in statute, equity, contract, tort, or any other grounds or authority based on the facts, events, transactions, occurrences, and/or any circumstances that form the basis of any of the claims in the Litigation; provided, however, the releases and covenants not to sue contained herein do not apply to the rights and obligations created under this Agreement.

3.2 _Claims Against Excentus and Certain Individuals Released by the Defendants_. The Defendants, on behalf of the Defendants and their predecessors, successors, and all persons and entities claiming by, through, or under them, hereby fully, finally, and forever releases, acquits, discharges, and covenants not to sue Excentus and its predecessors, successors, and all persons and entities claiming by, through, or under them, including Dickson Perry, Brandon Logsdon, Jim Mills, Stacey Smotherman, James Callier, Art Hinckley Jr., Randy Nicholson, and R. Julian Allen (and his estate), for any claim asserted in the Litigation, including all claims that could have been asserted in the Litigation based on acts performed by, through, or on behalf of Excentus, regardless of the legal basis, including but not limited to any claims, cross-claims, liabilities, demands, obligations, damages, actions, and causes of action of any kind or nature, known or unknown, suspected or unsuspected, whether based on or sounding in statute, equity, contract, tort, or any other grounds or authority based on the facts, events, transactions, occurrences, and/or any circumstances that form the basis of any of the claims in the Litigation; provided, however, the releases and covenants not to sue contained herein do not apply to the rights and obligations created under this Agreement. Notwithstanding the foregoing, if Dickson Perry asserts any claims against the Defendants that are in any way related to this Litigation, Defendants may assert any defenses or counterclaims against Dickson Perry that would otherwise be subject to this Section 3.2.

3.3 _Covenant Not to Sue for Patent Infringement_. For so long as Giant Eagle utilizes the fuelperks! Program in its business, Excentus, on behalf of Excentus Corporation and its predecessors, successors, and all persons and entities claiming by, through, or under them, hereby covenants not to sue the Defendants for infringement of any patents listed in Exhibit A to this Agreement, including all continuations, divisionals, reissues, and reexaminations thereto or any existing, new or after acquired patents or patent applications including all continuations, divisionals, reissues, and reexaminations thereof that would be infringed by the fuelperks! program in effect as of the date of this Agreement ("Existing fuelperks! Program"), or any Improvement by the Defendants to the Existing fuelperks! Program. "Improvement" shall mean any refinement to the Existing fuelperks! Program conceived and reduced to practice which falls within the scope of one or more claims of any patent or patent application owned or controlled by Excentus as of the date of this Agreement. Furthermore, Excentus Corporation and its predecessors, successors and all persons and entities claiming by, through or under them, hereby covenants not to sue the Defendants for infringement of any patents listed in Exhibit A or any new or after acquired patents or patent applications owned or controlled by Excentus, including all continuations, divisionals, reissues and reexaminations, for Defendants' use of the software licensed in the Software License and SL Addendum as long as the Software License and SL Addendum are in full force and effect.

3.4 _Liquidated Damages/Attorneys' Fees to Prevailing Party_. In any dispute, claim or controversy in which it is alleged that a party has violated a covenant not to sue as set forth in this Article 3, the breaching party shall be immediately be liable (i.e., upon filing of a prohibited lawsuit)

to the non-breaching party for liquidated damages in the amount of          The parties expressly acknowledge and agree that these liquidated damages are a fair and reasonable estimate of fair compensation for losses that may reasonably be anticipated to arise from such a breach, and that this Section is a material term of this Agreement. In addition, in any dispute, claim or controversy in which it is alleged that a party has violated a covenant not to sue as set forth in this Article 3, the prevailing party is entitled to recover reasonable attorneys' fees in addition to any other available remedy.

3.5     Dismissal of Litigation.    The parties shall, within ten (10) business days of the Effective Date of this Agreement, file the attached Joint Stipulation of Dismissal (Exhibit B to this Agreement) in the Pennsylvania Case and the attached Joint Stipulation of Dismissal (Exhibit C to the Agreement) in the Second Texas Case, and Giant Eagle shall, within ten (10) business days of the Effective Date of this Agreement, dismiss the Appeal. All dismissals of the above-referenced matters shall be with prejudice.

## ARTICLE 4
## CONFIDENTIALITY

4.1     Confidentiality.    The terms of this Agreement, together with the facts and circumstances that gave rise thereto, are confidential and may not be disclosed to any person by the parties. Notwithstanding the confidential nature of the Agreement, the parties may disclose the terms of the Agreement to their representatives, including their accountants and lawyers, as may be necessary in the ordinary course of their business. The parties also may disclose the terms of this Agreement pursuant to a proper discovery request in any legal proceeding or as otherwise required by law.

## ARTICLE 5

## GE/EXCENTUS AGREEMENTS

5.1     Article 5 of the 2004 SP Agreement shall be deleted in its entirety and replaced with the following:

5.01 [Intentionally Omitted]

5.02 Repurchase Restrictions. For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the consent of the Investor shall be required for the repurchase or redemption by the Company of any shares of Common Stock or Preferred Stock from any of the Company's shareholders in either a single or multiple transactions and from time to time for an aggregate amount in excess of $250,000 (except pursuant to any obligation or right of the Company to repurchase or redeem shares of Common Stock or Preferred Stock upon termination of a Company shareholder's employment or other service to the Company).

5.03 Information Rights. For so long as the Investor continues to hold at least 5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the Company shall deliver to Investor annual, quarterly and monthly financial statements, annual budgets and other information reasonably requested by the Investor. The annual financial statements shall be audited by an accounting firm approved by the Company's board of directors. The Investor shall have the right no more than twice per calendar year, with reasonable notice and at the Investor's sole expense, to inspect, or have it accountants inspect, the Company's books and records, provided,

however, that such inspection(s) shall be conducted in a manner so as not to be unreasonably disruptive to the Company's operations.

5.04. Use of Purchase Price. The Purchase Price shall be used by the Company for items such as working capital, capital expenditures, product development, marketing and sales expenses and insurance coverages (including key person life insurance coverages) or as otherwise approved by the Company's board of directors.

5.05 Stock Option Agreements. Each stock option agreement executed after the Closing Date between the Company and any optionee (each, an "**Optionee**") in connection with a Common Stock option grant shall provide, unless otherwise approved by the Investor, that, (i) upon the cessation of employment or service to the Company for any reason, such Optionee shall immediately lose all unvested options; (ii) if such Optionee is terminated for cause, such Optionee shall immediately lose all vested but unexercised options and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee pursuant to the exercise of options at the actual exercise price of such options; and (iii) if such Optionee's employment with or service to the Company ceases for any reason other than termination for cause (including without limitation by reason of death or disability), the Optionee (or his or her estate as the case may be) shall have 60 days to exercise any vested options, and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee (or his or her estate as the case may be) pursuant to the exercise of options at the then-current fair market value of such share of Common Stock , as reasonably determined by the Company's board of directors. The Company shall also use its best efforts to enter into amended stock option agreements containing the provisions set forth in the preceding sentence with all Persons with whom the Company has entered into stock option agreements prior to the Closing Date.

5.06. Retail/Gasoline Station Alliances. The Investor shall have the non-exclusive right to license the Company's Products and to establish retail/gas station alliances utilizing the Company's Products in any market in which the Investor operates as of or after the Closing Date. Any exclusive license or arrangement granted to any other Person in any such market shall provide an exception for the Investor's non-exclusive rights as set forth in the preceding sentence. For the purposes of this Agreement, "Products" means the technology which the Company has licensed to the Investor as of the Closing Date, and all improvements and enhancements thereto, and the Company's Reward Marketing Engine software module.

5.2 Section 8.13 of the 2004 SP Agreement shall be deleted in its entirety and replaced with the following:

8.13 Survival of representations and Warranties. All representations and warranties of the Parties as set forth in Articles 3 and 4 shall survive the Closing for a period of 18 months thereafter. All covenants, agreements and obligations made herein shall survive the execution and delivery hereof.

5.3 Article 5 of the 2005 SP Agreement shall be deleted in its entirety and replaced with the following:

5.01 [Intentionally Omitted]

5.02 Repurchase Restrictions. For so long as the Investor holds at least 7.5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the consent of the Investor shall be required for the repurchase or redemption by the Company of any shares of Common Stock or Preferred Stock from any of the Company's shareholders in either a single or multiple

transactions and from time to time for an aggregate amount in excess of $250,000 (except pursuant to any obligation or right of the Company to repurchase or redeem shares of Common Stock or Preferred Stock upon termination of a Company shareholder's employment or other service to the Company).

5.03 <u>Information Rights</u>. For so long as the Investor continues to hold at least 5% of the Company's issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the Company shall deliver to Investor annual, quarterly and monthly financial statements, annual budgets and other information reasonably requested by the Investor. The annual financial statements shall be audited by an accounting firm approved by the Company's board of directors. The Investor shall have the right no more than twice per calendar year, with reasonable notice and at the Investor's sole expense, to inspect, or have it accountants inspect, the Company's books and records, provided, however, that such inspection(s) shall be conducted in a manner so as not to be unreasonably disruptive to the Company's operations.

5.04. <u>Use of Purchase Price</u>. The Purchase Price shall be used by the Company for items such as working capital, capital expenditures, product development, marketing and sales expenses and insurance coverages (including key person life insurance coverages) or as otherwise approved by the Company's board of directors. The Purchase Price will not be used to make any payments outside of the ordinary course of the Company's business, including without limitation any payments of dividend or any payments of extraordinary bonuses.

5.05 <u>Stock Option Agreements</u>. Each stock option agreement executed after the Closing Date between the Company and any optionee (each, an "**Optionee**") in connection with a Common Stock option grant shall provide, unless otherwise approved by the Investor, that, (i) upon the cessation of employment or service to the Company for any reason, such Optionee shall immediately lose all unvested options; (ii) if such Optionee is terminated for cause, such Optionee shall immediately lose all vested but unexercised options and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee pursuant to the exercise of options at the actual exercise price of such options; and (iii) if such Optionee's employment with or service to the Company ceases for any reason other than termination for cause (including without limitation by reason of death or disability), the Optionee (or his or her estate as the case may be) shall have 60 days to exercise any vested options, and the Company shall have the right to repurchase any shares of Common Stock purchased by such Optionee (or his or her estate as the case may be) pursuant to the exercise of options at the then-current fair market value of such share of Common Stock , as reasonably determined by the Company's board of directors. The Company shall also use its best efforts to enter into amended stock option agreements containing the provisions set forth in the preceding sentence with all Persons with whom the Company has entered into stock option agreements prior to the Closing Date.

5.06. <u>Retail/Gasoline Station Alliances</u>. The Investor shall have the non-exclusive right to license the Company's Products and to establish retail/gas station alliances utilizing the Company's Products in any market in which the Investor operates as of or after the Closing Date. Any exclusive license or arrangement granted to any other Person in any such market shall provide an exception for the Investor's non-exclusive rights as set forth in the preceding sentence. For the purposes of this Agreement, "Products" means the technology which the Company has licensed to the Investor as of the Closing Date, and all improvements and enhancements thereto, and the Company's Reward Marketing Engine software module.

5.07. <u>Board Representation</u>.

(a) For so long as the investor holds at least 7.5% of the Company' issued and outstanding Common Stock (on an as-converted, fully-diluted basis), the size of the Company's Board of Directors shall be fixed at seven (7) persons as follows:

(i) The Investor shall have the right to nominate two candidates (the "Investor Nominees") for election to the Company's Board of Directors. One of the initial Investor Designee shall be Mr. David Shapira. If any Investor Nominee ceases to serve in such capacity for any reason, the resulting vacancy on the Board of Directors shall be filled by a new director appointed by Investor;

(ii) The Company covenants that no more than two nominees will be officers of the Company (the "Officer Nominees").

5.4    Section 8.13 of the 2005 SP Agreement shall be deleted in its entirety and replaced with the following:

8.13 Survival of representations and Warranties. All representations and warranties of the Parties as set forth in Articles 3 and 4 shall survive the Closing for a period of 18 months thereafter. All covenants, agreements and obligations made herein shall survive the execution and delivery hereof.

## ARTICLE 6
## MISCELLANEOUS

6.1    No Other Rights. Nothing in this Agreement shall be construed (expressly or by implication) as granting or conveying to Defendants or any third party, or as otherwise creating, any licenses or other rights or interest in or to any patents or other intellectual property owned or controlled by Excentus.

6.2    Publicity. Except for the fact that the parties have settled their dispute and as may be required by applicable law or the rules of any stock exchange applicable to a party, the parties to this Agreement shall not issue any other press release or make any other public statement regarding this Agreement.

6.3    Dispute Resolution; Governing Law. Any dispute, claim, or controversy arising out of our relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules & Procedures. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. This Agreement shall be interpreted and the rights and liabilities of the parties determined in accordance with the laws of the State of Texas, irrespective of and without any application of Texas conflict of laws rules.

6.4    Compliance with Laws. Each party shall comply with all applicable federal, state and local laws and regulations in connection with its activities pursuant to this Agreement.

6.5    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns.

6.6 **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified, (ii) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address, e-mail address or facsimile number as set forth below or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section.

| | |
|---|---|
| **If to Excentus:** | Excentus Corporation<br>Attention: CEO & President<br>14241 Dallas Parkway, Suite 1200<br>Dallas, TX 75254 |
| With a copy to: | Excentus Corporation<br>Attention: General Counsel<br>14241 Dallas Parkway, Suite 1200<br>Dallas, TX 75254 |
| **If to Giant Eagle:** | Giant Eagle, Inc.<br>Attention: Richard A. Russell, Esquire<br>Vice President and General Counsel<br>101 Kappa Drive, RIDC Park<br>Pittsburgh, PA 15238 |
| With a copy to: | Marcus & Shapira LLP<br>Attention: Bernard D. Marcus, Esquire<br>One Oxford Centre, 35th Floor<br>301 Grant Street<br>Pittsburgh, PA 15219 |
| With a copy to: | Eckert Seamans Cherin & Mellott, LLC<br>Attention: David V. Radack, Esquire<br>600 Grant Street, 44th Floor<br>Pittsburgh, PA 15219 |
| **If to Phoenix:** | Giant Eagle, Inc.<br>Attention: Richard A. Russell, Esquire<br>Vice President and General Counsel<br>101 Kappa Drive, RIDC Park<br>Pittsburgh, PA 15238 |
| With a copy to: | Marcus & Shapira LLP<br>Attention: Bernard D. Marcus, Esquire<br>One Oxford Centre, 35th Floor<br>301 Grant Street |

A0875506.3      A0874556.2      - 9 -

Pittsburgh, PA 15219

With a copy to:        Eckert Seamans Cherin & Mellott, LLC
                       Attention: David V. Radack, Esquire
                       600 Grant Street, 44th Floor
                       Pittsburgh, PA 15219

**If to David Shapira:** Giant Eagle, Inc.
                       101 Kappa Drive, RIDC Park
                       Pittsburgh, PA 15238

With a copy to:        Marcus & Shapira LLP
                       Attention: Bernard D. Marcus, Esquire
                       One Oxford Centre, 35th Floor
                       301 Grant Street
                       Pittsburgh, PA 15219

**If to Daniel Shapira:** Marcus & Shapira LLP
                       One Oxford Centre, 35th Floor
                       301 Grant Street
                       Pittsburgh, PA 15219

6.7    Waiver. No delay or failure by a party to exercise any right hereunder, and no partial or single exercise of that right, shall constitute a waiver of that or of any other right, unless otherwise expressly provided therein.

6.8    Counterparts. This Agreement and any amendment to this Agreement may be executed and delivered by facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. If this Agreement is executed in counterparts, no signatory hereto shall be bound until both the parties named below have duly executed or caused to be duly executed a counterpart of this Agreement.

6.9    Severability. If any term or other provision of this Agreement is determined by a decision by a court, administrative agency or arbitrator to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either party.

6.10    Entire Agreement. This Agreement, including all Exhibits, constitutes the entire understanding and agreement between the parties relating to this subject matter, and supersedes any and all prior correspondence or other agreement(s) relating thereto. This Agreement may not be amended or modified except by written instrument specifically referring to this Agreement bearing an original signature of each party or an authorized officer of each party.

6.11    Headings. The captions in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement. References in this Agreement to a Section are references to such Section of this Agreement.

6.12    Third Party Beneficiaries.  Except as expressly set forth herein, the provisions of this Agreement are for the benefit of the parties hereto and not for any other person or entity.

6.13    Further Assurances.  The parties hereby agree to perform any further acts and to execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement, including but not limited to any necessary and appropriate amendment to the Trademark Agreement.

6.14    Mutual Drafting.  This Agreement is the joint product of Excentus and the Defendants, and each provision hereof has been subject to mutual consultation, negotiation and agreement of Excentus and the Defendants.  To the extent any language in this Agreement is determined to be ambiguous, it shall not be construed for or against any party based on the fact that either party controlled the drafting of this Agreement.

6.15    No Effect on Other Agreements.  Except as modified by this Agreement, the GE/Excentus Agreements are not affected by this Agreement.

6.16    No Admission Liability.  This Agreement shall not constitute an admission of any liability with respect to any claim asserted by any party to this Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties designated below have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

EXCENTUS CORPORATION

By: _____

Name: BRANDON LOGSDON

Title: CEO & PRESIDENT

GIANT EAGLE, INC.

By: _____

Name: John Lucot

Title: President and COO

PHOENIX INTANGIBLE HOLDINGS COMPANY

By: _____

Name: Mark J. Minnaugh

Title: Director

GIANT EAGLE OF DELAWARE, INC.

By: _____

Name: Mark J. Minnaugh

Title: Director

DAVID SHAPIRA

_____

DANIEL SHAPIRA

_____

# EXHIBIT A

| Serial No. | Patent No. | Publication No. |
|---|---|---|
| 09/255,472 | 6,321,984 | NONE |
| 09/253,275 | 6,332,128 | NONE |
| 09/991,815 | 6,732,081 | US20020040321 |
| 09/183,788 | 6,741,968 | US20010018664 |
| 10/764,930 | 6,885,996 | US20040158493 |
| 11/702,866 | 7,383,204 | US20070174126 |
| 09/412,415 | 6,778,967 | NONE |
| 11/157,578 | 7,653,571 | US20050234776 |
| 12/008,882 | NONE | US20080126208 |

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Excentus Corporation, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | Civil Action No. 2:13-CV-178-JFC |
| Giant Eagle, Inc., et al., | § § | |
| Defendants. | § § | |

## JOINT STIPULATION OF DISMISSAL

It is stipulated by Plaintiff Excentus Corporation ("Excentus") and Defendants Giant Eagle, Inc., David Shapira, and Daniel Shapira (collectively, "Defendants") that they have agreed to a settlement in this case. All of Excentus' claims against the Defendants asserted in this litigation are hereby dismissed with prejudice consistent with the terms of the settlement agreement between Excentus and the Defendants. All of the Defendants' claims against Excentus asserted in this litigation are hereby dismissed with prejudice consistent with the terms of the settlement agreement between Excentus and the Defendants.

Each party will be responsible for paying all costs and expenses, including attorneys' fees, incurred by it in connection with this case.

**FULBRIGHT & JAWORSKI L.L.P.**

s/ Brett C. Govett
Brett C. Govett
Attorneys for Excentus Corporation

**MARCUS & SHAPIRA LLP**

s/ Bernard D. Marcus
Bernard D. Marcus
Attorneys for Giant Eagle, Inc., David
Shapira, and Daniel Shapira

A0875506.3                    A0874556.2                    - 14 -

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Giant Eagle, Inc., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-1195-B |
| | § | |
| Excentus Corporation, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## JOINT STIPULATION OF DISMISSAL

It is stipulated by Plaintiff Giant Eagle, Inc. ("Giant Eagle") and Defendant Excentus Corporation ("Excentus") that they have agreed to a settlement in this case. All of the Giant Eagle's claims against Excentus asserted in this litigation are hereby dismissed with prejudice consistent with the terms of the settlement agreement between Giant Eagle and Excentus. All of Excentus' claims against Giant Eagle asserted in this litigation are hereby dismissed with prejudice consistent with the terms of the settlement agreement between Excentus and Giant Eagle.

Each party will be responsible for paying all costs and expenses, including attorneys' fees, incurred by it in connection with this case.

**FULBRIGHT & JAWORSKI L.L.P.**

s/ Brett C. Govett
Brett C. Govett
Attorneys for Excentus Corporation

**MARCUS & SHAPIRA LLP**

s/ Bernard D. Marcus
Bernard D. Marcus
Attorneys for Giant Eagle, Inc., David
Shapira, and Daniel Shapira

A0875506.3                 A0874556.2                 A0866028.1        - 15 -

# Complete Capitulation of Excentus' Interests

CONFIDENTIAL

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Agreement") is made and entered into effective as of December 16, 2014 ("Effective Date") by and between Excentus Corporation ("Excentus"), a Texas corporation, formerly known as CCISTech, Inc. ("CCIS"), with its principal office at 14241 Dallas Parkway, Suite 1200, Dallas, Texas 75254 and Giant Eagle, Inc. ("Giant Eagle"), Giant Eagle's wholly-owned subsidiary Phoenix Intangible Holdings Company ("Phoenix"), Giant Eagle's wholly-owned subsidiary Giant Eagle of Delaware, Inc. ("GE Delaware"), David Shapira, and Daniel Shapira (collectively, "Defendants").

WHEREAS, on March 4, 2002, Excentus and Giant Eagle entered into a Software License and General Services Agreement (the "Software License");

WHEREAS, on August 6, 2004, Excentus entered into a Series A Preferred Stock Purchase Agreement, as amended by the First Amendment to the Series A Preferred Stock Purchase Agreement dated as of November 15, 2005, (the "2004 SP Agreement") with GE Delaware;

WHEREAS, on November 15, 2005, Excentus entered into a Series B Preferred Stock Purchase Agreement (the "2005 SP Agreement") with GE Delaware;

WHEREAS, on June 11, 2008, Excentus entered into the Trademark and Copyright License Agreement as amended on September 2, 2008, (the "Trademark Agreement") with Phoenix;

WHEREAS, on February 4, 2010, Excentus entered into Addendum No. 1 to Software License and General Services Agreement (the "SL Addendum") with Giant Eagle;

WHEREAS, the Software License, the 2004 and 2005 SP Agreements (together, the "SP Agreements"), the Trademark Agreement, and the SL Addendum shall be collectively referred to herein as the "GE/Excentus Agreements";

WHEREAS, on December 2, 2011, Excentus filed a lawsuit against the Defendants in the U.S. District Court for the Northern District of Texas in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 3:11-CV-3331 in which Excentus asserted claims against the Defendants for breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("First Texas Case"), and which case was dismissed for improper venue without prejudice to refiling in a court of proper venue;

WHEREAS, on February 1, 2013, Excentus refiled its claims against the Defendants in the U.S. District Court for the Western District of Pennsylvania in *Excentus Corp. v. Giant Eagle, Inc. et al.*, Case No. 2:13-CV-178 asserting claims of breach of duties of loyalty and utmost good faith, declaratory judgment of no patent license, patent infringement, and unfair competition ("Pennsylvania Case");

WHEREAS, David Shapira and Daniel Shapira (collectively, "the Shapiras") asserted counterclaims against Excentus for advancement, indemnification, breach of contract, and for an award of attorneys' fees in the Pennsylvania Case; and

WHEREAS, Giant Eagle asserted counterclaims against Excentus for breach of contract, breach of an implied duty, breach of the implied covenant of good faith and fair dealing, for an award of attorneys' fees, and declaratory judgment of patent license in the Pennsylvania Case, some of which

A0875506.3          A0874556.2          EXC-0d0803

- ▭ paid to Shapiras
- ▭ paid to Giant Eagle affiliate
- Excentus to pay royalties for using its FRN mark

Ex. 5

Original Image of 878 S.W.2d 351 (PDF)

878 S.W.2d 351

Court of Appeals of Texas,
Beaumont.

Jewell ROBBINS, Appellant,

v.

HNG OIL COMPANY, et al., Appellees.

No. 09–93–107 CV.   |   Submitted
Jan. 13, 1994.   |   Decided June 23, 1994.

Attorney-in-fact of grantee's heir brought action against oil companies seeking to recover unpaid mineral royalties for property in Spindletop oil field allegedly conveyed to grantee in 1911 deed. The 136th District Court, Jefferson County, Jack R. King, J., granted summary judgment in favor of defendant, and plaintiff appealed. The Court of Appeals, Brookshire, J., held that: (1) deed conveyed only four properties specifically named in deed, and (2) decision in prior federal action concerning same property had collateral estoppel effect.

Affirmed.

West Headnotes (16)

[1]     Deeds
         Particular Words or Terms
         Recitation in deed that it conveyed all property inherited through decedent could not operate to enlarge specific description given in deed of property conveyed.

         1 Cases that cite this headnote

[2]     Evidence
         Grounds for Exclusion of Extrinsic Evidence
         If written instrument is so worded that same can be given certain and definite legal meaning or interpretation or construction by applying relevant, pertinent rules of construction, then

written instrument is not ambiguous and parol evidence will not be received to create ambiguity or to give written instrument different meaning from that which its own language and wording imparts.

         Cases that cite this headnote

[3]     Evidence
         Grounds for Exclusion of Extrinsic Evidence
         Parol evidence rule prevails even to extent to prohibiting proof of circumstances surrounding transaction when written instrument involved is so worded that it is not fairly susceptible to more than one legal meaning or construction; no intention, however discovered, can contradict or destroy legal effect of wording and language used.

         Cases that cite this headnote

[4]     Deeds
         Questions for Jury
         Identity of land conveyed by deed was question of law for court, rather than mixed question of law and fact required to be determined by jury, where provision of deed unambiguously identified four tracts to be conveyed.

         Cases that cite this headnote

[5]     Judgment
         Operation and Effect
         Determination in federal action brought by plaintiff on behalf of grantee's heirs that 1911 deed conveyed to grantee only four specifically named tracts contained in deed, had collateral estoppel effect in plaintiff's subsequent state action brought in her capacity as attorney-in-fact for one of grantee's heirs.

         Cases that cite this headnote

**[6]** **Judgment**
 👉 Mutuality of Estoppel

**Judgment**
 👉 Mutuality of Estoppel in General

Mutuality was not required for application of doctrine of collateral estoppel.

1 Cases that cite this headnote

**[7]** **Evidence**
 👉 Deeds

**Evidence**
 👉 Contracts in General

Under Texas law, parol evidence will not be received or admitted to create ambiguity or to give contract or deed meaning different from that which its language imparts.

2 Cases that cite this headnote

**[8]** **Courts**
 👉 Previous Decisions as Controlling or as Precedents

Once definitive construction has been given to specific writing or particular specified fact situation such as determination of true construction of will or validity of deed, such definite determination is binding and conclusive in subsequent suits involving same subject matter and same deed, whether parties and property are the same or not; doctrine of stare decisis controls the result.

2 Cases that cite this headnote

**[9]** **Courts**
 👉 Previous Decisions as Controlling or as Precedents

Doctrine of stare decisis gives force of law to precedents and is broader in its scope than doctrine of collateral estoppel; commonality or privity among parties to present or prior litigation is not required by stare decisis.

1 Cases that cite this headnote

**[10]** **Courts**
 👉 Decisions of Higher Court or Court of Last Resort

When reviewing court with jurisdiction sets forth final ruling on matter of law before appellate court, then such ruling and determination is binding and conclusive in all subsequent suits involving same subject matter, whether parties and property are the same or not.

1 Cases that cite this headnote

**[11]** **Courts**
 👉 Decisions of United States Courts as Authority in State Courts

Determination by federal court that deed conveyed only four parcels of property was stare decisis in subsequent state court action seeking to construe same deed.

Cases that cite this headnote

**[12]** **Judgment**
 👉 Identity of Subject-Matter

Doctrine of issue preclusion barred relitigation in state court of issue of whether deed conveyed more than four parcels specifically named in deed after federal court construed and determined exact effect of deed.

1 Cases that cite this headnote

**[13]** **Judgment**
 👉 Identity of Subject-Matter

**Judgment**
 👉 Identity of Issues, in General

"Issue preclusion," or "preclusion by judgment," bars relitigation of identical questions of fact or law that were actually litigated and which questions of fact or law were essential to judgment in prior suits.

1 Cases that cite this headnote

[14] **Deeds**
  ⌖ Evidence

Grantee's successor failed to establish complete and proper chain of title for three parcels named in deed, where deed recited that it was conveying property inherited from decedent, and three of those tracts did not appear in inventory of decedent's estate.

Cases that cite this headnote

[15] **Perpetuities**
  ⌖ Suspension of Absolute Power of Alienation

Restraints on alienation are contrary to public policy and forbidden and disallowed. Vernon's Ann.Texas Const. Art. 1, § 26.

Cases that cite this headnote

[16] **Mines and Minerals**
  ⌖ Actions

**Mines and Minerals**
  ⌖ Rights and Liabilities as to Third Persons

Affidavit of president of title company that land conveyed in 1911 deed was located in city considerable distance from oil field, and that no oil or gas wells ever existed on the property supported judgment in favor of oil company in action to recover unpaid royalties.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*352** Joseph P. Conner, Brenham, Kyle Davis, Chappell Hill, for appellant.

John G. Tucker, Orgain, Bell & Tucker, Beaumont, Ronald G. Manning, Pogo Producing Co., Houston, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

**OPINION**

BROOKSHIRE, Justice.

Appellant, Jewell Robbins, individually and as attorney-in-fact for Abigail Meaders, timely appealed from the granting of a summary judgment. Robbins contends that Abigail Meaders is the heir of James Meaders. Robbins takes the position that in her capacities she is the owner of an undivided one-eighth **\*353** interest in and to described tracts and parcels of land located in Jefferson County, Texas. At trial and on appeal—as clearly set out in her brief—Robbins relies upon a Deed from Ephriam Garonzik to James Meaders ("the Garonzik deed") dated December 14, 1911.

Appellant contends that she is the owner of an undivided one-eighth interest in over forty tracts of land alleged to have been in the estate of William McFaddin, deceased, but only four tracts were particularly described in the Garonzik deed. Appellant contends that certain other deeds and instruments exist in her chain of title and that the remaining thirty-seven tracts of land can obtain descriptions by numerous references to the "land records of Jefferson County, Texas, and the estate of William McFaddin". [1] But the "bargained, sold and conveyed" clause of the Garonzik deed reads:

> [H]ave bargained, sold and conveyed, and by these presents do grant, sell and convey unto the said James Meaders, of the County of Dallas, State of Texas, an undivided one-eighth interest in and to the following described tracts and parcels of land, to-wit:
>
> Situated in the State of Texas, County of Jefferson, and more fully described as hereinafter set forth, the said property herein conveyed being

four (4) tracts, the first of which said tracts is described as follows, to-wit:

Then the deed describes only four tracts. The four tracts were:

FIRST TRACT: "One labor, first class, Abstract No. 166 ... (old Abstract No. 112)."

SECOND TRACT: "One Hundred and Sixty (160) acres school lands ... known as Abstract No. 181."

THIRD TRACT: "Three Hundred and Twenty (320) acres (donation) ... (old abstract No. 119) ... said abstract number being No. 182."

FOURTH TRACT: "Three Hundred and Twenty (320) acres ... Being Abstract No. 183 ... (old Abstract No. 120)."

The above are condensed forms or abbreviations of the full descriptions in the 1911 deed.
In this litigation the appellant seeks an accounting for unpaid royalties from the real property and mineral interests in which appellant avers that she is entitled to a one-eighth interest.

The appellees are HNG Oil Company, Elf Aquitaine, Inc., IMC Exploration Company, Pogo Producing Company, and Westland Oil Development Corporation. These companies were defendants below.

The deed from Garonzik to James Meaders bore the date of December 14, 1911. Interestingly, the Garonzik deed was filed for record March 21, 1931, at 1:30 o'clock p.m.; this deed was recorded March 26, 1931, in the office of the County Clerk of Jefferson County, Texas. The deed recites that the described four tracts conveyed by the deed is all of the property that J.H. McFaddin, R.D. McFaddin, and A.J. McFaddin inherited through their ancestor, Wm. McFaddin (spelled "McFadden" in the Garonzik deed).

Nevertheless, appellant seeks to expand the deed so that it is construed to include approximately thirty-seven additional tracts of real property comprising the Spindletop Oil Field in Jefferson County. Appellant's claim in this litigation is based upon the Garonzik deed to James Meaders which deed was recorded

approximately twenty years after its date. Without doubt, the Spindletop Oil Field had been in existence and in production since the very early part of 1901. The Spindletop Oil Field was the field that brought the oil industry into its significant importance in January of 1901 and it was extensively developed with prolific production before December of 1911.

The companies (hereinafter Defendants) filed summary judgment motions. The defendants received a favorable grant of a summary judgment on several grounds.

[1] Robbins presents four points of error. The first point is:

> *354 The trial court erred in construing the Garonzik deed as conveying solely the four specifically described tracts rather than an interest in all properties inherited by the McFaddin heirs from William McFaddin as expressly stated in the deed.

In this opinion we will endeavor to address appellant's four point of error in order.

Robbins does not contend that the 1911 deed was ambiguous, although she contends that the intention of the 1911 deed should be construed to cover an additional thirty-seven tracts of land. In her written argument in her brief under Point One, Robbins does not aver any ambiguity in what property was conveyed at each step in the Meaders chain of title. In the trial court Robbins made no claim of ambiguity in the 1911 deed.

Jewell Robbins, individually and as attorney-in-fact, filed her response to the first motion for summary judgment of the defendants. The appellant's response to the summary judgment proceedings is lengthy. And in the response the appellant refers in considerable detail to the Garonzik deed. In appellant's response, she makes no contention that the 1911 deed was ambiguous. Thus, the question of ambiguity was not presented in the district court. Although a second response to the defendants' second motion for summary judgment was filed, the second response

contained no contention that the 1911 Garonzik deed was ambiguous.

In that posture, then, the construction of the deed became a question of law for the trial court. The responses of appellant were not sworn to, nor did they have proper affidavits attached. Their office was that of a pleading. Generally, pleadings are not proof in summary judgment proceedings.

[2] Thus, the 1911 deed's language and wording and its meaning becomes a question of law for the court. *See Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193 (Tex.1962). If a written instrument is so worded that the same can be given a certain and definite legal meaning or interpretation or construction by applying the relevant, pertinent rules of construction, then the written instrument is not ambiguous and parol evidence will not be received to create an ambiguity or to give the written instrument a different meaning from that which its own language and wording imparts. *See Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154 (1951).

[3] And this rule prevails even to the extent of prohibiting proof of circumstances surrounding the transaction when the written instrument involved is so worded that it is not fairly susceptible to more than one legal meaning or construction. *See Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977 (1941). And importantly and paramountly, no intention, however discovered, can contradict or destroy the legal effect of the wording and language used. *Reynolds v. McMan Oil & Gas Co.,* 11 S.W.2d 778 (Tex. Comm'n App.1928, holding approved). *See and compare Stahl Petroleum Co. v. Phillips Petroleum Co.,* 550 S.W.2d 360 (Tex.Civ.App.—Amarillo 1977), *aff'd,* 569 S.W.2d 480 (Tex.1978). *See and compare Tower Contracting Company v. Flores,* 157 Tex. 297, 302 S.W.2d 396 (1957).

In *Coffee v. Manly,* 166 S.W.2d 377 (Tex.Civ.App.—Eastland 1942, writ ref'd), the unanimous court in an opinion by Justice Funderburk held that a grant unto certain grantees of a perpetual right to use the water on Subdivisions five and six of Sections Nos. 40 and 41 of the T. & P. Railroad Company lands in Jones and Shackelford Counties, Texas, was a specific description and that specific description prevailed over

later language used in the instrument of perpetual right to use the water in: "being the same land conveyed to us by Mary A. Manly, on Dec'r. 31st, 1919." In the water rights conveyance, one Bertha Craig and her husband S.A. Craig had joined and they had been the owners of Subdivision four. The suit was by S.S. Manly and Amos Manly, who were the grantees of the perpetual water rights against Aaron Craig Coffee and Kathryn Thigpen, who were owners by inheritance from Mrs. Bertha Craig of Subdivision four.

The court held that where a recitation was made to another deed or another record for the purpose of showing from what source the real property had been derived and as a help in tracing the title, then such a reference or **\*355** referral will not and could not operate to enlarge the specific description given in the deed which contained the reference. This principle of law applies to the 1911 Garonzik deed because there was in that deed an adequate and specific, unambiguous description of the four tracts—hence, the reference in the 1911 deed cannot be given the effect of enlarging the specific descriptions to include different, additional tracts of land. This reference only serves to show the source from which the real property has been derived.

It is noteworthy that the writ was refused outright in *Coffee v. Manly.* In *Coffee,* at the district court level the plaintiffs demonstrated by extrinsic evidence that Mary A. Manly had conveyed Subdivision four as well as Subdivisions five and six to the defendant grantors on the date in question, being "on Dec'r. 31st, 1919." And accordingly, the plaintiffs-grantees at trial were awarded water rights on Subdivision Four. On appeal, however, the court not only reversed the judgment but rendered the judgment for the defendants, holding that the deed was unambiguous on its face and that extrinsic evidence could not be admitted to contradict the deed or to create ambiguities. Parol testimony is not admissible. Holding that it was simply not permissible to give controlling effect to that which creates an ambiguity and destroys the certainty which was expressed by other language is the holding in *Cartwright v. Trueblood,* 90 Tex. 535, 39 S.W. 930 (1897).

We hold that the specific descriptions such as those set out in the 1911 Garonzik deed of Abstracts 181,

182, 183, and 166 definitely control over the reference to the source of the interest in the four tracts. We deem that the reasoning and rationale in the *Coffee* case is compellingly persuasive because Bertha Craig, who was the owner of Subdivision four, and her husband, joined in the conveyance of the perpetual water rights. Nevertheless, the grantees only obtained the water rights to Subdivision five and six. Bertha Craig was clearly the owner of Subdivision four. Thus, the Garonzik 1911 deed could have conveyed only the lands in Abstracts Nos. 166, 181, 182, and 183 and in no other tract or abstract.

From the record before us and from the summary judgment proofs as proffered by the defendants as well as Robbins' responses to the motions for summary judgment, we determine that the Fifth Circuit in the Jewell Robbins and Clark cases (as hereinafter discussed) considered, disposed of, and rejected all of the arguments and positions here advanced by Robbins. The Fifth Circuit especially rejected Robbins' arguments and contentions relevant to appellant's point of error number one. Thus, we are constrained to overrule appellant's point of error number one for the reason that the State trial court below properly construed the Garonzik 1911 deed as conveying four, and only four, specifically described tracts. There was no ambiguity in the deed, nor did Jewell Robbins in her various capacities present to the trial court the issue of ambiguity. *See* TEX.R.CIV.P. 166a(c). We have overruled appellant's point of error number one pursuant to Texas precedents. Nevertheless, at least two of the Fifth Circuit decisions are also of controlling effect. *See Robbins v. Amoco Production Co.,* 952 F.2d 901 (5th Cir.1992); *Clark v. Amoco Production Co.,* 908 F.2d 29 (5th Cir.1990). Robbins had also litigated previously in *Robbins v. Chevron U.S.A., Inc.,* 940 F.2d 1529 (1991).

[4] Appellant's point of error number two argues that the evidence introduced by appellees in support of their summary judgment was insufficient as a matter of law to support the summary judgment granted by the trial court. As briefed by the appellant, this point of error two deals only with the issue of which properties were conveyed. First, the appellant concedes that the interpretation of real property descriptions is normally a matter exclusively for the court; nevertheless, the appellant further argues that when there is an uncertainty in the description that does not appear on the face of the deed but had its origin in extraneous fact or an ambiguity, then the identity of the land becomes a mixed question of law and fact which must be determined by the jury. We reject this argument. We conclude that the four tracts were not described with uncertainty—nor was the 1911 deed ambiguous. The four tracts of land were identified, as **\*356** noted above, in the 1911 deed to Meaders; neither the four tracts nor the deed present a mixed question of fact and law. Appellant's point of error number two insists that the 1911 deed actually encompasses and conveys interest in thirty-seven other tracts of land described as McFaddin property.

The appellant under her point of error number two concedes that the appellees have submitted summary judgment evidence and proof by affidavits demonstrating that no minerals have been produced by any of the appellees from Abstracts 181, 182, 183, and 166. However, appellant takes the position that no evidence was introduced on nonownership and nonproduction as to Pogo Producing Company. This question will be discussed below. In point of error two appellant stresses: "[n]o evidence of any kind has been introduced, by affidavit or otherwise, on any of the other thirty seven tracts of the McFaddin property about the production of minerals by these Appellees." But as noted above, we have construed the Garonzik 1911 deed as being strictly limited to Abstracts 181, 182, 183, and 166. Thus, whether production of minerals by these appellees from any of the other thirty-seven tracts is a non-issue. Appellants have not controverted the evidence and affidavits of the appellees (showing nonownership and nonproduction) being: HNG Oil Company, Elf Aquitaine, Inc., IMC Exploration Company, Westland Oil Development Corporation. Pogo Producing Company is excepted. Our decision on appellant's point of error one definitely governs appellant's point of error two which is hereby overruled.

Appellant's point of error number three argues this:

> The trial court erred in relying upon cases with different parties in federal court as preventing full decision on the

merits of appellant's cause of action.

We disagree. And equally important is that part of the record before us establishing the defendants' nonproduction in the four abstracts described in the 1911 deed. This summary judgment proof and evidence was proper and supported the summary judgment granted by the trial court. Robbins did not controvert the nonproduction of these four oil companies.

### Some Background Factors Relevant to Appellant's Point of Error Number Three

Jewell Robbins, individually and as the legal representative and attorney-in-fact for the heirs of James Meaders, has also claimed that the defendants had unlawfully produced oil, gas, and minerals from under the four tracts specifically described for which the plaintiff in her various capacities sought an accounting and damages.

The defendants had joined issue herein by answering with the following pleas of general denial, pleas of not guilty, pleas of the statutes of limitations, *res judicata*, collateral estoppel, and *stare decisis*. Significantly, the defendants by appropriate and proper summary judgment proof and evidence advance the defense that the plaintiff's claim against the defendants for damages fails because the defendants have not owned or produced any oil and gas or other minerals from Abstracts 181, 182, 183, or 166.

There exists an extensive, in depth and detailed affidavit of one Sam O. Smith dated April 9, 1992. In brief summary, Sam Smith had been continuously engaged in the land title and abstract business in Jefferson County Texas, for twenty-two years as president of the Jefferson County Title Company, Inc., and as president of the Jefferson County Abstract Company, Inc., from 1975 through April 1990. The abstract plant involved utilized and contained a geographical indexing of all real estate instruments recorded in Jefferson County from the sovereignty of the soil to the date of the affidavit.

Sam O. Smith was personally familiar with the William McFaddin Labor Abstract No. 166, said Labor containing 177 acres and was patented by the Republic of Texas to William McFaddin on July 24, 1845. Sam Smith searched for any deed, lease, or other type of instrument conveying any interest in No. 166 to the defendants. Smith could not locate any instrument of record in Jefferson County naming any of the entities as grantees and indexed to any of the above described lands. Furthermore, he did not know of any oil and *357 gas wells located in the William McFaddin Labor Abstract No. 166.

In like manner, Smith could not locate any evidence of any recorded instruments which may have conveyed any interests by deed, lease, or otherwise to Abstracts 181, 182, and 183 to any of the above named entities which might affect the lands lying in any of the Abstracts Nos. 181, 182, and 183. In view of our opinion concerning the 1911 deed, these oil company defendants needed no evidence to support their motions for summary judgment other than the uncontested affidavits of nonownership and nonproduction from Abstracts Nos. 181, 182, 183, and 166. *See Robbins v. Amoco Production Co.,* 952 F.2d 901 (5th Cir.1992); *Clark v. Amoco Production Co.,* 908 F.2d 29 (5th Cir.1990).

By means of amended answers, each one of the defendants pleaded that the final judgments entered in the Federal court litigation in *Robbins v. Amoco Production Co., supra,* and *Clark v. Amoco Production Co., supra,* had binding effect and final effect under several doctrines. In this case, the defensive pleaded doctrines were, inter alia, *res judicata,* collateral estoppel, and *stare decisis.* Each of these doctrines were asserted in defense of this suit at the trial level and, in the defendants' motions for summary judgment, the defendants pleaded and reasserted that the defendants were entitled to summary judgment based on these same, well-established doctrines. Interestingly and importantly, the trial brief of the defendants urged these doctrines and supported and argued the same with applicable authorities for such defenses.

Indeed, the trial court's order granting the motion for summary judgment cited and referred to the federal cases as binding and possessing finality as against

the plaintiff in her several capacities by establishing that as a matter of law the Garonzik 1911 deed only conveyed interest in the four tracts that were specifically described as Abstracts Nos. 181, 182, 183, and 166—and nothing more. We have affirmed the action of the trial court in that regard. Further, the trial court determined that the defendants were entitled to summary judgment because of lack of ownership by the plaintiff in the other thirty-seven tracts.

### The Collateral Estoppel Defense

[5]  [6]  We determine that the doctrine of collateral estoppel properly applies and is a correct basis for one of the separate, independent grounds for the granting of the motion for summary judgment. We think that the well-established rules of collateral estoppel as applied by the Supreme Court of Texas no longer make mutuality a requirement. Appellant has contended that a lack of mutuality defeats summary judgment. We disagree. In *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714 (Tex.1990), the Supreme Court of Texas in a unanimous opinion written by Justice Cook held:

### A. No Requirement of Mutuality

In *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361 (Tex.1971), this Court stated,

> The rule [of collateral estoppel] is generally stated as binding a party and those in privity with him.... Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy,....

This definition does not require mutuality for the invocation of collateral estoppel; rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation. *Myrick v. Moody Nat'l Bank*, 590 S.W.2d 766, 769 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Hardy v. Fleming*, 553 S.W.2d 790, 793–93 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). As this Court stated in *Tarter v. Metropolitan Sav. & Loan Ass'n* [744 S.W.2d 926 (1988) ], "The doctrine applies when the party *against whom* collateral estoppel is asserted had a

full and fair opportunity to litigate the issue in the prior suit" (emphasis added). [emphasis theirs]

Jewell Robbins is the self-same Jewell Robbins in the same capacities as plaintiff in the prior litigation. In her individual capacity she was the same actual party in the prior litigation. Jewell Robbins in her representative *358 capacity or in her attorney-in-fact capacity was certainly in privity in the prior litigation. In the prior Federal litigation she sued *for two hundred heirs of James Meaders*. In this State litigation she is suing as the attorney-in-fact *for Abigail Meaders, as the heir of James Meaders*. Therefore, we conclude that Abigail is in privity with the two hundred heirs of the same James Meaders inasmuch as she claims directly under James Meaders; thus, she claims she is an heir of James Meaders. We conclude the trial court was correct in granting the motion on the separate basis of collateral estoppel.

We perceive that there was also an identity of lawyers at crucial times. It is significant and important that in the Federal court suit that Robbins as plaintiff both in the trial court and as appellant in the appeal was represented by the legal professional who has represented Robbins in the case at bar at the time the summary judgment for the defendants was granted. Later this counsel withdrew. It is evident that the same arguments and contentions were made in the Federal court *Robbins* case as were made below in this State court litigation and those same arguments and contentions were overruled in both courts.

Hence, it is accurate to state that the parties here and in the prior Federal case were in privity in that Abigail Meaders is an heir of James Meaders. Also, the identity of the attorneys and the identity of the issues that were presented and determined in the prior Federal court proceeding and in the State trial court were shown as being the same. In the Federal court cases at the Circuit level each involved the issue of the legal interpretation of the 1911 deed, holding that the construction of said deed was a question of law for the court.

Again, in *Eagle Properties, Ltd. v. Scharbauer, supra*, the Texas Supreme Court resolved the question of the application of the doctrine of collateral estoppel in a state court suit, we perceive, based upon a prior federal court suit and judgment. Our Supreme Court

held that collateral estoppel precludes the relitigation of identical issues of fact and precludes the relitigation of identical issues of law. Our Texas Supreme Court held this:

> Under state law, collateral estoppel only precludes the relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment. *Tarter*, 744 S.W.2d at 927; *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex.1985).

*Id.*, 807 S.W.2d at 721–22. Under this record, we conclude that identical issues of law were actually litigated and were essential to prior decisions and judgments. We hold that the defendants have met and satisfied the elements of collateral estoppel.[2] *See and compare Peregoy v. Amoco Production Co.*, 742 F.Supp. 372 (E.D.Tex.1990), *aff'd*, 929 F.2d 196 (5th Cir.), *cert. denied*, 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991).

Thus, we conclude and hold that the question of law that was decided in the *Robbins* Federal court case as well as the *Clark* Federal case (which was brought by and on behalf of Meaders' heirs)—which question of law resulted in final judgments in the United States Courts determine that, as a matter of law, the 1911 deed only purported to convey interest in the four specifically described abstracts as numbered above and importantly, that the 1911 deed could not be enlarged so as to include any additional tracts. By like reasoning and rationale, as noted later, we hold that the doctrine of *stare decisis* applies and is binding upon Jewell Robbins, individually and as attorney-in-fact for Abigail. Jewell Robbins, in her several capacities, had a full and fair opportunity to present and litigate her issues in a prior suit. Indeed, she did so. We overrule appellant's point of error number three.

**Fifth Circuit Court of Appeals' Opinion
in *Clark v. Amoco Production Co.*,
908 F.2d 29 (5th Cir.1990)—Clark II**

In *Clark II*, the Circuit Court passed upon and specifically and definitively construed the **\*359** 1911 Garonzik deed to James Meaders. There, Clark and Profitt, *as administrators of James R. Meadors' estate*, instituted litigation in the Federal District Court of the Eastern District of Texas against four oil companies, alleging that the oil companies had extracted without payment or permission literally billions of dollars worth of oil and gas from the lands in which James Meadors claimed a one-eighth interest. These lands were perceived to include and encompass the famed Spindletop Oil Field[3]. Judge Joe J. Fisher of the District Court granted a summary judgment in favor of the defendant oil companies, concluding that the deed (being the 1911 deed upon which the administrators based their claim) conveyed rights only to four specific tracts of land in which the companies had never held any interest. The suit in the Federal District Court was to establish the Meadors' interest in Jefferson County lands in general and to obtain an accounting of all minerals produced therefrom. Such an accounting, the Meadors heirs and their representatives asserted, would reveal that Meadors' estate was entitled to at least twenty billion dollars in royalties from the oil companies' unauthorized use and production from the various properties for a period exceeding seventy years.

It is clear from the opinion that the basis of the Meadors' estate claim is the 1911 deed from Ephriam Garonzik to Meaders that purported to convey four specifically described tracts of land in Jefferson County, being the same identical deed upon which Jewell Robbins bases her claims. However, in addition, the Garonzik 1911 deed to Meaders stated that those four parcels were all the lands in Jefferson County that the same grantors of the McFaddin family had inherited from their ancestor, William McFaddin, and further, that the intention of the grantors was to convey all of the properties in the thus-defined McFaddin inheritance. In *Clark II*, 908 F.2d at 31, the Fifth Circuit set out in a footnote the exact language, wording and clauses in the 1911 deed and judicially determined that deed's meaning and legal import. We set out in our footnote number three the pertinent portions of the 1911 deed specifically adjudicated and definitely determined by the Fifth Circuit[4]. The Fifth Circuit squarely passed on the clause in the deed that reads: "and this deed is intended to convey to the

said James Meaders [sic] one-eights [sic] interest in and to all properties ... that the said ... [McFaddens] are entitled to by inheritance ... of every description whatsoever" is to be construed—according to the plaintiffs (in *Clark II*) that the 1911 deed was intended to convey a one-eighth interest not only in the four described tracts but also in all of the Jefferson County land inherited through their ancestor Wm. McFaddin by J.H., A.J., and R.D. McFaddin. *But the Fifth Circuit disagreed.* These other, additional lands were determined to have included parts of the Spindletop field. From the Spindletop fields the oil companies had produced billions of dollars worth of oil and gas.

**\*360** In *Clark II,* the Fifth Circuit specifically wrote that the trial court correctly held that the 1911 deed unambiguously conveyed an interest *only in four parcels of land.* The circuit court then held that the 1911 deed unambiguously evidenced an intent to convey only the four specifically described tracts. The deed was construed as clearly stating that "the said property herein conveyed being four (4) tracts". Then the deed provides a legal description of these four properties and the deed explains that "the above described property herein conveyed is all the property that the" McFaddins inherited from William McFaddin.

[7] It was recognized that the deed redundantly stated that it is intended to convey one-eighth interest in all the lands inherited by the McFaddins from William McFaddin, being a phrase already defined within the instrument as equal to the four described tracts. The issue was then clearly decided that there was no merit to the *Clark II* plaintiffs' contention that the deed is ambiguous on its face and that therefore, extrinsic evidence, that is the inventory of the William McFaddin estate must be admitted in order to remove and resolve the ambiguity. We agree that the 1911 deed is unambiguous and that the deed is forced into a false ambiguity only when extrinsic evidence is introduced to attempt to show something contrary to the express terms of the deed in that the Wm. McFaddin estate contained more than four parcels of land. We determine that such extrinsic evidence is impermissible under the Texas law which has been established to the effect that parol evidence will not be received or admitted to create an ambiguity or to give a

contract or a deed a meaning different from that which its language imparts.

### *The Opinion in [Jewell] Robbins v. Amoco Production Co., 952 F.2d 901 (5th Cir.1992)*

But Jewell Robbins has litigated before. The previous litigation was based directly and squarely on the deed dated December 14, 1911, being the deed from Ephriam Garonzik to James Meaders. Jewell Robbins had alleged that she individually and as attorney-in-fact for some two hundred heirs of James Meaders owned and owns an undivided one-eighth interest in certain lands located in Jefferson County, Texas. The prior Jewell Robbins litigation involved the very same deed determinative of this appeal.

The 1911 deed conveyed an undivided interest in four specifically described tracts of land. These four tracts of land were said to be situated at some distance between three to sixteen miles from the Spindletop dome. In the prior litigation involving the same 1911 deed, Robbins relied upon certain language, claiming that the deed included also thirty-seven additional tracts which did include the land upon which the Spindletop dome is situated. Robbins in the prior suit contended that various oil companies had extracted oil and gas and other minerals from the land described in the 1911 deed without compensating Meaders or his heirs.

The United States District Court for the Eastern District of Texas, Judge Joe J. Fisher, held that the crucial 1911 Garonzik deed conveyed only the four specifically referenced and described tracts. The prior Jewell Robbins litigation specifically dealt with the interpretation of the Garonzik deed of 1911 which set forth specific descriptions of four tracts of land designated as Abstracts 166, 181, 182, and 183. The relevant, governing, operative language of the deed is set out verbatim in *Robbins v. Amoco, supra,* at 903[5]. Again, the Fifth Circuit dealt with and construed the exact same clauses in the 1911 deed upon which the same Jewell Robbins now relies upon to expand the said deed to include thirty-seven additional (or more) tracts of land.

Robbins has previously specifically argued and maintained that the McFaddins had *361 owned more than forty different parcels of real property in Jefferson County at the time of the 1911 conveyance. And Robbins has previously specifically asserted that the language must be construed to convey not just the four specifically described parcels or tracts, but all of the tracts owned by the McFaddins in Jefferson County. The circuit court overruled Robbins' construction of the 1911 deed specifically; as we do now. Put in simplest terms, Jewell Robbins' attempt to expand the deed beyond the four referenced tracts has failed in the past in at least two squarely decided, "White Horse" cases and must fail now. The Fifth Circuit has, at least on two prior occasions in two published opinions, squarely made the holding—an actual holding— that the 1911 deed was not ambiguous and thus, extrinsic evidence had to be refused. That court necessarily based its interpretation and construction of the deed upon the contractual language. The Federal appeals court specifically held that inasmuch as the interpretation of the unambiguous terms of a contract is purely a question of law, the interpretation is one for the court. *See Browning v. Navarro,* 743 F.2d 1069, 1080 (5th Cir.1984).

unambiguous on a number of occasions, one of which involved Jewell Robbins. Robbins in State court has certainly not demonstrated why *Robbins v. Amoco, supra,* in Federal Fifth Circuit Court should not govern this appeal. Thus, we necessarily hold that the 1911 deed conveyed, at the very most, an interest in the four parcels of land (if it did so convey) specifically described in the 1911 deed and nothing more. The doctrine of *stare decisis* gives force of law to precedents and is broader in its scope than the doctrine of collateral estoppel. Commonality or privity among the parties to the present or prior litigation is not required by *stare decisis.* In suits involving claims to title to land, *stare decisis* is particularly applicable. This is true because of the importance of establishing stability of land titles, sales, and transactions. When a reviewing court with jurisdiction sets forth a final ruling on a matter of law before that appellate court, then such ruling and determination is binding and conclusive in all subsequent suits involving the same subject matter, whether the parties and the property are the same or not. *Sturgeon v. Strachan Shipping Co.,* 698 F.2d 798 (5th Cir.1983); *Case–Pomeroy Oil Corporation v. Pure Oil Company, supra.*

### The Stare Decisis Defense

[8] We decide that once a definitive construction has been given to a specific writing or a particular specified fact situation such as the determination of the true construction of a will or the validity of a deed, such a definite determination is binding and conclusive in subsequent suits involving the same subject matter and the self-same deed whether the parties and the property are the same or not. The doctrine of *stare decisis* controls the result. And Robbins loses. *See Case– Pomeroy Oil Corporation v. Pure Oil Company,* 279 S.W.2d 886 (Tex.Civ.App.—Waco 1955, writ ref'd).

[9]  [10]  [11] Furthermore, lacking any subsequent disapproval by the proper state court, the Federal interpretation and construction still applies with equal force to cases such as the one before us. Jewell Robbins is not in a position to demonstrate or maintain how the quantity or quality of extraneous evidence would explode the prohibition against considering such evidence when the 1911 deed has been pronounced

### The Doctrine of Issue Preclusion; a/k/a Preclusion by Judgment

[12]  [13] Additionally and as an independent ground of defense, we hold that the district court ruling below was correct based on the doctrine of issue preclusion. We hold that the questions below and the questions before us on appeal definitely involve the doctrine of issue preclusion, also known as preclusion by judgment. This doctrine is clearly implicated by reason of the prior federal judgments construing and determining the exact effect of the Garonzik 1911 deed. Issue preclusion, or preclusion by judgment, bars the relitigation of identical questions of fact or law that were actually litigated and which questions of fact or of law were essential to the judgment in the prior suits. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381 (Tex.1985); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980).

*362 Indeed, our Texas Supreme Court has cited section 87 of the RESTATEMENT (SECOND) OF

JUDGMENTS, and our highest civil court has determined where the earlier judgment was rendered in a federal court, that intermediate State appellate courts are to follow the federal decisions based on issue preclusion. See *Jeanes v. Henderson*, 688 S.W.2d 100, 103 (1985). See *Acker v. City of Huntsville*, 787 S.W.2d 79 (Tex.App.—Houston [14th Dist.] 1990, no writ). Therefore, under the doctrine of issue preclusion in view of the identity of the party-plaintiff, being Jewell Robbins in her various capacities, with the identity of the attorneys and the identity of the questions of law presented, we hold that the federal decisions and determinations in *Robbins* and *Clark, supra,* are definitely binding upon the plaintiff here and upon the State courts under the doctrine of issue preclusion. We hold in this case that it is correct to give effect to the holdings, judgments, and opinions of the Fifth Circuit Court.

**[14]** Although it may be redundant and somewhat overlapping, we hold that the trial court correctly ruled that the plaintiff's chain of title as to Abstracts 181, 182, and 183 failed because the inventory of William McFaddin's estate did not list such Abstracts as being assets of the said estate. We conclude that the plaintiff has failed to establish a complete, correct chain of title to any of the four tracts conveyed in the 1911 deed with the exception of Abstract 166. Abstract 166 was listed in the proper inventory. Robbins is in a position of being obliged to rely upon a certain March 9, 1898, agreement. This 1898 agreement is in essence a lease which contains what might be described as a five-year primary term. The agreement is between certain McFaddins and one Anthony Lucas. The 1898 agreement is limited to a one-fourth undivided interest in the tracts or parcels of land that are referenced in the William McFaddin estate. It is undisputed that the inventory of the William McFaddin estate simply fails to list Abstracts Nos. 181, 182, and 183. Thus, the plaintiff's chain of titles as to these three abstracts fails.

The defendants, however, never owned any interest or produced any minerals from the Abstract No. 166. The plaintiff, of course, must establish her own title and the plaintiff can prevail only on the strength of her own title. *Hunt v. Heaton,* 643 S.W.2d 677, 679 (Tex.1982); *Land v. Turner,* 377 S.W.2d 181, 183 (Tex.1964). In order to succeed, a plaintiff must establish a superior title in himself or herself by an affirmative showing.

*See and compare Gillum v. Temple,* 546 S.W.2d 361, 363 (Tex.Civ.App.—Corpus Christi 1946, writ ref'd n.r.e.). The correct concept of the term "chain of title" under Texas law has been defined as "[t]he successive conveyances, commencing with the patent from the government, each being a perfect conveyance of the title down to and including the conveyance to the present holder." *See Reserve Petroleum Co. v. Hutcheson,* 254 S.W.2d 802, 806 (Tex.Civ.App.—Amarillo 1952, writ ref'd n.r.e.).

Under this record we hold that the 1898 agreement to Lucas which failed to mention or describe any specific property, but only referred to the William McFaddin estate was insufficient and inadequate to establish a complete chain of title as to the three abstracts, 181, 182, and 183. Pursuant to this holding, the trial court's summary judgment denying the plaintiff's claim was properly granted on this additional basis—that basis being the plaintiff's failure to establish a complete and proper chain of title to the three abstracts 181, 182, and 183.

*Appellant's Point of Error Number Four*

But, the appellant contends that under her point of error number four that Wm. McFaddin in certain instances was prohibited from alienating any property during his lifetime because of the prohibition against alienation in the Donation Patent. This contention was not raised or presented to the trial court at the proper time when the motion for summary judgment was presented, considered, and granted. Therefore, it is clearly not before this Court of Appeals for consideration. In order for an appellant to preserve a complaint for appellate review, that appellant must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the ruling he desired the court to make and it is also necessary for the appellant to have obtained a ruling from *363 the trial court upon his contention or his issue. TEX.R.APP.P. 52(a). Rule 52(a) is harmonious and consistent with Rule 166a(c) of the Texas Rules of Civil Procedure, especially pertaining to summary judgment proceedings. Rule 166a(c) states:

> Issues not expressly presented
> to the trial court by

written motion, answer or other response shall not be considered on appeal as grounds for reversal.

[15] But it is Hornbook law and an axiomatic rule that restraints on alienation are squarely contrary to public policy and are forbidden and disallowed. *See* Article I, § 26 of the 1876 Constitution, as amended. In 34 TEX.JUR.3d *Estates* § 61 (1984) it is written:

Alienability is a legal incident of property and restraints against it are contrary to public policy unless imposed under an active trust. Accordingly, a provision that annexes to a grant or devise a general restraint on the grantee's or devisee's power to convey or transfer the property is invalid. Thus, a condition against alienation during the lifetime of the grantee, contained in a deed purporting to convey an absolute fee simple estate, has been *held to be void* on the ground either that it is repugnant to the estate granted, or, admitting that such a restriction may be imposed for a reasonable time, that *it restricts alienation for an unreasonable time.* (emphasis added)

*See O'Connor v. Thetford,* 174 S.W. 680 (Tex.Civ.App.—San Antonio, 1915, writ ref'd).

*Pogo Producing Company and Abstract No. 166*

[16] The affidavit of Sam O. Smith has been reviewed and analyzed a second time. We determine that Abstract No. 166 principally exists in the northern and western parts of the City of Beaumont and is therefore removed a considerable distance from the Spindletop Oil Field. The summary judgment proof plainly shows that the Averill Addition, the First McFaddin Addition, and the Second McFaddin Addition (when dedicated) were parts of Beaumont as the City then existed. These additions are located in Abstract No. 166. Furthermore, the proof establishes that no oil or gas wells, according to the affiant, have existed or did exist in Abstract No. 166. This affidavit is similar to the evidence of nonproduction passed on and approved of in *Clark II.* Appellant does not controvert these matters. In *McConnell v. Southside School Dist.,* 858 S.W.2d 337 (Tex.1993), our Supreme Court wrote:

Likewise, issues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence. *See City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979) ("the non-movant must expressly present to the trial court any reasons seeking to avoid movant's entitlement ...").

Thus, Pogo as well as the other four defendants were entitled to a summary judgment. No damages were shown by plaintiff; no grounds for an accounting were shown by plaintiff; no extraction of oil, gas, or other minerals by these defendants were shown by plaintiff. The trial court's judgment is affirmed.

AFFIRMED.

**All Citations**

878 S.W.2d 351, 129 Oil & Gas Rep. 541

Footnotes

1    For edification, "McFaddin" will be spelled throughout this opinion with an "i", however, some references quoted spell the name with an "e". "Meaders" in this cause of action is spelled with an "ers"; again, some actions quoted spell the name "ors".

2    The elements of collateral estoppel are:

(1) the issue at stake being identical to the one involved in the previous litigation;

(2) the said issue has been actually litigated in the previous litigation; and

(3) the determination of that issue in the previous litigation had been a critical and necessary part of the judgment in that previous litigation.

3    The Fifth Circuit in a footnote noted that "[t]he Spindletop Oil Field has been a leading source of oil production since 1901. The discovery of the 'Lucas Gusher' at Spindletop began the East Texas oil boom. Uncounted billions of dollars worth of oil have since been produced in the Spindletop field ... *Clark v. Amoco Production Co.,* [hereinafter referred to as *Clark I* ] 794 F.2d 967, 969 n. 2 (5th Cir.1986)."

4    The pertinent portions of the deed are quoted below:

I, Ephriam Garonzik, of the County of Dallas, State of Texas, for and in consideration of the sum of Ten (10) Dollars and other considerations, the receipt of which is hereby acknowledged, have bargained, sold and conveyed, and by these presents do grant, sell and convey unto the said James Meaders [sic] of the County of Dallas, State of Texas, an undivided one-eighth interest in and to the following described tracts and parcels of land, to-wit: Situated in the State of Texas, County of Jefferson, and more fully described as hereinafter set forth, the said property herein conveyed being four (4) tracts....

[A specific description of the four tracts—Abstracts 166, 181, 182, and 183—follows.]

... [T]he above described property herein conveyed is all the property that the that [sic] J.H. McFadden, R.D. McFadden, and A.J. McFadden inherited through their ancester [sic], Wm. McFadden, and this deed is intended to convey to the said James Meaders [sic] one-eights [sic] interest in and to all properties properties [sic] that the said J.H. McFadden, A.J. McFadden, and R.D. McFadden are entitled to by inheritance through their ancestor, the said Wm. McFadden, of every description whatsoever, situated in the said County of Jefferson.

5    Quoting from *Robbins:*

[T]he above described property herein conveyed is all the property that ... J.H. McFadden, R.D. McFadden, and A.J. McFadden inherited through their ancester [sic], Wm. McFadden, and this deed is intended to convey to the said James Meaders one-eights [sic] interest in and to all properties ... that the said J.H. McFadden, A.J. McFadden, and R.D. McFadden are entitled to by inheritance through their ancestor, the said Wm. McFadden, of every description whatsoever, situated in the said County of Jefferson.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Original Image of 28 F.3d 600 (PDF)

**28 F.3d 600**

**United States Court of Appeals,
Seventh Circuit.**

OMRON HEALTHCARE,
INC., Plaintiff-Appellant,

v.

MACLAREN EXPORTS
LIMITED, Defendant-Appellee.

No. 93-2965. | Argued March
31, 1994. | Decided June 27, 1994.

Former exclusive distributor brought action against baby stroller manufacturer for trademark infringement, based upon posttermination distribution of strollers with former distributor's marks. Manufacturer filed motion to dismiss based upon forum selection clause in distributorship agreement, which conferred exclusive jurisdiction on the high court of justice in England. The United States District Court for the Northern District of Illinois, Brian Barnett Duff, J., enforced forum selection clause and dismissed case, and former distributor appealed. The Court of Appeals, Easterbrook, Circuit Judge, held that trademark infringement suit arose out of distributorship agreement, within meaning of forum selection clause, in light of manufacturer's contention that its conduct in selling strollers bearing former distributor's marks was justified by pretermination orders distributor placed under agreement, coupled with its refusal to accept delivery.

Affirmed.

West Headnotes (6)

**[1]** **Contracts**
⟜ Legal Remedies and Proceedings
Former exclusive distributor's trademark infringement suit against baby stroller manufacturer arose out of distribution agreement, and thus was subject to forum selection clause in agreement

conferring exclusive jurisdiction on high court of justice in England, where manufacturer contended that its conduct in selling strollers bearing former distributor's marks was justified by pretermination orders distributor placed under agreement, coupled with its refusal to accept delivery.

12 Cases that cite this headnote

**[2]** **Contracts**
⟜ Legal Remedies and Proceedings
But-for causation is unsatisfactory understanding of language in forum selection clause referring to "disputes arising out of" agreement.

37 Cases that cite this headnote

**[3]** **Contracts**
⟜ Legal Remedies and Proceedings
That foreign court designated in forum selection clause would have to interpret federal law was no obstacle to reference.

11 Cases that cite this headnote

**[4]** **Contracts**
⟜ Legal Remedies and Proceedings
All disputes resolution of which arguably depend on construction of agreement, "arise out of" that agreement for purposes of forum selection clause.

42 Cases that cite this headnote

**[5]** **Contracts**
⟜ Agreement as to Place of Bringing Suit; Forum Selection Clauses
Sending trademark infringement dispute to England pursuant to forum selection clause in distributorship agreement would not offend public policy of the United States; litigating in England would be neither immoral nor illegal, and no law or policy of the United States demanded that

every dispute be litigated in tribunal with most experience.

11 Cases that cite this headnote

**[6]    Contracts**

⟜ Agreement as to Place of Bringing Suit; Forum Selection Clauses

Third-party interests in trademark laws are not so dominant that they must be protected from parties' voluntary bargains, by refusing to enforce forum selection clause conferring exclusive jurisdiction on foreign court.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*601** Marcia E. Goodman, Marian C. Haney, Jeffrey S. Fowler (argued), Mayer, Brown & Platt, Chicago, IL, for plaintiff-appellant.

John L. Conlon (argued), Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

**Opinion**

EASTERBROOK, Circuit Judge.

A few years ago the Marshall Baby Products Division of Omron Healthcare became the exclusive distributor, in the United States, of baby strollers manufactured by Restair Maclaren Limited, a British firm. The contract allowed Maclaren to cancel on 90 days' notice. Disappointed by Omron's sales, Maclaren gave notice terminating the distributorship as of January 22, 1993. One of Omron's employees left to create a new firm, KidCo, which became Maclaren's U.S. distributor. Omron noticed that KidCo's strollers identified Omron as the distributor, and it sued Maclaren for trademark infringement.

**[1]**    When Omron's distributorship ended, Maclaren had on hand 2,300 strollers that had been manufactured

with trademarks identifying Omron as the seller. (Each stroller also, and more prominently, identified Maclaren as the manufacturer.) Maclaren blames Omron for this situation, contending that after receiving notice of termination Omron placed firm orders for the strollers, demanded that Maclaren build them, and then refused to accept delivery; Omron denies that it is responsible for the excess inventory. Maclaren and its new distributor pasted labels over the Omron marks and included literature identifying KidCo as the reseller but did not succeed in obliterating all traces of Omron's trademarks. Omron demands a remedy. Maclaren moved to dismiss, relying on this portion of its contract with Omron:

> The parties hereto agree that all disputes arising out of this Agreement which cannot **\*602** be resolved amicably between the parties shall be referred to the High Court of Justice in England which will have exclusive jurisdiction to determine such disputes.

Omron protested that this dispute arose out of trademark infringement, not out of the contract, and that Maclaren would have been equally (if not more) liable for its conduct had there never been an agreement. To this the district court replied:

> Because the instant dispute would not have arisen if Omron and Maclaren Exports had never entered into their Distribution Agreement, the case at bar "arises out of" the Distribution Agreement. The forum selection clause in the Distribution Agreement therefore deprives this court of jurisdiction over the matter. Accordingly, the case is dismissed with prejudice.

**[2]**    But-for causation is an unsatisfactory understanding of language referring to "disputes arising out of" an agreement. Let us suppose that while inspecting Omron's facilities, a manager of Maclaren stepped on a baby rattle and fell. Would

the ensuing tort litigation go to the High Court of Justice in the United Kingdom just because, but for the distribution agreement, none of Maclaren's employees would have been on Omron's premises? "Arising out of" and "arising under" are familiar phrases, and courts have resisted the siren call of collapsing them to but-for causation. An example: but for the existence of federal drug safety standards, it would not be possible to contend that noncompliance with the standards is tortious, but it does not follow that a tort suit "arises under" those standards and thus activates federal jurisdiction. *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). See also, e.g., *Spearman v. Exxon Coal USA, Inc.,* 16 F.3d 722 (7th Cir.1994).

Nonetheless, the parties' dispute arises out of the agreement. Maclaren contends that its conduct in selling the 2,300 strollers bearing Omron's marks is justified by orders Omron placed under the agreement, coupled with its refusal to accept delivery. Although the distribution agreement does not provide expressly for the means of wrapping up the parties' affairs and disposing of unsold inventory, courts regularly imply such terms-not as legal rules independent of the contract, but as implicit terms *under* the contract. When the contracting parties have not provided explicitly for some contingency, courts impute to their contract the provisions that they probably would have adopted had they focused on the subject and resolved it explicitly. These imputed terms are justified not only by a desire to make contract a more productive institution by holding down the costs of bargaining, but also by the parties' knowledge of the common law history of judicial gap-filling. Because these parties did not provide expressly for the disposition of unsold inventory, they invited a process of construction that will resolve their dispute. A court might say that the agreement implicitly licensed Maclaren to use the marks incident to a commercially reasonable means of selling the inventory. There are other possible outcomes, but all depend on an understanding of the parties' written bargain and of its implied terms.

[3] Omron's claim engages both the parties' compact and the rules of trademark law, but the fact that the parties' designated forum would have to interpret federal law is no obstacle to the reference. E.g., *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111

S.Ct. 1647, 114 L.Ed.2d 26 (1991) (arbitration of claims under the Age Discrimination in Employment Act); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (forum selection clause sending admiralty case to Florida); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 U.S. 1917, 104 L.Ed.2d 526 (1989) (arbitration of claims under the Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (arbitration of claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (arbitration in Japan of claims under U.S. antitrust laws); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (arbitration **\*603** in France of claims under the Securities Exchange Act of 1934); *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clause sending admiralty case to High Court of Justice in England); *Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993) (forum selection clause sending fraud and securities claims to England).

[4] We concluded in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Ltd.,* 1 F.3d 639, 642-43 (7th Cir.1993), that all disputes the resolution of which arguably depend on the construction of an agreement "arise out of" that agreement for purposes of an arbitration clause. See also *Hugel v. Corporation of Lloyd's,* 999 F.2d 206 (7th Cir.1993); *S+L+H S.p.A. v. Miller-St. Nazianz, Inc.,* 988 F.2d 1518 (7th Cir.1993). We cannot imagine why the scope of that phrase would differ for purposes of a forum-selection clause. Neither side contends that the phrase has any special meaning in this contract, so *Sweet Dreams* is a sufficient answer to Omron's submission. Perhaps the second circuit has a more restricted view of such language, see *Corcovado Music Corp. v. Hollis Music, Inc.,* 981 F.2d 679, 682-83 (2d Cir.1993), but in *Sweet Dreams,* 1 F.3d at 642, we expressly disagreed with a precursor decision in that circuit, *In re Kinoshita & Co.,* 287 F.2d 951 (2d Cir.1961). When *Kinoshita* was decided, many judges were hostile to sending questions of U.S. law to arbitration abroad. Although the panel in *Corcovado* was not overtly hostile to permitting the parties to choose their tribunal, it treated

the fact that the claim would turn on an interpretation of U.S. copyright law as a dispositive argument in favor of decision by a federal court. It did not discuss *Gilmer* or any of the other cases cited in the preceding paragraph, and we find it unpersuasive.

[5] According to Omron, sending this dispute to England would offend the public policy of the United States. What policy, in particular? The dominant policy in contract cases is enforcing the parties' agreement, the better to promote commerce. *Bremen,* 407 U.S. at 9, 92 S.Ct. at 1912-13; see also *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1327-30 (7th Cir.1992). American firms can hardly expect to do international business if American courts permit them to welch on their commitments to their trading partners.

Omron tells us that the "policies" in question favor sending disputes to courts that have the expertise to resolve them, and ensuring that courts with the interest of Americans at heart interpret laws designed for the protection of American consumers. Notice that neither of these policies has a secure footing in any statute. Public-policy arguments depend on the fact that "no court will lend its aid to one who founds a cause of action upon an immoral or illegal act". *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). Contracts that violate the rights of third parties aren't enforced; neither are agreements designed to get 'round statutes that protect the contracting parties from their own improvidence. But litigating in England is neither immoral nor illegal, and no law or policy of the United States demands that every dispute be litigated in the tribunal with the most experience-if that were so, jurisdiction based on diversity of citizenship would be abolished (for state courts have more experience with their own law than federal courts do), federal defenses to claims filed in state court would all be removed to federal court, and the courts of the United States would disclaim any power to adjudicate disputes under foreign law. Yet all of these things are common, even in cases of exceptional complexity. In *Amoco Cadiz* we devoted great energy to interpreting the law of France and the United Kingdom, without suggesting that we were violating a "public policy" of confining disputes to the tribunals with the most expertise.

Omron's reminder that the trademark laws are designed for the benefit of consumers as well as producers suggests that third-party interests are at stake. But the antitrust and securities laws also are designed for the benefit of consumers; indeed, we suppose that all U.S. laws may be said to serve the interests of (some) U.S. nationals. Does it follow that disputes that turn on the resolution of U.S. law must be decided in U.S. courts? If so, then *Scherk, Mitsubishi,* and many other *604 cases are wrongly decided, for they depend on the belief that foreign tribunals will interpret U.S. law honestly, just as the federal courts of the United States routinely interpret the law of the states and other nations.

[6] What is more, Omron cannot really tell us that third-party interests are so dominant that they must be protected from parties' voluntary bargains. Omron could have licensed Maclaren to use its trademarks for the 2,300 strollers. Omron fears that the High Court of Justice is more likely to rule in favor of a U.K. national than a court of this nation would be. We doubt that the commercial judges of the High Court, for whom international transactions are routine business, display such a bias-but, if they do, so what? Omron knew this when it signed the contract, and it would have received some compensation for the risk (a lower price of strollers, some procedural concession). If Omron is free to allow Maclaren to win with certainty by licensing its marks, a slight increase in the probability of Maclaren's prevailing cannot be objectionable. This case is about how much money changes hands between these parties, and not about the protection of American consumers. Compare the Sherman Act, which bars firms from agreeing to fix prices no matter how much all of them want to do so, and the securities acts, which forbid contractual waiver of their provisions. 15 U.S.C. §§ 1, 77n, 78cc(a). Here are *real* restrictions on the power of contract-yet the Supreme Court has held that antitrust and securities cases may be arbitrated in foreign nations.

Omron signed a contract promising to litigate in the High Court of Justice, or not at all. It broke that promise. Instead of seeking damages for breach of contract, Maclaren is content with specific performance. The district court properly dismissed the suit.

AFFIRMED.

**All Citations**

28 F.3d 600, 31 U.S.P.Q.2d 1376

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 245142
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Tyler Division.

INTERACTIVE MUSIC TECHNOLOGY, LLC
v.
ROLAND CORP. U.S., et al.

Civil Action No. 6:07–CV–
282. | Jan. 29, 2008.

**Attorneys and Law Firms**

Ronald P. Oines, Rutan & Tucker, Costa Mesa, CA, Jennifer Parker Ainsworth, Wilson Sheehy Knowles Robertson & Cornelius PC, Tyler, TX, for Plaintiff.

Charles W. Goehringer, Jr., Lawrence Louis Germer, Germer Gertz, L.L.P., Beaumont, TX, Gregory P. Korn, Jonathan Steinsapir, Lawrence Y. Iser, Kinsella Weitzman Iser Kump & Aidisert, Santa Monica, CA, Bryan Russell Horton, Kincaid Horton & Smith, Austin, TX, Melvin R. Wilcox, III, Smead Anderson & Dunn, Longview, TX, Martin M. Noonen, Vincent J. Belusko, Morrison & Foerster LLP, Los Angeles, CA, for Defendants.

### ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

LEONARD DAVIS, District Judge.

**\*1** The above entitled and numbered civil action was referred to United States Magistrate Judge John D. Love pursuant to 28 U.S.C. § 636. The Report and Recommendation of the Magistrate Judge, which contains his proposed findings of fact and recommendations, has been presented for consideration (Doc. No. 57). The parties did not file any objections to the Report and Recommendation. The Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report and Recommendation of the United States Magistrate Judge as the findings of this Court.

Accordingly, it is **ORDERED** that Defendant Roland's motion to transfer (Doc. No. 19); Defendant Yamaha Corporation of America's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 25); and Defendant Open Labs, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 38) are **GRANTED** pursuant to 28 U.S .C. § 1404(a), and Defendant Roland's motion to dismiss is **DENIED.**

**So ORDERED.**

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JOHN D. LOVE, United States Magistrate Judge.

Before the Court are Defendant Roland Corporation U.S.'s Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(3) For Plaintiff's Failure to Abide by Contractual Forum Selection Clause (Doc. No. 19); Defendant Yamaha Corporation of America's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 25); and Defendant Open Labs, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 38).

For the following reasons, Defendant Roland Corp.'s (hereinafter "Roland") motion to dismiss should be **DENIED.**However, Defendants Roland, Yamaha Corp. (hereinafter "Yamaha") and Open Labs, Inc.'s (hereinafter "Open Labs") motions to transfer venue should be **GRANTED.**

### BACKGROUND

On May 10, 2004, Interactive Music Technology (hereinafter "IMT") initiated patent infringement proceedings against Roland in the U.S. District Court for the Central District of California (hereinafter "the California proceeding"). In the California proceeding, IMT alleged infringement of U.S. Patent No. 5,908,997 [1] (hereinafter "the ˌ997 patent"), a patent which relates to electronic musical instruments containing a computer-based control system. The case was assigned to U.S. District Judge John F. Walter.

During the course of the California proceeding, the parties filed answers and counterclaims and appeared before Judge Walter for a scheduling conference, but the California court never held a *Markman* hearing or interpreted any of the language in the ʹ997 patent.[2] After a year of litigation, the parties settled the dispute, with IMT taking nothing on the complaint and covenanting not to sue Roland on the ʹ997 patent except in certain limited circumstances. As part of their settlement, Roland and IMT included a venue provision for any further disputes, stating that "venue over any dispute arising out of this Agreement shall lie in the state or federal courts sitting in Los Angeles or Orange County, California."*See* Def.'s Mot. Dismiss 1, Ex. 4 at 4; Settlement Agreement at 4, *Interactive Music Tech., LLC v. Roland Corp.,* Case No. CV 04–03285 JW (C.D.Cal.2005). Pursuant to the settlement agreement, Judge Walter dismissed the case in a one page order, but noted that the Central District of California "retains full jurisdiction over this action."*Interactive Music Tech., LLC v. Roland Corp.,* Case No. CV 04–03285 JW; (Doc. No. 22).

**\*2** IMT is a Wyoming corporation, Yamaha and Roland are California corporations, and Open Labs is a Texas corporation headquartered in Austin, Texas.[3] *See* Van Koevering Decl. ¶ 2–4; Def. Yamaha Mot. Transfer at 1. There is some uncertainty about where the inventors, all likely witnesses, currently reside. According to IMT, the nine inventors of the patents-in-suit are located in Texas (though not in the Eastern District of Texas), Tennessee, Iowa, and Illinois. Pl.'s Opp'n Def. Yamaha's Mot. Transfer 2; (Doc. No. 32). Yamaha asserts that three inventors have since moved from the locales in which IMT claims they live, and notes that some may have moved to California. Def. Yamaha Reply Br. Supp. Mot. Transfer 1 (citing Noonen Reply Declaration, ¶¶ 2–7 and Exhs. A–B).

## ANALYSIS

IMT filed the present suit in the U.S. District Court for the Eastern District of Texas, asserting that Defendants Roland, Yamaha and Open Labs are actively infringing the patents-atissue. IMT claims the present case involves products that did not exist at the time of the California proceeding, and which are not subject to

the covenant not to sue in the California proceeding settlement agreement. Pl.'s Opp'n Def.'s Mot. Dismiss 1. Roland filed a motion to dismiss for IMT's failure to comply with the contractual forum selection clause, and in the alternative, Roland requests a venue transfer for convenience purposes pursuant to 28 U.S.C. § 1404(a). Defendants Yamaha and Open Labs have filed their own motions seeking to transfer the case to the Central District of California pursuant to § 1404(a).

In considering a motion to transfer pursuant to § 1404(a) in a patent infringement case, the Federal Circuit applies the law of the regional circuit, which in this case is the Fifth Circuit. *See Storage Tech. Corp. v. Cisco Sys., Inc.,* 329 F.3d 823, 836 (Fed.Cir.2003).

### I. The Forum Selection Clause
Parties may designate by contract a forum in which any litigation is to take place. *Kessmann and Assocs., Inc. v. Barton–Aschman Assocs., Inc.,* 10 F.Supp.2d 682, 688 (S.D.Tex.1997). Any lawsuit commenced elsewhere may then be subject to dismissal for improper venue. *Id.* (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)). The law favors enforcement of forum selection clauses, and the U.S. Supreme Court has held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."*D.B. Inc. v. Nat'l Admin. Solutions Corp.,* 2004 WL 865842, at \*1 (N.D.Tex.2004) (citing *M/S Bremen v. Zapata Offshore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)).

As noted above, Roland and IMT included a forum selection clause in their agreement settling the California proceeding. The language at issue states that "venue over any dispute arising out of this Agreement shall lie in the state or federal courts sitting in Los Angeles or Orange County, California."*See* Def.'s Mot. Dismiss 1, Ex. 4 at 4; Settlement Agreement at 4, *Interactive Music Tech., LLC v. Roland Corp.,* Case No. CV 04–03285 JW (C.D.Cal.2005). IMT does not argue that enforcement of the agreement is unreasonable, only that the settlement agreement does not cover the products it asserts are infringing in the present litigation. IMT bases its argument on two points, which are the primary issues before the Court. First, IMT argues the "venue ... shall lie" language of

the forum selection clause is permissive rather than mandatory, meaning the clause allows, but does not require, litigation in the federal courts within Los Angeles or Orange County, California. Second, IMT claims its infringement action does not arise out of the settlement agreement. For its part, Roland argues the present action should be dismissed or transferred to California pursuant to the mandatory forum selection clause in the settlement agreement.

## A. *Mandatory v. Permissive Forum Selection Clauses*

*3 Before determining whether a forum selection clause should be enforced, the Court must first determine whether the clause is mandatory or permissive.*Caldas & Sons, Inc. v. Willinham,* 17 F.3d 123, 127 (5th Cir.1994). A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum. *Dorsey v. Northern Life Ins. Co.,* 2004 WL 2496214, at *3 (E.D.La.2004). In examining forum selection clauses, courts must examine the language of the clause and determine whether or not the forum selection clause evidences an intent of the parties' to limit the scope of jurisdiction or venue to a particular forum, or whether an ambiguity exists. *City of New Orleans v. Municipal Admin. Serv., Inc.,* 376 F.3d 501, 504 (5th Cir.2004) ("For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive"). Where an agreement contains clear, unequivocal and mandatory language showing that jurisdiction is appropriate only in a designated forum, the clause is considered mandatory. *Von Graffenreid v. Craig,* 246 F.Supp.2d 553, 560 (N.D.Tex.2003); *Dorsey,* 2004 WL 2496214, at *3. On the contrary, permissive forum selection clauses authorize jurisdiction in the designated forum, but do not prohibit litigation elsewhere. *Von Graffenreid,* 246 F.Supp.2d at 560.Whenever a forum selection clause contains an ambiguity, the clause must be construed against the drafter. *Keaty v. Freeport Indonesia, Inc.,* 503 F.2d 955, 957 (5th Cir.1974) (per curiam).

The distinction between specifying jurisdiction and venue in forum selection clauses is often important. While analyzing a forum selection clause is extremely context specific, the Tenth Circuit found a general uniformity in the federal courts when analyzing the law on this matter: where *venue* is specified in a forum selection clause *with mandatory or obligatory language,* the clause will be enforced, while where only *jurisdiction* is specified, the clause will generally not be enforced without some further language indicating the parties' intent to make venue exclusive.[4] *K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft,* 314 F.3d 494, 499 (10th Cir.2002) (emphasis added). However, merely mentioning venue in the forum selection clause does not make the clause mandatory by itself. *See Bentley v. Mutual Benefits Corp.,* 237 F.Supp.2d 699, 702 (S.D.Miss.2002) (finding clause providing "[t]his Agreement shall be construed under the laws of Florida, and the parties stipulated to venue in Broward County," was permissive because the parties merely agreed to a venue without excluding others). Also, the Fifth Circuit has stated that even though a clause uses the term "shall," which is generally mandatory, the clause need not necessarily be classified as mandatory. *Caldas & Sons, Inc.,* 17 F.3d at 127.Even when venue is specified and "shall" is used, the language of the clause must be examined thoroughly to determine if the parties intended for the specified forum to be exclusive.

*4 Nevertheless, the combination of specified venue and obligatory language is a powerful combination. A review of forum selection cases in the Fifth Circuit reveals that the Fifth Circuit courts appear to be overwhelmingly in line with the Tenth Circuit's observation in *K & v. Scientific,* as the Fifth Circuit and District Courts within the Circuit have consistently found that specified venue in conjunction with obligatory language (such as the term "shall") in a forum selection clause mandates venue wherever specified. *See, e.g., Collin County, Tex. v. Siemens Bus. Serv., Inc.,* 2007 WL 2908926, at *4 (5th Cir.2007) ("Here, it is undisputed that the venue clause at issue [, which states venue 'shall lie exclusively in Collin County, Texas,'] is mandatory"); *Kevlin Servs., Inc. v. Lexington State Bank,* 46 F.3d 13, 14–15 (5th Cir.1995) (finding mandatory a forum selection clause stating: "The legal venue of this contract and any disputes arising from it shall be settled in Dallas County, Texas"); *In re Fireman's Fund Ins. Co.,* 588 F.2d 93, 93–94 (5th Cir.1979)

(finding clause stating that "any suit or action for the enforcement of any of the obligations under this agreement, the *venue* of such suit or action *shall be laid* in the County of Essex and State of New Jersey" is mandatory); *Dorsey*, 2004 WL 2496214, at *4("[T]he forum selection clause provides that 'venue shall be laid in King County, Washington.' The Court finds that the forum selection clause is unambiguous with respect to exclusivity and it is, therefore, mandatory."); *First Nat'l of N. Am., LLC v. Peavy*, 2002 WL 449582 (N.D.Tex.2002) (holding that forum selection clause providing that "all claims shall be litigated only in Collin County, Texas" was a mandatory clause requiring venue in state court in Collin County); *Greenville Elec. Util. Sys. v. N. Pac. Group, Inc.*, 2001 WL 804521 (N.D.Tex.2001) (finding that clause providing that "venue for any litigation arising from this contract shall lie in Greenville, Hunt County, Texas" mandatory); *Taylor v. Titan Midwest Const. Corp.*, 474 F.Supp. 145, 146, 148 (N.D.Tex.1979) (transferring action and enforcing forum selection clause providing that "if any controversy or claim arises out of or relates to this Subcontract or any alleged breach thereof jurisdiction and venue shall be in the appropriate Court ... sitting within the County in which the principal offices of Contractor are located").

In their brief, IMT argues that the "venue ... shall lie" language is not exclusive. Citing multiple cases as support, IMT argues that further limiting language such as "venue shall only lie" or "venue shall lie exclusively in" is necessary to truly remove ambiguity from the phrase.[5] *See, e.g., Argyll Equities LLC v. Paolino*, 211 F. App'x 317, 318 (5th Cir.2006) (finding as mandatory forum selection clause stating: "Borrower hereby consents to the *exclusive* jurisdiction of the courts sitting in Kendall County, Texas") (emphasis added); *Maley v. Design Benefits Plan, Inc.*, 125 F.Supp.2d 836, 838 (E.D.Tex.2000) (finding as mandatory forum selection clause stating: "Venue for any action, suit or other proceeding, including non-contract disputes, *shall be exclusively* in Winnebago County, Illinois") (emphasis added); *Dixon v. TSE International, Inc.*, 330 F.3d 396, 397 (5th Cir.2003) (finding as mandatory forum selection clause stating: "The Courts of Texas, U.S.A., shall have jurisdiction over all controversies with respect to the execution, interpretation or performance of this Agreement, and the parties *waive any other*

*venue* to which they may be entitled by virtue of domicile or otherwise").

**\*5** IMT's argument is unavailing, as it ignores Fifth Circuit and District Court cases where the "venue shall" language is found to be mandatory without further language indicating exclusivity. *See, e.g., Kevlin Servs., Inc.*, 46 F.3d at 14–15; *In re Fireman's Fund Ins. Co.*, 588 F.2d at 93–94; *Dorsey*, 2004 WL 2496214, *4; *Greenville Elec. Util. Sys.*, 2001 WL 804521, *1–2; *Taylor*, 474 F.Supp. At 146–48. While it is true that parties must do more than just name a venue, and also that generally mandatory terms such as "shall" do not necessarily make a forum selection clause mandatory, there is no reason to think the parties in the present circumstance meant to allow for other venues. By stating "[v]enue over any dispute arising out of this Agreement shall lie in the state or federal courts sitting in Los Angeles or Orange County, CA," the parties left no ambiguity as to their intent to resolve all disputes arising out of the agreement in the specified California courts. Interpreting the clause to include the federal court in the Eastern District of Texas would be a strained and unsupported interpretation. *See Infinite Tech.*, 2001 WL 527357, at *2. Accordingly, the Court finds the parties' forum selection clause to be mandatory rather than permissive.

**B. "Arising Out Of"**
The second major issue before the court is whether or not the present dispute arises out of the settlement agreement such that the forum selection clause mandates litigation in California. IMT argues its patent infringement claims in the present case do not arise out of the California proceeding's settlement agreement, and therefore, the present action is not governed by the forum selection clause. Roland counters by arguing that IMT's ability to bring its infringement suit against Roland based on the ʹ997 patent depends entirely on the interpretation of the settlement agreement, and therefore the present dispute arises out of the settlement agreement. With limited guidance from the Fifth Circuit on this matter, the parties have turned to other Circuits' analyses.[6]

IMT bases its position on a Second Circuit copyright case decided this year. In *Phillips v. Audio Active Ltd.*,

494 F.3d 378 (2d Cir.2007), the forum selection clause before the court stated that "any legal proceedings that may arise out of [the agreement] are to be brought in England."The *Phillips* court examined the phrase "arise out of," which the court found means "to originate from a specified source," and determined the copyright infringement claims brought by the plaintiff did not "arise out of" the pertinent agreement. *Id.* at 386–389.The *Phillips* court found that the plaintiff's claims arose out of the Copyright Act instead of the agreement, thereby rendering the forum selection clause inapplicable to the plaintiff's ability to bring infringement allegations in New York instead of England. IMT contends the *Phillips* analysis should govern the present issues, and that under *Phillips*, its rights as a patent holder do not arise out of the settlement agreement, and therefore the forum selection clause should not bar it from bringing the present action in the Eastern District of Texas.

**\*6** Roland turns to the Seventh Circuit for its position. In *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 603 (7th Cir.1994), the Seventh Circuit was faced with a forum selection clause stating: "The parties hereto agree that all disputes arising out of this Agreement which cannot be resolved amicably between the parties shall be referred to the High Court of Justice in England which will have exclusive jurisdiction to determine such disputes."*Id.* at 601–02.The *Omron* court determined that "all disputes the resolution of which arguably depend on the construction of the agreement 'arise out of' that agreement for purposes" of a forum selection clause. *Id.* Roland contends the dispute before the Court is whether the products accused of infringing are covered by the California proceeding's settlement agreement, and such a dispute arises of the settlement agreement.

The Court finds the Seventh Circuit's analysis and conclusion more applicable to the present situation. As part of the settlement agreement of the California proceeding, IMT and Roland freely bargained for the inclusion of the forum selection clause. According to that clause, "venue over any dispute arising out of this Agreement shall lie in the state or federal courts sitting in Los Angeles or Orange County, California."In examining the plain language of the clause, the key question to determine when the clause is triggered is not whether the *claims* arise out of the agreement, but

whether *"any dispute"* arises out of the agreement. There is no doubt that a dispute exists regarding interpretation of the parties' agreement. According to the parties' settlement agreement, IMT cannot bring suit against Roland based on infringement of the ʹ997 patent except in limited circumstances. Roland argues IMT's infringement action, and more specifically the allegedly infringing product IMT asserts, is within the scope of the parties' settlement agreement. IMT claims the product-atissue did not exist at the time of the prior agreement, and the terms of the settlement agreement therefore do not cover the products at issue. If Roland is correct that the agreement does in fact cover the products at issue, then IMT will be barred from continuing with this proceeding. However, should the terms of the agreement not cover the product-at-issue, then IMT may have the right to continue infringement litigation against Roland on the ʹ997 patent, but only so long as the action falls within the limited circumstances provided for in the settlement agreement.[7] Though the rights IMT is seeking to vindicate arise from patent law, the contractual relationship governs the circumstances under which IMT may sue Roland, and therefore IMT's ability to bring suit implicates the agreement. *Kessmann & Assocs., Inc. v. Barton–Aschman Assocs., Inc.*, 10 F.Supp.2d 682, 688 (S.D.Tex.1997) ("Claims that arise out of the contractual relationship and implicate the agreement are subject to the forum selection clause"). The issue cannot be resolved without interpreting the prior agreement. Therefore, under the *Omron* approach, because the resolution of this issue depends on interpretation of the agreement, the dispute "arises out of" the agreement.

**\*7** The Court recognizes that *Omron* is not binding authority. However, the *Omron* analysis leads to the more logical conclusion in the present circumstances.[8] By following the Second Circuit's approach in *Phillips* to its conclusion in the present case, the forum selection clause is rendered virtually meaningless, as a plaintiff would always be able to characterize a claim as arising out of patent law, and thereby effectively sidestep the agreement. Allowing this approach under the present circumstances would ignore the freely bargained-for exchange of two sophisticated entities. IMT seeks to characterize the bargained-for forum selection clause as applying only when the cause of action arises out of the agreement

Interactive Music Technology, LLC v. Roland Corp. U.S., Not Reported in F.Supp.2d...

2008 WL 245142

itself, such as a breach of the settlement agreement, and not when the cause of action springs from another body of law (such as patent law) outside the agreement. Roland, however, is asserting that IMT has breached the settlement agreement by filing suit on products covered under the terms of the settlement agreement. Thus, in fact, the parties do have a dispute arising out of the settlement agreement.

The U.S. Supreme Court has noted a strong preference for enforcing valid forum selection clauses. *See M/S Bremen*, 407 U.S. at 10.Neither party has challenged the validity of the clause, only its applicability. The Court has reviewed the parties' assertions and arguments over the settlement agreement's terms, and found a genuine dispute exists regarding the applicability of the settlement agreement's covenant not to sue to the present litigation. Accordingly, the Court finds there to be a dispute that "arises out of" the settlement agreement, and the forum selection clause must be given full effect.

## C. Enforcing the Clause

Where the designated venue in a forum selection clause is another federal court, the majority of District Courts in the Fifth Circuit have interpreted Supreme Court and Fifth Circuit precedent to mean the proper way to enforce the clause is through a venue transfer pursuant to 28 U.S.C. § 1404(a), and not dismissal for improper venue pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406(a). [9] *See Southeastern Consulting Group, Inc. v. Maximus, Inc.*, 387 F.Supp.2d 681, 683–84 (S.D.Miss.2005); *Speed v. Omega Protein, Inc.*, 246 F.Supp.2d 668, 671 (S.D.Tex.2003); *Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc.*, 2007 WL 3256210, at *4 (W.D.Tex.2007); *Wal–Mart Stores, Inc. v. Oore, Inc.*, 2007 WL 2769835, at *2 (N.D.Miss.2007); *Canvas Records, Inc. v. Koch Entm't Distrib., LLC*, 2007 WL 1239243, at *5 (S.D.Tex.2007); *Gutermuth Inv., Inc. v. Coolbrands Smoothies*, 2006 WL 2933886, at *3 (W.D.Tex.2006); *Dorsey v. Northern Life Ins. Co.*, 2004 WL 2496214, at *9 (E.D.La.2004).

Defendants moved to dismiss the case pursuant to Rule 12(b)(3), or alternatively pursuant to § 1404(a) or § 1406(a). Although the forum selection clause provides for the state or federal courts, patent infringement is a

federal question, and therefore the federal courts will be the appropriate venue. The proper procedure for enforcing the clause is therefore through § 1404(a), and the Court will therefore analyze the motion entirely under § 1404(a).

*8 Under § 1404(a), a district court must weigh a number of factors. The presence of a forum selection clause is "a significant factor that figures centrally into district court's calculus. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Brock v. Baskin–Robbins USA Co.*, 113 F.Supp.2d 1078, 1084 (E.D.Tex.2000). Although the forum selection clause is a significant factor in the transfer analysis, on its own it is not sufficient to justify transfer. *Canvas Records, Inc.*, 2007 WL 1239243, at *5."The forum selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration ... nor no consideration, but rather the consideration for which Congress provided in § 1404(a)."*Stewart Org., Inc.*, 487 U.S. at 31.

## II. Motion to Transfer Venue

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." [10] *See*28 U.S.C. § 1404(a). The goals of § 1404(a) are to prevent waste of time, energy, and money, and also to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Ultimately it is within a district court's sound discretion to transfer venue pursuant to 28 U.S.C. § 1404(a), but the court must exercise its discretion in light of the particular circumstances of the case. *Hanby v. Shell Oil Co.*, 144 F.Supp.2d 673, 676 (E.D.Tex.2001); *Mohamed v. Mazda Corp.*, 90 F.Supp.2d 757, 768 (E.D.Tex.2000).

When deciding whether to transfer venue, a district court balances two categories of interests: (1) the convenience of the litigants (or private interest factors), and (2) the public interests in the fair and efficient administration of justice. *In re Volkswagen of America, Inc.*, 506 F.3d 376, 384 (5th Cir.2007); *Hanby*, 144 F.Supp.2d at 676.The private interest

factors weighed by the court include: (1) the plaintiff's choice of forum, (2) the relative ease of access to sources of proof, (3) the availability of compulsory process to secure the attendance of witnesses, (4) the cost of attendance for willing witnesses, and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen of America, Inc.,* 506 F.3d at 380.The public interest factors include: "(1) the administrative difficulties flowing from court congestion, (2) the local interest in having localized interests decided at home, (3) the familiarity of the forum with the law that will govern the case, and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law."*Id.*

None of the factors are dispositive on their own. One of the factors, the plaintiff's choice of forum, is entitled to a certain level of deference, and "this deference establishes the burden that a moving party must meet in seeking a § 1404(a) transfer."*Id.* A party seeking transfer 'must show good cause,' which according to the Fifth Circuit means "that a moving party must demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.' " *Id.* A transfer should be ordered "when the transferee forum is clearly more convenient," but a plaintiff's choice of forum should not be disturbed "when the transferee forum is no more convenient than the chosen forum." *Id.*

**\*9** Because of the presence of the forum selection clause between IMT and Roland, but not IMT and the other Defendants, two separate analyses under § 1404(a) are required.

### A. Roland's Motion to Transfer

While all of the factors are always pertinent in any § 1404(a) analysis, the disposition of Roland's motion to transfer ultimately amounts to two major competing components: the deference afforded to IMT's choice of forum versus the weight of the mandatory forum selection clause bargained-for by Roland and IMT. The presence of the forum selection clause looms large in the § 1404(a) transfer analysis, and "provides some indication that the convenience of the parties would presumably be better served by transfer."*Elliott v. Carnival Cruise Lines,* 213 F.Supp.2d 555, 561 (S.D.Tex.2002). Given that the parties previously

agreed on a forum, the parties themselves presumably already accounted for a number of the factors in bargaining for the terms of the agreement and settling on the Central District of California as the best place to continue litigation when required. If ease of access to sources of proof, availability of compulsory process to secure the attendance of witnesses, cost of attendance for willing witnesses, and the familiarity of the forum with the law that will govern the case were more convenient for the parties elsewhere, the parties could have agreed to that at the time. Of course, the parties could also have agreed not to specify a venue for continued litigation. Also, a change in circumstances could certainly have rendered the parties' forum selection determination less convenient now than it was at the time of settlement, but that is not the case here. Nothing has happened since the California proceeding that makes the Eastern District of Texas a more appropriate venue.

Only the deference given to IMT's choice of forum weighs against transfer. Factors such as ease of access to sources of proof, availability of compulsory process to secure attendance, the cost of attendance for willing witnesses, administrative difficulties flowing from court congestion, the local interest in deciding the dispute at home, and the avoidance of conflict of law problems all either play neutral or weigh slightly in favor of transfer. More importantly, certain factors weigh significantly in favor of transfer, such as the familiarity of the forum with the governing law. Though Judge Walter never held a *Markman* hearing or construed the terms in the patent, he nonetheless has already invested judicial time and resources into this case. In his order dismissing the case, Judge Walter noted that the Central District of California "retain[ed] full jurisdiction over this action."While IMT claims that phrase was included solely because the settlement agreement was not finalized, the issues before the Court today concern interpretation of the forum selection clause, and are in essence a continuation of the finalization of the previous case's settlement agreement. Furthermore, while both the Eastern District of Texas and the Central District of California maintain heavy patent dockets (and therefore equivalent familiarity with patent law), the interpretation of the parties' settlement agreement, which is governed under California law, will ultimately determine whether or not IMT will

Interactive Music Technology, LLC v. Roland Corp. U.S., Not Reported in F.Supp.2d...

2008 WL 245142

be barred from proceeding with the present patent infringement action. Not only will the Central District of California judges be better versed in applying California law, Judge Walter also will have specific familiarity with the intent of the parties' in their settlement agreement. [11]

**\*10** When viewed as a whole, the forum selection clause and familiarity of the forum with the law that will govern the case outweigh IMT's choice of forum, which is the only factor lending any significant weight against transfer. The effect of the forum selection clause operates to mandate litigation between Roland and IMT in the Central District of California. In light of the Supreme Court's strong preference for enforcing valid forum selection clauses, and considering all of the appropriate factors and the effect of the forum selection clause, the Court finds that the interests of justice and the convenience of the parties would be better served in the Central District of California. The proper enforcement by this Court is to transfer the case to the appropriate venue pursuant to § 1404(a) rather than dismiss Roland based on the forum selection clause. *See Stewart Org., Inc.,* 487 U.S. at 29–30.Accordingly, the Court recommends Roland's motion to transfer pursuant to § 1404(a) be GRANTED, and its motion to dismiss pursuant to Rule 12(b)(3) be DENIED.

**B. Yamaha and Open Labs' Motions to Transfer**

The analysis of the traditional § 1404(a) factors for Defendants Yamaha and Open Labs' motions to transfer is much the same as the analysis for Roland's motion (without the presence of the forum selection clause). The majority of the factors will play neutral. The relative ease of access to sources of proof is neutral because the vast majority of the documents in the case will likely be exchanged electronically, making the physical location of the documents of lesser consequence. *See Symbol Techs., Inc. v. Metrologic Instruments, Inc.,* 450 F.Supp.2d 676, 678 (E.D.Tex.2006). The inventors are scattered across the country, and will have to travel great distances regardless of whether the litigation is in California or Texas. While a number of the witnesses are in the Central Time Zone, a number of others are in California or would find it easier to travel there from Japan. No conflict of law or court congestion

problems, both public factors, have been presented to the Court. Also, the allegedly infringing products are sold in both districts, so both California and Texas have an interest in deciding the issues at home. Both districts also maintain heavy patent dockets, neutralizing the familiarity of the forum factor with the governing law.

Once again, the only factor weighing against transfer is IMT's choice of forum. Nonetheless, that choice of forum is given deference, and another forum must be "clearly more convenient" to disturb that choice. A court should consider the choice of forum, but the plaintiff's forum choice by itself is not conclusive or determinative. *In re Horseshoe Entm't,* 337 F.3d 429, 434 (5th Cir.2003). While a number of the factors are neutral, one factor weighs heavily in favor of transfer: judicial economy. It is well established that the public interest factors in a § 1404(a) analysis encompass the interest of justice.*Zoltar Satellite Sys., Inc. v. LG Elec. Mobile Commc'ns,* 402 F.Supp.2d 731, 735 (E.D.Tex.2005)."Consideration of the interest of justice, which includes judicial economy, 'may be determinative to a particular transfer motion, even if the convenience of the parties and the witnesses may call for a difference result.'"*Id.* (quoting *Regents of the Univ. Of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1565 (Fed.Cir.1997)). In cases that involve a highly technical subject matter, such as patent litigation, judicial economy may favor transfer to a court that is already familiar with the issues involved in the case.*Id.*

**\*11** While Yamaha and Open Labs were not defendants in IMT's previous litigation on the patents at issue against Roland, Judge Walter nonetheless already has some familiarity with the patents at issue. Where the judicial economy factor weighs heaviest, however, is in avoiding confusion over litigating the same patent simultaneously in separate venues. Because the Court has already recommended transferring IMT's litigation against Roland to California, the Central District of California will have to preside over the *Markman* hearing and issue claim constructions on the ʹ997 patent. If *only* Roland were transferred, both the Central District of California and the Eastern District of Texas would then be faced with the untenable prospect of infringement actions involving the same plaintiff litigating on the same patent in two separate venues. Such a situation would be inefficient in conserving judicial efficiency,

and bears potential for confusion on appeal, as it would lead to competing claim constructions on the same terms in the same patent. A single judge is better positioned to resolve the matter efficiently and in its entirety. Preserving efficiency and avoiding potential confusion serves the interests and convenience of the parties and the Court. Therefore, as it relates to Yamaha and Open Labs, this factor weighs heavily in favor of transfer. The Court recommends Yamaha and Open Labs motions to transfer be GRANTED.

### CONCLUSION

With Roland and IMT continuing litigation in the Central District of California on the ′997 patent, and the factors weighing in favor of transfer for all three Defendants, it is in the interests of justice and for the convenience of the parties that all matters involving these parties be pursued in the Central District of California. Accordingly, the Court therefore **RECOMMENDS** that Defendant Roland's motion to transfer (Doc. No. 19); Defendant Yamaha Corporation of America's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 25); and Defendant Open Labs, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 38) should **GRANTED** pursuant to 28 U.S.C. § 1404(a). Roland's motion to dismiss should be **DENIED.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within ten days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).

**So ORDERED and SIGNED this 7th day of January, 2008.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 245142

Footnotes

1  In the California proceeding, IMT also asserted infringement of U.S. Patent No. 6,160,213 (hereinafter "the ′213 patent"), but only the ′997 patent has been asserted against Roland in the present proceeding. The ′213 patent is being asserted against the other Defendants in this case.

2  Roland describes the extent of the California litigation as follows: "disclosures were exchanged, a protective order was entered and then amended, documents were requested and produced, interrogatories were propounded and answered, third party discover was taken, etc."Def.'s Mot. Dismiss 2 (Doc. No. 19).

3  Austin, Texas is located in the U.S. District Court for the Western District of Texas.

4  This principal is illustrated well in the court's analysis in a recent case from the Western District of Texas. *See Paolino v. Argyll Equities, L.L.C.,* 2005 WL 2147931, at *4 n. 3 (W.D.Tex.2005). The *Paolino* court cited a bevy of cases from federal courts across the country which validate the Tenth Circuit's observation in *K & v. Scientific* that when venue is specified in a forum selection clause with mandatory language, the clause is deemed mandatory. *See, e.g., Phillips v. Audio Active Ltd.,* 494 F.3d 378, 386–87 (2d Cir.2007) (recognizing that in the Second Circuit, obligatory venue language suffices to give mandatory force to a forum selection clause); *Excell, Inc. v. Sterling Boiler & Mech.,* 106 F.3d 318 (10th Cir.1997) (construing forum selection clause stating that "[j]urisdiction shall be in the State of Colorado, and venue shall lie in the County of El Paso, Colorado" as mandatory); *Milk 'n' More, Inc. v. Beavert,* 963 F.2d 1342, 1346 (10th Cir.1992) (construing forum selection clause stating that "venue shall be proper under this agreement in Johnson County, Kansas" as a mandatory); *Docksider, Ltd. v. Sea Tech.,* 875 F.2d 762, 764 (9th Cir.1989) (holding that a clause providing that "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia" was mandatory and exclusive); *Sompo Japan Ins., Inc. v. Alarm Detection Sys., Inc.,* 2003 WL 21877615 (N.D.Ill.2003) (holding that forum selection clause providing that "venue shall be proper in Kane County,

Illinois should any portion of this contract have to be legally enforced" was a mandatory forum selection clause); *Relm Wireless Corp. v. C.P. Allstar Corp.,* 265 F.Supp.2d 523 (E.D.Pa.2003) (granting motion to dismiss based on forum selection clause providing that "[t]his Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania with venue in Chester County"); *Navickas v. Aircenter, Inc.,* 2003 WL 21212747 (E.D.Tenn.2003) (construing clause stating that the "laws of the State of Tennessee shall govern this contract and transaction, and the parties further agree that venue for any matter relating to this contract shall be in Marion County, Tennessee" was unambiguous and mandatory); *Infinite Tech. v. Rockwell Elec. Commerce Corp.,* 2001 WL 527357 (N.D.Ill.2001) (noting that interpreting a forum selection clause designating the "courts of DuPage County" to include a federal court located in Cook County would be a strained interpretation); *N. Am. Air Force v. Rose,* 2001 WL 1155078 (N.D.Cal.2001) (holding that forum selection clause stating that "[v]enue for any disputes between the parties will be in Newton County, Mississippi" clearly intended to limit venue to the state court in Newton County); *Double A Home Care, Inc. v. Epsilon Sys., Inc.,* 15 F.Supp.2d 1114, 1116 (D.Kan.1998) (finding that a clause providing that any "action shall be venued in the County of Ramsey, State of Minnesota" was mandatory and "clearly require[d] venue in Minnesota state court").

On the contrary, where jurisdiction is the sole focus of the forum selection clause, there is often an ambiguity unless very clear language evidencing an intent for sole jurisdiction in a particular forum is included.*See, e.g., City of New Orleans,* 376 F.3d at 504 (finding clause that states "[the parties] hereby consent and yield to the jurisdiction of the State Civil Courts of the Parish of New Orleans" was ambiguous, and therefore permissive); *Southridge Ethanol, Inc. v. South La. Ethanol L.L.C.,* 2007 WL 2375758, at *7– 8 (N.D.Tex.2007) (finding that clause stating "the parties hereby attorn to the jurisdiction of the Courts of competent jurisdiction of the State of Louisiana in any proceeding hereunder" to be permissive since it does not vest exclusive jurisdiction in the courts of Louisiana); *Von Graffenreid,* 246 F.Supp.2d at 560–61 (finding clause stating "that the district court of Dallas County, Texas, or ... the United States District Court for the Northern District of Texas, Dallas Division, shall have jurisdiction to hear and determine any claims or disputes ... pertaining to this Agreement" was permissive since it only specified that certain courts will always have jurisdiction, but evidenced no intent to exclude other jurisdictions).

The Fifth Circuit and District Courts within the Fifth Circuit also seem to adhere to this principal, as discussed in the main text of the opinion.

5      IMT's most persuasive support for its position comes from a case in the United States District Court for the District of Columbia. *See Byrd v. Admiral Moving & Storage, Inc.,* 355 F.Supp.2d 234, 238–39 (D.D.C.2005) (holding that a forum selection clause providing "venue shall lie" is permissive and ambiguous since it did not say venue "shall ONLY lie" in the referenced district). The precedential value of a single District of Columbia case is outweighed, however, by the plethora of contrary authority cited herein from the Fifth Circuit and District Courts within the Fifth Circuit. These cases show that the *Byrd* court's analysis is not the preferred interpretation for clauses such as the one at issue.

6      The most pertinent analysis on this issue comes from the Seventh Circuit and the Second Circuit. Both the Seventh Circuit and Second Circuit have each rejected, either explicitly or implicitly, the other court's approach to this issue.

7      IMT covenanted not to sue Roland "for infringement of any claim of the ′997 patent... based upon any products made, used or sold by Roland in the United states, or imported by Roland in the United States, as of the effective date of this Agreement."Iser Decl. ¶ 7. The parties "intend[ed] that th[e] covenant [not to sue] shall apply to the Current Products as well as any new models or new products to the extent that said new models or new products do not incorporate capabilities or features relating to any claim of the ′997 patent... beyond those capabilities and features contained in the Current Products."Iser Decl. ¶ 7.

8      It is worth noting that the *Omron* court was dealing with a clause more similar in structure and style to the present case than *Phillips.*In *Omron,* the clause used the phrase "disputes arising out of this agreement," the same phrase used in the present forum selection clause. Meanwhile, the clause in *Phillips* used "any legal proceedings that may arise out of [the agreement]."

9      The District Courts rely on the Supreme Court's discussion in *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), and the Fifth Circuit's analysis of the *Stewart* opinion in *Int'l Software v. Amplicon,* 77 F.3d 112, 113–14 (5th Cir.1996).

Interactive Music Technology, LLC v. Roland Corp. U.S., Not Reported in F.Supp.2d...

2008 WL 245142

10  The first question a court must address when ruling on a motion for change of venue under 28 U.S.C. § 1404 is whether the suit could have been filed originally in the destination venue. Defendants Roland, Yamaha and Open Labs seek to transfer this case to the U.S. District Court for the Central District of California, and there is no question the case could have been filed in the Central District of California.

11  The Court is cognizant of the fact that Judge Walter may not be assigned this case upon transfer. However, that determination is for the Central District of California.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1740032
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Thomas SKÖLD, Plaintiff,

v.

GALDERMA LABORATORIES, L.P.; Galderma
Laboratories, Inc.; and Galderma S.A., Defendants.

Civil Action No. 14–5280.
|   Signed April 17, 2015.

**Synopsis**
**Background:** Inventor of skin care technology brought action against corporation, as successor-in-interest to cooperation, development, and licensing agreement, as well as related partnership and purported common parent of both corporation and partnership, alleging Lanham Act claims for trademark infringement, false advertising, and unfair competition and Pennsylvania-law claims for unfair competition, breach of contract, and unjust enrichment. Defendants moved to dismiss or to stay pending administrative proceeding.

**Holdings:** The District Court, Wendy Beetlestone, J., held that:

[1] alternative dispute resolution clause in agreement did not require inventor to refer dispute to mediation;

[2] corporation waived any rights under agreement to have its senior executives negotiate end to dispute;

[3] breach of contract claim against corporation was timely;

[4] parent was not liable for any breach of agreement;

[5] inventor sufficiently pled unjust enrichment claims against parent and partnership ;

[6] "gist of the action doctrine" barred certain unfair competition claims against corporation; and

[7] forum selection clause in agreement applied to claims against parent.

Motion granted in part and denied in part.

West Headnotes (37)

**[1]    Alternative Dispute Resolution**
       Compulsory mediation;  mediation as condition precedent

Alternative dispute resolution clause in cooperation, development, and licensing agreement between inventor of skin care technology and corporation did not require inventor to refer dispute to mediation before bringing suit against corporation's successor-in-interest for trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment under federal and Pennsylvania law, where clause contained two clauses, one of which was mandatory, stating that parties "shall" refer matter to senior executives to attempt to negotiate resolution, and other of which was permissive, stating that parties "may" refer matter to nonbinding mediation.

Cases that cite this headnote

**[2]    Alternative Dispute Resolution**
       Compulsory mediation;  mediation as condition precedent

Alternative dispute resolution clause in cooperation, development, and licensing agreement between inventor of skin care technology and corporation did not bar inventor's federal and Pennsylvania-law claims against related partnership and purported common parent of both corporation and partnership for trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment, where partnership and parent were not parties to agreement and no relevant case or statute permitted non-parties to force signatory party to engage in negotiations pursuant to permissive mediation clause as condition precedent to filing suit.

Cases that cite this headnote

**[3]    Alternative Dispute Resolution**
&#128273; Right to enforcement and defenses

Successor-in-interest with respect to cooperation, development, and licensing agreement with inventor of skin care technology waived any rights it may have had under that agreement to seek to have its senior executives negotiate end to dispute in which inventor alleged federal and Pennsylvania-law claims for trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment, even though inventor failed to bring dispute to senior executives to try to resolve dispute as he was required to do under agreement's alternative dispute resolution clause, by participating in four-year litigation in cancellation action before Trademark Trial and Appeal Board (TTAB), including successful motion for summary judgment on inventor's abandonment contention.

Cases that cite this headnote

**[4]    Federal Courts**
&#128273; Limitations and Laches

Absent a borrowing statute, a federal court exercising supplemental jurisdiction applies the forum state's statute of limitations.

1 Cases that cite this headnote

**[5]    Federal Civil Procedure**
&#128273; Limitations, laches and prematurity

So-called "Third Circuit Rule," permits a limitations defense to be raised by a motion to dismiss for failure to state a claim only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[6]    Federal Civil Procedure**
&#128273; Limitations, laches and prematurity

Under the so-called "Third Circuit Rule," if a limitations bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[7]    Federal Civil Procedure**
&#128273; Matters considered in general

When determining whether a document is integral to or explicitly relied upon in the complaint, such that it may be considered on a motion to dismiss for failure to state a claim, what is critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[8]    Limitation of Actions**
&#128273; Contracts;  warranties

Pennsylvania's four-year statute of limitations for skin care technology inventor's breach of contract claim against successor-in-interest to cooperation, development, and licensing agreement, as well as related partnership and purported common parent of both corporation and partnership, began to run when inventor became aware of alleged breach, which was when partnership issued press release introducing United States products bearing inventor's trademark but not involving inventor's technology. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[9]    Federal Civil Procedure**
&#128273; Matters considered in general

Court could rely on partnership's press release in considering motion to dismiss for failure to state claim by partnership, related corporation, as successor-in-interest to cooperation, development, and licensing agreement with inventor, and purported common

parent of partnership and corporation on inventor's breach of contract claim, even though press release was not attached to complaint or to any of parties' briefs, where it was clear that this claim was based on press release, which introduced products bearing inventor's trademark, which was first time that defendants had used trademark in connection with United States product that did not involve inventor's skin care technology. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[10]    Federal Civil Procedure**
    Matters considered in general

Skin care technology inventor's breach of contract claim against successor-in-interest to cooperation, development, and licensing agreement, as well as related partnership and purported common parent of both corporation and partnership was not based on third-party document, and thus court would not consider this document on defendants' motion to dismiss for failure to state claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[11]    Federal Civil Procedure**
    Briefs in general

**Federal Civil Procedure**
    Waiver, abandonment, or default

Where an issue of fact or law is raised in an opening brief but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue.

Cases that cite this headnote

**[12]    Corporations and Business Organizations**
    Contracts

Even if non-conclusory, skin care technology inventor's single allegation that corporation was ultimate owner of successor-in-interest with respect to cooperation, development, and licensing agreement with inventor was

insufficient under *Twombly–Iqbal* pleading standard to hold corporation liable on Pennsylvania-law breach of contract claim.

Cases that cite this headnote

**[13]    Pleading**
    Disjunctive and alternative allegations

Only if there is a question as to the validity of the contract in question can a plaintiff proceed on both breach of contract and unjust enrichment theories under Pennsylvania law.

Cases that cite this headnote

**[14]    Implied and Constructive Contracts**
    Unjust enrichment

Under Pennsylvania law, "unjust enrichment" is essentially an equitable doctrine under which the law implies a contract which requires the defendant to pay to the plaintiff the value of the benefit conferred.

Cases that cite this headnote

**[15]    Implied and Constructive Contracts**
    Unjust enrichment

To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege: (1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable or unjust for the defendant to retain the benefit without payment of value.

Cases that cite this headnote

**[16]    Implied and Constructive Contracts**
    Unjust enrichment

Skin care technology inventor alleged that he conferred benefits on partnership related to successor-in-interest to cooperation, development, and licensing agreement with inventor and purported common parent of both partnership and successor-in-interest, neither of which were party to agreement, based on their use of inventor's trademark in marketing and

selling products and related goodwill and that defendants had failed to return trademark to him in accordance with agreement or to make payment, as required to plead Pennsylvania-law unjust enrichment claims against these defendants.

Cases that cite this headnote

**[17]** **Action**

☞ Nature of Action

Under Pennsylvania law, the "gist of the action doctrine" bars plaintiffs from recovering under tort theories for failure to perform a contract.

1 Cases that cite this headnote

**[18]** **Action**

☞ Nature of Action

Under Pennsylvania law, the "gist of the action doctrine" bars tort claims (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

1 Cases that cite this headnote

**[19]** **Action**

☞ Nature of Action

**Antitrust and Trade Regulation**

☞ Passing Off or Palming Off

Under Pennsylvania law, "gist of the action doctrine" barred skin care technology inventor's federal and state-law unfair competition claims against corporation, as successor-in-interest to cooperation, development, and licensing agreement, as well as related partnership and purported common parent of both corporation and partnership, insofar as inventor's claims were based upon defendants' failure to revert trademark to him, in violation of agreement, or upon defendants' continued marketing and selling of products bearing trademark, since success on these grounds was wholly dependent

on finding that defendants breached agreement by not reverting trademark to inventor when corporation voluntarily terminated it.

Cases that cite this headnote

**[20]** **Action**

☞ Nature of Action

**Antitrust and Trade Regulation**

☞ Representations, assertions, and descriptions in general

Under Pennsylvania law, "gist of the action doctrine" did not bar skin care technology inventor's federal and state-law unfair competition claims against corporation, as successor-in-interest to cooperation, development, and licensing agreement, as well as related partnership and purported common parent of both corporation and partnership, insofar as inventor's claims were based on defendants' actions and communications after they chose not to revert trademark to him, as required by agreement, since this alleged deception by defendants breached broader societal duty to inventor not to mislead him, which did not relate to any provision of agreement.

Cases that cite this headnote

**[21]** **Action**

☞ Nature of Action

**Antitrust and Trade Regulation**

☞ Passing Off or Palming Off

Under Pennsylvania law, the gist of the action of an unfair competition claim lies in the deception practiced in passing off the goods of one for that of another, and the underlying principle of the law of unfair competition is to prevent substitution by deception.

Cases that cite this headnote

**[22]** **Fraud**

☞ Effect of existence of remedy by action on contract

Under Pennsylvania law, where a purported misrepresentation extends beyond a failure to

adhere to any provision of the contract, the claim sounds primarily in tort and may be maintained concurrently with a breach of contract action.

Cases that cite this headnote

**[23]** **Federal Courts**

Contacts with United States as a whole; nationwide jurisdiction

Federal long-arm statute sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States law, but is without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state. U.S.C.A. Const.Amend. 5; Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[24]** **Federal Courts**

Related contacts and activities; specific jurisdiction

Under the federal long-arm statute, a court may exercise specific personal jurisdiction over a defendant where the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[25]** **Federal Courts**

Unrelated contacts and activities; general jurisdiction

Under the federal long-arm statute, the exercise by a court of general personal jurisdiction is appropriate where the defendant's contacts with the forum are so continuous and systematic as to render it essentially at home in the forum state. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[26]** **Federal Courts**

Contacts with United States as a whole; nationwide jurisdiction

Federal long-arm statute applies in a narrow band of cases in which the United States serves as the relevant forum for a minimum contacts analysis. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[27]** **Constitutional Law**

Non-residents in general

For a court to constitutionally exercise personal jurisdiction over a foreign defendant under the federal long-arm statute: (1) there must be a claim arising under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the defendant must have sufficient contacts with the United States as a whole so that the court's exercise of personal jurisdiction over the defendant comports with the due process requirements of the Constitution or other federal law. U.S.C.A. Const.Amend. 5; Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[28]** **Federal Courts**

Related or affiliated entities; parent and subsidiary

**Federal Courts**

Particular Entities, Contexts, and Causes of Action

Even assuming that purported parent of both partnership and related corporation that was successor-in-interest to cooperation, development, and licensing agreement with inventor owned and operated single research and development facility in United States, this was insufficient to render parent essentially at home in U.S., as required for district court to exercise personal jurisdiction over parent under federal long-arm statute in inventor's federal and Pennsylvania-law action alleging trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[29]    Federal Courts**

🔑 Contacts with United States as a whole; nationwide jurisdiction

Even a defendant's engagement in a substantial, continuous, and systematic course of business is alone insufficient to render it at home in a forum, as required to satisfy more stringent "essentially at home" standard for determining the applicability of general jurisdiction under the federal long-arm statute. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

Cases that cite this headnote

**[30]    Federal Courts**

🔑 Waiver, estoppel, and consent

Personal jurisdiction is a waivable right, and litigants can give express or implied consent to the personal jurisdiction of the court through a variety of legal arrangements, including forum selection clauses in contracts executed by the parties.

Cases that cite this headnote

**[31]    Contracts**

🔑 Legal remedies and proceedings

Nonsignatory third parties who are closely related to a contractual relationship are bound by the forum selection clauses contained in the agreements underlying that relationship.

Cases that cite this headnote

**[32]    Contracts**

🔑 Legal remedies and proceedings

In determining whether a nonsignatory third party is "closely related to a contractual relationship," such that it may be bound by the forum selection clauses contained in the agreements underlying that relationship, the court must consider several factors, including the nonsignatory's ownership of the signatory, the relationship between the two parties, and

whether the nonsignatory received a direct benefit from the agreement.

Cases that cite this headnote

**[33]    Contracts**

🔑 Legal remedies and proceedings

Nonsignatory third parties that should have foreseen governance by a forum selection clause in a contract to which they are closely related may be bound to it if it is fair and reasonable to do so.

Cases that cite this headnote

**[34]    Contracts**

🔑 Legal remedies and proceedings

Forum selection clause in cooperation, development, and licensing agreement between corporation and inventor of skin care technology was binding upon corporation's purported parent as non-signatory third party, in inventor's federal and Pennsylvania-law action alleging trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment, where parent gained benefit from use of inventor's trademark pursuant to agreement to market and sell products, parent had registered trademark in other jurisdictions and sued to prevent other entities from using mark, and parent could have reasonably foreseen governance by clause.

Cases that cite this headnote

**[35]    Contracts**

🔑 Legal remedies and proceedings

Forum selection clauses are treated as ordinary contract provisions and are subject to the ordinary rules of contract interpretation.

Cases that cite this headnote

**[36]    Contracts**

🔑 Existence of ambiguity

To be "unambiguous," a contract clause must be reasonably capable of only one construction.

Cases that cite this headnote

**[37] Contracts**

 👉 Legal remedies and proceedings

Forum selection clause in cooperation, development, and licensing agreement between corporation and inventor of skin care technology applied to inventor's claims against corporation's purported parent, alleging federal and Pennsylvania-law claims for trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment, where inventor's claims against parent implicated agreement's terms with respect to inventor's trademark and would require consideration of agreement and parties' respective rights pursuant to agreement that represented only manifestation of any relationship between inventor and parent or corporation.

Cases that cite this headnote

**Attorneys and Law Firms**

Christopher J. Michie, Bruce W. Clark, Clark Michie LLP, Princeton, NJ, Michael D. Lipuma, Philadelphia, PA, for Plaintiff.

Jeffrey M. Becker, Norman , Haynes & Boone LLP, Dallas, TX, Joseph Lawlor, Richard D. Rochford, Haynes & Boone LLP, New York, NY, Frederick A. Tecce, Panitch, Schwarze, Belisario And Nadel, LLP, Philadelphia, PA, for Defendants.

*OPINION*

WENDY BEETLESTONE, District Judge.

**I. INTRODUCTION**

 **\*1** Before the Court are Defendants Galderma Laboratories, L.P. and Galderma Laboratories, Inc.'s Motion to Dismiss and Motion to Stay Pending the Outcome of the Administrative Proceeding, Plaintiff Thomas Sköld's Response in Opposition thereto, and Galderma L.P. and Galderma Inc.'s Reply, as well as Defendant Galderma S.A.'s Motion to Dismiss and

Motion to Stay Pending the Outcome of the Administrative Proceeding, the Plaintiff's Response in Opposition thereto, and Galderma S.A.'s Reply. [1] The Court held oral argument on all pending motions on March 19, 2015.

For the reasons that follow, the motion to stay shall be denied as moot, the motions to dismiss for failure to state a claim shall be granted in part, and the motion to dismiss for lack of personal jurisdiction shall be denied.

**II. FACTUAL HISTORY AND PROCEDURAL BACKGROUND**

According to the facts alleged in the Complaint, Plaintiff Thomas Sköld is a citizen of Sweden. Compl. ¶ 4. Defendant Galderma S.A. ("S.A.") is a Swiss corporation with its principal place of business in Switzerland, while Defendant Galderma Laboratories, Inc. ("Inc.") is a Delaware corporation with its principal place of business in Texas and Defendant Galderma Laboratories, L.P. ("L.P.") is a Texas limited partnership with its principal place of business in Texas. *Id.* ¶¶ 5–7. All three Defendant entities are "involved in the research, development, marketing, and sale of pharmaceutical and therapeutic skin care products."*Id.* Sköld alleges that S.A. is the ultimate owner of both Inc. and L.P. *Id.* ¶ 8.

In Summer 2001, Sköld began developing the technology that would eventually become known as "Restoraderm" and set out to find entities interested in licensing the technology and developing the resulting product to be marketed and distributed for mass consumption. *Id.* ¶ 11. In September 2001, Sköld met with Collagenex Pharmaceuticals, Inc. ("Collagenex") of Newtown, Pennsylvania, and presented it formulations of his Restoraderm technology, using the phrase "Restoraderm technology" both in his oral presentation and written materials. *Id.* ¶ 12. Sköld used the term "Restoraderm" in similar meetings he had with other pharmaceutical companies throughout the remainder of 2001. *Id.* ¶¶ 14–18. He first manufactured a Restoraderm product "in its current form in about October 2001," and delivered samples of a material with the "Restoraderm" label to Collagenex in November and December 2001 and January 2002. *Id.* ¶¶ 19–21. Sköld and Collagenex executed a Letter of Intent in December 2001 and signed a Cooperation, Development, and Licensing Agreement on February 11, 2002 (the "2002 Agreement").*Id.* ¶¶ 22–23. Under the 2002 Agreement, Sköld continued developing the Restoraderm technology, while Collagenex developed

and maintained the Restoraderm intellectual property rights, including registering and protecting the "Restoraderm" trademark, a process Collagenex began in 2002. *Id.* ¶¶ 24–26.

**\*2** In August 2004, Sköld and Collagenex signed a Consulting Agreement under which Sköld would provide "technical consulting and development services with respect to Restoraderm Technology in such manner as shall be requested by the Company from time to time," defining "Restoraderm Technology" as the "topical drug delivery technology developed by Sköld."*Id.* ¶ 28. On August 19, 2004, Sköld and Collagenex restructured the 2002 Agreement into an Asset Purchase and Product Development Agreement (the "2004 Agreement"), which "formalized Sköld's control of the Restoraderm development."*Id.* ¶¶ 27, 29. In the course of negotiating this agreement, Collagenex "confirmed" that the Restoraderm trademark was included in the assets contemplated in the agreement. *Id.* ¶ 30.

Inc. acquired Collagenex in March 2008 and terminated the 2004 Agreement with Sköld on November 27, 2009. *Id.* ¶¶ 33–34. Section 8.5(b) of the 2004 Agreement provides that should Collagenex terminate the Agreement, the assets, including the Restoraderm intellectual property, and additional related records shall be transferred to Sköld. *Id.* ¶ 35 & Ex. A at 19. Sköld alleges that the "parties' contractual intent was that the Restoraderm trademark would be returned to Sköld if the 2004 Agreement were cancelled by Collagenex (or its successors-in-interest)," but that the Defendants have yet to return the Restoraderm trademark to Sköld in accordance with this provision. *Id.* ¶¶ 36–37.

After terminating the 2004 Agreement, Sköld alleges the Defendants "gave mixed messages" regarding their intentions for future use of the Restoraderm trademark and Restoraderm technology. *Id.* ¶ 38. On September 14, 2010, L.P. issued a Press Release announcing the launch of "Cetaphil® Restoraderm® products" in the United States, which, according to the Complaint, "made it clear that the Defendants intended to use the mark 'Restoraderm' in connection with a product to be sold by them in the United States."*Id.* ¶¶ 39–40. Sköld alleges that this press release "was the first time that the Defendants had used the term 'Restoraderm' in connection with a U.S. product that did not involve Sköld's Restoraderm technology."*Id.* ¶ 43.

Sköld filed an action in this Court on September 15, 2014, alleging three counts under the Lanham Act—trademark infringement, false advertising, and unfair competition—

and three counts under Pennsylvania state law—unfair competition, breach of contract, and unjust enrichment. *Id.* ¶¶ 48–80. Sköld previously initiated a proceeding before the U.S. Patent and Trademark Office seeking to cancel the Defendants' registration of the "Restoraderm" trademark, *id.* ¶ 37, but that proceeding has been stayed by the Trademark Trial and Appeal Board ("TTAB") pending the outcome of this litigation. *See infra* Section IV.A.

L.P. and Inc. filed a motion to dismiss on December 1, 2014. They contend as follows. First, the breach of contract and unjust enrichment claims are barred by Pennsylvania's four-year statute of limitations because the claims began to accrue prior to September 15, 2010. Second, the breach of contract claim should also be dismissed for failing to comply with the agreement's dispute resolution and mediation clause. Third, the unjust enrichment claim should be dismissed because the complained-of conduct is governed by contract, which precludes Sköld from availing himself of quasi-contract theories of recovery. And finally, the unfair competition claim is precluded by the gist of the action doctrine because he impermissibly attempts to recast a breach of contract claim as a tort claim. *See* L.P./Inc. Mot. to Dismiss at 8–9.

**\*3** On December 22, 2014, Sköld filed his response in opposition. He argues that he filed the Complaint within the four-year limitations period because he was unaware the contract was breached until September 14, 2010, when L.P. issued the press release announcing the Restoraderm product. In the alternative, Sköld contends he is entitled to equitable tolling of the statute of limitations. Furthermore, he argues that the unjust enrichment claim is not precluded against all parties by the contract and the gist of the action doctrine does not bar his unfair competition claim. *See* Pl.'s L.P./Inc. Opp'n at 10–13. In reply, L.P. and Inc. argue that Sköld knew about the Defendants' use of Restoraderm no later than August 16, 2010, when he initiated the TTAB proceeding, attaching a May 26, 2010 press release "demonstrating Defendant's widespread public use of the RESTORADERM mark for its products."L.P./Inc. Reply at 2. Based on that press release, L.P. and Inc. contend that Sköld "transparent[ly] attempt[s] to avoid dismissal on statute of limitations grounds."*Id.* They also argue that Sköld is not entitled to equitable tolling and reaffirm their arguments on the other grounds. *See id.* at 4–8.

S.A. filed its own motion to dismiss on January 15, 2015. *See* S.A. Mot. to Dismiss; *see also supra* note 1. In opposition to S.A.'s jurisdictional argument, Sköld argued that jurisdiction is proper under the federal long-arm statute, Federal Rule of

Civil Procedure 4(k)(2), because S.A. has sufficient contacts with the United States such that the exercise of jurisdiction comports with due process. *See* Pl.'s S.A. Opp'n at 9–10. Furthermore, Sköld alleges that the forum selection clause in the 2004 Agreement operates to subject S.A. to jurisdiction in this Court. *See id.*In Reply, S.A. argues that: (1) Rule 4(k)(2) does not apply; (2) the forum selection clause does not apply to S.A. as a non-signatory third party to the 2004 Agreement; and (3) the forum selection clause does not apply to the Sköld's claims against it. *See* S.A. Reply at 2–9.

## III. DISCUSSION

### A. *Motions to Stay*

The Court first addresses the Defendants' motions to stay this action pending a decision of the TTAB in the cancellation proceeding. In his Opposition to S.A.'s motion to dismiss and motion to stay, Sköld brought to the Court's attention that the TTAB proceeding has been stayed pending the outcome of this litigation. Pl.'s S.A. Opp'n at 11 (citing Michie Decl. ¶ 13 & Ex. J). In its Reply, S.A., on behalf of all three Defendants, recognized this action by the TTAB and withdrew the motions to stay. S.A. Reply at 1 n. 1. Accordingly, the Defendants' motions to stay are moot.

### B. *Alternative Dispute Resolution Clause*

The Defendants contend that the Complaint should be dismissed in its entirety for failure to comply with the 2004 Agreement's dispute resolution and mediation clause. L.P./ Inc. Mot. to Dismiss at 12–13. The clause provides that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination, or invalidity thereof *shall* first be referred by the parties to their senior-level executives for attempted resolution through good-faith negotiations."Compl. Ex. A § 9.1 (emphasis added). Should negotiations fail, thirty days after making a written request to initiate those negotiations, "either Party *may,* by written notice to the other, require that the Dispute be referred to non-binding mediation administered by the American Arbitration Association."*Id.* (emphasis added). The Defendants assert that Sköld did not refer a dispute to a senior-level executive for negotiations and failed to make a written request that the dispute be referred to nonbinding mediation. L.P./Inc. Mot. to Dismiss at 12–13. Sköld responds that the language of the mediation clause is permissive ("either Party *may*... require") and also argues that, in any event, Inc. has waived its right to invoke the clause because it participated in litigation over the

dispute in the cancellation action before the TTAB. *See* Pl.'s L.P./Inc. Opp'n at 14–15.

**\*4** **[1]** The dispute resolution clause in the 2004 Agreement contains two clauses, one of which is mandatory (the parties *shall* refer the matter to senior executives to attempt to negotiate a resolution) and the other which is permissive (the parties *may* refer the matter to nonbinding mediation). Given the voluntary nature of the latter, this Court agrees with Sköld that he was not required to refer this dispute to mediation before bringing suit here against Inc.

**[2]** L.P. and S.A., who are not parties to the 2004 Agreement, also contend that the dispute resolution clause requires their dismissal from this action. In essence, they urge this Court to accept the contention that a nonparty to an agreement should be permitted to force a signatory party to engage in negotiations pursuant to a permissive mediation clause in that agreement as a condition precedent to filing suit but cite no relevant case or statute in support of this contention. *See United States v. Benish,* 5 F.3d 20, 26 (3d Cir.1993) (rejecting a party's claim where the party "provid[ed] no legal support for his argument or any persuasive reason" for the court to find in his favor). [2] The Court sees no persuasive reason to dismiss Sköld's entire Complaint based on this unsupported argument. Accordingly, the motion to dismiss the Complaint against L.P. and S.A. on this ground shall be denied.

**[3]** Regarding Inc.: although Sköld did fail to bring in a senior-level executive to try to resolve the dispute—as he was required to do under the dispute resolution provision—Inc.'s participation in the TTAB proceedings waived any rights it may have had to seek to have the parties' executives negotiate an end to the dispute. *See, e.g., LBL Skysystems (USA), Inc. v. APG–Am., Inc.,* No. 02–5379, 2005 WL 2140240, at \*30 (E.D.Pa. Aug. 31, 2005) (holding that a "party that engages in discovery and files pretrial motions waives a contract's alternative dispute resolution provision"); *Smith v. IMG Worldwide, Inc.,* 360 F.Supp.2d 681, 687 (E.D.Pa.2005) (finding that a party's engaging in motion practice and providing "substantial discovery" constituted waiver of contractual alternative dispute resolution provision).

Viewing the four years' worth of docket entries in the TTAB action, the Court considers that Inc. did not file a motion to stay the TTAB proceedings pending executive-level negotiations and instead filed, *inter alia,* motions to dismiss, a protective order, multiple summary judgment motions (one

of which was partially granted in its favor), and a final brief in preparation for trial. *See, e.g., Sköld v. Galderma Labs., Inc.,* Cancellation No. 92052897, 2012 WL 5902083 (T.T.A.B. Nov. 8, 2012) (granting Inc.'s motion for partial summary judgment on Sköld's abandonment claim).*See also generally* Registrant's Trial Brief, *Sköld v. Galderma Labs., Inc.,* Cancellation No. 92052897 (T.T.A.B. Aug. 13, 2014), Docket No. 81. This four-year history of litigation in the cancellation action—from filing nearly through trial—is, on its face, inconsistent with the notion that Inc. was willing to engage in the good-faith executive-level negotiations required by the dispute resolution provision.

**\*5** Moreover, the Court can look to the TTAB's grant of partial summary judgment in favor of Inc. and dismissing Sköld's abandonment claim as a concrete example of an instance where Inc.'s conduct inconsistent with the dispute resolution clause caused prejudice to Sköld, not to mention the expenditure of time, cost, and resources attendant to maintaining a multi-year trademark cancellation action. The Defendants have undisputedly accepted the judicial process and have demonstrated that fact by: (1) Inc.'s failure to raise the issue of good-faith negotiations promptly before the TTAB; (2) Inc.'s engaging in discovery in the TTAB action; (3) Inc.'s filing of several pretrial motions in the TTAB action, none of which raise the issue of negotiation; and (4) the Defendants' decision to wait until the case was ready to proceed to trial before the TTAB and until a Complaint was filed in this Court before asserting Sköld's failure to negotiate as grounds for a motion to dismiss. *See St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.,* 733 A.2d 677, 682 n. 6 (Pa.Commw.Ct.1999) ("The key to determining whether [an alternative dispute resolution procedure] has been waived is whether the party, by virtue of its conduct, has accepted the judicial process."). Inc. cannot now attempt to stand on the alternative dispute resolution clause as a reason for dismissal. Its right to invoke the clause has been waived.

Accordingly, the motions to dismiss on this ground shall be denied. [3]

## C. *Breach of Contract*

### 1. Timeliness of the Claim

**[4]** The parties dispute whether Sköld's breach of contract claim in Count Five of the Complaint is barred by the statute of limitations. Absent a borrowing statute, a federal court

exercising supplemental jurisdiction applies the forum state's statute of limitations. *Layser v. Morrison,* 935 F.Supp. 562, 570 (E.D.Pa.1995). Pennsylvania's statute of limitations to file contract actions is four years. 42 Pa. Cons.Stat. § 5525. In the Complaint and his Opposition, Sköld asserts that the breach of contract claim accrued on Sunday, September 14, 2010, when L.P. issued the press release announcing the launch of "Cetaphil® Restoraderm® Products" in the United States. *See* Compl. ¶ 39; Pl.'s L.P./Inc. Opp'n at 7. Because the Complaint was filed four years later, on Monday, September 15, 2014 (September 14, 2014, was a Sunday), he argues the claim is timely. *See*1 Pa. Cons.Stat. § 1908 ("Whenever the last day of such period shall fall on a Saturday or Sunday ... such day shall be omitted from the computation.").

The Defendants argue that the claim for breach of contract began to accrue as early as November 27, 2009, when Inc. terminated the 2004 Agreement with Sköld and did not immediately revert the Restoraderm intellectual property to Sköld, as he alleges they were required to do. L.P./Inc. Mot. to Dismiss at 6. They further argue that Sköld's commencing of the TTAB proceeding on August 16, 2010, necessarily evinces his knowledge on that date that the Defendants had breached the contract by not reverting the Restoraderm trademark to Sköld as provided for in the contract. *Id.* They point to an attachment to Sköld's petition in the TTAB proceeding: a May 26, 2010, article titled "Cetaphil RestoraDERM for extra dry skin and Eczema," which stated that Cetaphil, an allegedly well-known Inc. brand, was planning to introduce a new line of skin care products called "RestoraDERM" in August 2010. L.P./Inc. Reply at 2 (quoting Rochford Decl. Ex. B at Ex. 8). Given Sköld's concession that the Defendants' September 14, 2010, press release put him on notice of the breach of contract claim, they contend that the similarly worded May 26, 2010, article should have also put him on notice. *Id.* at 2–3. If they are correct, the cause of action for breach of contract accrued no later than August 16, 2010, when Sköld filed his petition in the TTAB proceeding attaching the article, and this lawsuit is untimely because it was filed over four years and three months later. *Id.*

**\*6** **[5]** **[6]** Whether they are correct is determined by reference to the so-called "Third Circuit Rule," which "permit[s] a limitations defense to be raised by a motion under Rule 12(b)(6)'only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'"*Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir.2014) (quoting *Robinson v. Johnson,* 313

F.3d 128, 135 (3d Cir.2002)). Under this rule "[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."*Id.*(quoting *Robinson,* 313 F.3d at 135) (internal quotation marks omitted).

 **[7]** "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."*Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993)) (internal quotation marks omitted). An exception to this rule, however, is that "a 'document *integral to or explicitly relied upon* in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (emphasis added) (alteration in original) (citation and internal quotation marks omitted). In the context of a motion decided pursuant to the Third Circuit Rule, "what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."*Schmidt,* 770 F.3d at 249.

 **[8]** **[9]** Here, the bar is not apparent on the face of the Complaint. Accepting all facts alleged in the Complaint as true, *see Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009), Sköld was not aware of the Defendants' breach until September 14, 2010, when L.P. issued the press release introducing the products bearing the Restoraderm trademark. [4] Sköld alleges in the Complaint that the press release "was the first time that the Defendants had used the term 'Restoraderm' in connection with a U.S. product that did not involve Sköld's Restoraderm technology."Compl. ¶ 42. Although this press release was not attached to the Complaint or to any of the parties' briefs, it is clear that the breach of contract claim is "based" on this extrinsic document, and the Court may thus rely on it. *Schmidt,* 770 F.3d at 249.

 **[10]** The Defendants urge this Court to consider a document attached to Sköld's petition initiating the proceeding before the TTAB: a May 26, 2010, document L.P. and Inc. describe as a "release," comparing it directly to the September 14, 2010, press release Sköld alleges forms the basis for the breach of contract action. *See* L.P./Inc. Reply at 3. They argue that this document, titled "Cetaphil RestoraDERM for extra dry skin and Eczema," contains all the information Sköld needed to ascertain his injury and thus the claim for breach of contract is untimely. *Id.*"While this may be true, these materials may not be considered at the motion to dismiss

stage. They are not integral to the complaint—the complaint was not 'based' on" this third-party document, but rather on the September 14, 2010, press release published by the Defendants.*Schmidt,* 770 F.3d at 249–50. The Court will not consider this document. [5]

 ***7** Thus, taking the well-pleaded allegations in the Complaint as true, and drawing all reasonable inferences in Sköld's favor therefrom, the Court will not dismiss the contract claims on statute of limitations grounds, at least at this stage of the proceedings. Accordingly, the motions to dismiss the breach of contract claim in Count Five on this ground shall be denied. [6]

### 2. Whether S.A. is a Proper Defendant

 **[11]** S.A. contends that the breach of contract claim should be dismissed against it because Sköld does not allege that it was a party to the 2004 Agreement. S.A. Mot. to Dismiss at 11; S.A. Reply at 2–3. [7] Sköld does not provide any counterargument in his opposition brief. "Where an issue of fact or law is raised in an opening brief but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue."*Markert v. PNC Fin. Servs. Grp., Inc.,* 828 F.Supp.2d 765, 773 (E.D.Pa.2011); *see also Young v. St. Luke's Hosp.,* No. 09–3460, 2010 WL 1348468, at *6 (E.D.Pa. Mar. 30, 2010) ("Parties who fail to adequately brief their opposition to motions do so at the risk of having those motions granted as uncontested.").

 **[12]** Even so, the only allegations in the Complaint concerning S.A.'s relationship with Inc., the successor-in-interest to the signatory party are so sparse as to warrant a dismissal of the contract claim against S.A. Paragraph 8 provides, "Upon information and belief, Galderma S.A. is the ultimate owner of Galderma Laboratories, Inc. and Galderma Laboratories, L.P." Compl. ¶ 8. And paragraph 9 states simply, that "[e]ach defendant acted in concert and active participation with each other in committing the wrongful acts alleged herein."*Id.* ¶ 9. Notwithstanding the fact that paragraph 9 is conclusory, and, without more, is not entitled to any credence under *Twombly* and *Iqbal,* the single allegation in paragraph 8 that S.A. is the ultimate owner of Inc. is insufficient to hold S.A. liable for a breach of contract. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Rule 8 ... does

not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir.2012) (stating that a court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth" (citation and internal quotation marks omitted)). There are simply insufficient "facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]."*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Because Sköld has not addressed S.A.'s argument that it is not a party to the contract and because the Complaint does not contain sufficient allegations to survive *Twombly* and *Iqbal* scrutiny, the breach of contract claim in Count Five shall be dismissed as to S.A.

### D. *Unjust Enrichment*

 **\*8**  **[13]**  The Defendants argue that Sköld fails to state a claim for unjust enrichment. They contend the claim should be dismissed because it is precluded by the 2004 Agreement. This Court agrees that the existence of the 2004 Agreement precludes Sköld from proceeding on an unjust enrichment claim against Inc., the successor-in-interest to the original Collagenex contract. *See Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987) (stating that a claim for unjust enrichment is unavailable "when the relationship between the parties is founded on a written agreement or express contract") (citation and internal quotation marks omitted). Sköld has not questioned the validity of the 2004 Agreement, and Inc. does not dispute its validity. Only if there were a "question as to the validity of the contract in question" could Sköld proceed on both theories in the alternative against Inc. *Premier Payments Online, Inc. v. Payment Sys. Worldwide,* 848 F.Supp.2d 513, 527 (E.D.Pa.2012) (citation and internal quotation marks omitted). There being no such question, the motion to dismiss the unjust enrichment claim against Inc. shall be granted.

 **[14]**  **[15]**  The same is not so for S.A. or L.P. S.A. argued throughout its briefing that it is not a party to the contract and that this Court should dismiss the breach of contract claims against it based on that fact, and the Court agreed. *See supra* subsection IV.C.2. However, because the relationship between Sköld and S.A. is not governed by an express written agreement, S.A. cannot rely on the existence of the 2004 Agreement to shield it from Sköld's unjust enrichment claim. " 'Unjust enrichment' is essentially an equitable doctrine," under which "the law implies a contract which requires the defendant to pay to the plaintiff the value of the benefit conferred."*Mitchell v. Moore,* 729 A.2d 1200, 1203

(Pa.Super.Ct.1999) (quoting *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347 (1993), *aff'd,*535 Pa. 610, 637 A.2d 276 (1994); *Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327 (1995)). To state a claim for unjust enrichment, a plaintiff must allege:

> [1] benefits conferred on one party by another; [2] appreciation of such benefits by the recipient; and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable [or unjust] for defendant to retain the benefit without payment of value.

*Premier Payments,* 848 F.Supp.2d at 527 (quoting *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir.2000)); *accord Torchia ex rel. Torchia v. Torchia,* 346 Pa.Super. 229, 499 A.2d 581, 582 (1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.").

 **[16]**  Sköld's allegations support a prima facie case for unjust enrichment. As to the first element, he alleges that he has conferred benefits on the Defendants as a result of their use of the Restoraderm trademark in marketing and selling products and the related goodwill. Compl. ¶¶ 39–41, 79. As to the third element, he alleges that the Defendants have "registered the term Restoraderm as a trademark in the United States and other jurisdictions" and "have failed to return the Restoraderm trademark to Sköld in accordance with the 2004 Agreement."*Id.* ¶ 37. It can also be inferred that this element is satisfied because it would be inequitable or unjust for the Defendants to retain the benefit of the Restoraderm trademark (which allegedly should have been returned to Sköld upon termination of the Agreement) without payment of value. As to the second element, although Sköld has not explicitly pled that the Defendants appreciated such benefits, such appreciation is plausible given the Defendants' acts of marketing (and deriving profits from) products containing the Restoraderm trademark. This same reasoning applies to L.P., as well, which is also not a party to the 2004 Agreement.

 **\*9**  Based on the allegations in the Complaint, Sköld has plausibly stated a claim for unjust enrichment against S.A. and L.P. Accordingly, the motion to dismiss the unjust enrichment claim for failure to state a claim against S.A. and L.P. shall be denied. [8]

**E.** *Unfair Competition*

 **[17]**    The Defendants contend that Sköld's unfair competition claim should be dismissed because of the gist of the action doctrine, which bars plaintiffs from recovering under tort theories for failure to perform a contract. *See* L.P./Inc. Mot. to Dismiss at 8; *see also Jones v. ABN Amro Mortg. Grp., Inc.,* 606 F.3d 119, 123 (3d Cir.2010). [9] More specifically, they argue that Sköld "attempts to recast a breach of contract claim as an unfair competition tort claim."L.P./Inc. Mot. to Dismiss at 8.

 **[18]**    The doctrine "forecloses a party's pursuit of a tort action for the mere breach of contractual duties 'without any separate or independent event giving rise to the tort.'"*Brown & Brown, Inc. v. Cola,* 745 F.Supp.2d 588, 619 (E.D.Pa.2010) (quoting *Smith v. Lincoln Benefit Co.,* No. 081324, 2009 WL 789900, at *20 (W.D.Pa. Mar. 23, 2009), *aff'd,*395 Fed.Appx. 821 (3d Cir.2010)). It bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 19 (Pa.Super.Ct.2002) (citations omitted). The mere existence of a contractual relationship between the parties, however, does not preclude one party from bringing a tort claim against the other. *See Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 104 (3d Cir.2001).

In its first foray into an analysis of the gist of the action doctrine—after a long history of predictive federal court and lower state court litigation on the same [10]—the Pennsylvania Supreme Court, in *Bruno v. Erie Insurance Co.,* 106 A.3d 48 (Pa.2014), summarized the doctrine's contours as follows:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.,* a specific promise to do something that a party would not

ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* at 68 (citations omitted).

 **[19]**    Under *Bruno,* cases where tort actions are permitted to arise in the context of a contractual relationship are cases in which the defendant's alleged acts are "not founded on the breach of any of the specific executory promises which comprise the contract."106 A.3d at 70. To the extent that Sköld bases his claim upon the Defendants' failure to revert the Restoraderm trademark to him, in violation of Section 8.5(b)(iii) of the 2004 Agreement (providing that Defendants "shall transfer to Sköld the Purchased Assets" upon their voluntary termination of the Agreement), or even upon the Defendants' continuing to market and sell products bearing the Restoraderm trademark, the claim is barred by the gist of the action doctrine. The success on these grounds of Sköld's unfair competition claim, which has been traditionally defined under Pennsylvania law as the " 'passing off' a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival,"*Giordano v. Claudio,* 714 F.Supp.2d 508, 521 (E.D.Pa.2010), would be wholly dependent on this Court finding that the Defendants breached the 2004 Agreement by not reverting the Restoraderm trademark to Sköld when Inc. voluntarily terminated it in 2009. The claim would not "lie from the breach of duties imposed as a matter of social policy," but rather from "the breach of duties imposed by mutual consensus."*Bohler–Uddeholm,* 247 F.3d at 103–04 (quoting *Redev. Auth. v. Int'l Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (en banc)) (internal quotation marks omitted); *see also eToll,* 811 A.2d at 19 (stating that the doctrine bars tort claims where the "success of [the tort claim] is wholly dependent on the terms of a contract").

 **\*10**  **[20]**  **[21]**  **[22]**    However, to the extent that Sköld bases his unfair competition claim on the Defendants' actions and communications *after* they chose not to revert the Restoraderm trademark, the Court finds that these allegations plausibly state an unfair competition claim that is not barred

by the gist of the action doctrine. The Court recognizes the existence of some broader social duties at play in the law of unfair competition. The "gist of the action" of an unfair competition claim "lies in the deception practiced in 'passing off' the goods of one for that of another," and moreover, "the 'underlying principle of law of unfair competition is to prevent substitution by deception.'"*Pa. State Univ. v. Univ. Orthopedics, Ltd.,* 706 A.2d 863, 870–71 (Pa.Super.Ct.1998) (quoting *Winthrop Chem. Co. v. Weinberg,* 60 F.2d 461, 463 (3d Cir.1932)). Sköld alleges in the Complaint that, after termination, the Defendants gave "mixed messages concerning their intentions concerning their future use of the Restoraderm trademark and the Restoraderm technology developed by Sköld," but that the September 14, 2010, press release announcing the launch of the "Cetaphil® Restoraderm® products" gives rise to the inference that the Defendants all along intended to use the Restoraderm trademark on products they planned to sell. Compl. ¶¶ 38–40. Sköld has alleged that this deception on the part of the Defendants breaches a broader societal duty they had to Sköld not to mislead him, which does not relate to any provision of the contract. *See* Pl.'s Supp. Br. at 3. The Court agrees. "[W]here the purported misrepresentation extends beyond a failure to adhere to any provision of the contract, [a] claim sounds primarily in tort and may be maintained concurrently with [a] breach of contract action."*Brown & Brown,* 745 F.Supp.2d at 624. Although Sköld will likely need to substantiate his claim further to survive summary judgment on this ground, the Court finds that he has alleged sufficient facts to allow his unfair competition claim to survive a motion to dismiss; it is not barred by the gist of the action doctrine.

Accordingly, the motion to dismiss the unfair competition claim shall be denied.

### F. *Personal Jurisdiction Over Galderma S.A.*

Sköld contends that this Court may exercise personal jurisdiction over S.A. on the Lanham Act Claims pursuant to the federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2). Pl.'s S.A. Opp'n at 9–10. Furthermore, he contends that the forum selection clause in the 2004 Agreement subjects S.A. to jurisdiction in this Court. *Id.* at 6–8. S.A. counters that it is not subject to jurisdiction under Rule 4(k)(2) because it does not have sufficient contacts with the United States as a whole to satisfy that Rule's requirements and because Sköld fails to properly allege Lanham Act claims against it. S.A. Reply at 4–9. S.A. rejects Sköld's claim that this Court has jurisdiction over S.A. under the forum selection

clause, because, it argues, the breach of contract claim is time-barred [11] and because it cannot be bound by the forum selection clause in a contract to which it is not a party or a successor-in-interest to a party. *Id.* at 2–4. The Court will first address the jurisdictional arguments involving the Lanham Act claims, followed by the arguments involving the forum selection clause.

### 1. Rule 4(k)(2)

**\*11** **[23]** **[24]** **[25]** The Due Process Clause of the Fourteenth Amendment to the Constitution permits personal jurisdiction so long as the nonresident defendant has certain minimum contacts with the forum such that maintenance of the suit does not offend " 'traditional notions of fair play and substantial justice.'"*Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).Federal Rule of Civil Procedure 4(k)(2), colloquially termed the "federal long-arm statute," "sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of U.S. law, but is without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state."*Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 455 n. 7 (3d Cir.2003). Under this paradigm, a court may exercise specific personal jurisdiction over a defendant where the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities."*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The exercise by a court of general personal jurisdiction is appropriate where the defendant's contacts with the forum "are so 'continuous and systematic' as to render [it] essentially at home in the forum State."*Daimler AG v. Bauman,* ——U.S. ——, 134 S.Ct. 746, 761, 187 L.Ed.2d 624 (2014). For the purposes of a Rule 4(k)(2) general jurisdiction analysis, however, the relevant "forum State" is the United States as a whole, rather than any individual state. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000).

**[26]** **[27]** **[28]** The Rule applies "in a narrow band of cases in which the United States serves as the relevant forum for a minimum contacts analysis."*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1126 (9th

Cir.2002). This Court can exercise jurisdiction pursuant to this rule only where:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed.R.Civ.P. 4(k)(2). In other words, for a Court to constitutionally exercise personal jurisdiction over a foreign defendant under the Rule: (1) there must be a claim arising under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the defendant must have sufficient contacts with the United States as a whole so that the court's exercise of personal jurisdiction over the defendant comports with the due process requirements of the Constitution or other federal law. *Saudi v. Acomarit Maritimes Servs., S.A.,* 114 Fed.Appx. 449, 455 (3d Cir.2004). Although S.A. concedes that it is beyond the jurisdictional reach of any state court of general jurisdiction, *see*S.A. Reply at 5 n. 2, it contends that neither of the other two prongs are met. First, it argues that Sköld's Complaint does not state a Lanham Act claim against it and hence it should be dismissed. *Id.* at 5. Second, it argues that it does not have sufficient contacts with the United States as a whole such that the exercise of jurisdiction comports with due process. *Id.* This Court agrees with the second point and, thus, it declines to address S.A.'s argument regarding whether Sköld has alleged claims "arising under federal law."

**\*12** S.A. argues that Sköld has not alleged that S.A. has sufficient minimum contacts with the United States as a whole to satisfy the Rule 4(k)(2) test. Sköld counters that the standard to be followed in analyzing satisfaction of the third prong "is similar to that of personal jurisdiction for a particular state: 'general jurisdiction is available when the defendant's contacts unrelated to the litigation are continuous and systematic,' " and proffers that S.A.'s website states that S.A. maintains a Research and Development facility in the United States, claiming that the existence of this facility is sufficient to satisfy this prong. Pl.'s S.A. Opp'n at 10 (quoting *BP Chemicals,* 229 F.3d at 262 (3d Cir.2000)) (internal quotation marks omitted); *see also* Michie Decl. ¶ 8, Ex. E.

To the extent Sköld invokes the standard governing the exercise of general personal jurisdiction over a nonresident corporate defendant, this Court very recently explained in *Farber v. Tennant Truck Lines, Inc.,* ——F.Supp.3d ——, ——, 2015 WL 518254 (E.D.Pa. Feb. 9, 2015), that the

"unadorned 'continuous and systematic' contacts standard for determining general jurisdiction is no longer viable" in this District in light of the U.S. Supreme Court's decisions in *Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011), and *Daimler AG v. Bauman,* —— U.S. ——, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), and held that those cases' more stringent "essentially at home" standard is the operative standard for determining the applicability of general jurisdiction.*Farber,* —— F.Supp.3d at ——, 2015 WL 518254, at \*9. "[T]he inquiry ... is whether corporation's 'affiliations with the state are so "continuous and systematic" as to render [it] essentially at home in the forum State.'"*Daimler,* 134 S.Ct. at 754 (quoting *Goodyear,* 131 S.Ct. at 2851). Because the language of the Rule 4(k)(2) jurisdictional analysis previously has tracked the language of the due process jurisdictional analysis under *International Shoe* and its progeny, *see BP Chemicals,* 229 F.3d at 259, this Court will update accordingly the Rule 4(k)(2) analysis to incorporate the *Goodyear/Daimler* standard. *Cf., e.g., Archangel Diamond Corp. Liquidating Trust v. OAO Lukoil,* —— F.Supp.3d ——, —— – ——, 2014 WL 7232341, at \*13–16 (D.Colo. Dec. 18, 2014); *Toumazou v. Turkish Republic of N. Cyprus,* —— F.Supp.3d ——, ——, 2014 WL 5034621, at \*6 (D.D.C. Oct. 9, 2014); *Best Odds Corp. v. iBus Media Ltd.,* No. 13–2008, 2014 WL 2527145, at \*5 (D.Nev. June 4, 2014).

**[29]** *Goodyear* and *Daimler*"make clear that even a company's 'engage [ment] in a substantial, continuous and systematic course of business' is alone insufficient to render it at home in a forum."*Farber,* —— F.Supp.3d at ——, 2015 WL 518254, at \*10 (quoting *Sonera Holding B.V. v. Çukurova Holding A.S.,* 750 F.3d 221, 226 (2d Cir.) (per curiam), *cert. denied,* —— U.S. ——, 134 S.Ct. 2888, 189 L.Ed.2d 837 (2014)). Thus, a nonresident trucking company that completed 4600 deliveries in Pennsylvania, earned approximately 3% of its revenue from Pennsylvania deliveries, employed drivers who traveled hundreds of thousands of miles per year in Pennsylvania, purchased tens of thousands of gallons of gas per year in Pennsylvania, and made payments of over \$1.7 million to Pennsylvania-based carriers over the course of several years could not be subjected to general personal jurisdiction in Pennsylvania. *Id.* at —— – ——, at \*9–11. "Mere deliveries in Pennsylvania, even occurring at regular intervals, are insufficient to justify Pennsylvania's assertion of general jurisdiction over [a nonresident corporate defendant] in causes of action unrelated to those deliveries."*Id.* at ——, at \*11 (citing *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

**\*13** Here, even assuming *arguendo* that S.A. does own and operate a single research and development facility in the United States, as Sköld contends (and S.A. denies, *see*S.A. Reply at 8), that fact is insufficient to render S.A. "essentially at home" in the United States. *See BP Chemicals,* 229 F.3d at 258–59 (declining to find sufficient contacts where the defendant Taiwanese corporation exported its products to the United States, held an ownership interest in a Delaware corporation, required its personnel to travel to the United States for training); *Toumazou,* ––– F.Supp.3d at ––––, 2014 WL 5034621, at \*6 (declining to find sufficient contacts where the plaintiff alleged that the defendant maintained a "West coast" and "NY" representative, participated in a conference in the "Southern United States," and attempted to intervene in an Indiana litigation); *Best Odds Corp.,* 2014 WL 2527145, at \*5 (declining to find sufficient contacts, even in light of the defendant's media kit, in which it self-described its "significant U.S. presence"); *Chavez v. Dole Food Co.,* 947 F.Supp.2d 438, 443 (D.Del.2013) (finding that a company's "ownership of a facility in Delaware, movement of its products through Delaware, and sale of its products in Delaware" did not render the company "at home" in Delaware). This Court concludes that it cannot exercise personal jurisdiction over S.A. under Rule 4(k)(2).

### 2. Forum Selection Clause

**[30]** Personal jurisdiction is, however, a waivable right, and litigants can give "express or implied consent to the personal jurisdiction of the court" through a "variety of legal arrangements," including forum selection clauses in contracts executed by the parties. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (quoting *Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964)) (internal quotation marks omitted).

And this is Sköld's final potential avenue for this Court to have personal jurisdiction over S.A.: the forum selection clause found in section 9.10 of the 2004 Agreement. The section reads, in relevant part:

> Each Party hereby submits itself for the purpose of this Agreement and any controversy arising hereunder to

the exclusive jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania, and any courts of appeal therefrom, and waives any objection on the grounds of lack of jurisdiction (including, without limitation, venue) to the exercise of such jurisdiction over it by any such courts.

Compl. Ex. A § 9.10. The Court must make two inquiries in determining the clause's applicability to its jurisdictional analysis here: first, whether the forum selection clause binds S.A. as a non-signatory third party, and, second, whether the claims Sköld alleges against S.A. arise out of the agreement and are thus governed by its terms.

#### a. *Whether the clause binds S.A.*

**[31]** **[32]** **[33]** Nonsignatory third parties who are "closely related" to a contractual relationship are bound by the forum selection clauses contained in the agreements underlying that relationship. *See, e.g., AAMCO Transmissions, Inc. v. Romano,* 42 F.Supp.3d 700, 708 (E.D.Pa.2014). In determining whether a nonsignatory is closely related, the Court must consider several factors, including the nonsignatory's ownership of the signatory, the relationship between the two parties, and whether the nonsignatory received a direct benefit from the agreement. *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA,* 779 F.3d 214, 219 (3d Cir.2015). Further, third parties "that should have foreseen governance by the clause may also be bound to it."*First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Balt., Inc.,* No. 11–5821, 2012 WL 1150131, at \*3 (E.D.Pa. Apr. 5, 2012).

**\*14** The Court may apply the forum selection clause to a nonsignatory if the totality of the circumstances makes it fair and reasonable to bind the nonsignatory to the clause because it is foreseeable to the nonsignatory that it would become involved in the contract dispute. *Lefkowitz v. McGraw–Hill Cos.,* No. 13–1661, 2013 WL 3061549, at \*3 (E.D.Pa. June 9, 2013); *also see Magi XXI, Inc. v. Stato della Citta del Vaticano,* 714 F.3d 714, 722 (2d Cir.2013) (recognizing that using "[a] literal approach to interpreting forum selection clauses" could undermine their purpose); *Adams v. Raintree Vacation Exch.,* 702 F.3d 436, 441 (7th Cir.2012) (reasoning that "[w]ere it not for judicial willingness in appropriate

circumstances to enforce forum selection clauses against [nonparties], such clauses often could easily be evaded").

 **[34]** Sköld alleges that S.A. is the owner of Inc., the successor-in-interest to Collagenex (the original signatory). Compl. ¶ 8. He also alleges that S.A. has received a direct benefit from the agreement: according to the Complaint, S.A. has "taken the fruits of the Sköld–Collagenex contract —the trademark and related goodwill associated with the Restoraderm® name—and used those assets in the marketing and sale of its Cetaphil® products."Pl.'s S.A. Opp'n at 8. *See Synthes, Inc. v. Emerge Med., Inc.,* 887 F.Supp.2d 598, 607 (E.D.Pa.2012) (recognizing that a forum selection clause also applies to a nonsignatory third party where the third party's *conduct* is closely related to the contractual relationship or the contractual dispute and where the third party enjoys financial benefit from the contract). He further alleges that S.A. has "registered the Restoraderm® name as a trademark in multiple jurisdictions and has sued to prevent other entities using the domain name Restoraderm.com." Pl.'s S.A. Opp'n at 8.

It is certainly plausible from the totality of the circumstances alleged that S.A. was closely related to the contractual relationship between Sköld and Inc. As a nonsignatory, it gained a benefit from the use of a trademark that was transferred to its subsidiary (as successor-in-interest) via a contract between the plaintiff and the subsidiary's predecessor-in-interest. Given its engagement in the marketing and sale of the Cetaphil/Restoraderm product, it also should reasonably have foreseen becoming involved in the relevant dispute over the Defendants' alleged refusal to revert the trademark back to Sköld after Inc. terminated the 2004 Agreement and after S.A. continued to register and use the very trademark at issue in marketing and selling its products. Thus, the Court finds it eminently fair and reasonable that the forum selection clause binds S.A. as a nonsignatory party.

S.A. argues that the law requires the non-signatory foresee "being sued *on the contract itself.*" S.A. Reply at 4 (emphasis in original). In support of this argument, it includes a truncated quote from *Burtch v. Security Pacific Bank Oregon* (*In re Mushroom Transportation Co.*), to the effect that to demonstrate the "foreseeability [ ] required to enforce such a clause against a nonparty to an agreement" a plaintiff must establish that the nonsignatory "should have foreseen governance *by the clause.*" 247 B.R. 395, 398 (E.D.Pa.2000) (emphasis in original). S.A. omits the portion

of the passage that undermines its position: the court in *Mushroom Transportation* stated that forum selection clauses are enforceable only against nonsignatories "**that are closely related to the contractual relationship** *or* that should have foreseen governance by the clause."247 B.R. at 398 (emphasis added) (citation and internal quotation marks omitted). The Court has already found that S.A. is closely related to the contractual relationship between Sköld and Inc. Furthermore, as the Court's discussion above makes plain, S.A. *should have* foreseen governance by the clause based on its relationship to the signatory parties and to the dispute at issue. S.A. was closely related to the Agreement through the ownership of its subsidiary Inc., it derived a direct benefit from the Agreement, and it was closely related to the dispute through its actions involving the Restoraderm trademark pre- and post-termination of the Agreement. Thus, the "totality of the circumstances makes it fair and reasonable" to bind the nonsignatory party to the forum selection clause. *Lefkowitz,* 2013 WL 3061549, at *3. The Court therefore finds the 2004 Agreement's forum selection clause binds S.A. as a non-signatory third party.

 **\*15** This is only the first part of the analysis, however; the Court yet may be unable to enforce the forum selection clause and exercise jurisdiction over S.A. if the claims Sköld alleges do not "arise under" the 2004 Agreement.

### b. *Whether the clause applies to Sköld's claims against S.A.*

 **[35]** **[36]** Forum selection clauses are treated as ordinary contract provisions and are subject to the ordinary rules of contract interpretation. *See M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). First, a court must determine whether the clause states the parties' intentions unambiguously. "To be 'unambiguous,' a contract clause must be reasonably capable of only one construction."*Otto v. Erie Ins. Exch.,* 11 F.Supp.3d 482, 483 (E.D.Pa.2014). The only reasonable construction of the clause in the 2004 Agreement ("Each Party hereby submits itself for the purpose of this Agreement and any controversy arising hereunder to the exclusive jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania ....") is that any dispute between the parties arising under the Agreement must be litigated in Pennsylvania. This clause on its face is unambiguous. *See Health Robotics, LLC v. Bennett,* No. 09–0627, 2009 WL 1708067, at *3 (E.D.Pa. June 16, 2009). Having so found, this Court must now determine

whether Sköld's claims "arise out of the Agreement" and are thus covered by the terms of the forum selection clause. *Id.; see also Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 692 (8th Cir.1997) (stating that before a court can consider enforcing a forum selection clause, "it must first decide whether the clause applies to the type of claims asserted in the lawsuit"). [12]

The Third Circuit's decision in *Crescent International v. Avatar Communities, Inc.,* 857 F.2d 943 (3d Cir.1988) (per curiam), is instructive on this question. The issue in *Crescent* involved interpretation of a forum selection clause in an agreement between Crescent, a Pennsylvania-based corporation, and Avatar, a Florida-based corporation, under which Crescent sold real estate owned by Avatar in return for commissions. The agreement chose Florida law and provided that "any litigation upon any of [its] terms ... shall be maintained" in a state or federal court in Miami, Florida. *Id.* at 944. Crescent, however, filed an action in the Eastern District of Pennsylvania alleging breach of contract and several related, albeit noncontractual, claims. Avatar moved to dismiss, arguing that the forum selection clause applied to noncontractual as well as contractual claims and, as such, the action was in the wrong forum. The district court agreed and dismissed the suit.

Crescent argued on appeal that the forum selection clause was narrowly drafted and could not apply to noncontractual claims. The Third Circuit, however, determined that the pleading of alternate noncontractual theories does not alone allow a party to avoid enforcement of a forum selection clause "if the claims asserted arise out of the contractual relation and implicate the contract's terms." *Id.* at 945. The court held that the district court correctly construed the forum selection clause, concluding that "[a]lthough only one of Crescent's claims is based on a breach of contract theory, all of them involve allegations arising out of the agreement implicating its terms." *Id.; see also Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.1983) ("[W]here the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain."), *overruled on other grounds by Lauro Lines s.r.l. v. Chasser,* 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989).

**\*16** Several decisions involving similarly worded forum selection clauses in similar factual scenarios from courts in other jurisdictions are also helpful in resolving this question.

In *Omron Healthcare, Inc. v. Maclaren Exports Ltd.,* 28 F.3d 600 (7th Cir.1994), the Seventh Circuit expressed its broad view on the applicability of forum selection clauses to claims, holding that "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement" for purposes of enforcing such clauses. *Id.* at 603. In *Laserdynamics, Inc. v. Acer America Corp.,* 209 F.R.D. 388 (S.D.Tex.2002), the Southern District of Texas held that important to the forum selection clause analysis was a determination of the "spirit" of the underlying agreement, as well as the subject matter comprising the agreement's "nucleus." *Id.* at 391. And finally, the Southern District of New York, in finding that a plaintiff's action "clear[ly]" arose pursuant to the contract and enforcing a forum selection clause, looked to the fact that the plaintiff's "entire business relation with the defendant ... stemmed from the contract," and, as a result "[a]ny determination with respect to plaintiff's claims will require consideration of the contract and of the parties' respective rights pursuant to the contract."*YWCA v. HMC Entm't, Inc.,* No. 91–7943, 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992).

**[37]** Taking into account the above analysis, the Court finds that the forum selection clause in the 2004 Agreement applies to Sköld's claims against S.A. Those claims arise out of the 2004 Agreement and implicate its terms. *See Crescent,* 857 F.2d at 945. In fact, Sköld's "entire business relation" with the Galderma entities with respect to the Restoraderm trademark stems from the 2004 Agreement. *YWCA,* 1992 WL 279361, at *4. Thus, determination of Sköld's claims implicate the contract's terms and will require consideration of the contract and the parties' respective rights pursuant to the contract. *See id.*The 2004 Agreement is not "merely one of the final manifestations" of the "ongoing business relationships between the parties"—a situation in which forum selection clauses have been held inapplicable to noncontractual claims.*Gen. Envtl. Sci. Corp. v. Horsfall,* 753 F.Supp. 664, 667–68 (N.D.Ohio 1990). Quite the contrary, the 2004 Agreement was the final manifestation of the relationship between Sköld and Collagenex and the *only* manifestation of a relationship between Sköld and any Galderma entity.

The "nucleus" of the 2004 Agreement is the transfer of the Restoraderm trademark, and the "spirit of the ... agreement contemplate[d] the rights and duties of the parties" concerning the Restoraderm trademark. *Laserdynamics,* 209 F.R.D. at 389. Accordingly, if any of the rights or obligations in the 2004 Agreement were "threatened or impaired by

an act of the parties or their privities, that act gives rise to a dispute under the agreement."*Id.* Sköld's allegations that the acts of the Defendants, in declining to revert the Restoraderm intellectual property to him upon termination of the 2004 Agreement and continuing to market and sell products bearing the Restoraderm mark, are the nucleus of his claims that his rights under the 2004 Agreement have been impaired. S.A. should be expected to answer to those claims.

 **\*17** At bottom, because "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement" for purposes of enforcing a forum selection clause, *Omron,* 28 F.3d at 603, the Court holds that S.A. cannot avoid enforcement of the forum selection clause because the non-contractual claims asserted "arise out of the contractual relation and implicate the contract's terms."*Crescent,* 857 F.2d at 945. When the substance of the plaintiff's claims, stripped of their labels, fall within the scope of the forum selection clause, the opposing party cannot avoid it. The dispute between Sköld and S.A. arises out of the 2004 Agreement such that the forum selection clause is applicable against S.A. on all claims Sköld has alleged.

The exercise of personal jurisdiction over S.A. is proper. [13] The motion to dismiss for lack of personal jurisdiction shall be denied.

An appropriate Order follows.

Dated: March 20, 2015.

### *REVISED ORDER*

**AND NOW**, this 17th day of April, 2015, upon consideration of Defendants Galderma Laboratories, L.P. and Galderma Laboratories, Inc.'s Motion to Dismiss and Motion to Stay Pending the Outcome of the Administrative Proceeding [ECF No. 22], Plaintiff Thomas Sköld's Response in Opposition thereto [ECF No. 29], and Galderma L.P. and Galderma Inc.'s

Reply [ECF No. 33]; Defendant Galderma S.A.'s Motion to Dismiss and Motion to Stay Pending the Outcome of the Administrative Proceeding [ECF No. 36], the Plaintiff's Response in Opposition thereto [ECF No. 38], and Galderma S.A.'s Reply [ECF No. 46]; the parties' supplemental briefing on the Plaintiff's unfair competition claim [ECF Nos. 54 & 55]; and oral argument on March 19, 2015, and for the reasons provided in the Court's revised opinion of April 17, 2015 [ECF No. 56], **IT IS ORDERED** that:

(1) Defendant Galderma S.A.'s motion to dismiss the breach of contract claim in Count Five is **GRANTED**; Count Five of the Complaint shall be **DISMISSED WITH PREJUDICE** as to Defendant Galderma S.A.;

(2) Defendants' Galderma Laboratories, Inc.'s motion to dismiss the unjust enrichment claim in Count Six is **GRANTED**; Count Six of the Complaint shall be **DISMISSED WITH PREJUDICE** as to Defendant Galderma Laboratories, Inc.;

(3) Defendants' motions to dismiss the unfair competition claim in Court Four are **GRANTED IN PART**; to the extent the Plaintiff bases his unfair competition claim on the Defendants' alleged failure to revert the trademark to him based on the terms of the parties' agreement, the claim is **DISMISSED WITH PREJUDICE** as to all Defendants on those grounds; the motions to dismiss this claim are otherwise **DENIED**;

(4) Defendants' motions to dismiss for failure to state a claim are otherwise **DENIED**;

(5) Defendants' motions to stay are **DENIED AS MOOT**; and

(6) Defendant Galderma S.A.'s motion to dismiss for lack of personal jurisdiction is **DENIED**.

**All Citations**

--- F.Supp.3d ----, 2015 WL 1740032

### Footnotes

1   Galderma S.A. was served after Galderma Laboratories, L.P. and Galderma Laboratories, Inc. had filed their motion to dismiss. Galderma S.A. then filed its own motion to dismiss, incorporating the arguments contained in L.P. and Inc.'s motion to dismiss Sköld's state-law claims and also arguing separately that this Court cannot exercise either general or specific personal jurisdiction over it. *See* S.A. Mot. to Dismiss at 11. Hereinafter, any reference in this Opinion to an argument made by "the Defendants" collectively will be used in the context of an argument asserted by Galderma

Laboratories, L.P. and Galderma Laboratories, Inc. in their Motion to Dismiss that was later incorporated by Galderma S.A. in its Motion to Dismiss.

Both cases the Defendants cite ostensibly in support of their argument are inapposite, as both involved parties to an agreement forcing other parties to that agreement to engage in the binding arbitration to which they assented at the time of contracting. *See Seus v. John Nuveen & Co.,* 146 F.3d 175, 177 (3d Cir.1998) ("I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ...."), *overruled on other grounds by Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000); *Halide Grp., Inc. v. Hyosung Corp.,* No. 10–2392, 2010 WL 4456928, at \*2 (E.D.Pa. Nov. 8, 2010) (stating that the relevant agreement provided any dispute or claim that could not be settled by mandatory "best efforts" negotiation "*shall* be finally resolved by arbitration in the defendant's country" (emphasis added)).

As an alternative to dismissal, the Defendants request that the Court stay this action and order that Sköld take the steps outlined in the dispute resolution clause before proceeding here. L.P./Inc. Mot. to Dismiss at 13 n. 5. In support of this argument, they cite *Mendez v. Puerto Rican International Cos.,* 553 F.3d 709 (3d Cir.2009), in which the Third Circuit affirmed the district court's grant of a stay pending arbitration. While it is true that Section 3 of the Arbitration Act permits a district court to stay "*any* suit ... brought in any of the courts of the United States upon *any* issue referable to arbitration," 9 U.S.C. § 3 (2012) (emphasis added), and while it is true that this section is drafted broadly enough "to permit the stay of litigation between nonarbitrating parties as long as that lawsuit is based on issues referable to arbitration under" an agreement governed by the Arbitration Act, *Contracting Nw., Inc. v. City of Fredericksburg,* 713 F.2d 382, 387 (8th Cir.1983), the Defendants have not provided any support for the argument that these principles apply to nonparties seeking stays pending the outcome of good-faith negotiations.

"The power to stay proceedings," and, as a corollary, the power to decline to stay proceedings, "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936). The 2004 Agreement was allegedly breached in 2010, and Sköld has already been involved in four years of litigation with one Defendant in the TTAB action since then (which, as stated above, has already been stayed). Moreover, all parties in the present action have been involved in this litigation for over half a year. If the parties have been unable to reach some common ground through all that time, the Court finds it unlikely that imposing a stay to force good-faith negotiations and perhaps a separate mediation will be anything but a waste of the parties' (and the Court's) time, energy, and resources. For these reasons, the Court will not stay this action to impose the 2004 Agreement's alternative dispute resolution clause.

The Court finds no merit in the Defendants' argument that the breach accrued on the day Inc. terminated the 2004 Agreement. Section 8.2 of the Agreement expressly provided that Collagenex could terminate at any time after March 31, 2007. *See* Compl. Ex. A. Construing all reasonable inferences in the Plaintiff's favor, the Agreement was unclear by what date Inc. was required to transfer assets to Sköld after electing to terminate the Agreement. Any arguments to the contrary involve fact-specific issues of contract interpretation not appropriate for determination at this stage of the proceedings.

The Defendants also urged the Court at oral argument to consider the fact of the Plaintiff's filing of the TTAB petition as evidence that he was aware the contract was breached prior to September 14, 2010. While the Complaint mentions that there was a TTAB proceeding pending at the time of filing, *see* Compl. ¶ 37, the date of filing is not included and thus the Court need not consider it in ruling on whether to grant a motion to dismiss the breach of contract claim on timeliness grounds, which, again, is only permissible "[i]f the bar is ... apparent on the face of the complaint." *Schmidt,* 770 F.3d at 249.

As the Court has denied the Defendants' motion to dismiss on timeliness on the face of the Complaint, it declines to address Sköld's equitable tolling argument.

S.A. argues (but only in passing) in its Reply that L.P. likewise is not a party to the contract and should likewise not be called to defend against the breach claims. S.A. Reply at 2. This is not an argument that was raised by L.P. in its briefing, however, and the Court thus declines to address such an argument now. *See Carpenter v. Vaughn,* 888 F.Supp. 635, 648 (M.D.Pa.1994) ("A litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority ... forfeits the point.").

The Defendants also argue that the unjust enrichment claim is untimely because the Complaint was filed beyond the four-year statute of limitations. L.P./Inc. Mot. to Dismiss at 6–8. Sköld repeats the arguments he raised in the breach of contract context. Pl.'s L.P./Inc. Opp'n at 10–12. The Court finds, for the purposes of this motion to dismiss, that the unjust enrichment claim similarly is not barred by the statute of limitations.

At the Preliminary Pretrial Conference held on March 17, 2015, the Court ordered the parties to submit supplemental briefing on Sköld's unfair competition claim in light of the Pennsylvania Supreme Court's recent decision in *Bruno. See* ECF No. 48. That briefing having been provided, the Court will now rule on this claim.

*See, e.g., Williams v. Hilton Group PLC,* 93 Fed.Appx. 384, 385 (3d Cir.2004); *Vives v. Rodriguez,* 849 F.Supp.2d 507, 516 (E.D.Pa.2012); *PPG Indus., Inc. v. Generon IGS, Inc.,* 760 F.Supp.2d 520, 527 n. 1 (W.D.Pa.2011); *Sunburst Paper, LLC v. Keating Fibre Int'l,* No. 06–3957, 2006 WL 3097771, at *2 n. 2 (E.D.Pa. Oct. 30, 2006); *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.,* 123 F.Supp.2d 826, 833–34 (E.D.Pa.2000).

The Court has already addressed the merits of the statute of limitations argument and denied the Defendants' motion to dismiss on that ground. *See supra* subsection IV.C.1. It will not reiterate the discussion here.

At the outset, the Court recognizes the restrictive "arising under" language present in the 2004 Agreement's forum selection clause. Several courts have held that the term "relating to" in a clause casts a wider net than the term "arising out of" or "arising under," and thus drawing analogies to other cases "is useful only to the extent those other cases address contact language that is the same or substantially similar."*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1075 (3d Cir.1997) (Alito, J.); *see also id.* at 1074–75 (interpreting the term "arising in relation to" to mean that the dispute has some "logical or causal connection to the contract"); *Vt. Pure Holdings Ltd. v. Descartes Sys. Grp., Inc.,* 140 F.Supp.2d 331, 335 (D.Vt.2001) ("[T]he term 'relating to' has a much broader meaning than 'arising out of.' "). As a result, the analogous cases cited by the Court in this Section all involve forum selection clauses containing "arising out of" language.

In its Reply brief and at oral argument, S.A. advanced the argument that "even if the 2004 Agreement's forum selection clause were somehow to apply to Galderma S.A., Sköld ignores that he still needs to meet the constitutional minimum contacts test...." S.A. Reply at 4. This argument is meritless. The forum selection clause is one of the "variety of legal arrangements" through which parties impliedly consent to the personal jurisdiction of a particular court. *See Insurance Corp. of Ireland,* 456 U.S. at 703, 102 S.Ct. 2099. Mandating that a plaintiff meet the constitutional minimum contacts test for personal jurisdiction as a prerequisite to enforcement of a forum selection clause would utterly defeat the purpose of forum selection clauses. Indeed, "Pennsylvania law provides that were a party has consented to personal jurisdiction via a contractual provision, the minimum contacts due process analysis usually employed to analyze jurisdiction on a Rule 12(b)(2) motion to dismiss is not appropriate."*Synthes,* 887 F.Supp.2d at 606 n. 4 (internal punctuation omitted).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3451675
Only the Westlaw citation is currently available.
Court of Appeals of Texas,
Dallas.

Jeffrey Leibovitz and Sequoia
Frankford Springs 23, L.P., Appellants
v.
Sequoia Real Estate Holdings, L.P., Appellee

No. 05–14–00125–CV | 
Opinion Filed May 29, 2015

**Synopsis**
**Background:** Following parties' settlement of underlying lawsuits stemming from investment offering concerning apartment complex, business that created investment offering sued investor, who had invested tax-deferred money in complex as tenant in common pursuant to business's investment offering, for breach of contract and seeking injunction barring investor from filing complaint against investor with Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) and from communicating with other investors regarding complaint. Investor filed affirmative defenses to business's claims. The 116th Judicial District Court, Dallas County, Tonya Parker, J., granted injunction, granted business summary judgment on investor's affirmative defenses, and awarded business damages and attorney fees. Investor appealed.

**Holdings:** The Court of Appeals, Myers, J., held that:

[1] investor waived reliance in settlement agreement, precluding affirmative defense of fraud;

[2] enforcement of confidentiality provision of settlement agreement would not have made investor guilty of misprision of felony;

[3] as a matter of apparent first impression, investor's statement in agreement that he signed agreement without any duress was enforceable, precluding economic duress defense.

[4] injunction was properly granted against limited partnership created by investor to purchase and hold investment; and

[5] award of attorney fees in favor of business was proper.

Affirmed.

West Headnotes (38)

[1]  **Contracts**
     ⬤ Reliance on representation
     Reliance by the party asserting fraud is element of breach of contract defenses of fraudulent inducement, fraudulent concealment, and fraud by nondisclosure.

     1 Cases that cite this headnote

[2]  **Contracts**
     ⬤ Fraud and Misrepresentation
     In general, contract is subject to avoidance on ground of fraudulent inducement; however, in some situations, parties can agree in contract to waive right to assert fraud as a defense to breach of the contract by expressly disclaiming reliance.

     1 Cases that cite this headnote

[3]  **Contracts**
     ⬤ Fraud and Misrepresentation
     Factors most relevant to whether there was a waiver of reliance precluding affirmative defense of fraud to breach of contract claim are whether: (1) terms of contract were negotiated, rather than boilerplate, and during negotiations parties specifically discussed issue which has become topic of subsequent dispute; (2) complaining party was represented by counsel; (3) parties dealt with each other in an arm's length transaction; (4) parties were knowledgeable in business matters;

and (5) release and non-reliance language was clear.

2 Cases that cite this headnote

[4] **Compromise and Settlement**
    🔗 Fraud or duress

Fact that an agreement is a once and for all settlement constitutes factor for rejecting fraud-based affirmative defenses to breach of contract claims.

Cases that cite this headnote

[5] **Compromise and Settlement**
    🔗 Fraud or duress

Investor and business that created investment offering specifically discussed issue that became topic of subsequent dispute in business's breach of contract action against investor during parties' prior settlement negotiations pertaining to underlying actions arising out of investment offering, as factor used to determine whether investor waived reliance, as element of fraud, in settlement agreement, thereby precluding investor's affirmative defense of fraud to breach of contract claim; parties disclaimed reliance with respect to all decisions being made during settlement negotiations, including decisions that parties released one another from any and all presently existing claims relating to dispute, investment offering, or any other matter, and even if it were required that parties had to have discussed facts of subsequent lawsuit, facts discussed by parties during negotiation of settlement agreement were closely related to facts alleged in breach of contract suit.

1 Cases that cite this headnote

[6] **Compromise and Settlement**
    🔗 Fraud or duress

Investor, who invested tax-deferred money in apartment complex as tenant in common pursuant to investment offering, was represented by counsel during settlement negotiations of prior actions arising out of investment offering, as factor weighing in favor of determination that waiver-of-reliance provision of settlement agreement precluded investor's affirmative defense of fraud to subsequent breach of contract claim asserted by business that created investment opportunity, stemming from investor's statement that he would file complaints against business if investor was not reimbursed by business for alleged losses he suffered through investment; even if investor signed agreement without consulting attorney, agreement stated that investor had opportunity to review agreement with independent legal counsel, and attorney had access to attorneys at time agreement was signed.

Cases that cite this headnote

[7] **Compromise and Settlement**
    🔗 Fraud or duress

Settlement agreement pertaining to parties' prior actions involving investment offering concerning apartment complex was an arm's-length transaction, as factor weighing in favor of determination that waiver-of-reliance provision of agreement precluded investor's affirmative defense of fraud to subsequent breach of contract claim asserted by business that created investment opportunity; there were attorneys on all sides at time of agreement, and there were negotiations leading to agreement.

Cases that cite this headnote

[8] **Compromise and Settlement**
    🔗 Fraud or duress

Parties to settlement agreement pertaining to prior actions involving investment offering concerning apartment complex

were knowledgeable in business matters, as factor weighing in favor of determination that waiver-of-reliance provision of agreement precluded investor's affirmative defense of fraud to subsequent breach of contract claim asserted by business that created investment opportunity; agreement stated parties were sophisticated, in order to invest in offering, investor was required to be an accredited investor, and prior to investing in offering, investor was required to state in writing that he had such knowledge and experience in financial and business matters that he was capable of evaluating merits and risks of investment and had ability to protect his own interests concerning investment. 17 C.F.R. § 230.215(e), (f), (h).

Cases that cite this headnote

[9] **Compromise and Settlement**
&#9756; Fraud or duress

**Release**
&#9756; Fraud and Misrepresentation

Language of release and disclaimer of reliance contained in parties settlement agreement pertaining to prior actions involving investment offering concerning apartment complex was clear, as factor weighing in favor of determination that disclaimer-of-reliance provision of agreement precluded investor's affirmative defense of fraud to subsequent breach of contract claim asserted by business that created investment opportunity; parties did not rely on any representation by any other party when they gave up any rights they might have had regarding complaint about another party that existed on effective date of agreement, regardless of whether complaining party knew of complaint's existence, and concerning any matter whatsoever, from beginning of time to present.

1 Cases that cite this headnote

[10] **Compromise and Settlement**
&#9756; Fraud or duress

**Release**
&#9756; Fraud and Misrepresentation

Parties' settlement agreement pertaining to prior actions involving investment offering concerning apartment complex was once and for all settlement, as factor weighing in favor of rejecting fraud-based affirmative defenses asserted by investor to breach of contract claims filed by business that created investment offering; agreement stated that it was intended to extinguish, without limitation, any and all claims that parties did not know or suspect to exist at time agreement was executed, that it was express intention of parties that releases would be construed as broadly as possible, and that parties did not intend to except any entity or claim from releases, except breaches of agreement.

Cases that cite this headnote

[11] **Compromise and Settlement**
&#9756; Construction of Agreement

**Obstructing Justice**
&#9756; Misprision of a Felony

Enforcement of confidentiality provision of settlement agreement between investor in apartment complex and business that created investment offering concerning complex, pertaining to underlying lawsuits stemming from investment offering, would not have prevented investor from reporting business's felonious actives, such that enforcement of confidentiality provision would not have made investor guilty of misprision of felony; to extent confidentiality provision prohibited party from reporting another party's illegal activities, those prohibitions were nullified by statement that agreement did not prohibit party from

disclosing information as required by law. 18 U.S.C.A. § 4.

Cases that cite this headnote

[12] **Obstructing Justice**
&#11088; Misprision of a Felony

Misprision of felony has four elements: (1) felony was committed; (2) accused had knowledge of felony; (3) accused failed to notify authorities; and (4) accused took an affirmative step to conceal crime. 18 U.S.C.A. § 4.

Cases that cite this headnote

[13] **Contracts**
&#11088; Effect of Illegality

Contract to do a thing which cannot be performed without violation of law is void.

Cases that cite this headnote

[14] **Contracts**
&#11088; Effect of Illegality

When illegality does not appear on the face of the contract, it will not be held illegal and thus void unless facts showing its illegality are before the court.

Cases that cite this headnote

[15] **Contracts**
&#11088; Duress

Economic duress is defense to enforcement of contract.

Cases that cite this headnote

[16] **Contracts**
&#11088; Duress

**Contracts**
&#11088; Threats in general

Elements of economic duress, as defense to enforce contract, are: (1) threat to do something that threatening party has

no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) restraint is imminent and such as to destroy free agency without present means of protection.

Cases that cite this headnote

[17] **Contracts**
&#11088; Questions for jury

Whether the conduct or acts of party accused constitute economic duress, as defense to contract enforcement, is a question of law, but whether duress exists in a particular situation is a question of fact dependent upon the circumstances surrounding the situation, including mental effect on party claiming duress.

Cases that cite this headnote

[18] **Compromise and Settlement**
&#11088; Fraud or duress

Investor's statement in prior settlement agreement with business that created investment offering that investor signed agreement voluntarily and without any duress or undue influence was enforceable, precluding investor's economic duress defense to enforceability of agreement in subsequent action brought by business for breach of settlement agreement; agreement was negotiated at arm's length by sophisticated parties that were represented by counsel or had opportunity and means to obtain representation, disclaimer of duress was clear, and parties intended for agreement to create end to all disputes between them.

Cases that cite this headnote

[19] **Injunction**
&#11088; Grounds in general; multiple factors

To be entitled to permanent injunction, plaintiff must plead and prove: (1) wrongful act; (2) imminent harm; (3)

irreparable injury; and (4) no adequate remedy at law.

Cases that cite this headnote

**[20]**   **Appeal and Error**
   🗝 Injunction
   **Appeal and Error**
   🗝 Refusing injunction

Court of Appeals reviews trial court's grant or refusal of permanent injunction to determine whether it clearly abused its discretion.

Cases that cite this headnote

**[21]**   **Appeal and Error**
   🗝 Abuse of discretion

Under abuse of discretion standard, legal and factual sufficiency of evidence are not independent grounds for reversal, but sufficiency of the evidence is a relevant factor in determining whether trial court had sufficient evidence to exercise its discretion.

Cases that cite this headnote

**[22]**   **Appeal and Error**
   🗝 Verdict
   **Appeal and Error**
   🗝 Extent of Review

When reviewing the legal sufficiency of the evidence to support finding, Court of Appeals considers all the evidence, crediting evidence in support of verdict if reasonable jurors could, and disregarding evidence contrary to verdict unless reasonable jurors could not.

Cases that cite this headnote

**[23]**   **Appeal and Error**
   🗝 Sufficiency of Evidence in Support

When reviewing the legal sufficiency of the evidence to support finding, if there is more than a scintilla of evidence to

support finding, the evidence is legally sufficient.

Cases that cite this headnote

**[24]**   **Evidence**
   🗝 Sufficiency to support verdict or finding

When evidence offered to prove vital fact is so weak as to do no more than create mere surmise or suspicion of its existence, evidence is no more than a scintilla and, in legal effect, is no evidence.

Cases that cite this headnote

**[25]**   **Evidence**
   🗝 Sufficiency to support verdict or finding

If evidence furnishes reasonable basis for differing conclusions by reasonable minds as to existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact.

Cases that cite this headnote

**[26]**   **Appeal and Error**
   🗝 Extent of Review
   **Appeal and Error**
   🗝 Clear or palpable weight or preponderance

When reviewing factual sufficiency of evidence, Court of Appeals examines all evidence and sets aside finding only if it is so contrary to evidence as to be clearly wrong and unjust.

Cases that cite this headnote

**[27]**   **Injunction**
   🗝 Breaches in general

Limited partnership created by investor to purchase and hold investment in apartment complex performed or threatened to perform wrongful act against business that created investment

offering, as required for business to be entitled to permanent injunction against partnership in business's action for breach of parties' prior settlement agreement pertaining to underlying actions stemming from investment offering; investor was manager of corporation that was limited partnership's general partner, and investor performed or threatened to perform wrongful act against business.

Cases that cite this headnote

**[28]    Injunction**
     Breaches in general

Inclusion of limited partnership created by investor to purchase and hold investment in apartment complex in injunction granted in suit filed against investor by business that created investment offering for breach of parties' prior settlement agreement pertaining to underlying actions stemming from investment offering did not render injunction overly broad, despite contention that limited partnership was not in active concert or participation with investor; investor was manager of limited partnership's general partner, and investor's actions in breach of agreement were not made solely on his own behalf. Tex. R. Civ. P. 683.

Cases that cite this headnote

**[29]    Injunction**
     Breaches in general

Investor's threat to send copies of complaint regarding investment offering created by business to other investors involved in business's investment offerings would have, if carried out, constituted irreparable injury, as required for business to be entitled to permanent injunction against investor and limited partnership created by investor to purchase and hold investment

in business's subsequent suit for breach of parties' prior settlement agreement pertaining to underlying actions stemming from investment offering; threat would have caused business injury that was either not able to be compensated by damages or was not able to be measured by any certain monetary standard.

Cases that cite this headnote

**[30]    Injunction**
     Irreparable injury

Injury is "irreparable injury," as required for party to be entitled to injunction, if injured party cannot be compensated in damages or if damages cannot be measured by any certain monetary standard.

Cases that cite this headnote

**[31]    Injunction**
     Adequacy of remedy at law

Existing legal remedy is adequate, such that party would not be entitled to permanent injunction, if it is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief.

Cases that cite this headnote

**[32]    Injunction**
     Breaches in general

There was legally and factually sufficient evidence to support trial court's finding, in granting injunction against investor and limited partnership created to purchase and hold investment in action filed by business that created investment offerings for breach of parties' prior settlement agreement pertaining to prior actions stemming from investment offering, that business had no adequate remedy at law; testimony that it would take significant time to repair damage from investor

carrying out threat to send complaint regarding investment to other investors, in breach of agreement, showed that enjoining limited partnership and investor from contacting other investors before investor carried out threat was a more efficient remedy than any award of damages.

Cases that cite this headnote

[33] **Constitutional Law**
    👉 Injunctions and restraining orders
**Injunction**
    👉 Breaches in general

Granting request for injunction by business that created investment offerings against investor and limited partnership created by investor to purchase and hold investment was not illegal prior restraint on speech in business's action against investor for breach of parties' prior settlement agreement pertaining to underlying actions stemming from investment offering, even though investor was enjoined from sending additional complaint against business related to investment to other investors; investor agreed not to engage in certain actions, including disparagement of other parties, in settlement agreement, investor agreed that violation of that provision of agreement was enforceable through injunctive relief, and injunction was narrowly tailored and did nothing more than enforce restraint on speech investor agreed to in settlement agreement. Tex. Const. art. 1, § 8.

Cases that cite this headnote

[34] **Trial**
    👉 Sufficiency as to Subject-Matter
**Trial**
    👉 Matters of law
**Trial**
    👉 Application of Instructions to Case

Valid jury instruction assists jury, accurately states the law, and finds support in pleadings and evidence.

Cases that cite this headnote

[35] **Appeal and Error**
    👉 Conduct of trial or hearing in general

Court of Appeals does not disturb trial court's decision on which instructions to submit to jury absent abuse of discretion.

Cases that cite this headnote

[36] **Damages**
    👉 Mode of estimating damages in general

"Benefit-of-the-bargain standard" for measuring damages is the difference in value given and value received.

Cases that cite this headnote

[37] **Appeal and Error**
    👉 Instructions

Investor waived argument for review that evidence was insufficient to support damages question instructing jury to measure damages in favor of business that created investment offering under benefit-of-the-bargain standard in business's action against investor for breach of settlement agreement pertaining to underlying actions stemming from investment offering, since investor did not object to jury instruction on such ground in trial court. Tex. R. Civ. P. 274.

Cases that cite this headnote

[38] **Costs**
    👉 Prevailing party

Award of attorney fees in favor of business that created investment offering was proper in action against investor for breach of parties prior settlement agreement pertaining to underlying actions stemming from investment

offering; settlement agreement provided for attorney fees, requiring that substantially non-prevailing party bear any fees and expenses incurred by substantially prevailing party, and business was clearly and substantially prevailing party.

Cases that cite this headnote

On Appeal from the 116th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC–11–14357–F, Tonya Parker, Judge

**Attorneys and Law Firms**

Charles R. Nichols, Garland, TX, for appellants.

Edward Jason Dennis, Samuel Hardy IV, Dallas, TX, for appellees.

Before Justices Myers, Evans, and O'Neill [1]

**OPINION**

Opinion by Justice Myers

**\*1** Jeffrey Leibovitz and Sequoia Frankford Springs 23, L.P. (SFS 23) appeal the trial court's judgment enjoining them from breaching a settlement agreement, awarding Sequoia Real Estate Holdings, L.P. damages of $2,500 against Leibovitz for breach of the settlement agreement, and awarding Holdings attorney's fees of $200,000 against both appellants. Appellants bring thirteen issues on appeal contending the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses, imposing an injunction on appellants, awarding Holdings damages, and awarding Holdings attorney's fees against SFS 23. We affirm the trial court's judgment.

**BACKGROUND**

In 2006, Leibovitz sold investment property in California. The law permitted Leibovitz to defer

the taxes due from that sale by investing the proceeds in another investment. Holdings, which was operated by Donald Behunin, created real-estate investment offerings, including Sequoia Frankford Springs, an investment offering concerning an apartment complex in Dallas. [2] In the Private Placement Memorandum (essentially a prospectus) for the Sequoia Frankford Springs investment, Holdings offered qualified investors [3] the opportunity to purchase tenancies in common in the complex and promised a 6.5 percent annual return. Leibovitz invested the tax-deferred money in Frankford Springs as a tenant in common with twenty-seven other tenant-in-common investors. As required by the Private Placement Memorandum, Leibovitz created the limited partnership SFS 23 to purchase and hold the investment.

**\*2** The structure of the investment and what happened to the money is complex involving many entities including the name "Sequoia," and the structure is not entirely clear from the record. However, it appears the Frankford Springs apartment complex was purchased in 2006 by Sequoia Frankford Springs, L.P. The twenty-eight tenant-in-common investors, through Sequoia Frankford Springs, L.P., paid cash (Leibovitz testified he invested cash of $378,781.50), executed a nonrecourse note for $21,400,000, and granted the lender a deed of trust to secure the note. According to the Private Placement Memorandum, the money and debt provided by the investors was to be used to purchase the property, create certain reserves, and pay expenses described in the Private Placement Memorandum. The investors signed a master lease agreement with Sequoia Frankford Springs LeaseCo, LP (LeaseCo) as Master Tenant, which was to pay rent to the investors of $789,653 per year, which would provide a return of over 6.5 percent to the investors on their cash investment. LeaseCo would manage the property through its contractor, Sequoia Real Estate Management, L.P., and sublease the units to the individuals who would actually reside in the apartments and pay rent. LeaseCo would pay Real Estate Management four percent of the gross revenues earned by the apartment complex. Behunin was the president of Holdings; the president, secretary, treasurer, and sole manager of LeaseCo's general

Giant Eagle's Letter Brief

partner; and the chief executive and chief financial officer of Sequoia Real Estate Management.

The investors in Frankford Springs received only 4.64 percent return on investment instead of the promised 6.5 percent. In 2009, LeaseCo missed some note payments to the lender. On February 10, 2010, the lender notified LeaseCo that the note was in default. On June 4, 2010, the lender notified LeaseCo that the loan was accelerated and the property posted for foreclosure. When the investors learned Behunin and LeaseCo had stopped paying the note and that the property was facing foreclosure, some of them, including Leibovitz, questioned Behunin and the Sequoia entities' management of the project, including why the money generated by the property was not used to pay the note. Behunin sued Leibovitz and other investors for libel and business disparagement.

Another group of investors, not including Leibovitz, sued Behunin and the Sequoia entities operating Frankford Springs. In this lawsuit, the investors alleged that Behunin and the Sequoia entities committed fraud by failing to provide necessary information in the Private Placement Memorandum, misrepresented the expected return on investment at 6.5 percent when the appraisal of the property showed only a 4.64 percent return was possible and that the property would lose money, and misrepresented the condition of the property as being satisfactory when the property required $508,000 of capital improvements in the first three and one-half years of operation. The investors also alleged Behunin and the Sequoia entities breached the agreement with the investors to make the payments on the note by failing to make three of those payments and then further breached the agreement by failing to forward the lender's notice of default to the investors. The investors alleged Behunin and the Sequoia entities converted about $128,000 of the property's funds.

For almost a year, negotiations continued with the lender and amongst the parties to the two lawsuits. Effective March 31, 2011, the bank agreed to reinstate the loan, and the parties to the lawsuits and all the investors and business entities involved in Frankford Springs entered into a settlement agreement. Before reinstating the loan, however, the lender required the payment of about $1,256,400 in past due principal,

interest, escrow deposit, and fees. To pay this amount, Holdings made a "cash call" to the investors to pay their pro-rata share of the amount. Sequoia Frankford Springs, L.P, deeded the property to the investors. In the "Settlement and Mutual Release Agreement" (the Agreement), the parties agreed to dismiss the two pending lawsuits against one another. The Agreement provided for the distribution of the funds from the cash call. The Agreement also terminated the Master Lease with LeaseCo and provided that a new management group, unaffiliated with Behunin and the Sequoia entities, would manage the property under a new asset management agreement.[4] The Agreement contained a "Confidentiality and Non–Disparagement" provision in which the parties agreed not to disclose the terms and conditions of the Agreement "to any individual or entity." The provision stated that the parties "further agree not to make any derogatory, disparaging and/or untruthful statements about any other party to any person or entity." The Agreement stated that violation of this provision would be a breach of the Agreement and would entitle the non-breaching party to immediate injunctive relief against further violations of the provision. Leibovitz signed the Agreement as manager of SFS 23's general partner and signed on his own behalf agreeing that he was bound by the terms and conditions of the Agreement.

*3 After signing the Agreement, Leibovitz learned that some of the money from the initial cash investment was being used in ways he believed were not disclosed in the Private Placement Memorandum. Holdings, managed by Behunin, was the sponsor of four other tenancy-in-common investment offerings in the Dallas area, which operated similarly with a "LeaseCo" entity as the master tenant managing the property and paying rent to the investors. Leftover funds from the initial investment of each offering were pooled in Holdings. Holdings would then lend that money to master tenants, including Frankford Springs LeaseCo, that needed funds to pay rent to the investors. Only one of the properties, not Frankford Springs, was able to pay its rent to the investors solely from the operations of the property. Thus, many investors were paid the rent from their own investment funds and with the investment funds from other properties instead of from the funds the properties actually earned by leasing to residents.[5] In this case, LeaseCo did not inform appellants and the other investors that the property was

not generating sufficient income to pay the rent to them and that the rent was being paid by LeaseCo borrowing money from Holdings.

On November 8, 2011, Leibovitz sent an e-mail to the brokers that sold him the investment stating that, unless the brokers paid Leibovitz for the losses he suffered through the investment, he would file complaints with the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) and send copies of the complaints to all the investors in Holdings' other investment offerings. Holdings then filed the current suit seeking an injunction barring Leibovitz from filing the complaint with FINRA and the SEC and from communicating with investors in the other investment offerings. [6] The trial court issued a temporary restraining order. At the hearing on the temporary injunction, Leibovitz testified that unless he was enjoined from doing so, he would file a complaint with FINRA and would send a copy of the complaint to the investors in Holdings' other investment offerings.

Leibovitz asserted numerous affirmative defenses to Holdings' claims. Holdings moved for summary judgment on the defenses. The trial court granted summary judgment on most of the defenses. Holdings' claim of breach of contract was tried before a jury, which found Leibovitz liable and found Holdings suffered damages of $2,500.

The trial court's judgment awarded Holdings damages of $2,500 against Leibovitz and attorney's fees of $200,000 against both appellants. The court also imposed a permanent injunction on appellants, prohibiting them from (a) disclosing the existence or terms of the Agreement to anyone not a party to the Agreement; (b) communicating with any of the investors in Holdings' other investment offerings that appellants had threatened to contact; and (c) bringing or asserting any claims relating to the "dispute" as defined in the Agreement. The trial court stated in the order that the permanent injunction did not prohibit appellants from reporting a crime to law-enforcement authorities or from providing testimony in response to an inquiry from any regulatory authority as long as appellants did not initiate the inquiry.

Appellants now appeal from this judgment.

## RELEASE PROVISIONS
## IN THE AGREEMENT

The parties' Settlement and Mutual Release Agreement stated that the parties, which included appellants, Holdings, and Behunin,

> hereby fully and finally mutually release one another of and from any and all presently existing claims, demands, promises, causes of action, and/or similar rights of any type of whatever kind or nature ("*Claim* "), whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present.

> *4 In further exchange for the covenants and consideration set forth herein, the Parties agree that they will not bring or assert in any manner, either directly or indirectly, any Claims, professional grievances, professional liability claims, allegations of misconduct, litigation, arbitration and/or any other form of adversary proceeding relating to and/ or arising in any way out of any presently existing claim relating to the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present, whether same is presently known or unknown.

> For the purpose of implementing a full and complete release and discharge of each other, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, any and all claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of those claims.

> ....

> It is the express intention of the Parties to this Agreement that these mutual releases and associated definitions be construed as broadly as possible to effectuate the Parties' desire for absolute and complete peace going forward in relation to all dealings between them whatsoever. The Parties do not intend to except any entity or claim of any kind from these releases, except breaches of this Agreement.

The Agreement defined "the Dispute" as "any and all issues and matters that have been discussed and debated relating to, *among other things, including without limitation,* the Property, the Master Lease Agreement, the TIC [Tenants in Common] Agreement and/or the PPM [Private Placement Memorandum]."

## SUMMARY JUDGMENT

In their first five issues, appellants contend the trial court erred by granting Holdings' motion for summary judgment on their affirmative defenses. The standard for reviewing a traditional summary judgment is well established. *SeeNixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 825 (Tex.App.–Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon,* 690 S.W.2d at 549; *In re Estate of Berry,* 280 S.W.3d 478, 480 (Tex.App.–Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.,* 12 S.W.3d 172, 175 (Tex.App.–Dallas 2000, pet. denied). When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm the summary judgment if any of the summary judgment grounds are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000); *Furmanite Worldwide, Inc. v. NextCorp., Ltd.,* 339 S.W.3d 326, 331 (Tex.App.–Dallas 2011, no pet.).

## Fraud

In the first three issues, appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses of fraudulent inducement, fraudulent concealment, and fraud by nondisclosure. Appellants alleged Holdings committed fraud leading to the Agreement by failing to inform appellants that the funds they and the other investors in the property invested were placed in an integrated fund with investment monies from other Holdings investment projects and not used solely for Frankford Springs. Appellants alleged Holdings commingled the funds of numerous real estate projects and used those funds as needed for all the real estate projects. Appellants alleged these facts were required to be disclosed in the Private Placement Memorandum but were not disclosed. Appellants also alleged Holdings failed to disclose a due-diligence report stating that the Frankford Springs real estate project would never perform as represented.

**\*5** **[1]** Holdings moved for summary judgment on the fraud defenses, asserting appellants disclaimed in the Agreement the element of reliance necessary for appellants' affirmative defenses based on fraud. Reliance by the party asserting fraud is an element of the defenses of fraudulent inducement, fraudulent concealment, and fraud by nondisclosure. *In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 678 (Tex.2009) (false representation "was intended to be and was relied upon by the injured party" as element of fraudulent inducement); *Wise v. SR Dall., LLC,* 436 S.W.3d 402, 409 (Tex.App.–Dallas 2014, no pet.)("the listener relies on the nondisclosure resulting in injury" is element of fraud by nondisclosure); *Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 439 (Tex.App.–Fort Worth 1997, pet. denied) ("plaintiff's reasonable reliance on the deception" is element of fraudulent concealment).

**[2]** **[3]** **[4]** In general, a contract is subject to avoidance on the ground of fraudulent inducement. However, in some situations, the parties can agree in the contract to waive the right to assert fraud as a defense to breach of the contract by expressly disclaiming reliance. *SeeForest Oil Corp. v. McAllen,* 268 S.W.3d 51, 58 (Tex.2008); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 179 (Tex.1997). The factors most relevant to whether there was a waiver of reliance precluding an affirmative defense of fraud are whether:

1. the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties

R448

specifically discussed the issue which has become the topic of the subsequent dispute;

2. the complaining party was represented by counsel;

3. the parties dealt with each other in an arm's length transaction;

4. the parties were knowledgeable in business matters; and

5. the release and non-reliance language was clear.

*Forest Oil Corp.*, 268 S.W.3d at 60. The court also added a sixth factor, stating the fact that an agreement is a "once and for all" settlement constitutes an additional factor for rejecting fraud-based claims. *Id.* at 58.

Concerning the fifth factor, the supreme court stated the factor with reference to clarity of the release language, but throughout the opinion, the court examined the clarity of the non-reliance language as well. For example, "[a]n all-embracing disclaimer of any and all representations ... shows the parties' clear intent." *Id.* at 58; *see also id.* at 59 ("the release ... mak[es] clear that at the time of the agreement, the parties disclaimed reliance"). In rejecting the argument that the breadth of the clear non-reliance language should be viewed as limited to the more narrow release language, the court reasoned that the parties' agreement "makes clear the parties intended an exhaustive waiver unconfined to claims specifically released." *Id.* at 59. Therefore, we understand that the subject of the fifth factor is the clarity of both the language effecting the release and the language disclaiming reliance.

Whether a contract's disclaimer-of-reliance provision negates an assertion of fraud as a defense is a question of law reviewed de novo. *Id.* at 55 & n. 9.

The Agreement provided,

**D. *Jointly Drafted; Savings Clause***

The Parties[7] ... agree that this Agreement was jointly drafted and shall not be construed against any party....

....

**J. *Review and Understanding of Agreement***

a. The Parties ... acknowledge and agree that they have carefully read this Agreement and have asked any questions needed to understand the terms, consequences and binding effect of this Agreement.

b. Each Owner acknowledges and agrees that the Attorneys have not made and will not make any representations, warranties and/or covenants with respect to any federal, state or local income tax consequences to the Owners....

*6 c. The Parties ... acknowledge and agree that they are sophisticated and that they had an opportunity to review this Agreement with independent legal counsel, accountants, CPAs, advisors and/or other professionals or representatives of their own choosing.

d. The Parties ... further understand that this Agreement is the full, final and complete agreement between the Parties, even if the final tax consequences and/or monetary distributions are different from what was original[ly] anticipated by the Owners.

e. The Parties ... represent and warrant that they have been fully informed and have full knowledge of all of the terms, provisions, conditions, and effects of this Agreement, and they are fully satisfied with the terms and effects of this Agreement.

f. The Parties ... warrant and represent that they have full standing and capacity to enter into this Agreement, that they execute this Agreement of their own free will and accord for the purposes and the consideration set forth herein.

g. The Parties ... warrant and represent that no promise or inducement has been offered or made, except as herein set forth, and that this Agreement is executed voluntarily *and without reliance* upon any statement or representation by any party, lawyer or third party.

(Footnote and emphasis added.)

### Negotiation of the Terms of the Contract that Are the Subject of the Current Dispute

[5] The first factor set forth in *Forest Oil Corp.* for determining whether a disclaimer of reliance is enforceable is whether "the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute." *Forest Oil Corp.*, 268 S.W.3d at 60. In this case, the Agreement states that it was "jointly drafted" by the parties, which indicates its terms were negotiated. Also, Leibovitz states in his affidavit of August 9, 2012, that there were negotiations leading to the Agreement: "With regards to claims by Plaintiff in their MSJ facts that I was never represented by the law firm of Walters [Balido] and Crain in the review and negotiation of the subject settlement agreement in the lawsuit styled *Tamera Franklin et al. v. David Freeman et al.,* Cause No. 10–10364, 193rd Judicial District, Dallas County, Texas [sic]." The "subject settlement agreement" of the *Franklin v. Freeman* lawsuit is the Agreement, so appellants have conceded the Agreement was negotiated. This is evident from the provision of the Agreement that the parties would dismiss with prejudice their claims in the "Franklin–Behunin–SREM Lawsuit," which was defined as meaning "Case No. DC–10–10364–L." The cause numbers of the lawsuits mentioned in the affidavit and in the Agreement are the same. Therefore, "the subject settlement agreement," the "negotiation" of which Leibovitz states he was not represented by "Walters [Balido] and Crain," was the Agreement at issue in this appeal. Accordingly, appellants have conceded the Agreement was negotiated.

*7 Appellants also argue that the parties did not specifically discuss the issues that became the topics of this dispute, namely, (1) Behunin's combining the funds of multiple investment projects and using the funds from Frankford Springs to pay the shortfalls of other investments managed by Behunin and his entities, and (2) Holdings' failure to include the due diligence report showing the unprofitable nature of Frankford Springs in the Private Placement Memorandum. Under appellants' interpretation, then, "the issue which has become the topic of the subsequent dispute" is the factual basis of the subsequent fraudulent inducement claim. We disagree. Under *Forest Oil Corp.,*"the topic of the subsequent dispute" is the specific contract term being asserted against the party claiming fraud. [8] This interpretation goes along with the rest of the factor that "the terms of the contract were negotiated, rather than boilerplate." *Forest Oil Corp.,* 268 S.W.3d at 60. The terms of the contract and the factual basis of the subsequent fraud claim are such different concepts that we believe the supreme court would have made them different factors. Also, in *Forest Oil Corp.,* the court's analysis of the enforceability of the contract concerned the terms of the contract Forest Oil was seeking to enforce, an arbitration provision and a disclaimer of reliance, not the allegations in the subsequent lawsuit.

In *Forest Oil Corp.,* the disclaimer of reliance stated the parties were not "relying upon any statement or any representation of any agent of the parties being released." *Id.* at 54 n. 4. The parties released all claims "in any manner relating to" certain oil and gas leases. *Id.* at 53. The parties also agreed to arbitrate all claims for environmental damage and personal injuries "relating to" the leases. When McAllen sued Forest Oil for environmental damage, Forest Oil invoked the arbitration clause. *Id.* at 54. McAllen argued the arbitration provision was induced by fraud and was therefore unenforceable because a lawyer for Forest Oil told him there was no environmental contamination on the property. *Id.* at 55. McAllen argued that the disclaimer of reliance applied only to the released claims and not to the arbitration provision. *Id.* at 58–59. The supreme court disagreed and stated, "the parties disclaimed reliance with respect to *all* decisions being made during negotiations, including the decision to resolve future disputes regarding environmental and personal-injury claims via arbitration." *Id.* at 59. The court's decision was not based on any similarity between the topics of discussion during negotiations and the factual allegations of McAllen's fraudulent inducement claim.

Likewise, in this case, "the parties disclaimed reliance with respect to *all* decisions being made during negotiations,"*id.* including the decisions that the parties released one another "from any and all presently existing claims ..., whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property, and/or any other

matter whatsoever from the beginning of time to the present." Appellants do not assert on appeal that the parties failed to discuss this release provision in their negotiations.

However, even if it were required that the parties had to have discussed the facts of the subsequent lawsuit, the facts discussed by the parties during negotiation of the Agreement were closely related to the facts alleged in this lawsuit. The Agreement settled the two pending lawsuits, which involved the issues of what happened to the money generated by the property and appellee's failure to disclose information in the Private Placement Memorandum showing that the investment could not meet the promised rate of return and would be unprofitable. These lawsuits were dismissed by the Agreement. Appellants' claims of fraud in this case—the failure to disclose in the Private Placement Memorandum the integration of the investment funds for Frankford Springs with those of other investment projects and the failure to disclose the due diligence report showing the unprofitability of the investment—involve those same issues of what happened to the money in the investment and the failure to disclose necessary information in the Private Placement Memorandum. *See Tex. Std. Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.,* 394 S.W.3d 753, 772 (Tex.App.–Houston [14th Dist.] 2012, no pet.) ("However, the *Forest Oil* court did not opine that the parties must have discussed the exact grounds that form the basis of the subsequent dispute, in order to satisfy this factor."); *cf. Forest Oil Corp.,* 268 S.W.3d at 58 (parties' negotiations discussed environmental matters and treatment of surface issues, which touched on the subject of the fraud, the burying of highly toxic, mercury-contaminated material on the property).

**\*8** We conclude appellants have not shown the trial court erred by determining "the parties specifically discussed the issue which has become the topic of the subsequent dispute."

### Representation by Counsel

[6] Concerning whether appellants were represented by counsel before signing the Agreement, a provision of the Agreement (not quoted above) states that Joel M. Eastman was the attorney for the "Owners," which the Agreement defined as including Leibovitz and SFS 23.[9] The Agreement also states appellants "had an opportunity to review this Agreement with independent legal counsel." In an e-mail, Leibovitz referred to "my attorney" addressing Leibovitz's concerns about the defamation lawsuit, which was one of the disputes leading to the Agreement. In his affidavit, Leibovitz stated that Walters Balido & Crain were not representing him on the settlement agreement. However, that testimony is not evidence that he did not have counsel to advise him about the Agreement.

Leibovitz also testified in his deposition that he did not have counsel to advise him on the Agreement and that Eastman did not represent him or SFS 23. Even if Leibovitz signed the Agreement without consulting an attorney, the Agreement states, and Leibovitz does not dispute, that he "had an opportunity to review this Agreement with independent legal counsel." The fact that Leibovitz had the opportunity to consult a lawyer (as stated in the Agreement) and the evidence that he had access to attorneys (as shown by his representation by an attorney in the defamation lawsuit and the Agreement's statement that there was an attorney for the Owners) support enforcement of the waiver-of-reliance provision. *See RAS Grp., Inc. v. Rent–A–Center E., Inc.,* 335 S.W.3d 630, 640 (Tex.App.–Dallas 2010, no pet.)(fact that parties had lawyers they regularly used and had the opportunity to consult with them supported enforcement of disclaimer-of-reliance clause even though parties testified they could not remember if they submitted the agreement to their lawyers). Leibovitz's personal decision not to protect his interests by having counsel advise him on the Agreement should not bar enforcement of the waiver-of-reliance provision.

### Arm's–Length Transaction

[7] The record also shows the Agreement was an arm's-length transaction. At the time of the Agreement, Leibovitz and other investors were in litigation against Holdings, and the record shows there were attorneys on all sides. Leibovitz admitted in his affidavit that there were "negotiations" leading to the Agreement. We conclude this evidence established the Agreement was an arm's-length transaction.

and concerning any "matter whatsoever, from the beginning of time to the present."

### Knowledgeable in Business Matters

**[8]** The next factor is whether the parties were knowledgeable in business matters. The Agreement states the parties "are sophisticated." In order to invest in the project, Leibovitz and his wife must have had combined incomes of more than $300,000 per year for the preceding two years and prospects of the same for the following year or assets of more than $1 million. *See supra* note 3. Leibovitz states in his affidavit that he is not a lawyer, real estate broker, or securities investment professional, but these facts do not show he was not "sophisticated." Moreover, the Private Placement Memorandum required that all investors state in writing that they "have such knowledge and experience in financial and business matters that [they] are capable of evaluating the merits and risks of an investment in an Interest and have the ability to protect [their] own interests in connection with such investment." By entering into the investment with these requirements, Leibovitz conceded he was knowledgeable in business matters.

### Clarity of the Release and Disclaimer–of–Reliance Language

**\*9 [9]** The language of the release and non-reliance clauses is clear. In addition to the parties releasing one another from "any and all presently existing claims, demands, promises, causes of action, and/or similar rights of any type of whatever kind or nature ("Claim"), whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present," those who signed the Agreement acknowledged that they did so "voluntarily *and without reliance* upon any statement or representation by any party, lawyer or third party." (Emphasis added.) In other words, the parties did not rely on any representation by any other party when they gave up any rights they may have had regarding a complaint about another party that existed on March 31, 2011, the effective date of the Agreement, regardless of whether the complaining party knew of the complaint's existence,

### "Once and for All" Settlement

**[10]** The Agreement is clear that the settlement was intended to be a "once and for all" settlement. The Agreement stated,

> For the purpose of implementing a full and complete release and discharge of each other, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, any and all claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of those claims.
>
> ....
>
> It is the express intention of the Parties to this Agreement that these mutual releases and associated definitions be construed as broadly as possible to effectuate the Parties' desire for absolute and complete peace going forward in relation to all dealings between them whatsoever. The Parties do not intend to except any entity or claim of any kind from these releases, except breaches of this Agreement.

The Agreement could not be clearer that the parties intended the Agreement to be a "once and for all" settlement of all claims related to the investment. As the supreme court stated in *Forest Oil Corp.,* the fact that an agreement is a "once and for all" settlement is an additional factor for rejection of fraud-based claims. *See Forest Oil Corp.,* 268 S.W.3d at 58.

### Special Relationship

Appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses of fraudulent concealment and fraudulent inducement because there was a special relationship between Holdings and appellants resulting in a fiduciary duty to disclose material facts and information related to the investment. Regardless of the factual basis for the assertion of fraud, appellants

would have to prove reliance, which they disclaimed. Appellants do not cite any authority concluding that a disclaimer of reliance is not enforceable by a fiduciary against a party to whom the duty was owed. *See Tex. Std. Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.,* 394 S.W.3d 753, 774–76 (Tex.App.–Houston [14th Dist.] 2012, no pet.)(supreme court has not expressly held that fiduciary relationship bars disclaimer of reliance).

### Conclusion

After considering all six factors under *Forest Oil Corp.,* we conclude the Agreement's provision that appellants disclaimed the element of reliance necessary to bring a fraudulent concealment, fraudulent inducement, or fraud by nondisclosure affirmative defense is enforceable against appellants as a matter of law. We overrule appellants' first, second, and third issues.

### Misprision of Felony

[11] In their fourth issue, appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defense of misprision of felony. Appellants assert the enforcement of the confidentiality provision of the Agreement would prevent appellants from reporting Holdings' and Behunin's felonious activities, which would make appellants guilty of the federal offense of misprision of felony.[10] Appellants argue that because the Agreement cannot be performed without the commission of a crime, the Agreement violated public policy and is void.

**\*10** [12] Title 18, section 4 of the United States Code provides:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the

> United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4. Misprision of felony has four elements: (1) a felony was committed; (2) the accused had knowledge of the felony; (3) the accused failed to notify authorities; and (4) the accused took an affirmative step to conceal the crime. *United States v. Davila,* 698 F.2d 715, 717 (5th Cir.1983).

[13] [14] "A contract to do a thing which cannot be performed without a violation of the law is void." *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 148–49 (1947) (quoting *Tex. Emp'rs' Ins. Ass'n v. Tabor,* 283 S.W. 779, 780 (Tex.Com.App.1926, judgm't adopted)). When the illegality does not appear on the face of the contract, it will not be held illegal and thus void unless the facts showing its illegality are before the court. *Id.* at 149.

The confidentiality provision in the Agreement stated:

**L. *Confidentiality and Non–Disparagement***

As mutual consideration for entering into this Agreement, the Parties, the Released Group, and each of their respective attorneys agree and acknowledge that the fact of this Agreement and the terms and conditions of this Agreement, including the amount of consideration paid in connection with the resolution of the Dispute are confidential and shall not be disclosed to any individual or entity. All Parties, members of the Released Group, and their attorneys agree that the response to any inquiry by anyone about the status or disposition of the lawsuits or any Claims related to the Dispute or the Property shall be limited to the following: "The case was resolved by the agreement of the parties." *Notwithstanding the above, any party may disclose such information to the extent reasonably necessary for the purpose of tax or securities law compliance and/or other legitimate business purposes and/or responding to any other regulatory proceedings or inquiry or as otherwise required by any law or governmental rule or regulation or court order.*

The Parties and each member of the Released Group further agree not to make any derogatory,

disparaging and/or untruthful statements about any other party to any person or entity (although this restriction shall not be construed to limit any party's truthful testimony). The Parties and each member of the Released Group, as well as their respective attorneys, acknowledge and agree that these confidentiality provisions are material terms of this Agreement and substantial inducements to the settlement of this matter. The Parties and each member of the Released Group further acknowledge and agree that any violation of this paragraph shall be a breach of this Agreement entitling the non-breaching party, in addition to any other rights or remedies afforded at law or in equity, to immediate injunctive relief against any further violations thereof.

**\*11** (Emphasis added.) To the extent parts of this provision may prohibit a party from reporting another party's illegal activities to an "authority under the United States," those prohibitions are nullified by the statement that the Agreement does not prohibit a party from disclosing information as required by law. Under this provision, the Agreement would not prevent appellants from reporting felonious activities, if any, to the appropriate authorities. Therefore, as a matter of law, the Agreement may be enforced without any party being guilty of misprision of felony.

We overrule appellants' fourth issue.

### Economic Duress

In their fifth issue, appellants contend the trial court erred by granting summary judgment on appellants' affirmative defense of economic duress. Appellants alleged they signed the Agreement because Behunin and Holdings had withheld payment of the mortgage and threatened to let the property go into foreclosure unless all the parties to the Agreement signed it. [11] Appellants assert "[t]here was a scintilla of evidence creating a material issue of fact." [12]

**[15]** **[16]** **[17]** Economic duress is a defense to enforcement of a contract. *King v. Bishop*, 879 S.W.2d 222, 224 (Tex.App.–Houston [14th Dist.] 1994, no writ). The elements of the defense are: (1) a threat to do something that the threatening party has no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection. *Simpson v. MBank Dall., N.A.*, 724 S.W.2d 102, 109 (Tex.App.–Dallas 1987, writ ref'd n.r.e.). Whether the conduct or acts of the party accused constitute duress is a question of law, but whether duress exists in a particular situation is a question of fact dependent upon the circumstances surrounding the situation, including the mental effect on the party claiming duress. *Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, No. 04–13–00529–CV, — S.W.3d —, —, 2014 WL 7185081, at \*15 (Tex.App.–San Antonio Dec. 17, 2014, no pet. h.); *Matthews v. Matthews*, 725 S.W.2d 275, 278 (Tex.App.–Houston [1st Dist.] 1986, writ ref'd n.r.e.).

Holdings moved for summary judgment on several grounds, including that there was no economic duress as a matter of law because appellants expressly disclaimed any duress. The Agreement stated,

**I. *No Duress or Undue Influence...***

The Parties and the Released Group acknowledge and agree that they enter into this Agreement voluntarily and without any duress or undue influence.

**[18]** The parties presented almost no argument and cited no cases concerning whether economic duress can be disclaimed in a contract. Likewise, we have found no authority on the subject. However, just as the element of reliance may be expressly waived in certain cases where it is clear that adequate due-process protections exist, so also should the parties be allowed to include a term that the parties were not under duress when they signed it. As the supreme court stated in *Schlumberger,* "Parties should be able to bargain for and execute a release barring all further dispute." *Schlumberger,* 959 S.W.2d at 179. The supreme court stated "[t]his principle necessarily contemplates that parties may disclaim reliance on representations." *Id.* If parties may disclaim reliance in a case that meets all the factors set forth in *Schlumberger* and *Forest Oil Corp.,* then we fail to see why the right of the parties "to bargain for and execute a release barring all further dispute" should not permit the parties to disclaim economic duress. Where an arms-length

contract is negotiated, the parties are sophisticated, they are represented by counsel or had the opportunity and means to obtain representation, the disclaimer of duress is clear, and the parties intended for the contract to create an end to all disputes between them, we conclude that parties may disclaim economic duress. As discussed above, the Agreement meets all of these factors. Accordingly, we conclude as a matter of law that appellants' statement that they signed the Agreement "voluntarily and without any duress or undue influence" is enforceable.

*12 We overrule appellants' fifth issue.

## INJUNCTION

In the sixth through ninth issues, appellants contend the trial court erred by granting Holdings' request for a permanent injunction against SFS 23. Appellants do not challenge the applicability of the injunction to Leibovitz.

The trial court's order imposing the injunction states appellants would breach the Agreement by (1) filing new claims; (2) contacting Holdings' investors and making known to them the derogatory allegations of such claims; and (3) making the terms of the Agreement public. The court observed that both appellants expressly consented in the Agreement to injunctive relief to prevent further violations of the Agreement. The court ordered that appellants (a) not disclose the existence or terms of the Agreement to anyone not a party to the Agreement; (b) not communicate with Holdings' 160 other investors; and (c) not bring any claims, grievances, or other litigation relating to or arising out of any claim relating to the Dispute as defined in the Agreement, the property, Holdings, or any other matter. The order stated it did not prohibit appellants from providing testimony requested by any state or federal regulatory authority, and it did not prohibit appellants from reporting a crime to law enforcement officials.

[19] [20] [21] Appellants contend the trial court should not have granted the injunction against SFS 23 because Holdings failed to prove the elements required to obtain an injunction. To be entitled to a permanent injunction, a plaintiff must plead and prove (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Henning v. OneWest Bank FSB,* 405 S.W.3d 950, 970 (Tex.App.–Dallas 2013, no pet.). We review the trial court's grant or refusal of a permanent injunction to determine whether it clearly abused its discretion. *Priest v. Tex. Animal Health Comm'n,* 780 S.W.2d 874, 875 (Tex.App.–Dallas 1989, no writ). The trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Triantaphyllis v. Gamble,* 93 S.W.3d 398, 402 (Tex.App.–Houston [14th Dist.] 2002, pet. denied). A trial court's clear failure to analyze and apply the law correctly constitutes an abuse of discretion. *SeeWebb v. Glenbrook Owners Ass'n, Inc.,* 298 S.W.3d 374, 380 (Tex.App.–Dallas 2009, no pet.). Under an abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds for reversal, but the sufficiency of the evidence is a relevant factor in determining whether the trial court had sufficient evidence to exercise its discretion. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991).

[22] [23] [24] [25] When reviewing the legal sufficiency of the evidence, we consider all the evidence, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 823, 827 (Tex.2005); *Morris v. Wells Fargo Bank, N.A.,* 334 S.W.3d 838, 842 (Tex.App.–Dallas 2011, no pet.). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). If the evidence furnishes a reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact. *Id.*

*13 [26] When reviewing the factual sufficiency of the evidence, we examine all the evidence and set aside

*Giant Eagle's Letter Brief*

R455

a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Cameron v. Cameron,* 158 S.W.3d 680, 683 (Tex.App.–Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the fact finder was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller,* 168 S.W.3d at 819; *Hinkle v. Hinkle,* 223 S.W.3d 773, 782 (Tex.App.–Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *SeeMaritime Overseas Corp.,* 971 S.W.2d at 407; *Hinkle,* 223 S.W.3d at 782.

### Wrongful Act

**[27]** Appellants argue there was no evidence SFS 23 performed or threatened to perform a wrongful act. They argue that Holdings had to show an act or threat by SFS 23 separate or independent of any threat or act by Leibovitz. We disagree. Limited partnerships, such as SFS 23, act only through their general partners, and Leibovitz was the manager of the corporation that was SFS 23's general partner. *See*TEX. BUS. ORGS.CODE ANN. §§ 153.102, .152(a)(1) (West 2012); *Nw. Otolaryngology Assocs. v. Mobilease, Inc.,* 786 S.W.2d 399, 404 (Tex.App.–Texarkana 1990, writ denied) ("A limited partnership acts only through its general partner."). Appellants do not contest that Leibovitz performed or threatened to perform a wrongful act, and Leibovitz admitted at trial that he breached the Agreement. Behunin testified that Leibovitz threatened to communicate with the investors in other Sequoia offerings about the problems in the Sequoia Frankford Springs offering.[13] Leibovitz was the manager of SFS 23's general partner. The trial court could have concluded Leibovitz breached the Agreement in his role as manager of SFS 23's general partner as well as on his own behalf.

### Breadth of the Injunction

**[28]** Appellants also contend the inclusion of SFS 23 in the injunction made the injunction overly broad. Rule of civil procedure 683 provides that injunctions are "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." TEX.R. CIV. P. 683. Appellants contend SFS 23 does not fall into these categories because it was not "in active concert or participation" with Leibovitz. We disagree. Leibovitz was the manager of SFS 23's general partner. The evidence did not show that Leibovitz's actions in breach of the Agreement were made solely on his own behalf and not on behalf of SFS 23. The trial court could conclude from the evidence that SFS 23 was "in active concert or participation with" Leibovitz.

### Imminent Harm and Irreparable Injury

**\*14 [29]** **[30]** Appellants also argue there was no evidence of imminent harm or irreparable injury. An injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). As part of the Agreement, appellants promised not to make derogatory or disparaging statements about any other party to the Agreement to any person or entity. In an e-mail sent to the brokers who enrolled Leibovitz in the Sequoia Frankford Springs investment offering, Leibovitz threatened to file a complaint about the investment with FINRA and to send that complaint to the 160 investors in the other Sequoia investment offerings. At the hearing on whether to impose a temporary injunction, Leibovitz testified that unless he were enjoined, he would file the complaint with FINRA and send a copy of it to every investor in the other Sequoia investment offerings. Behunin testified that Leibovitz's threatened actions, if carried out, would "significantly" damage Holdings' reputation and require "significant time and money" to repair. The trial court could construe this evidence as showing an imminent threat to disparage and make derogatory remarks about Behunin, Sequoia Frankford Springs, and Holdings to persons who were not parties to the Agreement.

"[A]ssigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing

techniques, and office stability, among others, is not easy." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex.App.–Fort Worth 2009, pet. denied). The trial court could determine from Behunin's testimony that Leibovitz's threat to send copies of a FINRA claim to the investors in the other Sequoia investments, if carried out, would cause Holdings injury that either cannot be compensated by damages or that cannot be measured by any certain monetary standard.

We conclude there was legally and factually sufficient evidence of imminent harm and irreparable injury.

### No Adequate Remedy at Law

**[31]** **[32]** Appellants also assert Holdings failed to prove it lacked an adequate remedy at law. An existing legal remedy is adequate if it is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief. *Brazos River Conservation & Reclamation Dist. v. Allen*, 141 Tex. 208, 171 S.W.2d 842, 846 (1943); *Hilb, Rogal & Hamilton Co. of Tex. v. Wurzman*, 861 S.W.2d 30, 32 (Tex.App.–Dallas 1993, no writ). Behunin's testimony that it would take "significant time" to repair the damage from appellants carrying out the threat to send the FINRA complaint to the investors in the other Sequoia investments shows that enjoining appellants from contacting the other investors before he carried out the threat was a more efficient remedy than any award of damages after appellants had sent the complaint to the other investors. We conclude there was legally and factually sufficient evidence that Holdings lacked an adequate remedy at law.

### Prior Restraint on Speech

**[33]** Appellants also contend the injunction is an illegal prior restraint on speech. Appellants cite two cases, *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930), and *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). In *Near*, a permanent injunction barred a newspaper from ever publishing again because of its history of publishing defamatory articles. *Near*, 283 U.S. at 706, 51 S.Ct.

625. The Supreme Court held that such a restraint on future speech was unconstitutional even though it was preceded by defamatory material. *Id.* at 722–23, 51 S.Ct. 625. In *Keefe*, a group of picketers and pamphleteers was enjoined from protesting a real estate developer's business practices, *Keefe*, 402 U.S. at 417, 91 S.Ct. 1575, and the Court held this restraint on free expression unconstitutional, *id.* at 419–20, 91 S.Ct. 1575. Neither case is applicable to the case before us. In this case, appellants agreed not to engage in certain actions, including disparagement of the other parties, and appellants agreed that violation of that provision could be enforced through injunctive relief. *Near* and *Keefe* did not involve such agreements, which is an important distinction between those cases and the facts before us. If appellants' theory of the law were correct, then any agreement not to disclose information would be unenforceable, which is clearly not correct. *SeeTom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 888 (Tex.App.–Dallas 2003, no pet.) ("A non-disclosure agreement may be enforceable even if a covenant not to compete is not."); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex.App.–Dallas 1992, no writ) ("nondisclosure covenants are not against public policy").

**\*15** Appellants also cite article 1, section 8 of the Texas Constitution, which provides,

> Every person shall be at liberty
> to speak, write or publish his
> opinions on any subject, being
> responsible for the abuse of that
> privilege; and no law shall ever
> be passed curtailing the liberty
> of speech or of the press.

TEX. CONST. art. I, § 8. However, appellants do not cite any case where the enjoined party had agreed in a written contract to a restriction on his speech and agreed that the restriction could be enforced through injunctive relief.

In this case, the prior restraint on appellants' speech was the Agreement. The injunction was narrowly tailored and did nothing more than enforce the restraint on speech appellants agreed to in the Agreement. We conclude appellants have not shown the injunction constituted an illegal prior restraint.

We overrule appellants' sixth through ninth issues.

### JURY CHARGE

[34] [35] In their tenth issue, appellants contend the trial court erred by submitting a damages question instructing the jury to measure Holdings' damages under the benefit-of-the-bargain standard. The rules of civil procedure require the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R. CIV. P. 277. A valid instruction assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Thota v. Young,* 366 S.W.3d 678, 687 (Tex.2012). The trial court has considerable discretion when framing a jury charge. We do not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 856 (Tex.2009). A trial court abuses its discretion by failing to follow guiding rules and principles. *Id.*

a. Jeffrey Leibovitz:

b. Sequoia Frankford Springs 23, LP:

(Jury's answers in italics.)

For damages, Behunin testified to the interest in the investment and potential earnings he and the Sequoia entities gave up as part of the Agreement. Behunin personally gave up about $300,000 of his limited partnership interest to the other limited partners, and about $2,800 of that interest went to SFS 23, which was owned and controlled by Leibovitz. Additionally, the Sequoia entities, by giving up the management of the property, gave up the right to receive about $819,000 in management fees they probably would have earned and the right to six percent of the price for the eventual sale of the property, which Behunin estimated would probably have been at least $2.1 million. The Sequoia entities also gave up control of the escrows and reserves, worth about $274,000. According to Behunin, he and the Sequoia entities he controlled gave up about $3.5 million for the settlement. Leibovitz conceded that he breached the agreement. When asked what he thought the amount of damages he should pay as a consequence of his breaches of the Agreement,

The sole jury question in this case was:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Sequoia Real Estate Holdings, L.P. ("Sequoia") for its damages, if any, that resulted from the failure of any of the following to comply with the Settlement Agreement?

Consider the following elements of damages, if any, and none other.

> The difference, if any, between the value Sequoia gave in connection with the Settlement Agreement on March 31, 2011 and the value Sequoia received from the Settlement Agreement at the time of the breach.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any, for those named below:

*$2,500.00*

*–0–*

Leibovitz stated he would "give Mr. Behunin back his $2,800." Leibovitz then said, "I believe $2,800 is fair." The jury awarded Holdings $2,500 against Leibovitz.

*16 [36] [37] The jury question asked the jurors to measure Holdings' damages under the benefit-of-the-bargain standard, which is the difference in the value given and the value received. *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007). Appellants contend that in a suit for breach of a settlement agreement, the jury should be asked to determine the amount of consequential damages the plaintiff suffered, that is, the natural, probable, and foreseeable consequence of the defendant's breach of the settlement agreement, including the attorney's fees the plaintiff incurred in defending the settlement agreement. Appellants cite two cases in support of their argument: *Widener v. Arco Oil & Gas Co.,* 717 F.Supp. 1211 (N.D.Tex.1989), and *Ganske v. WRS Group, Inc.,* No. 10–06–00050–CV, 2007 WL 1147357 (Tex.App.–Waco Apr. 18, 2007, no pet.)(mem.op).[14] Those cases conclude that in a suit

involving breach and enforcement of a settlement agreement that sought to bring an end to litigation or prevent future litigation, the attorney's fees incurred by the non-breaching party in enforcing the settlement agreement are damages for the breach because they are a foreseeable consequence of the breach. *See Widener,* 717 F.Supp. at 1217 ("Because the purpose of entering into a release is to avoid litigation, the damages a releaser suffers when the release is breached are its costs and attorneys' fees incurred in defending against the wrongfully brought action."); *Ganske,* 2007 WL 1147357, at *3 ("In an action for breach of contract, actual damages may be recovered when the loss is the 'natural, probable, and foreseeable consequence of defendant's conduct.' The prior attorney's fees are such consequences of the breach."(quoting *Mead v. Johnson Grp., Inc.,* 615 S.W.2d 685, 687 (Tex.1981))). Those cases did not hold that benefit of the bargain cannot be an appropriate measure of damages for breach of a settlement agreement. Appellants cite no cases concluding that Holdings' damages could not be measured by the benefit of the bargain.

Appellants also contend the trial court erred by submitting the jury question based on the benefit-of-the-bargain measure because there was no evidence of that measure of damages. Appellants did not object to the jury charge on that ground. Accordingly, they have waived any error on that ground. *See* TEX.R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.").

We conclude appellants have not shown the trial court abused its discretion. We overrule appellants' tenth issue.

## ATTORNEY'S FEES

In their eleventh, twelfth, and thirteenth issues, appellants contend the trial court abused its discretion by awarding Holdings its attorney's fees against SFS 23. In Texas, attorney's fees are not recoverable from an opposing party unless authorized by statute or contract. *Tucker v. Thomas,* 419 S.W.3d 292, 295 (Tex.2013).

In the eleventh issue, appellants contend Holdings is not entitled to attorney's fees against SFS 23 because Holdings did not establish the elements for a permanent injunction against SFS 23. This issue depends upon our sustaining appellants' sixth through ninth issues. However, because we overruled those issues and concluded Holdings established the elements for a permanent injunction against SFS 23, we overrule appellants' eleventh issue.

In the twelfth and thirteenth issues, appellants contend the trial court erred by awarding attorney's fees against SFS 23 "because the permanent injunction against [SFS 23] must be reversed,""the jury failed to find damages [against SFS 23]," and Holdings "failed to plead and prove SFS 23 was jointly and severally liable." We have overruled appellants' issues challenging the enforceability of the injunction. The arguments about the jury failing to find damages against SFS 23 concern appellants' argument that Holdings is not entitled to attorney's fees under section 38.001 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (West 2015). However, we need not consider those arguments because the Agreement provided for attorney's fees.

*17 [38] The Agreement contained a paragraph describing the procedures for any future litigation related to the Agreement. It stated that any dispute, claim, or controversy concerning breach or enforcement of the Agreement would be resolved through arbitration in Dallas. The paragraph described the method for selecting the panel of arbitrators and then described the method of allocating costs and attorney's fees incurred in the litigation:

> The substantially non-prevailing party (as determined by the arbitration panel after determining the relative success of the parties, including the successful assertion of any defense) shall bear any fees and expenses of the arbitrators, other tribunal fees and expenses, reasonable attorneys' fees of both parties, any costs of producing witnesses and any other reasonable costs or

*Giant Eagle's Letter Brief*

expenses incurred by him or the substantially prevailing party.

Because neither side demanded arbitration, the parties waived their right to have the dispute determined by an arbitration panel, and the parties elected to proceed in traditional litigation before a trial court and jury. Regardless of whether the adjudicator was an arbitration panel or a trial court, it appears the intent of the parties as expressed in the Agreement was that the "substantially non-prevailing party" pay the substantially prevailing party's attorney's fees. See*Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument.").

In this case, Holdings was clearly the substantially prevailing party against both appellants. Although Holdings did not recover any damages from SFS 23 and only minimal damages from Leibovitz,

Holdings obtained a permanent injunction against both Leibovitz and SFS 23 to enforce the provisions of the Agreement prohibiting appellants from filing claims against and disparaging other parties to the Agreement, including contacting the investors in other Sequoia investments and making derogatory allegations about Holdings. We conclude appellants have not shown the trial court erred by awarding Holdings its attorney's fees against SFS 23. We overrule appellants' twelfth and thirteenth issues.

## CONCLUSION

We affirm the trial court's judgment.

**All Citations**

--- S.W.3d ----, 2015 WL 3451675

## Footnotes

1     The Hon. Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

2     All of the investment offerings created or overseen by Behunin and mentioned in the record included the word "Sequoia" in the name. Thus, the investment offering concerning the Frankford Springs apartment complex was called "Sequoia Frankford Springs." Likewise, all of the entities involved in the ownership or management of the investments also included the word "Sequoia" in their names.

3     The Private Placement Memorandum required that each investor "have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of an investment in an Interest and have the ability to protect your own interests in connection with such investment." Each investor also had to qualify as an "accredited investor" under the Securities Act of 1933 by being (1) "a natural person who had had individual income in excess of $200,000 in each of the two most recent years, or joint income with your spouse in excess of $300,000 in each of these years, and have a reasonable expectation of reaching the same income level in the current year;" (2) "a natural person and your individual net worth, or joint net worth with your spouse, exceeds $1,000,000 at the time you purchase the Interests;" or (3) "an entity ... in which each equity owner is an accredited investor." See17 C.F.R. § 230.215(e), (f), (h) (codification of rule 501 of Regulation D defining "accredited investor").

4     Besides managing the investment offering, Behunin was also a tenant in common in the investment. As part of the settlement, Behunin transferred about twenty-five percent of his investment (valued by Behunin at about $282,000) to the other investors. This transfer increased Leibovitz's percentage of ownership from 3.118 percent to 3.197 percent.

5     Behunin revealed how remaining investment funds were pooled in Holdings. Behunin's statements were part of his testimony in bankruptcy court in 2011 concerning the bankruptcy of another Sequoia tenancy-in-common investment.

6     Behunin testified that he and the Sequoia entities he controlled assigned their claims against appellants to Holdings.

7     The agreement defined "Owners" as meaning all the limited partnerships that owned an interest in the property, including SFS 23, and the partnerships' general partners, including Leibovitz and his wife. "Parties" was defined as including the Owners, "Sequoia" (which was defined as including specific Sequoia entities,

including Holdings, and their owners, officers, directors, employees, etc.), and Behunin. Thus, appellants were both "Owners" and "Parties" as defined in the agreement.

8    Part of the difficulty of interpreting the meaning of the language arises from the fact that the supreme court set forth the factors in *Forest Oil Corp.* but did not expressly apply them.

9    The Agreement also stated that Eastman was not the attorney for Behunin and his limited partnership that was one of the tenants in common in the investment.

10   Appellants assert Holdings committed the offenses of misapplication of fiduciary property over $200,000, TEX. PENAL CODE ANN. § 32.45(c)(7) (West Supp.2014), exploitation of an elderly individual, *id.* § 32.53, and violations of the Texas Securities Act, TEX. REV. CIV. STAT. ANN. . art. 581–29 (West Supp.2014).

11   This case involves a claim of economic duress concerning the subject matter of the Agreement. The alleged threat in this case does not involve a threat of physical harm or criminal wrongdoing. Whether actual, physical duress, such as a threat of physical harm to a person, could ever be disclaimed in a contract is not before us, and we make no determination of that issue. Likewise, we make no determination of whether a threat of harm to economic interests with no relation to the Agreement could be disclaimed or whether a threat of criminal wrongdoing to the economic interest that is the subject of the contract could be disclaimed.

12   We presume appellants mean there was more than a scintilla of evidence. A mere scintilla of evidence does not create a material fact issue and, in legal effect, is no evidence. *SeeKindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

13   Appellants argue that their threatened derogatory statements or disparagement of Holdings to investors in other Sequoia investments was not a proper ground for the injunction because Holdings withdrew that claim for breach of contract. We disagree. At the conclusion of the first day of the jury trial, the attorney for Holdings stated that Holdings was not seeking to prove breach of contract beyond those grounds for breach of contract on which the trial court had granted summary judgment for Holdings. Those grounds for breach of contract on which the trial court granted summary judgment included "anticipatory repudiation" and "disparagement." These grounds appear to include appellants' threat to send a copy of a FINRA claim to the investors in other Sequoia investments. Therefore, appellants' argument that this ground was a not proper ground for the injunction because Holdings waived it lacks merit.

14   Appellants also cited a third case, *Guffey v. Clark,* No. 05–93–00849–CV, 1997 WL 142750 (Tex.App.–Dallas Mar. 31, 1997, writ denied) (not designated for publication). Because *Guffey* was decided before January 1, 2003, and was designated "do not publish" under the rules of appellate procedure in effect at that time, it has no precedential value. *See*TEX.R.APP. P. 47.7(b). However, like *Widener* and *Ganske,* it also does not conclude that benefit of the bargain cannot be an appropriate measure of damages for breach of a settlement agreement. *Guffey,* 1997 WL 142750 at *3–4.

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab I

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | §<br>§<br>§ | IN THE DISTRICT COURT |
| *Plaintiff,* | §<br>§<br>§ | |
| vs. | §<br>§ | |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | DALLAS COUNTY, TEXAS |
| *Defendants,* | § | 68TH JUDICIAL DISTRICT |

## MOTION TO STRIKE PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF IN OPPOSITION TO GIANT EAGLE'S MOTION TO DISMISS

Defendant Giant Eagle, Inc. ("Giant Eagle") moves to strike Plaintiff Dickson Perry's Supplemental Brief in Opposition to Giant Eagle's Motion to Dismiss ("Supplemental Brief"). On August 24, 2015, after the scheduled start time of the hearing on Giant Eagle's Motion to Dismiss, Perry electronically filed a Supplemental Brief. Counsel for Mr. Perry referred to this Supplemental Brief, and the eleven previously-undisclosed cases cited therein, throughout his argument. Every argument that Perry made in his Supplemental Brief was available to him, and could have been raised, prior to the briefing deadline of August 19, 2015.[1]

This Supplemental Brief was filed contrary to Local Rule 2.09, which provides that "[e]xcept in case of emergency, briefs, responses and replies relating to a motion (other than for summary judgment) set for hearing **must be served and filed** with the Clerk of the Court **no**

---

[1] The Supplemental Brief improperly relies on other Defendants' Responses to Perry's Requests for Admission in an attempt to – again – argue that litigation against Giant Eagle in Pittsburgh would be inconvenient. Like every other argument made in the Supplemental Brief, Perry could have made arguments about these Responses in a timely Response brief, as they were served on August 14th and 17th, respectively. Moreover, one of these response exhibits is not legible. *See* Supp. Br. Ex. 2.

**later than three working days before the scheduled hearing**." Dallas County Local Rule 2.09 (emphasis added). Perry did not serve and file this brief at least three days before the hearing. Counsel did not even provide Giant Eagle with a courtesy copy before or during the hearing. Only after the hearing, at Defendants' insistence, did counsel for Perry actually provide a copy.

For the above reasons, this Court should not consider Perry's untimely Supplemental Brief. However, in the event the Court does consider it, the Court should also be aware of several flaws in Perry's arguments. First, Perry cites *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 883 (Tex. 2010) in an attempt to portray the Texas Supreme Court as applying a "but for" test when interpreting "arising out of." That is not what *Lisa Laser* stands for; rather, the Court there actually granted mandamus relief from the trial court's failure to enforce a forum selection clause and stated that "forum-selection clauses should be given full effect, and subjecting a party to trial in a forum other than the contractually chosen one amounts to clear harassment ... injecting inefficiency by enabling forum-shopping, wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics...." *Id.* (quotations omitted).

Second, the Supplemental Brief also misrepresents Judge Boyle's opinion in the First Texas Case by portraying Judge Boyle as relying on a single case from the Northern District of Illinois. That is not accurate. Judge Boyle relied on *Aerus LLC v. Pro Team, Inc.*, No. CIV.A. 3-04-CV-1985M, 2005 WL 1131093, at *1 (N.D. Tex. May 9, 2005), a Texas federal case directly on point.[2] The Texas Supreme Court has expressly stated that it "look[s] to federal law for guidance in analyzing forum-selection clauses." *In re Int'l Profit Associates, Inc.*, 274 S.W.3d 672, 677 (Tex. 2009). Moreover, Judge Boyle's analysis (in addition to being preclusive under collateral estoppel) is completely in accord with many other courts. *See, e.g., Wellogix, Inc. v.*

---

[2] *Aerus*, and other cases not previously provided to the Court, are attached as Exhibit A.

MOTION TO STRIKE PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF
IN OPPOSITION TO GIANT EAGLE'S MOTION TO DISMISS                                    Page 2
{A0948819.2}/252067.docx

R463

*SAP Am., Inc.*, 58 F. Supp. 3d 766, 779 (S.D. Tex. 2014) (finding that where resolution of a plaintiff's claims "arguably depends" on construction of an agreement containing a forum selection clause, "[t]hose claims would therefore also fall within the scope of the forum-selection clause."); *Interactive Music Tech., LLC v. Roland Corp. U.S.*, No. CIV.A. 6:07-CV-282, 2008 WL 245142, at *6 (E.D. Tex. Jan. 29, 2008) ("because the resolution of this issue depends on interpretation of the agreement, the dispute 'arises out of' the agreement."); *Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 391 (S.D. Tex. 2002) (finding that where the "spirit of the … agreement contemplates the rights and duties of the parties[,] … [i]f any right or obligation in the … agreement is threatened or impaired by an act of the parties or their privities, that act gives rise to a dispute under the agreement."); *Skold v. Galderma Labs., L.P.*, No. CIV.A. 14-5280, 2015 WL 1740032, at *16 (E.D. Pa. Apr. 17, 2015) (forum selection clause applies where contract forms the "entire business relation" between the parties and "determination of [planitiff's] claims implicate the contract's terms and will require consideration of the contract and the parties' respective rights pursuant to the contract.").

Third, Perry's continued complaints about litigation in Pittsburgh being inconvenient are not relevant. The Texas Supreme Court has held that multi-forum litigation resulting from the enforcement of a forum selection clause does not constitute the type of "unusual and special circumstance" that would allow a court to ignore a forum selection clause. *See In re Int'l Profit Associates, Inc.*, 274 S.W.3d 672, 680 (Tex. 2009) ("[A]ssuming plaintiff's argument that if the clauses are enforced, it will have to pursue two suits—one against IPA in Illinois and one against Salinas in Texas—is correct, that is not the type of unusual and special circumstances that show litigating in the contracted-for forum will be so gravely difficult and inconvenient [Plaintiff] will be deprived of its day in court. Litigation over contractual business obligations frequently

MOTION TO STRIKE PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF
IN OPPOSITION TO GIANT EAGLE'S MOTION TO DISMISS                    Page 3
{A0948819.2}/252067.docx

R464

involves more parties than the two principals to the contract. If all it takes to avoid a forum-selection clause is to join as defendants local residents who are not parties to the agreement, then forum-selection clauses will be of little value."); *See also In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010) ("The mere existence of another defendant does not compel joint litigation, even if the claims arise out of the same nucleus of facts.").

For the above reasons, the Court should strike Perry's untimely Supplemental Brief and grant Giant Eagle's Motion to Dismiss.

Respectfully Submitted,

*/s/ Orrin Harrison III*

Orrin L. Harrison III
  Bar No. 09130700
  oharrison@ghetrial.com
GRUBER HURST ELROD JOHANSEN
HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Telephone:  214-855-6828
Fax: 214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com
Jonathan Marcus
  jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone:  412-338-5200
Fax: 412-391-8758

***Attorneys for Giant Eagle, Inc., David Shapira, and Daniel Shapira***

MOTION TO STRIKE PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF
IN OPPOSITION TO GIANT EAGLE'S MOTION TO DISMISS                    Page 4
{A0948819.2}/252067.docx

R465

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause via electronic filing and E-mail, in accordance with Rule 21a, Texas Rules of Civil Procedure, on August 25, 2015.


*/s/ Orrin L. Harrison III*
Orrin L. Harrison III

MOTION TO STRIKE PLAINTIFF DICKSON PERRY'S SUPPLEMENTAL BRIEF
IN OPPOSITION TO GIANT EAGLE'S MOTION TO DISMISS     Page 5
{A0948819.2}/252067.docx

R466

# Exhibit A

R467

2005 WL 1131093
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

AERUS LLC, Plaintiff,

v.

PRO TEAM, INC., Defendant.

No. Civ.A. 304CV1985M.    |    May 9, 2005.

**Attorneys and Law Firms**

John A Dondrea, Douglas Alan Sorensen, Kelly J Kubasta, Dallas, TX, for Plaintiff.

Anthony J Dain, Victor M Felix, San Diego, CA, for Defendant.

*MEMORANDUM OPINION AND ORDER*

LYNN, J.

 **\*1** Before the Court is Defendant's Motion to Dismiss, or in the Alternative, to Transfer for Improper Venue, filed on December 3, 2004. Having considered the motion, response, reply and the applicable law, the Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss, or in the Alternative, to Transfer for Improper Venue.

**I. Background**

Plaintiff Aerus LLC, formerly doing business as Electrolux, is a limited liability company with its principal place of business in Texas. Plaintiff manufactures and distributes cleaning equipment. Defendant ProTeam, Inc. is a corporation with its main corporate office in Idaho. Defendant develops and markets floor care products for the janitorial and sanitation industry. On July 1, 2001, the parties entered into a Marketing Agreement ("2001 Agreement"), which provided that Defendant would purchase, sell, market, and distribute Plaintiff's commercial floor care products. The 2001 Agreement also addressed use of Plaintiff's trademark and intellectual property. On May 12, 2003, the parties entered into the Termination, Transition, and Release Agreement ("2003 Agreement"), terminating the 2001 Agreement. On September 10, 2004, Plaintiff filed suit against the Defendant, alleging the following claims: (1) Patent Infringement; (2) Breach of Contract; (3)

Unauthorized Trademark Reproduction; (4) Infringement of Common Law Trade Dress Rights; and (5) Common Law Unfair Competition. On October 4, 2004, Defendant filed its Answer, generally denying Plaintiff's allegations and asserting that venue is improper in the Northern District of Texas. On December 3, 2004, Defendant filed the subject motion.

**II. Analysis**

Pursuant to 28 U.S.C. § 1406(a), Defendant moves to dismiss this case, or to transfer it to the Southern District of California, arguing the parties contractually agreed that the forum for their disputes would be San Diego, California.

This Court must determine whether an enforceable forum selection clause exists, and if so, what deference should be given to it. Federal law governs the determination of whether an enforceable forum selection clause exists. *Haynsworth v. The Corp.,* 121 F.3d 956, 962 (5th Cir.1997). In this case, the Court must first determine which agreement (and which corresponding forum selection clause) governs: the 2001 Agreement or the 2003 Agreement. The Court will interpret these Agreements in accordance with Texas law to decide which controls. *See In re Dengel,* 340 F.3d 300, 313 (5th Cir.2003) (quoting *F.D.I.C. v. Firemen's Ins. Co. of Newark, N.J.,* 109 F.3d 1084, 1087 (5th Cir.1997)) ("We look to state law for rules governing contract interpretation.").

**A. The Applicable Forum Selection Clause**

When construing a written contract, it is the court's primary concern "to ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *see also J .M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). To the extent possible, provisions should be interpreted in a way that gives the entire agreement effect and "harmonizes potential conflicts between differing provisions." *New Concept Constr. Co. v. Kirbyville Consol. Indep. Sch. Dist.,* 119 S.W.3d 468, 470 (Tex.App.-Beaumont 2003, pet. denied). Parties to a contract are presumed to intend that each provision has meaning, and a clause will not be struck unless an irreconcilable conflict exists. *Id.* at 469.

 **\*2** Ambiguity is a question of law for the court to decide. *CBI Indus., Inc.,* 907 S.W.2d at 520. In determining whether a contractual provision is ambiguous, the court reviews the wording in light of surrounding circumstances "in order to ascertain the meaning that would be attached to the

wording 'by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the [contract], other than oral statements by the parties of what they intended to mean." ' *Watkins v. Petro-Search, Inc.,* 689 F.2d 537, 538 (5th Cir.1982) (quoting *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981)). If the contract's wording has a definite or certain legal meaning, it is not ambiguous. *CBI Indus., Inc.,* 907 S.W.2d at 520. Even if an instrument is unambiguous, a trial court may admit extrinsic evidence, such as "parol testimony of the facts and circumstances surrounding or pertaining to the making of the agreement, in order that the court may apply the language used in the instrument to the facts and circumstances then existing for the purpose of ascertaining the true intention of the parties." *Templeton v. Dreiss,* 961 S.W.2d 645, 657 n. 12 (Tex.App.-San Antonio 1998, pet. denied). If the language of the contract is subject to two or more reasonable interpretations in light of surrounding circumstances and after applying rules of contract construction, it is ambiguous, and the Court will resolve its meaning. *See Watkins,* 689 F.2d at 538; *Webster,* 128 S.W.3d at 229; *CBI Indus., Inc.,* 907 S.W.2d at 520.

Plaintiff argues that the 2001 and 2003 Agreements' provisions relating to venue and jurisdiction are "ambiguous at best," and that the forum selection clause therefore is not mandatory. Two provisions in the 2003 Agreement require examination. Section 2.1 of the 2003 Agreement states,

> With the sole exception of this Agreement, the Parties acknowledge and agree that any and all written or oral agreements between the Parties related to products or services are hereby terminated and are of no further force or effect (*except those provisions thereof that, by their terms, survive termination* ).

(emphasis added). Section 5.13 states,

> This Agreement, including all Exhibits attached hereto, contains the entire agreement between the Parties as of the date concerning the subject matter hereof and supercedes [sic] any and all prior agreements, oral or written, between the Parties concerning the subject matter hereof....

The parenthetical at the end of Section 2.1 is not present in Section 5.13.

By virtue of Section 5.7 of the 2001 Agreement ("survival clause"), "Sections 4.4, 5.6, and 6 through 20 will survive any termination or expiration of this Agreement."One of the surviving sections is Section 10, which states, "In the event [Aerus, LLC] asserts a breach or default by ProTeam under the terms of this Agreement, the jurisdiction, venue, and applicable law shall be the State of Texas, United States...." Plaintiff argues that the forum selection clause in the 2001 Agreement is in conflict with the 2003 Agreement. Section 5.9 of the 2003 Agreement states:

> **\*3** In the event either Party asserts a breach or default by the other under the terms of this Agreement, the jurisdiction, venue, and applicable law shall be [the] City of San Diego, California, United States of America, and this Agreement shall be deemed to have been signed at such location to the extent necessary for such jurisdiction and venue to apply.

The terms of the 2001 Agreement that allegedly survive termination would render the 2003 Agreement illogical and inconsistent. For example, the dispute resolution and the forum selection clauses in the 2001 and 2003 Agreements are very similar, but they provide for completely different fora and applicable law. If these provisions in the 2001 Agreement were intended to survive termination, then they would render conflicting provisions in the 2003 Agreement unenforceable. Certain of these provisions, which the 2001 Agreement says survive are nonsensical in light of the 2003 Agreement. For example, the 2001 Agreement, Section 20, states, "This Agreement, including Schedules attached hereto, contains the entire agreement between the parties as of the date concerning the subject matter hereof and supercedes [sic] any and all prior agreements."Similar wording also exists in the 2003 Agreement. Both provisions could not logically coexist.

Defendant argues that merger occurred, and therefore, no inconsistency exists. "Merger refers to the absorption of one contract into another subsequent contract and is largely a matter of intention of the parties."*Fish v. Tandy Corp.,* 948 S.W.2d 886, 898 (Tex.App.-Fort Worth 1997, writ denied); *see also Superior Laminate & Supply, Inc. v. Formica Corp.,* 93 S.W.3d 445, 449 (Tex.App.-Houston [14th Dist.] 2002,

pet. denied). In order for one contract to be merged into another, the parties must be the same in both contracts, the last contract must address the same subject matter, and merger must have been intended by the parties. *Smith v. Smith,* 794 S.W.2d 823, 828 (Tex.App.-Dallas 1990, writ withdrawn)."[A] subsequent integration will not supersede or invalidate a written agreement relating to the same subject matter if the agreement is such that [it] might naturally be made as a separate agreement."*Fish,* 948 S.W.2d at 899. "However, if the parties to one contract execute another whose terms are so inconsistent with the first that they both cannot stand, the first agreement is conclusively presumed to have been superseded by the second."*Smith,* 794 S.W.2d at 828;*see also Willeke v. Bailey,* 144 Tex. 157, 160, 189 S.W.2d 477, 479 (1945); *Fish,* 948 S.W.2d at 899; *Leon Ltd. v. Albuquerque Commons P'ship,* 862 S.W.2d 693, 700 (Tex.App.-El Paso 1993, no writ); *Montgomery Elevator Co. v. Tarrant County,* 604 S.W.2d 363, 367 (Tex.App.-Fort Worth 1980, no writ)."An integration clause is in essence the merger doctrine memorialized."*Smith,* 794 S.W.2d at 828.

The 2003 Agreement includes an integration clause in Section 5.13, which states, "[t]his Agreement ... contains the entire agreement between the Parties as of the date concerning the subject matter hereof and supercedes [sic] any and all prior agreement, oral or written, between the Parties as of the date concerning the subject matter hereof ..." The parties explicitly set forth their intent that the 2003 Agreement constituted the entire agreement, and that it superseded any and all prior agreements. Any language that survived termination merged into the 2003 Agreement, and to the extent it is inconsistent, the 2003 Agreement controls. Thus, the Court finds that the 2003 Agreement is unambiguous, and its forum selection clause controls the Court's examination of where venue properly lies for this suit.

## B. Mandatory Versus Permissive Forum Selection Language

**\*4** Having determined that the 2003 Agreement controls, the Court must determine whether the forum selection clause in the 2003 Agreement is mandatory (sometimes called "exclusive") or permissive. "Where the agreement contains clear language showing that jurisdiction is appropriate only in a designated forum, the clause is mandatory."*Von Graffenreid v. Craig,* 246 F.Supp.2d 553, 560 (N.D.Tex.2003) (citing *Excell, Inc. v. Sterling Boiler & Mech., Inc.,* 106 F.3d 318, 321 (10th Cir.1997)); *Docksider, Ltd. v. Sea Tech., Ltd.,* 875 F.2d 762, 763-64 (9th Cir.1989); *First Nat'l of N. Am., LLC v. Peavy,* No. 3-02-CV-0033-R, 2002 WL 449582, at \*1

(N.D.Tex. Mar.21, 2002). A party that consents to jurisdiction in one forum does not automatically waive its rights to have an action heard in another. *City of New Orleans v. Mun. Admin. Servs.,* 376 F.3d 501, 504 (5th Cir.2004). According to the Fifth Circuit, "for a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive."*Id.* at 504.The court noted, "It is important to distinguish between jurisdiction and venue when interpreting such clauses. Although it is not necessary for such a clause to use the word 'venue' or 'forum,' it must do more than establish that one forum will have jurisdiction."*Id.* A permissive forum selection clause authorizes jurisdiction in a particular forum, but does not prohibit litigation elsewhere. *Peavy,* 2002 WL 449582, at \*1.

A forum selection clause is not necessarily classified as mandatory or exclusive simply because it contains the word "shall." *Caldas & Sons, Inc. v. Willingham,* 17 F.3d 123, 127 (5th Cir.1994) (analyzing *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75 (9th Cir.1987)). In *Hunt,* the court explained that, "although the word 'shall' is a mandatory term, here it mandates nothing more than that the Orange County courts have jurisdiction."*Id.* at 128 (reviewing a forum selection clause that stated, "the laws of the State of California shall govern the validity, construction, [and] interpretation ... of this contract. The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract."). "[W]here venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive."*K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft,* 314 F.3d 494, 499 (10th Cir.2002); *see also Docksider,* 875 F.2d at 764 ("The prevailing rule is clear from these and other cases that where venue is specified with mandatory language[,] the clause will be enforced").

**\*5** The Plaintiff argues that because in the 2003 Agreement the forum selection clause (Section 5.9) and the dispute resolution clause (Section 5.3) provide for two different fora, the forum selection clause is not mandatory, and trademark and confidentiality disputes between the parties can be brought in any court with jurisdiction. The Court disagrees with Plaintiff's argument.

In *Personal Security & Safety Systems, Inc. v. Motorola Inc., 297 F.3d 388 (5th Cir.2002)*, the Fifth Circuit distinguished between arbitration clauses and forum selection clauses. In *Motorola,* the Plaintiff argued that the forum selection clause's specific forum precluded only lawsuits in other than the designated forum, not arbitration elsewhere. *Id.* at 395.The court explained that the forum selection clause must be interpreted in the context of the entire agreement. *Id.* The forum selection clause in *Motorola* was interpreted to mean cases should be litigated in Texas, only when they were not subject to arbitration. *Id.* at 396.The forum selection clause governed "any suit or proceeding," while the arbitration clause governed "all disputes or all claims," evidencing the parties' desire to apply the forum selection clause only when the dispute was not subject to arbitration. *Id.* The court further noted that this was consistent with cases that hold "a forum selection clause cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration."*Id.* at n. 11 (citing *In re Winter Park Constr., Inc.,* 30 S.W.3d 576, 578 (Tex.App.-Texarkana 2000, no pet.)). In *Winter Park,* the court held the forum selection clause did not supersede the arbitration clause, explaining that the forum selection clause simply provided where venue would exist and the law that governed in lawsuits. *Id.* at 578."A contractual choice of law provision will not supersede or obviate an arbitration provision unless the choice of law provision specifically excludes arbitration."*Id.*

In this case, the dispute resolution provision and the forum selection clause apply to different types of disputes. According to Section 5.3 of the 2003 Agreement, "Any disputes arising under Section 3.7 [Trademarks; Branding] or 5.4 [Confidentiality] hereof may be introduced into and heard by any court having jurisdiction, without any requirement to comply with the procedures described above in this Section 5.3."Section 5.9 provides, "In the event either Party asserts a breach or default by the other under the terms of this Agreement, the jurisdiction, venue, and applicable law shall be [the] City of San Diego, California, United States of America ..." As in *Motorola,* the forum selection clause in issue here specifically addresses suits for breach or default of the 2003 Agreement. The dispute resolution provision governs "disputes," which encompasses an array of other conflicts. Therefore, the more general language of the dispute resolution clause is not in conflict with the more specific language of the forum selection clause. "It is a fundamental axiom of contract interpretation that specific provisions control general provisions."*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373,

377 (5th Cir.2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203(c)). Thus, even if the dispute resolution and forum selection clauses provide for different fora, the forum selection clause applies to claims of breach or default.

**\*6** Plaintiff argues that the conflicting venue language of the forum selection clause and the dispute resolution clause renders the forum selection clause permissive. Courts have held forum selection provisions permissive when the language does not prescribe venue nor provide for exclusivity. *See Mun. Admin. Servs., Inc.,* 376 F.3d at 504-05 ("The undersigned Contractor does further hereby consent and yield to the jurisdiction of the State Civil Courts of the Parish of Orleans ..."); *Caldas & Sons, Inc.,* 17 F.3d at 127-28 ("The laws of the Courts of Zurich are applicable."); *Keaty v. Freeport Indonesia, Inc.,* 503 F.2d 955, 956 (5th Cir.1974) ("This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York."); *K & v. Scientific Co.,* 314 F.3d at 496, 500 ("Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich. All and any disputes arising out of or in connection with this agreement are subject to the laws of the Federal Republic of Germany."); *Watson v. John K. Burch Co.,* No. 3:02-CV-2555-D, 2003 WL 21145755, at *3 (N.D.Tex. May 14, 2003) ("All lawsuits will be handled in the State of Michigan."); *Von Graffenreid,* 246 F.Supp.2d at 557, 561 ("Borrower and each other Loan Party hereby consents and agrees that the district court of Dallas County, Texas, or, at Agent's option, the United States District Court for the Northern District of Texas, Dallas Division, shall have jurisdiction to hear and determine any claims or disputes between Borrower and/or any other Loan Party and Agent and/or Guarantors pertaining to this Agreement or to any matter arising out of or related to this Agreement."); *Blue Cross & Blue Shield of Tex., Inc. v. Dimark Mktg., Inc.,* No. 3:97-CV-1257-D, 1997 WL 405169, at *1 (N.D.Tex. July 15, 1997) ("each party 'agrees to' the jurisdiction of the courts of 'the Commonwealth of Pennsylvania and the Eastern District of the Courts of the United States.' ").

On the other hand, courts have held that forum selection clauses are mandatory and enforceable when they provide for exclusivity as to where a case can be brought. *See Kevlin Servs., Inc. v. Lexington State Bank,* 46 F.3d 13, 14-15 (5th Cir.1995) (emphasis added) ("This contract shall be interpreted and construed in accordance with the laws of the State of Texas. The legal *venue* of this contract and any

disputes arising from it shall be settled in Dallas County, Texas."); *Docksider Ltd.,* 875 F.2d at 763-64 (emphasis added) ("This agreement shall be deemed to be a contract made under the laws of the State of Virginia, United States of America, and for all purposes shall be interpreted in its entirety in accordance with the laws of said State. Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. *Venue* of any action brought hereunder shall be deemed to be in Gloucester County, Virginia."); *Klinghoffer v. Mama Fu's Noodle House, Inc.,* No. 3-04-CV-1695-L, 2004 WL 2583632, at *1, *3 (N.D.Tex. Nov.12, 2004) (emphasis added) ("Each party agrees that any legal action or proceeding against the other party that arises out of or is related to this Agreement *may only be brought* in the courts of the State of Georgia or of the United States of America for the Northern District of Georgia and by entering into this Agreement each party accepts and consents to the jurisdiction of the aforesaid courts."); *Dorsey v. N. Life Ins. Co.,* No. 04-0342, 2004 WL 2496214, at *1, *4 (E.D.La. Nov.5, 2004) (emphasis added) (citing *Docksider, Ltd.,* 875 F.2d at 763) ("This Agreement is governed by the laws of the State of Washington. In the event of a lawsuit arising out of this Agreement, the Executive General Agent agrees that *venue* shall be laid in King County, Washington."); *Marengo Films, Inc. v. Koch Int'l LLC,* No. 3:03-CV-0369-P, 2003 WL 21435728, at *1, *5 (N.D. Tex. June 16, 2003) (emphasis added) ("This agreement shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed entirely in such State. The parties agree to the *exclusive jurisdiction* of the Southern District Court of New York, New York."); *Bonded Inspections, Inc. v. Northrop Grumman Corp.,* No. 3:98-CV-0214-D, 1998 WL 185518, at *1-*2 (N.D.Tex. Apr.10, 1998) (emphasis added) (*"Exclusive jurisdiction and venue* shall lie in the State of New York, County of Nassau, including the United States Federal Courts therein.").

 **\*7** In *Docksider,* the Ninth Circuit distinguished its earlier decision in *Hunt* (in which the court held the forum selection clause was permissive) by explaining that the forum selection clause at issue specifically prescribed venue. *Docksider, Ltd.,* 875 F.2d at 763. The Ninth Circuit explained that the clause required enforcement because the parties not only consented to jurisdiction in Virginia, but agreed to mandatory venue in Virginia. *Id.*"This mandatory language makes clear that venue, the place of suit, lies exclusively in the designated county."*Id.* In *Dorsey,* the court held the explicit venue language in the forum selection clause was

not ambiguous regarding its exclusivity, and was therefore mandatory. *Dorsey,* 2004 WL 2496214, at *4.

The forum selection clause in this case is similar to the clauses in *Dorsey* and *Docksider.*The 2003 Agreement forum selection clause states, "the jurisdiction, venue, and applicable law shall be [the] City of San Diego, California, United States of America ..." This clause addresses jurisdiction and venue, fixing such in the City of San Diego, California. While the clause does not expressly use the language "exclusively" or "only," the Court construes it, in context, to be so limited. The specific venue requirement makes this forum selection clause mandatory and pursuant to it, a lawsuit must be brought in state or federal court in San Diego, California.

**C. Applicability of Forum Selection Clause to Claims**

The Court must next determine whether the forum selection clause applies to the claims asserted in this case. *Soil Bldg. Sys. v. CMI Terex Corp.,* No. 3:04-CV-0210-G, 2004 WL 1283966, at *4 (N.D.Tex. June 9, 2004); *Woolf v. Mary Kay, Inc.,* 176 F.Supp.2d 642, 647 (N.D.Tex.2001). The court must examine the language of the contract to determine which causes of action are governed by the forum selection clause. *Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 222 (5th Cir.1998); *Soil Bldg. Sys.,* 2004 WL 1283966, at *5. "If the *substance* of [the plaintiff's] claims, stripped of their labels, does not fall within the scope of the [forum selection] clause [ ], the clause[ ] cannot apply."*Soil Bldg. Sys.,* 2004 WL 1283966, at *4 (quoting *Roby v. The Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993)) (alteration in original)."Claims that arise out of the contractual relationship and implicate the agreement are subject to the forum selection clause."*Kessmann & Assoc., Inc. v. Barton-Aschman Assoc., Inc.,* 10 F.Supp.2d 682, 688 (S.D.Tex.1997); *see also Tex. Source Group, Inc. v. CCH, Inc.,* 967 F.Supp. 234, 238 (S.D.Tex.1997); *Hoffman v. Burroughs Corp.,* 571 F.Supp. 545, 547 (N.D.Tex.1982). In other words,

> the precise issue before this Court is whether the facts and claims alleged in the ... complaint have a direct or indirect connection, link or association with, or relation to (1) the contractual relationship evidenced by the ... Agreement; (2) an interpretation of the ... Agreement; (3) the facts that would support a breach of contract action based on the ... Agreement;

or (4) the subject matter of the ... Agreement. In arriving at its decision, the Court, taking the allegations in the ... complaint as true and resolving factual conflicts in the documentary submissions in favor of the plaintiff, looks to whether a connection, link, association with or relation to the ... Agreement, exists by reason of an established or discoverable relation.

**\*8** *Smith v. Lucent Techs., Inc.,* No. 02-0481, 2004 U.S. Dist. LEXIS 4074, at \*37 (E.D.La., Mar. 16, 2004). If such a connection is found between the claims at issue and the 2003 Agreement, the forum selection clause applies.

The Plaintiff argues the forum selection clause does not apply to any of its claims. It is asserting the following claims: (1) Count I-Patent Infringement; (2) Count II-Breach of Contract; (3) Count III-Unauthorized Trademark Reproduction in Violation of the Lanham Act; (4) Count IV-Infringement of Common Law Trade Dress Rights; and (5) Count V-Common Law Unfair Competition. The relevant language at issue from the 2003 Agreement forum selection clause is, "In the event either Party asserts a breach or default by the other under the terms of this Agreement, the jurisdiction, venue, and applicable law shall be [the] City of San Diego, California ..."

### 1. Count I-Patent Infringement
Plaintiff argues that resolution of the Patent Infringement claim does not depend on interpretation of either the 2001 Agreement or the 2003 Agreement. Plaintiff explains that because the contracts do not explicitly address patents or patent infringement, the forum selection clause is inapplicable to such a claim. Defendant argues that the 2003 Agreement authorized it to manufacture and sell Plaintiff's products embodying inventions in the patent at issue, without a time limit to market and sell such products. Thus, one of the Defendant's defenses to the patent infringement claim is based on the 2003 Agreement. "If enforcement of a provision in the [Agreement] is ... a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause."*Penn, L.L.C. v. New Edge Network, Inc.,* No. 03 C 5496, 2003 U.S. Dist. LEXIS 17664, at \*7 (N.D.Ill. Oct. 1, 2003). Thus, the Court finds that the allegations in this claim have a "direct or indirect connection, link or association with, or relation to" the 2003 Agreement. *See Lucent Techs., Inc.,*2004 U.S. Dist.

LEXIS 4074, at \*37. Therefore, the forum selection clause is applicable to this claim.

### 2. Counts II & III-Breach of Contract & Unauthorized Trademark Reproduction in Violation of the Lanham Act
Because the Plaintiff asserts the same argument for both of these claims, the Court considers them together. Plaintiff argues the forum selection clause does not apply to the breach of contract claim because the breach asserted involves use of licensed marks and confidentiality. Plaintiff further states that such subject matter is expressly allowed to "be introduced into and heard by any court having jurisdiction," pursuant to Section 5.3 of the 2003 Agreement. In addition, Plaintiff asserts that the breach related to Plaintiff's licensed marks falls under Section 7 [Intellectual Property] of the 2001 Agreement, and that Texas is the proper venue and jurisdiction to bring such a claim under Section 10 [Forum Selection] of the 2001 Agreement, and both Sections survive termination according to the Survival Clause, Section 5.7 of the 2001 Agreement. Plaintiff makes a similar argument regarding the Lanham Act claim.

**\*9** The forum selection clause specifically addresses breach or default under the 2003 Agreement. The breach of contract and Lanham Act claims fall within the purview of the 2003 Agreement's forum selection clause because the 2003 Agreement must be interpreted to determine whether the Defendant violated such rights of the Plaintiff, or whether it was acting in accordance with the Agreement. In addition, the 2003 Agreement is the controlling agreement as explained above. Thus, the forum selection clause is applicable with regard to both claims.

### 3. Count IV-Infringement of Common Law Trade Dress Rights
Plaintiff argues that because trade dress rights are another form of trademark rights, and trademark claims can be brought in any jurisdiction pursuant to Section 3.7 [Trademarks; Branding] of the 2003 Agreement, the forum selection clause does not apply. As explained above regarding the Lanham Act claim, interpretation of the 2003 Agreement is necessary to determine whether the Defendant violated the Plaintiff's trademark rights. Therefore, the forum selection clause applies to this claim.

### 4. Count V-Common Law Unfair Competition

Plaintiff argues that Defendant "unfairly competed by infringing [Plaintiff's] common law trade dress rights." Plaintiff further states that this claim falls under Section 3.7 [Trademarks; Branding] of the 2003 Agreement, and can be brought in "any court having jurisdiction," since the forum selection clause does not apply. To determine whether Defendant violated Plaintiff's trade dress rights, interpretation of the contract is necessary. If no violation occurred, then no unfair competition occurred. Because interpretation of the contract is necessary to determine if such claim can stand, the forum selection clause applies to this claim.

## D. Deference

The Court must next determine the amount of deference to be given to the forum selection clause. The amount of deference a court should give to a forum selection clause is determined by whether the Defendant has requested dismissal for improper venue under 28 U.S.C. § 1406(a) or requested transfer under § 1404(a). *See Int'l Software Sys., Inc. v. Amplicon, Inc.,* 77 F.3d 112, 115-16 (5th Cir.1996); *Pugh v. Arrow Elecs., Inc.,* 304 F.Supp.2d 890, 893 (N.D.Tex.2003); *Von Graffenreid,* 246 F.Supp.2d at 561; *Beauticontrol, Inc. v. Burditt,* No. 3:01-CV-0744-M, 2001 WL 1149360, at *2 (N.D.Tex. Sept.26, 2001). In this case, the Defendant has moved to dismiss, or in the alternative, to transfer for improper venue pursuant to § 1406(a). 28 U.S.C. § 1406(a) states, "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

Where a party seeks dismissal under § 1406(a), the forum selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Enforcement may be "unreasonable" when:

> **\*10** (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Haynsworth,* 121 F.3d at 963. However, the party seeking to avoid enforcement of the forum selection clause bears a heavy burden of proof. *Id.* "Where the contract contains a valid forum selection clause, dismissal rather than transfer is appropriate if the case is filed in the wrong district." *Von Graffenreid,* 246 F.Supp.2d at 562 (citing *Amplicon,* 77 F.3d at 115). The Fifth Circuit has upheld dismissal as an appropriate means of enforcement of a forum selection clause. *Amplicon, Inc.,* 77 F.3d at 114. The Plaintiff does not specifically address whether the forum selection clause is unreasonable. Rather, the Plaintiff only sets forth reasons why the case should not be transferred pursuant to the "interest of justice" balancing of 28 U.S.C. § 1404(a).

A transfer for improper venue falls under § 1406(a). *Jackson v. W. Telemarketing Corp. Outbound,* 245 F.3d 518, 523 (5th Cir.2001); *Soil Bldg. Sys.,* 2004 WL 1283966, at *6. The court has broad discretion in determining whether to dismiss or transfer a case in the interest of justice under 28 U.S.C. § 1406(a). *Soil Bldg. Sys.,* 2004 WL 1283966, at *6. "[I]n considering a defendant's motion to transfer, courts in this circuit should use an 'interest of justice' balancing test based on § 1404 and § 1406 in which the forum selection clause is only one consideration among many, whereas with a motion to dismiss, a court should presume that the clause is valid unless a defendant proves fraud or overreaching in relation to the clause itself." *Beauticontrol, Inc.,* 2001 WL 1149360, at *5. The court should look at convenience of the forum given the parties' expressed preference in the forum selection clause, the fairness of transferring the case in light of the forum selection clause, and the relative bargaining power of the parties. *Id.* at *6 The court should also weigh the convenience of the witnesses and "those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.' " *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 30, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). In most cases, the movant bears the burden of proving transfer is appropriate. *Watson,* 2003 WL 21145744, at *4. However, "the presence of a valid and enforceable forum selection clause shifts the burden of persuasion to the nonmovant who is attempting to avoid enforcement." *Id.*

Defendant argues that the parties' expressed preference in the 2003 Agreement was San Diego, California. Defendant avers Plaintiff has the burden of persuading the Court why the forum selection clause should not be enforced. It explains that Plaintiff is "a sophisticated business entity that has been in business for nearly 80 years, has over 500 franchise-owned centers throughout the United States and Canada, and has sold products or services to nearly 50 million households and businesses."In addition, the 2003 Agreement was executed in San Diego, California, and California law is applicable in interpretation of the contract. Defendant also argues both parties were represented by counsel in drafting this agreement. Therefore, Defendant asserts the case should be transferred to San Diego, California.

 **\*11** Using the interest of justice analysis, and considering the convenience of the parties, and witnesses the Plaintiff suggests the Northern District of Texas is the appropriate venue. Plaintiff's headquarters are in Dallas, Texas, and Plaintiff's representatives would have to travel over 1,000 miles to San Diego, California. Plaintiff also argues its "officers and key employees are located in Dallas, Texas," "most, if not all" documents related to Plaintiff's claims are located in Dallas, no relevant documents or witnesses are located in San Diego, it would significantly burden resources of the company to travel to San Diego for court appearances, and Plaintiff would have to retain local counsel in California. Additionally, Plaintiff argues whether venue is in San Diego or Dallas, Defendant will still have to travel over 1,000 miles. Defendant will have to retain local counsel in either city, Defendant does not have a sales representative in either city, and Defendant has a comparable number of warranty centers in both cities. Thus, Plaintiff asserts there is no reason to override its choice of forum in Dallas.

In analyzing the interest of justice factors, the Court agrees with the Defendant. In the 2003 Agreement, both parties contractually agreed to choose San Diego, California, as the forum. Plaintiff's concerns should have been raised at the time of drafting the forum selection provision, not after the fact. Both parties were represented by attorneys, and there is no evidence of any unequal bargaining power. It is not unfair or unreasonable to enforce a forum selection provision to which both parties contractually agreed to be bound.

This Court will enforce the contract's forum selection clause. Because the forum selection clause mandates the case be filed in San Diego, California, venue in this Court is "wrong." However, as transfer is an appropriate means under § 1406 to enforce the forum selection clause when a case is filed in the wrong district, this Court transfers the case to the United States District Court for Southern District of California, located in San Diego, California. *See*28 U.S.C. § 1406(a) (2005).

### III. Conclusion
For the reasons stated above, the Defendant's Motion to Dismiss is DENIED and Defendant's Motion to Transfer Venue is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1131093

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

58 F.Supp.3d 766
United States District Court,
S.D. Texas,
Houston Division.

WELLOGIX, INC., Plaintiff,

v.

SAP AMERICA, INC., et al., Defendants.

Civil Action No. H–14–
741. | Signed Nov. 10, 2014.

**Synopsis**
**Background:** Competitor of software production company sought declaration of noninfringement of company's patents. Production company counterclaimed under state law for misappropriation of trade secrets obtained during course of work performed pursuant to cooperation agreement. Following severance of counterclaims, competitor moved for summary judgment.

**Holdings:** The District Court, Sim Lake, J., held that:

[1] competitor did not waive forum selection clause in agreement;

[2] misappropriation claims were within scope of forum selection clause;

[3] forum selection clause was enforceable;

[4] dismissal for forum non conveniens was merited; and

[5] Germany was adequate and available forum.

Motion granted.

West Headnotes (34)

[1]     **Federal Courts**
        Forum non conveniens

        A federal court applies the federal law of forum non conveniens in deciding a motion to dismiss pursuant to a forum-selection clause pointing to a state or foreign forum.

        Cases that cite this headnote

[2]     **Federal Courts**
        Forum Non Conveniens
        **Federal Courts**
        Discretion in general

        The doctrine of forum non conveniens enables a district court, at its discretion, to decline to exercise jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum.

        Cases that cite this headnote

[3]     **Federal Courts**
        Forum Non Conveniens
        **Federal Courts**
        Convenience of parties and witnesses; location of evidence

        The ultimate inquiry in a forum non conveniens analysis is where trial will best serve the convenience of the parties and the ends of justice.

        Cases that cite this headnote

[4]     **Contracts**
        Legal remedies and proceedings

        For purposes of forum non conveniens analysis, because a valid forum-selection clause represents the parties' agreement as to the most proper forum and the overarching consideration is whether dismissal would promote the interest of justice, a valid forum-selection clause should be given controlling weight in all but the most exceptional cases.

        Cases that cite this headnote

[5]     **Contracts**
        Legal remedies and proceedings

        Competitor that allegedly misappropriated trade secrets from a software production company during course of cooperation agreement did not

waive right to enforce forum selection clause by filing declaratory action in Texas, where there was no indication that competitor intended to waive that right, and competitor did not substantially invoke judicial process in Texas to production company's detriment.

Cases that cite this headnote

**[6]** **Federal Courts**
👉 Agreement as to place of bringing suit; forum selection clauses

The enforceability of a forum-selection clause in federal court is governed by federal law, regardless of the basis for federal jurisdiction.

Cases that cite this headnote

**[7]** **Contracts**
👉 Legal remedies and proceedings

Before a court can consider enforcing a forum-selection clause, it must first determine whether the clause applies to the type of claims asserted in the lawsuit.

Cases that cite this headnote

**[8]** **Judgment**
👉 Essentials of Adjudication

Once a court has decided an issue of fact or law necessary to its judgment in a case, the doctrine of collateral estoppel precludes parties from relitigating that issue in a subsequent case involving a party to the first.

Cases that cite this headnote

**[9]** **Judgment**
👉 Identity of Issues, in General

**Judgment**
👉 Matters actually litigated and determined

**Judgment**
👉 Essentials of Adjudication

Collateral estoppel applies when a previously litigated issue of law or fact was: (1) identical to the present issue, (2) actually litigated, (3)

necessary to a final judgment, and (4) reviewed under the same standard as the present issue.

Cases that cite this headnote

**[10]** **Contracts**
👉 Legal remedies and proceedings

Software production company's state law misappropriation of trade secret claims were within the scope of forum selection clause contained in cooperation agreement with competitor; dispute arose out of agreement, since its resolution arguably depended on construction of confidentiality language in the agreement.

Cases that cite this headnote

**[11]** **Contracts**
👉 Legal remedies and proceedings

To determine whether a claim falls within the scope of a forum-selection clause, a court looks to the language of the contract.

Cases that cite this headnote

**[12]** **Contracts**
👉 Legal remedies and proceedings

As with the potential waiver of a forum-selection clause, a threshold issue in determining whether a claim falls within the scope of that clause is what law to apply.

Cases that cite this headnote

**[13]** **Contracts**
👉 Legal remedies and proceedings

The scope of a forum-selection clause is not limited solely to claims for breach of the contract that contains it.

Cases that cite this headnote

**[14]** **Contracts**
👉 Legal remedies and proceedings

In a forum-selection clause, the term "arising" is generally interpreted as indicating a causal connection; thus, clauses that extend only to

disputes "arising out of" a contract are construed narrowly, while clauses extending to disputes that "relate to" or "are connected with" the contract are construed broadly.

Cases that cite this headnote

**[15]** **Contracts**
 ⚷ Legal remedies and proceedings

In determining whether a claim falls within the scope of a forum selection clause, the phrase "arising in connection with" has been found to reach every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract; such a clause encompasses not only contract claims, but also statutory and common law trade secrets claims in connection with the agreement.

Cases that cite this headnote

**[16]** **Contracts**
 ⚷ Legal remedies and proceedings

All disputes the resolution of which arguably depend on the construction of the agreement arise out of that agreement for purposes of a forum-selection clause.

Cases that cite this headnote

**[17]** **Contracts**
 ⚷ Legal remedies and proceedings

**Federal Courts**
 ⚷ Waiver, estoppel, and consent

For purposes of a forum selection clause's exclusivity, a party's consent to jurisdiction in one forum does not necessarily waive its right to have an action heard in another.

Cases that cite this headnote

**[18]** **Contracts**
 ⚷ Legal remedies and proceedings

For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and

must clearly demonstrate the parties' intent to make that jurisdiction exclusive; therefore, to be enforceable, a forum-selection clause must be mandatory, not just permissive.

Cases that cite this headnote

**[19]** **Contracts**
 ⚷ Agreement as to place of bringing suit; forum selection clauses

Forum selection clause in cooperation agreement between two software production company and competitor was enforceable absent showing that it was unreasonable or exceptional.

Cases that cite this headnote

**[20]** **Contracts**
 ⚷ Agreement as to place of bringing suit; forum selection clauses

To show that a forum-selection clause is unreasonable, the resisting party must prove: (1) the incorporation of the forum-selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

Cases that cite this headnote

**[21]** **Contracts**
 ⚷ Legal remedies and proceedings

Forum-selection clauses must be given controlling weight in all but the most exceptional cases, because in all but the most unusual cases the interest of justice is served by holding parties to their bargain.

Cases that cite this headnote

**[22]** **Federal Courts**
 ⚷ Denial, dismissal, or transfer

*Giant Eagle's Motion to Strike* *Page 17*
R478

Dismissal of software production company's state law misappropriation of trade secret claims against competitor with which it had entered into a cooperation agreement for forum non conveniens was merited, where forum selection clause in agreement provided for Germany as the appropriate jurisdiction, private factors of the forum non conveniens analysis were irrelevant, public factors were insufficient to overcome the parties' agreement, and the case was not so unusual as to overcome forum selection clause.

Cases that cite this headnote

**[23]** **Contracts**
🔑 Agreement as to place of bringing suit; forum selection clauses
**Federal Courts**
🔑 Forum non conveniens

A forum-selection clause that points to a nonfederal forum must be evaluated under the doctrine of forum non conveniens, including a balancing-of-interests analysis.

Cases that cite this headnote

**[24]** **Federal Courts**
🔑 Public and private interests; balancing interests
**Federal Courts**
🔑 Availability and adequacy

The traditional forum non conveniens analysis comprises a two-step inquiry: first, the court must establish the existence of an alternative forum in which the case may be brought that is both available and adequate; second, if an alternative forum is both available and adequate, the district court must then weigh various private and public interest factors to determine whether dismissal is warranted.

Cases that cite this headnote

**[25]** **Federal Courts**
🔑 Availability and adequacy

For purposes of forum non conveniens analysis, Germany was adequate and available forum for software production company's

misappropriation of trade secrets claims against a competitor with which it had entered into a cooperation agreement; absent good faith showing to the contrary, court would assume that competitor would consent to jurisdiction provided in forum selection clause of cooperation agreement.

Cases that cite this headnote

**[26]** **Federal Courts**
🔑 Availability and adequacy

For purposes of forum non conveniens analysis, an alternative forum is available when the entire case and all parties can come within the jurisdiction of that forum.

Cases that cite this headnote

**[27]** **Federal Courts**
🔑 Availability and adequacy
**Federal Courts**
🔑 Amenability to process

For purposes of forum non conveniens analysis, a defendant's submission to the jurisdiction of a foreign forum sufficiently satisfies the availability requirement.

Cases that cite this headnote

**[28]** **Federal Courts**
🔑 Amenability to process

To dismiss a case for forum non conveniens a court must establish that the defendants are amenable to process in the alternative forum.

Cases that cite this headnote

**[29]** **Federal Courts**
🔑 Availability and adequacy

For purposes of forum non conveniens analysis, an alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they might not enjoy the same benefits as they might receive in an American court.

Cases that cite this headnote

**[30]** **Federal Courts**

🔑 Presumptions and burden of proof

A party moving to dismiss for forum non conveniens may rely on a presumption that the foreign forum is adequate.

Cases that cite this headnote

**[31]** **Federal Courts**

🔑 Presumptions and burden of proof

Under a forum non conveniens analysis, the substantive law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there.

Cases that cite this headnote

**[32]** **Federal Courts**

🔑 Parties' choice of forum; forum-shopping

**Federal Courts**

🔑 Public and private interests; balancing interests

Because a forum selection clause represents the parties' agreement as to the most proper forum, the plaintiff's choice of forum merits no weight, and a court must deem the private-interest factors to weigh entirely in favor of the preselected forum under forum non conveniens analysis; thus a court may only consider arguments about public-interest factors.

Cases that cite this headnote

**[33]** **Federal Courts**

🔑 Parties' choice of forum; forum-shopping

Because public interest factors in a forum non conveniens analysis will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases.

Cases that cite this headnote

**[34]** **Federal Courts**

🔑 Presumptions and burden of proof

For purposes of a forum non conveniens analysis, the party resisting enforcement of a forum selection clause has the burden of showing that public-interest factors overwhelmingly disfavor dismissal.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*769** Richard N. Laminack, Buffy Kay Martines, Thomas Wayne Pirtle, Laminack Pirtle et al., Thomas C. Wright, Wright & Close LLP, Houston, TX, D. Scott Hemingway, Eugenia Simmons Hansen, Hemingway Hansen LLP, Dallas, TX, for Plaintiff.

Joseph T. Jakubek, John D. Vandenberg, Stephen J. Joncus, Klarquist Sparkman, LLP, Portland, OR, How–Ying Albert Liou, Joseph Beauchamp, Scott W. Cowan, Jones Day, Michael Paul Graham, Attorney at Law, Maria Wyckoff Boyce, Amy Pharr Hefley, Baker Botts LLP, Edward Michael Cottrell, First Court of Appeals, Houston, TX, Tharan Gregory Lanier, Jones Day, Palo Alto, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SIM LAKE, District Judge.

Plaintiff Wellogix, Inc. ("Wellogix") brought this trade secrets action against SAP AG and SAP America, Inc. (collectively "SAP" or "Defendants"). Pending before the court is Defendants SAP America, Inc.'s and SAP AG's Motion for Summary Judgment ("Motion for Summary Judgment") (Docket Entry No. 8). For the reasons stated below, Defendants' Motion for Summary Judgment will be granted, and this case will be dismissed.

**I.** *Background*

**A. Business Relationship**

Wellogix develops software for the electronic procurement of goods and services by oil and gas operators.[1] This is commonly referred to as electronic "Purchase **\*770** to Pay" ("P2P") in the industry.[2] Traditionally, oil and gas companies planned drilling projects using paper records to track and pay costs.[3] Around 1998, Wellogix developed software that allowed oil companies to schedule and pay for complex services electronically.[4] According to Wellogix, it was the only firm offering such software from 2000 to 2005.[5] Wellogix did not offer a standalone solution, however, but implemented its technology through a series of pilot projects with partner firms.[6]

SAP, a potential partner, had an existing software solution providing electronic P2P functionality for the oil and gas industry, but it lacked the complex services functionality offered by Wellogix.[7] To facilitate integration of third-party software with its existing solution, SAP developed "middleware" software called "NetWeaver."[8] On March 15, 2005, Wellogix and SAP entered into the Powered by SAP NetWeaver Cooperation Agreement (the "NetWeaver Agreement"), which "permitted Wellogix, on a nonexclusive basis, to integrate its software with SAP's software through NetWeaver."[9]

In May of 2005, SAP and Wellogix pitched their integrated software to the consulting firm Accenture, which was working on behalf of BP to identify a global software provider for BP's operations.[10] "Without notifying Wellogix, Accenture and SAP began developing the complex services component of the global software for BP. As they developed the component, Accenture and SAP apparently accessed Wellogix technology ... that had been uploaded to [a confidential] portal."[11] Wellogix alleges that "SAP used these misappropriated trade secrets for its own substantial financial benefit, profiting handsomely from technology it did not develop but which it fully incorporated into its own products."[12]

### B. Trade Secrets Litigation and the 2008 Order

In May of 2008, Wellogix sued Accenture, BP, and SAP in Texas state court, and the case was removed to the Southern District of Texas, Galveston Division.[13] Wellogix asserted multiple causes of action, including breach of a partnership agreement by SAP, breach of fiduciary duty by SAP

and Accenture, fraud by SAP, negligent misrepresentation by SAP, tortious interference with contract and **\*771** prospective business relationships by SAP, Accenture, and BP, and theft of trade secrets by SAP, Accenture, and BP.[14] Judge Keith B. Ellison presided over the case.

Wellogix's claims against BP were arbitrated before Judge Ellison, who found that BP breached its confidentiality agreement with Wellogix by making Wellogix's confidential information accessible to Accenture and SAP.[15] Wellogix's suit against Accenture proceeded to trial.[16] The jury found for Wellogix, awarding $26.2 million in compensatory damages and $68.2 million in punitive damages.[17]

Relevant to the present case, Wellogix's trade secrets claims against the SAP defendants were dismissed pursuant to a forum-selection clause in the NetWeaver Agreement.[18] In a December 8, 2008, Memorandum and Order (the "2008 Order"), Judge Ellison held that the clause, which specified Frankfurt, Germany, as "[t]he place of jurisdiction for all disputes arising between the parties out of or in connection with [the NetWeaver Agreement]," was mandatory and enforceable,[19] and that all of Wellogix's claims against SAP AG and SAP America would have to be decided in Germany.[20]

### C. Patent Declaratory Judgment Action

On April 15, 2010, SAP America filed a Complaint for Declaratory Relief against Wellogix, Inc. and Wellogix Technology Licensing LLC (the "Declaratory Judgment Action"), which was assigned to the undersigned judge.[21] SAP sought a declaration of noninfringement and invalidity of five Wellogix patents.[22] In July of 2010, SAP filed *inter partes* requests for reexamination of Wellogix's patents with the United States Patent Office ("PTO").[23] SAP then moved to stay the Declaratory Judgment Action pending the outcome of the PTO reexamination.[24] Wellogix counterclaimed in the Declaratory Judgment Action for infringement of the same patents.[25] On January 4, 2011, the court stayed the Declaratory Judgment Action, pending reexamination.[26]

At a hearing on March 14, 2014, counsel for all parties agreed that the patent review process could take an additional six to **\*772** eighteen months to complete.[27] In order to allow Wellogix to file an amended answer and counterclaims

*Giant Eagle's Motion to Strike*

alleging theft of trade secrets, the court lifted the stay and directed Wellogix to file its amended answer and a motion to sever the trade secrets counterclaims into a new case. [28] On March 19, 2014, Wellogix filed its amended answer and counterclaims for patent infringement and theft of trade secrets. [29] Wellogix moved to sever its trade secrets counterclaims, the motion was granted, and on March 21, 2014, the counterclaims were docketed as Civil Case No. H–14–741. [30] SAP then moved for summary judgment on Wellogix's trade secrets claims. [31]

## II. *Analysis*

Wellogix's counterclaims against SAP America, Inc. and SAP AG allege misappropriation of trade secrets under Texas common law and theft of trade secrets in violation of the Texas Penal Code, which is made actionable under the Texas Theft Liability Act ("TTLA"). The common law claim is nearly identical to the claim that was dismissed by Judge Ellison in 2008. [32] The TTLA claim stems from the same incident. [33] Defendants have moved for summary judgment on the grounds that Wellogix's claims are barred by claim preclusion and issue preclusion, or, alternatively, that they should be dismissed for *forum non conveniens* pursuant to the forum-selection clause in the NetWeaver Agreement. Because the court is persuaded that Wellogix's counterclaims should be dismissed pursuant to the forum-selection clause and that the relevant portions of Judge Ellison's 2008 Order are issue preclusive, only these grounds are addressed in detail.

## A. Legal Standard

[1]  [2]  [3]  [4]  A federal court applies the federal law of *forum non conveniens* in deciding a motion to dismiss pursuant to a forum-selection clause pointing to a state or foreign forum. *Atlantic Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.,* —— U.S. ——, 134 S.Ct. 568, 580, 187 L.Ed.2d 487 (2013). The doctrine of *forum non conveniens* enables a district court, at its discretion, to decline to exercise jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co.,* 265 F.3d 258, 268 (5th Cir.2001). Indeed, "the ultimate inquiry is where trial will best serve the convenience **\*773** of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut.*

*Cas. Co.,* 330 U.S. 518, 67 S.Ct. 828, 834, 91 L.Ed. 1067 (1947). Because a valid forum-select ion clause "represents the parties' agreement as to the most proper forum" and the overarching consideration is whether dismissal would promote the "interest of justice," a valid forum-selection clause should be given controlling weight "in all but the most exceptional cases." *Atlantic Marine,* 134 S.Ct. at 581 (internal quotation marks and citations omitted).

## B. SAP has not waived its right to enforce the forum-selection clause.

[5]  As an initial matter, Wellogix argues that SAP has waived its rights under the forum-selection clause by filing the Declaratory Judgment Action in the Southern District of Texas. [34] SAP argues that it has not. [35] The parties have cited a smattering of cases from various federal jurisdictions, but they have ignored a key threshold issue: What law governs a finding of waiver in this context?

Wellogix relies on Supreme Court precedent for the "well-established law that a party waives all of its potential objections to a venue with respect to any counterclaims filed by a defendant when it chooses to bring suit in a forum where it could not otherwise be sued." [36] *See Gen. Elec. Co. v. Marvel Rare Metals,* 287 U.S. 430, 53 S.Ct. 202, 204, 77 L.Ed. 408 (1932). That case held that patent-specific venue provisions of the Judicial Code did not apply to counterclaims and, therefore, that a plaintiff who sues on a patent in a district in which he would not otherwise be subject to venue consents to that venue for other issues of the case, "including those pertaining to a counterclaim praying that he be restrained from infringing a patent of the defendant." *Id.* SAP does not contest the propriety of this court hearing Wellogix's patent counterclaims in the Declaratory Judgment Action.

While Wellogix contends that "[c]ourts have applied this rule to hold that parties have waived forum selection clauses by initiating litigation," [37] it has identified only one case in eighty years that did so, *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC,* No. 11–165 (JRT/LIB), 2012 WL 838439, at \*3 (D.Minn. Mar. 12, 2012). [38] Nevertheless, many federal courts have held, as a general matter, that a contracting party can waive a forum-selection clause, thereby relieving the other party of any obligation to file suit in the originally specified forum. *See, e.g., Innovative Display Techs. LLC v. Microsoft Corp.,* No. 2–13–783, 2014 WL 2757541, at \*5 (W.D.Tex. June 17, 2014). SAP responds that "Wellogix entirely ignores the touchstone of the

waiver inquiry: that a party cannot waive its forum-selection clause right[ ] unless that party possessed an actual intent to relinquish that right." [39] Although there is some support **\*774** for this proposition, the correct source of the governing rule remains unclear.

 **[6]** The *enforceability* of a forum-selection clause in federal court is governed by federal law, regardless of the basis for federal jurisdiction. *Haynsworth v. The Corporation,* 121 F.3d 956, 962 (5th Cir.1997); *see also Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir.1995) ("Because questions of venue and the enforcement of forum-selection clauses are essentially procedural, rather than substantive, in nature, federal law applies in diversity cases irrespective of *Erie.*") (internal quotation marks and citations omitted). While there is still considerable confusion as to what body of law applies to the *interpretation* of a forum-selection clause, there is some consensus that the court should apply the law that governs the rest of the contract. *See Martinez v. Bloomberg LP,* 740 F.3d 211, 222–23 (2d Cir.2014) (reviewing cases from several circuits).

Like interpreting a forum-selection clause, determining waiver of a forum-selection clause is arguably a matter of substantive contract law to be governed by the law applicable to the rest of the contract. *Cf. CK DFW Partners Ltd. v. City Kitchens, Inc.,* No. 3–6–1598, 2007 WL 2381259, at \*2 n. 8 (N.D.Tex. Aug. 17, 2007) ("Although federal law governs the enforceability of an otherwise valid forum selection clause, threshold questions concerning whether a forum selection clause is triggered or is somehow nullified under the other terms of the contract is a question governed by the applicable state law."); *Martinez,* 740 F.3d at 221 ("In construing a forum selection clause, a court may confront a wide range of contract law issues.... *Erie* warns against an approach that would force federal courts to generate a sprawling 'federal general common law' of contracts to govern such questions whenever they arise in the context of forum selection clauses.").

In the arbitration context, the Fifth Circuit holds that waiver is to be addressed as a matter of federal law. *See, e.g., Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 497 n. 4 (5th Cir.1986) ("The issue of arbitrability under the United States Arbitration Act is a matter of federal substantive law. We thus dismiss out of hand FWDC's citation of 60 Tex. Jur.2d 199 for the proposition[ ] that waiver is a question of fact based largely on intent.") (internal quotation marks and citations omitted).

When addressing waiver of a forum-selection clause, however, the Fifth Circuit applied Texas law and concluded that waiver requires an intent to relinquish a known right. [40] *See GP Plastics Corp. v. Interboro Packaging Corp.,* 108 Fed.Appx. 832, 836 (5th Cir.2004) (per curium) (unpublished) (citing *Two Thirty Nine Joint Venture v. Joe,* 60 S.W.3d 896, 904 (Tex.App.-Dallas 2001)), *rev'd,* 145 S.W.3d 150 (Tex.2004). [41]

 **\*775** Authorities cited by Wellogix also rely on state law to determine what constitutes waiver. *See Unity Creations, Inc. v. Trafcon Indus.,* 137 F.Supp.2d 108, 111 (E.D.N.Y.2001) ("In New York, when a party disregards a forum selection clause and sues on a contract in an unauthorized forum, it waives the forum selection clause on the claims it pursues."); *Dart Mech. Corp. v. Johnson Controls, Inc.,* No. 13–CV–2941(JS) (WDW), 2013 WL 5937424, at \*2 (E.D.N.Y. Nov. 4, 2013) (citing cases that applied New York law).

If federal law governs, the court has found no controlling cases on point and would therefore defer to the intent requirement articulated in *GP Plastics* and other cases in this district. [42] If the law applicable to the contract governs, this case presents two additional complications: First, the NetWeaver Agreement specifies that it is to be governed and construed in accordance with German law. [43] However, Wellogix has neither invoked the choice-of-law clause nor shown how SAP waived its rights under German law. Not having been formally invited, the court declines to venture further down this road. *Cf. Int. Admins., Inc. v. Life Ins. Co. of N.A.,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985) ("Although we are not certain that Illinois law would apply to every issue, were the question properly argued, we are certain that it is not the job of the trial judge to do the parties' work for them."). Second, the Texas Supreme Court has adopted a specific test to determine whether a party has waived a forum-selection clause, and it differs from the waiver test cited in *GP Plastics. See In re ADM Investor Servs., Inc.,* 304 S.W.3d 371, 374 (Tex.2010) ("A party waives a forum-selection clause by substantially invoking the judicial process to the other party's detriment or prejudice."). The parties have not addressed these issues; they simply disagree as to whether *GP Plastics* is distinguishable. Ultimately, the court concludes that SAP has not waived its rights under either the *GP Plastics* approach or the *In re ADM* approach.

*Giant Eagle's Motion to Strike*

*Page 22*

R483

*GP Plastics* holds that waiver of a forum-selection clause requires an intent to relinquish rights under the contract. 108 Fed.Appx. at 836–37. There is no evidence that SAP intended to waive its rights under the forum-selection clause in this case. In fact, SAP's complaint in the Declaratory Judgment Action demonstrates an intent not to relinquish the relief granted by Judge Ellison in 2008:

> ***\*776 SPECIFIC RELIEF NOT REQUESTED***
>
> SAP does not request any additional relief with respect to the claims adjudicated in [Judge Ellison's December 2008 Memorandum and Order] beyond that which has already been granted to SAP, all such claims being separate and distinct from the non-infringement and invalidity of the Wellogix Patents. [44]

The court therefore concludes that SAP did not intentionally relinquish its rights under the forum-selection clause.

*In re ADM* holds that a party waives a forum-selection clause by substantially invoking the judicial process to the other party's detriment or prejudice, but that there is a strong presumption against such waiver. [45] 304 S.W.3d at 374. Wellogix has not shown how it suffered any detriment or prejudice with respect to its trade secrets claims as a result of SAP's Declaratory Judgment Action in this forum. [46] The court therefore concludes that SAP has not waived its rights under the *In re ADM* approach. [47]

**C. The forum-selection clause is mandatory and enforceable with respect to Wellogix's trade secrets claims.**

SAP argues that Judge Ellison's 2008 Order dismissing Wellogix's trade secrets claims precludes Wellogix from challenging the enforcement of the forum-selection clause in this action. [48] Wellogix does not contest the preclusive effect of Judge Ellison's order, except to argue that the trade secrets claims are outside the scope of the forum-selection clause and that this issue was not litigated before Judge Ellison. [49] The court concludes that Judge Ellison's 2008 Order is entitled to full preclusive effect as to the enforceability of the forum-selection clause. Because the scope of the clause was not fully litigated before Judge Ellison, however, the court will address that issue.

**1.** *Wellogix's trade secrets claims are within the scope of the forum-selection clause.*

**[7]** Before a court can consider enforcing a forum-selection clause, it must first determine whether the clause applies to **\*777** the type of claims asserted in the lawsuit. *Braspetro Oil Servs. Co. v. Modec (USA), Inc.,* 240 Fed.Appx. 612, 616 (5th Cir.2007). SAP argues that Judge Ellison decided this issue in 2008 and that his order has preclusive effect. Wellogix argues that the issue was not actually litigated before Judge Ellison.

**[8] [9]** Once a court has decided an issue of fact or law necessary to its judgment in a case, the doctrine of collateral estoppel precludes parties from relitigating that issue in a subsequent case involving a party to the first. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). "In this circuit, collateral estoppel applies when a previously litigated issue of law or fact was [1] identical to the present issue, [2] actually litigated, [3] necessary to a final judgment, and [4] reviewed under the same standard as the present issue." *Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.,* 448 F.3d 825, 829 (5th Cir.2006).

Here, the parties appear not to have "actually litigated" the scope of the forum-selection clause before Judge Ellison. Although Wellogix arguably conceded that its trade secrets claims arose out of the NetWeaver Agreement, [50] concessions and stipulations do not necessarily have issue-preclusive effect. *See Martin v. Trend Personnel Servs.,* No. 3:13–CV–3953–L, 2014 WL 2894440, at \*4 (N.D.Tex. June 26, 2014); 18A Fed. Prac. & Proc. Juris. § 4443 (2d ed.). Even if resolution of the issue was logically necessary to Judge Ellison's decision, the scope of the clause was neither briefed by the parties nor fully addressed in Judge Ellison's Order. Although it is a close question, because the court reaches the same conclusion as Judge Ellison there is no reason to decide the preclusive effect of the Order on this issue.

**[10] [11] [12]** To determine whether a claim falls within the scope of a forum-selection clause, a court looks to the language of the contract. *Braspetro,* 240 Fed.Appx. at 616 (citing *Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 222 (5th Cir.1998)). As with the potential waiver of a forum-selection clause, a threshold issue here is what law to apply. The Fifth Circuit has applied federal law in this context, drawing on maritime and diversity cases in this and other circuits. *See, e.g., id.* Despite the choice-of-law clause in the NetWeaver Agreement, the parties also rely on federal law. This court will do the same. *See Phillips v. Audio Active*

*Ltd.,* 494 F.3d 378, 386 (2d Cir.2007) ("We will assume from the parties' briefing that they do not rely on any distinctive features of [the contractually selected] law and apply general contract law principles and federal precedent to discern the meaning and scope of the forum clause.").

The forum-selection clause in the NetWeaver Agreement states:

> The Agreement shall be governed and construed in accordance with the laws of the Federal Republic of Germany. The UNICITRAL purchase law shall not apply. The place of jurisdiction for all disputes arising between the parties out of or in connection with this Agreement **\*778** shall be Frankfurt, Germany. [51]

[13] [14] [15] "The scope of a forum-select ion clause is not limited solely to claims for breach of the contract that contains it." *MaxEn Capital, LLC v. Sutherland,* No. H–08–3590, 2009 WL 936895, at \*6 (S.D.Tex. Apr. 3, 2009). In a forum-selection clause, "[t]he term 'arising' is generally interpreted as indicating a causal connection." *Braspetro,* 240 Fed.Appx. at 616. Clauses that extend only to disputes "arising out of" a contract are construed narrowly, while clauses extending to disputes that "relate to" or "are connected with" the contract are construed broadly. *Blueskygreenland Envtl. Solutions, LLC v. Rentar Envtl. Solutions, Inc.,* No. H–11–1745, 2011 WL 6372842, at \*4 (S.D.Tex. Dec. 20, 2011). Thus, the phrase "arising in connection with" has been found to reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir.1999). Such a clause encompasses not only contract claims, but also statutory and common law trade secrets claims "in connection with" the agreement. *Id.* at 724–25. [52]

Beginning with the first substantive paragraph of Wellogix's trade secrets counterclaim, it is clear that this is "a dispute[ ] arising between the parties out of or in connection with [the NetWeaver Agreement]":

> Wellogix took reasonable steps to keep its technology and other confidential information as trade secrets and would not have disclosed its trade secrets

to any party without agreement by the receiving party to keep them secret. The SAP Parties, through their confidential and fiduciary relationships with Wellogix, acquired access to Wellogix's trade secrets. By acknowledging and agreeing that Wellogix had valuable trade secrets, the SAP Parties owed a duty not to use or disclose these trade secrets without Wellogix's permission. The SAP Parties, without permission or legal authority from Wellogix, misappropriated this highly valuable technology in order to obtain and perform under various agreements with its other business partners and customers. As a direct result of this misappropriation of trade secrets, Wellogix has been damaged and the SAP Parties have profited. [53]

**\*779** [16] Case law cited by Wellogix supports this conclusion as well, In arguing that SAP's patent claims against Wellogix also fall within the scope of the forum-selection clause, an issue the court need not reach, Wellogix relies primarily on *Omron Healthcare, Inc. v. Maclaren Exports Ltd.,* 28 F.3d 600 (7th Cir.1994). In *Omron,* the Seventh Circuit recognized that a test of but-for causation would be overly broad, and it held that "all disputes the resolution of which arguably depend on the construction of the agreement 'arise out of' that agreement" for purposes of a forum-selection clause. *Id.* at 603. The phrase "arise out of" is narrower than the language in the NetWeaver Agreement. Nevertheless, since the NetWeaver Agreement governs the confidentiality of Wellogix's trade secrets, [54] the resolution of Wellogix's claims "arguably depends" on construction of the NetWeaver Agreement. Those claims would therefore also fall within the scope of the forum-selection clause under the *Omron* test.

### 2. *The clause is mandatory, and it applies to both defendants.*

[17] [18] "A party's consent to jurisdiction in one forum does not necessarily waive its right to have an action heard in another." *City of New Orleans v. Mun. Admin. Servs., Inc.,* 376 F.3d 501, 504 (5th Cir.2004). "For a forum selection clause to be exclusive, it must go beyond establishing that

a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *Id.* Therefore, to be enforceable, a forum-selection clause must be mandatory, not just permissive. *Caldas & Sons, Inc. v. Willingham,* 17 F.3d 123, 127–28 (5th Cir.1994). Judge Ellison determined that the forum-selection clause in the NetWeaver Agreement is mandatory. [55] Judge Ellison also determined that the forum-selection clause applies to claims against both SAP AG, which was a signatory to the Agreement, and SAP America, which was not. [56] The parties do not dispute the preclusive effect of these findings.

### 3. *The clause is enforceable.*

 [19]    [20]    Prior to the Supreme Court's decision in *Atlantic Marine,* courts in this and other circuits enforced forum-selection clauses under the standard articulated in *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Under the *Bremen* standard, forum-selection clauses are prima facie valid and will be enforced unless the resisting party proves that enforcement is unreasonable. *Id.* at 1913. [57] A resisting party can show unreasonableness by establishing a number of relevant factors, [58] However, **\*780** that party bears a "heavy burden of proof." *Bremen,* 92 S.Ct. at 1917.

 [21]    After *Atlantic Marine,* forum-selection clauses must be "given controlling weight in all but the most exceptional cases," 134 S.Ct. at 579 (internal quotation marks and citation omitted), because in "all but the most unusual cases ... the 'interest of justice' is served by holding parties to their bargain," *id.* at 583. [59]

As the Second Circuit has observed, *Atlantic Marine* "did not address the extent to which the 'interest of justice' test ... resembles the test developed under *Bremen.*" *Martinez,* 740 F.3d at 219. Although there is still some uncertainty as to whether the *Bremen* factors remain relevant, courts continue to apply them. *See, e.g., id.* at 228; *Emrit v. Watts, Guerra, L.L.P.,* No. SA–13–CV–00473–XR, 2014 WL 3970172, at \*2 (W.D.Tex. Aug. 13, 2014) ("Assuming, for the sake of argument, that these factors all remain relevant post-*Atlantic Marine* ...."); *1–Stop Fin. Serv. Centers of Am., LLC v. Astonish Results, LLC,* No. A–13–CA–961–SS, 2014 WL 279669, at \*6–\*7 (W.D.Tex. Jan. 23, 2014) (applying balancing-of-interest factors but also addressing unreasonableness argument under *Bremen* standard).

Judge Ellison applied the *Bremen* standard, and he held that the forum-selection clause was enforceable. [60] To the extent that the *Bremen* standard is still applicable and dispositive, the court gives Judge Ellison's ruling full preclusive effect. Furthermore, since Wellogix has made no showing that this is an "exceptional" or "most unusual" case, the clause is also enforceable under *Atlantic Marine.*

### D. Wellogix's claims should be dismissed for forum *non conveniens.*

 [22]    [23]    Following *Atlantic Marine,* a forum-selection clause that points to a nonfederal forum must be evaluated under the doctrine of *forum non conveniens,* including a balancing-of-interests analysis. *Atlantic Marine,* 134 S.Ct. at 581–83. Because Judge Ellison's 2008 Order ruled on a 12(b)(3) motion and did not apply a *forum non conveniens* analysis, [61] the court must now do so.

 [24]    Under a traditional *forum non conveniens* analysis, the court conducts a two-step inquiry. First, the court must establish the existence of an alternative forum in which the case may be brought. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981). Such a forum must be both available and adequate. **\*781** *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147, 1165 (5th Cir.1987), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989), *reinstated except as to damages by In re Air Crash Disaster Near New Orleans, La.,* 883 F.2d 17 (5th Cir.1989). "If an alternative forum is both available and adequate, the district court must then weigh various private and public interest factors to determine whether dismissal is warranted." *Saqui v. Pride Cent. Am., LLC,* 595 F.3d 206, 211 (5th Cir.2010).

### 1. *Availability*

 [25]    [26]    [27]    "An alternative forum is available when the entire case and all parties can come within the jurisdiction of that forum." *Id.* (internal quotation marks and citation omitted). "A defendant's submission to the jurisdiction of a foreign forum sufficiently satisfies the availability requirement." *City of New Orleans Employees' Ret. Sys. ex rel. BP P.L.C. v. Hayward,* 508 Fed.Appx. 293, 296 (5th Cir.2013); *see also Saqui,* 595 F.3d at 210 ("Fifth Circuit law has consistently held that when a defendant submits to the jurisdiction of an alternate forum, that renders the forum available for purposes of FNC analysis.").

**[28]** To dismiss a case for *forum non conveniens* a court must establish that the defendants are amenable to process in the alternative forum. *In re BP Shareholder Derivative Litig.,* No. 10–MD–2185, 2011 WL 4345209, at *6 (S.D.Tex. Sept. 15, 2011) aff'd sub nom. *City of New Orleans Employees' Ret. Sys. ex rel. BP P.L.C. v. Hayward,* 508 Fed.Appx. 293 (5th Cir.2013). Neither party has addressed the availability of Germany as a forum or the Defendants' amenability to process there. Courts in this circuit sometimes condition dismissal for *forum non conveniens* on defendants stipulating that they will submit to the jurisdiction of the foreign court. *See, e.g., id.* However, this practice pre-dates *Atlantic Marine,* and it is not clear that such conditions are required in a case involving a forum-selection clause.

In light of the mandatory forum-selection clause providing for jurisdiction in Frankfurt, Germany, and Defendants' argument that the clause applies to claims against both SAP AG and SAP America, the court is satisfied that Defendants have consented to the jurisdiction of the German courts. The court is not inclined to delay the resolution of this matter by imposing conditions on dismissal. However, should Wellogix have a good-faith argument that SAP AG or SAP America is not amenable to process in Germany, the court *may* reconsider and condition dismissal on an appropriate stipulation. Barring a good-faith showing to the contrary, the Court finds that German courts provide an available alternative forum in which to proceed with this case.

**2.** *Adequacy*

**[29]** **[30]** **[31]** An alternative forum is adequate "when the parties will not be deprived of all remedies or treated unfairly, even though they might not enjoy the same benefits as they might receive in an American court." *In re Air Crash Disaster,* 821 F.2d at 1165 (citing *Piper,* 102 S.Ct. at 265; *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.,* 796 F.2d 821, 829 (5th Cir.1986)). Although neither party has addressed the adequacy of Germany as a forum, a party moving to dismiss for *forum non conveniens* "may rely on a presumption that the foreign forum is adequate." *Indusoft, Inc. v. Taccolini,* 560 Fed.Appx. 245, 249 (5th Cir.2014). "The substantiative law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum **\*782** made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there."

*DTEX, LLC v. BBVA Bancomer, S.A.,* 508 F.3d 785, 796 (5th Cir.2007) (internal quotation marks and citation omitted). Because Wellogix has made no showing to the contrary, the court presumes that Germany is an adequate alternative forum. Furthermore, the parties expressly agreed to both a German forum and the application of German law. The court sees no injustice in holding the parties to their bargain.

**3.** *Balancing of Interests*

**[32]** **[33]** *Atlantic Marine* modified the typical *forum non conveniens* analysis for cases involving a forum-selection clause. Because such a clause "represents the parties' agreement as to the most proper forum," the plaintiff's choice of forum "merits no weight," and a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atlantic Marine,* 134 S.Ct. at 581–82. Thus a court may only consider arguments about public-interest factors. [62] *Id.* at 582. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 583. "[S]uch cases will not be common." *Id.*

**[34]** SAP points to a number of public-interest factors favoring dismissal. [63] However, under *Atlantic Marine,* the party *resisting* enforcement has the burden of showing that public-interest factors "overwhelmingly disfavor" dismissal. *Id.* Because Wellogix has made no showing that public-interest factors disfavor dismissal, it has not met its burden under *Atlantic Marine.* This is not an "unusual case," and the forum-selection clause should control.

### III. *Conclusions and Order*

For the reasons stated above, Defendants SAP America, Inc.'s and SAP AG's Motion for Summary Judgment is **GRANTED.** However, this court may reassert jurisdiction upon timely notification if the courts of Germany refuse to accept jurisdiction for reasons other than Wellogix's refusal to pursue an action or to comply with the procedural requirements of German courts. The court retains jurisdiction to supervise the terms of this dismissal.

**All Citations**

58 F.Supp.3d 766

Footnotes

1   Wellogix's Opposition to SAP America, Inc.'s and SAP AG's Motion for Summary Judgment ("Opposition to Motion for Summary Judgment"), Case No. H–14–741, Docket Entry No. 15, pp. 8–9. Page citations are to the pagination imprinted by the federal court's electronic filing system at the top and right of the document. For a succinct summary of the background of this dispute see Facts and Proceedings, *Wellogix v. Accenture, L.L.P.,* 716 F.3d 867, 872–73 (5th Cir.2013).

2   Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, p. 3.

3   Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, p. 7.

4   *Id.*

5   *Wellogix,* 716 F.3d at 873.

6   *Id.*

7   Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, pp. 5–6.

8   Complaint for Declaratory Relief, Case No. H–10–1224, Docket Entry No. 1, pp. 3–4.

9   *Id.*

10  *Wellogix,* 716 F.3d at 873.

11  *Id.*

12  Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, p. 9.

13  *See* Notice of Removal, Case No. G–8–119, Docket Entry No. 1.

14  *See* Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, pp. 11–30.

15  *Wellogix,* 716 F.3d at 874.

16  *Id.*

17  *Id.* Ultimately, Wellogix accepted a remittitur of the punitive damages to $18.2 million, the amount it sought at trial. *Id.*

18  *See* Memorandum and Order, Case No. G–8–119, Docket Entry No. 54.

19  *Id.* at 5–16.

20  *Id.* at 16.

21  Complaint for Declaratory Relief, Case No. H–10–1224, Docket Entry No. 1.

22  *Id.* at 8–14. SAP later filed another declaratory judgment action, Case No. H–11–2840, which added a sixth Wellogix patent. It was consolidated into the pending Declaratory Judgment Action. *See* Order, Case No. H–10–1224, Docket Entry No. 72.

23  Notice of Filing of Requests for Reexamination, Case No. H–10–1224, Docket Entry No. 21.

24  SAP America, Inc.'s Motion to Stay Pending Reexamination, Case No. H–10–1224, Docket Entry No. 30.

25  Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Counterclaims, Case No. H–10–1224, Docket Entry No. 38, pp. 9–43.

26  Order, Case No. H–10–1224, Docket Entry No. 63.

27  *See* Transcript of Proceedings, Case No. H–10–1224, Docket Entry No. 112, pp. 4–5.

28  *Id.* at 5–8.

29  Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Amended Counterclaims, Case No. H–10–1224, Docket Entry No. 104; *see also* Case No. H–14–741, Docket Entry No. 1.

30  Counter–Plaintiff Wellogix, Inc.'s Motion for Severence, Case No. H–10–1224, Docket Entry No. 105; Order on Wellogix, Inc.'s Motion for Severance, Case No. H–10–1224, Docket Entry No. 106; Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Amended Counterclaims, Case No. H–14–741, Docket Entry No. 1.

31  Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8.

32  *Compare* Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Amended Counterclaims, Case No. H–14–741, Docket Entry No. 1, pp. 45–46 ¶¶ 242–249, *with* Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, pp. 23–24 ¶¶ 102–106.

33  *See* Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Amended Counterclaims, Case No. H–14–741, Docket Entry No. 1, p. 46 ¶¶ 247–249.

34  Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, pp. 19–29.

35    Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8, pp. 27–31; Defendants SAP America, Inc.'s and SAP AG's Reply Brief in Support of Their Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 16, pp. 4–10.

36    Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, p. 20.

37    *Id.* at 21.

38    The other cases Wellogix cites are either inapposite, *see id.* at 20–21, or apply New York state law, *see id.* at 21–22.

39    Defendants SAP America, Inc.'s and SAP AG's Reply Brief in Support of their Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 16, p. 8 (internal quotation marks and citation omitted).

40    The court did not specify whether or why state or federal law should control the issue.

41    The Dallas Court of Appeals in *Two Thirty Nine Joint Venture* recited the elements of waiver, but it was in the context of waiving a conflict of interest, not a waiver of contractual rights or a forum-selection clause. 60 S.W.3d at 911. *But see Johnson v. Structured Asset Servs., LLC,* 148 S.W.3d 711, 722 (Tex.App.-Dallas 2004, no pet.) ("In order to establish a waiver of rights under a contract, there must be proof of an intent to relinquish a known right."); *In re EPIC Holdings, Inc.,* 985 S.W.2d 41, 57 (Tex.1998) ("Waiver is an affirmative defense.... Waiver occurs when a party either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.").

42    Other courts in this district have required intent to waive a forum-select ion clause, though the source of the governing rule remains unclear. *See Texas Cmty. Bank, N.A. v. Dunn,* No. H–9–3514, 2010 WL 3220652, at *2 n. 1 (S.D.Tex. Aug. 13, 2010) (finding defendant's waiver argument "unpersuasive" because plaintiff "did not 'intentionally relinquish' its rights under the forum-selection clause.") (no citation in original); *Bancroft Life & Cas. ICC, Ltd. v. Davnic Ventures, L.P.,* No. H–12–2015, 2013 WL 1222112, at *2 (S.D.Tex. Mar. 25, 2013) (" 'For waiver to occur, there must be an existing right, knowledge of its existence, and either an actual intention to relinquish that right or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.' ") (quoting *N. Am. Specialty Ins. Co. v. Debis Fin. Servs., Inc.,* 513 F.3d 466, 470 (5th Cir.2007) (citing *Steptore v. Masco Const. Co.,* 643 So.2d 1213, 1215 (La.1994))). The Seventh Circuit has also held that waiver of a forum-selection clause requires "voluntary or intentional relinquishment of a known right." *Haber v. Biomet, Inc.,* 578 F.3d 553, 558 (7th Cir.2009). For authority, the court quoted a Seventh Circuit ERISA case, *Vershaw v. Nw. Nat. Life Ins. Co.,* 979 F.2d 557, 560 (7th Cir.1992), which in turn quoted a Fifth Circuit ERISA case, *Pitts v. Am. Sec. Life Ins. Co.,* 931 F.2d 351, 357 (5th Cir.1991).

43    Powered by SAP NetWeaver Cooperation Agreement, Exhibit A to Motion for Summary Judgment, Docket Entry No. 8–2, p. 13 ¶ 15.2.

44    Complaint for Declaratory Relief, Case No. H–10–1224, Docket Entry No. 1, p. 14.

45    The Fifth Circuit applies a similar test under federal law in the arbitration context: "Although waiver of arbitration is a disfavored finding, '[w]aiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party.' " *Nicholas v. KBR, Inc.,* 565 F.3d 904, 907 (5th Cir.2009) (citation omitted). "Prejudice in the context of arbitration waiver refers to delay, expense, and damage to a party's legal position." *Id.* at 910.

46    As Wellogix has stated, "the theft of trade secret claims stand completely independent of the patent claims." Wellogix, Inc. and Wellogix Technology Licensing, L.L.C.'s Renewed Motion to Lift Stay and Request for Entry of Scheduling Order, Case No. H–10–1224, Docket Entry No. 98, p. 3 ¶ 6. Judge Ellison was of the same opinion when, in 2010, he denied Wellogix's motion to consolidate the patent action with the then-pending trade secrets claims against Accenture. *See* Memorandum and Order, Case No. G–8–119, Docket Entry No. 203, pp. 3–5.

47    Because Wellogix has failed to establish that SAP waived any rights under the forum-selection clause, and neither party seeks to enforce the clause in the Declaratory Judgment Action, the court need not address whether the patent claims fall within the scope of the forum-selection clause.

48    Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8, pp. 19–24.

49    *See* Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, pp. 24–25.

50    *See* Wellogix, Inc.'s Response in Opposition to SAP America, Inc., SAP A.G. and Manfred Heil's Motion to Dismiss for Improper Venue, Case No. G–8–119, Docket Entry No. 22, p. 7 ("Plaintiff has pled that SAP A.G. has misappropriated confidential information and misappropriated trade secrets. These claims arise under both the Content Certification Agreement (Pennsylvania clause) as well as the [NetWeaver] Agreement (Germany clause).")

51    Powered by SAP NetWeaver Cooperation Agreement, Exhibit A to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8–2, p. 13 ¶ 15.2.

52    While some of these cases deal with arbitration clauses, the scope given to the phrase should not differ for purposes of a forum-selection clause. *Omron Healthcare, Inc. v. Maclaren Exports Ltd.,* 28 F.3d 600, 603 (7th Cir.1994); *see also* Opposition to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 15, p. 23 n. 4 ("Cases involving

arbitration clauses are broadly applicable to disputes about forum-selection clauses, because an agreement to arbitrate before a specific tribunal is considered by courts to be nothing more than a 'specialized kind of forum-selection clause.' " (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974))).

53    Defendants Wellogix, Inc. and Wellogix Technology Licensing's Amended Answer and Amended Counterclaims, Case No. H–14–741, Docket Entry No. 1, p. 45 ¶ 243; *see also* Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, p. 6 ¶ 25 ("*As part of this agreement,* after its execution on or about March 22, 2005 through March 24, 2005, several SAP/SAP A.G. employees went to Wellogix's offices for a three-day workshop wherein Wellogix disclosed highly confidential information and trade secrets." (emphasis added)).

54    Powered by SAP NetWeaver Cooperation Agreement, Exhibit A to Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8–2, p. 10 ¶¶ 12.1–12.2; *see also* Plaintiff's First Amended Complaint, Case No. G–8–119, Docket Entry No. 53, p. 6 ¶ 24 ("SAP/SAP A.G. is required under the NetWeaver Partner Agreement to strictly maintain the confidential information and trade secrets of Wellogix.")

55    Memorandum and Order, Case No. G–8–119, Docket Entry No. 54, pp. 5–9.

56    *Id.* at 14–16.

57    Although *Bremen* was an admiralty case, this and other circuits have applied it in diversity and federal question cases as well. *Haynsworth v. The Corporation,* 121 F.3d 956, 962 & n. 10 (5th Cir.1997).

58    To show that a forum-selection clause is unreasonable, the resisting party must prove: "(1) the incorporation of the forum-selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *Id.* at 963 (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *Bremen,* 92 S.Ct. at 1914–15, 1916, 1917).

59    The Court in *Atlantic Marine* established this standard for motions to transfer under § 1404(a), which permits a transfer "in the interest of justice." However, the court stated that "Section 1404(a) is merely a codification of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Atlantic Marine,* 134 S.Ct. at 580. The Court made clear that "the same standards should apply to motions to dismiss for *forum non conveniens* in cases involving valid forum-selection clauses pointing to state or federal forums." *Id.* at 583 n. 8; *see also Emrit v. Watts, Guerra, L.L.P.,* No. SA–13–473, 2014 WL 3970172, at *1 n. 5 (W.D.Tex. Aug. 13, 2014) ("[T]here is no doubt that *Atlantic Marine* controls the outcome of this case.").

60    *See* Memorandum and Order, Case No. G–8–119, Docket Entry No. 54, pp. 6 n. 2, 9–14.

61    *See id.* at 4–5.

62    "Public-interest factors may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.' " *Atlantic Marine,* 134 S.Ct. at 581 n. 6 (2013) (quoting *Piper,* 102 S.Ct. at 258 n. 6).

63    *See* Motion for Summary Judgment, Case No. H–14–741, Docket Entry No. 8, pp. 26–27.

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

R490

310 S.W.3d 880
Supreme Court of Texas.

In re LISA LASER USA, INC. and
Lisa Laser Products, oHG, Relators.

No. 09–0557.    |    April 16, 2010.

**Synopsis**
**Background:** Medical-device distributor brought breach-of-contract action against manufacturer. The 98th District Court, Travis County, Rhonda G. Hurley, J., denied manufacturer's motion to dismiss for improper forum on basis of contractual forum-selection clause. Manufacturer filed petition for mandamus relief. The Court of Appeals denied the petition. Manufacturer filed petition for mandamus relief in the Supreme Court.

**[Holding:]** The Supreme Court held that distributor's claims were required to be litigated in California.

Petition conditionally granted.

West Headnotes (7)

**[1]**    **Mandamus**
    ⬤ Remedy by Appeal or Writ of Error
**Mandamus**
    ⬤ Matters of discretion

Mandamus relief is available when a trial court clearly abuses its discretion and relief on appeal after a final judgment is inadequate.

4 Cases that cite this headnote

**[2]**    **Mandamus**
    ⬤ Change of venue and transfer of causes

A trial court abuses its discretion, so as to warrant mandamus relief, when it fails to properly interpret or apply a forum-selection clause.

21 Cases that cite this headnote

**[3]**    **Mandamus**
    ⬤ Modification or vacation of judgment or order
**Mandamus**
    ⬤ Change of venue and transfer of causes

An appellate remedy is inadequate, so as to warrant mandamus relief, when a trial court improperly refuses to enforce a forum-selection clause, because allowing the trial to go forward will vitiate and render illusory the subject matter of an appeal, i.e., trial in the proper forum.

15 Cases that cite this headnote

**[4]**    **Contracts**
    ⬤ Agreement as to place of bringing suit; forum selection clauses

In general, forum-selection clauses should be given full effect, and subjecting a party to trial in a forum other than the contractually chosen one amounts to clear harassment, injecting inefficiency by enabling forum-shopping, wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics.

7 Cases that cite this headnote

**[5]**    **Contracts**
    ⬤ Legal remedies and proceedings

Distributor's claims against medical-device manufacturer, alleging that manufacturer failed to inform distributor of new products and failed to offer distributor a right of first refusal to distribute new products, arose out of distribution agreement between the parties, rather than general obligations imposed by law, and thus, pursuant to agreement's forum-selection clause, claims were required to be litigated in California.

8 Cases that cite this headnote

**[6]**    **Contracts**
    ⬤ Legal remedies and proceedings

Contract between medical-device manufacturer and distributor included both document titled "Distribution Agreement" and document titled

"Standard Terms and Conditions," and thus forum-selection clause contained in terms and conditions applied to dispute arising out of manufacturer's alleged breach of terms contained in distribution agreement, since neither document alone contained enough terms to be a separate contract; terms and conditions document did not mention what product was the subject of the agreement between the parties, and distribution agreement, while setting out the rough outline of the parties' obligations, was also incomplete.

1 Cases that cite this headnote

[7] **Contracts**
👉 Legal remedies and proceedings

Forum-selection clause contained in distribution agreement between medical-device distributor, German manufacturer, and California corporation affiliated with manufacturer, applied to distributor's claims against German manufacturer as well as claims against California corporation, and thus claims were required to be litigated in California; German manufacturer was a signatory to agreement and forum-selection clause applied to "any dispute" arising from agreement.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*881** Derek Lawrence Davis, Byrd Davis Furman, L.L.P., Austin, for Relators.

George Breck Harrison, Joshua Abraham Romero, Jackson Walker L.L.P., Austin, for Real Parties in Interest.

**Opinion**

PER CURIAM.

In this mandamus petition we are asked to review a trial court's refusal to enforce a forum-selection clause designating a California forum for any lawsuits "arising out of" a distribution agreement. The clause was in an exhibit to the agreement, signed by all the parties, but the exhibit

specifically referenced only one of the two defendants sued. We hold that the trial court abused its discretion in failing to enforce the clause, and we conditionally grant the petition.

Relator Lisa Laser Products, oHG [1] ("Lisa Germany") is a German partnership that manufactures lasers for use in various medical fields. Lisa Laser USA, Inc., ("Lisa USA") is the registered assumed named of a California corporation affiliated with Lisa Germany (collectively, "Lisa Laser"). Lisa Germany manufactures medical lasers, and Lisa USA is the distributor of those products within the United States. In 2005, Lisa USA signed a distribution agreement with Real Party in Interest HealthTronics, Inc., a Georgia corporation headquartered in Austin, Texas. In 2007, **\*882** the agreement was superseded by an Amended and Restated Distribution Agreement (the Distribution Agreement or Agreement) that included Lisa USA and HealthTronics, the original contracting parties, and added Lisa Germany as a party. The President of Lisa USA, the CEO of Lisa Germany, and the Senior Vice–President for Medical Products of HealthTronics signed it.

The Distribution Agreement gave HealthTronics exclusive U.S. distribution rights for particular Lisa Laser medical devices. It also provided HealthTronics with rights of first refusal to distribute new, related products that Lisa Laser may produce, on condition that HealthTronics fulfill yearly purchase quotas and comply with other requirements. The Distribution Agreement also contained eight separately attached Exhibits, labeled A through H. Exhibit F is Lisa Laser's "Standard Terms and Conditions." Its preamble states:

> The following standard terms and conditions of sale apply to sales by Seller [Lisa Laser USA, Inc.] to HealthTronics, Inc. ... pursuant to the Distribution Agreement between the parties, a copy of which is attached hereto and incorporated herein by this reference, except as specifically modified in the Distribution Agreement.

Exhibit F also includes the following forum-selection clause, in Paragraph 16:

**APPLICABLE LAW; JURISDICTION AND VENUE**

This agreement will be governed by the laws of the State of California. The California state [or federal] courts

of Alameda County, California ... will have exclusive jurisdiction and venue over any dispute arising out of this agreement, and [HealthTronics] hereby consents to the jurisdiction of such courts.

Exhibit F is mentioned in the body of the Distribution Agreement in Section 4, titled "Terms of Purchase of Products By Customer." Relevant here, under the subhead "Terms of Purchase Orders" in Section 4, Exhibit F is incorporated:

> To the extent consistent with the terms set forth in this Agreement, Lisa Laser USA['s] standard terms and conditions, set forth as *Exhibit F* hereto, shall be applicable to the shipment of any Product to [HealthTronics]. [HealthTronics]'s purchase orders submitted to Lisa Laser USA from time to time with respect to Products to be purchased hereunder shall be governed by the terms of this Agreement, and nothing contained in any such purchase order shall in any way modify such terms of purchase or add any additional terms or conditions.

In September 2008, Lisa Laser notified HealthTronics that it was in default for failing to use its best efforts to market and sell the products to which it had exclusivity. HealthTronics alleged that it was abiding by the minimum purchase requirements during the contract period, but that Lisa Laser had refused to provide information about new products, failed to offer a right of first refusal to distribute new products, and began to directly market new products in the United States. HealthTronics then filed suit in district court in Travis County, Texas against both Lisa USA and Lisa Germany for breach of contract and tortious interference with contract (related to confidentiality and non-solicitation agreements between HealthTronics and its former employees) and sought monetary damages and injunctive relief.

In the trial court, Lisa Laser filed a motion to dismiss for improper forum on the basis of the forum-selection clause in Exhibit F. The trial court denied the motion. **\*883** Lisa Laser then sought mandamus relief and an emergency stay at the court of appeals. After originally granting the requested stay, the court of appeals denied the petition for writ of

mandamus. 2009 WL 2217745. Following the denial, Lisa Laser petitioned this Court for relief.

**[1]** **[2]** **[3]** **[4]** Mandamus relief is available when a trial court clearly abuses its discretion and relief on appeal after a final judgment is inadequate. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). [2] A trial court abuses its discretion when it fails to properly interpret or apply a forum-selection clause. *In re Laibe Corp.,* 307 S.W.3d 314 (Tex.2010). Further, an appellate remedy is inadequate when a trial court improperly refuses to enforce a forum-selection clause because allowing the trial to go forward will "vitiate and render illusory the subject matter of an appeal"—i.e., trial in the proper forum. *In re AIU Ins. Co.,* 148 S.W.3d 109, 115 (Tex.2004) (quoting *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992)); *accord In re Laibe Corp.,* 307 S.W.3d at 316. Accordingly, we have repeatedly held that mandamus relief is available to enforce an unambiguous forum-selection clause in a contract. *See, e.g., id.; In re AIU Ins. Co.,* 148 S.W.3d at 115–19; *In re AutoNation, Inc.,* 228 S.W.3d at 665; *In re Int'l Profit Assocs. I,* 274 S.W.3d at 674; *In re Int'l Profit Assocs. II,* 286 S.W.3d at 922; *In re ADM Investor Servs., Inc.,* 304 S.W.3d 371 (Tex.2010). In general, forum-selection clauses should be given full effect, and subjecting a party to trial in a forum other than the contractually chosen one amounts to " 'clear harassment' ... injecting inefficiency by enabling forum-shopping, wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics...." *In re AutoNation,* 228 S.W.3d at 667–68 (quoting *In re AIU Ins. Co.,* 148 S.W.3d at 117). [3]

**\*884** **[5]** In this case, HealthTronics argues that the forum-selection clause does not apply to the Texas lawsuit. First, it argues that because the clause was contained only in Exhibit F, it applies only to claims specifically related to "sales by Seller ... to HealthTronics," and not to any other claims based on the parties' relationships (such as breach of contract for failure to provide rights of first refusal or tortiously interfering with HealthTronics's contracts with its employees). Second, HealthTronics argues that the 2007 modification of the limiting language in the preamble indicates the parties' intent to limit the forum-selection clause only to disputes over sales transactions. Because all of HealthTronics's claims are directed at protecting its rights for the marketing and sale of the new lasers "to third parties" and protecting its confidential information, HealthTronics contends the claims in the Texas lawsuit are outside the scope of the clause and the Court should enforce the language of the Agreement as written

and bargained for. Finally, HealthTronics argues because the plain language of the preamble to Exhibit F indicates that the exhibit applies only to sales by "Seller" [Lisa USA] to HealthTronics, the forum-selection clause does not apply to its claims against Lisa Germany, a signatory to the Distribution Agreement but an entity that was specifically omitted from the terms in Exhibit F.

In this case, HealthTronics does not argue that the forum-selection clause is unenforceable, but that it only applies to part of the contract—sales transactions between it and Lisa USA. In examining whether claims brought by the plaintiff were within the scope of the clauses, this Court held that a reviewing court should engage in a "common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims." *Int'l Profit Assocs. I,* 274 S.W.3d at 677 (citing *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte,* 536 F.3d 439, 444 (5th Cir.2008)); *In re Laibe Corp.,* 307 S.W.3d at 316. In *International Profit Associates I,* the Court borrowed from its arbitration jurisprudence to determine whether a forum-selection clause included in contracts to provide business consulting services would apply to a tort suit. 274 S.W.3d at 674. In that case, the plaintiff the consulting company and its employee for negligently providing services, fraud, and breach of duty of good faith after the consulting company's employee allegedly embezzled large sums of money from the client. The Court held that "whether claims seek a direct benefit from a contract turns on the substance of the claim, not artful pleading.... [A] claim is brought in contract if liability arises from the contract, while a claim is brought in tort if liability is derived from other general obligations imposed by law." *Id.* at 677 (citing *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 131–32 (Tex.2005)). Using that rationale, the Court held that the tort claims arose from the contractual relationship of the parties. *Id.*

Although *In re International Profit Associates I* discussed a tort/contract dichotomy, rather than the scope of contractual coverage, its reasoning applies in this case. HealthTronics alleges that Lisa Laser failed to inform it of new products and failed to offer it a right of first refusal to distribute new products in the United States. Lisa Laser's obligation, if any, to do so only arises from the Distribution Agreement, in which Lisa Laser agreed to **\*885** sell and HealthTronics to buy urological lasers pursuant to certain terms. Those terms are set out both in the body of the Distribution Agreement as well as in the Exhibits.

**[6]** HealthTronics's textual argument—that the forum-selection clause applies only to sales "By Seller to HealthTronics" and that Section 4 of the Distribution Agreement incorporates the standard terms and conditions as "applicable to the shipment of any Product to the Distributor"—is unavailing. The Distribution Agreement and the Standard Terms and Conditions in Exhibit F are not separate, or even separable, agreements. Exhibit F does not contain price or quantity terms. *Cf.* TEX. BUS. & COM.CODE § 2.201 (setting basic terms for enforceable contracts for the sale of goods with a value over $500); *Miller v. Vaughn & Taylor Const. Co.,* 345 S.W.2d 852, 853 (Tex.Civ.App.-Fort Worth 1961, writ ref'd n.r.e.) ("A contract is not sufficiently certain to be enforced if it fails to specify the quantity of the goods to be sold."). Nor does it mention any particular product to be distributed. It is nothing more than the standard terms of purchase that would normally accompany any commercial purchase order. Likewise, the Distribution Agreement, while setting out the rough outline of the parties' obligations, is also incomplete. It requires and incorporates the additional terms from the exhibits to fully elucidate the parties' agreement. The exhibits are consecutively paginated following the body of the Distribution Agreement. The Distribution Agreement and the Exhibits were intended to be one document. And even if the exhibits have some independent significance, as this Court recognized in *In re Laibe,* "[a] contract can consist of more than one document [and d]ocuments pertaining to the same transaction may be read together." *In re Laibe Corp.,* 307 S.W.3d at 317. This is a prime example of a single transaction governed by a document with multiple subparts, referencing each other, and substantially incomplete without each other, but together comprising the Agreement.

Because neither document could be considered "this Agreement" by itself, the common sense approach is to read the two documents as multiple documents describing a singular transaction, with the forum-selection clause applying to all claims arising out of the Distribution Agreement. *Int'l Profit Assocs. I,* 274 S.W.3d at 677; *see also In re Laibe,* 307 S.W.3d 314; *Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34 (5th Cir.1990). Further, the forum-selection clause itself describes a scope broader that the mere sales transactions between Lisa USA and HealthTronics. It states that California shall be the forum "over *any* dispute arising out of this agreement," not merely any dispute arising out of *any particular sale.*

*Giant Eagle's Motion to Strike*

HealthTronics cites to two Texas court of appeals cases in support of its position that the forum-selection clause should not apply to its claims—*Apollo Property Partners, LLC v. Diamond Houston I, L.P.,* No. 14–07–00528–CV, 2008 WL 3017549, 2008 Tex.App. LEXIS 5884 (Tex.App.-Houston [14th Dist.] Aug. 5, 2008, no pet.) and *IKON Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Both are distinguishable. *Apollo Property Partners* is inapposite because the forum-selection clause at issue did not clearly mandate an Illinois forum; rather, it merely prevented either party from raising venue or personal jurisdiction arguments if an action were filed in Illinois. 2008 WL 3017549 *2–3. *IKON Office Solutions* is distinguishable because the portion of the sale agreement containing **\*886** the arbitration clause (an employment agreement) was an independent, integrated agreement, and because the arbitration provision did not broadly require arbitration of all disputes between the parties. "[T]he narrow arbitration clause in this case cover[ed] only disputes *related to the termination of employment.*" *IKON Office Solutions,* 2 S.W.3d at 696 (emphasis added). Because the fraudulent inducement claims at issue in the case were not related to the termination of the individual's employment, the dispute was outside the scope of the arbitration clause.

HealthTronics also argues that a change from the original 2005 distribution agreement evidences the parties' intent for the forum-selection clause to apply only to sales transaction disputes between HealthTronics and Lisa USA. The preamble to Exhibit F in the 2005 distribution agreement stated that the standard terms and conditions "apply except as specifically modified in the Distribution Agreement between the parties...." The preamble in the amended, 2007 Distribution Agreement, which is effective for this dispute, states that the terms apply "to sales by [Lisa USA] to HealthTronics, Inc. pursuant to the Distribution Agreement between the parties." This amendment does not limit the forum-selection clause (which continues to state that the clause applies to "any disputes" between the parties) but merely describes the "standard terms and conditions." This amendment is reasonable, considering that Lisa Germany was not a party to the 2005 agreement, but is a party to the 2007 Distribution Agreement, and the amendment was necessary to identify the buyer and the seller.

HealthTronics's claims arise out of the Agreement rather than other general obligations imposed by law. That is, but for the Agreement, HealthTronics would have no basis to complain that Lisa Germany failed to offer the right of first refusal to

HealthTronics to distribute new products, failed to provide HealthTronics information about new products, allowed other distributors to sell products for which HealthTronics was supposed to be the exclusive distributor, and wrongfully terminated the contract. *See In re Int'l Profit Assocs. I,* 274 S.W.3d at 678. Accordingly, the trial court erred in refusing to enforce the clause in the Texas lawsuit.

 **[7]** Next, HealthTronics contends that even if the forum-selection clause applies to its claims against Lisa USA, it does not apply to claims against Lisa Germany, because the plain language of the preamble makes Exhibit F applicable only to "sales by Seller [Lisa USA] to HealthTronics, Inc. ... pursuant to the Distribution Agreement." As discussed above, Exhibit F is the default terms and conditions to the sales and distribution contract between Lisa Laser and HealthTronics. Because no sales actually occur between Lisa Germany and HealthTronics, it is not surprising that Lisa Germany is not mentioned in Exhibit F.

HealthTronics's claims against Lisa Germany are for breaches of the right of first refusal and exclusivity clauses in the Distribution Agreement. Lisa Germany was a signatory to the Distribution Agreement, which incorporated Exhibit F, and HealthTronics seeks to enforce obligations of the contract in this lawsuit. A plaintiff "cannot both have his contract and defeat it too." *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 135 (Tex.2005). In other words, HealthTronics cannot claim that Lisa Germany has obligations to HealthTronics under the Distribution Agreement and simultaneously claim that the forum-selection clause does not apply to those claims. *See also Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) (holding, in the context of an **\*887** arbitration agreement, that "a signatory to that agreement cannot, ... 'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory").

Accordingly, reading the forum-selection clause in Exhibit F in context of the whole Agreement, considering that Lisa Germany was a signatory to the Distribution Agreement, that the forum-selection clause applies to "any dispute arising out of this agreement," and that HealthTronics seeks to hold Lisa Germany responsible for obligations under the Distribution Agreement, we conclude that all disputes arising out of the Distribution Agreement against either or both defendants are to be litigated in Alameda County, California.

The forum-selection clause at issue in this case governs the forum for the dispute between HealthTronics and Lisa Laser, and the trial court abused its discretion in failing to dismiss the case based on the clause. For these reasons, and without hearing oral argument, TEX.R.APP. P. 52.8(c), we conditionally grant Lisa Laser's petition for writ of mandamus and direct the trial court to vacate its order and grant Lisa Laser's motion to dismiss. We are confident the trial court will comply, and the writ will issue only if it fails to do so.

**All Citations**

310 S.W.3d 880, 53 Tex. Sup. Ct. J. 624

Footnotes

1  oHG is short for "offene Handelsgesellschaft" which literally translates to "open trading company." LANGENSCHEIDT'S GERMAN–ENGLISH, ENGLISH–GERMAN DICTIONARY 112, 165 (E. Klatt & G. Golze eds., 1962); MODERN DICTIONARY OF INTERNATIONAL LEGAL TERMS 27 (Little, Brown & Co. 1993) (1992). It is the German equivalent of a general partnership. *E.g.,* Norbert Meister & Gunner Schuster, *Classifying Foreign Entities Investing in Germany,* 2 INT'L TAX REV., July/Aug. 1991, at 42, 42.

2  Before this Court for the first time on appeal, Lisa Laser argues that California law applies to determine whether the forum-selection clause is applicable and whether mandamus relief is available to correct the trial court's error, as the parties chose California law in the Distribution Agreement. This Court has applied Texas law in the mandamus cases in which the parties seek to enforce a forum-selection clause, even if the contract also contains a choice-of-law clause selecting the application of another state's substantive law. *See, e.g., In re AIU Ins. Co.,* 148 S.W.3d 109, 111 (Tex.2004) (applying Texas law in a mandamus action enforce a forum-selection clause in a contract that also included a choice-of-law provision designating New York law); *In re Automated Collection Techs., Inc.,* 156 S.W.3d 557, 558 (Tex.2004) (same, Pennsylvania law); *In re AutoNation, Inc.,* 228 S.W.3d 663, 665 (Tex.2007) (same, Florida law); *In re Lyon Fin. Servs.,* 257 S.W.3d 228, 230–31 (Tex.2008) (same, Pennsylvania law); *In re Int'l Profit Assocs., Inc. ("Int'l Profit Assocs. I"),* 274 S.W.3d 672, 674 (Tex.2009) (same, Illinois law); *In re Int'l Profit Assocs., Inc. ("Int'l Profit Assocs. II"),* 286 S.W.3d 921, 922 (Tex.2009) (same, Illinois law). Further, the determination of whether mandamus relief is available is a matter of procedure. The law of the forum state applies to procedural questions. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 387 & n. 17 (Tex.2008). Accordingly, we apply Texas law in determining whether mandamus relief is available in this case.

3  Notwithstanding Lisa Laser's invocation of California law, the parties do not allege that there are any material differences between California and Texas law when it comes to interpretation and enforcement of forum-selection clauses. In California, as in Texas, (a) the denial of a motion to dismiss or to stay pursuant to a valid forum-selection clause may be the basis for mandamus relief; (b) a mandatory forum-selection clause is to be enforced unless it is unreasonable; and (c) the plaintiff must shoulder a "heavy burden" to prove unreasonableness, and mere inconvenience and additional expense is insufficient. *See, e.g., Net2Phone, Inc. v. Superior Court,* 109 Cal.App.4th 583, 135 Cal.Rptr.2d 149, 154 (2003); *Olinick v. BMG Entm't,* 138 Cal.App.4th 1286, 42 Cal.Rptr.3d 268, 273 (2006); *Smith, Valentino & Smith, Inc. v. Superior Court,* 17 Cal.3d 491, 131 Cal.Rptr. 374, 551 P.2d 1206, 1208–09 (1976).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

209 F.R.D. 388
United States District Court,
S.D. Texas,
Houston Division.

LASERDYNAMICS INC., Plaintiff,
v.
ACER AMERICA CORP., and Acer Communications
& Multimedia America Inc. Defendants.
Acer America Corp. and Benq Inc.
Acer Communications & Multimedia
America Inc. Third–Party Plaintiffs,
Cyberlink Corp., Intervideo, Inc., and
Mediamatics, Inc., Third–Party Defendants.

No. CIV.A.H–01–1745.  |  Aug. 15, 2002.

Patentee brought suit for infringement of patent on DVD software. Defendant impled third-party defendant, seeking indemnity pursuant to a licensing agreement. On third-party defendant's motion to dismiss for improper venue, or to transfer venue, the District Court, Hoyt, J., held that: (1) forum selection clause in software licensing agreement which provided "any dispute arising out of this Agreement" would subject to exclusive jurisdiction of California state and federal courts was applicable to third-party claim, and (2) clause was not unreasonable.

Motion to dismiss granted.

West Headnotes (4)

[1]     **Contracts**
          Agreement as to Place of Bringing Suit;
      Forum Selection Clauses

       Forum selection clauses carry a presumption of validity.

       2 Cases that cite this headnote

[2]     **Contracts**
          Agreement as to Place of Bringing Suit;
      Forum Selection Clauses

       Opponents of a motion to enforce a forum selection clause may rebut the presumption of validity by establishing that the clause is unreasonable-namely, that the clause is the synthesis of fraud or coercion.

       2 Cases that cite this headnote

[3]     **Contracts**
          Legal Remedies and Proceedings

       Forum selection clause in software licensing agreement which provided "any dispute arising out of this Agreement" would subject to exclusive jurisdiction of California state and federal courts was applicable to third-party claim of licensee seeking indemnity pursuant to the agreement for any liability flowing from underlying patent infringement suit against licensee, notwithstanding licensee's claim that clause covered only specific licensing or payment issues.

       5 Cases that cite this headnote

[4]     **Contracts**
          Agreement as to Place of Bringing Suit;
      Forum Selection Clauses

       Forum selection clause in software licensing contract was not unreasonable, where it was entered into by sophisticated global business entities, incorporated and licensed to transact business all over the world, and record established that the agreement was entered into freely and without coercion.

       2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*388**  Timothy N Trop, Trop Pruner et al, Houston, TX, for plaintiff.

 **\*389**  Scott F Partridge, Baker & Botts, Paul R Morico, Baker Botts, LLP, Houston, TX, Warren J Krauss, Sedgwick Detert et al, James Yuanxin Li, Sedgwick Detert et al, San Francisco, CA, for defendants.

## MEMORANDUM AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

This case concerns the scope of forum selection clauses and their relationship to Third–Party Practice promulgated under Rule 14 of the FEDERAL RULES OF CIVIL PROCEDURE. Before the Court is the third-party defendant Mediamatics Inc.'s ("Mediamatics") motion to dismiss pursuant to 12(b)(3), or transfer venue pursuant to § 1404. The Court has reviewed the papers on file and concludes that Mediamatics's motion to dismiss should be GRANTED.

## II. FACTUAL HISTORY

In May of 1998, Acer America Corporation and Benq Inc., ("Acer") and Mediamatics entered into a licensing agreement concerning DVD software. Pursuant to the agreement, Mediamatics licensed its DVD software to Acer, and promised to indemnify Acer for any patent infringement liability flowing from Acer's use of the DVD software. The Acer–Mediamatics agreement also contains a forum selection clause that mandates all disputes "arising under [the] Agreement" be litigated in the state and federal courts of California. In the cardinal action, the plaintiff, Laserdynamics Inc., is suing Acer, alleging patent infringement of its DVD software, listed as Patent No. 6,215,743. As a result, Acer impled Mediamatics in this action, seeking indemnity from any liability flowing from its underlying case against Laserdynamics concerning the DVD software. Mediamatics moves this Court to dismiss Acer's indemnity claim against it, arguing that the parties contracted to litigate all matters arising from their contract in another forum.

## III. CONTENTIONS OF THE PARTIES

### A. Mediamatics's Contentions

Mediamatics contends that the Court should enforce the forum selection clause and dismiss the Acer's third-party action pursuant to 12(b)(3), because the agreement's forum selection clause controls Acer's indemnity claim against Mediamatics. Mediamatics maintains that Acer's indemnity claim "arises out of the agreement," because the contract itself must be interpreted to resolve the question presented. Therefore, the forum selection clause mandates that suits between the parties be litigated under the laws and courts of California. Mediamatics bulwarks this position by citing various United States Supreme Court and lower court authority for the proposition that forum selection clauses are presumptively valid. In light of the Supreme Court and lower court authority treating forum selection clause enforcement issues, Mediamatics opines that the forum selection clause is neither unreasonable nor overreaching, it does not violate public policy, and does not deprive Acer of its day in court. Further, Mediamatics notes that the parties are sophisticated international business entities that freely entered into the agreement.

As to the manner of disposition, Mediamatics opines that the Court is empowered to dismiss Acer's claim under 12(b)(3). In the alternative, Mediamatics argues that the Court should transfer the third-party claim to the appropriate federal court in California, pursuant to 28 U.S.C. § 1404(a). [1]

### B. Acer's Contentions

Acer argues that the parties' forum selection clause does not apply to its Rule 14 action here. Acer interprets the "disputes arising out of this agreement" language of **\*390** the forum selection clause to embrace only specific licensing or payment issues between the parties. Acer asserts that there is no dispute with Mediamatics as to any licensing or payment issues between the two parties. Instead, Acer maintains that its impleader is the natural consequence from the underlying patent case concerning Mediamatics's DVD software. From this, Acer concludes that the Laserdynamics lawsuit has nothing to do with the Acer–Mediamatics agreement. Acer goes on to note that Mediamatics has a "general obligation under the law" and the Uniform Commercial Code [2] to indemnify it in this case.

Second, Acer contends that the Court should employ its discretion to retain jurisdiction over Acer's third-party claim. Even assuming the forum selection cause applies, Acer opines, the forum selection clause is only one factor in the Court's consideration to transfer or dismiss this action. Acer maintains that when the Court examines collateral issues such as witness convenience and other factors of fundamental fairness, judicial economy principles should persuade the Court to deny Mediamatics's motion to dismiss. In reaching this result, Acer opines that the Court would avoid the apparent injustice of unduly burdening Acer to litigate the infringement liability issue from both sides-that is, defending against liability issue in this Court, while conversely attempting to establish that same infringement liability issue

to buttress its indemnity claim against Mediamatics in California.

Lastly, Acer contends that the Court's retention of the indemnity claim is essential to preserve Acer's right to indemnity under the contract. Because of complexity of the case, and the potentially expensive cost of defending and litigating this action, Acer asserts that the Court should not dismiss or transfer the case, because doing so would constitute an undue burden upon Acer.

## IV. STANDARD OF REVIEW

### *Motions to Dismiss Pursuant to Rule 12(b)(3)*

FEDERAL RULE oF CIVIL PROCEDURE 12(b)(3) permits a defendant to move to dismiss an action on the basis of improper venue. *Frietsch v. Refco, Inc.,* 56 F.3d 825, 830 (7th Cir.1995) *Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir.1998); *Lipcon v. Underwriters at LLoyd's, London,* 148 F.3d 1285, 1290 (11th Cir.1998); *Psarros v. Avior Shipping, Inc.,* 192 F.Supp.2d 751, 752–53 (S.D.Tex.2002). The majority of the courts conform to the standard that once a defendant has raised the improper venue issue by motion, the burden of sustaining venue rests with the plaintiff. *McCaskey v. Continental Airlines Inc.,* 133 F.Supp.2d 514, 523 (S.D.Tex.2001); *Bigham v. Envirocare of Utah, Inc.,* 123 F.Supp.2d 1046, 1048 (S.D.Tex.2000). In the absence of an evidentiary hearing on the matter, courts will allow a plaintiff to carry the burden by establishing facts, taken as true, that establish venue. *McCaskey,* 133 F.Supp.2d at 523; *Bigham,* 123 F.Supp.2d at 1048; *Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir.1994). The Court will accept uncontroverted facts contained in the Plaintiff's pleadings as true, and resolve any conflicts in the parties' documents and affidavits in the Plaintiff's favor. *McCaskey,* 133 F.Supp.2d at 523. While a defendant need not affirmatively disprove all bases for a plaintiff's choice of venue, courts will provide the plaintiff the benefit of the doubt in ascertaining the controlling facts. *Id.*

## V. ANALYSIS

**[1]** **[2]** Federal law controls the Court's examination concerning the enforceability of a forum selection clause. *Haynsworth v. The Corp.,* 121 F.3d 956, 962 (5th Cir.1997). The United States Supreme Court has held that forum selection clauses carry a presumption of validity. *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *see also Mitsui & Co. (USA), Inc. v. MIRA M/V,* 111 F.3d 33 (5th Cir.1997). Opponents

of a motion to enforce a forum selection clause may rebut the presumption by establishing that the clause is unreasonable-namely, that the clause is the synthesis of fraud or coercion. **\*391** *Bremen,* 407 U.S. at 12–13, 92 S.Ct. 1907. Unreasonableness in this context may be established if the motion-opponent proves either that the provision is the product of fraud or overreaching. Thus enforcement of the provision would violate a stout public policy, or "enforcement of the clause would deprive the plaintiff of his day in court." *Bremen,* 407 U.S. at 12–13, 92 S.Ct. 1907; *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *MacPhail v. Oceaneering Int'l Inc.,* 170 F.Supp.2d 718, 726 (S.D.Tex.2001).

**[3]** In the instant case, Acer argues that the forum selection clause does not apply to its indemnity action against Mediamatics. In addition, Acer advances the position that the Court should narrowly construe the forum selection clause to cover only specific licensing or payment issues. The Court disagrees with Acer's interpretation of the forum selection clause. The relevant language of the forum selection clause provides: "Any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts of California, and the parties hereby consent to the jurisdiction of such courts."

**[4]** The word "arising" connotes and denotes an *origin* or genesis of a thing. It follows that the parties intended that those disputes that arise under the Acer–Mediamatics agreement be litigated in the manner proscribed by the forum selection clause. The Acer–Mediamatics agreement has "patent licensing" as its nucleus. In other words, the spirit of the Acer–Mediamatics agreement contemplates the rights and duties of the parties concerning the DVD software. If any right or obligation in the Acer–Mediamatics agreement is threatened or impaired by an act of the parties or their privities, that act gives rise to a dispute under the agreement. [3] *See Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 222–23 (5th Cir.1998). Moreover, Acer's arguments concerning systemic fairness do not carry its heavy burden to rebut the presumption of the forum selection clause's enforceability. *See M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). This contract was entered into by sophisticated global business entities, incorporated and licensed to transact business all over the world. The record establishes that the Acer–Mediamatics agreement was entered into freely and without coercion. Fairness, in this action, mandates enforcement of the Acer–Mediamatics agreement.

Acer has not met its "heavy burden" to rebut the presumption that the forum selection clause is reasonable. This contract is not the product of fraud or overreaching. The Court finds that enforcing the forum selection clause in this matter neither frustrates a stout public policy, nor deprives Acer of its day in court. Acer notes that our policy of "systemic integrity and fairness" warrants the Court's retention of Acer's third-party claim. The Court disagrees with Acer's use of that policy premise. Acer's third party claim is for indemnity. The indemnity claim is one that requires a condition precedent before the right is truly implicated: an adjudicative finding of liability upon the benefactor of the indemnity clause. *See* BLACK'S LAW DICTIONARY 772 (7th ed.1999).[4] Acer is free to litigate the indemnity issue once this matter is resolved or re-file its claim in California upon the final judgment of Mediamatics's motion. Although Rule 14 permits defendants to implead parties that may be primarily or secondarily liable on the plaintiff's claim, the same Rule enables our federal courts with the necessary[5] discretion to avoid the potential pitfalls of complex multi-party litigation. **\*392** FED. R. CIV. P. 14; *see also Dery v. Wyer, 265 F.2d 804 (2nd Cir.1959)*; *Florida East Coast Railway Co. v. United States, 519 F.2d 1184 (5th Cir.1975).* Hence, the Court exercises its discretionary authority to dismiss Acer's third-party action, pursuant to Rule 12(b)(3) of the FEDERAL RULES OF CIVIL PROCEDURE.

After weighing the validity of Acer's contentions, the Court finds no compelling justification to avoid enforcement of Acer's forum selection clause. To do otherwise would contravene the spirit of contract law. This Court has long adhered to the legal maxim, *pacta sunt servanda:* Agreements of the parties must be observed. This resolution also furthers a co-existing judicial policy goal that every party should be duly afforded the opportunity to address his disputes and independent grievances in a just manner. *See* F ED. R. CIV. P. 1. Therefore, the Court finds that the forum selection clause of the Acer–Mediamatics agreement applies and should be enforced.

## VI. CONCLUSION

In light of the discussion above, and pursuant to the discretion allotted this Court by Rule 14 of the FEDERAL RULES OF CIVIL PROCEDURE, the Court GRANTS the Third–Party Defendant's motion to dismiss Acer's third-party indemnity claim against Mediamatics WITHOUT PREJUDICE.

It is so ORDERED.

### All Citations

209 F.R.D. 388

## Footnotes

1    Rule 12(b)(3) and 28 U.S.C. § 1404(a) have been employed by courts to enforce forum selection clauses. *See International Software Sys. v. Amplicon, Inc.,* 77 F.3d 112, 113 (5th Cir.1996); *Lafargue v. Union Pacific Railroad,* 154 F.Supp.2d 1001 (S.D.Tex.2001). The Fifth Circuit has not squarely addressed the procedural method to dismiss cases on the basis on enforcing a forum selection clause; however, in *Mitsui & Co. (USA), Inc. v. MIRA M/V,* 111 F.3d 33 (5th Cir.1997), the Court affirmed the District Court's decision to dismiss a lawsuit that employed 12(b)(3) as its basis. Based on the rationale articulated below, the Court need not consider Mediamatics's alternative motion to transfer venue.

2    In its reply to this premise, Mediamatics points out that the relative U.C.C. provision applies in absence of an agreement to indemnify. *See* CAL. COM. CODE § 2312(3) (West 2001).

3    It must be noted that Acer cannot "have its cake and eat it too"-by arguing the inapplicability of the forum selection clause in its reply to Mediamatics's motion to dismiss while using the same clause as its basis for the lawsuit in its Third–Party Complaint.

4    BLACK'S defines indemnity as "[a] duty to make good any loss, damage, or liability incurred by another."

5    Nor does this Court opine that Acer would suffer an undue financial burden by litigating this matter in its contract's forum subsequent to, or concurrently with, the instant case. If Acer is found liable in the underlying lawsuit, its indemnity right becomes a matter of contract interpretation by the California courts.

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

304 S.W.3d 371
Supreme Court of Texas.

In re ADM INVESTOR SERVICES, INC., Relator.

No. 08–0570.    |    Feb. 19, 2010.

**Synopsis**
**Background:** Futures commission merchant filed petition for writ of mandamus, seeking relief from order of the 354th District Court, Rains County, Richard A. Beacom, Jr., J., denying its motion to dismiss on basis of mandatory forum selection clause investor's action for fraud, breach of fiduciary duty, and negligence. The Court of Appeals, James T. Worthen, C.J., 257 S.W.3d 817, denied petition. Merchant appealed.

**Holdings:** The Supreme Court, Green, J., held that:

[1] merchant did not waive enforcement of forum selection clause;

[2] merchant's broker did not waive forum selection clause on merchant's behalf; and

[3] trial court abused it discretion by refusing to enforce forum-selection clause.

Petition conditionally granted with directions.

Willett, J., concurred and filed opinion.

West Headnotes (15)

**[1]    Contracts**
☞ Legal remedies and proceedings
Futures commission merchant did not waive enforcement of forum selection clause in agreement with investor by simultaneously filing answer to complaint and motion to transfer venue with motion to dismiss; merchant fell far short of invoking judicial process to investor's detriment or prejudice.

2 Cases that cite this headnote

**[2]    Mandamus**
☞ Remedy by Appeal or Writ of Error
**Mandamus**
☞ Nature of acts to be commanded
Mandamus will issue if the relator establishes a clear abuse of discretion for which there is no adequate remedy by appeal.

Cases that cite this headnote

**[3]    Contracts**
☞ Legal remedies and proceedings
Party waives a forum-selection clause by substantially invoking the judicial process to the other party's detriment or prejudice; there is a strong presumption against such waiver.

10 Cases that cite this headnote

**[4]    Contracts**
☞ Legal remedies and proceedings
Merely participating in litigation does not categorically mean the party has invoked the judicial process so as to waive enforcement of forum selection clause.

4 Cases that cite this headnote

**[5]    Contracts**
☞ Legal remedies and proceedings
Waiver of forum selection clause can be implied from a party's unequivocal conduct, but not by inaction.

6 Cases that cite this headnote

**[6]    Contracts**
☞ Legal remedies and proceedings
Futures commission merchant's approximately three-month delay in requesting a hearing on motion to dismiss was not waiver of forum selection clause in agreement with investor; despite delay, merchant did nothing unequivocal to waive enforcement.

1 Cases that cite this headnote

**[7]** **Brokers**

Contracts in general

Futures commission merchant's broker did not waive on merchant's behalf forum selection clause in investor's action against merchant and broker for fraud, breach of fiduciary duty, and negligence; nothing in record suggested either that scope of any agency relationship between merchant and broker encompassed actual authority to waive forum-selection clause during litigation, or that merchant communicated to investor that broker would have such authority.

Cases that cite this headnote

**[8]** **Principal and Agent**

Implied Agency

**Principal and Agent**

Implied and Apparent Authority

An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent, actual or express authority, or to the third party, apparent or implied authority.

3 Cases that cite this headnote

**[9]** **Principal and Agent**

Contracts in General

Because an agent's authority is presumed to be co-extensive with the business entrusted to his care, it includes only those contracts and acts incidental to the management of the particular business with which he is entrusted.

Cases that cite this headnote

**[10]** **Contracts**

Agreement as to place of bringing suit; forum selection clauses

Trial court abused its discretion by refusing to enforce forum-selection clause in agreement between investor and futures commission merchant in investor's action against merchant for fraud, breach of fiduciary duty, and negligence; investor failed to meet her heavy burden to establish that enforcing the forum-selection clause would be unreasonable, unjust, or seriously inconvenient.

11 Cases that cite this headnote

**[11]** **Contracts**

Agreement as to place of bringing suit; forum selection clauses

Trial court abuses its discretion in refusing to enforce a forum-selection clause unless the party opposing enforcement of the clause can clearly show that: (1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial.

16 Cases that cite this headnote

**[12]** **Contracts**

Agreement as to place of bringing suit; forum selection clauses

**Contracts**

Presumptions and burden of proof

Burden of proof is heavy for the party challenging enforcement of forum selection clause; when inconvenience in litigating in the chosen forum is foreseeable at the time of contracting, the challenger must show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.

13 Cases that cite this headnote

**[13]** **Action**

Claims Arising Out of Same Transaction or Transactions Connected with Same Subject of Action

**Action**

Joint or Common Liability of Defendants

Mere existence of another defendant does not compel joint litigation, even if the claims arise out of the same nucleus of facts.

Cases that cite this headnote

**[14]    Contracts**
       Agreement as to place of bringing suit; forum selection clauses

Conclusory statements that investor's health concerns would preclude her from litigating case in two different states were insufficient to establish inconvenience sufficient to avoid enforcement of forum-selection clause.

1 Cases that cite this headnote

**[15]    Contracts**
       Agreement as to place of bringing suit; forum selection clauses

Bright-line test for avoiding enforcement of forum-selection clauses has not been established.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*372**  J. Brad McCampbell, Curtis Alexander McCampbell & Morris PC, Emory, TX, for relator.

Michael Jason Forni, Law Office of Mike Forni, Thomas L. Kapioltas, Kapioltas & Forni, PLLC, Dallas, TX, for real party in interest.

John W. Alexander, Alexander & Boswell, Winnsboro, TX, for Texas Trading Company Incorporated.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this case, we consider whether the trial court abused its discretion by denying a motion to dismiss premised on a forum-selection clause. We conclude that it did. The real party in interest did not overcome the presumption against the relator's waiving its right to enforce the forum-selection clause, or satisfy her burden to demonstrate that enforcing the clause would be unreasonable and unjust. Accordingly,

we conditionally grant the relator's petition **\*373**  for writ of mandamus and order the trial court to dismiss the case as to the relator.

## I

Jetta Prescott executed an agreement in 2001 with ADM Investor Services, Inc., allowing ADM to trade commodities on Prescott's behalf. Texas Trading Company Incorporated acted as a broker and guarantor in the transaction. When Prescott's account balance reached a deficit greater than $50,000.00, ADM was authorized to close her account and collect the deficit from Texas Trading. In early 2004, Prescott's balance reached a deficit of $57,844.29. ADM closed her account and collected the deficit from Texas Trading's CEO, Charles Dawson. Dawson filed suit in his individual capacity in Hopkins County against Prescott and obtained a judgment against her.

Prescott then sued both Texas Trading and ADM in Rains County, alleging several legal theories including fraud, breach of fiduciary duty, and negligence. Texas Trading simultaneously filed an answer and a motion to transfer venue to Hopkins County. ADM responded to the suit by filing an answer, a motion to dismiss, and, alternatively, a motion to transfer venue to Hopkins County. ADM's motion to dismiss relied on the choice-of-law and forum-selection clause in its agreement with Prescott, which reads:

> All actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to, or from this Agreement or any transaction covered hereby shall be governed by the law of Illinois and may, at the discretion and election of [ADM], be litigated in courts whose situs in [sic] within Illinois.

A hearing was set for Texas Trading's motion to transfer venue. ADM acknowledged the setting for this hearing in a letter to Prescott's counsel, but then elected not to appear so as to avoid potentially waiving its motion to dismiss. Instead, approximately three months after filing its answer and motion to dismiss, ADM requested a separate hearing on its motion to dismiss. After the hearing on Texas Trading's motion to transfer venue, the trial court granted that motion. The trial court later conducted a hearing on ADM's motion to dismiss,

which it denied. The trial court explained its reasoning in a letter, stating that although the forum-selection clause would be enforceable if ADM were the lone defendant, "[i]t seems unreasonable to the Court for Plaintiff to have to pursue the same cause of action against two defendants in two different states." Nothing in the record before us indicates whether the trial court ruled on ADM's motion to transfer venue to Hopkins County, where Prescott's claims remain pending against Texas Trading. The court of appeals denied ADM's petition for writ of mandamus on the alternative ground that ADM waived enforcement. 257 S.W.3d 817, 822 (Tex.App.-Tyler 2008).

## II

**[1]** Prescott primarily argues to us that ADM waived enforcement by failing to request a hearing sooner or appear at the hearing on Texas Trading's motion to transfer venue, which prevented the trial court from being able to determine the proper forum for the entire case to be heard. Prescott also argues that Dawson, as ADM's agent, waived the forum-selection clause by his earlier lawsuit against Prescott, and that Texas Trading, as ADM's agent, waived the clause by moving to transfer venue. In the alternative, Prescott argues that it would be unreasonable or unjust to enforce the forum-selection clause.

**[2]** Mandamus will issue if the relator establishes a clear abuse of discretion for **\*374** which there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). We have consistently granted petitions for writ of mandamus to enforce forum-selection clauses because a trial court that improperly refuses to enforce such a clause has clearly abused its discretion. *See In re AIU Ins. Co.,* 148 S.W.3d 109, 114–15 (Tex.2004).

**[3]** **[4]** **[5]** A party waives a forum-selection clause by substantially invoking the judicial process to the other party's detriment or prejudice. *In re Automated Collection Techs., Inc.,* 156 S.W.3d 557, 559 (Tex.2004) (per curiam); *see also AIU,* 148 S.W.3d at 121. There is a strong presumption against such waiver. *See Perry Homes v. Cull,* 258 S.W.3d 580, 590 (Tex.2008) (observing strong presumption against waiver of arbitration clause); *Automated,* 156 S.W.3d at 559 (stating that waiver in arbitration clause context is analogous to forum-selection clauses). In *Perry Homes,* we adopted a test considering the totality of the circumstances. 258 S.W.3d at 596. But merely participating in litigation does

not categorically mean the party has invoked the judicial process so as to waive enforcement. *Automated,* 156 S.W.3d at 559–60. Waiver can be implied from a party's unequivocal conduct, but not by inaction. *See Perry Homes,* 258 S.W.3d at 593.

**[6]** We disagree with the court of appeals that ADM waived enforcement. Simultaneously filing an answer and motion to transfer venue with a motion to dismiss falls short of substantially invoking the judicial process to Prescott's detriment or prejudice. Indeed, in both *AIU* and *Automated,* the defendants participated in the litigation process much more substantially. *See AIU,* 148 S.W.3d at 121 (defendant filed answer and request for jury before filing its motion to dismiss); *Automated,* 156 S.W.3d at 558–60 (defendant filed answer with counterclaims and served substantial discovery requests before filing its motion to dismiss). ADM's approximately three-month delay in requesting a hearing also does not compel us to find waiver. We do not consider the length of any delay separate from the totality of the circumstances. *See Perry Homes,* 258 S.W.3d at 595–97. Here, despite the gap between filing and requesting a hearing, ADM did nothing "unequivocal" to waive enforcement. *See id.* at 593. Moreover, we have considered comparable delays before without finding waiver. *See AIU,* 148 S.W.3d at 121 (five-month delay); *Automated,* 156 S.W.3d at 558 (four-month delay).

**[7]** **[8]** **[9]** We also reject any agency theory that holds ADM as waiving enforcement because of the actions taken by Texas Trading, an initial co-defendant, or its CEO, Dawson. "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly,* 235 S.W.3d 179, 182 (Tex.2007). "Because an agent's authority is presumed to be co-extensive with the business entrusted to his care, it includes only those contracts and acts incidental to the management of the particular business with which he is entrusted." *Id.* at 185. Nothing in the record suggests that the scope of any agency relationship between ADM and Texas Trading, its broker, encompasses the actual authority to waive the forum-selection clause during litigation. Likewise, nothing suggests that ADM communicated to Prescott that Texas Trading would have such authority.

**[10]** **[11]** **[12]** Prescott has also failed to establish an exception under which the trial court's refusal to enforce the forum-selection **\*375** clause would be permissible. A trial

court abuses its discretion in refusing to enforce a forum-selection clause unless the party opposing enforcement of the clause can clearly show that (1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial. *In re Lyon Fin. Servs., Inc.,* 257 S.W.3d 228, 231–32 (Tex.2008) (per curiam). The burden of proof is heavy for the party challenging enforcement. *AIU,* 148 S.W.3d at 113. When inconvenience in litigating in the chosen forum is foreseeable at the time of contracting, the challenger must "show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Id.* (quoting *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)); *see also Lyon,* 257 S.W.3d at 234 ("By entering into an agreement with a forum-selection clause, the parties effectively represent to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for cost or other reasons.").

**[13]** Prescott failed to meet her heavy burden to establish that enforcing the forum-selection clause will be unreasonable or unjust, or seriously inconvenient. The mere existence of another defendant does not compel joint litigation, even if the claims arise out of the same nucleus of facts. *See In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 680 (Tex.2009) (per curiam) ("If all it takes to avoid a forum-selection clause is to join as defendants local residents who are not parties to the agreement, then forum-selection clauses will be of little value."). Indeed, as the case reaches us, the trial court already separated the case, isolating ADM as a defendant in Prescott's suit in Rains County. Still, our conclusion would not differ even if ADM and Texas Trading were co-defendants in a single forum. Nothing in the record establishes that Prescott could not proceed in Illinois. Moreover, while a trial in Texas is undoubtedly more convenient for a Texas resident, Prescott failed to prove that a trial in Illinois would deprive her of her day in court. *See Lyon,* 257 S.W.3d at 234. Prescott's circumstances here are thus not sufficient to meet the heavy burden she has to avoid a forum-selection clause. *See AIU,* 148 S.W.3d at 113.

**[14]** We observe that Prescott asserted in her brief to this Court that her "health will prevent her from prosecuting her claims in two different states." The record shows that Prescott presented an affidavit to the trial court, opposing

Texas Trading's motion to transfer venue to Hopkins County. Prescott swore that she was nearing the age of 80, suffered chronic health problems including fibromyalgia and heart problems, often had difficulty walking, and had been hospitalized several times in recent months. Prescott believed that her "case will be severely prejudiced if transferred to Hopkins County." Although we are sympathetic to Prescott's health concerns, the record does not establish that requiring her to pursue her claims against ADM in Illinois, the forum to which she agreed in 2001, would be unreasonable or unjust. Further, even assuming that health concerns could render a selected forum sufficiently inconvenient to preclude enforcement of a forum-selection clause, we believe that Prescott's conclusory statements are insufficient to establish such inconvenience. *Cf. Lyon,* 257 S.W.3d at 234 ("If merely stating that **\*376** financial and logistical difficulties will preclude litigation in another state suffices to avoid a forum-selection clause, the clauses are practically useless."). [1]

**[15]** By allowing for exceptions when enforcement of forum-selection clauses would be unreasonable or unjust, or seriously inconvenient, we, as the Supreme Court in *M/S Bremen,* have recognized that there may be extreme circumstances that courts cannot presently anticipate or foresee; but we have not established a bright-line test for avoiding enforcement of forum-selection clauses. *See M/S Bremen,* 407 U.S. at 17, 92 S.Ct. 1907 (speculating that exceptional circumstances could exist such as a forum-selection clause in a contract of adhesion, or a controversy that the parties could never have had in mind). [2] We have consistently refused to close the door to the possibility that exceptional circumstances could exist, even as we have chosen not to confront them in particular cases. *See, e.g., Int'l Profit Assocs.,* 274 S.W.3d at 679–80; *Lyon,* 257 S.W.3d at 231–32; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 793 (Tex.2005). Here, though, we need not elaborate on these exceptions any further because the sparse record in this mandamus case does not demonstrate such exceptional circumstances.

### III

We conclude that Prescott did not overcome the presumption against ADM's waiving its right to enforce the forum-selection clause by showing that ADM substantially invoked the judicial process. We also conclude that Prescott failed to satisfy her burden to demonstrate that enforcement of the forum-selection clause would be unjust and unreasonable.

Accordingly, we hold that the trial court abused its discretion in denying ADM's motion to dismiss. There is no adequate remedy by appeal when a trial court refuses to enforce a forum-selection clause. *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670, 679 (Tex.2007). For these reasons, without hearing oral argument, TEX. R. APP. P. 52.8(c), we conditionally grant ADM's petition for writ of mandamus and direct the trial court to vacate its February 11, 2008 order and grant ADM's motion to dismiss. We are confident the trial court will comply, and the writ will issue only if it fails to do so.

Justice WILLETT filed a concurring opinion.

Justice WILLETT, concurring.

I join the Court's result and write separately only to add a brief word on the evidentiary burden borne by a party asserting medical hardship to escape a forum-selection clause, an issue of first impression in this Court. Also, while today's case is a sub-par vehicle given its slim record, I believe the Court should one day clarify something else in medical-hardship cases: the meaning of phrases like "seriously inconvenient" and "unreasonable or unjust"—two of the bases for avoiding a forum-selection clause—and, relatedly, whether physical ailments can qualify as **\*377** "special and unusual circumstances" sufficient to defeat enforcement. Actions to enforce forum-selection clauses arrive at the Court via mandamus, and it seems unfair to conclude a lower court clearly abused its discretion by acting without reference to guiding principles if the principles they must reference supply scant guidance.

### 1. What sort of health-related evidence would suffice to escape a forum-selection clause?

I agree that Jetta Prescott's affidavit detailing her myriad health woes is, standing alone, insufficient to avoid the contracted-for forum. The lesson of *In re Lyon,* as the Court notes, is that the mere assertion of "financial and logistical difficulties" is not enough to negate a forum-selection clause, lest such clauses become "practically useless." [1] Ease of evasion is certainly no less a concern when the claimed hardship is physical rather than financial. So I agree that a party asserting medical infirmities must offer more than her own testimony.

I would go a step further, however, and make clear for the bench and bar what sort of evidence *would* suffice.

Boiled down, a party opposing a forum-selection clause bears a "heavy burden" [2] of proving a heavy burden—that trial in the chosen forum would be unjustly onerous. And if the assertion is health-related, a health professional should do the asserting. In my view, first-party patient testimony is insufficient (though perhaps not always necessary), and third-party provider testimony is necessary (though perhaps not always sufficient). Specifically, a competent medical provider should attest that the patient's condition makes travel to the agreed forum not merely inconvenient or impracticable, but medically prohibited. This is the approach adopted in a recent federal-court case involving an 81–year–old New York resident who broke her hip on a cruise ship and argued "inconvenience" to defeat transfer of her personal-injury suit to Washington State under a forum-selection clause. [3] Both the plaintiff and her orthopedic surgeon described her condition, the surgeon testifying she could tolerate a plane flight, although it would be difficult and she would suffer discomfort. [4] The court held that while this plaintiff failed to make the requisite showing—she proved only that travel would be unpleasant, not unfeasible—a plaintiff whose physical limitations bar travel can satisfy the heavy burden of proof required to set aside a forum-selection clause on grounds of inconvenience. [5] If health concerns are ever held to preclude enforcement, this type of proof, at minimum, seems necessary.

### 2. In a forum-selection clause case involving a medically infirm party, what do "seriously inconvenient" and "unreasonable or unjust" mean?

A litigant may defeat enforcement of a forum-selection clause by showing one of four things:

(1) enforcement would be unreasonable or unjust,

**\*378** (2) the clause is invalid for reasons of fraud or overreaching,

(3) enforcement would contravene a strong public policy of the forum where the suit was brought, or

(4) the selected forum would be seriously inconvenient for trial. [6]

Today's case focuses on grounds (1) and (4) above, and while I understand that the slender record makes this case a less-than-ideal vehicle for extended analysis, I believe we should

one day explain more fully how these rather opaque phrases apply to assertions of medical hardship.

Most Texas cases avoid fleshing out the term "seriously inconvenient"; the only discernible "definition" seems to emerge from piecing together examples of what various courts have held *not* to be seriously inconvenient.[7] Many cases recite the general standard from *M/S Bremen v. Zapata Off–Shore Co.,*[8] essentially that "a forum clause ... may [ ] be 'unreasonable' and unenforceable if the chosen forum is seriously inconvenient for the trial of the action," and conclude the party's proof fell short.[9] None of the cases, however, are medical-hardship cases; today's case is the first, meaning Texas courts have no guidance for discerning the confusing, but apparently consequential, line between "inconvenient" (clause enforced) and "seriously inconvenient" (clause evaded) ... **\*379** not to mention what separately qualifies as "unreasonable or unjust" in the context of someone asserting health maladies that arose after the clause was adopted.

Cases involving medical hardship strike me as somewhat unique. Financial or logistical burdens may be easily anticipated; not so with many medical burdens.[10] The Court notes that when a forum's inconvenience is foreseeable at the time of contracting, the party opposing enforcement must "show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court."[11] True, but in conducting that analysis we must also confront what we confirmed just last year: a party asserting inconvenience can avoid enforcement by proving that "special and unusual circumstances developed *after* the contracts were executed" such that litigation in the chosen forum would work a deprivation of its day in court.[12] So can exacting evidence

of severe medical ailments constitute "special and unusual circumstances" in certain cases?

The Court never mentions this "special and unusual circumstances" basis for negating a forum-selection clause, but that is immaterial here. Mrs. Prescott's only evidence of post-contract medical problems is her lone affidavit, which even if wholly persuasive, is wholly insufficient. Accordingly, we need not consider the affidavit's substance (or lack thereof) and whether Mrs. Prescott's ailments qualify as "special and unusual circumstances."

In sum, this Court has never addressed, nor has *any* Texas appellate court, whether medical concerns can negate a forum-selection clause. Given the ubiquity of such clauses in everyday contracts, both commercial and consumer, I hope a future case with a more-developed record gives us an opportunity to clarify how the various bases for avoiding enforcement apply when a party asserts serious medical hardship. This seems only fair. Actions to enforce forum-selection clauses reach us via mandamus,[13] a remedy "controlled largely by equitable principles,"[14] and we must determine if the court below clearly abused its discretion in denying enforcement. It seems inequitable to fault lower courts for acting without reference to guiding principles if there are few on-point principles to be referenced.

I understand why the Court declines to use today's imperfect case to dive deeper and provide greater specificity for forum-selection cases involving medical hardship, **\*380** but I hope a future case will give us occasion to say more.

**All Citations**

304 S.W.3d 371, 53 Tex. Sup. Ct. J. 363

Footnotes

1    In considering the circumstances of this case, we offer no opinion as to whether, in a different case, health concerns might be sufficient grounds to preclude enforcement of a forum-selection clause, or what sort of proof of such health concerns would be required.

2    The Supreme Court clarified in *Carnival Cruise Lines, Inc. v. Shute* that its use of "serious inconvenience of the contractual forum" in *M/S Bremen* was in the context of a hypothetical agreement between two Americans to resolve a local dispute in a remote alien forum, not an agreement to resolve the dispute in another state. 499 U.S. 585, 594, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).

1    *In re Lyon Fin. Servs., Inc.,* 257 S.W.3d 228, 234 (Tex.2008) (per curiam).

2    *In re AIU Ins. Co.,* 148 S.W.3d 109, 113 (Tex.2004).

3    *See Caputo v. Holland Am. Line, Inc.,* No. 08–CV–4584, 2009 WL 2258326 (E.D.N.Y. July 29, 2009) (stating an 81–year–old plaintiff whose recent hip surgery made her unable to walk alone or sit for extended periods could have made the requisite showing if she had shown she was physically unable to fly to the selected forum).

4    *Id.* at *1–2.

5    *Id.* at *4.

6    *Lyon,* 257 S.W.3d at 231–32. Despite the disjunctive "or," which signals textual separateness, we seemed to intermingle grounds (1) and (4) in *In re Lyon,* asking "whether Pennsylvania is such an inconvenient forum that enforcing the forum-selection clause would produce an unjust result." *Id.* at 233.

7    *See, e.g., In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 679, 680 (Tex.2009) (per curiam) (holding that even though plaintiff may have to pursue two suits, one in Illinois and one in Texas, that is not the type of unusual and special circumstances that shows litigating in the contracted-for forum would be so gravely difficult and inconvenient that plaintiff would be deprived of its day in court; also, Illinois is not a remote alien forum for purposes of forum-selection agreements); *Lyon,* 257 S.W.3d at 233–34 (clause was not so inconvenient to the lessee that enforcing it would produce an unjust result, even though lessee claimed it lacked the financial or logistical ability to pursue its claims in Pennsylvania); *AIU,* 148 S.W.3d at 112–13 (rejecting argument that many if not most potential witnesses regarding coverage issues were in Texas and therefore trial in New York would be seriously inconvenient); *First ATM, Inc. v. Onedoz, Inc.,* No. 03–08–00286–CV, 2009 WL 349164, at *3 (Tex.App.-Austin Feb. 13, 2009, no pet.) (mem. op.) (holding that unsupported pleadings regarding a party's financial condition and its expected costs of litigation in Texas did not show that litigating in Texas would be so inconvenient that party would be deprived of its day in court); *Bailey v. Sorenson Labs., Inc.,* 217 B.R. 523, 527 (Bankr.E.D.Tex.1997) (finding that mere fact that debtor had experienced financial difficulties resulting in bankruptcy was not sufficient to preclude enforcement of a forum-selection clause on the theory that it had become seriously inconvenient).

8    407 U.S. 1, 16, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (the Supreme Court also noted: "the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause," *id.* at 17, 92 S.Ct. 1907). The Court later clarified in *Carnival Cruise Lines, Inc. v. Shute* that the inconvenience discussion in *The Bremen* was in the context of a hypothetical agreement between two Americans to resolve a local dispute in a remote alien forum, not an agreement to resolve the dispute in another of the United States. 499 U.S. 585, 594, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). *See Lyon,* 257 S.W.3d at 234.

9    *See, e.g., AIU,* 148 S.W.3d at 112–13; *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 692–93 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *In re Talent Tree Crystal,* No. 01–05–00686–CV, 2006 WL 305015, at *4 (Tex.App.-Houston [1st Dist.] Feb. 9, 2006, no pet.) (mem. op.); *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.,* 177 S.W.3d 605, 621 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

10   Parties ought not bear an expectation of prognostication when it comes to their health, required to foretell whether future maladies might make a potential out-of-state trial too onerous. Infirmities are inevitable, but that doesn't make them foreseeable such that healthy parties who execute a forum-selection clause must consider whether health woes years or decades down the road might pose a travel problem. Cross-country travel may be undemanding for a healthy 60–year–old who signs a forum-selection clause but inconceivable for an ailing almost–80–year–old who contests one.

11   304 S.W.3d at 375 (citing *AIU,* 148 S.W.3d at 113 (quoting *The Bremen,* 407 U.S. at 18, 92 S.Ct. 1907)).

12   *Int'l Profit Assocs.,* 274 S.W.3d at 680 (emphasis added). *See also Lyon,* 257 S.W.3d at 234 (noting no "proof of special and unusual circumstances" and "no evidence that ... conditions changed from the time the agreements were executed").

13   *See Lyon,* 257 S.W.3d at 231 ("There is no adequate remedy by appeal when a trial court refuses to enforce a forum-selection clause, and such clauses can be enforced via mandamus.").

14   *Int'l Profit Assocs.,* 274 S.W.3d at 676.

---

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Tab J

485C 00069

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | § § § § § § § § § § | |
| Defendants. | § § | 68TH JUDICIAL DISTRICT |

## ORDER

Before the Court is Defendant Giant Eagle, Inc.'s Motion to Dismiss for Collateral Estoppel or, In the Alternative, Pursuant to the Governing Forum Selection Clause ("the Motion"). On August 24, 2015, the parties appeared through their counsel. Having considered the parties' briefing, the arguments of counsel, and all of the evidence properly before it, the Court denied the Motion with respect to collateral estoppel at the hearing, and the Court hereby DENIES the Motion with respect to forum selection clause.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's Motion is DENIED.

SIGNED this 22 day of Septenber, 2015.

_____
HON. MARTIN HOFFMAN, PRESIDING JUDGE

ORDER                                                                    Page 1

R509

# Tab K

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| vs. | § § | |
| EXCENTUS CORPORATION, BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | § § § § § § § § | DALLAS COUNTY, TEXAS |
| *Defendants,* | § § | 68TH JUDICIAL DISTRICT |

**DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS**

Defendant Giant Eagle, Inc. ("Giant Eagle") files this Motion to Stay All Proceedings, Aside From Outstanding Motions, Pending Resolution of Its Forthcoming Petition for Writ of Mandamus ("Motion") with the Court of Appeals for the Fifth District of Texas.[1] Giant Eagle requests a hearing on this Motion as soon as practicable. In support of this Motion, Giant Eagle states as follows:

1. Giant Eagle respectfully requests a stay of all proceedings (aside from outstanding motions) so that it may have the opportunity to file a petition for writ of mandamus in the Court of Appeals for the Fifth District of Texas seeking relief from this Court's denial of

---

[1] The following motions are currently pending before this Court and are scheduled for hearing on November 2, 2015: Defendants David and Daniel Shapira's Verified Special Appearance and Motion Objecting to Jurisdiction; Defendants Motion to Abate and Plea to Jurisdiction; and Defendants Logsdon and Mills's Motion to Dismiss. Giant Eagle is not asking the Court to stay the hearing on these motions or otherwise delay determination thereof. Rather, for the reasons explained herein, the present motion seeks to stay all proceedings after resolution of these threshold issues, so as to preserve the status quo and protect Giant Eagle's contractual rights.

**DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS** PAGE 1
A0963864.1/266096.docx

R510

Giant Eagle's Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause ("Motion to Dismiss").

2.      On July 15, 2015, Giant Eagle filed its Motion to Dismiss, arguing that collateral estoppel mandated application of the forum selection clause in the Excentus-Giant Eagle Stock Purchase Agreements ("SP Agreements") because of a prior decision by Judge Boyle of the U.S. District Court for the Northern District of Texas. *Excentus Corp. v. Giant Eagle, Inc.*, 3:11-cv-03331, 2012 WL 2525594, at *8-11 (N.D. Tex. July 2, 2012). Giant Eagle's position is that venue for this action is only proper in Allegheny County, Pennsylvania. Giant Eagle also argued, in the alternative, that even if collateral estoppel did not apply, the forum selection clause in the SP Agreements nevertheless applied for the same *reasons* outlined in Judge Boyle's opinion; namely, that the dispute "arose out of" the SP Agreements because the court would be required to determine the parties' rights thereunder to resolve Perry's claims.

3.      At oral argument on August 24, 2015, this Court denied Giant Eagle's motion to dismiss with respect to the collateral estoppel argument.

4.      By order dated and signed September 22, 2015, this Court denied Giant Eagle's motion to dismiss with respect to the forum selection clause. Giant Eagle did not receive notice of this order until September 28, 2015 after Excentus' counsel checked the Court's docket.

5.      Giant Eagle plans to file a petition for writ of mandamus in the Court of Appeals for the Fifth District of Texas seeking review of, and relief from, this Court's denial of Giant Eagle's Motion to Dismiss. A petition for writ of mandamus is the appropriate method for seeking review of this Court's order refusing to apply the forum selection clause in the SP Agreements. *See In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 374 (Tex. 2010) (citing *In re AIU Ins. Co.*, 148 S.W.3d 109, 114–15 (Tex. 2004)) ("We have consistently granted petitions

**DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS        PAGE 2**
A0963864.1/266096.docx

R511

for writ of mandamus to enforce forum-selection clauses because a trial court that improperly refuses to enforce such a clause has clearly abused its discretion.").

6. A stay of all proceedings in the District Court pending a ruling by the Court of Appeals on Giant Eagle's forthcoming petition for writ of mandamus is necessary to preserve the status quo and protect Giant Eagle's rights. *See, e.g.*, *Syrian-American Oil Corp. S.A. v. Pecten Orient Co.*, No. 2007-67830, 2010 WL 7096628, at *1 (109th Jud. Dist.—Harris County, May 13, 2010) (granting motion to stay all trial court proceedings pending all appeals by petition for writ of mandamus of court's orders denying motion to dismiss on venue grounds). Granting this stay would not result in any prejudice to Perry.

7. The right Giant Eagle bargained for in the SP Agreements – i.e., litigation in the agreed upon forum (Pennsylvania) – will be lost forever if Giant Eagle is forced to proceed with discovery and further litigation in Texas while its petition for writ of mandamus is pending. *See In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 883 (Tex. 2010) ("an appellate remedy is inadequate when a trial court improperly refuses to enforce a forum-selection clause because allowing the trial to go forward will vitiate and render illusory the subject matter of an appeal— i.e., trial in the proper forum." (quotations and citations omitted)).

8. Further, in order to protect Giant Eagle's rights, the court should stay the *entire* proceeding, not just proceedings against Giant Eagle. If proceedings go forward without Giant Eagle, and its petition is denied, Giant Eagle may miss the opportunity to protect its rights by taking discovery, including by deposing Plaintiff Perry.

9. In addition, a stay is necessary to protect the rights of other Defendants, particularly David and Daniel Shapira (together, the "Shapiras"). As noted in Giant Eagle's Motion to Dismiss, the forum selection clause also applies to the Shapiras. (*See* Motion to

**DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS** PAGE 3
A0963864.1/266096.docx

R512

Dismiss at 1, n.1). The Shapiras did not join Giant Eagle's Motion to Dismiss so as not to waive their Special Appearance and Motion Objecting to Jurisdiction (scheduled for hearing on November 2, 2015). If the Shapiras' Special Appearance is denied, however, they will move to dismiss because collateral estoppel mandates that this court apply the forum selection clause to them as well. Like Giant Eagle, the Shapiras would lose the benefit of the forum selection clause forever if they were required to participate in discovery and further proceedings before the applicability of the forum selection clause is fully resolved in the court of appeals.

10. For the reasons set forth above, Giant Eagle respectfully requests that all proceedings in this matter, other than those currently scheduled to be heard on November 2, 2015, be stayed pending the final resolution of Defendants' Petition for Writ of Mandamus.

Respectfully Submitted,

*/s/ Orrin L. Harrison III*

Orrin L. Harrison III
  Bar No. 09130700
  oharrison@ghetrial.com
GRUBER HURST ELROD JOHANSEN HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Telephone:  214-855-6828
Fax: 214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com
Jonathan Marcus
  jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone:  412-338-5200
Fax: 412-391-8758

**Attorneys for Giant Eagle, Inc., David Shapira, and Daniel Shapira**

DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS          PAGE 4
A0963864.1/266096.docx

R513

## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion and despite best efforts the counsel have not been able to resolve those matters presented.

Certified to the Day of October 6, 2015.


/s/ Orrin L. Harrison III
Orrin L. Harrison III

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause via electronic filing and E-Mail, in accordance with Rule 21a, Texas Rules of Civil Procedure, on October 6, 2015.


/s/ Orrin L. Harrison III
Orrin L. Harrison III

**DEFENDANT GIANT EAGLE, INC.'S MOTION TO STAY ALL PROCEEDINGS, ASIDE FROM OUTSTANDING MOTIONS, PENDING RESOLUTION OF ITS FORTHCOMING PETITION FOR WRIT OF MANDAMUS**      **PAGE 5**
A0963864.1/266096.docx

R514

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| vs. | § § | |
| | § | DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, and ALLIANCE DATA SYSTEMS, INC., | § § § § § § § | |
| | § | 68TH JUDICIAL DISTRICT |
| *Defendants,* | § | |

## ORDER

After considering Defendant Giant Eagle's *Motion to Stay All Proceedings, Aside from Outstanding Motions, Pending Resolution of Its Forthcoming Petition for Writ of Mandamus*, the Court:

**GRANTS** Giant Eagle's Motion to Stay.

SIGNED on this _____ day of _____, 2015.


_____
PRESIDING JUDGE

Tab L

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | § § § § § § § § | |
| Defendants. | § | 68TH JUDICIAL DISTRICT |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT GIANT EAGLE, INC.'S
MOTION TO STAY ALL PROCEEDINGS**

---

TO THE HONORABLE JUDGE:

Plaintiff Dickson Perry ("Mr. Perry" or "Perry") responds to Defendant Giant Eagle, Inc.'s ("Giant Eagle"), Motion to Stay the All Proceedings Pending Resolution of Its Forthcoming Petition For Writ of Mandamus (the "Motion") and respectfully shows the Court as follows:

### I.    INTRODUCTION

The Court should deny Giant Eagle's Motion to Stay All Proceedings for four reasons.

***First***, Mr. Perry would be prejudiced if all proceedings were stayed for a single defendant. This case involves multiple parties and multiple claims, most of whom would not be affected by the mandamus relief sought by Giant Eagle. This case will require significant discovery, and Mr. Perry must commence that discovery before memories begin to fade and important witnesses resign, move, or otherwise become unavailable. Halting the progress of this case for a single defendant when there are multiple claims and other parties involved would unnecessarily delay

---

**PLAINTIFF'S RESPONSE TO GIANT EAGLE'S MOTION TO STAY**                    **Page 1**

Mr. Perry's right to a speedy trial. Giant Eagle fails to explain why *all* of the remaining claims against the other defendants should be stayed. Tellingly, this Court recently entered an agreed Scheduling Order in this case establishing a trial date of November 29, 2016, as well as numerous pretrial deadlines. Giant Eagle agreed to those dates and yet seeks to circumvent that Scheduling Order despite its prior agreement to them. Giant Eagle's motion should be denied.

*Second*, Giant Eagle has not yet filed a petition for writ of mandamus and, therefore, its Motion is premature and improper.

*Third*, mandamus relief is extraordinary and will lie only when there has been a *clear* abuse of discretion. The undisputed facts here show that there was no abuse of discretion by this Court. Courts are reluctant to grant a stay pending a mandamus decision when it is unlikely that the movant will succeed on the merits — as is the case here.

*Fourth*, it is unnecessary and unwarranted to stay all proceedings or even the proceedings as they relate to Giant Eagle. Giant Eagle cited no statute or precedent that requires a stay of *all* the proceedings based upon the particular circumstances of this case. Further, mandamus relief is similar in nature to an appeal from an interlocutory order which, absent specific circumstances delineated by the Texas legislature, does not necessitate the staying of a case and certainly not the staying of *all* proceedings. And even when an interlocutory appeal demands an *automatic* stay, such a stay relates to the *commencement of trial* and typically does not apply to any other proceedings for which the trial court retains jurisdiction. The same reasoning should be applicable here. Accordingly, for all of the above reasons, the request for a stay should be denied.

## II. RELEVANT BACKGROUND

Previously, Defendant Giant Eagle moved to dismiss Mr. Perry's complaint on the basis of collateral estoppel and, alternatively, pursuant to a forum-selection clause in the Stock Purchase Agreements in which, approximately 10 years ago, Giant Eagle purchased certain shares of stock in Excentus (the "SP Agreements"). As to collateral estoppel, this Court denied Giant Eagle's Motion at oral argument for numerous reasons, including that Mr. Perry's claims in this lawsuit have never actually been litigated (nor could they have been) because they arise out of the actions of Excentus shareholders, directors, and officers during the summer of 2014 — over two years after the issuance of the opinion Giant Eagle contends fully adjudicated the forum-selection clause issue. As to the forum-selection clause, this Court sought further briefing regarding the applicable language of the SP Agreements — specifically, the "arising out of" language. After receiving that briefing, this Court denied Giant Eagle's Motion to Dismiss. In doing so, the Court recognized that "tangential" connections between the SP Agreements and the claims in this case or agreements that "merely created the conditions that led to" the parties dealing with each other are insufficient to bring the subject dispute within the forum-selection provision. The Court also recognized that the designation of Dallas, Texas as the forum for disputes "arising out of or related to" the Excentus/Giant Eagle settlement agreement directly contradicted Giant Eagle's contention that it negotiated and expected Pittsburgh to be the forum for all disputes involving the parties and that, further, the settlement agreement's broad forum-selection provision stands in sharp contrast to the narrow provision Giant Eagle negotiated and agreed to in the SP Agreements.

In short, after consideration, and in a proper exercise of its discretion, this Court rejected **both** of Giant Eagle's arguments. Giant Eagle now seeks a second bite of the apple and, in doing

_____
**PLAINTIFF'S RESPONSE TO GIANT EAGLE'S MOTION TO STAY** **Page 3**

R518

so, necessarily seeks to delay the adjudication of this case having previously agreed to the pre-trial scheduling order governing this case. This Court should deny the Motion.

### III.   ARGUMENT

**A.   Giant Eagle Has Not and Cannot Demonstrate Compelling Circumstances for a Stay.**

A motion to stay will necessarily delay this case. The Texas Supreme Court has recognized that a stay "increases delay and expense and should not be done absent ***compelling circumstances***." *Coal. of Cities for Affordable Util. Rates v. Third Court of Appeals*, 787 S.W.2d 946, 947 (Tex. 1990) (per curiam) (emphasis added). A motion to stay can also become a strategic weapon used by an opponent to unnecessarily prevent discovery, increase expense, and all around delay litigation.

As the Court is aware, this case involves several claims against several defendants. Staying all proceedings gives Giant Eagle the power to delay not only claims against it but ***other claims against at least six other Defendants*** that are unrelated and unaffected by any mandamus request — all at Mr. Perry's expense. Mr. Perry is entitled to commence discovery before memories begin to fade and important witnesses resign, move, or otherwise become unavailable.[1] Staying the case would cause Mr. Perry to be unduly prejudiced in accessing the necessary witnesses and documents that are crucial to the support of ***all*** his claims, not just those against Giant Eagle. What is more, even if the claims against Giant Eagle were to be finally tried in Pennsylvania (an event Mr. Perry and the undersigned believes is unlikely), the discovery developed in Texas would necessarily be used in that proceeding. This Court recently entered a Scheduling Order in this case setting a trial date of November 29, 2016, as well as numerous

---

[1] It is worth noting that, unfortunately, there are several witnesses whose health is a serious issue, including two of the named Defendants, and further delay could result in their testimony not being taken in this case.

pretrial deadlines. Exhibit A, Scheduling Order Entered By Court On September 21, 2015. By requesting a stay of all proceedings, Giant Eagle is circumventing this agreed Scheduling Order. Accordingly, the Court should deny the Motion.

**B.** **Giant Eagle's Motion Is Premature Because It Has Not Filed A Petition For Writ of Mandamus And, In Any Event, The Motion Should Be Addressed By The Court of Appeals.**

Giant Eagle has not yet filed a petition for writ of mandamus. Thus, its Motion is premature and improper, as it asks this Court to stay *all* proceedings because it contends it will, at some unspecified time, file a petition for writ of mandamus. It cannot seek a stay before it has filed a petition for writ of mandamus. *See In re Khan*, No. 13-12-00404-CV, 2012 WL 2360885, at *1 (Tex. App. — Corpus Christi June 21, 2012, no pet.) (per curiam) (mem. op.) (denying the motion to stay and mandamus petition because relator failed to meet the rigorous requirements specified in Texas Rule of Appellate Procedure 52.3 and 52.7); *see also* Tex. R. App. P. 52. Notably, in its Motion, Giant Eagle has not even alleged this Court abused its discretion or that it has met the requirements for the relief sought on appeal.

In any event, in the rare instances where a stay is instituted pending mandamus, it is generally the ***Court of Appeals*** — not the trial court — that effectuates the stay. *D'Brien v. Alderman*, No. 2009-20328, 2011 WL 2790533 (151st Jud. Dist.—Harris County, Jan. 11, 2011) (acknowledging that when a direct appeal is not allowed through the appellate procedures or statutes, relief "may be sought by mandamus and a motion to stay in the court of appeals"); *In re Julian*, No. 13-08-00363-CV, 2008 WL 2503280, at *1 (Tex. App.—Corpus Christi June 5, 2008, no pet.) (per curiam) (granting a motion to stay only after having examined and fully considered the motion); *Archer Daniels Midland Co. v. Garcia*, No. 01-96-01466-CV, 1996 WL 711266, at *1 (Tex. App.—Houston [1st Dist.] Dec. 5, 1996, no writ) (making the initial determination as to

whether to allow leave for relator to file a petition for writ of mandamus and whether to grant the emergency motion to stay). Deferring to the Court of Appeals here is prudent because it is better positioned to initially assess the merits of the mandamus petition and it avoids unnecessary delays in the trial court proceedings, particularly in those circumstances when the mandamus relief will be unlikely or has not been properly sought. *See In re Khan,* 2012 WL 2360885, at *1 (denying the motion to stay and mandamus petition because relator failed to meet the rigorous requirements specified in Texas Rule of Appellate Procedure 52.3 and 52.7).

Accordingly, even if this Court were inclined to grant a stay, it should nevertheless defer to the Court of Appeals as to whether a stay is appropriate.

**C.**     **<u>Giant Eagle's Motion to Stay Should be Denied Because the Mandamus Relief Sought is Extraordinary and Giant Eagle Has Not Shown That It Would Likely Obtain Such Relief.</u>**

Crucial to a court's discretion in ruling on a motion to stay is whether the movant has met the requirements for a writ of mandamus. *Sanchez v. Huntsville Indep. Sch. Dist.,* 844 S.W.2d 286, 291 (Tex. App.—Houston [1st Dist.] 1992, no writ) (upholding the trial court's denial of the motion to stay because the movant did not meet the requirements for obtaining injunctive relief); *Erwin v. Valley Hosp. Medical Center*, No. A636641, 2011 WL 7737836 (D. Nev. Aug. 29, 2011) (holding that the defendant was not entitled to a stay pending writ because it had not shown that it will likely succeed on the merits in the writ petition). It is well-settled under Texas law that "mandamus is an ***extraordinary*** remedy, available only in limited circumstances." *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (emphasis added); *see also* Tex. R. App. P. 52.1. Mandamus will only issue when necessary to correct a "***clear*** abuse of discretion." *Walker*, 827 S.W.2d at 839 (emphasis added). A clear abuse of discretion occurs when the trial court "reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.*

_____
**PLAINTIFF'S RESPONSE TO GIANT EAGLE'S MOTION TO STAY**      **Page 6**

R521

A reviewing court will not issue a mandamus "to control the action of a lower court in a matter involving discretion." *Cessna Aircraft Co. v. Kirk,* 702 S.W.2d 321, 323 (Tex. App.—Eastland 1986, no writ) (internal citations omitted), nor will the court substitute its judgment for that of the trial court with respect to factual issues, *Packer*, 827 S.W.2d at 839. "A mere error in judgment is not an abuse of discretion." *In re Clark,* 977 S.W.2d 152, 155 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (internal citation omitted).

In terms of forum-selection clauses, a trial court abuses its discretion when the clause is found to be unambiguous and the matter before the court falls within its scope. However, when a contract is ambiguous, it is reasonably susceptible to two or more meanings and creates a fact issue for regarding the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). "A trial court does not abuse its discretion if it bases its decision on ***conflicting evidence and some evidence supports its decision***." *In re Barber*, 982 SW 2d 364, 366 (Tex. 1998) (emphasis added). Therefore, to support its request, Giant Eagle must be able to show that there was only one permissible view of the evidence and the trial court "could reasonably have reached only one decision." *Packer*, 827 S.W.2d at 839. Importantly, Texas courts construe "arise out of" (which was the language at issue in the SP Agreements) or similar language narrowly and to exclude the particular claims at issue in this case. *See, e.g.*, *Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 812 (Tex. App.—Texarkana 1995, writ denied) (in forum selection case, construing "arising hereto" to exclude tort claims where "[t]he rights, obligations, and cause of action do not arise from the contracts but from the Deceptive Trade Practices Act, the Texas Securities Act, and the common law"); *Major Help Ctr., Inc. v. Ivy, Crews & Elliott, P.C.*, 03-99-00285-CV, 2000 WL 298282, at *2 (Tex. App.—Austin Mar. 23, 2000, no pet.) (in forum-selection case, construing "[a]ny action brought by either party

under this agreement" to exclude tort claims that "do not rely on the terms of the Agreement as the[ir] basis" and plaintiffs "do not attempt to enforce duties or obligations arising under the Agreement"); *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (in arbitration case, construing "any and all claims arising out of this Agreement" narrowly due to absence of "relating to" language); *Associated Air Freight, Inc. v. Meek*, 01-00-00843-CV, 2001 WL 225516, at *2 (Tex. App.—Houston [1st Dist.] Mar. 8, 2001, no pet.) (in arbitration case, construing "a dispute hereunder" to exclude claims where "allegations in this lawsuit touch only tangentially on the" agreements at issue).

Giant Eagle has failed to show it meets the requirements for mandamus relief and thus should not be entitled to stay the proceedings of this case. *See, e.g.*, *In re Ruby Tequila's Amarillo W., LLC*, 07-11-00494-CV, 2012 WL 537812, *5 (Tex. App.—Amarillo Feb. 17, 2012, no pet.) (finding underlying suit was not within the scope of forum-selection clause in certain agreements and denying the petition for writ of mandamus). Specifically, the SP Agreements' forum-selection clause brings within its scope only disputes "arising out of" the SP Agreements, which Texas courts have interpreted to mean disputes that look to the subject agreement as the source of the obligations allegedly breached. Indeed, the settlement agreement's broad forum-selection provision Giant Eagle negotiated and agreed to — encompassing all claims "related to" the settlement agreement — stands in sharp contrast to the narrow provision Giant Eagle negotiated and agreed to in the SP Agreements. Mr. Perry's claims arise out of Defendants' breaches of obligations imposed by Texas common and statutory law, not by the SP Agreements, and his claims make no reference to any of the rights or obligations in the SP Agreements. Further, at the very least, conflicting evidence exists given that the settlement agreement entered into by Excentus and Giant Eagle designates Dallas, Texas as the forum for

_____
**PLAINTIFF'S RESPONSE TO GIANT EAGLE'S MOTION TO STAY** **Page 8**

R523

disputes related to that settlement agreement, which directly contradicts Giant Eagle's contention that it negotiated and expected Pittsburgh to be the forum for all disputes involving the parties. *See In re Sterling Chemicals, Inc.*, 261 S.W.3d 805, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (finding that inconsistency among agreements created an ambiguity and, therefore, trial court did not abuse its discretion by denying motions to dismiss based on a forum-selection clause); *In re Yahoo! Inc.,* 313 F. App'x. 722, 723 (5th Cir. 2009) (holding that mandamus relief was not warranted and the district court did not abuse its discretion in determining that the forum selection clause was ambiguous and the claims were not subject to the clause); *Louisiana Ice Cream Distributors, Inc. v. Carvel Corp.,* 821 F.2d 1031, 1033 (5th Cir. 1987) (holding that mandamus review regarding the forum selection clause would have been inappropriate because the clause was ambiguous and the trial court's determination involved questions of fact).

Therefore, because Giant Eagle is unable to meet the heavy burden required to prove it is entitled to mandamus relief and, at the very least, there is conflicting evidence making the denial of the motion to dismiss a decision well within the discretion of this Court, this Court should deny Giant Eagle's Motion.

**D.** **Staying the Entire Case is Unwarranted, Particularly When All of Mr. Perry's Claims Do Not Implicate the Stock Purchase Agreement's Forum-Selection Clause.**

It is unnecessary to stay the entire case or even the proceedings related to Giant Eagle. Giant Eagle has cited no statute or precedent that requires a stay of all the proceedings based on the particular circumstances of this case. Not every mandamus request requires the trial court to stay its proceedings. *See, e.g.*, *Whittington v. Bayer Materialscience LLC*, No. 22949, 2007 WL 5112566 (253rd Jud. Dist. — Chambers County, Aug. 27, 2007) (denying the motion to stay

R524

pending writ of mandamus).[2]

Giant Eagle's single citation to *Syrian-American Oil Corp. S.A. v. Pecten Orient Co.*, No. 2007-67830, 2010 WL 7096628, at *1 (109th Jud. Dist.—Harris County, May 13, 2010), in support of its Motion provides no reasoning or guidance for the Court's consideration and is, at best, distinguishable. For instance, while devoid of any analysis whatsoever, there is sno indication in that case that the trial court was faced with a situation involving multiple claims against multiple defendants, the potential for testimony to become unavailable, the lack of a petition for writ of mandamus, and the absence of any indication of even the potential for an abuse of discretion—factors that would undoubtedly impact the motion to stay analysis here and weigh in favor of its denial. Again, none of the pending claims against Excentus, Brandon Logsdon, Jim Mills, Auto-Gas Systems, Inc., Randy Nicholson, and Alliance Data Systems, Inc. will be affected by Giant Eagle's proposed mandamus request as those claims are not subject to the SP Agreements. It is unnecessary to prolong the entire case when only three of the nine parties may potentially be affected. *Sheinfeld, Maley & Kay, P.C. v. Bellush,* 61 S.W.3d 437, 439 (Tex. App.—San Antonio 2001, no pet.) (holding that "[t]he trial court retains jurisdiction over the case and may go forward with all other proceedings except the commencement of trial").

Mandamus relief is similar in nature to an appeal from an interlocutory order which, absent specific circumstances delineated by the Texas legislature, does not necessitate the staying of a case and certainly not the staying of ***all*** proceedings. And even when an interlocutory appeal demands an ***automatic*** stay, such stay generally only relates to the ***commencement of trial*** and typically does hinder the trial court's jurisdiction on pretrial proceedings. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(b). The same reasoning should apply here.

---

[2] Indeed, if every mandamus request required a stay of all proceedings it would encourage defendants to request mandamus at any opportunity — even if they believed such requests to be wholly without merit — in an effort to unnecessarily prolong and stay cases.

R525

Therefore, this Court should deny Giant Eagle's Motion. Alternatively, even if this Court determines that the circumstances warrant a stay, this Court should only stay the case as to the *commencement of trial* with respect to Giant Eagle and should continue with all other proceedings against the defendants.

## IV. CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Giant Eagle's Motion to Stay All Proceedings. Alternatively, if the Court determines a stay is warranted, the stay should only be to the *commencement of trial* against Giant Eagle and the Court should continue all other proceedings against the defendants.

Date: October 14, 2015

Respectfully submitted,

*/s/Michael P. Lynn*
Michael P. Lynn, P.C. (mlynn@lynnllp.com)
State Bar No. 12738500
Andrés Correa (acorrea@lynnllp.com)
State Bar No. 24076330
Andrew S. Hansbrough (ahansbrough@lynnllp.com)
State Bar No. 24094700
**LYNN TILLOTSON PINKER & COX, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 Telephone
214-981-3839 Facsimile

**ATTORNEYS FOR PLAINTIFF**
**DICKSON PERRY**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served as shown below on counsel of record on October 14, 2015:

<u>*Via Email*</u>
Orrin L. Harrison III
(oharrison@ghjhlaw.com)
GRUBER HURST ELROD JOHANSEN HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

<u>*Via Email*</u>
Bernard Marcus (marcus@marcus-shapira.com)
Scott Livingston (livingston@marcus-shapira.com)
Jonathan Marcus (jmarcus@marcus-shapira.com)
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, PA 15219-6401
*Attorneys for Defendants*
*Giant Eagle, Inc., David Shapira, and*
*Daniel Shapira*

<u>*Via Email*</u>
Lisa S. Gallerano
(lgallerano@akingump.com)
Patrick O'Brien (pobrien@akingump.com)
AKIN GUMP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4624
*Attorneys for Defendant*
*Alliance Data Systems, Inc.*

<u>*Via Email*</u>
Ken Carroll (kcarroll@ccsb.com)
Byran Erman (berman@ccsb.com)
Sara Romine (sromine@ccsb.com)
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202-3767
*Attorneys for Defendants*
*Brandon Logsdon and Jim Mills*

<u>*Via Email*</u>
Robert B. Wagstaff (rwagstaff@mcmahonlawtx.com)
MCMAHON SUROVIK SUTTLE
P.O. Box 3679
Abilene, TX 79604
*Attorney for Defendants*
*Randy Nicholson and Auto-Glass Systems, Inc.*

*/s/ Andres Correa*
Andres Correa

4852-7445-3545, v. 1

---

**PLAINTIFF'S RESPONSE TO GIANT EAGLE'S MOTION TO STAY**          **Page 12**

# EXHIBIT A

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | §<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | 68TH JUDICIAL DISTRICT |

## [PROPOSED] LEVEL THREE SCHEDULING ORDER

Pursuant to TEX. R. CIV. P. 190.4, and based upon the information available to the parties and the Court at this time, the following Level Three Scheduling Order shall apply to this case unless modified by the Court.

The parties may change the deadlines in this Order by written agreement at any time during the prosecution of this case, but may not change the pretrial conference date, deadlines for filing materials with Court, or the trial date without Court approval.

This case shall be ~~be tried~~ *be set for trial* before a jury on **November 8, 2016.** (29)

### I. PRELIMINARY MATTERS TO BE RESOLVED BY COURT

The following preliminary matters shall be resolved as follows:

**Defendants David and Daniel Shapira's Special Appearance ("Shapira Special Appearance")**: The Shapira Special Appearance is hereby set for hearing on November *[4-6]*, 2015. The parties shall file any briefing in connection with the Shapira Special Appearance in

R528

All Defendants' Motion to Abate, Motion to Dismiss under TBOC 21.553, and Special Appearance is set for hearing on ~~Oct 29~~ Nov 9 2015 at 3pm. If there is no ruling on Giant Eagle's Motion to Dismiss by a week before the hearing, the hearing will be reset.

accordance with the Texas Rules of Civil Procedure. Plaintiff shall serve his First Requests for Production and First Set of Interrogatories Directed at Threshold Issues to Defendants David and Daniel Shapira no later than September 22, 2015. Defendants David and Daniel Shapira shall make any objections and produce any responsive documents by October 9, 2015. David and Daniel Shapira shall submit for deposition limited to jurisdictional issues no later than October 23, 2015.

**Defendants' Motion to Abate by reason of Plaintiff's arbitration:** Defendants' Motion to Abate shall be heard by the Court on October ___, 2015. The parties shall file any briefing in connection with this motion in accordance with the Texas Rules of Civil Procedure. Participation by Defendants Daniel and David Shapira or by Defendant Giant Eagle in Defendants' Motion to Abate by reason of Plaintiff's arbitration shall be without prejudice to either the Shapira Special Appearance or Giant Eagle's Motion to Dismiss for Forum Selection Clause.

~~Any other preliminary matters raised by Defendants shall be set for hearing by this Court no later than November 6, 2015.~~

(27)

(4/11)

## II.    CASE SCHEDULING

~~MARCH~~ (4/11) 21, 2016

**DEADLINE FOR ANY PARTY SEEKING AFFIRMATIVE RELIEF TO DESIGNATE EXPERT WITNESSES AND PRODUCE EXPERT REPORTS**
Any Party seeking affirmative relief shall designate all witnesses from whom that Party intends to elicit expert opinion testimony no later than this date and shall simultaneously produce written reports containing information described in Rule 195.5 for all experts retained by, employed by, or otherwise subject to that Party's control.

~~APRIL~~ (5/12) 21, 2016

**DEADLINE FOR ANY PARTY OPPOSING AFFIRMATIVE RELIEF TO DESIGNATE EXPERT WITNESSES AND**

R529

## PRODUCE EXPERT REPORTS

Any Party opposing affirmative relief shall designate all witnesses from whom that Party intends to elicit expert opinion testimony no later than this date and shall simultaneously produce written reports, containing information described in Rule 195.5 for all other experts retained by, employed by, or otherwise subject to that Party's control.



~~MAY 21,~~ 2016

## DEADLINE FOR DESIGNATION OF REBUTTAL EXPERTS AND PROVIDE REPORTS

The Parties shall designate rebuttal experts from whom they intend to elicit expert opinion testimony regarding matters not reasonably anticipated prior to that Party's original expert designation deadline. Any Party designating a rebuttal expert shall simultaneously produce written reports, containing information described in Rule 195.5 for all rebuttal experts retained by, employed by, or otherwise subject to the designation Party's control.



~~JULY 4,~~ 2016

## DEADLINE TO JOIN ADDITIONAL PARTIES

No additional parties may be joined after this date, except on motion for leave showing good cause. This paragraph does not otherwise alter the requirements of Rule 38. The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.



~~JULY 1,~~ 2016

## DEADLINE FOR FILING AMENDED PLEADINGS ASSERTING NEW CLAIMS OR DEFENSES

All amendments asserting new claims or defenses must be filed by this date. Amended pleadings responsive to timely filed pleadings under this scheduling order may be filed after this deadline, if filed within 2 weeks after the pleading to which they respond.



~~SEPTEMBER 2,~~ 2016

## DISCOVERY CLOSES

All depositions shall be completed by this date and all written discovery requests shall have been served no later than August 2, 2016, so that responses are due not later than this date. Counsel may initiate discovery beyond this deadline by agreement.



~~SEPTEMBER 16,~~ 2016

## DEADLINE TO FILE MOTIONS TO COMPEL

Any motion to compel responses to discovery must be filed no later than this date, except for motions for sanctions as provided for by Rule 193.6.

---

R530

**~~SEPTEMBER 16, 2016~~** *10/7*

**MEDIATION DEADLINE** *John De Groote is appointed as mediator*
The Parties shall mediate the case no later than this date.

**~~SEPTEMBER 30, 2016~~** *10/21*

**DEADLINE TO FILE MOTIONS CHALLENGING EXPERT QUALIFICATIONS (DAUBERT/ROBINSON MOTIONS)**
Any objection or motion to exclude or limit expert testimony due to qualifications of the expert or reliability of opinions must be filed no later than this date. All evidence to offer in support of such motion must be filed with the motion.

**~~SEPTEMBER 30, 2016~~** *10/21*

**DEADLINE TO DESIGNATE RESPONSIBLE THIRD PARTIES**
Defendants shall file any motions for leave to designate responsible third parties, under §33.004 Civ. Prac. & Rem. Code by this date.

**~~SEPTEMBER 30, 2016~~** *10/21*

**DEADLINE TO FILE DISPOSITIVE MOTIONS**
**All dispositive motions shall be filed no later than this date.**

**~~OCTOBER 12, 2016~~** *11/2*

**EXCHANGE TRIAL MATERIALS DEADLINE**
The Parties shall exchange* the following materials by this date:
1. Proposed jury panel questionnaires, if any;
2. Motions in Limine;
3. Information described in Rule 166(e)-(1);
4. Designations of deposition testimony to be offered in direct examination;
5. List of Exhibits;**
6. Any demonstrative aids and affidavits; and
7. Any Exhibits not previously produced.
* The Parties shall not file these materials with the Court at this time.
** Each exhibit must be identified separately (rather than by category or group), except for records to be offered by way of business records affidavit.

**~~OCTOBER 19, 2016~~** *NOVEMBER 9*

**DEADLINE TO EXCHANGE OBJECTIONS TO OPPOSING PARTY'S TRIAL MATERIALS**
The Parties shall exchange* the following materials by this date:
1. Objections to opposing Party's proposed jury panel questionnaires, if any;
2. Written objections to the opposing Party's Motion in Limine;
3. Cross-designation of deposition testimony to be offered in direct examination;
4. Written objections to the opposing Party's proposed

R531

exhibits, demonstrative aides, or affidavits; and

5. Written objections to the opposing Party's designations of deposition testimony to be offered in direct examination. The Parties shall not file these materials with the Court at this time.

*NOVEMBER 14, 2016*
~~OCTOBER 24, 2016~~ **DEADLINE TO CONFER ON TRIAL MATTERS**

On or before this date, the attorneys in charge for all parties shall meet and confer on pretrial materials and objections, stipulations to exhibits, deposition designations to be submitted to the Court, and any other evidentiary matters, and will attempt to maximize agreement on all matters.

*NOVEMBER 18*
~~OCTOBER 28,~~ 2016 **DEADLINE FOR PARTIES\* \*\* TO FILE MATERIALS WITH COURT**

The Parties shall file the following materials with the Court by this date:

1. An estimate of the length of trial;
2. Motions in Limine;
3. Items and Materials stated in Rule 166 (d)-(m);
4. Designation of deposition testimony to be offered in direct examination;
5. Cross-designation of deposition testimony to be offered; and
6. Objections to opposing Parties': Proposed jury panel questionnaires; Motion in Limine; Designation of deposition testimony; Proposed exhibits; Demonstrative aides; and Affidavits.

* Plaintiff shall be responsible for filing a joint Pre-Trial Statement of the Parties containing all information required under this deadline that is agreed upon by the Parties.
** Each Party shall file materials separately that are not agreed upon by the Parties

*(23)*
NOVEMBER 2, 2016 **DEADLINE TO ANNOUNCE READY FOR TRIAL** ✓

*(29)*
NOVEMBER 8, 2016 ~~PROPOSED PREFERENTIAL (SPECIAL)~~ JURY TRIAL *SETTING*
9:30 A.M.

SIGNED this _α1_ day of _Septб_ , 2015.

---

**MODIFIED LEVEL 3 DOCKET CONTROL ORDER**          **Page 5**
02708-402/4826-2888-3496

R532

_____

PRESIDING JUDGE

02708-403/4826-2888-3496, v. 1

R533

# Tab M

486C - 000172

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| DICKSON PERRY, derivatively on behalf of EXCENTUS CORPORATION, | §<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | OF DALLAS COUNTY, TEXAS |
| BRANDON LOGSDON, JIM MILLS, GIANT EAGLE, INC., DAVID SHAPIRA, DANIEL SHAPIRA, AUTO-GAS SYSTEMS, INC., RANDY NICHOLSON, AND ALLIANCE DATA SYSTEMS, INC., and EXCENTUS CORPORATION. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | § | 68TH JUDICIAL DISTRICT |

## ORDER

Before the Court is Defendant Giant Eagle, Inc.'s Motion to Stay All Proceedings, Aside

from Outstanding Motions, Pending Resolution of Its Forthcoming Petition for Writ of

Mandamus ("the Motion"). On October 19, 2015 the parties appeared through their counsel.

Having considered the parties' briefing, the arguments of counsel, and all of the evidence

properly before it, the Court hereby DENIES the Motion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's

Motion is DENIED.

SIGNED this ___ day of _____, 2015.

_____
HON. MARTIN HOFFMAN, PRESIDING JUDGE

**ORDER**                                                                                          **Page 1**

R534

# Tab N

CAUSE NO. DC-15-03853

| | | |
|---|---|---|
| **DICKSON PERRY, derivatively on behalf** § | | **IN THE DISTRICT COURT** |
| **of EXCENTUS CORPORATION,** § | | |
| § | | |
| **Plaintiff,** § | | |
| § | | |
| **v.** § | | **OF DALLAS COUNTY, TEXAS** |
| § | | |
| **BRANDON LOGSDON, JIM MILLS,** § | | |
| **GIANT EAGLE, INC., DAVID SHAPIRA,** § | | |
| **DANIEL SHAPIRA, AUTO-GAS** § | | |
| **SYSTEMS, INC., RANDY NICHOLSON,** § | | |
| **AND ALLIANCE DATA SYSTEMS, INC.,** § | | |
| **and EXCENTUS CORPORATION.** § | | |
| § | | |
| **Defendants.** § | | **68TH JUDICIAL DISTRICT** |

## RESPONSE TO PLAINTIFF'S [PROPOSED] LEVEL THREE SCHEDULING ORDER

Defendants Giant Eagle, Inc. ("Giant Eagle"), David Shapira, and Daniel Shapira (collectively, "Giant Eagle and the Shapiras"), through undersigned counsel, respectfully submit this Response to Plaintiff's [Proposed] Level Three Scheduling Order (the "Proposed Order") as follows:[1]

Giant Eagle and the Shapiras have no objection to many aspects of Plaintiff's Proposed Order, except (1) the schedule should commence only at the appropriate time, after a series of preliminary matters have been decided; and (2) given the several preliminary matters either pending or not yet scheduled for argument, the large number of Defendants, and the nature of the claims, the trial in this action should be scheduled for no sooner than April 2017 to allow sufficient time for discovery and summary judgment briefing.

---

[1] Giant Eagle and the Shapiras submit this Response subject to, reserving, and without prejudice to Giant Eagle's Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause and Defendants David Shapira's and Daniel Shapira's Verified Special Appearance and Motion Objecting to Jurisdiction.

A0954766.3

**RESPONSE TO PLAINTIFF'S [PROPOSED] LEVEL THREE SCHEDULING ORDER**      **Page 1**
4833-3615-0537

Defendants David and Daniel Shapira's Special Appearance (the "Shapira Special Appearance") hearing should not proceed until the Court rules on Giant Eagle's Motion to Dismiss for Collateral Estoppel or, in the Alternative, Pursuant to the Governing Forum Selection Clause, as that ruling may eliminate the need for the Shapira Special Appearance. A hearing on Defendants' Motion to Abate is similarly premature, as it is not yet clear which Defendants will be in the case. A short delay to address remaining preliminary matters will not prejudice the Plaintiff Dickson Perry ("Mr. Perry"). Mr. Perry has been engaged since August in substantial discovery in his employment arbitration proceeding against Excentus Corporation, covering issues that largely overlap with the issues in this action. The arbitration hearing is currently scheduled for November 2015.

Defendants Giant Eagle and the Shapiras respectfully request that the Court refrain from entering a scheduling order while the aforementioned preliminary matters are pending. Alternatively, Giant Eagle and the Shapiras request that the Court set only the trial date for no sooner than April 2017 pending resolution of these preliminary matters.

Dated: September 18, 2015

Respectfully submitted,

/s/ Orrin L. Harrison III

Orrin L. Harrison III
  Texas Bar No. 09130700
  oharrison@ghetrial.com
Hayley Ellison
  Texas Bar No. 24074175
  hellison@ghetrial.com
GRUBER HURST ELROD
  JOHANSEN HAIL SHANK, LLP
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6828
Fax: 214-855-6808

-and-

Bernard Marcus
  marcus@marcus-shapira.com
Scott Livingston
  livingston@marcus-shapira.com
Jonathan Marcus
  jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Telephone: 412-338-5200
Fax: 412-391-8758

**Attorneys for Giant Eagle, Inc., David Shapira, and Daniel Shapira**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above in accordance with the Texas Rules of Civil Procedure, on this the 18th of September, 2015.

*/s/ Hayley Ellison*
Hayley Ellison

## CERTIFICATE OF CONFERENCE

I, the undersigned attorney, hereby certify to the Court that counsel for Giant Eagle and the Shapiras has conferred with counsel for all Defendants regarding the issues presented by this Response, and counsel for all Defendants have indicated they agree to the relief requested in this Response.

*/s/ Hayley Ellison*
Hayley Ellison
